No. 24-50783

# In the United States Court of Appeals for the Fifth Circuit

La Unión del Pueblo Entero, et al.,

*Plaintiffs-Appellees,*

*v.*

Gregory W. Abbott, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Texas, San Antonio Division

## DEFENDANTS' EMERGENCY MOTION TO STAY DISTRICT COURT ORDER AND PERMANENT INJUNCTION PENDING APPEAL AND FOR A TEMPORARY ADMINISTRATIVE STAY

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Aaron L. Nielson
Solicitor General

Lanora C. Pettit
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

Counsel for State Defendants-
Appellants

# Certificate of Interested Persons

No. 24-50783

La Unión del Pueblo Entero, et al.,
*Plaintiffs-Appellees,*

*v.*

Gregory W. Abbott, et al.,
*Defendants-Appellants.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, State Appellants, as governmental parties, need not furnish a certificate of interested persons.

/s/ Lanora C. Pettit
Lanora C. Pettit
*Counsel of Record for*
*State Defendants-Appellants*

i

# Introduction and Nature of Emergency

It is blackletter law that "federal court[s] should avoid altering state election rules close to an election," *Tex. League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 142 (5th Cir. 2020) (citing *Purcell v. Gonzalez*, 549 U.S. 1, 6 (2006) (per curiam); *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam))—a settled rule that the district court deemed inapplicable here. With only 23 days until early voting starts and at least 7 days after Counties *already* have started mailing out absentee ballots, the district court enjoined enforcement of Texas's paid-vote-harvesting ban. And if that weren't enough, the injunction creates different voting rules for voters participating in the same election. After all, it applies to the District Attorneys of only 3 of Texas's 254 counties, as well as the Secretary of State and Attorney General who cannot directly enforce the law at all.

Absent an emergency stay by this Court, the injunction will irreparably injure Texas's sovereignty and confuse voters, potential voter assistants, and election officials alike. It will also result in different rules being applied to an in-progress election. Therefore, as the Court has already previously done with respect to this same voting statute and same district court, *see* Orders, *United States v. Paxton*, No. 50885 (5th Cir. Dec. 6, 2023 & Dec. 15, 2023) (granting administrative stay and then stay pending appeal) (App.D & App.E), Defendants respectfully urge the Court to promptly enter a temporary administrative stay and a stay pending appeal.

# Background

In 2021, as part of Senate Bill 1 ("S.B.1"), Texas banned paid vote harvesting, which it defined as the "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." Tex. Elec. Code §276.015(a)(2). This ban only applies to interactions that (1) are performed for compensation or benefit, (2) occur in the presence of a ballot or during the voting process, (3) involve an official ballot or mail-in ballot, (4) are conducted in-person with a voter, and (5) are designed to deliver votes for or against a specific candidate or measure. *Id.* §276.015.

Among challenges to dozens of provisions of S.B.1, some of which are already pending before the Court, *see Paxton*, No. 50885, Plaintiffs—a coalition of organizations rather than individual voters—facially challenged this common-sense voter-integrity provision as violating free speech and being unconstitutionally vague. On September 11, 2023, the district court started its bench trial on Plaintiffs' claims and on February 13, 2024, heard closing arguments. Then on September 28, 2024— seven months later and only 23 days before early voting starts—the district court issued its opinion enjoining Defendants from enforcing the paid-vote-harvesting ban. *See* Findings of Fact and Conclusions of Law (App.A). On September 30, 2024, Texas asked the district court to stay its injunction, which was denied the next day. *See* Order Denying Motion for Stay Pending Appeal (App.F).

# Statement of Jurisdiction

The Court has jurisdiction under 28 U.S.C. §1292.

# Argument

The district court has declared unconstitutional a major state law that has been in effect for over three years in the middle of an ongoing presidential election. Accordingly, all four traditional factors favor a stay: (1) the State Defendants are likely to succeed on the merits; (2) they will suffer irreparable harm absent a stay; (3) Plaintiffs will not be substantially harmed by a stay; and (4) the public interest favors a stay. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). Moreover, where, as here, the "balance of the equities weighs *heavily* in favor of granting the stay," only a "*serious legal question*" about the merits is required. *Tex. Dem. Party v. Abbott*, 961 F.3d 389, 397 (5th Cir. 2020).

## I.    The Equities Favor Granting a Stay.

The equities strongly favor staying an injunction that disrupts the rules governing an election that has already begun. Indeed, the injunction irreparably injures not only the State's sovereignty but also the orderly administration of a major election—not to mention exposing both voters and those who seek to assist them to potential liability should the Court (as it is likely to do) reverse the injunction after the election. By contrast, a stay will not harm Plaintiffs, who have no constitutionally protected interests implicated by a regulation of mail-in ballots.

### A. The State and the public interest will suffer irreparable injury without a stay.

**1.**    A stay is vital here under the well-established *Purcell* principle, which provides that federal courts "should not alter state election laws in the period close to an election." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28

(2020) (Kavanaugh, J., concurring) (upholding Seventh Circuit's stay of injunction entered six weeks before the general election). This rule flows from the fact that elections are complex affairs, and changes to election rules—even minor ones—without care and planning risks chaos that will neither ensure the integrity of an election nor engender public confidence in its outcome. *See, e.g.*, *Purcell*, 549 U.S. at 5-6; *see also Robinson v. Ardoin*, 37 F.4th 208, 228 (5th Cir. 2022) (per curiam).[1] That is, it reflects that "[w]hen an election is close at hand, the rules of the road must be clear and settled. Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Merrill v. Milligan*, 142 S.Ct. 879, 880-81 (2022).

Although "the Supreme Court has never specified precisely what it means to be 'on the eve of an election' for *Purcell* purposes," *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1371 (11th Cir. 2022)), this injunction comes far too late. And the risk of such confusion and disruption will only continue to increase as the "election draws closer." *Purcell*, 549 U.S. at 5. Thus, the Supreme Court has applied the *Purcell* principle to stay injunctions entered 29, 33, and even 60 days before elections. *Robinson*, 37 F.4th at 229 (citations omitted).

Here, the district court has issued an order—with respect to some but not all Counties—addressing a provision that governs the mechanism of mail-in balloting *after* such ballots have already been dispatched. *See* App.A. Leaving aside that the

---

[1] This is in addition to the sovereign injury the State *always* suffers when its law is enjoined—and will suffer here. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

*months* of training that Counties must undertake to ensure that election judges and clerks know the rules they are to apply,[2] they have *already* started mailing out absentee ballots. Federal and state law required counties to mail ballots to military personnel overseas by September 21, 2024—seven days before the district court's order. 52 U.S. Code § 20302(a)(8); Tex. Elec. Code § 86.004(b). Each mail-in ballot included a letter stating, in bold, that "**[i]f anyone attempts to pressure or intimidate you, we urge you to report this**" and that an assistant "**cannot suggest how you should vote.**" Tex. Sec'y of State, *Form 6-29*, https://perma.cc/N5FY-XSCL. Those instructions further state that any person who "**deposits your [c]arrier [e]nvelope in the mail or delivers your ballot to a common or contract carrier**" must disclose "**whether he or she received or accepted any form of compensation or other benefit**." Tex. Sec'y of State, *Form 6-26*, https://perma.cc/QGT9-UH9E. As only Texas's paid-vote-harvesting ban mentions compensation or other benefits, *see* Tex. Elec. Code §276.013, it is unclear whether those instructions are proper. But, at minimum, any voter who has already received these instructions will not know whether compensation disclosures are still necessary. Accordingly, "[w]hatever *Purcell'*s outer bounds," this "case fits within them." *League*, 32 F.4th at 1371 (discussing challenge to voter-registration rules while registration underway).

    **2.**    The district court acknowledged the *Purcell* principle, but—as before when it considered a provision of S.B. 1, *see* App.D & App.E—it dismissed that principle's

---

[2] *See, e.g.*, Fort Bend County, *Training Dates*, https://perma.cc/4ENP-5NYB.

relevance. App.A.75-76. This time, the court asserted that *Purcell* was inapplicable because it governs only provisions addressing the "mechanics and procedures" of voting. *Id*. at 76. The district court insists that an injunction here does not "create the potential for confusion and disruption of the election administration" because it "does not affect any voting or election procedures." *Id.* at 75. The court further explained that "an injunction against enforcement proceedings is removed in space and time from the mechanics and procedures of voting" and is thus "unlike an order requiring affirmative changes to the election process before it occurs." *Id*. at 76. This is wrong for several reasons.

To start, the State is aware of no case in which the Supreme Court has limited the *Purcell* principle to the "mechanics" of voting. To the contrary, the Supreme Court has applied the principle to "substantive" issues—for example, gerrymandering. *See Robinson v. Callais*, 144 S.Ct. 1171, 1171-72 (2024); *Merrill*, 142 S. at 879-80; *North Carolina v. Covington*, 585 U.S. 969, 979 (2018) (per curiam).

Even if the *Purcell* principle applies only to mechanics and procedures, Texas's paid-vote-harvesting ban qualifies as both because it applies only to interactions that (1) are performed for compensation or benefit, (2) occur in the presence of a ballot or during the voting process, (3) "involve an official ballot or ballot by mail", (4) are "conducted in-person with a voter", and (5) are "designed to deliver votes for or against a specific candidate or measure." Tex. Elec. Code § 276.015(e). These requirements—location, intent, and payment conditions with respect to harvesting votes—are just as mechanical and procedural as the eligibility requirements, mask-

mandate exemptions, and ballot forms that the district court acknowledged *would* be subject to *Purcell* even under its own rule. App.A.76 n.46.

The threat of irreparable harm to the State absent a stay, moreover, also means that the public interest favors a stay. "Because the State is the appealing party, its interest and harm merge with that of the public." *Veasey*, 870 F.3d at 391; *see also, e.g.*, *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers).

## B.   The Plaintiffs will suffer no injury from a stay.

The harm to the State and to the public outweighs any supposed harm to Plaintiffs. An injunction requires a showing of "irreparable harm" that is *likely*, not merely possible. *See, e.g.*, *Winter v. NRDC*, 555 U.S. 7, 22 (2008); *see also Crown Castle Fiber, LLC v. City of Pasadena*, 76 F.4th 425, 441 (5th Cir. 2023) (applying *Winter* standard in context of permanent injunction). And the threatened harm must be "imminent." *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975). In considering that factor, "the maintenance of the status quo is an important consideration in granting a stay." *E.T. v. Paxton*, 19 F.4th 760, 770 (5th Cir. 2021). Here, a stay will not substantially injure Plaintiffs but will simply maintain the status quo that has existed in Texas since 2021, when S.B. 1 went into effect.

In holding to the contrary, the district court relied upon the principle that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." App.A.75 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.)). But Plaintiffs' constitutional rights are not implicated by this common-sense regulation of mail-in ballots. After all, Plaintiffs

have numerous ways to influence elections: They can try to persuade voters all they want *outside the presence of a ballot*. What they cannot do, however, is engage in vote harvesting "in exchange for compensation or other benefit." Tex. Elec. Code § 276.015(b). As explained below, this is a regulation of conduct, not speech.

## II.    The State Will Likely Succeed on the Merits.

Because the "balance of the equities weighs *heavily* in favor of granting the stay," even a "*serious legal question*" is enough to require a stay. *Tex. Dem. Party*, 961 F.3d at 397. Here, however, the lower standard of proof is of no moment. The State Defendants are likely to succeed on the merits because under ordinary canons of statutes of construction, the provision easily satisfies the void-for-vagueness standard and is a reasonable and content-neutral regulation of either conduct or the time, place and manner of speech. And even if the Court were to disagree on all of that, the district court's injunction cannot be affirmed as written because it lacked jurisdiction to issue that injunction as to the Secretary or the Attorney General.

### A. The paid-vote-harvesting ban is not unconstitutionally vague.

Under the Fourteenth Amendment, statutes must give "'fair notice' of the conduct [the] statute proscribes." *Sessions v. Dimaya*, 584 U.S. 148, 155-56 (2018) (citation omitted). "Fair notice" does not require precision, and indeed, "[m]any perfectly constitutional statutes use imprecise terms." *Id.* at 159. Due process "does not require impossible standards" of clarity. *United States v. Petrillo*, 332 U.S. 1, 7 (1947). The district court gave short shrift to this principle in holding that the terms

"compensation," "benefit," and "physical presence" rendered the statute unconstitutionally vague.

Start with "compensation," which means "[r]emuneration and other benefits received in return for services rendered; esp., salary or wage." *Compensation*, Black's Law Dictionary (12th ed. 2024). An ordinary individual thus would understand that "compensation" "consists of wages and benefits in return for services" and "is payment for work." *Id.* (quoting Kurt H. Decker & H. Thomas Felix II, *Drafting and Revising Employment Contracts* §3.17, at 68 (1991)). People use "compensation" in everyday life to mean wages and salary for work—not sharing bottled water with volunteers when it is hot outside (which is inevitable in Texas).

The district court erroneously found vagueness based largely on the fact that *other* provisions of the Election Code use different definitions of "compensation," which generally refer to fees and payments. App.A.68-69. But when interpreting an *undefined* term, the district court should have given the words in the vote-harvesting ban their ordinary meaning. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 69, at 195 (2012). Moreover, the district court was required to indulge in any reasonable interpretation that *avoided* constitutional infirmity. *See Ostrewich v. Tatum,* 72 F.4th 94, 107 (5th Cir. 2023). The district court did the opposite when it read "compensation" broadly to include not only *monetary* compensation but also meals, bus fare, and t-shirts. App.A.68.

Next, section 276.015(1) defines a benefit as "anything reasonably regarded as a gain or advantage, including a promise or offer of employment, a political favor, or an official act of discretion[.]" Tex. Elec. Code §276.015(a)(1). Under the

associated-words canon, the phrase "anything reasonably regarded as a gain or advantage" means something like the accompanying examples of "employment," "political favors," and "official acts." *See* Scalia & Garner, *supra*. Items, like food, water, and letters of recommendation bear no resemblance to employment, political favors, and official acts.

Finally, the law's scienter requirement also removes any vagueness concerns over "physical presence"—itself, a common term that is generally understood to include an "in-person interaction." *See, e.g.*, 42 U.S.C. § 3030s(a). The district court acknowledged that scienter can cure vagueness but observed that "knowledge that there is a ballot in the vicinity" does not require knowledge that the person is in the "physical presence" of a ballot. App.A.70. Even if that were true, Texas law includes a default *mens rea* requirement of criminal recklessness, Tex. Penal Code §6.02(c), meaning a paid persuader cannot be criminally liable unless he *at least* "consciously disregards a substantial and unjustifiable risk" that a ballot is present, *id.* §6.03(c). Merely being unsure if there is a ballot nearby falls well short of that demanding standard.

### B. The paid-vote-harvesting ban complies with the First Amendment.

#### 1. The vote-harvesting ban is not overbroad.

The paid-vote-harvesting provision is also far from constitutionally overbroad. Under the overbreadth doctrine, courts hold statutes "facially unconstitutional even though [they have] lawful applications" if they "'prohibit[] a substantial amount of protected speech' relative to [their] 'plainly legitimate sweep.'" *United States v. Hansen*, 599 U.S. 762, 769-70 (2023) (quoting *United States v. Williams*, 553 U.S.

285, 292 (2008)). Here, despite proceeding all the way to trial, Plaintiffs have offered nothing more than farfetched hypothetical examples of potentially chilled speech. Yet "[t]he 'mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.'" *Williams*, 553 U.S. at 303 ((citation omitted)).

For example, Plaintiffs' hypotheticals include a paid canvasser unknowingly advocating for a particular vote while a ballot is hidden somewhere in the room or even in a voter's purse. *See*, *e.g.*, Second Amended Complaint, ECF No. 208 at ¶294 (Jan. 25, 2022) (App.B); Transcript of Bench Hearing at 1790-81 (Sept. 22, 2023) (App.C). But such a circumstance would not satisfy the scienter requirement discussed above. Moreover, Plaintiffs presented no actual evidence that (1) such a scenario has ever occurred or realistically would occur, (2) prosecutors are likely to learn it happened, or (3), having learned of such an event, a prosecutor would charge individuals under such outlandish facts. That the law "might cover" such farfetched circumstances does not establish constitutional overbreadth. *Cf. Williams*, 553 U.S. at 292, 302-03.

The district court fares no better by speculating that "a voter discussing his mail ballot with a like-minded GOTV volunteer would arguably violate Section 7.04 by offering a glass of water as a pick-me-up during a hot afternoon of door-knocking." App.A.56. As discussed above, water is clearly not "compensation" or a "benefit." *Supra* pp. 8-10. And, given that Plaintiffs presented no evidence prosecutors would pursue voters for giving out water, this Court is unlikely to uphold an overbreadth challenge based on such speculation. *See Williams*, 553 U.S. at 292, 302-03.

**2.    The vote-harvesting ban is a content-neutral restriction on the manner of narrow situations of paid election influence.**

The Court is also unlikely to hold that the injunction survives the familiar *Anderson/Burdick* test—or that the vote-harvesting ban is subject to strict scrutiny because it addresses core political speech. App.A.48-49. True, strict scrutiny typically applies to content-based restrictions on speech. *Cf. Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). But the Supreme Court has recognized that a different test is needed in this context because elections themselves are a form of political expression, and all "[e]lection laws will invariably impose some burden upon individual voters." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). Accordingly, "subject[ing] every voting regulation to strict scrutiny … would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Id.* To avoid this problem, courts apply a "more flexible standard" to election laws. *Id.* at 434; *see also Voting for America Inc. v. Steen*, 732 F.3d 382, 385 (5th Cir. 2013) (recognizing lower standard in canvassing restriction challenge). Under this more flexible standard, the *Anderson/Burdick* test, the level of scrutiny applied depends on the severity of the restriction. 504 U.S. at 434. Strict scrutiny applies to severe restrictions, but "the State's important regulatory interests are generally sufficient to justify" other "reasonable, nondiscriminatory restrictions." *Id.* Here, as a regulation of the privilege of voting by mail, it is questionable if anything more than a rational basis is required. *See Tex. Dem. Party v. Abbott*, 961 F.3d 389, 406 (5th Cir. 2020). But even if *Anderson/Burdick* did require a heightened level of scrutiny, the challenged provisions here would easily pass it.

**a.** The paid-vote-harvesting ban is a content-neutral restriction—analogous to time, place, and manner restrictions—that is subject at most to a deferential form of intermediate scrutiny under *Anderson/Burdick*. Specifically, the ban applies only where an individual is knowingly "in the physical presence" of a ballot—an inherently narrow range of scenarios. *Supra* p.10. Paid persuaders otherwise remain free to say whatever they want on behalf of whichever candidate they please so long as a ballot is not immediately present—which will be the *vast majority* of the time. In this respect, the ban functions like constitutionally permissible bans on solicitation near polling places. *See Ostrewich,* 72 F.4th at 106-07; *Burson v. Freeman*, 504 U.S. 191, 210 (1992). And the State has a "compelling interest"—not just an important one—"in protecting voters from confusion and undue influence." *Burson*, 504 U.S. at 199. The risk that paid partisans will unduly pressure voters—particularly the elderly—to fill out their ballots is especially acute when the voter has their ballot in hand.[3] *See Veasey v. Abbott*, 830 F.3d 216, 239 (5th Cir. 2016).

**b.** Even if strict scrutiny applied, the vote-harvesting ban would survive review. *First*, the State has a compelling interest "in protecting voters from confusion and undue influence," *id.*, and "in preserving the integrity of its election process," *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 685 (2021). These interests are reflected by all 50 States requiring secret ballots and limiting access to

---

[3] It is no response that the district court was unconvinced such fraud would occur. *See, e.g., Crawford v. Marion Cnty Elec. Bd.*, 553 U.S. 181, 193-95 (2008) (allowing States to enact prophylactic legislation even in the absence of fraud).

13

polling places to prevent voter coercion. *See Burson*, 504 U.S. at 206. The same concerns that justify protecting in-person voters apply even more forcefully to mail-in voters, whose ballots are, by definition, "completed far from any government office or employee." *Vote.Org v. Callanen*, 89 F.4th 459, 489 (5th Cir. 2023); *see also Brnovich*, 594 U.S. at 685-86. *Second*, the statute is narrowly tailored as it restricts paid persuaders from advocating while physically in the presence of a ballot—a moment when the risk of pressure is highest. *Veasey*, 830 F.3d at 239. And "[l]imiting the classes of persons who may handle early ballots to those less likely to have ulterior motives" furthers the State's compelling interests. *Id.* That is, if every State can shield in-person voting from pressure by paid persuaders, surely Texas can extend the same protection to voters who fill out their ballots elsewhere.

**c.** The district court improperly relied on campaign finance caselaw to conclude that *any* use money in an election context is inherently protected speech. *See* App.A.52. Such cases, however, deal with limits on how much people can spend on advocating for their preferred candidates—not on which services such money can be spent. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010); *Buckley v. Valeo*, 424 U.S. 1, 19 (1976) (per curiam). This distinction makes all the difference. No one would read those cases to authorize, for example, buying votes merely because money is used—a practice that all would surely agree is anathema to our democratic process. They similarly say nothing about the only conduct barred by Texas's vote-harvesting ban: The use of paid service providers either to collect completed ballots or influence voters in the presence of the physical ballots. *See* Tex.

Elec. Code § 276.015. Therefore, the vote-harvesting ban complies with the First Amendment, and the district court erred in holding otherwise.

## C. The district court lacked jurisdiction to enjoin the Attorney General and Secretary.

Even if the Court were to conclude that some portion of the injunction could be stayed (and it should not), a stay would still be appropriate because the injunction *as written* cannot be affirmed. Because Texas's Attorney General and Secretary of State do not enforce this criminal statute, they are immune from suit.

### 1. The Attorney General and Secretary have sovereign immunity.

Because of sovereign immunity, "individuals may not sue a state" unless (1) "Congress abrogates state sovereign immunity through the Fourteenth Amendment," (2) "the state itself consents to suit," or (3) "a state actor enforces an unconstitutional law." *Russell v. Jones*, 49 F.4th 507, 512 (5th Cir. 2022) (citation omitted). Of course, the *Ex parte Young* doctrine provides a limited exception to this rule "where a state actor enforces an unconstitutional law." *Id.* (citing *Ex parte Young*, 209 U.S. 123, 160 (1908)). But for the doctrine to apply, "state officials must have some connection to the state law's enforcement" and "have taken some step to enforce" it. *Tex. Democratic Party*, 961 F.3d at 400-01 (cleaned up). The district court cited two possible ways the defendants might enforce the vote-harvesting provision. Neither is sufficient because neither involves "compelling" or "constraining" anyone to comply with the Election Code. *Mi Familia Vota v. Ogg*, 105 F.4th 313, 332 (5th Cir. 2024).

*First*, the district court asserted that the Attorney General *must* investigate certain election crimes, *may* investigate other crimes (including at the instigation of the Secretary), and is "*likely*" to investigate vote-harvesting crimes specifically. App.A.31-32. But this Court has already stated—with respect to this very statute— that "investigations" are not "enforcement" and will not bring a state official within the scope of *Ex parte Young*. *See Mi Familia Vota*, 105 F.4th at 331; *see also id.* at 1332 ("Furthermore, to the extent the Plaintiffs argue Ogg's ability to investigate election code violations compels or constrains their conduct, that power does not rise to the level of compulsion or constraint needed.").

*Second*, the district court then noted that the Attorney General and Secretary have (1) enforced and referred for investigation, respectively, election laws in the past and (2) not disavowed an intent to do so in the future. App.A.32-33. Yet the Secretary's role is largely administrative and informational—not prosecutorial. *See, e.g.*, *Richardson v. Flores*, 28 F.4th 649, 654 (5th Cir. 2022) (discussing, *inter alia*, *Tex. Dem. Party*, 978 F.3d at 179). And her investigation referrals are not enforcement actions. *See Mi Familia Vota*, 105 F.4th at 332.

Moreover, the Texas Court of Criminal Appeals struck down the Election Code statute purporting to give the Attorney General such authority. *See Ostrewich*, 72 F.4th at 101 (citing *State v. Stephens*, 663 S.W.3d 45, 57 (Tex. Crim. App. 2021)).[4] And this Court has already rejected the district court's suggestion (at App.A.42-44) that "[s]peculation that [the Attorney General] might be asked by a local prosecutor

---

[4] While the State maintains that *Stephens* was wrongly decided, *Stephens* is nonetheless binding on this Court.

to 'assist' in enforcing" criminal laws is sufficient "to support an *Ex parte Young* action." *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020) (citation omitted). Indeed, so long as *Stephens* is the law, "the Attorney General and Secretary of State" have no authority "to exercise undue influence over [a district court's exclusive] prosecutorial discretion." *Mi Familia Vota*, 105 F.4th at 331.

### 2. The Plaintiffs lack standing.

Such speculation is also insufficient to establish standing. Under Article III, Plaintiffs have standing only if they have suffered an injury in fact that is "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *California v. Texas*, 593 U.S. 659, 668-69 (2021). Plaintiffs must also show that their alleged self-censorship arises from a fear of prosecution that is not "imaginary or wholly speculative." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979). A fear of prosecution is "imaginary or speculative" where plaintiffs "do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible." *Id.* at 289-99 (citation omitted). For the reasons discussed above, plaintiffs have shown no such reasonable fear of prosecution for protected conduct. *Supra* pp. 15-16.[5]

---

[5] The district court's reliance on *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023), is misplaced. App.A.42. Plaintiffs fail to show they face the daunting threat that the plaintiff did in *303 Creative. See* 600 U.S. at 580 (plaintiff was required to "show 'a credible threat' existed that [the State] would, in fact, seek to compel speech from her that she did not wish to produce." (citation omitted)). Indeed, that plaintiff pointed to a recent, concrete example of a prosecution under similar circumstances, *id.* at 581-82, whereas Plaintiffs here lack such real-world evidence. Furthermore, at issue here is primarily organizational standing, which the Supreme

To prove traceability, Plaintiffs also must show that the Attorney General's and Secretary's "actual or threatened *enforcement*" of the vote-harvesting ban caused Plaintiffs' alleged injury—here, chilling of their paid vote harvesting. *California*, 593 U.S. at 669-70. The Article III standing and *Ex parte Young* analyses for enforcement "significantly overlap." *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019) (citation omitted). Plaintiffs lack standing for the same reason that they fall outside the scope of *Ex parte Young*: Neither the Secretary nor the Attorney General enforces the paid-vote-harvesting ban.

## III.    The Court Should Enter a Temporary Administrative Stay.

For the reasons set out above, Appellants are entitled to a stay pending appeal. Appellants request that the Court enter an order granting a stay **as soon as possible**—given that ballots have already been mailed—and by no later than **October 10, 2024**. In the alternative to ruling on the stay motion by that time, Appellants request that the Court immediately enter an administrative stay while it considers this motion. Such stays "freeze legal proceedings until the court can rule on a party's request for expedited relief." *United States v. Texas*, 144 S.Ct. 797, 798 (2024) (Barrett, J., concurring in denial of application to vacate stay) (citation omitted). They are a common "docket-management" tool and "do not typically reflect the court's consideration of the merits of the stay application." *Id.*

---

Court significantly curtailed in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). And the district court's nod towards associational standing (at App.A.45 n.32) ignored that for a facial claim, individualized member discovery is now all but essential under *Moody v. NetChoice, LLC*, 144 S.Ct. 2383 (2024).

Such stays are routine where activities in the district court or events outside the court are moving so quickly that even a reasoned stay pending appeal may prove too late. *BST Holdings, L.L.C. v. OSHA*, No. 21-60845, 2021 WL 5166656, at *1 (5th Cir. Nov. 6, 2021) (per curiam) *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 227-28 (5th Cir. 2020); *M.D. ex rel. Stukenberg v. Abbott*, No. 18-40057, ECF 12 (5th Cir. Jan. 19, 2018). Indeed, it has done so in an earlier appeal involving a different order from the same judge addressing a different provision of the same statute—there too issued in the middle of an ongoing election. *See* App.D & App.E.

Here, an administrative stay would be, in the parlance of the All Writs Act, "necessary or appropriate in aid of" this Court's collateral-order jurisdiction. *See* 28 U.S.C. § 1651(a). As noted above, because voting has already started, time is of the essence. At the same time, this case involves multiple constitutional issues and an extensive record, including a trial that spanned six weeks—and about which the district court has been contemplating findings of fact and conclusions of law for more than six months. An administrative stay would preserve the status quo long enough to allow the Court to adequately consider whether a full stay pending appeal is appropriate before Texas's ongoing election is further disrupted. *See Veasey v. Abbott*, 870 F.3d 387, 392 (5th Cir. 2017) (per curiam) (holding that "a temporary stay is appropriate to 'suspend[] judicial alteration of the status quo.'").

## CONCLUSION

The Court should enter a stay pending appeal of the district court's order and permanent injunction by **October 10, 2024**. Additionally, or alternatively, the Court should immediately enter a temporary administrative stay while it considers this motion.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

AARON L. NIELSON
Solicitor General

BRENT WEBSTER
First Assistant Attorney General

/s/ LANORA C. PETTIT
LANORA C. PETTIT
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for State Defendants-Appellants

## Certificate of Compliance with Rule 27.3

I certify the following in compliance with Fifth Circuit Rule 27.3:

- Before filing this Motion, counsel for Appellants contacted the Clerk's Office and opposing counsel to advise them of the intent to file this Motion. Counsel for Appellant also made telephone calls to the Clerk's Office before filing this Motion.

- The facts stated herein supporting emergency consideration of this motion are true and complete.

- The Court's review of this motion is requested as soon as possible, but no later than **October 10, 2024**. In addition, or alternatively, Appellant respectfully requests an immediate administrative stay while the Court considers this motion.

- True and correct copies of relevant orders and other documents are attached as an appendix to this motion.

- This motion is being served at the same time it is being filed.

/s/ Lanora C. Pettit
Lanora C. Pettit

## Certificate of Conference

On October 3, 2024, counsel for State Defendants-Appellants conferred with counsel for all Plaintiffs-Appellees, who indicated they are all opposed to this motion. The filing of this motion was also preceded by telephone calls to the Clerk's Office on October 3, 2024, advising of the intent to file the emergency motion.

/s/ Lanora C. Pettit
Lanora C. Pettit

## CERTIFICATE OF SERVICE

On October 3, 2024, this document was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Lanora C. Pettit
LANORA C. PETTIT

## CERTIFICATE OF COMPLIANCE

This motion complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,240 words, excluding the parts of the motion exempted by rule; and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Lanora C. Pettit
LANORA C. PETTIT

# Appendix

Findings of Fact & Conclusions of Law, ECF No. 1157 (Sept. 28, 2024) .......App. A

Second Amended Complaint, ECF No. 208 (Jan. 25, 2022) ......................... App. B

Transcript of Bench Hearing (Sept. 22, 2023) ................................................App. C

Unpublished Order, *United States of America, et al. v. Ken Paxton, et al.*,
   No. 50885 (5th Cir. Dec. 6, 2023) ............................................................. App. D

Order Granting Stay Pending Appeal, *United States of America, et al. v. Ken Paxton, et al.*, No. 50885 (5th Cir. Dec. 15, 2023) ...............................App. E

Order Denying Motion for Stay, ECF No. 1161 (Oct. 1, 2024)......................App. F

# Appendix A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | 5:21-CV-0844-XR |
| | § | [Consolidated Cases] |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## (OVERBREADTH, VAGUENESS, AND FREE SPEECH CHALLENGES TO S.B. 1 § 7.04)

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 3

PROCEDURAL HISTORY ...................................................................................... 5

FINDINGS OF FACT .............................................................................................. 7

    THE CANVASSING RESTRICTION ................................................................ 7

    THE PARTIES ..................................................................................................... 8

        The OCA Plaintiffs ........................................................................................ 9

            OCA-Greater Houston ............................................................................... 9

            League of Women Voters of Texas ......................................................... 11

        The LULAC Plaintiffs ................................................................................. 12

            League of United Latin American Citizens ............................................. 12

            Texas AFT ................................................................................................ 13

            Texas Alliance for Retired Americans ................................................... 14

        The LUPE Plaintiffs ................................................................................... 15

            La Union Del Pueblo Entero ................................................................... 15

            Mexican American Bar Association of Texas ......................................... 16

        Defendants ................................................................................................... 16

            The Texas Attorney General .................................................................... 17

            The Texas Secretary of State .................................................................. 19

            The County DAs ....................................................................................... 20

    IMPACT OF THE CANVASSING RESTRICTION ...................................... 21

        There is widespread confusion about how to interpret the Canvassing Restriction ............ 21

        Confusion about the meaning of "compensation or other benefit" ................................. 22

        Confusion about the meaning of "physical presence" ...................................... 23

        Confusion about canvassers' ability to provide voting assistance ..................................... 23

        The Canvassing Restriction has chilled Plaintiffs' in-person interactions with voters ......... 24

CONCLUSIONS OF LAW ...................................................................................... 27

    SUBJECT MATTER JURISDICTION ............................................................ 27

        Plaintiff's Claims fall within the *Ex parte Young* Exception to Sovereign Immunity .......... 27

        Plaintiffs have Standing to Challenge the Canvassing Restriction ...................................... 34

    PLAINTIFFS' CONSTITUTIONAL CHALLENGES ................................... 45

        The Canvassing Restriction is Facially Overbroad ................................................................. 53

        The Canvassing Restriction is Unconstitutionally Vague ...................................................... 66

        The Canvassing Restriction is Unconstitutional as applied to Plaintiffs' Speech ................. 72

    PERMANENT INJUNCTION OF THE CANVASSING RESTRICTION ............................. 74

CONCLUSION ......................................................................................................... 77

## INTRODUCTION

On September 7, 2021, Texas Governor Greg Abbott signed into law the Election Protection and Integrity Act of 2021, an omnibus election law commonly referred to as "S.B. 1." *See* Election Integrity Protection Act of 2021, S.B. 1, 87th Leg., 2d Spec. Sess. (2021).

Premised on the state legislature's authority to make all laws necessary to detect and punish fraud under article VI, section 4 of the Texas Constitution, S.B. 1 amended the Texas Election Code to, among other things, prohibit compensated canvassers from engaging in voter advocacy in the presence of a mail-in ballot (the "Canvassing Restriction").[1] *See* S.B. 1 § 7.04 (JEX 1 at 59–60), codified at TEX. ELEC. CODE ("TEC" or the "Election Code") § 276.015.[2]

Several private plaintiffs filed lawsuits, challenging certain provisions of S.B. 1 as unconstitutional and otherwise unlawful under federal voter-protection statutes. For judicial economy, these were consolidated under the above-captioned case, which was first filed.[3]

---

[1] While Section 7.04 of S.B. 1 sets out a ban on "vote harvesting," *see* TEC § 276.015, Plaintiffs generally refer to the provision as a "ban on in-person canvassing" or "voter interaction ban." *See, e.g.*, ECF No. 848 ¶ 97; ECF No. 849 ¶ 296. In the Court's view, all three characterizations are misleading in multiple respects. Regardless of how the term is defined in the Election Code, Section 7.04's proscriptions reach conduct well beyond any common understanding of "vote harvesting." On the other hand, the provision does not ban canvassers from interacting with voters altogether—it prohibits *compensated* interactions in the *presence of a mail ballot*. In an effort to describe Section 7.04's scope more accurately and impartially, the Court refers to the challenged provisions as the "Canvassing Restriction" throughout this order.

[2] Section 7.04 of S.B. 1 also added TEC provisions addressing the solicitation of applications to vote by mail (TEC § 276.016), the distribution of early voting ballots and balloting materials (TEC § 276.017), and unauthorized alterations to election procedures (TEC § 276.019). For the purposes of this order, however, "Section 7.04" refers only to the Canvassing Restriction, codified at TEC § 276.015.

[3] *See* ECF No. 31 (consolidating *OCA-Greater Houston v. Esparza*, No. 1:21-cv-780 (W.D. Tex. 2021); *Houston Area Urban League v. Abbott*, No. 5:21- cv-848 (W.D. Tex. 2021); *LULAC Texas v. Esparza*, No. 1:21-cv-786 (W.D. Tex. 2021) and *Mi Familia Vota v. Abbott*, No. 5: 21-cv-920 (W.D. Tex. 2021) under the lead case.

Three Plaintiffs groups—the OCA Plaintiffs,[4] the LULAC Plaintiffs,[5] and the LUPE Plaintiffs[6]—assert that Section 7.04's Canvassing Restriction is overbroad, unconstitutionally vague, and burdens their core political speech. *See* Tr. at 230:14–17, 232:24–233:1, 234:23–235:4. Following a six-week bench trial, the Court agrees.

After careful consideration, the Court issues the following findings of fact and conclusions of law pursuant to FED. R. CIV. P. 52(a) bearing on Plaintiffs' claims under 42 U.S.C. § 1983 that the Canvassing Restriction, codified at TEC § 276.015, violates the First and Fourteenth Amendments of the United States Constitution.

---

[4] For the purposes of the OCA Plaintiffs' free speech and due process challenges to the Canvassing Restriction, this group includes OCA-Greater Houston and the League of Women Voters of Texas. *See* ECF No. 200 (OCA Compl.) ¶¶ 214–25 (free speech claim), ¶¶ 226–39 (due process claim); Text Order dated Apr. 14, 2022 (granting Texas Organizing Project's withdrawal from the case); ECF No. 551 (granting Workers Defense Action Fund's withdrawal from the case and dismissing its claims with prejudice).

[5] This group includes LULAC Texas, Texas Alliance for Retired Americans, Texas AFT, and Voto Latino. *See* ECF No. 207 (LULAC Compl.) ¶¶ 273–86 (free speech claim).

[6] This group includes La Unión del Pueblo Entero, the Mexican American Bar Association of Texas, the Southwest Voter Registration Education Project, Texas Hispanics Organized for Political Education, Jolt Action, the William C. Velasquez Institute, FIEL Houston Inc., Friendship-West Baptist Church, Texas Impact, and James Lewin. *See* ECF No. 208 (LUPE Compl.) ¶¶ 286–300 (free speech and due process claims).

## PROCEDURAL HISTORY

Plaintiffs filed their original complaints in August and September 2021, seeking to enjoin the Secretary of State and Attorney General of the State of Texas (together, the "State Defendants") and local election officials from enforcing many provisions of S.B. 1, including provisions that (like the Canvassing Restriction) impose criminal liability.

In December 2021, the Texas Court of Criminal Appeals held in *State v. Stephens* that the Election Code's delegation of unilateral prosecutorial authority to the Attorney General to prosecute election crimes violated the separation-of-powers clause of the Texas Constitution. 663 S.W.3d 45 (Tex. Crim. App. 2021). The court explained that the Texas Constitution assigns to county and district attorneys, as members of the judicial branch, the "specific duty" to represent the state in criminal prosecutions. *Id.* at 52. The Attorney General, as part of the state's executive branch, has no similar, independent power under the Texas Constitution. Thus, the Attorney General can prosecute election crimes only with the consent of local prosecutors. *Id.* at 47.

Following *Stephens*, Plaintiffs amended their complaints to join local district attorneys from several Texas counties as Defendants.[7] The State Defendants moved to dismiss these complaints in their entirety, including Plaintiffs' free speech and due process challenges to the Canvassing Restriction. The Court denied the motions as to those challenges in August 2022, concluding that Plaintiffs had adequately alleged standing to challenge the Section 7.04 and that their claims against the State Defendants fell within the *Ex parte Young* exception to sovereign immunity.[8]

---

[7] Plaintiffs' Second Amended Complaints ("SACs"), filed in January 2022, are the operative pleadings. ECF Nos. 199, 200, 207, 208.

[8] *See La Union del Pueblo Entero v. Abbott*, 614 F. Supp. 3d 509 [LULAC], 618 F. Supp. 3d 388 [OCA], 618 F. Supp. 3d 504 [LUPE] (W.D. Tex. 2022).

In May 2023, the State Defendants joined in a motion for summary judgment filed by a group of Republican committees that intervened in this case as Defendants (the "Intervenor-Defendants"),[9] arguing that Plaintiffs' pre-enforcement free speech and vagueness claims were premature and otherwise meritless because the Canvassing Restriction did not impose a "severe" burden on protected speech and was intended to protect voters from confusion and undue influence. *See* ECF No. 608 at 29–34. The Court carried the motion with the case and addresses those arguments herein to the extent that they were not disposed in the Court's orders on the State Defendant's motions to dismiss.

The Court held a bench trial from September 11, 2023 to October 20, 2023. In all, the parties presented about 80 witnesses (both live and by deposition testimony), nearly 1,000 exhibits, producing over 5,000 pages of trial transcripts. The Court heard testimony from voters, Plaintiffs' organizational representatives and volunteers, former and current state and local officials, and expert witnesses.

The parties submitted proposed findings of fact and conclusions of law in January 2024,[10] and presented closing arguments on February 13, 2024.[11]

---

[9] The Intervenor-Defendants include the Harris County Republican Party, the Dallas County Republican Party, the Republican National Committee, the National Republican Senatorial Committee, and the National Republican Congressional Committee.

[10] *See, e.g.*, ECF No. 848 (OCA); ECF No. 849 (LULAC); ECF Nos. 854, 855 (LUPE); ECF No. 843-1 (Dallas County District Attorney); ECF Nos. 861, 862 (State Defendants). The State Defendants filed their proposed findings of fact and conclusions of law jointly with the Intervenor-Defendants. *See* ECF Nos. 861, 862. In light of the joint submissions, the Court has no need to address the Intervenor-Defendants separately in this order and will attribute the filings and arguments therein to the State Defendants.

[11] At the Court's request, the parties also submitted supplemental briefing addressing the impact of the Supreme Court's recent decision in supplemental briefing addressing the impact of the Supreme Court's recent decision in *FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024), on Plaintiffs' standing. *See* ECF Nos. 1138, 1140, 1142–45.

# FINDINGS OF FACT

**THE CANVASSING RESTRICTION**

1.     Section 7.04 of S.B. 1 creates three new, third-degree felonies under the Election Code, each imposing up to ten years in prison and a fine of up to $10,000 on anyone who gives, offers, or receives some "compensation or other benefit" for "vote harvesting services." TEC § 276.015(f); TEX. PENAL CODE § 12.34.

2.     "Vote harvesting services" include any "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." TEC § 276.015(a)(2).

3.     A "benefit" is "anything reasonably regarded as a gain or advantage, including a promise or offer of employment, a political favor, or an official act of discretion, whether to a person or another party whose welfare is of interest to the person." TEC § 276.015(a)(1).

4.     Using these definitions, Section 7.04 creates three third-degree felonies:

> (b)  A person commits an offense if the person, directly or through a third party, knowingly provides or offers to provide vote harvesting services in exchange for compensation or other benefit.

> (c)  A person commits an offense if the person, directly or through a third party, knowingly provides or offers to provide compensation or other benefit to another person in exchange for vote harvesting services.

> (d)  A person commits an offense if the person knowingly collects or possesses a mail ballot or official carrier envelope in connection with vote harvesting services.

TEC §§ 276.015(b)–(d).

5.     The Canvassing Restriction contains a number of exceptions. It "does not apply" to:

> (1)    an activity not performed in exchange for compensation or a benefit;

(2) interactions that do not occur in the presence of the ballot or during the voting process;

(3) interactions that do not directly involve an official ballot or ballot by mail;

(4) interactions that are not conducted in-person with a voter; or

(5) activity that is not designed to deliver votes for or against a specific candidate or measure.

TEC § 276.015(e).

## THE PARTIES

### The Plaintiffs

6.     Plaintiffs are membership-driven, non-partisan civil rights and social advocacy groups in Texas that regularly conduct in-person voter outreach and engagement activities. Despite the diversity of their respective missions in the state—e.g., encouraging civic participation, supporting K-12 public school employees, advocating for the interest of senior citizens, improving infrastructure in the colonias—the Plaintiff organizations rely on in-person voter advocacy to advance their causes.

7.     All Plaintiffs have endorsed ballot measures (and some have supported candidates) aligned with their organizational missions in the past and deployed staff, independent contractors and volunteers to engage with voters in person to increase turnout and electoral support for their preferred measure or candidate. These voter engagement efforts include neighborhood door-knocking campaigns, voter registration drives, candidate forums, town hall meetings, tabling at community events, and exit-polling. Plaintiffs' staff and volunteers have also regularly helped voters with disabilities and/or voters with limited English proficiency ("LEP"), including voters who vote by mail.

8.      Plaintiffs' volunteers often receive refreshments, t-shirts, pens, gas cards, and other tokens of appreciation for their canvassing and assistance efforts.

9.      Plaintiffs' voter engagement activities generally occur in the weeks before elections (when they are most effective), when voters are likely to have received their mail ballots. During some outreach events, voters have taken out their mail ballots while speaking with Plaintiffs' organizers to ask questions about their ballots or request voting assistance.

10.     Plaintiffs fear that the Canvassing Restriction will subject their organizations, staff, and volunteers—and even voters—to criminal liability for engaging in ordinary and routine in-person interactions with voters.

**The OCA Plaintiffs**

***OCA-Greater Houston***

11.     Plaintiff OCA-Greater Houston ("OCA") is a membership-driven organization dedicated to advancing the social, political, and economic well-being of Americans of Asian and Pacific Island descent ("AAPIs"), largely in Harris, Brazoria, and Fort Bend counties. Tr. at 1684:8–12, 1685:1–3, 1686:16–17, 1688:10–14. The organization has nearly 200 dues-paying members who serve on and elect the organization's board, and hundreds of volunteer members. Tr. at 1686:19–1687:7, 1688:7–9.

12.     The organization's mission comprises four main goals: (1) advocate for social justice, equal opportunity, and fair treatment; (2) promote civic participation, education, and leadership; (3) advance coalition and community building; and (4) foster cultural heritage. Tr. at 1689:6–13.

9

13.     In support of this mission, OCA has endorsed and advocated for ballot measures at in-person events and while conducting door-to-door canvassing and is likely to do so in the future. Tr. at 1711:8–19, 1712:17–1713:11, 1726:8–14.

14.     Before S.B. 1 was enacted, OCA regularly hosted election events attended by hundreds of people, including in-person candidate forums (Tr. at 1694:21–1696:8), "AAPI meet-and-greets" with AAPI political candidates (Tr. at 1699:24–1702:2), and voting machine demonstrations (Tr. at 1706:12–1707:3). Attendees often brought their mail-in ballots to these events and received assistance, including language assistance, from OCA volunteers and staff. Tr. at 1696:9–1697:8, 1697:22–1699:7 (candidate forums); Tr. at 1700:1–1702:2 (meet-and-greets), Tr. at 1706:12–1707:3 (voting machine demonstrations).

15.     OCA also engaged in canvassing efforts through volunteers and staff, who knocked on voters' doors to provide information about voting. Tr. at 1702:3–17. As they were door-knocking, some bilingual OCA canvassers assisted voters who requested language assistance with their mail-in ballots. Tr. at 1703:17–20.

16.     In addition to candidate forums, meet-and-greets, and canvassing, OCA conducts exit-polling at polling locations, where voters also requested (and received) assistance with their mail-ballots from OCA staff and volunteers. Tr. at 1706:4–11, 1723:6–13.

17.     OCA's voting-related activities are carried out by volunteers and paid staff, all of whom are OCA members. Tr. at 1687:22–1688:6, 1693:21–25. OCA's standard practice is to provide staff, volunteers, and attendees with refreshments during voting-related activities. Tr. at 1694:11–20. OCA provides its members and volunteers with benefits like food and beverages at in-person events where they provided voting assistance to LEP voters. Tr. at 1694:4–20, 1697:22–

25. Similarly, OCA provides canvassers with benefits like Gatorade and water "to canvass in the Texas heat of a hundred degrees or more" to help them stay hydrated. Tr. at 1718:1–5.

### *League of Women Voters of Texas*

18. The League of Women Voters of Texas ("LWV" or the "League") is a non-partisan organization founded in San Antonio in 1919 with over 3,000 dues-paying members, including members in Harris and Travis Counties. Tr. at 1580:1–4, 1585:18–22, 1586:7–19, 1587:19–21.

19. The League's mission is to empower voters and defend democracy. Tr. at 1580:1–4. The League actively works to register eligible citizens to vote, ensure that voters' ballots count, help voters obtain mail-in ballots, vote by mail, and obtain voter assistance when needed. Tr. at 1580:1–8, 1581:9–18, 1589:12–15, 1589:25–1590:3.

20. The League educates its members and Texas voters about the voting process through resources it creates, like the League's voter's guide, get out the vote ("GOTV") events for every election, and voter education materials on the League's social media, videos, and website. Tr. at 1583:22–1584:16, 1606:23–1608:10.

21. The League does not endorse specific candidates, Tr. at 1595:18–20, but has supported ballot measures in the past, Tr. at 1600:17–25.

22. The League hosts in-person election events across Texas that are open to the public, including candidate forums and discussions of proposed ballot measures and constitutional amendments. Tr. at 1599:3–9. The League does not ask whether voters have their mail ballots in their possession, Tr. at 1600:6–16, but it is likely that some voters will bring their ballots to such events. These events almost always occur when mail-ballots have been sent out because "that's when people are most interested in learning about candidates and what's on the ballot." Tr. at 1599:17–21.

23.     Volunteers at the League's in-person outreach events often receive token gifts for their efforts, including pens, stickers, refreshments, free parking, and certificates of participation or letters of recommendation. Tr. at 1598:6–22, 1601:18–1602:1.

**The LULAC Plaintiffs**

***League of United Latin American Citizens***

24.     The League of United Latin American Citizens ("LULAC") is a national Latino civil rights organization founded in 1929 in Corpus Christi, Texas. Tr. at 1632:9–11.[12] The group has approximately 4,000 to 5,000 dues-paying members within Texas, as well roughly 80,000 to 90,000 "eMembers" in the state. There are 30 to 40 LULAC councils in Texas, including in Dallas, San Antonio, Houston, and El Paso. Tr. at 1634:6–20, 1637:3–7.

25.     LULAC's mission is "to improve the lives of Latino families throughout the United States" and "to protect their civil rights in all aspects." Tr. at 1633:10–18. Promoting the right to vote is "crucial" to LULAC's mission because when Latinos are "allowed to vote, they are able to choose candidates of their choice" who "will stand and work on issues that are important to them." Tr. at 1645:4–15.

26.     LULAC has volunteers that engage in voter registration and GOTV efforts every year. Tr. at 1645:23–1646:5. These efforts often focus on community members who face greater challenges when voting, including elderly Latinos and those who do not speak or write English. Tr. at 1649:7–24. Accordingly, LULAC has historically run a voter assistance program for seniors, including many who are not literate or have physical disabilities. Tr. at 1654:20–1655:5.

---

[12] LULAC has approximately 4,000 to 5,000 dues-paying members within Texas, as well roughly 80,000 to 90,000 "eMembers" in the state. Tr. at 1637:3–7. There are 30 to 40 LULAC Councils in Texas, including in Dallas, San Antonio, Houston, and El Paso. Tr. at 1634:6–20, 1637:3–7.

27.     LULAC's members and volunteers who participate in these GOTV and voter assistance efforts often receive food and drink, gas credit, or other tokens of appreciation for their efforts. Tr. at 1655:19–1656:10, 1656:11–18.

### Texas AFT

28.     Texas AFT ("AFT") is a 501(c)(5) designated labor union representing K-12 public school employees and higher education employees in Texas, Tr. at 920:16–20, with about 66,000 members across the state. Tr. at 920:16–20.

29.     AFT's mission is to advocate for increased funding for public schools, for programming that treats children as holistic individuals and seeks to remove external barriers to receiving a high-quality education, and for capping class sizes at a reasonable number so that all students get appropriate attention from their teacher. Tr. at 922:2–22. To advance its mission, AFT also participates in the political process by regularly engaging with its membership about the candidates and issues that best align with the organization's values. Tr. at 923:2–15.

30.     Prior to S.B. 1, AFT's primary way of communicating with its members about advocacy issues and endorsed candidates was door-knocking. Tr. at 924:13–20. AFT members would typically knock on the doors of fellow union members, introduce themselves, and then discuss the issues and candidates that the organization was endorsing and why. Tr. at 926:5–10.

31.     While these conversations between members and AFT block-walkers would unfold, members would sometimes have their ballots with them, either because they were home and had questions about how to fill them out or because they were gathering with other members to fill out their ballots as a group. Tr. at 927:21–23.

32.     Some of the members who would engage in this type of door knocking or "block-walking" for AFT are paid staff members. Tr. at 929:6–930:5. Others are volunteers who would receive benefits such gas and meal cards in exchange for their work. Tr. at 929:6–24.

### *Texas Alliance for Retired Americans*

33.     Texas Alliance for Retired Americans ("TARA") is the Texas state member of the National Alliance for Retired Americans, an organization with 4.5 million members that works on issues that affect seniors and retirees. Tr. at 1761:4–10. TARA itself has chapters throughout Texas, including in Dallas, Fort Worth, Austin, Houston, San Antonio, Corpus Christi, Beaumont, and Port Arthur. Tr. at 1761:14–18.

34.     TARA educates and mobilizes its members and volunteers around issues impacting seniors, including the government pension offset for social security and the expansion of Medicaid within Texas. Tr. at 1762:8–19. TARA is non-partisan organization, but it does engage in issue advocacy and endorses local and state candidates based on their positions on issues relevant to TARA. Tr. at 1764:3–10. It also advocates for or against ballot measures impacting TARA's areas of concern. Tr. at 1764:3–10.

35.     To advance its views on these issues, TARA hosts monthly chapter meetings across Texas with members. Tr. at 1762:20–1763:4. TARA holds rallies and community events to promote its views, and also uses social media and email to educate its members and the public. Tr. at 1762:20–1763:4.

36.     TARA's voter advocacy relies primarily on the efforts of its sole paid field organizer, Judy Bryant, who testified on behalf of TARA at trial. Tr. at 1763:16–18.

### The LUPE Plaintiffs

#### *La Union Del Pueblo Entero*

37.     La Union Del Pueblo Entero ("LUPE") is a non-partisan, membership organization headquartered in San Juan, Texas, with members primarily in Hidalgo, Cameron, Willacy, and Starr Counties, Texas. Tr. at 58:13–16.

38.     LUPE organizes its approximately 8,000 members and other colonia residents on issues that affect low-income neighborhoods, including drainage, lighting, paved roads, safety, emergency services, trash pickup, among others. Tr. at 88:8–24.

39.     In recent years, LUPE's primary organizing focus has been civic engagement and educating voters about their right to vote. Tr. at 60:10–61:2. LUPE relies on paid staff members, temporary paid canvassers, and volunteers to engage with voters in-person. Tr. at 88:1–7.

40.     LUPE members speak to voters on issues promoted by LUPE, including urging voters to support certain non-partisan ballot measures. Tr. at 88:1–24. LUPE has supported ballot measures, including a drainage bond, the creation of a health care district in Hidalgo County, increased broadband access in South Texas, Tr. at 88:8–89:18, and plans to advocate for other ballot measures in the future. Tr. at 88:25–89:16.

41.     LUPE staff and canvassers advocate for its support of any ballot measures in a variety of settings, including when meeting with community members in neighborhoods, at LUPE events, at union halls, and in the LUPE offices. Tr. at 89:7–18. Speaking to voters at their homes is an essential part of LUPE's activities because it ensures that hard-to-reach voters in the colonias have the information they need to vote to improve their communities. Tr. at 3686:1–20.

42.     While canvassing neighborhoods in support of ballot measures, LUPE organizers have been invited into voters' homes and asked for assistance with voters' mail-in ballots. Tr. at

71:1–72:15, 75:11–75:17, 119:20–120:18. LUPE members also often bring mail ballots to meetings at LUPE offices and union halls. Tr. at 90:4–24.

43.     LUPE staff members and volunteers have been asked for assistance with voting by mail and in-person at the polls by elderly and disabled voters, and have provided such assistance. *See* Tr. at 145:16–20, 145:25–146:4, 150:9–13, 150:19–151:2, 157:14–158:9.

44.     LUPE often provides its volunteers with t-shirts or gas cards, particularly because there is little public transportation in the Rio Grande Valley. Tr. at 122:3–19.

### *Mexican American Bar Association of Texas*

45.     The Mexican American Bar Association of Texas ("MABA") is a volunteer-based professional membership association of Latino lawyers across Texas with approximately 500 members. Tr. at 2533:20–23, 2535:9–10.

46.     Although MABA is non-partisan, it routinely encourages voters to support a candidate or measure. Tr. at 2535:19, 2542:6–8.

47.     MABA engages in voter outreach and education by tabling at local community events, such as candidate forums. Tr. at 2535:21–2536:5. MABA members also provide voter assistance. *See, e.g.*, Tr. at 2539:3–4. Members are concerned that they are committing a crime if they accept meals, gas cards, swag or other forms of compensation while performing these activities. Tr. at 2542:6–20.

**Defendants**[13]

48.     Collectively, Plaintiffs have sued the Attorney General and Secretary of State of Texas (together, the "State Defendants"), and the district attorneys of Travis County, Dallas

---

[13] Over the course of the litigation, several Defendants have been substituted pursuant to Federal Rule of Civil Procedure 25(d).

County, and Hidalgo County, and 34th Judicial District, which includes El Paso, Culberson, and Hudspeth Counties (collectively, the "DAs" or "County DAs").[14]

**The Texas Attorney General**

49.     Plaintiffs sue Defendant Ken Paxton in his official capacity as the Attorney General of the State of Texas (the "AG").

50.     The AG has statutory duties for certain aspects of Section 7.04's enforcement scheme. *Stephens* did not alter the authority of the AG to investigate allegations of election-related crimes, and, in some cases, the Office of the Attorney General ("OAG") considers certain investigative duties to be "statutorily required" or "mandatory" for election-related allegations. Tr. at 4041:18–4042:25; *see, e.g.*, TEC § 273.001 (providing that the AG "shall investigate" allegations of election crimes in elections covering more than one county). The AG may also "direct the county or district attorney . . . to *conduct* or *assist* the attorney general in conducting the investigation." *See* TEC § 273.002(1) (emphasis added); *see also id.* § 273.001 (district attorneys must investigate alleged violations referred to them).

51.     The AG has demonstrated a willingness to enforce the Canvassing Restriction, and has actually enforced, the Election Code, including S.B. 1. Tr. at 3909:8–17, 3913:9–3914:16.

52.     The AG publicly maintains that one of his key priorities is to investigate and prosecute allegations of voter fraud. *See, e.g.*, OCA-384, OCA-385, OCA-386. The OAG continues to operate the Criminal Prosecutions Division unit that prosecutes election-related allegations, known as the Election Integrity Division. Tr. at 3903:23–3905:4, 3905:11–15,

---

[14] Although the LULAC Plaintiffs' SAC names local election officials as Defendants to their free speech claims, *see* ECF No. 207 at 57, their proposed findings of fact and conclusions of law do not argue that any local election officials' have a role in enforcing the Canvassing Restriction, *see* ECF No. 849. The Court thus considers the LULAC Plaintiffs to have waived any such argument and will dismiss their undeveloped claims seeking to enjoin local election officials from enforcing the Canvassing Restriction.

4039:14–19. As of March 17, 2023, the OAG had identified at least one investigation of a possible violation of the Canvassing Restriction. [15] *See* LULAC-86 at 6.

53.     Before *Stephens*, the OAG regularly prosecuted election crimes, including alleged vote-harvesting schemes, in counties across Texas. *See* OCA-377 (showing 401 counts—not cases—of election crimes prosecuted by the OAG, alone or in conjunction with local prosecutors, between 2005 and 2022).

54.     Even after *Stephens*, Jonathan White, former Chief of the OAG Election Integrity Division, testified that the "vote harvesting" schemes (purportedly targeted by the Canvassing Restriction) remain among the three most common elections-related allegations that the OAG pursues. Tr. at 3915:3–8. For the November 2022 elections, the OAG established a 2022 General Election Integrity Team and publicly stated it was "prepared to take action against unlawful conduct where appropriate," highlighting offenses related to "vote harvesting." OCA-383.

55.     Although the AG may no longer unilaterally prosecute allegations of election-related crimes, *Stephens*, 663 S.W.3d at 51–55, the OAG enforces criminal election offenses through other mechanisms. After OAG investigations conclude, the OAG refers cases to local prosecuting attorneys[16] and often seeks opportunities to partner with DAs to prosecute such allegations through deputization by a DA or appointment *pro tem* by a district judge or the DA. Tr. at 3908:21–3909:17, 3909:1–12; 4043:21–4045:21; 4051:2–10.

---

[15] There may very well be additional investigations that the DA failed to produce during discovery. Throughout this litigation, the OAG has, invoking the investigative privilege, withheld documents discussing "actual or alleged illegal voting, election fraud, or other criminal conduct in connection with" voting and voter assistance. *See* ECF No. 992-3; ECF No. 992-16; *In Re U.S. Dep't of Homeland Sec.*, 459 F.3d 565, 568–69, n.2 (5th Cir. 2006) (the investigative privilege, also known as the "law enforcement privilege," protects government documents relating to an ongoing criminal investigation from release).

[16] For example, after the prosecution of Hervis Rogers was dismissed in Montgomery County, the OAG referred the case to the Harris County DA, who brought charges against Mr. Rogers before a grand jury. Tr. at 4058:17–4059:24, 4062:7–12. The same procedure was used in the prosecution of Ignacio González Beltrán, whose case was dismissed in Montgomery County and referred by the OAG to Harris County, where it was presented to a grand jury. Tr. at 4063:3–4064:6.

56.     The OAG has specifically identified previous prosecutions in which it participated, including prosecutions for "vote harvesting" and prosecutions conducted by or with the assistance of local DAs in the following counties: Nolan County, Limestone County, Hidalgo County, Harris County, Navarro County, Brewster County, Gregg County, and Starr County. *See* OCA-377.

### The Texas Secretary of State

57.     The LUPE Plaintiff seek to enjoin Jane Nelson, the Secretary of State (the "Secretary") from enforcing the Canvassing Restriction.

58.     The Secretary routinely collaborates with the OAG to enforce election laws in accordance with her mandatory duties under the Election Code. Tr. at 3913:9–19, Tr. at 4054:16–4055:8.

59.     Under the Election Code, the Secretary must evaluate information she "receiv[es] or discover[s]" about potential election crimes and, if she "determines that there is probable cause to suspect that criminal conduct occurred, the [S]ecretary *shall* promptly refer the information to the attorney general" and provide all pertinent documents and information in his possession to the AG. TEC § 31.006 (emphasis added).

60.     In this capacity, the Secretary serves as "a gathering point for election complaints from individuals and election officials." Tr. at 3913:12–19. The Secretary logs each complaint received. Tr. at 4326:23–4327:2. Sometimes, the Secretary will also ask the complainant for additional information. Tr. at 1876:24–1879:21. Ultimately, the Secretary must determine whether the information in her possession satisfies the probable cause standard. Tr. at 1881:1–9. "If it's a close call, [the Secretary of State's Office] refer[s] it anyways, because it's better to err on the side of making sure that crimes are prosecuted." Tr. at 1877:14–21.

61.     The Secretary has received allegations related to mail ballot "vote harvesting," which she has referred to the OAG both before and after the passage of S.B. 1. Tr. at 1914:1–6.

**<u>The County DAs</u>**

62.     Plaintiffs have sued the District Attorneys of several counties in Texas (the "DAs" or "County DAs") in their official capacity to enjoin them from enforcing Section 7.04's Canvassing Restriction.

63.     The OCA Plaintiffs seek injunctive relief against the Travis County DA. *See* ECF No. 200. The LULAC Plaintiffs name the DAs of Travis, Dallas, and Hidalgo Counties as Defendants. *See* ECF No. 207. The LUPE Plaintiffs seek injunctive relief against the DAs of Travis County, Dallas County and the 34th Judicial District, which includes El Paso, Culberson, and Hudspeth Counties. *See* ECF No. 208.

64.     Every County DA other than the DA for the 34th Judicial District executed a stipulation stating that he or she had *not* (1) adopted a policy refusing to prosecute crimes under S.B. 1, (2) instructed law enforcement to refuse to arrest individuals suspected of criminal conduct under S.B. 1, or (3) permitted an assistant DA to take either of the foregoing actions. *See* ECF No. 753-6 (Travis) ¶¶ 3–6; ECF No. 753-7 (Dallas) ¶¶ 3–4; ECF No. 753-13 (Hidalgo) ¶¶ 3–6. For his part, the DA of the 34th Judicial District agreed not to enforce the provisions challenged by the LUPE Plaintiffs during the pendency of this action but stipulated that he has the authority to enforce crimes under the Election Code, would be free to do so at any time, and intended to fulfill his duty to enforce election crimes, subject to his prosecutorial discretion. ECF No. 753-8 ¶¶ 5–7.

65.     A newly enacted law House Bill 17 ("H.B. 17") curbs DAs' authority to adopt a policy against enforcing crimes under the Election Code. H.B. 17, which went into effect on September 1, 2023, provides that DAs may be removed from office if they adopt any policy that

"prohibits or materially limits the enforcement of any criminal offense." H.B. 17 § 1 (adding TEX. LOC. GOV'T CODE § 813(B)).

## IMPACT OF THE CANVASSING RESTRICTION

### There is widespread confusion about how to interpret the Canvassing Restriction

66.     The Canvassing Restriction applies to anyone who knowingly gives or receives some "compensation or other benefit" for an "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." TEC § 276.015(a)(2).

67.     Trial testimony establishes that there is widespread confusion about the meaning of the Canvassing Restriction. Even local election administrators ("EAs") are unsure about how to interpret Section 7.04. *See, e.g.*, Tr. at 496:5–8 (Dallas County EA Michael Scarpello) ("I don't know what ballot harvesting means," "it could be interpreted a lot of different ways based on the definition . . . put into the law."); Tr. at 844:1–12 (former Travis County EA Dana DeBeauvoir) (pointing out that the Canvassing Restriction criminalizes "paying someone to encourage people to vote *for* a measure" but not against that same measure).

68.     Witnesses were particularly uncertain about how to interpret the terms "compensation" and "physical presence"—neither of which is defined in the statute—and how Section 7.04 impacts organizers' ability to provide voting assistance.

69.     Despite this confusion, state officials have not offered any definitive answers about the scope of the Canvassing Restriction. The Secretary of State has not provided any guidance. Tr. at 1914:7–14, 1924:7–18. Nor has the OAG. Tr. at 1924:24–1925:3.

70.     At trial, the State Defendants' witnesses attempted to clarify the meaning of the Canvassing Restriction, but their testimony only underscored the potential for disagreement about what kind of conduct Section 7.04 proscribes.

**Confusion about the meaning of "compensation or other benefit"**

71.     Plaintiffs are uncertain whether providing volunteers food, beverages, gas cards, bus fare, letters of recommendation, or academic credit to volunteers for their advocacy work is unlawful because "compensation" is not defined in the Election Code and benefit is merely defined by a synonym. TEC § 276.015(a)(1) (defining "benefit" as "anything reasonably regarded as a gain or advantage"). For example, MABA members, all of whom are attorneys, worry that a bottle of water could be considered "compensation." Tr. at 2544:9–43.

72.     They also worry that their voter outreach activities could expose *voters* to criminal liability if they offer door-to-door canvassers refreshments, for example. *See* Tr. at 1592:1–5 ("It's not just my concern for the League members, but it's also a concern if just a voter that were helping provides compensation, or the place that they live provides compensation of some type that they may be committing a crime."). AFT has cautioned its members that they should not complete their ballots at meetings in its offices because the free use of its facilities and other resources could be construed as a "compensation or other benefit." Tr. at 928:1–9.

73.     Former Election Division Director Keith Ingram testified that providing volunteers with bus fare was not "compensation" because "[t]hey can get their expenses reimbursed. That's not payment." Tr. at 1904:1–2.[17] In contrast, the State's chief voter fraud prosecutor, Jonathan White, stated that he would need to perform legal research to determine what kinds of economic

---

[17] Mr. Ingram was interpreting the term "compensation" in connection with S.B. 1 § 6.06, which prohibits compensation for mail-ballot assistance, but nothing in his testimony suggests that he would apply a different meaning to the word as it is used in S.B. 1 § 7.04, which, again, is not defined.

benefits would violate the provision. Tr. at 3992:20–3993:21 (conceding that he would need to "review[] the case law" to determine whether a meal, bus fare, or a gift bag containing a t-shirt constitute prohibited compensation).

### Confusion about the meaning of "physical presence"

74.     Plaintiffs worry about liability for canvassing in the "physical presence" of a mail ballot because their members have historically brought their ballots to candidate forums, town hall meetings, and other in-person events at community centers, union halls, and people's homes.

75.     Because "physical presence" is not defined in Section 7.04, Plaintiffs are unsure how physically proximate a ballot must be to a volunteer or employee to violate the Canvassing Restriction and risk exposure to a decade in prison.

76.     Indeed, trial witnesses were afraid of criminal liability for inadvertently advocating for a ballot measure in conversations with voters who happened to have a mail ballot in their possession. *See, e.g.*, Tr. at 1780:17–1781:4 (TARA's organizational representative, Judy Bryant, suggesting that a ballot might be concealed in a voter's backpack or purse during the conversation).

77.     At trial, Mr. Ingram refused to offer a specific distance or any concrete guidance about how canvassers should determine whether they are in the "physical presence" of a mail ballot, which can only be determined on a case-by-case basis. *See* Tr. at 1917:5–14; *see also* Tr. at 1916:1–4 (stating that the Secretary does not have an official opinion on whether a ballot being within five or ten feet of a discussion constitutes physical presence under Section 7.04). "Whether or not a prosecutor agrees with us," he conceded, "is a different story entirely." Tr. at 1917:18–19.

### Confusion about canvassers' ability to provide voting assistance

78.     County election officials agreed that Section 7.04 could interfere with community organizers' ability to assist voters with their mail-ballots because its prohibition on "in-person

interactions" in the "presence of a mail ballot" does not include an exception for mail-ballot assistance. *See* Tr. at 758:8–19, 758:22–759:12 (Cameron County EA Remi Garza); Tr. at 841:15–842:9, 844:13–25 (DeBeauvoir); Tr. at 496:2–8 (Scarpello).

79.     Mr. White testified that if his office encountered a GOTV group that paid its organizers to provide mail ballot assistance as a public service while canvassing, he would be concerned that this activity is a subterfuge for voter fraud. Tr. at 3995:11–24. He acknowledged, however, that prior to S.B. 1, the Election Code already criminalized: assisting a voter who is not eligible for assistance or did not ask for assistance; voting a ballot differently than the voter wished or directed the assistant to vote the ballot; suggesting to the voter during the voting process how the voter should vote, or attempting to influence or coerce the voter receiving assistance. Tr. at 3923:21–3924:14, 3925:4–6.

**The Canvassing Restriction has chilled Plaintiffs' in-person interactions with voters**

80.     Plaintiffs and their members cannot determine from the text of TEC § 276.015 whether the Canvassing Restriction prohibits their organizations' routine voter engagement activities. This ambiguity has chilled Plaintiffs' willingness to conduct in-person community events and political outreach to voters where a mail-in-ballot might be present, including events where Plaintiffs' members have historically provided (and received) voting or language assistance.

81.     To avoid putting staff members and volunteers in legal jeopardy under the Canvassing Restriction, Plaintiffs and their members have limited their in-person interactions with voters in the weeks before elections, when voters are most likely to have mail ballots in their possession—and when Plaintiffs' speech is most likely to be effective. Tr. at 1766:15–23 (TARA's mission has been severely impacted by the restrictions during the early voting period because voter engagement and advocacy efforts are most critical in the weeks leading up to an election); Tr. at

1599:17–21 (The League hosts events in the weeks before elections, "when people are most interested in learning about candidates and what's on the ballot.").

82.     For example, Judy Bryant, TARA's sole paid field organizer, is no longer willing to "accept or set up any tabling invitations or events" once "mail ballots go out" because she does not want to take the chance of a person "having a mail ballot" when she advocates on behalf of TARA. Tr. at 1765:24–1766:5. As a result, Ms. Bryant plans to cease any in-person advocacy "after the first week in October" before an election "because mail ballots are generally going out by that time in most counties." Tr. at 1766:6–9. But for S.B. 1, Ms. Bryant would engage in this work "right up to and including Election Day." Tr. at 1766:10–14.

83.     Similarly, prior to S.B. 1, Deborah Chen, OCA's civic engagement programs director, personally provided language assistance to LEP voters who brought their mail-in ballots to OCA's candidate forums. Tr. at 1697:13–18. Ms. Chen has been unwilling to assist voters since S.B. 1 was enacted, due to the threat of criminal liability. Tr. at 1726:21–1727:6.

84.     Ms. Bryant and Ms. Chen are not alone their decisions to restrict their in-person voter outreach activities due to threat of criminal sanctions under the Canvassing Restriction:

- **OCA** has stopped hosting in-person events where members have historically brought mail-in ballots and received voting assistance, include candidate forums, Tr. at 1718:20–24, and no long offers voters assistance or rides to the polls, Tr. at 1722:3–16. OCA is especially worried about exposing its student volunteers to criminal charges, since one of its missions is to educate and develop a pool of future leaders. Tr. at 1721:2–10, 1721:11–1722:22.

- **The League** determined that it "would turn away members with their mail-in ballots from candidate forums." Tr. at 1620:7–1621:1

- **LUPE** planned to advocate on a number of measures in the November 2023 Constitutional Amendment election but trained its staff not to advocate on the ballot measures in the presence of a mail ballot. Tr. at 3681:6–3682:8.

- **MABA** members are no longer willing to provide voting assistance because members fear that they might inadvertently commit a crime, potentially costing them their law licenses. Tr. at 2543:14–2544:23.

- **LULAC** volunteers "scaled . . . down" their GOTV efforts and decided not to conduct voter outreach with seniors, many of whom require voting assistance, for "fear that they could be subject to prosecution if they help seniors vote by mail." Tr. at 1655:10–18.

- **AFT** has shifted its voter engagement efforts away from block-walking to communicating with voters over the phone, video, and text message. Tr. at 924:21–925:12–14, 928:17–929: 3, 934:7–21, and must train its remaining block-walkers and temporary paid organizers to limit their interactions with voters to avoid criminal penalties, Tr. at 928:2–9.

85. Plaintiffs have found that alternative methods of communication are much less effective at reaching voters—during the precise time when their speech is most critical. *See* Tr. at 1720:9–15 (describing attendance at OCA's virtual candidate meet-and-greet in spring 2022 as "fairly abysmal" compared to previous, in-person meet-and-greets); Tr. at 930:11–21 (noting that AFT's outreach to voters by phone and text and video detracted from the "quality of the conversations" AFT was able to have with voters). As Ms. Bryant explained, "the closer you can do some education and information sharing the closer to the time of someone voting" the more effective it will be, "because people tend to forget or not be familiar with an issue" and speaking with them "closer to actually [] voting makes a big difference." Tr. at 1766:15–23.

86. Uncertainty about how to comply with S.B. 1's provisions, including the Canvassing Restriction, and fear of potential criminal liability have also impaired Plaintiffs' ability to recruit members and chilled existing members' willingness to volunteer with the Plaintiff organizations. MABA, for example, is finding it harder to recruit volunteers to educate and assist voters because of S.B. 1 because members fear that they might inadvertently commit a crime and risk their law licenses by accepting meals, gas cards, swag or other forms of compensation while tabling at community events or providing voter assistance. *See* Tr. at 2543:14–2544:16, 2553:11,

2542:6–20. AFT's members are likewise less willing to volunteer with the organization because they are uncertain about how to comply with the law. Tr. at 934:7–21.

## CONCLUSIONS OF LAW

**SUBJECT MATTER JURISDICTION**

This Court has subject matter jurisdiction pursuant to 28. U.S.C. § 1331, which provides that "district courts shall have original jurisdiction of all civil actions arising under the . . . laws . . . of the United States."

This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

**Plaintiff's Claims fall within the *Ex parte Young* Exception to Sovereign Immunity**

The State Defendants reassert their affirmative defense that, as to the Secretary and the AG, Plaintiffs' constitutional challenges to the Canvassing Restriction are barred by sovereign immunity. *See* ECF No. 862 at 21–26. Because the Election Code imposes particular enforcement duties upon both the AG and the Secretary and both Defendants have demonstrated a willingness to enforce the Canvassing Restriction, however, the Court concludes that Plaintiffs' claims fall within the *Ex Parte Young* exception to sovereign immunity. The County DAs do not assert that they are entitled to sovereign immunity. [18]

---

[18] The Court recently dismissed all constitutional claims against Harris County DA Kim Ogg as barred by Eleventh Amendment immunity in accordance with the Fifth Circuit's ruling and mandate issued in *Mi Familia Vota v. Ogg*, 105 F.4th 313 (5th Cir. 2024). *See* ECF No. 1147.

The remaining DAs have not argued that they are entitled to sovereign immunity in this action. Instead, they have stipulated that (1) they are responsible for investigating and prosecuting violations of the Canvassing Restriction and (2) they do not intend to refrain from enforcing the Canvassing Provision absent an injunction in this case. *See* ECF No. 753-6 (Travis) ¶¶ 3–6; ECF No. 753-7 (Dallas) ¶¶ 3–4; ECF No. 753-13 (Hidalgo) ¶¶ 3–6; ECF No. 753-8 ¶¶ 5–7 (34th Judicial District). Moreover, the DA of 34th Judicial District sought—and received—permission to be excused from participation in this case and agreed not to enforce the criminal provisions challenged by the private Plaintiffs during the pendency of the case. *See* ECF No. 356; Text Order dated Apr. 11, 2022.

Although district courts may raise the question of sovereign immunity *sua sponte*, Fifth Circuit precedent suggests that their authority to do so is discretionary. *See Carver v. Atwood*, 18 F.4th 494, 497 (5th Cir. 2021) (holding that the

### Legal Standard

State sovereign immunity under the Eleventh Amendment generally precludes suits against state officials in their official capacities. *City of Austin v. Paxton*, 943 F.3d 993, 997 (2019). The *Ex parte Young* exception to state sovereign immunity, however, allows private parties to bring "suits for injunctive or declaratory relief against individual state officials acting in violation of federal law." *Raj v. La. State Univ.*, 714 F.3d 322, 328 (5th Cir. 2013) (citing *Ex parte Young*, 209 U.S. 123, (1908)).

"*Ex parte Young* is a 'necessary exception' to sovereign immunity, preventing state officials from using their state's sovereignty as a shield to avoid compliance with federal law." *Planned Parenthood Gulf Coast, Inc. v. Phillips*, 24 F.4th 442, 451 (5th Cir. 2022) (quoting *P.R. Aqueduct*

---

district court "*could sua sponte* dismiss [a] complaint" based on sovereign immunity) (emphasis added). The Court declines to exercise its discretion with respect to the remaining County DAs here, for two reasons.

First, Fifth Circuit law addressing whether and when Eleventh Amendment immunity extends to local officials is unsettled. For example, in January 2024, the panel in *National Press Photographers Association v. McCraw* declined to extend Eleventh Amendment immunity to a county prosecutor charged with enforcing the challenged state statutes "because 'state sovereign immunity applies only to *states and state officials*,' not to political subdivisions like counties and county officials." 90 F.4th 770, 787 (5th Cir. 2024) (emphasis added). As the panel went onto explain:

> [W]e have held that Texas district attorneys are not protected by the Eleventh Amendment precisely because they are county officials, not state officials. Granted, a couple of unpublished opinions have suggested that a district attorney's entitlement to Eleventh Amendment immunity may depend on whether he or she is performing in a local or state capacity. But we understand our precedent to employ a more categorical approach, informed by various factors that [the DA] does not otherwise argue support his position that he is protected by the Eleventh Amendment.

*Id.* (quotations, citations, and alteration marks omitted) (citing *Clark v. Tarrant County*, 798 F.2d 736, 744–45 (5th Cir. 1986) (enumerating six factors that courts should consider in determining whether an entity is entitled to Eleventh Amendment immunity)).

Nonetheless, only five months after *McCraw*, the *Ogg* panel assumed that the Harris County DA could assert state sovereign immunity, without addressing *McCraw* or engaging with any of the factors set forth in *Clark*. *See generally Ogg*, 105 F.4th at 325–33. Nor did the panel offer any guidance about the how H.B. 17's restrictions on prosecutorial discretion should impact the duty analysis under *Ex parte Young*. *See id.*

Second, directing the County DAs to submit evidence and briefing on the question of their sovereign immunity would only serve to defeat one of the central purposes of their stipulations and of the doctrine of sovereign immunity itself: to preserve government resources. *See Ogg*, 105 F.4th at 324 ("[B]oth parties correctly highlight the costs and consequences of litigation when considering whether sovereign immunity applies[.]"); *cf. Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 720 n.4 (5th Cir.), *opinion corrected on denial of reh'g*, 380 F.3d 231 (5th Cir. 2004) (finding waiver where defendant waited until after summary judgment to raise sovereign immunity).

*& Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993)). The rule is based on the legal fiction that a sovereign state cannot act unconstitutionally. *Young*, 209 U.S. at 159. Thus, where a state actor enforces an unconstitutional law, he is stripped of his official clothing and becomes a private person subject to suit. *Id.* at 160.

The Supreme Court has counseled that, "[i]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry' into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (alterations on original) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., joined by Scalia and Thomas, JJ., concurring in part and concurring in judgment)). The Supreme Court has also made clear that, for the *Ex parte Young* exception to apply, the state official, by virtue of his office, must have "some connection with the enforcement" of the challenged law. *Young*, 209 U.S. at 157.

Despite the straightforward inquiry that the Supreme Court envisioned, the Fifth Circuit has acknowledged that its own decisions "are not a model of clarity on what 'constitutes a sufficient connection to enforcement.'" *Tex. Democratic Party v. Abbott* (*Tex. Democratic Party I*), 961 F.3d 389, 400 n.21 (5th Cir. 2020) (quoting *City of Austin*, 943 F.3d at 999). Nevertheless, the Fifth Circuit has articulated some general rules. For instance, the Fifth Circuit has stated that "it is not enough that the official have a '*general* duty to see that the laws of the state are implemented.'" *Id.* at 400–01 (emphasis in original) (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)). The Fifth Circuit has also determined that "[i]f the official sued is not statutorily tasked with enforcing the challenged law, then the requisite connection is absent and our *Young* analysis ends." *Id.* at 401 (quotation marks and citation omitted). "Moreover,"

29

according to the Fifth Circuit, "a mere connection to a law's enforcement is not sufficient—the state officials must have taken some step to enforce." *Id.*

The Fifth Circuit has further explained that plaintiffs must at least "show the defendant has 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.'" *Tex. Democratic Party v. Abbott* (*Tex. Democratic Party II*), 978 F.3d 168, 179 (5th Cir. 2020) (quoting *Morris*, 739 F.3d at 746). Put differently, the state "official must be 'statutorily tasked with enforcing the challenged law[,]'" *id.* (quoting *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020), *cert. granted, judgment vacated sub nom. Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 161 (2021)), though whether the particular duty to enforce the statute in question "arises out of the general law, or is specially created by the [statute] itself, is not material so long as it exists[,]" *Young*, 209 U.S. at 157.

"Enforcement typically means 'compulsion or constraint.'" *Tex. Democratic Party II*, 978 F.3d at 179 (quoting *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010)). The definition extends beyond the "type of direct enforcement found in *Ex Parte Young*, for instance, where the attorney general threatened civil and criminal prosecution." *Book People, Inc. v. Wong*, 91 F.4th 318, 335 (5th Cir. 2024) (quoting *Air Evac EMS*, 851 F.3d at 519. "[S]uch enforcement is not required." *Id.* "A 'scintilla of "enforcement" by the relevant state official with respect to the challenged law' will do." *Tex. Democratic Party II*, 978 F.3d at 179 (quoting *City of Austin*, 943 F.3d at 1002). In short, "if an 'official *can* act, and there's a significant possibility that he or she *will* . . . , the official has engaged in enough compulsion or constraint to apply the *Young* exception.'" *Tex. Democratic Party I*, 961 F.3d at 401 (emphasis in original) (quoting *City of Austin*, 943 F.3d at 1002).

**Analysis**

To begin, the State Defendants each have particular enforcement duties under the Election Code. Whether the defendant has the "particular duty" to enforce the challenged law is different than whether there is a "demonstrated willingness" of enforcement. *See Mi Familia Vota*, 105 F.4th at 325. To demonstrate a "particular duty," *Ex parte Young* requires neither a history of enforcement nor a statutory requirement of enforcement. *City of Austin*, 943 F.3d at 1001; *Air Evac EMS, Inc. v. Tex. Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 519 (5th Cir. 2017); *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 401 (5th Cir. 2020).

The Election Code provides that the AG "shall investigate" allegations of election crimes in elections covering more than one county. TEC § 273.001(a); *see also Garza v. Harrison*, 574 S.W.3d 389, 402 (Tex. 2019) (noting that, under Texas law, "[t]he term 'shall,' . . . 'imposes a duty.'") (quoting Tᴇx. Gᴏv'ᴛ Cᴏᴅᴇ § 311.016(2)). Allegations of vote-harvesting against the Plaintiff organizations are especially likely to be investigated by the AG because each of them operates in multiple counties in Texas. The AG may also investigate potential election crimes on its own initiative, TEC § 273.001(b), but also has the power to compel local prosecutors to investigate such allegations. *See* TEC § 273.002(b).

Likewise, the Election Code provides that the Secretary "shall promptly refer" information establishing probable cause to believe that an election crime has occurred to the AG" and "provide all pertinent documents and information in his possession to the AG." TEC § 31.006; *see also* TEC § 276.019 ("A public official or election official may not create, alter, modify, waive, or suspend any election standard, practice, or procedure mandated by law or rule in a manner not expressly

authorized by this code.").[19] The AG, in turn, "may investigate" referrals from the Secretary. TEC § 273.001(d).

Whether the State Defendants' enforcement is mandatory or discretionary speaks to a "demonstrated willingness" to enforce the statute—not whether they have the "particular duty" to enforce the Canvassing Provision. *See Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 786 (5th Cir. 2024) (finding state agency heads with discretionary enforcement power had a particular duty to enforce and noting that "[a]s heads of Texas law-enforcement agencies, [defendants] have more than just the general duty to see that the state's laws are implemented— they are directly responsible for enforcing Texas's criminal laws").

Here, the State Defendants have shown a desire to enforce the statute. Critically, neither the AG nor the Secretary has disavowed enforcement. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) ("We are not troubled by the pre-enforcement nature of this suit. The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise."); *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 302 (1979) ("[T]he State has not disavowed any intention of invoking the criminal penalty . . . . Appellees are thus not without some reason in fearing prosecution for violation of the ban[.]"). In the First Amendment context, this is enough. *See McCraw*, 90 F.4th at 782 ("Unlike in other constitutional

---

[19] The Court rejects the State Defendants' argument that the Secretary has no enforcement duty because her title does not appear in the Canvassing Provision itself. ECF No. 862 ¶ 23. Their position that *Ex parte Young* asks the Court to read each provision in a vacuum, without reference to any other Election Code provision—no matter how relevant to the enforcement question at hand—is entirely divorced from Fifth Circuit precedent, from the fundamental precepts of statutory interpretation, and from common sense. "[R]easonable statutory interpretation must account for both 'the specific context in which . . . language is used' and 'the broader context of the statute as a whole.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) (ellipsis in original) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). "[T]he cardinal rule [is] that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (citing *Massachusetts v. Morash*, 490 U.S. 107, 115 (1989)).

contexts, in the speech context, we may assume a substantial threat of future enforcement absent compelling contrary evidence.") (internal citation and quotation omitted).

Beyond the AG's refusal to disavow, the trial record makes clear that he *does* intend to enforce the Canvassing Restriction. Jonathan White, former Chief of the OAG Election Integrity Division, testified that the "vote harvesting" schemes (purportedly targeted by the Canvassing Restriction) remain among the three most common elections-related allegations that the OAG pursues. Tr. at 3915:3–8; *see also* LULAC-86 at 6 (identifying at least one OAG investigation of a possible violation of the Canvassing Restriction as of March 17, 2023). The OAG has specifically identified previous prosecutions in which it participated, including prosecutions for "vote harvesting" and prosecutions conducted by or with the assistance of local DAs in multiple counties. *See* OCA-377. The Secretary, for her part, has received allegations related to mail ballot "vote harvesting," which she has referred to the OAG both before and after the passage of S.B. 1. Tr. at 1914:1–6.

The State Defendants' duties under the Election Code and scintilla of enforcement are sufficient to establish that Plaintiffs' constitutional challenges to the Canvassing Restriction fall within the *Ex parte Young* exception to sovereign immunity.[20] Thus, the Court turns to the second

---

[20] The Court observes that, even if these statements were insufficient to establish the required scintilla of enforcement, it would be manifestly unfair to permit the State Defendants to pursue their sovereign immunity defense on this basis given their repeated use of the "investigative privilege" to withhold investigative documents throughout this litigation. *See* ECF No. 992-3 (OAG); ECF No. 992-16 (OAG); ECF No. 992-20 (SOS).

Under the sword-and-shield doctrine, "a party may not use privileged information both offensively and defensively at the same time." *Willy v. Admin. Rev. Bd.*, 423 F.3d 483, 497 (5th Cir. 2005); *Nguyen v. Excel Corp.*, 197 F.3d 200, 207 n.18 (5th Cir. 1999) (emphasizing "a client's inability to, at once, employ the [attorney-client] privilege as both a sword and a shield."). As the Fifth Circuit has emphasized, allowing a party to do so "would be manifestly unfair to the opposing party." *Conkling v. Turner*, 883 F.2d 431, 434 (5th Cir. 1989).

Here, the State Defendants cannot rely on Mr. White's testimony that that "vote harvesting" schemes remain among the most common elections-related allegations that the OAG pursues as proof that the Canvassing Restriction serves a compelling interest, Tr. at 3915:3–8, and at the same time argue, based on the dearth of documentary evidence of allegations, that the OAG has no role in enforcing Section 7.04.

component of subject matter jurisdiction challenged by the State Defendants: Plaintiffs' standing to challenge the Canvassing Restriction.

**Plaintiffs have Standing to Challenge the Canvassing Restriction**

Plaintiffs have established organizational standing to assert their constitutional challenges to the Canvassing Restriction. Plaintiffs and their members are directly regulated by the Canvassing Restriction and have chilled their speech due to a credible threat of enforcement by the State Defendants and the County DAs. An order enjoining enforcement of the Canvassing Restriction would remove the chill from their protected speech.

### Legal Framework

It is well settled that a plaintiff invoking a federal court's jurisdiction must establish standing by satisfying three irreducible requirements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

The elements of standing are "not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Lujan*, 504 U.S. at 561. Thus, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* In a case that proceeds to trial, plaintiffs must establish all three elements by a preponderance of the evidence. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[I]n a case like this that proceeds to trial, the specific facts set forth by the plaintiff to support standing "must be supported adequately by the evidence adduced at trial."). These requirements ensure that plaintiffs have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the

presentation of issues upon which the court so largely depends for illumination." *Massachusetts v. EPA*, 549 U.S. 497 (2007) (quoting *Baker v. Carr*, 369 U.S. 186 (1962)) (quotation marks removed).

"[P]laintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury" for the self-evident reason that "injunctive and declaratory relief 'cannot conceivably remedy any past wrong.'" *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998)).

To constitute an injury in fact, a threatened future injury must be (1) potentially suffered by the plaintiff, not someone else; (2) "concrete and particularized," not abstract; and (3) "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* at 720–21 (citations omitted). The injury must be "imminent . . . to ensure that the alleged injury is not too speculative for Article III purposes." *Id.* at 721 (quoting *Lujan*, 504 U.S. at 564 n.2). For a threatened future injury to satisfy the imminence requirement, there must be at least a "substantial risk" that the injury will occur. *Stringer*, 942 F.3d at 721 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Nonetheless, "[t]he injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an identifiable trifle." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (quotations omitted). "This is because the injury in fact requirement under Article III is qualitative, not quantitative, in nature." *Id.* (quotations omitted).

Juridical entities may establish standing under an associational or organizational theory of standing. *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017).

"Associational standing is a three-part test: (1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to

protect are germane to the purpose of the organization; and (3) neither the claim asserted, nor the relief requested requires participation of individual members." *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.,* 143 S. Ct. 2141, 2157 (2023) (quoting *Hunt v. Wash. State Apple Advert. Comm'n,* 432 U.S. 333, 343 (1977)). Participation of individual members is not required where, as here, the association seeks prospective and injunctive relief, rather than individualized damages. *Consumer Data Indus. Ass'n v. Texas,* No. 21-51038, 2023 WL 4744918, at *4 n.7 (5th Cir. July 25, 2023).

"By contrast, 'organizational standing' does not depend on the standing of the organization's members. The organization can establish standing in its own name if it 'meets the same standing test that applies to individuals.'" *OCA-Greater Hous.,* 867 F.3d at 610 (citations omitted) (quoting *Ass'n of Cmty. Orgs. for Reform Now v. Fowler,* 178 F.3d 350, 356 (5th Cir. 1999)). An organization can establish a likely future injury if it intends "to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute." *Babbitt,* 442 U.S. at 298; *see, e.g., Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n,* 760 F.3d 427, 439 (5th Cir. 2014) (charitable organizations had standing to challenge statute prohibiting their use of bingo proceeds for political advocacy as an unconstitutional burden on their political speech).[21]

### Analysis

Plaintiffs have established by a preponderance of the evidence that OCA, the League, LUPE, MABA, LULAC, TARA, and AFT and their respective members (1) are prospectively

---

[21] *See also S. Christian Leadership Conf. v. Sup. Ct. of State of La.,* 252 F.3d 781, 788 (5th Cir. 2001) (concluding that "at least some" of the plaintiffs—law students and faculty and community and student organizations—had standing to challenge a Louisiana Supreme Court rule restricting representation by student-practitioners because the operations of law-school clinics were "directly regulate[d]" and "[s]everal of the client organizations would be unable to obtain representation by the clinics").

subject to the Canvassing Restriction and (2) have been injured by the Canvassing Restriction's chilling effect on their speech.[22]

### Plaintiffs have suffered an organizational injury to their speech

"Organizations, like individuals, enjoy rights to free speech, free exercise, and equal protection of the laws." *Caractor v. City of New York Dep't of Homeless Servs.*, No. 11 CIV. 2990 DLC, 2013 WL 2922436, at *3 (S.D.N.Y. June 14, 2013) (citing *Grosjean v. Am. Press Co.*, 297 U.S. 233, 244 (1936)); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 365 (2010) ("Government may not suppress political speech on the basis of the speaker's corporate identity").

Like individuals, an organization does not need to affirmatively violate a law to have standing to challenge it. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 579–82 (2023) (considering company's First Amendment pre-enforcement challenge). Instead, the plaintiff need only "aver[] that it intend[s] to do so in the future." *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 927 n.23 (5th Cir. 2023).

The Fifth Circuit has "repeatedly held, in the pre-enforcement context, that '[c]hilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement.'" *Speech First, Inc. v. Fenves,* 979 F.3d 319, 330–31 (2020), *as revised* (Oct. 30, 2020) (quoting *Houston Chronicle v. City of League City*, 488 F.3d 613, 618 (5th Cir. 2007)). To satisfy standing requirements, this type of self-censorship must arise from a fear of prosecution that is not "imaginary or wholly speculative." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979). A fear of prosecution is "imaginary or wholly speculative" where plaintiffs "do not

---

[22] When multiple plaintiffs seek the same injunctive relief, only one needs to establish standing. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). Here, the Court must identify at least one organization in each Plaintiff group with standing to seek injunctive against the local DAs in their respective jurisdictions.

claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible.'" *Id.* (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971)).

The Fifth Circuit recently clarified in *Fenves* that, "when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will *assume* a credible threat of prosecution in the absence of compelling contrary evidence." *Fenves*, 979 F.3d at 335 (emphasis added) (quoting *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996)).

To establish a credible fear of enforcement, then, a plaintiff may, but need not, rely on a history of past enforcement of similar policies or direct threats to enforce the challenged policies: "Past enforcement of speech-related policies can assure standing," but "a lack of past enforcement does not alone doom a claim of standing." *Fenves*, 979 F.3d at 336 (citing *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006). Rather, a plaintiff may also establish a substantial threat of enforcement simply by showing that she is "either presently or prospectively subject to the regulations, proscriptions, or compulsions [being challenged]." *Id.* at 335 (citing *Laird v. Tatum*, 408 U.S. 1, 11 (1972)).

A plaintiff whose speech is subject to the challenged restriction can establish standing even when the defendant disavows any intention to enforce the policy. *Id.* at 337. As the Fifth Circuit put it:

> [I]f there is no history of inappropriate or unconstitutional past enforcement, and no intention to pursue discipline [up to and including criminal referral] under these policies for speech that is protected by the First Amendment, then why maintain the policies at all? At least, why maintain the plethora of potential sanctions?

*Id.* "Where the policy remains non-moribund, the claim is that the policy causes self-censorship among those who are subject to it, and the [plaintiffs'] speech is arguably regulated by the policy,

there is standing." *Id.* at 336–37 (citing *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767–70 (6th Cir. 2019) (fact that "there is no evidence in the record" of past enforcement "misses the point")). In the pre-enforcement context, "the threat is latent in the existence of the statute." *Id.* at 336. If a plaintiff "plainly belong[s] to a class arguably facially restricted by the [law]," that is enough to establish "a threat of enforcement." *Id.*; *see also Babbitt*, 442 U.S. at 302 (recognizing union's standing to assert pre-enforcement because the union was "not without some reason in fearing prosecution," since the criminal penalty provision applied to the union's speech, and "the State ha[d] not disavowed any intention of invoking the criminal penalty provision against unions").

The evidentiary burden for proving that a plaintiff is "prospectively" subject to the challenged regulation is not demanding. *Fenves*, 979 F.3d at 335; *Laird*, 408 U.S. at 11. A plaintiff need not show that it has engaged in arguably proscribed conduct in the past to demonstrate an intent to engage in such conduct in the future. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 579– 82 (2023) (considering company's First Amendment pre-enforcement challenge to an anti-discrimination statute by a graphic designer who had never created a wedding website but "worrie[d] that, if she enter[ed] the wedding website business, the State [of Colorado would] force her to express messages inconsistent with her belief[s]").

**Plaintiffs are prospectively subject to the Canvassing Restriction.**

All of the organizations:

   (a)   have supported ballot measures and/or candidates in the past and intend
         to do so in the future;[23]

---

[23] *See* Tr. at 1711:8–19, 1712:17–1713:11; 1726:8–14 (OCA has advocated for certain ballot measures); Tr. at Tr. at 1600:17–19 (LWV has supported ballot measures, including a school bond in Austin); Tr. at 89:2–18 (LUPE has supported ballot measures, including a drainage bond, the creation of a health care district in Hidalgo County, increased broadband access in South Texas); Tr. at 2542:6–8 (MABA routinely encourages support for candidates and ballot measures by tabling at local events, such as candidate forums); Tr. at 1632:25–1633:9 (LULAC does not endorse particular candidates but has taken positions on issues such as school and municipal bond measures, state constitutional amendments, and ballot propositions affecting taxes and public education); Tr. at 1764:3–10 (TARA has advocated for and against ballot measures, engaged in issue advocacy, and endorsed local and state candidates based on their

(b) have advocated for their positions through in-person voter engagement efforts, such as neighborhood block-walking, tabling in public places, and hosting candidate forums, town hall meetings, and other events at their offices and in members' homes;[24]

(c) reasonably expect mail-in ballots to be present during such interactions with voters, who often take out their ballots at election events or in conversations with door-to-door canvassers because they have questions about the ballot or needed voting assistance;[25] and

(d) maintain staff and/or volunteers who receive some "compensation or other benefit" in exchange for their in-person canvassing efforts.[26]

Each Plaintiff has thus established an intention, as an organization, to engage in speech arguably proscribed by the Canvassing Restriction. *See 303 Creative*, 600 U.S. at 579–82; *Susan B. Anthony List*, 573 U.S. at 159. Moreover, all the organizations and their members have self-

---

positions on issues relevant to TARA); Tr. at 929:6–930:5 (AFT engaged in block-walking to advocate for candidates and issues supported by the organization).

[24] *See* Tr. at 1694:21–1696:8, 1699:24–1702:2, 1706:12–1707:3 (OCA hosted election events attended by hundreds of people, including in-person candidate forums and meet-and-greets, and conducts block-walking and exit-polling, and encountered voters who requested assistance with their mail ballots); Tr. at 1595:3–15, 1596:3–12, 1607:7–14 (LWV hosts in-person events attended by hundreds of people in part because members like to hear about ballot measures and discuss them with other members of the community and ask candidates questions about their positions); Tr. at 71:1–72:15, 75:11–75:17, 90:4–24, 119:20–120:18 (LUPE members brought mail ballots to LUPE offices and meetings and took them out during interactions with door-to-door canvassers and asked for voting assistance); Tr. at (MABA tables at local events, including candidate forums); Tr. at 1654:2–1657:19 (LULAC members provided voter assistance during their GOTV efforts with senior citizens); Tr. at 1762:20–1763:4 (TARA hosts monthly chapter meetings, rallies, and community events across Texas); Tr. at 929:6–930:5 (AFT engaged in block-walking to advocate for candidates and issues supported by the organization).

[25] *See id; see also* Tr. at 925:9–12, 926:17–928:1 (AFT members have had voters take out their mail-in ballots while engaging in block-walking and door-to-door canvassing and AFT members themselves have filled out their mail ballots together during chapter meetings).

[26] *See* Tr. at 1717:24–1718:5, 1714:13–22, 1716:14–22, 1694:11–20 (OCA routinely offers volunteers benefits that could be considered compensation—meals, beverages, snacks, academic credit, shirts, and other nominal gifts—and pays independent contractors for literature-drop canvassing); Tr. at 1597:11–13, 1598:23–1599:1, 1601:2–8, 1601:12–1602:1 (LWV provides volunteers who staff in-person events with benefits such as food and letters of recommendation); Tr. at 75:11–17 (LUPE relies primarily on paid staff members and temporary paid canvassers); Tr. at 2542:17–20, 2544:14–16 (MABA volunteers are concerned that accepting gas cards, meals, swag, or a bottle of water will expose them to criminal liability); Tr. at 1654:2–1657:19 (LULAC volunteers receive modest compensation in the form of raffle tickets, food, and gasoline money); Tr. at 1763:16–18 (TARA relies primarily on its one paid field organizer, Judy Bryant); Tr. at 929:6–930:5 (AFT block-walkers include paid staff and volunteers who receive gas cards, food, "swag," and raffle tickets for their efforts).

censored speech that is "arguably regulated by" the Canvassing Restrictions.[27] Plaintiffs have also experienced a chilling effect on their associational rights, including their ability to recruit new members and volunteers and to assist voters during in-person events.[28]

**Plaintiffs' Organizational Injuries are Traceable to Defendants.**

The injury to Plaintiffs' and their members' free speech rights are fairly traceable to the State Defendants and County DAs, based on their authority to enforce the Canvassing Restriction under Texas law and willingness to do so.

Because the Canvassing Restriction "facially restrict[s]" Plaintiffs' expressive activity the Court must "*assume* a credible threat of prosecution in the absence of compelling contrary evidence." *Fenves*, 979 F.3d at 335 (emphasis added). The threat here is traceable to State Defendants and the County DAs, who, under the circumstances described in the Election Code,

---

[27] *See* Tr. at 1718:20–24, 1720:1–15, 1722:3–16, 1722:17–1723:5 (OCA no longer hosts in-person candidate forums and have stopped offering voter assistance); Tr. at 1599:17–21, 1620:7–1621:1 (LWV does not track whether voters bring ballots to their events but prospective voters are likely to have their ballots with them during candidate forums, which are typically held during the voting period); Tr. at 91:18–92:24, 3674:22–3675:11, 3684:13–3685:11, 3685:5–11 (LUPE has trained its canvassers to cease ballot issue advocacy to voters when a mail ballot is or might be present); Tr. at 2543:16–23 (MABA members are no longer willing to provide voter assistance); Tr. at 1654:2–1657:19 (LULAC had several counsels terminate their GOTV efforts with senior citizens because they were afraid of being asked for assistance); Tr. at 1765:19–1766:23 (TARA's only paid field organizer, is no longer willing to "accept or set up any tabling invitations or events" once "mail ballots go out" because she does not want to take the chance of a person "having a mail ballot" when she advocates on behalf of TARA); Tr. at 925:9–12, 926:17–19, 928:2–9, 930:11–21 (AFT has shifted its focus from in-person voter engagement to communicating with voters by text message, email, and phone, and must now warn its remaining block-walkers and temporary paid organizers to limit their interactions with voters so as to not risk criminal penalties).

[28] *See* Tr. at 1717:5–13, 1721:2–4, 1718:20–24, 1719:3–8, 1720:1–15 (OCA's attendance at virtual events has been "abysmal" and S.B. 1 has "decimated" its ability to provide voter assistance at events); Tr. at 1620:7–1621:1 (LWV "would turn away members with their mail-in ballots from candidate forums"); Tr. at 2543:14–2544:23 (MABA has had difficulty recruiting members to table events in support of candidates because of SB1 and because members fear that they might inadvertently commit a crime); Tr. at 1655:10–18 (LULAC volunteers "scaled . . . down" their GOTV efforts and decided not to conduct voter outreach with seniors, many of whom require voting assistance, for "fear that they could be subject to prosecution if they help seniors vote by mail"); Tr. at 1766:15–23 (TARA's mission has been severely impacted by the restrictions during the early voting period because voter engagement and advocacy efforts are most critical in the weeks leading up to an election); Tr. at 934:7–21 (AFT's members are less willing to volunteer with the organization because they are uncertain about how to comply with the law).

are vested with the authority to enforce the Canvassing Restrictions in the various jurisdictions in which Plaintiffs' free speech rights have been injured.[29]

That mere possibility that a defendant might exercise his discretion to decline to enforce a challenged law does not change the analysis: discretion does not obviate authority or defeat traceability. *See, e.g.*, *303 Creative*, 600 U.S. at 581 ("[S]tate officials . . . *may* bring actions to enforce the law. . . The Colorado Commission on Civil Rights *can* issue cease-and-desist orders and require violators to take various other "affirmative action[s].").[30] After all, it is the credible threat of enforcement that has harmed Plaintiffs and their members. *See Longoria v. Paxton*, No. SA:21-CV-1223-XR, 2022 WL 447573, at *17 (W.D. Tex. Feb. 11, 2022), *vacated and remanded on other grounds*, No. 22-50110, 2022 WL 2208519 (5th Cir. June 21, 2022) ("To be clear, the irreparable harm alleged in this case is not *actual* enforcement of the anti-solicitation provision; the harm is the chilling effect on Plaintiffs' speech that arises from the credible *threat* of enforcement." (emphasis in original)).

The injuries to Plaintiffs' First Amendment rights are traceable to the County DAs, who have "the specific duty" to prosecute election law violations. In Texas, County DAs are tasked with enforcing the State's criminal laws and represent the State of Texas in all criminal cases in

---

[29] All Plaintiffs operate within the State of Texas and thus are subject to enforcement by the Secretary and the AG. Among the OCA Plaintiffs, who have also sued the Travis County DA, *see* ECF No. 200, the League operates in Travis County, *see* Tr. at 1586:12–13 (LWV). Among the LULAC Plaintiffs, who have also sued the County DAs of Travis, Dallas, and Hidalgo Counties, *see* ECF No. 207, LULAC, TARA, and AFT operate across Texas, including through local chapters in Dallas County. *See* Tr. at 1634:6–20 (LULAC); Tr. at 1765:24–1766:5 (TARA); Tr. at 923:18–25 (AFT has 66,000 members across Texas). Among the LUPE Plaintiffs, who have also sued the DAs of Travis County, Dallas County and the 34th Judicial District (including Hidalgo County), *see* ECF No. 208, LUPE serves voters in Hidalgo County, Tr. at 58:13–16, and MABA has chapters throughout the state of Texas, Tr. at 2533:21–23.

[30] In *303 Creative*, the Supreme Court held that the plaintiff had established a credible threat of enforcement based on "*Colorado*'s" history of enforcement "against nearly identical conduct" and the fact that "*Colorado*" declined to disavow future enforcement proceedings. In attributing this conduct to "*Colorado*," the Court did not distinguish between the roles that the two key defendants—the Colorado Civil Rights Commission and the Colorado Attorney General—played in the previous enforcement proceedings. *See* 600 U.S. at 581–82 (citing a past enforcement under the same accommodation law that made its way to the Supreme Court in *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 584 U.S. 617 (2018)).

their district, unless conflicts arise. Tex. Const. art. 5, § 21; TEX. CODE CRIM. P. ART. 2.01; *see* TEX. GOV'T CODE § 43.180(b). "For this reason, courts have long recognized that prosecutors are 'natural targets for § 1983 injunctive suits since they are the state officers who are threatening to enforce and who are enforcing the law.'" *McCraw*, 90 F.4th at 785 (quoting *Sup. Ct. of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 736 (1980)).

By virtue of their positions, DAs are charged with investigating and prosecuting violations of the Election Code, including the Canvassing Restriction. *Stephens*, 663 S.W.3d at 52; *see also* TEC § 273.001 (granting county and district attorney's authority to investigate election crimes). Indeed, all prosecutions under the Election Code require the consent or authorization of the applicable DA. *See Stephens*, 663 S.W.3d at 52 (concluding that the AG "can prosecute [crimes under the Election Code] with the permission of the local prosecutor but cannot initiate prosecution unilaterally."). All the County DAs acknowledge that they are responsible for enforcing the Canvassing Provision.[31]

None of the County DAs have disavowed enforcement of the Canvassing Restriction. Indeed, the County DAs may *not* disavow such enforcement under Texas law. *See* TEX. LOC. GOV'T CODE § 87.011(3)(B) (prohibiting district attorneys from adopting an enforcement policy of refusing to prosecute a type or class of criminal offense); *see also KVUE, Inc. v. Moore*, 709 F. 2d 922, 930 (5th Cir. 1983) (holding that plaintiffs had standing to pursue a pre-enforcement challenge in part because "the state has not disavowed enforcement"), *aff'd sub nom. Texas v. KVUE-TV, Inc.*, 465 U.S. 1092 (1984).

---

[31] *See* ECF No. 753-6 (Travis County) ¶ 2; ECF No. 753-7 (Dallas County) ¶ 2; ECF No. 753-13 (Hidalgo County) ¶ 2; ECF No. 753-8 (El Paso County) ¶ 2.

Plaintiffs' injuries are traceable to the AG, who, even after *Stephens*, retains "broad investigatory powers" under the Election Code, State's Br. at 49, *LUPE v. Scott*, No. 22-50775 (5th Cir. Dec. 9, 2022), ECF No. 62, and may "direct the county or district attorney . . . to conduct or assist the attorney general in conducting the investigation." *See* TEC § 273.002(1) (emphasis added); *see also id.* § 273.001 (district attorneys must investigate alleged violations referred to them). On top of this investigative power, "the Attorney General can prosecute with the permission of [a] local prosecutor," *Stephens*, 663 S.W.3d at 55, and no County DA has disavowed a willingness to let the AG pursue cases within their counties.

Plaintiffs' injuries are also traceable to the Secretary. The Secretary must review complaints about potential violations of elections laws and, upon finding probable cause to believe that a crime occurred, refer the case to (and provide all relevant documents) to the AG. TEC § 31.006; *see also* TEC § 276.019 ("A public official or election official may not create, alter, modify, waive, or suspend any election standard, practice, or procedure mandated by law or rule in a manner not expressly authorized by this code."). Because this duty is mandatory under the Election Code, absent injunctive relief against the Secretary, she will be forced to refer potential violations of the Canvassing Restriction to the AG—even if the AG has himself been enjoined from enforcing TEC § 276.015. The threat of a such a referral to the AG could still chill Plaintiffs' speech by inviting the AG to embark on an arbitrary and discriminatory fishing expedition.

### Plaintiffs' Organizational Injuries are Redressable by Defendants.

Finally, the Court finds that Plaintiffs' injuries are "likely to be redressed by a favorable judicial decision." *Spokeo, Inc.*, 578 U.S. at 338. An order declaring the Canvassing Restriction unlawful and enjoining its enforcement would remove the chill that the provision presently imposes on Plaintiffs and their members. *See Ctr. for Individual Freedom v. Carmouche*, 449 F.3d

655, 661 (5th Cir. 2006) (finding "redressability prong[] of the standing inquiry . . . easily satisfied"

where "[p]otential enforcement of the statute caused the [plaintiff's] self-censorship, and the injury

could be redressed by enjoining enforcement of the [statute]"); *Nat'l Press Photographs Ass'n v.*

*McCraw*, 504 F. Supp. 3d 568, 582 (W.D. Tex. 2020), *aff'd* 90 F.4th 770 (5th Cir. 2024) (similar).

In short, Plaintiffs' position with respect to Section 7.04's Canvassing Restriction is

"sufficiently adverse" to the State Defendants and the County DAs to present a case or controversy

within this Court's jurisdiction. *Babbitt*, 442 U.S. at 302.[32]

Satisfied of its jurisdiction, the Court turns to the merits of Plaintiffs' constitutional

challenges to the Canvassing Restriction.

## PLAINTIFFS' CONSTITUTIONAL CHALLENGES

Plaintiffs challenge the Canvassing Restriction as applied to their in-person advocacy with

voters in the presence of a mail ballot in multiple contexts, including interactions in which voters

have asked Plaintiffs' staff members and volunteers questions involving their mail ballots or for

---

[32] Many, if not all, of the Plaintiffs, would also have associational standing as membership organizations with members in Texas who receive compensation or other benefits in connection with their in-person canvassing activities. *Cf. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023) (where "an organization has identified members and represents them in good faith, our cases do not require further scrutiny into how the organization operates").

Plaintiffs' individual members would independently meet the Article III standing requirements because they have engaged in self-censorship of speech that is arguably regulated by the Canvassing Restriction. *See, e.g.*, Tr. at 1765:19–1766:23 (TARA's only paid field organizer, Judy Bryant, is no longer willing to "accept or set up any tabling invitations or events" once "mail ballots go out" because she does not want to take the chance of a person "having a mail ballot" when she advocates on behalf of TARA).

Their First Amendment injuries are traceable to the State Defendants and the County DAs, based on their power to enforce the Canvassing Restriction under Texas law. Moreover, the free speech interests that Plaintiffs seek to protect are germane to their respective organizational missions. *See, e.g.*, Tr. at 1762:8–19, 1764:3–10, (TARA educates and mobilizes its members and volunteers to advance the interests of seniors citizens in Texas by engaging with voters in person about local and state candidates and ballot measures that would advance TARA's mission). Because Plaintiffs seek prospective and injunctive relief, rather than individualized damages, the participation of their members is not required. *See Consumer Data Indus. Ass'n*, 2023 WL 4744918, at *4 n.7.

The Court need not examine Plaintiffs' associational standing to challenge the Canvassing Restriction in any further detail, however, considering the obvious organizational interests at stake.

assistance completing them. The OCA Plaintiffs and LUPE Plaintiffs also assert facial challenges to the Canvassing Restriction as overbroad and unconstitutionally vague. *See* ECF Nos. 200, 208.

"Confusion abounds over the scope of as-applied and other types of First Amendment challenges that a plaintiff can pursue when challenging a statute," *Just. v. Hosemann*, 771 F.3d 285, 292 (5th Cir. 2014), but the primary distinction "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United*, 558 U.S. at 331.

"[T]he overbreadth doctrine enables litigants 'to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *Hill v. Colorado*, 530 U.S. 703, 731–32 (2000) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)); *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984) ("Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society[.]").

In the First Amendment context, facial challenges require courts to evaluate whether "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024) (finding in the "singular" First Amendment context, "even a law with a plainly legitimate sweep may be struck down in its entirety. But that is so only if the law's unconstitutional applications substantially outweigh its constitutional ones.") (citation and internal quotations omitted).

"[E]ven if an enactment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (citing *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).

As a practical matter, the Court will begin its analysis with Plaintiffs' facial challenges because, the "first step" in overbreadth and vagueness cases is to "construe the challenged statute." *United States v. Williams*, 553 U.S. 285, 293 (2008) ("[I]t is impossible to determine whether a statute reaches too far without first knowing what the statute covers."); *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 (1982) ("In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct.").

### The Canvassing Restriction is subject to strict scrutiny.

The threshold question is what level of scrutiny applies to the Canvassing Restriction. *See Turner Broad. System, Inc. v. FCC*, 512 U.S. 622, 637 (1994). The Canvassing Restriction is subject to strict scrutiny both because it is a content-based and because it burdens Plaintiffs' core political speech.

The First Amendment to the U.S. Constitution protects against laws "abridging the freedom of speech." Free speech is protected both "from abridgment by Congress" and "from impairment by the States." *Gitlow v. New York*, 268 U.S. 652, 666 (1925). Accordingly, under the First Amendment, states have "no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (quoting *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95 (1972)).

Content-based restrictions on speech "single[] out specific subject matter for differential treatment." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (quoting *Reed*, 576 U.S. at 169). They distinguish between "favored" and "disfavored speech." *Serv. Emps. Int'l Union*, *Loc. 5 v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010). "[A] speech regulation

targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Reagan Nat'l Advert.*, 596 U.S. at 71 (citation omitted).

Courts apply "strict scrutiny" to content-based restrictions on speech and laws that burden political expression. *See Reed*, 576 U.S. at 163–64 (content-based restrictions); *Meyer v. Grant*, 486 U.S. 414, 420 (1988) (political speech); *Citizens United*, 558 U.S. at 340 (same); *Veterans of Foreign Wars*, 760 F.3d at 438–39 (same). Such laws are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163.

Strict scrutiny is required because the First Amendment "'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)). Efforts to encourage voters to support a candidate or ballot measure constitute "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer*, 486 U.S. at 421–22. That is because "'[f]ree trade in ideas' means free trade in the opportunity to persuade to action, not merely to describe facts." *NAACP v. Button*, 371 U.S. 415, 437 (1963) (quoting *Thomas v. Collins*, 323 U.S. 516, 537 (1945)). Thus, facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the statute from chilling the First Amendment rights of other parties not before the court. *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984).

The Canvassing Restriction is content based because it "single[s] out specific subject matter"—speech intended to deliver votes for a specific candidate or measure—"for differential treatment." *Reagan Nat'l Advert.*, 596 U.S. at 69 (quoting *Reed*, 576 U.S. at 169). No other

category of speech is targeted for similar disfavored treatment. *City of Houston*, 595 F.3d at 596 (holding that content-based regulations are those that distinguish between "favored" and "disfavored speech"). It does not matter that the Canvassing Restriction does not target speech in support of *specific* candidates or measures—a regulation is content-based "even if it does not discriminate among viewpoints within that subject matter." *Reagan Nat'l Advert.*, 596 U.S. at 71.

Plaintiffs' in-person voter engagement activities constitute "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer*, 486 U.S. at 421–22; *see also NAACP v. Button*, 371 U.S. 415, 437 (1963) ("'Free trade in ideas' means free trade in the opportunity to persuade to action" (quoting *Thomas v. Collins*, 323 U.S. 516, 537 (1945))). Urging voters to support particular measures or candidates during in-person interactions—the category of speech targeted by the Canvassing Restriction—is fundamentally expressive, and an individual or organization that conducts such activities engages in core political speech.

The State Defendants incorrectly assert that *Anderson/Burdick* governs the level of scrutiny applicable to Plaintiffs' challenge to the Canvassing Restriction, based on a misreading of the Fifth Circuit's decision in *Voting for America Inc. v. Steen*, 732 F.3d 382, 385 (5th Cir. 2013).

*Steen* involved a challenge to Texas regulations governing the appointment of volunteer deputy registrars ("VDRs"), who are trained and empowered under Texas law to collect and deliver completed voter registration applications. *Id.* Specifically, the regulations provided that VDRs must be Texas residents and that they could register voters only for counties in which the VDRs had been appointed. *Id.* at 389. Reversing the district court's preliminary injunction, the Fifth Circuit acknowledged that VDRs often engage in core political speech by "soliciting, urging and

persuading the citizen to vote," *id.* at 390, but concluded that the VDR provisions did not impose any burden on such speech:

> The Non–Resident and County provisions do not in any way restrict or regulate who can advocate pro-voter-registration messages, the manner in which they may do so, or any communicative conduct. They merely regulate the receipt and delivery of completed voter-registration applications, two non-expressive activities.

*Id.* at 391 (citations omitted). In other words, prohibiting out-of-state canvassers from registering voters in Texas did not affect their ability to promote voter registration in Texas. Moreover, the voter registration application itself did not represent the VDR's speech, the majority reasoned, but the *voter*'s speech. *Id.* at 390. Because the canvassers' speech was "distinct from both the collection and delivery of the forms and from the voters' 'speech' in registering," registration drives could not be considered "expressive conduct" protected by the First Amendment. *Id.* at 391. Despite finding it "indisputable" that requirements "burden[ed] no one's core political speech," the majority addressed the alleged burden on the canvassers' purportedly expressive conduct under *Anderson-Burdick* for the sake of argument. *See id.* at 392–96 (concluding that any burden was minimal and justified by Texas's interest in preventing voter registration fraud).

*Steen* does not stand for the proposition that any election-related speech should be analyzed under *Anderson-Burdick*. To the contrary, the Supreme Court has made clear that while *Anderson-Burdick* applies to laws and regulations that "control the mechanics of the electoral process," it does not apply to "a regulation of pure speech," even in the election context. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995).

Burdens on core political speech during elections, like *all* burdens on core political speech, are subject to strict scrutiny. *Id.* at 347.[33] And with good reason: it would defy logic to subject a

---

[33] *See also Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 207 (1999) (Thomas, J., concurring) ("When a State's election law directly regulates core political speech, we have always subjected the challenged restriction to strict

content-based restriction of core political speech to *lesser* scrutiny because it happens to regulate speech during elections, when "the importance of First Amendment protections" is at its "zenith." *Meyer*, 486 U.S. at 425; *see also McIntyre*, 514 U.S. at 346–47 (noting political speech "occupies the core of the protection afforded by the First Amendment" and that "[n]o form of speech is entitled to greater constitutional protection"). Indeed, "it can hardly be doubted that the constitutional guarantee [of free speech] has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Serafine v. Branaman*, 810 F.3d 354, 361 (5th Cir. 2016) (holding that content-based restriction in election context was subject to "exacting scrutiny" (citing *McIntyre*, 514 U.S. at 347)).[34]

The State Defendants have not identified any election-related conduct purportedly regulated by the Canvassing Restriction—let alone non-expressive conduct—suggesting that it is directed toward the "mechanics of the electoral process" as opposed to "pure speech." Indeed, outside of voting assistance (which, as discussed herein, the State Defendants insist is still permitted under the Canvassing Restriction), it is unclear to the Court how a canvasser could

scrutiny and required that the legislation be narrowly tailored to serve a compelling governmental interest."); *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 138, 142 (3d Cir. 2022), *cert. denied sub nom. Mazo v. Way*, 144 S. Ct. 76 (2023) (concluding that *Anderson-Burdick* applies only to laws that "primarily regulate the mechanics of the electoral process, as opposed to core political speech," not to laws "that are primarily directed at regulating 'pure speech'") (quoting *McIntyre*, 514 U.S. at 345); *Lichtenstein v. Hargett*, 83 F.4th 575, 593 (6th Cir. 2023) (explaining the Supreme Court has "applied strict scrutiny—not *Anderson-Burdick* balancing—to many election laws" implicating core political speech) (collecting cases); *Fusaro v. Cogan*, 930 F.3d 241, 258 (4th Cir. 2019) (observing the Supreme Court has "distinguished between laws that . . . regulate 'pure speech,'" and those subject to *Anderson-Burdick*); *Campbell v. Buckley*, 203 F.3d 738, 745 (10th Cir. 2000) (recognizing "strict scrutiny," rather than *Anderson-Burdick*, "is applied where the government restricts the overall quantum of speech available to the election or voting process"); *Cotham v. Garza*, 905 F. Supp. 389, 396 (S.D. Tex. 1995) (holding that provisions governing the mechanics of voting are subject to *Anderson-Burdick* while a "content-based restriction on core political speech" is subject to strict scrutiny).

[34] Although the Supreme Court at times has used the terms "strict" and "exacting" scrutiny interchangeably when describing the relevant standard of review for content-based restrictions, more recent Supreme Court precedent has clarified that both content-based regulations and laws that restrict political speech are subject to strict scrutiny. *See, e.g.*, *City of Austin*, 596 U.S. at 68–69 (content-based regulations warrant application of strict scrutiny); *Reed*, 576 U.S. at 164 (content-based regulations must satisfy strict scrutiny); *Citizens United*, 558 U.S. at 340 (laws burdening political speech are subject to strict scrutiny); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812–13 (2000) (subjecting content-based restriction to strict scrutiny).

engage in an "in-person interaction" with a voter "intend[ing] to deliver votes for a specific candidate or measure" *without* engaging in core political speech.[35]

Any argument that the Canvassing Restriction regulates conduct—e.g., the payment of "compensation or other benefit"—rather than speech is foreclosed by *Citizens United*, 558 U.S. at 351 (applying strict scrutiny to a ban on independent corporate expenditures for electioneering communications); *see also Buckley v. Valeo*, 424 U.S. 1 (1976). "A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Buckley*, 424 U.S. at 19. As the Supreme Court has acknowledged, "all speakers, including individuals and the media, use money amassed from the economic marketplace to fund their speech," *Citizens United*, 558 U.S. at 351:

> [V]irtually every means of communicating ideas in today's mass society requires the expenditure of money. The distribution of the humblest handbill or leaflet entails printing, paper, and circulation costs. Speeches and rallies generally necessitate hiring a hall and publicizing the event. The electorate's increasing dependence on television, radio, and other mass media for news and information has made these expensive modes of communication indispensable instruments of effective political speech.

*Buckley*, 424 U.S. at 19. "The First Amendment protects the resulting speech." *Citizens United*, 558 U.S. at 351.

Strict scrutiny applies to the Canvassing Restriction.

---

[35] The Canvassing Restriction does regulate *voters*' conduct insofar as it prevents them from voting by mail in the presence of a paid canvasser advocating for a particular candidate or ballot measure. Indeed, the LUPE Plaintiffs have in fact challenged Section 7.04's impact on voters as an unconstitutional burden on the right to vote in violation of the First and Fourteenth Amendments and acknowledge that *Anderson-Burdick* applies to that claim. *See* ECF No. 208 ¶¶ 219–29; *see also* ECF No. 854 § V. This order is limited to Plaintiffs' free speech and overbreadth challenges to Section 7.04 in their capacity as *canvassers*.

**The Canvassing Restriction is Facially Overbroad**

### The Legal Framework

A "law imposing criminal penalties on protected speech is a stark example of speech suppression," *Ashcroft v. Free Speech Coal.*, 535 U.S. 564, 573 (2002), and the overbreadth doctrine permits courts to invalidate laws with civil or criminal penalties that might chill or dampen expressive activity of members of the public at large:

> Many persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech—harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas. Overbreadth adjudication, by suspending all enforcement of an overinclusive law, reduces these social costs caused by the withholding of protected speech.

*Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (citations omitted). Still, "invalidating a law that in some of its applications is perfectly constitutional . . . has obvious harmful effects." *United States v. Williams*, 553 U.S. 285, 292 (2008).

To "strike[] a balance between competing social costs," a court considering a First Amendment overbreadth challenge should invalidate the statute only if a significant number of its applications are unconstitutional, considering the statute's intended scope. *United States v. Stevens*, 559 U.S. 460, 473 (2010).

### *The Scope of the Canvassing Restriction*

The Court first "assess[es] the state law's scope." *Moody*, 144 S. Ct. at 2398. The Canvassing Restriction imposes criminal liability on anyone who receives or offers "compensation or other benefit" and engages in speech that is "intended to deliver votes for a specific candidate or measure" in "the physical presence" of a mail ballot. TEC § 276.015.

Neither the Secretary nor the OAG has provided any guidance on the meaning of the Canvassing Restriction. Tr. at 1914:7–14, 1924:7–18, 1924:24–1925:3.

<u>The Canvassing Restriction is not limited to instances of voter fraud or coercion.</u>

Despite the text of the statute, Mr. Ingram testified that vote harvesting involves "physical presence, intimidation, making sure that a voter marked one box one way," Tr. at 1914:1–6, and occurs when somebody puts pressure on a voter to vote a particular way on a particular race[.]" Tr. at 4427:7–18. However, the Canvassing Restriction says nothing about "intimidation," "making sure the voter marked one box one way," or putting "pressure on a voter." *See generally* TEC § 276.015.

The Canvassing Restriction criminalizes compensation for *interactions* rather than the actual *delivery* of votes and imposes liability based on the *intent* of the voter outreach activity—to encourage a voter to support a particular candidate or ballot measure—rather than its actual effect on a voter. Nothing in the text of the statute limits its application based on the *voter's perception* of the interaction.

The text of the Canvassing Restriction reaches activities in the presence of a mail ballot regardless of the interaction's *ability* to affect the voter. By its text, Section 7.04 does not even permit an organizer to continue speaking in the presence of a mail ballot that the organizer learns will never deliver a vote for her cause, simply because she entered the interaction with the *intent* to garner electoral support. Section 7.04 is silent as to the canvasser's knowledge about the *voter*'s intent or ability to *actually cast* the ballot that happens to be present in favor of the canvasser's preferred candidate or measure. The ballot may have already been completed in favor of an opposing candidate or measure. A voter in possession of a mail-in ballot may become ineligible to vote by mail under Texas law due to changes in her travel plans (or some other change in

circumstances)[36] and decide to surrender his mail ballot at a polling station and vote in person. Likewise, the ballot materials might contain some damage or defect that would invalidate the ballot. There is no chance that the canvasser's compensated speech would, under those circumstances, intimidate or pressure a voter *during the voting process*.

The text of the Canvassing Restriction reaches organizers who provide voter assistance at a voter's request. The State Defendants assert that such assistance falls outside the purview of Section 7.04 because it is not "designed to deliver votes for or against a specific candidate or measure." ECF No. 862 ¶ 479 (citing TEC §276.05(e)); *see also* ECF No. 608 at 36.

But any efforts designed to increase *turnout* among voters who are already likely to vote for the organization's preferred candidate or measure are, arguably "designed to deliver votes for the candidate or measure." Thus, training canvassers on how to provide non-coercive voting assistance to LEP and disabled voters upon request during candidate forums or block-walking would be arguably "designed to deliver votes for a specific candidate or measure" if the organization's outreach efforts were directed toward like-minded voters.

The expansive reach of the term "interaction"—as opposed to "communication" or "speech" or "advocacy"— compels the same conclusion because it very clearly encompasses *both* core political speech *and* voting assistance. *See Interaction*, Merriam-Webster, https://www.merriam-webster.com/dictionary/interaction (last visited Sept. 24, 2024) (defining "interaction" means "mutual or reciprocal action or influence"). Nothing in the text of the Canvassing Restrictions suggests that a voter who asks a canvasser for voting assistance while

---

[36] Texas authorizes several categories of voters to vote by mail. These include voters who are 65 years of age or older, disabled voters who cannot vote in person on Election Day "without the likelihood of needing personal assistance or injuring [their] health," voters absent from their home counties for the entire in-person voting period, and voters who expect to give birth near Election Day. TEC §§ 82.001–004, .007–.008.

discussing a ballot measure begins a new, distinct "interaction" that is no longer imbued with the canvasser's original intent.

Finally, the text of the Canvassing Restriction can be read to impose criminal liability on the very voters it purports to protect. For example, a voter discussing his mail ballot with a like-minded GOTV volunteer would arguably violate Section 7.04 by offering a glass of water as a pick-me-up during a hot afternoon of door-knocking. *See* TEC § 276.015 (making it a crime to offer a benefit for the canvasser's "services").[37] Likewise, a paid organizer could violate the statute by using her *own* mail-in ballot as a visual aid during conversations with voters. Section 7.04 criminalizes both interactions, even though neither voter faces risk of coercion or intimidation based on the "compensation" involved or the "presence" of a mail ballot.

<u>The Canvassing Restriction is not limited to speech during active voting.</u>

The State Defendants insist that the Canvassing Restriction is merely a restriction on the *timing* of canvassers' speech only "in situations where an individual is actively voting or is being pressured to do so." ECF No. 862 ¶ 1038; *see also* Tr. at 1915:12–16 (Mr. Ingram's testimony that illegal vote harvesting is limited to "whenever the voter and the harvester get together and they're reviewing the ballot together, and then they get down to that candidate, and the harvester makes sure they check the right box[.]").

Here, again, because nothing in the text of the Canvassing Restriction even limits its application to interactions involving *live* ballots, it appears to apply to interactions in the presence of mail ballots that will never actually be cast.

---

[37] This application of the Canvassing Restriction is not purely hypothetical. At trial, Grace Chimene, testifying on behalf of the League, was especially worried that League volunteer activities' during door-to-door canvassing could expose *voters* to criminal liability: "It's not just my concern for the league members, but it's also a concern if just a voter that were helping provides compensation, or the place that they live provides compensation of some type that they may be committing a crime." Tr. at 1592:1–5; *cf.* Tr. at 1904 (Keith Ingram's testimony that a voter would violate Section 6.06's bar on compensated assistance by offering a volunteer $20 to help them vote).

Even with respect to live ballots, the State Defendants' position is unsupported by the text of the provision, which applies to interactions that occur "in the presence of the ballot *or* during the voting process." TEC § 276.015(e)(2) (emphasis added). Nothing in S.B. 1 or the Election Code defines what it means for an individual to be in the "physical presence" of a ballot. Tr. at 1914:18–20. According to the State Defendants, "'physical presence' does not simply mean in the same house or within a particular distance, it means a vote harvester going through the ballot with the voter and ensuring the voter chooses the harvester's candidate." ECF No. 862 ¶ 479. To have any meaning at all, however, "in the physical presence of a ballot" must extend *beyond* the voting process itself. *Cf. Nielsen v. Preap*, 586 U.S. 392 (2019) (explaining that, under the interpretative canon against surplusage, "every word and every provision is to be given effect [and n]one should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." (quotation marks and citation omitted)). As discussed below in connection with Plaintiffs' vagueness claims, however, it is anyone's guess how far the Canvassing Restriction reaches beyond ballots that are being actively voted.

Having construed the Canvassing Provision, the next step is to "decide which of the [law's] applications violate the First Amendment, and to measure them against the rest." *Moody*, 144 S. Ct. at 2398.

### The Canvassing Restriction is unconstitutional in a large number of applications

Because the Canvassing Restriction is subject to strict scrutiny, the State Defendants must "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Veterans of Foreign Wars*, 760 F.3d at 438 (quoting *Citizens United*, 558 U.S. at 340).

**Legal Standard**

A law is "narrowly tailored" if it (1) actually advances the state's interest, (2) does not sweep too broadly, (3) does not leave significant influences bearing on the interest unregulated (i.e., is not underinclusive), and (4) could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative). *Id.* at 427.

Speech restrictions cannot "sweep too broadly" if they are to be considered "narrowly tailored." *Id.* at 440 (quoting *Republican Party of Minn. v. White*, 416 F.3d 738, 751 (8th Cir. 2005) (en banc)). The Government must identify an "actual problem" in need of solving, *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000), and demonstrate that restricting free speech is *necessary* to the solution, *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992). In other words, "if a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Playboy*, 529 U.S. at 813; *see also Serv. Emps. Int'l Union*, 595 F.3d at 603–04 (holding that Houston's broad restriction on the timing of parades was not narrowly tailored because the city could have advanced its interests with less restrictive alternatives); *see generally Citizens United*, 558 U.S. at 340.

In addition to overbreadth, evidence of underinclusivity can defeat a statute subject to strict scrutiny. *See Reed*, 576 U.S. at 172 ("[A] 'law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited[.]'") (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002)).

**Analysis**

The State Defendants insist that Section 7.04 of S.B. 1 "was enacted to prevent paid partisans from haranguing Texas citizens while they fill out their mail ballots." ECF No. 862 ¶

1023. "It applies," they argue, "only to individuals who are paid to press individuals to fill out their ballots—in the canvasser's presence—in particular ways. It does not apply to canvassing beyond that narrow situation." ECF No. 862 ¶ 1023 (citations omitted).

To the contrary, the Canvassing Restriction is unconstitutional precisely because, by its plain text, it reaches beyond that narrow situation to protected speech in a substantial number of its applications. Moreover, it is unclear to the Court that County DAs would even be able to adopt such a limiting construction without violating TEX. LOCAL GOV'T CODE § 813(B), which prohibits DAs from adopting any policy that "prohibits or materially limits the enforcement of any criminal offense."

The State Defendants' proposed limiting constructions are unsupported by the text and, in any event, would not satisfy strict scrutiny because the Canvassing Restriction, besides being overbroad, (1) does not actually advance the state's interest, (2) is underinclusive, and (3) could be replaced with a less restrictive alternative. *See Veterans of Foreign Wars*, 760 F.3d at 438.

**The Canvassing Restriction does not advance any state interests.**

To be clear, Plaintiffs do not suggest that the First Amendment confers upon canvassers an unfettered right to "harangue" a voter as she is casting a mail ballot—with or without the canvasser's assistance. States, to be sure, have an "important state interest" in "[e]nsuring that every vote is cast freely," *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2341 (2021).

Indeed, Plaintiffs acknowledge that the Election Code already imposes criminal penalties against "effort[s] to influence the independent exercise of the vote of another in the presence of the ballot or during the voting process," TEC § 276.013, or voting (or attempting to vote) a ballot belonging to another person, or attempting to mark another person's ballot without their consent or specific direction, TEC § 64.012. Similarly, it is already a crime for a voting assistor to

"suggest[] by word, sign, or gesture how the voter should vote" while providing such assistance or "prepare[] the voter's ballot in a way other than the way the voter directs or without direction from the voter." TEC § 64.036.

The fact that these preexisting provisions target the very conduct purportedly regulated by the Canvassing Restriction indicate that the law is not "necessary" to serve the government's interests. *R.A.V.*, 505 U.S. at 395; *see also*, *e.g.*, *Veterans of Foreign Wars*, 760 F.3d at 441 (holding that a statute's provision was not narrowly tailored because the purported interest it served was already met by a different provision).

The State Defendants dismiss concerns expressed by voters and election officials alike as "farfetched" and "fanciful hypotheticals." ECF No. 862 ¶¶ 1018, 1022. But, for their part, the State Defendants have not offered even *hypothetical* scenarios in which the Canvassing Restriction would serve the government's interest in ways that are not already accomplished by other criminal provisions of the Election Code, let alone identified an "actual problem" in need of solving. *United Playboy Ent. Grp., Inc.*, 529 U.S. at 813. The State Defendants failed to offer any evidence that voters have been confused or improperly influenced by "compensated" canvassers for community-based organizations who advocated in the presence of mail-in ballots. Nor is there any evidence that the preexisting limitations on mail-in ballot assistance were insufficient to identify and prosecute the few alleged instances of misconduct in Texas.

**The Canvassing Restriction is not narrowly tailored to any compelling interest.**

Even if the Canvassing Restriction served Texas's interest in preventing its citizens from being "harangued" while they fill out their mail ballots, ECF No. 862 ¶ 1023, it is not narrowly tailored to that purpose because, as discussed, nothing in the text of the Canvassing Restriction limits its application to "haranguing" speech or even speech that occurs *during the voting process*.

*See Am. Booksellers*, 484 U.S. at 397 ("[T]he statute must be readily susceptible to the limitation; we will not rewrite a state law to conform it to constitutional requirements." (quotation omitted)).

The Canvassing Restriction "sweep[s] too broadly." *Veterans of Foreign Wars*, 760 F.3d at 440. It is clear that Section 7.04 "could be replaced by . . . [an]other regulation that could advance the interest . . . with less infringement of speech," *id.*

If the legislature sought to prohibit canvassers from "haranguing" voters as they filled out their ballots, it could have said so. Instead, Section 7.04's broad terms extend its application to *any* "in-person interaction," from conversations at the voter's front door to conversations at the post office, sweeping in vast swaths of protected First Amendment activity. Rather than prohibiting protected expression—"intended[ed] to deliver votes for a specific candidate or measure"—the legislature could have crafted language specifically targeting speech that is "intended to defraud, confuse, unduly influence or deceive." Likewise, rather than restricting speech whenever a ballot is merely "present," the restriction at issue easily could have been limited to instances when a voter is actively completing their ballot.

Not only would a less restrictive provision serve the Government's purported interest, but it would also serve the Government's interests *better* than the Canvassing Restriction. Instead of targeting *interactions* with voters, the legislature could have discouraged "vote harvesting" activity by criminalizing compensation based on a canvasser's actual *delivery* of votes. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 512 (1996) ("[T]he First Amendment directs that government may not suppress speech as easily as it may suppress conduct, and that speech restrictions cannot be treated as simply another means that the government may use to achieve its ends."). Indeed,

before S.B. 1, TEC § 86.105 prohibited "performance-based compensation" for voting assistance based on the number of voters assisted or a quota of voters to be assisted. *See* JEX 1 at 54–55.[38]

**Comparisons to Texas's electioneering regulations are inapposite.**

The State Defendants insist that the protection afforded by the Canvassing Restriction is "precisely what Texas gives in-person voters by requiring campaigners and partisans to remain 100 feet away from in-person polling places." ECF No. 862 ¶ 1024; TEC §§ 61.003, 85.036. The analogy to in-person voting is inapt, for a number of reasons.

To begin, such electioneering laws apply only in specific locations—within 100 feet of polling places—and thus implicate the Supreme Court's "'forum based' approach for assessing restrictions that the government seeks to place on the use of its property." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018) (quoting *Int'l Soc. for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 678 (1992)) ("A polling place in Minnesota qualifies as a nonpublic forum. It is, at least on Election Day, government-controlled property set aside for the sole purpose of voting. The space is a special enclave, subject to greater restriction." (quotations omitted)).

That approach is impossible here, because there are no restrictions on where in the state a mail-ballot may be present or voted—including in traditional public forums, where content-based restrictions remain subject to strict scrutiny. *Id.* The Canvassing Restriction, then, according to the State Defendants, effectively converts the entirety of Texas into a polling place where conversations about candidates can create criminal liability. Under the State Defendants' theory, in weeks before an election, public parks and streets will vacillate from moment to moment between being traditional public forums and non-public forums designated for voting depending on whether a voter happens to be carrying or a casting a mail ballot on the premises. This position

---

[38] Section 6.06 of S.B. 1 amended TEC § 86.105 to prohibit all compensation for voting assistance.

fails as a matter of law and common sense.[39] *Cf. Burson v. Freeman*, 504 U.S. 191, 207–08 (1992) (upholding campaign-free zone outside the polls based on "common sense" that a was "necessary" to secure the advantages of the secret ballot and protect the right to vote).

The Canvassing Restriction itself implicitly acknowledges the difference in circumstances by requiring an "in-person interaction" between the canvasser and a voter in the context of mail ballots, while the electioneering provision prohibits individuals from "posting, us[ing], or distribut[ing] political signs or literature" or "loiter[ing]" within 100 feet of the door to a building in which a polling place is located. TEC § 61.003.

Because of the flexibility that voting by mail provides, mail voters who encounter unwelcome canvassing activities can simply put their ballots away and vote some other time. In-person voters, in contrast, do not have free rein to decide where to vote or the authority to control who else shows up at the polling place. In-person voters are essentially captives to the circumstances of their polling locations from the moment they get in line until they receive their "I voted" sticker.

Accordingly, the State of Texas has exercised its authority to restrict certain conduct in and around polling places that are simply inapplicable to the mail-in voting process. For example, in addition to electioneering restrictions, Texas law prohibits a person from using a wireless communication device within 100 feet of a voting station. TEC § 61.014(a). But the absentee analog—prohibiting a person from using such a device "in the presence of a mail-in ballot"— would be impractical. It would bar a voter from filling out his mail-in ballot at his kitchen table while watching the news and force his wife and children to turn off their phones in their own home.

---

[39] By prohibiting speech in support of a candidate or measure in the presence of mail ballots, even in public forums or at the voter's request, the Canvassing Restriction also appears to restrict the public's access to the canvassers' core political speech. *See Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 77 (1976) (Powell, J., concurring) ("[T]he central First Amendment concern remains the need to maintain free access of the public to the expression.").

Texas voters have the right to vote in secret. Tex. Elec. Code § 62.0115(b)(2). Nothing, however, imposes on voters a *duty* to vote in secret. Electioneering zones and other restrictions on who can enter polling places often creates de facto secrecy for in-person voters, of course, because again, as a practical matter, a voter cannot waive other voters' right to a secret ballot free from intimidation by inviting *his* preferred canvasser into the building to persuade them to vote a certain way. *See Burson v. Freeman*, 504 U.S. 191, 207–08 (1992) (upholding campaign-free zone outside the polls based on "common sense" that a was "necessary" to secure the advantages of the secret ballot and protect the right to vote).

But a voter's choice to complete his or her *mail* ballot in the presence of a paid organizer affects no one *else*'s right or ability to cast a secret ballot. Indeed, before S.B. 1, mail voters could—and often did—intentionally vote their ballot in the presence of canvassers for trusted community groups and advocacy organizations. For example, before S.B. 1, members of OCA and LUPE often brought their ballots to election events, seeking voting assistance.[40] Members of retiree chapters of AFT sometimes brought their mail-ballots to chapter meetings and marked and mailed their ballots together as a group. Tr. at 972:17–23.

**The Canvassing Restriction is underinclusive.**

The Canvassing Restriction is also underinclusive in several respects, especially in comparison to the electioneering restrictions applicable to in-person voting.

The electioneering laws, for example, apply on their face to anyone campaigning within 100 feet of the polling station, *regardless of compensation*, whether they are electioneering "for *or against* any candidate, measure, *or political party*." TEC §§ 61.003, 85.036. In contrast, the

---

[40] Tr. at 1694:21–1696:8, 1699:24–1702:2, 1706:12–1707:3 (OCA); Tr. at 71:1–72:15, 75:11–17, 119:20–120:18 (LUPE).

Canvassing Restriction prohibits canvassers receiving "compensation or other benefit" from interacting with voters to deliver votes *for* a particular candidate or measure. TEC § 276.015.

In other words, by its text, the Canvassing Restriction does *not* prohibit paid canvassers from engaging in the kind of "haranguing" conduct the provision is purportedly concerned with, so long as the organizers intend to deliver votes (1) *against* a particular candidate or measure or (2) *for or against* a *political party*. It is unclear to the Court why such haranguing would be more tolerable from a different class of canvasser—e.g., a paid party staffer or a hungrier, thirstier volunteer—seeking to deliver votes *against* their opponents or *for* a political party generally. [41]

The underinclusiveness of the Canvassing Restriction undermines the State Defendants' argument that it is narrowly tailored to further a compelling government interest. *See Reed*, 576 U.S. at 172 ("The Town cannot claim that placing strict limits on temporary directional signs is necessary to beautify the Town while at the same time allowing unlimited numbers of other types of signs that create the same problem."); *Veterans of Foreign Wars*, 760 F.3d at 441 (concluding that the "obvious underinclusiveness" of limiting undermines any argument that Texas is truly interested in regulating gambling).

The State Defendants maintain that the Canvassing Restrictions' sweep is sufficiently narrowed by the scienter requirement because "the vast majority of the time" canvassers will be unaware that they are in the presence of a mail ballot. The State Defendants have offered no evidence demonstrating how often canvassers encounter mail ballots while advocating for a candidate or issue. Plaintiffs, on the other hand, produced several witnesses who testified that

---

[41] Despite the State Defendants' unwillingness to define "compensation," to the extent that it includes items like bottles of water, bus fare, and t-shirts, the State Defendants have not demonstrated that such nominal gifts cause create an "actual problem" in need of solving (i.e., that they cause canvassers to "harangue" voters). *United Playboy Ent. Grp., Inc.*, 529 U.S. at 813.

voters regularly produced their mail ballots during in-person interactions with organizers to ask questions about their ballot or request voting assistance. [42]

Both overbroad and underinclusive, the Canvassing Restriction is unconstitutional in most of its applications, judged in relation to its legitimate applications to voter fraud or coercion. *Moody*, 144 S. Ct. at 2397.

## The Canvassing Restriction is Unconstitutionally Vague

### The Legal Framework

A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). "A law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement*." McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir.), *cert. denied* 144 S. Ct. 348 (2023).

"A regulation is void for vagueness when it is so unclear that people 'of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Id.* (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). When a statute "authorizes or even encourages arbitrary and discriminatory enforcement," it is a telltale sign of its unconstitutional vagueness. *Hill v*, 530 U.S. at 732; *Hiett v. United States*, 415 F.2d 664, 670 (5th Cir. 1969) ("another reason for holding vague statutes void . . . is that they furnish insufficient checks on Government discretion").

---

[42]*See id; see also* Tr. at 925:9–12, 926:17–928:1 (AFT members have had voters take out their mail-in ballots while engaging in block-walking and door-to-door canvassing and AFT members themselves have filled out their mail ballots together during chapter meetings).

"The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Vill. of Hoffman Ests.*, 455 U.S. at 498. The Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.* at 498–99; *cf. Citizens United*, 558 U.S. at 337 ( "The law before us is an outright ban, backed by criminal sanctions.").

When "a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of (those) freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (cleaned up). In such cases, "a more stringent vagueness test should apply." *Vill. of Hoffman Ests.*, 455 U.S. at 499; *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603–04 (1967) ("[S]tandards of permissible statutory vagueness are strict in the area of free expression . . . Because First Amendment freedoms need breathing space to survive."); *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 552 (5th Cir. 2008) (cleaned up) ("[A] more stringent vagueness test should apply where a law threatens to inhibit the exercise of constitutionally protected rights," especially when it is "capable of reaching expression sheltered by the First Amendment.").

### Analysis

The Canvassing Restriction is unconstitutionally vague because people of common intelligence "must necessarily guess at its meaning and differ as to its application." *Connally*, 269 U.S. at 391.

Indeed, trial testimony evinced widespread confusion and disagreement about how to interpret the Canvassing Restriction, not only among Plaintiffs' members but also among state and

local government officials tasked with interpreting and applying the laws. *See, e.g.*, Tr. at 496:5–8 (Dallas County EA Michael Scarpello) ("I don't know what ballot harvesting means," "it could be interpreted a lot of different ways based on the definition . . . put into the law.").

Witnesses were particularly uncertain about how to interpret the terms "physical presence" and "compensation"—neither of which is defined in the statute—and how the Canvassing Restriction impacts organizers' ability to provide voting assistance during their in-person interactions with voters.

### *The term "compensation or other benefit" is vague.*

It is unclear to Plaintiffs from the text of the Canvassing Restriction whether providing volunteers food, water, swag, letters of recommendation, academic credit, gas cards, bus fare, free parking, or even the use of its offices for their advocacy work is unlawful. Nothing in the text of the Canvassing Restriction explains which, if any of these items, qualifies as "compensation."

The definition of "benefit"—"anything reasonably regarded as a gain or advantage"—is no help, considering that it merely defines a term through its synonym. TEC § 276.015(a)(1). Stating that a benefit is a gain does not help a reasonable person to understand what is or is not permitted under the statute.

Considered alongside definitions of "compensation" elsewhere in the Election Code, the meaning of the term "compensation or other benefit" in Section 7.04 becomes even less clear. For example, the ban on compensated assistance under S.B. 1 § 6.06, codified at TEC § 86.0105, incorporates by reference the definition of "compensation" set forth in TEX. PENAL CODE § 38.01:

> anything reasonably regarded as an economic gain or advantage, including accepting or offering to accept employment for a fee, accepting or offering to accept a fee, entering into a fee contract, or accepting or agreeing to accept money or anything of value.

TEC § 86.105(f); TEX. PENAL CODE § 38.01. The ban on compensation for mailing another person's ballot, codified at TEC § 86.052, on the other hand, defines "compensation" as "any form of monetary payment, goods, services, benefits, or promises or offers of employment, or any other form of consideration offered to another person in exchange for depositing ballots." TEC § 86.052(e). Which of these definitions of "compensation", if either, should canvassers, voters, and courts apply to the Canvassing Restriction and how are they distinct from a "benefit"?

Trial testimony by state officials offered no satisfying answers, undermining the State Defendants' assertion that the meaning of "compensation or other benefit" is "crystal-clear." ECF No. 862.[43] For example, former Election Division Director Keith Ingram opined that providing volunteers with bus fare was not "compensation" because "[t]hey can get their expenses reimbursed. That's not payment." Tr. at 1904:1–2. The State's chief voter fraud prosecutor, Jonathan White, on the other hand, testified that he would need to perform *legal research* to determine what kinds of economic benefits would violate the provision. Tr. at 3992:20–3993:21 (conceding that he would need to "review[] the case law" to determine whether a meal, bus fare, or a gift bag containing a t-shirt constitute prohibited compensation).

This conflicting testimony effectively concedes the vagueness of "compensation or other benefit." "[N]otice is insufficient if lay persons are required to 'perform[ ] the lawyer-like task of statutory interpretation by reconciling the text of [ ] separate documents.'" *United States v. Rybicki*, 354 F.3d 124, 158 (2d Cir. 2003) (Jacobs, J., dissenting) (quoting *Chatin v. Coombe*, 186 F.3d 82, 89 (2d Cir. 1999)). Likewise, courts have found insufficient notice where, as here, those charged with enforcing a rule lack a shared understanding of its meaning, because their divergent interpretations are evidence that the rule "impermissibly delegates basic policy matters to

---

[43] Even in their own briefing, the State Defendants treat the terms as interchangeable, defining them by reference to one another. *See* ECF No. 862 ¶ 106 (describing "benefit" as "any *compensation*") (emphasis altered).

policemen, judges and juries for resolution on an ad hoc and subjective basis." *Chatin*, 186 F.3d at 89 (quoting *Grayned*, 408 U.S. at 108–09).

### The term "physical presence" is vague.

Plaintiffs cannot tell from the text of the Canvassing Restriction how physically proximate a ballot must be to a volunteer or employee to be criminally liable because the term "physical presence" is not defined in Section 7.04.

The Court agrees with the State Defendants that Plaintiffs and their members cannot be held liable for unknowingly canvassing in the presence of a mail ballot, both because of Section 7.04's scienter requirement ("knowingly") and because such interactions would not "directly involve" a mail ballot. TEC § 276.015(e).

In some circumstances, "[t]he Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Vill. of Hoffman Ests*, 455 U.S. at 499; *see also League of Women Voters of Fla. Inc*, 66 F.4th at 946–47.

Here, the problem is that a person's knowledge that there is a ballot in the vicinity still does not tell them whether they are violating the statute. Is it a crime to speak to a voter about a candidate while the voter's mail ballot lies nearby on the entryway table? What if the ballot is on the kitchen table in the next room instead of the entryway? What if the voter brings the ballot to a community meeting at which Plaintiffs' employees speak?

A person of "ordinary intelligence" has no way to know where the line is drawn and will respond with self-censorship of core political speech. *See Hill*, 530 U.S. at 732 (2000); *League of Women Voters of Fla. v. Fla. Sec'y of State*, 66 F.4th 905, 947-48 (11th Cir. 2023) ("We will not rely on the assumption that a state court enforcing the law would impose a *mens rea* requirement,

apply the law with lenity, and require that the defendant's conduct had the natural and probable effect of influencing the voter." (alterations and citation omitted)).

At trial, Mr. Ingram refused to offer a specific distance or any concrete guidance about how canvassers should determine whether they are in the "physical presence" of a mail ballot, which can only be determine on a case-by-case basis. *See* Tr. at 1917:5–14; *see also* Tr. at 1916:1–4 (stating that the Secretary does not have an official opinion on whether a ballot being within five or ten feet of a discussion constitutes physical presence under Section 7.04). "Whether or not a prosecutor agrees with us," he conceded, "is a different story entirely." Tr. at 1917:18–19.

Indeed, under these indefinite meanings, it is easy to see how the State Defendants and County DAs could arbitrarily discriminate in their enforcement of the Canvassing Restriction. *Computer & Commc'ns Indus. Ass'n v. Paxton*, No. 1:24-CV-849-RP, 2024 WL 4051786, at *18 (W.D. Tex. Aug. 30, 2024) (citing *Smith v. Goguen*, 415 U.S. 566, 575 (1974) ("Statutory language of such a standardless sweep allows prosecutors and juries to pursue their personal predilections." (alteration marks omitted)).

The State Defendants dismiss concerns expressed by voters and election officials alike as "farfetched" and "fanciful hypotheticals." ECF No. 862 ¶¶ 1018, 1022. Even setting aside the real-world scenarios in which Plaintiffs' core political speech were actually chilled, courts considering vagueness challenges to criminal statutes should be wary of accepting the government's interpretations uncritically, considering the potential consequences:

> As an abstract exercise, debating fact patterns like these may seem good fun. But there is nothing entertaining about a 2-year mandatory federal prison sentence. Criminal statutes are not games to be played in the car on a cross-country road trip. To satisfy the constitutional minimum of due process, they must at least provide "ordinary people" with "fair notice of the conduct [they] punis[h]."

*Johnson v. United States*, 576 U.S. 591, 595 (2015). Because the Canvassing Restriction does not provide such notice, it is unconstitutionally vague on its face under the Fourteenth Amendment.

**The Canvassing Restriction is Unconstitutional as applied to Plaintiffs' Speech.**

Beyond its applications to conduct that is already proscribed elsewhere in the Election Code (i.e., voter fraud and intimidation), the Canvassing Restriction is unconstitutional. Nothing in the trial record suggests that Plaintiffs' or their members seek to defraud or intimidate voters. Thus, as applied to Plaintiffs' voter outreach activities, the Canvassing Restriction violates Plaintiffs' First Amendment freedoms by criminalizing interactions meant to foster engagement and turnout in the communities they serve. The Canvassing Restriction has created an environment in which Plaintiffs and their members fear that they risk criminal sanction for assisting or speaking with voters, which has both chilled their speech and impaired their ability to recruit new members and volunteers and provide voter assistance.

The breadth of the prohibition not only reaches core political speech but basic common courtesy, potentially alienating voters and further burdening the effectiveness of Plaintiffs' political speech and associative activities. For example, the Canvassing Restriction would prohibit Plaintiffs' paid staff members from answering a voter's question about how to complete S.B. 1's identification-number requirement in the presence of his mail-in ballot during an event promoting a ballot measure.[44] When State Defendants' counsel suggested that an organizer who confronted a mail ballot at such an event could just ask the voter to "leave their ballot in the car," Grace Chimene, testifying on behalf of the League, responded that she "wouldn't ask anybody to do anything with their ballot" and pointed out that a voter might be "intimidated" by questions about

---

[44] This is not a "fanciful hypothetical." *United States v. Williams*, 553 U.S. 285, 301 (2008). Indeed, Ms. Chen testified that community members often brought their mail ballots to political events with questions about their ballots to OCA events with questions about the voting process and seeking assistance. Tr. at 1698:21–1699:8.

the physical location of his ballot (and being asked to leave the event if he had brought it along). Tr. at 1620:15–1621:4. Indeed, counsel's recommendation is impractical for several reasons,[45] not the least of which is the disruption of Plaintiffs' core political communications with awkward, inconvenient, and suspicion-inducing requests that voters move their ballots elsewhere or leave the event altogether.

Again, Plaintiffs do not assert a First Amendment right to "harangue" voters as they complete their ballots. Rather, they are afraid to advocate for ballot measures or candidates in circumstances where voters have historically brought their mail ballots and/or requested assistance, because Plaintiffs' members will either be forced to turn voters away (frustrating both their free speech and their associations with voters) or expose themselves to criminal liability by continuing to engage with the voter. The breadth and vagueness of Section 7.04 have compounded the chilling effect on Plaintiffs' speech by making it difficult for their members to know what kinds of interactions with voters are permissible.

Citizens confronted with vague and overbroad laws "inevitably" elect to "steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked," *Grayned*, 408 U.S. at 109 (cleaned up), but the Constitution does not permit laws that unnecessarily stifle protected speech, especially not during elections, when "the importance of First Amendment protections" is at its "zenith." *Meyer*, 486 U.S. at 425. "First Amendment freedoms need breathing space to survive." *Keyishian*, 385 U.S. at 603–04.

---

[45] A voter who took a bus to the event or was dropped off by a friend might not have access to a car in which to store their ballot. And even a voter who drove to the event may be unable to make multiple trips to and from the parking lot due to a physical disability. It's not clear that other alternatives, such as leaving the ballot in another room at the event venue, would be anymore "secure" than permitting the voter to hold onto their ballot in the presence of paid canvassers, considering the potential for theft and loss.

The First Amendment protects Plaintiffs' "right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Meyer*, 486 U.S. at 414. By Plaintiffs' restricting in-person interactions with voters, Section 7.04 "restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication. That it leaves open 'more burdensome' avenues of communication, does not relieve its burden on First Amendment expression." *Id.*

In short, the Court concludes that the Canvassing Restriction is unconstitutional under the First and Fourteenth Amendments, both facially and as applied to Plaintiffs' voter outreach activities. The Court now considers the proper scope of relief.

**PERMANENT INJUNCTION OF THE CANVASSING RESTRICTION**

A party seeking a permanent injunction must prove: (1) that it has succeeded on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest. *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021). The Court addresses each factor in turn.

First, for the reasons set forth in this order, the Court concludes that the Canvassing Restriction violates Plaintiff's First Amendment rights. Plaintiffs have thus succeeded on the merits of their First Amendment challenge to Sections 7.04 of S.B. 1.

Second, the Court concludes that failure to grant the requested injunction will result in irreparable injury to Plaintiffs, their members, and other organizers in Texas. Plaintiffs and their members have established that the Canvassing Restriction has had a chilling effect on their speech that arises from the credible *threat* of enforcement. *See also Babbitt*, 442 U.S. at 302 ("a plaintiff need not first expose himself to actual arrest or prosecution" to establish a cognizable harm). The

Supreme Court has long recognized that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). A permanent injunction, as discussed, would remove the threat of enforcement and the resulting chill on Plaintiffs' protected speech. Thus, it is an appropriate remedy in this case.

Third, threatened and ongoing injury to Plaintiffs outweighs any potential harm that an injunction might cause Defendants. Without injunctive relief, Plaintiffs and their members will continue to suffer irreparable injury to their constitutional rights. As a general matter, "injunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 298 (5th Cir. 2012) (citation and quotation marks omitted); *see also RTM Media, L.L.C. v. City of Houston*, 518 F. Supp. 2d 866, 875 (S.D. Tex. 2007) ("It is clearly in the public interest to enjoin an ordinance that restricts the public's constitutional right to freedom of speech."). To overcome the irreparable injury arising from this infringement on Plaintiffs' rights, Defendants must produce "powerful evidence of harm to its interests" to tip the equities in their favor. *Opulent Life Church*, 697 F.3d at 297.

Plaintiffs' requested injunction does not affect any voting or election procedures and thus does not create the potential for confusion and disruption of the election administration contemplated by the "*Purcell* principle." *See Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018). The *Purcell* principle provides that, as a general rule, federal courts "should not alter state election laws in the period close to an election." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28 (2020) (Kavanaugh, J., concurring) (upholding Seventh Circuit's stay of injunction entered

six weeks before the general election). *Purcell*'s logic, however, extends only to injunctions that affect the mechanics and procedures of election law applicable to voting.[46]

Moreover, unlike an order requiring affirmative changes to the election process before it occurs, an injunction against enforcement proceedings is removed in space and time from the mechanics and procedures of voting. Prosecutions simply do not occur at the polls (or, as the case may be, during block-walking and candidate forums); they require investigation, evidence, and due process. Because criminal prosecutions necessarily follow the offending conduct in time, the only prospective interest that Defendants can plausibly allege would be impaired by injunctive relief is the deterrent effect of the Canvassing Restriction. Given that its chilling effect on speech is the very feature that renders the Canvassing Restriction constitutionally infirm, however, deterring violations is unlikely to serve the public interest. *See Ingebretsen on behalf of Ingebretsen v. Jackson Public Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996) (where an enactment is unconstitutional, "the public interest [is] not disserved by an injunction preventing its implementation"); *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").

The public interest is not served by Texas officials' enforcement of a restriction on speech that Plaintiffs have shown violates their fundamental rights under the First Amendment. Plaintiffs' core political speech has been chilled and will continue to be chilled absent injunctive relief.

---

[46] *See, e.g.*, *RNC v. DNC*, 140 S. Ct. 1205, 1207 (2020) (extension of absentee ballot deadline); *Mi Familia Vota v. Abbott*, 834 F. App'x 860, 863 (5th Cir. 2020) (mask mandate exemption for voters); *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 244 (procedures for authenticating mail-in ballot signatures); *Tex. Alliance for Retired Ams. v. Hughs*, 976 F.3d 564, 566–67 (5th Cir. 2020) (new ballot type eliminating straight-ticket voting); *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 411–12 (5th Cir. 2020) (absentee ballot eligibility requirements); *DNC v. Wis. State Leg.*, 141 S. Ct. at 31 (extension of absentee ballot deadline).

Accordingly, the balance of the equities and the public interest weigh in favor of a permanent injunction.

Therefore, Plaintiffs' request for injunctive relief is granted.

## CONCLUSION

For the foregoing reasons, the Court hereby **DECLARES** that the Canvassing Restriction created by Section 7.04 of S.B. 1, codified at Texas Election Code § 276.015 is:

(1) an invalid restriction on speech, both on its face and as applied to Plaintiffs' speech, in violation of the First Amendment to the United States Constitution as incorporated to Texas by the Fourteenth Amendment of the United States Constitution; and

(2) unconstitutionally vague in violation of the due process clause the Fourteenth Amendment of the United States Constitution.

It is **FURTHER ORDERED** that the Intervenor-Defendants' motion for summary judgment (ECF No. 608) is **DENIED** as to Plaintiffs' First Amendment speech and Fourteenth Amendment due process claims.

**IT IS FURTHER ORDERED** that the Attorney General and Secretary of State of Texas and the District Attorneys of Travis County, Dallas County, Hidalgo County, and the 34th Judicial District, and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, are **IMMEDIATELY AND PERMANENTLY ENJOINED** from implementing, enforcing, or giving any effect to the Canvassing Restriction created by Section 7.04 of S.B. 1, codified at Texas Election Code § 276.015, that violates Plaintiffs' free speech and due process rights under the First and Fourteenth Amendments to the U.S. Constitution.

Thus, the Attorney General may not investigate potential violations of TEC § 276.015, refer potential violations of TEC § 276.015 to DAs for investigation or prosecution, or prosecute any

potential violation of TEC § 276.015 with the consent or at the request of any county or local prosecutor or appointment *pro tem* by a district judge.[47] The County DAs are permanently enjoined from deputizing the Attorney General, appointing him *pro tem*, or seeking his appointment *pro tem* from or by a district judge to prosecute alleged violations of TEC § 276.015 that occur within their jurisdictions.

It is so **ORDERED**.

**SIGNED** this 28th day of September, 2024.

_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

---

[47] In the interest of clarity, the Attorney General constitutes an "agent" or "person acting in concert with" a County DA under the terms of this order when he prosecutes crimes under the Election Code with the consent of, at the request of, or in cooperation with such County DA.

APPENDIX B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, FRIENDSHIP-WEST BAPTIST CHURCH, THE ANTI-DEFAMATION LEAGUE AUSTIN, SOUTHWEST, AND TEXOMA REGIONS, SOUTHWEST VOTER REGISTRATION EDUCATION PROJECT, TEXAS IMPACT, MEXICAN AMERICAN BAR ASSOCIATION OF TEXAS, TEXAS HISPANICS ORGANIZED FOR POLITICAL EDUCATION, JOLT ACTION, WILLIAM C. VELASQUEZ INSTITUTE, FIEL HOUSTON INC., and JAMES LEWIN, | |
| **Plaintiffs,** | |
| v. | Case No. 5:21-cv-00844-XR |
| THE STATE OF TEXAS, JOHN B. SCOTT, in his official capacity as the Texas Secretary of State, WARREN K. PAXTON, in his official capacity as the Texas Attorney General, MICHAEL SCARPELLO, in his official capacity as the Dallas County Elections Administrator, JOHN CREUZOT, in his official capacity as the Dallas County District Attorney, LISA WISE, in her official capacity as the El Paso County Elections Administrator, YVONNE ROSALES, in her official capacity as the El Paso County District Attorney, and JOSÉ GARZA, in his official capacity as the Travis County District Attorney, | |
| **Defendants.** | |

## SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs are membership and community-based organizations, many of whom represent the interests of Latino and Black Texans, churches and other faith-based groups, and a Texan who has served as an election judge.  Plaintiffs bring this action to challenge Senate Bill 1 ("SB1"), a new law that (among other things) restricts voter assistance; enables partisan poll watchers to intimidate voters and poll workers; and threatens to criminalize community-based voter

engagement activities that are otherwise protected by the United States Constitution, federal election law and the Texas Election Code.  On behalf of themselves and their members, Plaintiffs seek declaratory and injunctive relief to enforce the United States Constitution, the Voting Rights Act of 1965 ("VRA"), and the Americans with Disabilities Act ("ADA").

## I.    INTRODUCTION

1.    The 2020 general election in Texas was, according to the Texas Secretary of State's office, "smooth and secure."[1]  In the face of a global pandemic, the performance by Texas officials and voters alike during the 2020 election showcased their strength to overcome obstacles and fulfill the promise of democratic participation even, and perhaps especially, in light of a changing Texas electorate.

2.    Despite this, now on its third try, the Texas Legislature enacted SB1.  This new law imposes a series of additional burdens and restrictions that will have the effect of suppressing Texas voters and discouraging—including by criminalizing—work that has long been performed faithfully by public employees, private organizations and individuals to help citizens exercise their constitutional right to vote.  Among its many provisions, SB1:

- Targets Texans who need assistance to vote—including people who have limited English proficiency, disabilities, and/or less formal education—by adding multiple new requirements that hinder the provision of assistance at the polling place, curbside, or in connection with mail ballots (*e.g.*, Sections 6.01 (adding Sections 64.009(e), (f), (f-1), and (g) to the Election Code), 6.03 (adding Section 64.0322 to

---

[1] Taylor Goldenstein *et al.*, *Did a 'Smooth and Secure' 2020 Election Cost Texas Secretary of State Her Job?*, Houston Chronicle (May 21, 2021), https://www.houstonchronicle.com/politics/ texas/article/Texas-Secretary-of-State-Ruth-Hughs-resigns-under-16195586.php; also available at https://electionlawblog.org/?p=122282.

the Election Code), 6.04 (amending Section 64.034 of the Election Code), 6.05 (amending Section 86.010(e) of the Election Code), and 6.06 (amending Sections 86.0105(a), (c), and (e) of the Election Code)).

- Gives partisan poll watchers "free movement" to intimidate and harass voters and poll workers by expanding watchers' authority, while constraining election administrators' ability to ensure peaceful, orderly elections under penalty of criminal prosecution (*e.g.*, Sections 4.01 (adding Section 32.075(g) to the Election Code), 4.06 (adding Section 33.051(g) to the Election Code), 4.07 (adding Section 33.056(e) to the Election Code), and 4.09 (amending Section 33.061(a) of the Election Code)).

- Quashes protected political speech and legitimate voter turnout initiatives through overbroad and vague criminal penalties for so-called "vote harvesting" (Section 7.04 (adding Section 276.015 to the Election Code)).

- Restricts counties from offering accommodations that facilitated record turnout in 2020, including allowing for drive-thru voting (Section 3.04 (amending Section 43.031(b) of the Election Code)), permitting the use of movable structures as polling places (Sections 3.12 (amending Section 85.061(a) of the Election Code) and 3.13 (amending Section 85.062(b) and adding Section 85.062(f) to the Election Code)), and authorizing 24-hour early voting (Sections 3.09 (amending Sections 85.005(a) and (c) of the Election Code) and 3.10 (amending Sections 85.006(e) of the Election Code)).

- Requires election clerks to reject otherwise valid mail ballot applications and mail ballots because of simple errors or omissions notwithstanding the clerk's ability to

verify the mail ballot application or mail ballot by other means (Sections 5.07 (adding Section 86.001(f) to the Election Code) and 5.13 (amending Section 87.041(b) of the Election Code)).

- Facilitates the investigation and prosecution of perfectly legal activity by voters, such as being excused from jury service or having the same name as a non-U.S. citizen or non-resident in the county (Sections 2.04 (amending Section 15.028 of the Election Code), 2.06 (adding Sections 18.065(e)-(g) to the Election Code), 2.07 (amending Section 18.068(a) and adding Section 18.068(a-1) to the Election Code), 2.08 (amending Section 31.006 of the Election Code), and 2.11 (amending Sections 62.114(b) and (c) of the Government Code)).

- Forces election officials to shift resources to meet tight deadlines for reporting voters for investigation and removing voters from the rolls to avoid additional requirements and penalties (Sections 2.06 (adding Section 18.065(e)-(g) to the Election Code)).

3.    Governor Gregory W. Abbott ("Abbott" or the "Governor")—who is the chief executive officer of the State of Texas[2]—called for this legislation on the pretextual grounds that it was necessary to prevent voter fraud.  But there is simply no evidence that voter fraud occurs in

---

[2] Tex. Const. Art. IV, § 1.  Governor Abbott was a named defendant in the original Complaint. (ECF No. 1).  Plaintiffs' decision to remove Governor Abbott as a defendant in the First Amended Complaint was solely in an effort to narrow the issues before the Court and shall not be construed as an admission that Governor Abbott is not a proper defendant for claims arising under the VRA and the U.S. Constitution particularly where, as alleged here, Governor Abbott championed the challenged laws (and indeed called for them to be made more stringent) and played a direct and personal role in the administration of Texas elections via his authority to issue proclamations. Plaintiffs expressly reserve the right to seek leave from this Court to further amend the operative complaint in order to add back Governor Abbott as a defendant for claims asserted here in light of the facts that will be developed during discovery.

Texas beyond the very few examples already identified through Texas's pre-existing processes and procedures.  Indeed, as Texas Representative Diego Bernal testified before the Congressional subcommittee on Civil Rights and Civil Liberties on July 29, 2021: "There [we]re 154 prosecutions of voter fraud in the past 17 years in Texas out of 94 million votes cast.  The likelihood of voter fraud in Texas is less than any one of us being struck by lightning."[3]  Thus, the additional burdens and restrictions on voting contained in SB1 are not, and cannot be, justified by invoking unspecified and unproven voter fraud.

     4.     Rather, as described further below, SB1 is a reaction to Texas's changing electorate, which is now more racially diverse and younger than ever before.  Indeed, minority voter turnout in Texas in the 2018 mid-term election was dramatically higher than the 2014 mid-term, and turnout in the 2020 General Election—even in the face of COVID-related challenges—was higher than for any general election in the state since 1992.  Local election officials and community organizations throughout the State helped Texas voters fulfill their commitment to exercising their rights.  This effort—and the resulting success—merits universal praise.  Instead, however, the Texas Legislature responded to these community success stories by making baseless claims of threats to "election integrity," outlawing the very election procedures that made the 2020 election a success, and imposing additional requirements that will make it even harder for Texans— especially those in Texas's growing minority populations—to participate in our democracy.

     5.     Each of SB1's limitations described above and below violates federal law and will cause irreparable harm to Plaintiffs and citizens of Texas more broadly.  In particular, SB1's new

---

[3] House Committee on Oversight & Reform, Democracy in Danger: The Assault on Voting Rights in Texas (July 29, 2021) https://oversight.house.gov/legislation/hearings/democracy-in-danger-the-assault-on-voting-rights-in-texas.

restrictions on voter assistance violate Sections 2 and 208 of the Voting Rights Act of 1965[4] and the Americans with Disabilities Act.[5]  SB1's ill-defined prohibition on "vote harvesting" violates both the First Amendment and the Fourteenth Amendment's Due Process Clause because these provisions criminalize protected speech and are unconstitutionally vague.  The provisions on poll watcher obstruction are similarly vague—putting poll workers at risk of arbitrary prosecution. SB1's restrictions on the exercise of the right to vote violate the First and Fourteenth Amendments by unduly burdening voting rights and impermissibly limiting free speech of voter assistors. Lastly, as set forth below, SB1 intentionally discriminates against Texas minority voters in violation of the Fourteenth and Fifteenth Amendments and Section 2.

6.     Plaintiffs respectfully request that the Court declare that the challenged provisions of SB1 are unlawful and enjoin Defendants from enforcing the challenged provisions.

## II.     JURISDICTION AND VENUE

7.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because the claims in this action arise under federal law and seek to redress the deprivation of federal civil rights, including the right to vote.

8.     Venue is proper in this district under 28 U.S.C. § 1391(b) because all Defendants reside in Texas, and Defendants perform their official duties in this district.

---

[4] 52 U.S.C. §§ 10301 and 10508 ("Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice.").

[5] 42 U.S.C. §§ 12131, *et seq*.

### III.   PARTIES

**A.   Plaintiffs**

9.     Plaintiff LA UNIÓN DEL PUEBLO ENTERO ("LUPE") is a non-partisan membership organization founded by labor rights activists César Chávez and Dolores Huerta. LUPE's mission is to build strong, healthy communities in the Texas Rio Grande Valley through community organizing and civic engagement.  To promote civic engagement in the communities it serves, LUPE conducts know-your-rights discussions and membership meetings, participates in issue-focused advocacy, campaigns to support or oppose nonpartisan ballot measures through in-person canvassing, connects its members to social services, conducts census outreach, and conducts voter registration, education, and non-partisan get-out-the-vote campaigns (GOTV).  As part of their voter canvassing activities, LUPE members and paid staff interact with voters at the voters' homes, including in the physical presence of a ballot voted by mail.

10.     LUPE's individual members include registered voters who require assistance with voting in-person at the polling place, voting by mail, and voting curbside, as well as individuals who serve as assistors. LUPE is headquartered in San Juan, Texas, and its members primarily reside in Hidalgo, Cameron, Willacy, and Starr Counties, Texas.  LUPE has more than 8,000 members, including Latinos, U.S. citizens, and registered voters, some of whom are disabled. These voter members have disabilities that limit major life activities, including disabilities that limit their ability to walk, climb stairs, write or mark a ballot, interact with other people or otherwise navigate the polling place and voting process.  Some LUPE members are voters who are limited English proficient.  LUPE's disabled voter members require accommodations in the voting process that are prohibited by the challenged provisions of SB1.  Some of LUPE's voter members who are disabled and/or limited English proficient rely on assistors to vote.  LUPE has organizational and associational standing to bring this lawsuit.

11.     Plaintiff FRIENDSHIP-WEST BAPTIST CHURCH ("FRIENDSHIP-WEST") is a non-partisan religious organization in Dallas County that serves a predominantly Black congregation of more than 12,000 members, a substantial number of whom are registered to vote in Texas.   To promote democracy and voter engagement in the community it serves, FRIENDSHIP-WEST serves as a polling place, provides voter education, and encourages its congregants and others to register, to vote, and to serve as poll workers and volunteer deputy registrars.   FRIENDSHIP-WEST has organizational and associational standing to bring this lawsuit.

12.     Plaintiffs ANTI-DEFAMATION LEAGUE AUSTIN, SOUTHWEST, AND TEXOMA REGIONS ("ADL") are made up of the regional offices of the non-partisan Anti-Defamation League in Texas.   ADL has at least 23,000 supporters who are Texas residents, a substantial number of whom are registered to vote in Texas.   ADL also has approximately 250 regional board members throughout Texas, a substantial number of whom are registered to vote in Texas.   ADL's mission in Texas, consistent with their national organization's overall mandate, is to protect the civil rights of all persons, eliminate vestiges of discrimination, racism, extremism, and antisemitism within communities in Texas, and to fight hatred in all its forms.   ADL has organizational standing to bring this lawsuit.

13.     Plaintiff SOUTHWEST VOTER REGISTRATION EDUCATION PROJECT ("SVREP") is a nonprofit and non-partisan organization committed to promoting and increasing participation of Latino and other minority communities across the United States in the democratic process through voter registration, voter education, and voter participation activities.   In Texas, SVREP conducts voter registration and organizes non-partisan get-out-the-vote drives to remind

voters of election dates and to inform them about requirements for voting.  SVREP has organizational standing to bring this suit.

14.     Plaintiff TEXAS IMPACT is a nonprofit, non-partisan, multi-denominational organization working to put faith into action by equipping faith leaders and their congregations with information, opportunities, and outreach tools to educate communities and engage with lawmakers on pressing policy issues.  TEXAS IMPACT is comprised of dozens of member organizations, hundreds of member congregations, and more than 22,000 individual members who span the partisan spectrum and represent different ethnicities and denominations.  TEXAS IMPACT's individual members include individuals who are registered to vote in Texas; individuals who require assistance with voting in-person at the polling place, by mail, and curbside; individuals who serve as assistors; and individuals who serve as poll workers and volunteer deputy registrars.  TEXAS IMPACT also has members that take positions on ballot measures.  To further its mission, TEXAS IMPACT works to ensure that all eligible Texans can exercise their right to vote free from suppression.  To advance that goal, TEXAS IMPACT and its members (at all three levels: denominational bodies, congregations, and individuals) (a) assist voters with registration and voting; (b) educate voters on their rights, including eligibility to vote, eligibility to vote by mail, and polling place locations; and (c) encourage members and others to volunteer as volunteer deputy registrars and poll workers.  TEXAS IMPACT has organizational and associational standing to bring this lawsuit.

15.     Plaintiff MEXICAN AMERICAN BAR ASSOCIATION OF TEXAS ("MABA-TX") is a professional membership association of Latino lawyers located in Texas.  MABA-TX is a multi-purpose organization, and its goals include, among other goals: to provide a forum and a means for lawyers to promote the social, economic and educational advancement of the people of

Texas; to speak on behalf of the Latino community on legal issues affecting the community; to serve the Latino populace as a professional association by providing services, assistance and advice on matters of legal concern to the community; to work through legislation, advocacy and education to accomplish these goals; and to preserve high standards of integrity, honor and professional courtesy among Latino lawyers.  Members of MABA-TX include Latino registered voters who live throughout the State of Texas, including in Travis, El Paso and Dallas counties.  MABA-TX has organizational and associational standing to bring this lawsuit.

16.     Plaintiff TEXAS HISPANICS ORGANIZED FOR POLITICAL EDUCATION ("TEXAS HOPE") is a nonprofit, membership organization that seeks to empower Latinos in Texas through civil engagement, civic education, and outreach.  TEXAS HOPE's activities include helping register Latino citizens to vote, volunteering to take registered voters to the polls on election days, serving as poll watchers, administering voter education workshops, and conducting legislative advocacy on issues important to the Latino community including education, voting rights, immigrants' rights, healthcare, and housing.  Members of TEXAS HOPE include Latino registered voters who reside throughout Texas including in the following counties: Bell, Bexar, Dallas, Denton, Ector, El Paso, Guadalupe, Harris, Lubbock, Tarrant, Tom Greene, Travis, Victoria, Wharton, and Williamson.  TEXAS HOPE has organizational and associational standing to bring this lawsuit.

17.     Plaintiff JOLT ACTION is a nonprofit, membership organization whose mission is to increase the civic participation of Latinos in Texas to build a stronger democracy.  JOLT ACTION conducts and trains community members to conduct non-partisan voter registration and voter mobilization, works to develop Latino youth leadership, promotes community and student organizing, and supports cultural activities.  JOLT ACTION is a membership organization whose

members include Latino high school, community college, and university students, many of whom are Latino registered voters. JOLT ACTION's members and paid staff assist voters who are disabled and/or limited English proficient. JOLT ACTION has organizational and associational standing to bring this lawsuit.

18.     Plaintiff WILLIAM C. VELASQUEZ INSTITUTE ("WCVI") is a nonprofit and non-partisan public policy analysis organization that conducts research and works in Latino communities and with local leaders across Texas to increase Latino registration and voter turnout. WCVI's mission includes improving the level of political participation for all Latinos and other underrepresented communities. WCVI analyzes and reports on Latino voter registration and participation and uses its research to educate and collaborate with Latino community leaders to increase Latino political participation. WCVI conducts its work through policy seminars, social media campaigns and community workshops. WCVI has organizational standing to bring this lawsuit.

19.     Plaintiff FIEL Houston Inc. ("FIEL") is a nonprofit, non-partisan membership organization based in Houston, Texas. FIEL is an immigrant-led organization that advocates for just laws for immigrant youth, their families, access to higher education for all people regardless of immigration status, and access to justice for the Latino community. FIEL was born out of the need for civic engagement in support of undocumented students seeking higher education and conducts organizing for the betterment of the communities it serves, including voter registration and civic education, phone-banking, census outreach, voter assistance, and other advocacy efforts. FIEL has approximately 11,000 members in the greater Houston area, including Latinos, U.S. citizens, and non-U.S. citizens. FIEL members reside in parts of Texas where communities of color constitute significant portions of the population, including Harris County. FIEL's individual

members include Latino registered voters who require assistance with voting in-person at the polling place and voting by mail, as well as individuals who serve as assistors. Some FIEL members are voters who are limited English proficient. Some of FIEL's voter members who are limited English proficient rely on assistors to vote. FIEL has organizational and associational standing to bring this lawsuit.

20.     Plaintiff JAMES LEWIN is a Texas voter residing in Austin, Texas. Mr. Lewin worked as a deputy election judge during the October 2020 early voting period. Mr. Lewin decided to work at the polls because he observed well-intentioned poll workers giving voters incorrect information in previous elections. Mr. Lewin wanted to ensure that polling places were staffed with informed workers who could provide correct information and guidance so that eligible voters could properly cast ballots that would count.

**B.      Defendants**

21.     Defendant the STATE OF TEXAS is one of the United States of America.

22.     Defendant JOHN B. SCOTT is the Secretary of State of Texas (the "Secretary"). The Secretary is "the chief election officer of the state," and the Texas Election Code "reflect[s] the Legislature's intent that election laws operate . . . under the direction and guidance of the Secretary of State."[6]

23.     Defendant Scott is a licensed attorney who previously served as lead attorney and signed an amended complaint on behalf of the plaintiff in *Donald J. Trump For President, Inc. et al. v. Boockvar et al.*, No. 4:20-cv-02078-MWB (M.D. Pa.), ECF No. 125, which (among other things) sued Pennsylvania's Secretary of State and county boards of elections seeking "[a]n order,

---

[6] Tex. Elec. Code § 31.001; *State of Texas v. Hollins*, No. 20-0729, 2020 WL 5919729, at *5 (Tex. Oct. 7, 2020).

declaration, and/or injunction that prohibits the [county boards of elections and Pennsylvania's Secretary of State] from certifying the results of the 2020 General Election in Pennsylvania on a Commonwealth-wide basis." The amended complaint to which Defendant Scott was a signatory alleged on behalf of the plaintiff (among other things) that "[a]s part of the November 3, 2020 General Election, there are at least two Counties that had suspected instances of mail-in ballot fraud" and that "the disparate treatment between mail-in and in-person voters as to the verification of the voter's identity through signature verification has created an environment in Pennsylvania that encourages ballot fraud or tampering . . . ." *Id.* "[L]ess than 24 hours before oral argument was to begin, . . . Mr. Scott . . . requested this Court's permission to withdraw from the litigation."[7] The amended complaint was dismissed with prejudice and without granting leave to amend.[8]

24.     Under the Texas Election Code, Defendant Scott shall "obtain and maintain uniformity in the application, operation, and interpretation of [the] code and [other] election laws," "prepare detailed and comprehensive written directives and instructions" for "the appropriate state and local authorities," and "distribute these materials to the appropriate state and local authorities having duties in the administration of these laws."[9] The Secretary must also "assist and advise all election authorities with regard to the application, operation, and interpretation" of election laws.[10]

25.     Under Section 31.005 of the Texas Election Code (titled "Protection of Voting Rights; Enforcement"), the Secretary is authorized to "take appropriate action to protect" voting rights "from abuse by the authorities administering the state's electoral processes," which includes

---

[7] *Donald J. Trump for President, Inc. v. Boockvar*, 502 F. Supp. 3d 899, 909 (M.D. Pa. 2020).

[8] *Id.*

[9] TEX. ELEC. CODE § 31.003.

[10] TEX. ELEC. CODE § 31.004.

"order[ing] the person to correct the offending conduct."[11]  If the person "fails to comply with an order from the secretary of state under this section, the secretary may seek enforcement of the order by a temporary restraining order or a writ of injunction or mandamus obtained through the attorney general."[12]

26.     Section 18.065 of the Texas Election Code requires the Secretary to "monitor each registrar for substantial compliance" with sections of the Texas Election Code.[13]  As described further below, SB1 layers on civil penalties for a registrar's failure to correct violations in the amount of "$1,000 for each violation corrected by the secretary of state under that subsection."[14]  Thus, the Secretary is directly involved in identifying violations and does, by correcting violations, directly affect the amount of the new civil penalty for which the registrar becomes liable.

27.     Texas election law requires the Secretary to "prescribe the design and content, consistent with this code, of the forms necessary for the administration of this code other than Title 15" such that the "design and content . . . enhance the ability of a person to understand the applicable requirements and to physically furnish the required information in the space provided."[15]  Among other things, the Secretary "shall design the form" for "registration by mail" and "shall prescribe the procedures necessary to implement this section" regarding the official form for registration by mail."[16]  The Secretary must also "maintain a supply of the official

---

[11] TEX. ELEC. CODE § 31.005(a)-(b); *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 399 (5th Cir. 2020).

[12] TEX. ELEC. CODE § 31.005(c).

[13] TEX. ELEC. CODE §18.065.

[14] *Id.*

[15] *Hollins*, 620 S.W.3d 408 (citing TEX. ELEC. CODE § 31.002(a)).

[16] TEX. ELEC. CODE § 13.121.

application forms for ballots to be voted by mail and shall furnish the forms in reasonable quantities without charge to individuals or organizations requesting them for distribution to voters."[17]

28. As described further below, under SB1, "[t]he secretary of state shall prescribe the form[s]" that must be completed and signed by persons providing assistance, including transportation and translation assistance, to voters.[18]

29. Section 34.004 of the Texas Election Code provides that "[t]he secretary of state or a member of the secretary's staff may make inspections in the same manner as state inspectors whether or not a violation of election laws is suspected."[19]

30. Under Section 34.005 of the Texas Election Code, "[t]he secretary of state may refer a reported violation of law for appropriate action to the attorney general, if the attorney general has jurisdiction, or to a prosecuting attorney having jurisdiction."[20]

31. Under SB1, the Secretary is *required* to refer any and all "information indicating that criminal conduct in connection with an election has occurred" that he "receive[s] or discover[s]" to the Attorney General if the Secretary determines "that there is reasonable cause to suspect that criminal conduct has occurred."[21] The Secretary is further required to "deliver to the attorney general all documents and information in the secretary's possession."[22] This gives the

---

[17] TEX. ELEC. CODE § 84.013.

[18] *E.g.*, TEX. ELEC. CODE §§ 64.009(h), 64.0322(b).

[19] TEX. ELEC. CODE § 34.004.

[20] TEX. ELEC. CODE § 34.005.

[21] TEX. ELEC. CODE § 31.006(a).

[22] *Id.*

Secretary an active role in enforcing every provision of the Texas Election Code that may carry criminal penalties, including those challenged in the instant Second Amended Complaint.[23]

32.  Under Section 32.115 of the Texas Election Code, "[o]n request of a county executive committee or a county clerk, as appropriate, the secretary of state shall schedule and provide assistance for the training of election judges and clerks under Section 32.113 or 32.114" and "may provide similar training assistance to other political subdivisions."[24]

33.  The Secretary's website currently provides "Training and Education and Resources," including, among others, "Poll Worker Training"; "Volunteer Deputy Registrar Training"; an "Election Inspector Handbook"; and "Election Official Training Materials."[25]

34.  SB1 also provides that "[t]he secretary of state shall publish and maintain a training manual for watchers and shall make the manual available on the secretary of state's Internet website."[26] A "Poll Watcher's Guide[sic]" is currently available on the Secretary's website, but it has not been updated since November 2019.[27]

35.  As described further below, SB1 further gives the Secretary full authority to "prescribe any procedures necessary to implement" the sections of the Texas Election Code sections governing the "signature verification committee."[28]

---

[23] *E.g.*, TEX. ELEC. CODE §§ 15.028, 62.113, 33.051, 33.061, 64.034, 276.015, 276.016, 276.017.

[24] TEX. ELEC. CODE § 32.115.

[25] https://www.sos.texas.gov/elections/laws/education-resources.shtml.

[26] TEX. ELEC. CODE § 33.008.

[27] https://www.sos.texas.gov/elections/forms/pollwatchers-guide.pdf.

[28] TEX. ELEC. CODE §§ 87.0271(e).

36.     Defendant WARREN K. ("Ken") PAXTON is the Attorney General of Texas, the state's chief law enforcement officer.  He is sued in his official capacity.

37.     The Attorney General is Texas' chief law enforcement officer, with a "freestanding sovereign interest" in enforcing Texas law.[29]

38.     According to the Attorney General's website, Defendant Paxton's "role in enforcing the election laws" includes "statewide investigation authority and concurrent prosecution authority with local elected prosecutors over the election laws of the State" as well as having "deep experience and specialized resources to help train or assist local law enforcement and prosecution in working up complex and challenging election fraud cases."[30]  The Attorney General's website specifically notes that "Chapter 273, Texas Election Code, gives the OAG authority to investigate and prosecute election code violations anywhere in Texas."[31]  The Attorney General has prosecuted alleged violations of Texas's election laws alongside, or instead of, local district attorneys.[32]  Defendant Paxton also claims his office is "currently prosecuting over 500 felony election fraud offenses in Texas courts."[33]

---

[29] *City of Austin v. Abbott*, 385 F. Supp. 3d 537, 545 (W.D. Tex. Mar. 25, 2019).

[30] https://www.texasattorneygeneral.gov/initiatives/election-integrity (responding to question "What is the Office of the Attorney General's role in enforcing the elections laws?").

[31] *Id.* (responding to question "How are election fraud cases referred to the Office of the Attorney General?").

[32] https://www.texasattorneygeneral.gov/news/releases/ag-paxton-announces-joint-prosecution-gregg-county-organized-election-fraud-mail-balloting-scheme.

[33] *See* Press Release, Ken Paxton, Attorney General of Texas, AG Paxton Announces Formation of 2021 Texas Election Integrity Unit (Oct. 18, 2021), https://www.texasattorneygeneral.gov/news/releases/ag-paxton-announces-formation-2021-texas-election-integrity-unit.

39.     Although the Texas Court of Criminal Appeals recently held that Defendant Paxton lacks constitutional authority to unilaterally prosecute criminal offenses created by the Election Code, *see State v. Stephens*, --- S.W.3d ---, 2021 WL 5917198 (Tex. Crim. App. Dec. 15, 2021), Defendant Paxton may still assist the prosecuting district or county attorney upon request, *see id.* (citing *Saldano v. State*, 70 S.W.3d 873, 880 (Tex. Crim. App. 2002)); *see also* Tex. Gov't Code § 41.102.[34]

40.     Furthermore, Defendant Paxton is also charged with enforcing the civil provisions of the Texas Election Code, including Section 8.01 of SB 1, codified at Texas Election Code Section 31.129.

41.     Defendant Paxton has also recently filed suit on behalf of the State of Texas to enforce provisions of the Texas Election Code and to restrict the actions of a local election official, including by preventing him from mailing out mail ballot applications to many eligible voters unless those voters first submitted a request.[35]

42.     As described further below, Defendant Paxton has stated that prosecution of election-related offenses is one of his priorities.  For example, Defendant Paxton recently announced the formation of his "2021 Texas Election Integrity Unit," which he describes as a concentrated effort to devote agency lawyers, investigators, support staff, and resources to

---

[34] In the State Defendants' Motion to Dismiss the First Amended Complaint, they admit that the State of Texas and the Attorney General believe that *Stephens* was "wrongly decided" and "has filed a motion asking the Texas Court of Criminal Appeals to reconsider its decision." State Defs.' Mtn. to Dismiss the LUPE Plaintiffs' First Am. Compl. (ECF No. 176) at 1 n.2.

[35] *Hollins*, 2020 WL 5919729, at *5.

ensuring this local election season . . . is run transparently and securely."[36]  In fact, in the press release announcing the formation of his "2021 Election Integrity Unit," Defendant Paxton refers to himself as a "national leader in election integrity," brags about the "many elections administrators" that have been "held accountable for attempts to bend or break the boundaries of lawful practices" under his leadership, and claims his office is "currently prosecuting over 500 felony election fraud offenses in Texas courts."[37]

43.    Defendant MICHAEL SCARPELLO is the Elections Administrator of Dallas County.  He is sued in his official capacity.

44.    Defendant LISA WISE is the Elections Administrator of El Paso County.  She is sued in her official capacity.

45.    "In general, local election officials administer Texas elections.  They receive and review ballot applications, Tex. Elec. Code § 86.001, mail carrier and ballot envelopes to voters, id. § 86.002, receive and process marked ballots, id. §§ 86.006, 86.007(b), 86.011, verify voter signatures, *id.* § 87.027(i), and count the results, *id.* § 87.061."[38]

46.    Under Section 31.043 of the Texas Election Code, "[t]he county elections administrator shall perform: (1) the duties and functions of the voter registrar; (2) the duties and functions placed on the county clerk by this code; (3) the duties and functions relating to elections

---

[36] OFFICE OF THE ATTORNEY GENERAL, *AG Paxton Announces Formation of 2021 Texas Election Integrity Unit* (Oct. 18, 2021), https://www.texasattorneygeneral.gov/news/releases/ag-paxton-announces-formation-2021-texas-election-integrity-unit.

[37] *Id.*

[38] State Defs.' Mtn. to Dismiss the LUPE Plaintiffs' First Am. Compl. (ECF No. 176) at 23 (identifying local election officials as the administrators of elections properly subject to suit).

that are placed on the county clerk by statutes outside this code, subject to Section 31.044; and (4) the duties and functions placed on the administrator under Sections 31.044 and 31.045."[39]

47. Under Section 83.002 of the Texas Election Code, "[t]he county clerk is the early voting clerk for the county in: (1) the general election for state and county officers and any other countywide election held at county expense; (2) a primary election; and (3) a special election ordered by the governor."[40]

48. Defendant JOHN CREUZOT is the Dallas County District Attorney. He is authorized to investigate and prosecute violations of the Texas Election Code in Dallas County. He is sued in his official capacity.

49. Defendant YVONNE ROSALES is the El Paso County District Attorney. She is authorized to investigate and prosecute violations of the Texas Election Code in El Paso County. She is sued in her official capacity.

50. Defendant JOSÉ GARZA is the Travis County District Attorney. He is authorized to investigate and prosecute violations of the Texas Election Code in Travis County. He is sued is his official capacity.

51. Under the Texas Election Code, Defendants Scarpello, Wise, Creuzot, Rosales, and Garza are responsible for implementing and enforcing a number of SB1's challenged provisions in their respective counties, including the new law's restrictions on voter assistance, SB1 §§ 6.01(f), 6.01(g), 6.03(b), 6.04, 6.05(e), and 6.06(c), and the "vote harvesting" provision, *id.* § 7.04(h).[41]

---

[39] TEX. ELEC. CODE § 31.043.

[40] TEX. ELEC. CODE § 83.002.

[41] TEX. ELEC. CODE §§ 64.009, 64.0322, 64.034, 86.010, and 86.0105.

52.    Defendants Scott, Paxton, Scarpello, Wise, Creuzot, Rosales, and Garza are charged with enforcing and will enforce the provisions of SB1 challenged here.

### IV.    FACT BACKGROUND

**A.    Texas law has long restricted Latino and Black citizens' right to vote.**

53.    SB1 is the latest chapter in Texas's "long, well-documented history of discrimination" against Latino and Black citizens in the voting and electoral processes.[42]

54.    From as early as 1845, the year Texas gained its statehood, the government has suppressed Latinos' political participation. Laws prohibited Texans from using the Spanish language and Mexican-Americans from serving as election judges.

55.    Texas continued to formally disenfranchise Latino and Black citizens throughout the 19th and 20th centuries. In 1902, Texas voters approved a constitutional amendment requiring poll taxes, the "primary purpose" of which was a "desire to disenfranchise the Negro and the poor white supporters of the Populist Party."[43] The poll tax also disenfranchised Latino citizens, many of whom could not afford it. Texas maintained a poll tax until the Supreme Court found such taxes unconstitutional in 1966.[44]

56.    In the late 19th and early 20th centuries, the Texas Legislature expanded poll watchers' power to challenge voters (without any requirement of substantiating evidence), which facilitated discriminatory and abusive challenges to voter eligibility in an apparent attempt to disenfranchise voters of color.[45] Among other restrictions, the law included notorious Terrell

---

[42] *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006) (quoting *Vera v. Richards*, 861 F.Supp. 1304, 1317 (S.D. Tex. 1994).

[43] *United States v. Texas*, 252 F. Supp. 234, 245 (W.D. Tex. 1966).

[44] *See Harper v. Virginia State Bd. of Elections*, 383 U.S. 663 (1966).

[45] NICOLAS RILEY, BRENNAN CTR. FOR JUSTICE, VOTER CHALLENGERS 9–10 (2012), https://www.brennancenter.org/our-work/research-reports/voter-challengers.

election laws, which included a poll tax and provisions giving rise to "white primaries"[46] that also served to disenfranchise Black and Latino voters. One Texas newspaper declared that the white primary "absolutely eliminates the Mexican vote as a factor in nominating county candidates, though we graciously grant the Mexican the privilege of voting for them afterwards."[47] This law remained in effect in some form until its 2003 repeal.[48]

57. In the early 20th century, Texas Rangers actively discouraged Latinos from voting by selectively investigating them and scaring would-be voters by suggesting they would be imprisoned for voting if illiterate. The mere presence of armed Rangers at polling stations understandably intimidated Latino voters.

58. In the early 20th century, on multiple occasions, mobs gathered at polling places to prevent Latinos from voting. In one such incident, the so-called "Good Government League" assaulted the Weslaco barrio election box, and the crowd reportedly shouted, "Don't let those Mexicans in to vote. Throw them out." Latino participation decreased as a result.

59. In recent years, federal courts have overturned another insidious form of voting discrimination in Texas in the form of redistricting efforts. In 2006, the U.S. Supreme Court invalidated Texas's 2003 congressional redistricting plan, ruling the plan "b[ore] the mark of intentional discrimination" against Latinos.[49] In 2012, a federal court held Texas acted with

---

[46] *Id*. at 10, n. 75.

[47] DAVID MONTEJANO, ANGLOS AND MEXICANS IN THE MAKING OF TEXAS 1836–1986 144 (1986).

[48] *Id*. at 17.

[49] *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 440 (2006). In its reasoning, the Supreme Court noted that Texas "took away [] Latinos' [electoral] opportunity because Latinos were about to exercise it . . . The State not only made fruitless the Latinos' mobilization efforts but also acted against those Latinos who were becoming most politically active." *Id*. Texas thus "undermined the progress of a racial group that has been subject to significant voting-related discrimination and that was becoming increasingly politically active and cohesive." *Id*. at 439.

discriminatory purpose or effect and denied preclearance to the state's 2011 state legislative and congressional maps under Section 5 of the VRA.[50]  A second federal court also concluded that Texas intentionally discriminated against Latino and Black voters with its 2011 congressional and state legislative plans in violation of the VRA and the U.S. Constitution.[51]

60.     In addition to discriminatory redistricting, Texas has adopted other illegal measures to suppress minority participation in elections.  In 2016, the Fifth Circuit affirmed a district court's decision that Texas's photo voter identification law, S.B. 14, had a discriminatory effect on Latino and Black Texans' rights in violation of Section 2 of the VRA.[52]  The district court observed:

> [S.B.] 14's voter I.D. requirements interact with social and historical conditions in Texas to cause an inequality in the electoral opportunities enjoyed by African-Americans and Hispanic voters as compared to Anglo voters. In other words, [S.B.] 14 does not disproportionately impact African-Americans and Hispanics by mere chance. Rather, it does so by its interaction with the vestiges of past and *current* racial discrimination.[53]

As a result of this litigation, the Texas Legislature later replaced S.B. 14.[54]  Although that new law has survived legal challenge, this does not erase the judgment of the Court of Appeals that the Texas Legislature adopted measures that had a discriminatory effect on Texans of color, in violation of federal voting-rights laws.[55]

61.     In 2019, Secretary of State David Whitley attempted to purge Texas's voter rolls by falsely alleging that nearly 100,000 "non-U.S. citizens" were illegally registered to vote.  In

---

[50] *Texas v. United States*, 887 F.Supp.2d 133 (D.D.C. 2012).

[51] *Perez v. Abbott*, 390 F. Supp. 3d 803, 816 (W.D. Tex. 2019).

[52] *Veasey v. Abbott*, 830 F.3d 216, 265 (5th Cir. 2016).

[53] *Veasey v. Perry*, 71 F.Supp.3d 627, 698 (S.D. Tex. 2014) (emphasis added).

[54] *See Veasey v. Abbott*, 888 F.3d 792, 797 (5th Cir. 2018).

[55] *See id.*

fact, many of these alleged "non-U.S. citizens" were Latino naturalized U.S. citizens properly registered to vote. The data underpinning the proposed voter purge, however, did not show voters' current citizenship status, which the Secretary of State knew before attempting to remove 100,000 eligible voters from the voter rolls.[56] A federal district court enjoined the purge, but not before counties sent "ham-handed and threatening correspondence from the state which did not politely ask for information but rather exemplifie[d] the power of government to strike fear and anxiety and to intimidate the least powerful among us."[57]

A.    **Before SB1, Texas was already among the states that made it hardest to vote.**

62.    Texas voting procedures are among the most onerous in the country.[58] For example, Texas has "reduced the number of polling stations in some parts of the state by more than 50% and has the most restrictive pre-registration law in the country."[59]

63.    Although most states allow voting by mail without some special showing,[60] Texas reserves mail voting only for individuals who (a) are 65 or older; (b) are sick or disabled; (c) will be out of the county during the entire election period (early voting and election day); or (d) are confined to jail but otherwise eligible to vote.[61]

---

[56] Alexa Ura, *Texas Will End Its Botched Voter Citizenship Review and Rescind Its List of Flagged Voters*, THE TEXAS TRIBUNE (April 26, 2019), https://www.texastribune.org/2019/04/26/texas-voting-rights-groups-win-settlement-secretary-of-state/.

[57] *Texas League of United Latin Am. Citizens v. Whitley*, No. SA-19-CA-074-FB, 2019 WL 7938511, at *1 (W.D. Tex. Feb. 27, 2019).

[58] Ross Ramsey, *Analysis: It's harder to vote in Texas than in any other state*, THE TEXAS TRIBUNE (Oct. 19, 2020), https://www.texastribune.org/2020/10/19/texas-voting-elections/.

[59] *Id.*

[60] NATIONAL CONFERENCE OF STATE LEGISLATURES, *VOPP: Table 1: States with No-Excuse Absentee Voting* (May 1, 2021), https://www.ncsl.org/research/elections-and-campaigns/vopp-table-1-states-with-no-excuse-absentee-voting.aspx.

[61] TEX. ELEC. CODE §§ 82.001–82.004 (2020).

64.    Unsurprisingly, Texas's election laws yield one of the nation's lowest voter turnout rates; the state's turnout rate trailed the national average in 2016, 2018, and 2020 (*even after* factoring in the state's relative successes in 2018 and 2020 described below).[62]

**B.    The 2020 General Election tested Texas voters in unprecedented ways—and Texans passed with flying colors.**

65.    Leading up to the 2020 General Election, Texas voters began to increase their turnout dramatically.  In the 2018 mid-term election, Texas voter turnout increased by 18 percentage points compared with the previous midterms.  Texas Latinos increased their vote share by about five percentage points—from 14.4% to 19.1% of all votes cast (compared to the 2014 midterm election).  As a result, Texas Latinos cast 922,146 more votes in the 2018 General Election than the 2014 General Election.

66.    In the 2020 election, Texas again achieved record voter turnout, with Texans casting 11,315,056 total votes in the 2020 general election[63] in spite of the COVID-19 pandemic that has killed tens of thousands in the state.  A total of 66.73% of Texas's registered voters cast ballots—the highest voter turnout for any election since 1992 and more than 7% higher than Texans' 2016 General Election turnout.[64]

---

[62] U.S. CENSUS BUREAU, *Voting and Registration in the Election of November 2016* (May 2017), Table 4b, https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-580.html;  U.S. CENSUS BUREAU, *Voting and Registration in the Election of November 2018* (April 2019), Table 4b, https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-583.html;  U.S. CENSUS BUREAU, *Voting and Registration in the Election of November 2020* (April 2021), Table 4b, https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-585.html.

[63] TEX. SEC'Y OF STATE, *Texas Election Results*: *2020 November 3rd General Election*, https://results.texas-election.com/races (last visited Sep. 1, 2021).

[64] TEX. SEC'Y OF STATE, *Turnout and Voter Registration Figures*, https://www.sos.texas.gov/elections/historical/70-92.shtml (last visited Sep. 1, 2021).

67.     In the 2020 election officials and poll workers faced unprecedented obstacles as well as new threats to their health and safety.  Not only were they tasked with operating polling places during a pandemic, but they also faced threats and harassment from members of the public spurred on by conspiracy theories.[65]  These threats were particularly unsettling to communities of color.  In the face of these threats, Texas election officials struggled to find enough poll workers to do the job in 2020.[66]

68.     In 2020, the Latino turnout rate jumped to 56.45%; Latino votes constituted more than one-fifth of all votes cast in the 2020 General Election.  According to Census estimates, turnout among Asian-American voters increased by 15% and turnout among Black voters in Texas increased by more than 10%.

69.     The strong 2020 voter turnout was due in part to efforts by public officials throughout the State of Texas to make voting more accessible.  Community-based civic engagement and faith-based groups such as Plaintiff organizations also played a role in educating voters and encouraging them to cast lawful ballots.

70.     In May 2020, Secretary of State Ruth Hughes released a checklist of health protocols for voters and election officials.[67]  For voters, the guidance suggested maintaining six

---

[65] *See, e.g.*, Michael Wines, *Here Are the Threats Terrorizing Election Workers*, N.Y. TIMES (Dec. 3, 2020), https://www.nytimes.com/2020/12/03/us/election-officials-threats-trump.html.

[66] John Engel, *Central Texas Election Officials Confront Nationwide Shortage of Poll Workers*, KXAN (Sep. 11, 2020), https://www.kxan.com/news/your-local-election-hq/central-texas-election-officials-confront-nationwide-shortage-of-poll-workers/.

[67] TEX. SEC'Y OF STATE, *Health Protocols for voters*, https://www.sos.texas.gov/elections/forms/health-protocols-for-voters.pdf (last visited Sept. 2, 2021).

feet of distance where possible and recommended that voters exhibiting symptoms of COVID-19 "consider utilizing curbside voting" if they met eligibility requirements.[68]

71.    The guidance also referenced the right of voters to rely on the aid of voting assistants (including interpreters).[69]

72.    On July 27, 2020, Governor Abbott issued a proclamation extending the early voting period in light of the COVID-19 pandemic and suspending the restriction in Texas Election Code § 86.006 that only allowed in-person delivery of ballots on Election Day.[70]

73.    Local election officials across the state developed creative ways to make traditional voting methods more accessible, including extended voting hours and additional mail ballot drop-off locations.

74.    Some large counties, including Harris and Bexar counties, extended voting hours at in-person polling locations.  Harris County implemented 24-hour voting for one night during the early voting period.[71]  Bexar County kept polling places open until 10:00 p.m. for several days during the early voting period to accommodate additional voters.[72]  Certain counties also encouraged eligible voters to apply for mail ballots and to do so early.

---

[68] *Id.* at 2.

[69] *Id.* at 3, 7

[70] OFFICE OF THE TEX. GOVERNOR, *Governor Abbott Issues Proclamation Extending Early Voting Period for November 3rd Election* (Jul. 27, 2020), https://gov.texas.gov/news/post/governor-abbott-issues-proclamation-extending-early-voting-period-for-november-3rd-election.

[71] Alexa Ura, *Here's How Texas Elections Would Change, and Become More Restrictive, Under the Bill Texas Republicans are Pushing*, TEX. TRIB. (Apr. 21, 2021), https://www.texastribune.org/2021/04/21/texas-voting-restrictions-senate-bill-7/.

[72] David Lynch, *Bexar County's Early Voting Locations Staying Open Later this Week*, KENS5 (Oct. 27, 2020), https://www.kens5.com/article/news/politics/elections/bexar-countys-early-voting-locations-staying-open-later-this-week/273-c7e85454-46c8-4d7b-a048-85f306fc8281.

75.     In addition to expanding traditional in-person and mail-in voting, election officials in some counties created new, safe ways to vote.  Harris County, for example, opened drive-thru voting sites, which were used by almost 127,000 early voters in the county.[73]

76.     Texas voters also sought mail ballots in record numbers.  For example, the Travis County Clerk's office received requests from 65,678 people before September 30, 2020.  By comparison, only 27,000 mail ballots were mailed out in the 2016 election.[74]

77.     However, as voters sought to protect their health during the pandemic by voting by mail, Governor Abbott and Defendant Attorney General Paxton responded by imposing obstacles that limited exercise of the franchise.  For instance, Governor Abbott issued a proclamation on October 1, 2020, that arbitrarily limited mail ballot drop-off locations to one per county regardless of physical size or population.[75]  Attorney General Paxton filed suit against the Harris County Clerk to prevent him from mailing out mail ballot applications to many eligible voters unless those voters first submitted a request.[76]

---

[73] Ten percent (10%) of Harris County's in-person early voters (approximately 127,000 voters) took advantage of drive-thru voting. Jolie McCullough, *Nearly 127,000 Harris County Drive-Thru Votes Appear Safe after Federal Judge Rejects GOP-Led Texas Lawsuit*, TEX. TRIB. (Nov. 2, 2020), https://www.texastribune.org/2020/11/02/texas-drive-thru-votes-harris-county/.

[74] Russell Falcon, *Travis County Voters can Request a Mail Ballot until Oct. 23*, KXAN (Sept. 30, 2020), https://www.kxan.com/news/your-local-election-hq/travis-county-voters-can-request-a-mail-in-ballot-until-oct-23/.

[75] OFFICE OF THE TEX. GOVERNOR, *Governor Abbott Issues Proclamation Enhancing Ballot Security* (Oct. 1, 2020), https://gov.texas.gov/news/post/governor-abbott-issues-proclamation-enhancing-ballot-security.

[76] OFFICE OF THE ATTORNEY GENERAL OF TEX., *AG Paxton Sues Harris County Clerk to Prevent Him from Unlawfully Sending Out Millions of Unsolicited Mail-In Ballot Applications* (Aug. 31, 2020), https://www.texasattorneygeneral.gov/news/releases/ag-paxton-sues-harris-county-clerk-prevent-him-unlawfully-sending-out-millions-unsolicited-mail.

**C.    Following a historically successful election, some Texas politicians made baseless allegations of cheating.**

78.    By official accounts, Texas's 2020 General Election was a resounding success.  The Texas Secretary of State's office reassured the public that Texas had a "smooth and secure" election in 2020.[77]

79.    Governor Abbott nonetheless announced that "election integrity" would be an "emergency item" for the Texas Legislature's 2021 term, claiming that "[i]n the 2020 election, we witnessed actions throughout our state that could risk the integrity of our elections and enable voter fraud."[78]  But Governor Abbott has struggled to identify examples of such actions or to identify people who witnessed them.[79]

80.    Tellingly, there were only 23 *total* voter fraud complaints filed in Texas in 2020.[80] And, although Attorney General Paxton's office has spent 22,000 staff hours investigating voter fraud in the 2020 Election, he has identified only 16 minor offenses out of more than 11,000,000

---

[77] Goldenstein *et al.*, *supra* note 1.

[78] OFFICE OF THE TEX. GOVERNOR, *Governor Abbot Delivers 2021 State of the State Address*, (Feb. 1, 2021), https://gov.texas.gov/news/post/governor-abbott-delivers-2021-state-of-the-state-address; OFFICE OF THE TEX. GOVERNOR, *Governor Abbott Holds Press Conference on Election Integrity Legislation*, (Mar. 15, 2021), https://gov.texas.gov/news/post/governor-abbott-holds-press-conference-on-election-integrity-legislation.

[79] Alexa Ura, *Gov. Greg Abbott Formally Opens Texas GOP Bid to Clamp Down on Local Efforts Expanding Voter Access*, TEX. TRIB. (Mar. 15, 2021), https://www.texastribune.org/2021/03/15/texas-voting-greg-abbott/.

[80] Jeremy Rogalski, *Despite National Outcry, Texas Received Relatively Few Voting Fraud Reports this Election*, KHOU-11 (Nov. 20, 2020), https://www.khou.com/article/news/investigations/texas-received-few-voting-fraud-reports/285-deec7c9a-581b-42b1-b430-4cae7aef5f26.

ballots cast.[81]   That means about 99.999% of ballots were cast untainted by so much as an allegation—let alone any proof—of fraud.

81.    There is no evidence of widespread voter fraud in the 2020 election (or other elections in Texas for that matter).  Nor is there evidence that there is a substantial risk of fraud in future elections that Texas's already-restrictive voting laws did not previously address.

**D.    The Texas Legislature takes up anti-voter legislation.**

82.    Against this backdrop of a successful and untainted election in Texas, the Texas Legislature began its determined effort to restrict voting in the name of "election integrity."[82]

83.    On March 11, 2021, Texas Senator Bryan Hughes introduced Senate Bill 7 ("SB7") in the Texas Legislature as a sweeping so-called "voting integrity" bill.  Although SB7 ultimately did not succeed, SB1 contains many of the same restrictions designed to intimidate and discourage Texas voters and, in particular, Texas's minority voters.

84.    SB1 (also introduced by Senator Hughes) was heard before the Senate State Affairs Committee on August 9, 2021, and voted out of committee that same day.  SB1 passed the Senate in the early morning of August 12, 2021 on a party-line vote, following a 15-hour filibuster by Senator Carol Alvarado.

85.    SB1 was heard before the House Select Committee on Constitutional Rights and Remedies on August 23, 2021.  During the hearing, the Committee Chair permitted two witnesses

---

[81] Taylor Goldenstein, *Fact Checking Texas Lawmaker's Claim of 400 Voter Fraud 'Cases'*, HOUSTON CHRONICLE (Apr. 12, 2021), https://www.houstonchronicle.com/politics/texas/article/Fact-checking-Texas-lawmaker-s-claim-of-400-16095858.php.

[82] *See* HERITAGE ACTION FOR AMERICA, *Heritage Action Launches Election Integrity Campaign, Commits Over $10 Million* (Mar. 8, 2021), https://heritageaction.com/press/heritage-action-launches-election-integrity-campaign-commits-over-10-million; HERITAGE FOUNDATION, *The Facts About Election Integrity and the Need for States to Fix Their Election Systems* (Feb. 1, 2021), https://www.heritage.org/election-integrity-facts.

to testify virtually in favor of the bill without calling a vote to authorize virtual testimony or alerting the public that such testimony would be permitted. At that time Texas was facing a surge of COVID-19 cases which discouraged in-person public participation in the hearing. The Committee passed SB1 that same day.

86.     The House debated SB1 on August 26, 2021, and adopted seventeen amendments to the bill.

87.     The House passed SB1 on August 27, 2021.

88.     The House and Senate convened a conference committee, which issued its report to each chamber on August 30, 2021.

89.     The Senate and the House both passed the SB1 conference committee report on August 31, 2021, and the Legislature sent SB1 to the Governor for his signature on September 1, 2021.

90.     After the Legislature passed SB1, the Governor publicly stated that "[p]rotecting the integrity of our elections is critical in the state of Texas, which is why I made election integrity an emergency item during the 87th Legislative Session."[83]

91.     The Governor signed SB1 into law on September 7, 2021.

92.     SB1 went into effect on December 2, 2021.

93.     The next "Uniform Election Date" in the State of Texas is scheduled for November 8, 2022.

---

[83] OFFICE OF THE TEX. GOVERNOR, *Governor Abbott Statement On Passage Of Election Integrity Legislation* (Aug. 31, 2021), https://gov.texas.gov/news/post/governor-abbott-statement-on-passage-of-election-integrity-legislation.

E.      **State officials, including the Secretary, commence a "forensic audit" of Texas elections.**

94.     On September 23, 2021, the Secretary announced a "[f]ull [f]orensic [a]udit of 2020 General Election in [f]our [c]ounties."[84]  The news release stated that "[u]nder existing Texas laws, the Secretary of State has the authority to conduct a full and comprehensive forensic audit of any election and has already begun the process in Texas' two largest Democrat counties and two largest Republican counties—Dallas, Harris, Tarrant, and Collin—for the 2020 election."[85]

95.     According to materials available on the Secretary's website, part of the audit process includes "identif[ying] potential non-U.S. citizen voters" and "direct[ing] county voter registrars to take action to verify the eligibility of registered voters and cancel their registration if they do not present proof of eligibility."[86]  Moreover, "[o]nce that action has been taken," the Secretary's office "evaluates the persons cancelled and refers any instances of possible illegal voting to the Office of the Texas Attorney General for investigation (Sec. 31.006)."[87]

96.     The forensic audit will also include an examination of, among many other things, "Signature Verification Committee Materials."[88]

---

[84] https://www.sos.state.tx.us/about/newsreleases/2021/092321.shtml

[85] *Id.*

[86] https://www.sos.state.tx.us/about/forms/9-28-21-forensic-audit-summary.pdf.

[87] *Id.*

[88] *Id.*

97.     On November 19, 2021, Governor Abbott approved transferring $4 million in funding from Texas's state budget to the Secretary's office to establish an entirely "new Election Audit Division" tasked with "conducting comprehensive forensic audits in the State of Texas."[89]

**F.     State officials, including the Attorney General, support increased criminal penalties for so-called "illegal voting."**

98.     Still without any evidence of widespread voter fraud in the State of Texas, on September 30, 2021, Governor Abbott sent a letter to the Secretary of the Texas Senate calling for "[l]egislation increasing the penalties for illegal voting that were reduced in Senate Bill No. 1 that passed in the 87th Legislature, Second Called Session."[90]  In a September 30, 2021 press release, Governor Abbott praised the "tremendous progress" made by the State of Texas "in upholding the integrity of our elections," and stated that, "[b]y increasing penalties for illegal voting, we will send an even clearer message that voter fraud will not be tolerated in Texas."[91]

99.     According to Lieutenant Governor Dan Patrick, the amendment lowering the criminal classification from a second degree felony to a Class A misdemeanor was "added last minute" by the House "& went under the radar until Gov., @TXAG & I found it & agreed then it must be corrected.  The Senate will pass next week."[92]

---

[89]    https://gov.texas.gov/news/post/governor-abbott-approves-funding-to-launch-election-audit-division-within-texas-secretary-of-states-office;    https://www.ktsa.com/gov-abbott-establishes-election-audit-division/.

[90]

https://gov.texas.gov/uploads/files/press/MESSAGE_3rd_called_87th_adding_matter_to_call_IMAGE_09-30-21.pdf.

[91]  https://gov.texas.gov/news/post/governor-abbott-adds-illegal-voting-penalty-increase-to-third-special-session-agenda; *see also* Greg Abbott (@GregAbbott_TX), TWITTER (Sept. 30, 2021, 6:46 PM EST).

[92] Dan Patrick @DanPatrick, TWITTER (Sept. 30, 2021, 6:21 PM EST).

100.    These sentiments by the Governor and Lieutenant Governor were echoed by Defendant Paxton, who tweeted that it was "[a]n outstanding decision to demand increased penalties for vote fraudsters . . . . I will continue to muster all my resources to defend election integrity!"[93]

101.    On October 4, 2021, the Texas Senate's State Affairs Committee heard testimony from certain supporters and opponents of increasing criminal penalties for illegal voting and the Senate ultimately passed Senate Bill 10 ("SB10").  SB10 would have increased the penalty for illegal voting from a Class A misdemeanor to a second degree felony.

**G.    SB1 imposes burdens that will discourage, intimidate and deter eligible Texas voters, and will disproportionately impact voters of color and voters with disabilities.**

102.    The Texas Legislature's claims of voter fraud and voter integrity are merely pretexts for their actual purpose in enacting SB1, which is to make it harder for citizens of color and citizens with disabilities to cast their votes.  SB1 intentionally discriminates on the basis of race and national origin and is consistent with Texas' longstanding efforts to discriminate against citizens of color in Texas.

**1.    SB1 restricts the ability of eligible Texans, including voters who have limited English proficiency, disabilities, and less formal education, to access voter assistance.**

103.    As Representative Bernal testified before Congress, "[t]here are no cases of voter fraud relating to voter assistance."[94]

---

[93] Ken Paxton (@KenPaxtonTX), TWITTER (Oct. 1, 2021, 11:34 PM EST).

[94] HOUSE COMMITTEE ON OVERSIGHT & REFORM, *Democracy in Danger: The Assault on Voting Rights in Texas* (July 29, 2021), https://oversight.house.gov/legislation/hearings/democracy-in-danger-the-assault-on-voting-rights-in-texas.

104.    SB1 nonetheless targets eligible voters who vote with assistance, including voters who have limited English proficiency, disabilities, and/or less formal education.  The law's restrictions on voter assistance will deprive many voters of their right to choose their assistors, which will discourage and ultimately depress voter participation and have a particularly negative impact on Latino and Asian American voters.  Section 6.04 of SB1 also limits the type of assistance that a voter can receive to "reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot."[95]  As a result, many eligible voters will not receive the assistance to which they are entitled, which will impede their ability to vote or result in avoidable error on their ballots.  In addition, individuals who assist voters will be deterred and prevented from providing assistance by the new restrictions and penalties in SB1.

105.    According to data collected pursuant to Section 203 of the Voting Rights Act,[96] more than 277,000 voting-age U.S. citizens with limited English proficiency live in a Texas county that is not required to provide materials in their primary language.  These citizens are disproportionately Asian American and Latino.

106.    The Centers for Disease Control and Prevention estimates that 28% of adults in Texas have a disability.[97]  These Texans are disproportionately Black, representing more than 21% of all Texans with a disability, but only 13% of the overall population.

107.    SB1 imposes at least four new restrictions on assistance for voters.

---

[95] S.B. 1 § 7.06, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 64.034).

[96] 52 U.S.C. § 10503.

[97] Centers for Disease Control and Prevention, Disability and Health U.S. State Profile Data for Texas, last updated June 28, 2021, https://www.cdc.gov/ncbddd/disabilityandhealth/impacts/texas.html.

108.    First, SB1 alters the oath that an assistor must take before providing assistance to a voter.  The revised language is both more onerous and more intimidating.

109.    Under Section 6.04 of SB1, an assistor must now swear that the voter "represented to [them] they are eligible to receive assistance."[98]  This effectively requires the assistor to obtain from the voter a statement of eligibility for voter assistance.  Because one's eligibility for voter assistance necessarily turns on personal and/or medical background and information, this requirement will invade the privacy of and deter voters who need assistance.  It will further deter individuals from serving as assistors out of fear of criminal prosecution for failing to secure the appropriate "representation" of eligibility from voters.

110.    The assistor's oath must be made "under penalty of perjury" and the assistor must swear "I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted."[99]  This additional language will cause assistors to question every voter's "need" for assistance, which further invades the voter's privacy and opens assistors to the threat of prosecution for any misstep.

111.    An assistor must also swear that they did not "pressure" the voter to choose them as the assistor.[100]  This requirement will deter assistors from helping or even volunteering to help voters out of fear that the assistor may be perceived as pressuring their selection as assistors.  This will deprive voters of access to their chosen assistors.  Indeed, on its face, this provision will

---

[98] S.B. 1 § 6.04, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 64.034).

[99] Id.

[100] Id.

deprive voters of assistance from the person most likely to provide it—i.e., a person who encourages the voter to seek assistance.

112.    Second, in addition to the oath, Section 6.03 of SB1 requires assistors to fill out a form stating the assistor's "relationship to the voter," and whether the assistor "received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee."[101]  With respect to voting by mail, Section 6.05 of SB1 requires assistors to fill out additional information on the mail ballot carrier envelope—namely, the assistor's "relationship to the voter" and whether the assistor "received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee in exchange for providing assistance." This new requirement for information will deter assistors and increase the risk that the ballot will be rejected because the assistor made a clerical error.

113.    Together with Section 6.04, these new requirements will slow in-person voting and burden the right to vote of those seeking assistance, as each voter's assistor must take time to both complete a form and recite an oath.

114.    Third, Section 6.06 of SB1 makes it a crime to compensate (or offer, solicit, receive, or accept compensation for) assistance to mail voters.  This prohibits assistors who work for non-profit civic engagement organizations and who conduct voter outreach from assisting mail voters who require such assistance to vote.[102]  It will also likely deter many other assistors who fear prosecution because the section defines "compensation" to mean any "economic benefit."

---

[101] S.B. 1 § 6.03, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 64.0322(a)).

[102] S.B. 1 § 6.06, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 86.0105); TEX. PENAL CODE § 12.35.

115.    Finally, Section 6.01 of SB1 discourages voter assistance by imposing limitations on transportation to the polls for curbside voting.  Any individual other than a close relative who provides transportation to the polls to seven or more curbside voters who are entitled to receive ballots at the polling place entrance or curb under Section 64.009 of the Texas Election Code must complete and sign a form that contains the driver's name and address and state whether the driver is providing only transportation assistance or is also providing assistance with voting.[103]  SB1 provides that the form shall be delivered to the Secretary of State and retained as an election record available to the Attorney General for inspection upon request.[104]  Even though giving rides to seven or more voters is not illegal, this requirement will deter individuals from giving these rides, further reducing access to voting for voters who need assistance and depriving them of assistance by their chosen assistors.  In addition, poll watchers are expressly permitted to observe "any activity conducted under this section," which will further deter voter assistance by invading the privacy of curbside voters who receive assistance.[105]

116.    As a result of these provisions, voters eligible for assistance will be deprived of assistance and assistors will be deterred from and denied the opportunity to assist voters.

**2.      SB1 opens the door to intimidation and misconduct at the polls by tying the hands of poll workers and election officials.**

117.    The ability of poll workers and election officials to effectively control and (if necessary) remove poll watchers who are unruly or are violating the law is critical to protecting the right to vote.

---

[103] S.B. 1 § 6.01, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE §§ 64.009(f), (f-1)).

[104] *Id.* (codified at TEX. ELEC. CODE § 64.009(g)).

[105] *Id.* (codified at TEX. ELEC. CODE § 64.009(e)).

118.    In 2009, a group of predominantly white volunteers known as the "King Street Patriots" went to polling stations in minority neighborhoods in Harris County and interfered with voting.  In 2010, a poll watcher in Harris County stood directly behind and hovered over voters. An election judge requested that the overzealous poll watcher step back, but the watcher responded, "I have the right to stand wherever I want!"  In 2020, individuals in militia gear were gathered near an early voting location in Fort Worth.  In Travis County, a poll watcher was arrested after attempting to record activities during early voting with a hidden camera on her clothing.  In a 2021 training for poll watchers, an individual with the Harris County Republican Party, with a stated goal of recruiting an "army" of watchers, argued that poll watchers from specific areas of Harris County must "have the confidence and courage" to act as poll watchers in the areas "where the fraud is occurring."  The areas that the individual referenced when describing where poll watchers were coming from are suburban areas that are predominantly white.  The areas that the individual claimed were "where the fraud is occurring" are neighborhoods that are predominantly inhabited by people of color in Houston.  There was no evidence of fraud occurring in those neighborhoods.

119.    SB1 makes the work of poll workers even harder by loosening restrictions on poll watchers and at the same time limiting poll workers' ability to carry out their duty of "preserv[ing] order and prevent[ing] breaches of the peace and violations of [the election] code in the polling place."[106]

120.    First, SB1 limits the ability of poll workers to manage unruly poll watchers.  Section 4.06 of SB1 creates a new *criminal* offense—making it a Class A misdemeanor for an election officer to "intentionally or knowingly refuse[] to accept a watcher for service when acceptance of

---

[106] TEX. ELEC. CODE § 32.075(a).

the watcher is required by this section."[107]  This provision effectively criminalizes refusing to accept a poll watcher even if the polling place official is reasonably concerned that the watcher will be unruly or will actually intimidate voters.

121.   Section 4.01 of SB1 also prohibits "[a] presiding judge" from having a poll watcher "removed from the polling place" for "violating a provision of this code or any other provision of law relating to the conduct of elections, other than a violation of the Penal Code," unless the election judge or a clerk personally observed the violation.[108]  SB1 thus allows poll watchers to avoid being removed from a polling place, even after they violate the Election Code, and if there were dozens of witnesses as long as the election judge or clerk were not among them.

122.   Second, the Texas Election Code already allowed poll watchers to sit in a convenient location and report any activity that concerned them, but now, Section 4.07 of SB1 guarantees poll watchers the right to "free movement where election activity is occurring within the location at which the watcher is serving."[109]  In other words, under SB1, poll watchers can essentially go wherever they please within a polling place, even if their presence intimidates those present or causes other disruption.

123.   Third, Section 4.09 of SB1 adds that the existing offense of "knowingly prevent[ing] a watcher from observing an activity or procedure" now specifically includes "taking *any action* to obstruct the view of a watcher or distance the watcher from the activity or procedure

---

[107] S.B. 1 § 4.06, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 33.051(g)).

[108] S.B. 1 § 4.01, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 32.075(g)).

[109] S.B. 1 § 4.07, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 33.056(e)).

to be observed in a manner that would make observation not reasonably effective."[110]  There is no protection for poll workers taking routine actions of election administration that by chance obstruct the view of a poll watcher, provided such actions were taken "knowingly."  Similarly, there is no protection for poll workers who position themselves between a voter and a disruptive watcher in order to protect the privacy of the voter.

124.    Section 8.01 of SB1 adds another new provision to the Election Code, codified at TEX. ELEC. CODE § 31.129, entitled "Civil Penalty."  Subsection (b) of that provision states that "a[n] election official may be liable to this state for a civil penalty if the official: (1) is employed by or is an officer of this state or a political subdivision of this state; and (2) violates a provision of this code." TEX. ELEC. CODE § 31.129(b); *see also* TEX. ELEC. CODE § 1.005(4-a) (defining "election official").  Subsection (c) specifies that a "civil penalty imposed under this section may include termination of the person's employment and loss of the person's employee benefits." TEX. ELEC. CODE § 31.129(c).

125.    Fourth, Section 4.10 of SB1 allows the parties and candidates that appoint poll watchers to seek injunctive, mandamus, or "any other remedy available under law" whenever they "believe[] that the watcher was unlawfully prevented or obstructed from the performance of the watcher's duties."[111]

126.    Together, these provisions will intimidate poll workers into allowing poll watchers to roam around the polling place and stand uncomfortably close to voters.  Permitting poll watchers to stand over voters, make disruptive noises, and hawkishly observe voting activities is designed

---

[110] S.B. 1 § 4.09, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 33.061(a) (emphasis added)).

[111] S.B. 1 § 4.10, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 33.063).

to, and will, have a chilling and intimidating effect on Texas voters, particularly Black, Latino and Asian American voters, who are members of historically marginalized groups.

127.    SB1's new definition of poll watcher obstruction also is unconstitutionally vague. Under the revised Section 4.09, it may be unlawful for an election worker to take "any action" (no matter how small) if it renders "observation not reasonably effective."[112]

128.    The phrase "not reasonably effective" is not defined in SB1 or elsewhere in the Texas Elections Code.  SB1 provides no guidance as to what makes a watcher's observation activities "reasonably effective" or when routine actions of election administration unlawfully reduce the "effectiveness" of a watcher's observation.  Thus, the statute provides no objective standard for conduct that could "obstruct the view of a watcher" in a manner proscribed thereby—clearing a pathway for arbitrary application.[113]

129.    This ambiguity deprives Plaintiff Lewin and other election workers of reasonable notice of how to comply with the law and avoid severe jail time or fines.

130.    This ambiguity will further deter Texans from becoming poll workers, augmenting the struggles election officials already face to staff each polling location.

131.    Ultimately the burdens imposed by SB1 will fall on voters, particularly voters of color.  Should poll watchers engage in behavior that intimidates or harasses voters or election workers, including hovering over them or trailing voters through the polling place, election workers run the risk of criminal prosecution if they attempt to stop such behavior.  The risk of such intimidation has historically been and will continue to be higher for voters of color.

---

[112] *Compare* Tex. Elec. Code § 33.061(a) (2020) *with* S.B. 1 § 4.09, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at Tex. Elec. Code § 33.061(a)).

[113] S.B. 1 § 4.09, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at Tex. Elec. Code § 33.061(a) (2021).

3.    **SB1 prohibits voting procedures that facilitated record voter participation in 2020, despite no evidence that these measures contribute to voter fraud.**

132.    Several important accommodations that local officials in large, diverse counties adopted to ensure safe, secure voting during the 2020 Election in light of the COVID-19 pandemic are outlawed or undermined by SB1.

133.    For example, during the 2020 Election, Harris County's 24-hour voting allowed more than 10,000 Harris County voters to cast ballots overnight.[114] But Sections 3.09 and 3.10 of SB1 prohibit future efforts to increase access to the polls by requiring early voting clerks to restrict voting hours to between 6:00 a.m. and 10:00 p.m. on weekdays and the last Saturday of the early voting period, and to between 9:00 a.m. and 10:00 p.m. on the last Sunday of the early voting period.[115]

134.    SB1 also effectively prohibits local election officials from providing drive-thru voting—like Harris County did in 2020—despite the lack of any evidence to suggest a link between more convenient voting hours and fraud or irregularities of any kind.[116]

---

[114] Peter Holley, *Meet the Harris County Voters Who Showed Up After Midnight to Cast a Ballot*, Tex. Monthly (Oct. 30, 2020), https://www.texasmonthly.com/news-politics/harris-county-24-hour-voting/.

[115] S.B. 1 §§ 3.09, 3.10, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE §§ 85.005(a), (c), and 85.006(e)).

[116] Notably, following the success of Harris County's drive-thru voting program, a bipartisan task force of local Harris County officials released a report stating that the task force had not found "proof of any election tampering, ballot harvesting, voter suppression, intimidation or any other type of foul play that might have impacted the legitimate cast or count of a ballot." Alan Rosen *et al.*, Harris County Election Security Task Force Final Productivity Report, p. 8 (Dec. 17, 2020), available at https://www.dropbox.com/s/7mzy6aws7fnzvy9/Elections%20Security%20Task%20Force%20final%20report%20PUBLC%20FINAL%2012-17-20%20442p.pdf?dl=0 (last accessed Sep. 1, 2021).

135.    In particular, Sections 3.04, 3.12, and 3.13 of SB1 require polling places and early voting sites to be located "inside" buildings.[117]  Section 3.04 also expressly prohibits voting "from inside a motor vehicle" unless the voter meets other requirements.[118]  Further, except in the case of a natural disaster, "[a] polling place may not be located in a movable structure ...."[119]

136.    SB1's additional requirements for mail ballots increase the likelihood that ballots submitted by eligible voters will be rejected based on a technicality.  Sections 5.07 and 5.13 require a clerk to reject any mail ballot or mail ballot application if the required information does not identify "the same voter identified on the applicant's application for voter registration . . . ."[120]  This requires election clerks to reject otherwise valid mail ballots and mail ballot applications from voters eligible to vote by mail where, for example, the voter inadvertently omits their ID number or other required information, or where the clerk lacks ID information in the voter's record on file, even when the clerk can verify the voter's application or mail ballot envelope through other means.

---

[117] *See* S.B. 1 §§ 3.04, 3.12, 3.13, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at Tex. Elec. Code §§ 43.031; 85.061(a) (adding that an early voting location "shall be located *inside* each branch office" and not in a tent) (emphasis added), 85.062, respectively).

[118] S.B. 1 § 3.04, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at Tex. Elec. Code §§ 43.031(b)); S.B. 1 § 6.01, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at Tex. Elec. Code § 64.009).

[119] *See* S.B. 1 § 3.13, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (to be codified at Tex. Elec. Code §85.062); *see also* S.B. 1 §§ 3.04, 3.11, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at § 43.031, 85.061(a), respectively).

[120] *See* S.B. 1 §§ 5.07 and 5.13, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at Tex. Elec. Code §§ 86.001(f), 87.041(b)(8), respectively).  The corresponding provisions §§ 5.02 and 5.08 impose new requirements that a voter provide an ID number on the mail ballot application and mail ballot carrier envelope, respectively.

4. **SB1 criminalizes otherwise lawful voter assistance by community-based non-partisan organizations through vague and overbroad "vote harvesting" prohibitions.**

137.   SB1 takes aim at community-based organizations that conduct non-partisan voter turnout activities and criminalizes these activities under the label "vote harvesting."

138.   Under Section 7.04 of SB1, a person commits an offense if he or she (a) "directly or through a third party, knowingly provides or offers to provide vote harvesting services in exchange for compensation or other benefit;" (b) "directly or through a third party, knowingly provides or offers to provide compensation or other benefit to another person in exchange for vote harvesting services;" or (c) "knowingly collects or possesses a mail ballot or official carrier envelope in connection with vote harvesting services."[121]  Any violation is a third-degree felony, subject to a minimum of two years (and up to ten years) of jail time and a fine of up to $10,000.[122]

139.   SB1 defines "vote harvesting services" as "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure."[123]

140.   Section 7.04 of SB1 does not define "in-person interaction."  As a result, the statute does not limit the broad range of daily interactions that could come within the statute's prohibitions.[124]  SB1 on its face reaches pure speech, including political speech, so long as it is part of an "in-person interaction" somehow "in the physical presence of" an official ballot or a

---

[121] *Id.* (codified at TEX. ELEC. CODE § 276.015(b)–(d)).

[122] *Id.* (codified at TEX. ELEC. CODE § 276.015(f)); TEX. PENAL CODE § 12.34.

[123] *Id.* (codified at TEX. ELEC. CODE § 276.015(a)(2)).

[124] S.B. 1 § 7.04, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX ELEC. CODE § 276.015(a)(2)).

mail ballot, and the speech is made with the intent to "deliver votes for a specific candidate or measure."

141.     Although SB1 requires a person to receive "compensation or other benefit" for a violation, the range of what could constitute "compensation or other benefit" is impossible for the average citizen to determine.  Section 7.04 of SB1 defines "benefit" to mean "anything reasonably regarded as a gain or advantage," no matter how minor, thus providing little guidance and little constraint on prosecutorial discretion.[125]

142.     This vague and overbroad offense will chill even ordinary interactions between family members, friends or neighbors.  For example, if a wife is a paid campaign worker for a local school bond issue and encourages her husband during dinner to support the local school bond issue when he casts his mail ballot while the mail ballot happens to be in the same room, then she could be found to have knowingly (i) interacted in-person with a voter (i.e., her husband), (ii) in the presence of his mail ballot, (iii) with intent to "deliver a vote" for the measure she supports (i.e., by supporting her choice on the measure), and (iv) received compensation from a campaign, sufficient to constitute "compensation" (i.e., her salary) under the inference set forth in Section 6.03.  In fact, under SB1's vote harvesting provisions, any person who works (or even volunteers) for a political campaign for a particular candidate or issue must now worry about the possible presence of a mail ballot anytime he or she discusses politics with a friend.  Similarly, an employee of any of a wide array of civic engagement organizations, including the Plaintiff organizations, could potentially be prosecuted under this provision by canvassing for a local measure (such as infrastructure improvements) and assisting a mail voter who invites her into the house and requests help voting.

---

[125] *Id.* (codified at TEX. ELEC. CODE § 276.015(a)(1)); *see also* TEX. PENAL CODE § 1.07(a)(7).

143.    As a result of these unusual provisions, SB1 will reduce voter participation by Texans who rely on assistance to cast their mail ballots.  Although these restrictions have the potential to burden all Texas voters, they will impose the greatest burdens on voters of color, language minority voters, elderly voters, low-income voters, and voters with disabilities.

**5.    SB1 further burdens state officials and expands investigation of voter registration applicants and registered voters, despite no evidence of widespread voter fraud.**

144.    As described above, there is simply no evidence that widespread voter fraud has occurred in any election administered by the State of Texas and its political subdivisions.  Nor is there any evidence of a substantial risk of such fraud given Texas's already strict voting laws.

145.    Nonetheless, SB1 effectively creates a pipeline for prosecution by sending names of possibly ineligible voters to law enforcement, even if the voters are in fact eligible or simply made a mistake.  Previously, the county voter registrar verified the voter's eligibility and removed ineligible voter from the rolls.  Under SB1 Section 2.04, however, if a person whom the voter registrar subsequently determines is not eligible to vote either registered to vote or voted in an election, the registrar must execute and deliver, "within 72 hours[,]" an affidavit with the relevant facts to the Attorney General, the Secretary of State, and the local prosecutor.[126]  The added threat of criminal prosecution will have a chilling effect on voter registration, particularly among groups, including Black, Latino and Asian American communities, who have been historically victimized by law enforcement.

146.    Section 2.04 also sweeps in and facilitates investigation and prosecution of perfectly legal activity by voters.  For example, a person could register to vote in her home county,

---

[126] *See* S.B. 1 § 2.04, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 15.028).

then move temporarily to a different county for work.  If the voter subsequently seeks exemption from jury duty because she is not present in her home county, the registrar can report the voter to law enforcement under SB1 as an ineligible person registered to vote even though the voter has committed no offense.

147.    Section 2.07 requires the Secretary of State to compare on a quarterly basis the lists of individuals who were excused from jury duty service for non-residence in the county with the statewide computerized voter registration list and to send notice to the voter registrar of the county.[127]  As with Section 2.04, properly-registered voters living temporarily away from home, as in the case of migrant workers, for example, may be purged from the voter roll as ineligible non-residents and targeted for prosecution.  This provision will also have a disparate impact on Latino voters.

148.    Section 2.06 of SB1 requires the Secretary of State to impose certain requirements on registrars who are not in substantial compliance with a provision or rule related to: (1) the delivery of the suspense list; (2) the cancellation following end of suspense list period; and (3) the electronic submission of information for maintenance of the statewide computerized voter registration list.  A county may also be held liable if the county's registrar "fails to take overt action to comply with" the imposed requirements.[128]  Section 8.01 of SB1 imposes a civil penalty on employees or officers of the state (and its political subdivisions) who violate a provision of the election code.  The civil penalties "may include termination of the person's employment and loss

---

[127] *See* S.B. 1 § 2.07, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE §§ 18.068(a), (a-1).

[128] *See* S.B. 1 § 2.06, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 18.065).

of the person's employment benefits."[129]  These additional penalties will force career officials to shift resources towards meeting tight deadlines for reporting voters for investigation and removing voters from the voter rolls—even in the absence of any pending election—just to avoid these penalties.

## H.    SB1 Will Harm Plaintiffs.[130]

149.    LUPE's members include Latino registered voters, some of whom have limited English proficiency and/or have limited formal schooling and limited literacy.  LUPE's members include Latino voters who require and use assistors of their choice to vote due to disability and/or inability or limited ability to read or write in English.  These voters use their chosen assistors to navigate the polling place, interact with poll workers, understand how to use the voting equipment and read, interpret, mark and cast the ballot.  Some of LUPE's members are illiterate because racially discriminatory practices in Texas prevented them from gaining a formal education.

150.    LUPE's members include voters who are disabled and require and use assistors of their choice, but who are not blind and can see and read the ballot.

---

[129] *See* S.B. 1 § 8.01, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 31.129(b), (c)).

[130] According to Fifth Circuit precedent, an association does not need to "set forth the name of a particular member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss based on a lack of associational standing." *Hancock Cty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012); *id.* at 198 n.5 (quoting *Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 145 (2d Cir. 2006) ("[D]efendants cite to no authority -- nor are we aware of any -- that supports the proposition that an association must name names in a complaint in order properly to allege injury in fact to its members.").  Where an association generally alleges "that some of its members" fall within the group of aggrieved citizens, the associational plaintiffs have "adequately alleged that some of its members were suffering a concrete, particularized injury" and have standing to proceed.  *Hancock*, 487 F. App'x at 198–99; see *Lewis v. Hughs*, 475 F. Supp. 3d 597, 613 (W.D. Tex. 2020) (organizational plaintiffs had associational standing to challenge mail-in voting laws).

151.    LUPE members include voters with impairments that limit major life activities, including accessing the right to vote.  LUPE members include voters who require accommodations that SB1 limits or curtails with the imposition of new requirements for casting a ballot.  It will now be more difficult for LUPE members with disabilities to request a mail ballot, receive assistance with voting in person or by mail, or receiving a ride to the polls.

152.    LUPE's members also include voters who arrive at the polling place in a car with several individuals, including family members, as part of doing errands for the day, and have, and would in the future, use curbside voting or drive-thru voting.

153.    LUPE's members and staff include individuals chosen as assistors to assist voters with navigating the polling place, interacting with poll workers, understanding how to use the voting equipment and reading, interpreting, marking and casting the ballot.  LUPE's members and staff include individuals chosen as assistors to assist eligible voters with voting by mail, including helping the voters read, interpret, complete and return the application for ballot by mail and mail ballot.

154.    LUPE's members and staff include individuals who participate in in-person, door-to-door canvassing to support or oppose non-partisan ballot measures related to the development of infrastructure in the Rio Grande Valley colonias.  At times, a voter will ask a LUPE member or staff person who is canvassing to help the voter vote by mail.  Because LUPE's canvassing activities include in-person interaction with voters at their homes, including when a voter's mail ballot is in the home, LUPE members and staff are subject to investigation and prosecution under SB1's "vote harvesting" provisions.

155.    SB1 will injure LUPE by exposing the organization's paid staff and members to investigation and prosecution when they canvass for local measures (such as infrastructure

improvements) and either serve as a chosen assistor of a mail voter or advocate for a measure in the presence of a voter's mail ballot in the voter's home.

156.     SB1 will injure LUPE's members, including by depriving them of the assistors of their choice, which will cause LUPE members who vote in person to vote less than the complete ballot, not vote at all or make errors that will result in their ballot not being counted or being counted in a way that is contrary to the intent of the voter.  SB1 will also cause LUPE members who vote by mail to vote less than the complete ballot, not vote at all, or make errors that will result in their ballot not being counted or being counted in a way that is contrary to the intent of the voter.

157.     SB1 will also injure LUPE's members by extending wait times at the polling place as assistors are required to complete forms and take an oath for each assisted voter.

158.     SB1's requirements to provide additional information on mail ballot applications and carrier envelopes will injure LUPE's members by causing the rejection of their mail ballots when they make inadvertent clerical errors or where the clerk lacks ID information in the voter's record on file.

159.     LUPE's members include voters who will be intimidated by poll watchers roaming freely around polling places, watching and listening, and standing close to them while they vote.

160.     Members of LUPE include individuals who are migrant workers who are registered to vote.

161.     LUPE's members and staff include individuals who are chosen as assistors and will be deterred from serving as chosen assistors by SB1's requirement that the assistor fill out a form; take an oath; and face criminal prosecution, conviction and punishment for inadvertently making a mistake on the form or with the oath, or for providing necessary assistance to voters that exceeds

the scope of assistance described in the oath, or for encouraging a voter in a way that law enforcement officials will conclude is "pressur[ing]" a voter to use them as an assistor in violation of the required oath.

162.    SB1 will force LUPE to divert its resources away from its GOTV, voter registration and community education activities, which are central to its mission, in order to counteract the negative effects of SB1 on its members.  LUPE has in the past, and will in the future, conducted GOTV activities aimed at Latino registered voters with low turnout.  LUPE has in the past, and will in the future, pay employees who, among their other duties: educate voters about an upcoming election; urge the voters to vote; and encourage, offer and deliver assistance to the voters.  LUPE's employees have in the past, and will in the future, assisted voters in applying for and preparing their mail ballots as provided by Section 86.010 of the Texas Election Code including assisting non-family members to prepare their ballots.

163.    Members of LUPE include individuals who volunteer to be assistors for family members and non-family members in connection with voting at the polls and by mail.  Members of LUPE include individuals who assist voters, including Latino, elderly, disabled, limited English proficient and limited literacy voters, to vote by mail including helping the voters prepare their mail ballots.  Members of LUPE include individuals who assist voters, including Latino, elderly, disabled, limited English proficient and limited literacy voters, to vote in person at the polling place, including assisting voters in navigating the polling place, interacting with poll workers, using the voting equipment, reading and interpreting the ballot and recording a vote on the ballot. Individual LUPE employees and/or members have in the past driven, and would plan in the future to drive, more than seven voters to the polls for curbside voting.

164.     SB1 will frustrate the mission of LUPE by reducing the number of people available to assist voters and reducing voter turnout of voters who rely on assistance, including Latinos with limited English proficiency, limited literacy rates and low rates of turnout.  Members of LUPE face felony prosecution, conviction and punishment under SB1 for assisting voters to vote in person and by mail.

165.     LUPE will be required to divert resources to retrain staff, prepare new educational materials, recruit, train and manage new volunteers, and conduct community outreach to comply with SB1's new restrictions and requirements for assisting voters with mail and in-person voting. SB1 will also frustrate the mission of LUPE by reducing the number of people available to assist voters, and reducing the voter turnout of voters who rely on assistance, including Latinos with limited English proficiency, limited literacy rates and low rates of voter turnout.  Members, employees, and the leadership of LUPE face felony prosecution, conviction and punishment under SB1 for assisting voters to vote in person and vote by mail.

166.     SB1 will frustrate FRIENDSHIP-WEST's mission of encouraging its eligible congregants and community members, the majority of whom are Black, to register, to vote, and to serve as poll workers and volunteer deputy registrars, and will frustrate its ability to operate as a polling place.  FRIENDSHIP-WEST's congregants have already expressed hesitation to serve as poll workers in future Texas elections due to the lack of clarity around the impact of some of SB1's provisions and the several provisions that impose potential new criminal liability on poll workers.

167.     FRIENDSHIP-WEST has in the past and will in the future encourage civic education and participation among its congregants and in the communities it serves. FRIENDSHIP-WEST's voter engagement activities include registering eligible voters, hosting voter registrar trainings, providing written and online resources about in-person and mail voting,

holding events to encourage members to vote, recruiting poll workers and volunteer deputy registrars, and serving as a polling place.

168.   FRIENDSHIP-WEST's congregants include individuals who vote by mail and individuals who serve as poll workers.

169.   FRIENDSHIP-WEST believes it will have difficulty recruiting poll workers because of confusion about SB1's new rules and fear among volunteers about criminal prosecution. Many of FRIENDSHIP-WEST's congregants who served as poll workers in previous elections, including the 2020 election, will be deterred from doing so in future elections because of potential harassment by poll watchers and the possibility of criminal prosecution if they regulate poll watcher conduct.

170.   FRIENDSHIP-WEST will also be required to divert and expend resources to conduct voter education; recruit, train, and manage new volunteers; and conduct community outreach to ensure that its congregants and community members comply with SB1's new, often confusing, and vague restrictions. This is particularly true of the provision in SB1 that limits poll workers' ability to regulate poll watchers' conduct in polling places. For the 2020 general election, FRIENDSHIP-WEST engaged in efforts to recruit its members to serve as poll monitors to watch poll watchers at polling places out of fear that poll watchers would intimidate and disrupt voters while they cast their ballots. These fears are compounded now that poll watchers have, effectively, free movement within a polling location. Indeed, in addition to planning events to explain the impact of SB1 on future elections, FRIENDSHIP-WEST also anticipates specifically conducting independent trainings for congregants who do choose to serve as poll workers, in addition to county-provided trainings, to ensure their congregants are aware of the limits SB1 places on poll

workers' ability to regulate poll watcher conduct so that their congregants are not exposed to criminal liability.

171.    ADL and its supporters will be irreparably harmed by SB1.  In 2020, ADL's outreach and education was aimed at ensuring voters had a plan for voting safely.  ADL worked to educate Texans on how to vote, when to vote, and where to vote, focusing primarily on early voting and mail-in voting (for eligible voters).  ADL provided information to a wide audience, including 700 schools participating in its "No Place for Hate" program.  ADL's voter education and outreach required its staff and volunteers to gather information from local election officials on the applicable rules in each jurisdiction, and those efforts were time consuming given 2020's rule changes and disinformation campaigns.

172.    ADL is similarly concerned with SB1's provisions that limit and criminalize voter assistance.  Although ADL does not directly assist voters with mail ballots or applications, it provides supporters with information about assisting voters.  ADL is concerned that by providing its at least 23,000 Texas supporters with information about how to assist voters with mail-in voting or applications, the organization would place itself and its supporters at risk of prosecution.

173.    ADL will be required to divert and expend resources on designing its voter education to properly inform Texas voters about SB1's new, often confusing and/or vague, provisions.

174.    SVREP will be irreparably harmed by SB1.  SVREP has in the past, and will in the future, encouraged civic education and participation in the communities it serves.  SVREP's voter engagement activities include registering eligible voters, hosting voter registrar trainings, providing written and online resources about in-person and mail voting (including information

about assisting disabled and language minority voters), and holding events to encourage community members to vote.

175.    SB1 will force SVREP to divert its resources away from its GOTV and leadership-building activities, which are central to its mission, in order to counteract the negative effects of SB1 on the community members and voters SVREP serves.  SVREP has in the past, and will in the future, conducted GOTV activities aimed at Latino registered voters with low turnout.  SVREP has in the past, and will in the future, employed paid canvassers to contact voters in person at their homes and: educate the voters about an upcoming election, and urge the voters to vote, encourage, offer and deliver assistance to the voters.  SVREP's paid canvassers have in the past, and will in the future, assisted voters in applying for and preparing their mail ballots as provided by Section 86.010 of the Texas Election Code including assisting non-family members to prepare their ballots.

176.    Employees and volunteers of SVREP include individuals who encourage family members and non-family members to select them as assistors for voting at the polls and by mail. Employees and volunteers of SVREP include individuals who assist voters, including Latino elderly, disabled, limited English proficient and limited literacy voters, to vote by mail, including helping the voters prepare their mail ballots; employees and volunteers of SVREP include individuals who assist voters, including Latino elderly, disabled, and voters with limited English proficiency and limited literacy, to vote in person at the polling place, including assisting voters in navigating the polling place, interacting with poll workers, using the voting equipment, and reading and interpreting the ballot and recording a vote on the ballot.

177.    SVREP will be required to divert resources to retrain staff, prepare new educational materials, recruit, train and manage new volunteers, and conduct community outreach to comply with SB1's new restrictions and requirements for assisting voters with mail and in-person voting.

178.     Employees and volunteers of SVREP conduct their activities with Latino registered voters, some of whom are limited English proficient and/or have limited formal schooling and limited literacy, including Latino voters who require and use assistors of their choice to vote due to disability or inability to read or write.  These voters use their chosen assistors to navigate the polling place; interact with poll workers; understand how to use the voting equipment; and read, interpret, mark and cast the ballot.

179.     SVREP's employees and volunteers conduct their activities individuals who are chosen as assistors and will be deterred from serving as chosen assistors by SB1's requirement that the assistor fill out a form; take an oath and face criminal prosecution, conviction and punishment for inadvertently making a mistake on the form or with the oath, or for providing necessary assistance to voters that exceeds the scope of assistance described in the oath, or for encouraging a voter in a way that law enforcement officials will conclude is "pressur[ing]" a voter to use them as an assistor in violation of the required oath.

180.     SB1 will also frustrate the mission of SVREP by reducing the number of people available to assist voters, and reducing the voter turnout of voters who rely on assistance, including Latinos with limited English proficiency, and limited literacy rates, leading to low rates of voter turnout.  Volunteers, employees, and the leadership of SVREP face felony prosecution, conviction and punishment under SB1 for assisting voters to vote in person and vote by mail.

181.     SVREP's volunteers and employees serve voters who are disabled and require and use assistors of their choice but who are not blind and can see and read the ballot, including curbside voters who arrive at the polling place in a car with several individuals, including family members, as part of doing errands for the day.  SVREP's volunteers and employees serve voters

who are illiterate because racially discriminatory practices in Texas prevented them from gaining a formal education.

182.    SB1 will irreparably harm TEXAS IMPACT, its individual members, its member organizations and member congregations, and their individual members.   TEXAS IMPACT manages a significant voter education campaign, conducts voter registration drives at churches, educates members about early voting, encourages members to vote, and distributes mail ballot applications to eligible voters through its Vote by Mail Captains program.   Twenty-five different congregations participated in that program in 2020, working to assist their elderly and disabled members in voting by mail during the pandemic.   TEXAS IMPACT's staff and interns were compensated for their work in the Vote by Mail Captains program, and TEXAS IMPACT and its member congregations provided funding and resources, including copying services and postage, to carry out the program.   TEXAS IMPACT also recruits volunteer deputy registrar and poll workers.

183.    TEXAS IMPACT will have difficulty recruiting poll workers because of confusion about SB1's new rules for partisan poll watchers and fear among volunteers of criminal prosecution for conduct that could "obstruct the view of a watcher."   Indeed, several of TEXAS IMPACT's individual members have already expressed hesitation to serve as poll workers in 2022 specifically because of SB1's poll watcher provision (Section 4.09).   And those who may plan to still serve as a poll worker have already started to prepare and alter their approach to engaging with poll watchers.

184.    SB1's new identification requirements for mail-in ballots impose an additional burden on mail voting, which a significant portion of TEXAS IMPACT members utilized during the 2020 election.   This provision, along with SB1's voter assistance provisions and signature

matching provisions will particularly harm the members of TEXAS IMPACT who are elderly or have disabilities for which they require assistance to vote, and who, due to age or disability, may not be able to hold a pen or write the same signature over time.

185.    TEXAS IMPACT's member organizations, member congregations, and individual members will be deterred from assisting voters who need it.  Members will also be deterred from assisting eligible voters because of SB1's enhanced information requirements and expanded oath requirement that limits what actions assistors may take to assist a voter without consideration of the range of needs of voters with disabilities and exposes assistors to potential criminal liability, and would require them to breach the privacy of a voter to confirm that the voter is eligible to receive assistance.

186.    TEXAS IMPACT has already diverted time and resources toward ensuring that its members comply with SB1's new, onerous, and often confusing and/or vague provisions.  TEXAS IMPACT hosted a two-and-a-half-hour event on November 13, 2021, to update and field questions from its members about the impacts of SB1.  Given the gravity of fear, concern, and confusion expressed about SB1 by TEXAS IMPACT members during and after this educational event, TEXAS IMPACT anticipates being required to continue diverting its resources toward educating its members about the harmful and confusing provisions of SB1.

187.    TEXAS IMPACT's individual members—and the individual members of its organizational members—include individuals who require assistance with voting in-person at the polling place, by mail, and curbside; and individuals who serve as assistors.  TEXAS IMPACT members also take positions on ballot measures.

188.    MABA-TX's members include Latino registered voters.

189.    MABA-TX's members include individuals chosen as assistors to assist eligible voters in the polling place and with voting by mail, including helping the voters navigate the polling place, interact with poll workers, read, interpret, complete and submit the ballot.

190.    MABA-TX's members include individuals who are chosen as assistors and will be deterred from serving as chosen assistors by SB1's requirement that assistors fill out a form, take an oath and face criminal prosecution, conviction and punishment for inadvertently making a mistake on the form or with the oath, or for providing necessary assistance to voters that exceeds the scope of assistance described in the oath, or for engaging in activity that might be perceived to be "pressuring" a voter to use them as an assistor in violation of the required oath.

191.    SB1 will also injure MABA-TX's members by extending wait times at the polling place as assistors complete forms and take an oath for each assisted voter.

192.    SB1 will force MABA-TX to divert its resources away from its community education activities, which are part of its mission, in order to counteract the negative effects of SB1 on its members and the communities in which members practice.  MABA-TX has in the past, and will in the future, work to educate voters about upcoming elections, urge the voters to vote, and encourage, offer and provide assistance to the voters.

193.    Members of MABA-TX include individuals who volunteer to be assistors for family members and non-family members in connection with voting at the polls and by mail.

194.    MABA-TX will be required to divert resources to prepare new educational materials and conduct outreach to its members to educate them about SB1's new restrictions and requirements for assisting voters with mail and in-person voting.

195.     MABA-TX believes that SB1's negative effects on Latino voters will result in fewer Latinos casting ballots and the election of fewer Latino judges.  MABA-TX believes that SB1 will result in MABA-TX members practicing before less diverse judges.

196.     TEXAS HOPE and its members will be irreparably harmed by SB1.  Through its membership, Texas HOPE focused its 2020 efforts on GOTV strategies and encouraging Latinos to run for local office.  This included efforts to energize and educate voters.

197.     TEXAS HOPE's membership includes Latino voters who will be intimidated by poll watchers roaming freely around the polling place, watching and listening to voters, and standing close to them while they vote.

198.     TEXAS HOPE has members who qualify to vote by mail, and its membership will be harmed by the new barriers on mail voting imposed by SB1.

199.     TEXAS HOPE will be forced to divert resources to educate its membership about SB1's restrictions, the rights that voters still possess under the SB1 regime, and the continuing importance of voter participation.  For example, under SB1 partisan poll watchers have increased authority to get close to and possibly intimidate voters in the polling place. TEXAS HOPE will be required to divert resources into providing its members information about the rights of Latino voters to vote free of harassment in the polling place and recommended responses to voter harassment.

200.     Finally, due to its cumulative effect of suppressing Latino voters, laws such as SB1 depress Latino turnout by decreasing interest in and the convenience of voting.  In response, TEXAS HOPE will need to spend more of its resources on enfranchising and educating voters. Specifically, resources TEXAS HOPE could have used to educate persons who could run for local office will need to be reallocated to its GOTV effort.

201.     SB1 will also hurt TEXAS HOPE members who have historically served as poll workers and election judges.  TEXAS HOPE believes it will have difficulty recruiting election workers because of confusion about SB1's new rules for partisan poll watchers and fear among volunteers about criminal prosecution.  Yet, political engagement, such as volunteering at the polls, is integral to TEXAS HOPE's mission of promoting Latino civil engagement.  Accordingly, TEXAS HOPE will have to divert additional resources to energize its members and the Latino community to serve as election officials.

202.     JOLT ACTION will be irreparably harmed by SB1.  JOLT ACTION has in the past, and will in the future, conduct GOTV activities, which are aimed at Latino registered voters with low turnout, and leadership-building activities, which are central to its mission.  In order to counteract the negative effects of SB1 on its members and the voters it serves, JOLT ACTION will be forced to divert its resources away from its GOTV and leadership-building activities.

203.     JOLT ACTION has in the past, and will in the future, employ paid canvassers to contact voters in person at their homes to, among other things, educate the voters about an upcoming election; urge the voters to vote; and encourage, offer and deliver assistance to the voters.  JOLT ACTION's paid canvassers have in the past, and will in the future, assist voters in applying for and preparing their mail ballots as provided by Section 86.010 of the Texas Election Code, including assisting non-family members to prepare their ballots.

204.     Members of JOLT ACTION include individuals who volunteer to be assistors for family members and non-family members in connection with voting at the polls and by mail. Members of JOLT ACTION include individuals who assist voters, including Latino, elderly, disabled, limited English proficient and limited literacy voters, to vote by mail, including helping voters prepare mail ballots.  Members of JOLT ACTION include individuals who assist voters,

including Latino, elderly, disabled, limited English proficient and limited literacy voters, to vote in person at the polling place, including assisting voters in navigating the polling place, interacting with poll workers, using voting equipment, reading and interpreting the ballot and recording a vote on the ballot.

205.    JOLT ACTION's membership and staff include individuals who have been chosen as assistors in the past and will be deterred from serving as chosen assistors by SB1's requirement that the assistor fill out a form, take an oath, and face criminal prosecution, conviction and punishment for inadvertently making a mistake on the form or with the oath, or for providing necessary assistance to voters that exceeds the scope of assistance described in the oath, or for encouraging a voter in a way that law enforcement officials will conclude is "pressur[ing]" a voter to use them as an assistor in violation of the required oath.  JOLT ACTION members, staff and volunteers have already expressed great concern about the liability they face when assisting voters. In response to these concerns related to SB1, JOLT ACTION has been forced to divert time and resources into a process in which they will decide whether to continue to offer voter assistance, which is critical to fulfilling their mission.

206.    SB1 will frustrate the mission of JOLT ACTION by reducing the number of people available to assist voters and reducing voter turnout of voters who rely on assistance, including Latinos with limited English proficiency, limited literacy rates and low rates of turnout.  Members, employees, and the leadership of JOLT ACTION face felony prosecution, conviction and punishment under SB1 for assisting voters to vote in person and by mail.

207.    JOLT ACTION will be required to divert resources to retrain staff, prepare new educational materials, recruit, train and manage new volunteers, and conduct community outreach to comply with SB1's new restrictions and requirements for assisting voters with mail and in-

person voting.  For example, JOLT ACTION must redirect its resources towards retraining and obtaining new materials because employees previously used iPad tablets to help voters request a mail ballot, but SB1 now requires that mail ballot applications be "submitted" in writing and signed "using ink on paper."

208.    WCVI will be irreparably harmed by SB1.  WCVI will be forced to divert resources away from research, policy seminars, and community workshops to mitigate the effects of SB1 on Latino voters. WCVI will be compelled to begin to work immediately with Latino leaders to ameliorate the negative effects of SB1, including undertaking time-consuming efforts to quell the fears of Latino voters about SB1's new voting restrictions and requirements,  explaining how limited English proficient voters may continue to utilize assistors of their choice for voting, and analyzing the scope of permissible assistance under SB1.  WCVI will be required to divert and expend resources on informing Texas Latino voters about SB1's new, often confusing and/or vague, provisions.

209.    FIEL and its members will be irreparably harmed by SB1.  SB1 will force FIEL to divert its resources away from its GOTV and leadership-building activities, which are central to its mission, in order to counteract the negative effects of SB1 on its members and the voters FIEL serves.  FIEL has in the past, and will in the future, conduct GOTV activities aimed at Latino registered voters with low turnout.  FIEL has in the past, and will in the future, employ paid canvassers to contact voters in person at their homes and educate the voters about an upcoming election, urge the voters to vote, and encourage, offer and deliver assistance to the voters.  FIEL's paid canvassers have in the past, and will in the future, assist voters in applying for and preparing their mail ballots as provided by Section 86.010 of the Texas Election Code including assisting non-family members to prepare their ballots.

210.     Members of FIEL include individuals who encourage family members and non-family members to select them as assistors for voting at the polls and by mail.  Members of FIEL include individuals who assist voters, including Latino elderly voters, disabled voters, and voters with limited English proficiency and limited literacy, to vote by mail including helping the voters prepare their mail ballots; members of FIEL include individuals who assist voters, including Latino, elderly, disabled, limited English proficiency and limited literacy voters, to vote in person at the polling place, including assisting voters in navigating the polling place, interacting with poll workers, using the voting equipment, reading and interpreting the ballot and recording a vote on the ballot.

211.     FIEL will be required to divert resources to retrain staff, prepare new educational materials, recruit, train and manage new volunteers, and conduct community outreach to comply with SB1's new restrictions and requirements for assisting voters with mail and in-person voting.

212.     FIEL's membership and staff include individuals who are chosen as assistors and will be deterred from serving as chosen assistors by SB1's requirement that the assistor fill out a form, take an oath, and face criminal prosecution, conviction and punishment for inadvertently making a mistake on the form or with the oath, or for providing necessary assistance to voters that exceeds the scope of assistance described in the oath, or for encouraging a voter in a way that law enforcement officials will conclude is "pressur[ing]" a voter to use them as an assistor in violation of the required oath.

213.     SB1 will also frustrate the mission of FIEL by reducing the number of people available to assist voters, and reducing the voter turnout, of voters who rely on assistance, including Latinos with limited English proficiency, limited literacy rates and low rates of voter turnout.

Members, employees, and the leadership of FIEL face felony prosecution, conviction and punishment under SB1 for assisting voters to vote in person and vote by mail.

214.    FIEL's members include Latino registered voters, some of whom are disabled, have limited English proficiency and/or have limited formal schooling and limited literacy.  FIEL's members include Latino voters who require and use assistors of their choice to vote due to disability or inability to read or write.  These voters use their chosen assistors to navigate the polling place, interact with poll workers, understand how to use the voting equipment and read, interpret, mark and cast the ballot.

215.    Some of FIEL's members are illiterate because racially discriminatory practices in Texas prevented them from gaining a formal education.

216.    Members of FIEL include individuals who voted in Harris County in 2020 and cast ballots using drive-thru voting and/or temporary structures for voting, mail ballot applications proactively sent to them by election officials, and 24-hour voting.

217.    JAMES LEWIN was an election judge in the 2020 Election, and he intends to serve as an election judge in future Texas elections.  Election judges are election officials in Texas.  TEX. ELEC. CODE § 1.005(4-a)(E).  Before serving as an election judge in 2020, Mr. Lewin's greatest concern was that he and his team members would encounter disruption at the polls, including by poll watchers who sought to delay the voting process and discourage or intimidate voters. Fortunately, Mr. Lewin did not encounter any such disruptions during the 2020 Election. However, because SB1 limits election judges' ability to regulate poll watchers who engage in interference and intimidating conduct, and because SB1 creates risk of criminal prosecution for any "person" serving at a location "in an official capacity" who takes "any action to obstruct the view of a watcher or distance the watcher from [the observed activity] in a manner that would

66

make observation not reasonably effective," Mr. Lewin is concerned about his potential liability. Mr. Lewin is uncertain what "action" would make a watcher's observation "not reasonably effective." If SB1 is implemented, Mr. Lewin may hesitate to volunteer as an election judge again because of his (and his family members') fear for his personal safety and because of fear of criminal prosecution.

**COUNT I**

**Against Defendants Scott, Paxton, Scarpello, Wise, Creuzot, Rosales, and Garza**

**SB1 violates the First and Fourteenth Amendment of the U.S. Constitution.**

218.   Plaintiffs re-allege and incorporate by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as though fully set forth herein.

219.   This claim challenges Sections 2.04, 2.06, 2.07, 4.01, 4.06, 4.07, 4.09, 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, and 7.04 of SB1.

220.   A court considering a challenge to a state election law must carefully balance the character and magnitude of injury to First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the justifications offered by the state for the burdens imposed by the law. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

221.   The more a challenged law burdens the right to vote, the stricter the scrutiny courts apply when evaluating the law. *Tex. Indep. Party v. Kirk*, 84 F.3d 178, 182 (5th Cir. 1996). "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (quotation marks omitted).

222.   SB1 inflicts severe burdens on Texas's voters through each individual restriction and the cumulative effect of all the measures that impose barriers to voting, including by:

- Targeting Texans who need assistance to vote—including people who have limited English proficiency, disabilities, and/or less formal education—by adding multiple new requirements that hinder the provision of assistance at the polling place, curbside, or in connection with mail ballots (e.g., Sections 6.03, 6.04, and 6.05) and by deterring those who would otherwise provide assistance (Section 6.06);

- Giving partisan poll watchers "free movement" to intimidate and harass voters and poll workers by expanding watchers' authority while constraining election administrators' ability to ensure peaceful, orderly elections under penalty of criminal prosecution (*e.g.*, Sections 4.01, 4.06, 4.07, and 4.09);

- Quashing legitimate voter turnout initiatives through overbroad and vague criminal penalties for so-called "vote harvesting" (Section 7.04);

- Facilitating investigation and prosecution of perfectly legal activity by voters, such as being excused from jury service or having the same name as a non-resident in the county (Sections 2.04, 2.06, and 2.07);

- Increasing the likelihood that otherwise valid mail ballots and mail ballot applications from voters eligible to vote by mail will be rejected because of simple errors or omissions, or lack of information at the clerk's office, notwithstanding the clerk's ability to verify the mail ballot or mail ballot application by other means (Sections 5.07 and 5.13); and

- Forcing election officials to shift resources to meet tight deadlines for reporting voters for investigation and removing voters from the rolls to avoid additional requirements and penalties (Section 2.06).

223.     By prohibiting Plaintiffs, their employees, and their members (as applicable) from communicating with voters about mail ballots, SB1's new criminal restrictions on ballot assistance and collection services (including what Texas self-servingly calls "vote harvesting services") will impose severe burdens on Texas voters wishing to vote by mail by limiting the number of people available to assist them.

224.     SB1's enhanced information requirements, expanded oath, exposure to a potential perjury charge, and accompanying enhanced criminal penalties for persons assisting voters will impose severe burdens on, and in some cases entirely deny, the right to vote of Texas voters with disabilities or language access barriers by limiting the number of people available to assist them with voting in person, including curbside voting, or by mail, for fear of criminal prosecution.

225.     SB1's criminalization of all forms of compensated assistance will also impose severe burdens on, and in some cases entirely deny, the right to vote of Texas voters with disabilities, advanced age, and/or language barriers by limiting the number of people available to assist them with voting by mail, for fear of criminal prosecution.  Blind and elderly voters, voters with disabilities, and voters who cannot read the languages in which ballots are printed because they have limited English proficiency or limited literacy, are made the most vulnerable by these new provisions.  These groups already have difficulty voting and face even higher burdens under the new law.

226.     The law's proponents have not demonstrated any evidence that voter assistance was a major source of misconduct or fraud in Texas elections (the occurrence of which in any non-trivial amount is entirely unproven) or that the pre-existing limitations on such assistance were insufficient to identify and prosecute the very few instances of any such misconduct in this state. In fact, with respect to vote by mail, Texas already imposes more restrictions on mail voting than

most states in the country. And even in states that allow everyone to vote by mail, or even affirmatively mail every registered voter a ballot, fraud is rare.

227. The additional requirements and limitations on filling out mail ballots and mail ballot applications will result in the disenfranchisement of voters who are qualified to vote by mail and whose mail ballots and mail ballot applications could be verified by other means.

228. Under SB1, poll watchers will be emboldened while election officials who would otherwise be tasked with maintaining orderly elections will be deterred from taking action against even clearly intimidating behavior. This makes it more likely that in-person voters who have historically been targets of harassment, including people of color and individuals with disabilities, will be subject to such abuse in and around polling places.

229. The challenged additional limitations on voting serve no legitimate state interest. Indeed, any purported anti-fraud justification for these limitations is poorly disguised pretext.

## COUNT II
### Against Defendants Scott, Paxton, Scarpello, Wise, Creuzot, Rosales, and Garza

### SB1 Violates the Fourteenth Amendment of The U.S. Constitution

230. Plaintiffs re-allege and incorporate by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as though fully set forth herein.

231. This claim challenges Sections 2.04, 2.07, 2.08, 2.11, 3.04, 3.09, 3.10, 3.12, 3.13, 4.01, 4.06, 4.07, 4.09, 6.03, 6.04, 6.05, 6.06, and 7.04 of SB1.

232. Section 1 of the Fourteenth Amendment to the United States Constitution provides:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend., XIV.

233.    The Fourteenth Amendment prohibits intentional racial discrimination by state actors.  Discriminatory intent may be established by proof that the defendants used race as a motivating factor in their decisions.  *Vill. of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

234.    The facts alleged herein, among others to be uncovered during discovery, show that SB1 was enacted, at least partly, with the intent to discriminate against voters of color, on the basis of race and national origin, in violation of the United States Constitution.

235.    SB1's stated purpose as "relating to election integrity and security, including by preventing fraud in the conduct of elections in this state" is unfounded pretext since there is no evidence of widespread voter fraud in this state or any other state.

236.    Texas has a long, well-documented history of discrimination against Latino and Black citizens in the voting and electoral processes.  Indeed, courts have repeatedly found that Texas election laws were enacted with a discriminatory purpose or had a discriminatory effect— particularly as it pertains to Texas's Black and Latino voters.

237.    SB1 was enacted following record turnout among Black, Latino, and Asian-American voters in the 2018 and 2020 General Elections.

238.    The challenged provisions of SB1 specifically target and disproportionately burden assistance to voters with limited English proficiency, who are disproportionately Latino and Asian American, and individuals with disabilities in Texas, who are disproportionately Black.

239.    The disparate racial impact that the challenged limitations on voting would have on Texas's minority voters was also a subject of discussion and testimony throughout the legislative process for SB1 and its precursor SB7.

240.    The aforementioned burdens and restrictions of SB1 placed on voters individually—and even more so collectively—abridge the opportunity of minority voters to participate in the political process and exercise their right to vote.

241.    Texas's long history and ongoing record of racial discrimination in the context of voting, the known and reasonably foreseeable discriminatory impact of SB1, the sequence of events and substantive departures from the normal legislative process which resulted in the enactment of SB1, and the tenuousness of the stated justifications for SB1 raise a strong inference of a racially discriminatory purpose in violation of the Fourteenth Amendment.

## COUNT III
**Against Defendants Scott, Paxton, Scarpello, Wise, Creuzot, Rosales, and Garza**

### SB1 Violates the Fifteenth Amendment of the U.S. Constitution

242.    Plaintiffs re-allege and incorporate by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as though fully set forth herein.

243.    This claim challenges Sections 2.04, 2.07, 2.08, 2.11, 3.04, 3.09, 3.10, 3.12, 3.13, 4.01, 4.06, 4.07, 4.09, 6.03, 6.04, 6.05, 6.06, and 7.04 of SB1.

244.    Section 1 of the Fifteenth Amendment to the United States Constitution provides:

> The right of citizens of the United States to vote shall not be denied
> or abridged by the United States or by any State on account of race,
> color, or previous condition of servitude.

U.S. Const. amend., XV.

245.    The Fifteenth Amendment enfranchised voters nationwide, regardless of race or color, and is an independent source of authority to protect against discrimination in voting. "The Amendment bans racial discrimination in voting by both state and nation. It thus establishes a national policy . . . not to be discriminated against as voters in elections to determine public governmental policies or to select public officials . . . ." *Terry v. Adams*, 345 U.S. 461, 467 (1953).

246.    Similar to the Fourteenth Amendment, discriminatory intent under the Fifteenth Amendment may be established by proof that the defendants used race as a motivating factor in their decisions.  *Mobile v. Bolden*, 446 U.S. 55, 62, (1980) (plurality opinion) (citing *Vill. of Arlington Heights*, 429 U.S. at 265).

247.    The facts alleged herein, among others to be uncovered during discovery, show that SB1 was enacted, at least partly, with the intent to discriminate against voters of color, on the basis of race and national origin, in violation of the United States Constitution.

248.    SB1's stated purpose as "relating to election integrity and security, including by preventing fraud in the conduct of elections in this state" is unfounded pretext, since there is no evidence of widespread voter fraud in this state or any other state.

249.    Texas has a long, well-documented history of discrimination against Latino and Black citizens in the voting and electoral processes.  Indeed, courts have repeatedly found that Texas election laws were enacted with a discriminatory purpose or had a discriminatory effect—particularly as it pertains to Texas's Black and Latino voters.

250.    SB1 was enacted following record turnout among Black, Latino, and Asian-American voters in the 2018 and 2020 General Elections.

251.    The challenged provisions of SB1 specifically target and disproportionately burden assistance to voters with limited English proficiency, who are disproportionately Latino and Asian American, and individuals with disabilities in Texas, who are disproportionately Black.

252.    The disparate racial impact that the challenged limitations on voting would have on Texas's minority voters was also a subject of discussion and testimony throughout the legislative process for SB1 and its precursor SB7.

253.    The aforementioned burdens and restrictions of SB1 placed on voters individually—and even more so collectively—abridge the opportunity of minority voters to participate in the political process and exercise their right to vote.

254.    Texas's long history and ongoing record of racial discrimination in the context of voting, the known and reasonably foreseeable discriminatory impact of SB1, the sequence of events and substantive departures from the normal legislative process which resulted in the enactment of SB1, and the tenuousness of the stated justifications for SB1 raise a strong inference of a racially discriminatory purpose in violation of the Fifteenth Amendment.

### COUNT IV
### Against All Defendants

### SB1 discriminates against minority voters
### in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, *et seq.*

255.    Plaintiffs re-allege and incorporate by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as though fully set forth herein.

256.    This claim challenges Sections 4.01, 4.06, 4.07, 4.09, 6.03, 6.04, 6.05, 6.06, and 7.04 of SB1.

257.    Section 2 of the Voting Rights Act prohibits state political processes that are "not equally open to participation" by minority voters, such that those voters "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301.

258.    Laws enacted with a racially discriminatory purpose and/or that have a discriminatory effect violate Section 2. *See Veasey*, 830 F.3d at 229, 243; *see also Thornburg v. Gingles*, 478 U.S. 30, 35 (1986).

259.    Discriminatory intent may be established by proof that defendants used race as a motivating factor in their decisions. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,

429 U.S. 252, 265–66 (1977).  Even if a challenged legislation appears neutral on its face, discriminatory intent may still be inferred by analyzing the context during and by which the challenged provisions were enacted, and by reviewing the disproportionate racial impact of the challenged provisions.  *See id.* at 266–68; *Veasey*, 830 F.3d at 231–32.

260.    SB1's stated purpose as "relating to election integrity and security, including by preventing fraud in the conduct of elections in this state" is unfounded pretext, since there is no evidence of widespread voter fraud in this state or any other state.

261.    Texas has a long, well-documented history of discrimination against Latino and Black citizens in the voting and electoral processes.

262.    SB1 was enacted following record turnout among Black, Latino, and Asian-American voters in the 2018 and 2020 General Elections.

263.    The challenged provisions of SB1 specifically target and disproportionately burden assistance to voters with limited English proficiency, who are disproportionately Latino and Asian American, and individuals with disabilities in Texas, who are disproportionately Black.

264.    The aforementioned burdens and restrictions of SB1 placed on voters individually—and even more so collectively—abridge the opportunity of minority voters to participate in the political process and exercise their right to vote.

265.    As a result, under the totality of the circumstances, SB1's multifarious burdens and restrictions individually and collectively violate Section 2 of the Voting Rights Act by abridging and denying the right to vote and creating less opportunity for people of color than other members of the electorate to participate in the political process and to elect representatives of their choice, including Black and Latino voters, and including many of Plaintiffs' members and congregants. Texas's political process is not equally open to participation by minority voters.

## COUNT V
## Against all Defendants

**SB1 impedes voters' practical ability to get necessary and statutorily guaranteed assistance in violation of Section 208 of the Voting Rights Act, 52 U.S.C. § 10508.**

266.    Plaintiffs re-allege and incorporate by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as though fully set forth herein.

267.    This claim challenges Sections 6.01, 6.03, 6.04, 6.05, 6.06, and 7.04 of SB1.

268.    Section 208 of the Voting Rights Act provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write" in English for any reason "may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508.

269.    Section 208 thus establishes the right of a voter with a disability or a voter with limited English proficiency or limited literacy to choose an assistor to assist the voter with the voting process, including physically navigating the polling place, interacting with poll workers, reading and interpreting the ballot, and marking the ballot.

270.    Although Texas election law provides voters who need assistance with the right to receive such assistance from a person of their choice as required by Section 208, SB1's new restrictions gut that provision by impeding the voter's practical ability to get assistance. Specifically, SB1:

    a.  Increases the likelihood that ballots by voters with disabilities or who require assistance will be rejected (Section 6.05);

    b.  Deters individuals from providing needed assistance to voters (Sections 6.01, 6.03, 6.04, and 6.06); and

    c.  Limits the type of assistance that voters can receive in filling out their ballot (Section 6.04).

76

271.    The challenged provisions of SB1 thus violate Section 208 of the Voting Rights Act.  *OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017) (holding that Texas law limiting who can provide assistance to non-English speaking voters violated Section 208 of the Voting Rights Act and noting that "a state cannot restrict this federally guaranteed right [Section 208] by enacting a statute tracking its language, then defining terms more restrictively than as federally defined.").

### COUNT VI
**Against Defendants Scott, Paxton, Scarpello, Wise, Creuzot, Rosales, and Garza**

**SB1 discriminates against voters on the basis of a disability
in violation of Title II of the Americans with Disability Act, 42 U.S.C. § 12131, *et seq*.**

272.    Plaintiffs re-allege and incorporate by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as though fully set forth herein.

273.    This claim challenges Sections 6.01, 6.03, 6.04, 6.05, 6.06 and 7.04 of SB1.

274.    Title II of the Americans with Disabilities Act (the "ADA") provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

275.    The ADA directed the Attorney General of the United States to promulgate regulations enforcing Title II of the ADA and provide guidance on their content. 42 U.S.C. § 12134.  Regulations promulgated by the Attorney General require public entities to "make reasonable modifications" to their programs and activities "when the modifications are necessary to avoid discrimination." 28 C.F.R. §35.130(b)(7).  Regulations promulgated by the Attorney General also make it unlawful discrimination for a public entity to:

a.    "Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," 28 C.F.R. § 35.130(b)(1)(ii);

b.    "Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others," 28 C.F.R. § 35.130(b)(1)(iii);

c.    "[U]tilize criteria or methods of administration . . . [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(ii); and

d.    "[I]mpose or apply eligibility criteria that screen out or tend to screen out" people with disabilities from "fully and equally enjoying" the programs, services or activities of state and local governments. 28 C.F.R. § 35.130(b)(8).

276.    The ADA also states that it is unlawful to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of . . . or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of" any right protected by the ADA. 42 U.S.C. § 12203.

277.    Title II of the ADA applies to all services, programs, and activities or public entities, including voting.  42 U.S.C. § 12132.  "Voting is a quintessential public activity" and, accordingly, Title II requires state and local governments (i.e., "public entities") to ensure that people with disabilities have a full and equal opportunity to vote.  *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016) (noting in a case involving an ADA action by blind

voters against a Maryland election official that "[v]oting is a quintessential public activity. . . . Ensuring that disabled individuals are afforded an opportunity to participate in voting that is equal to that afforded others. . . .") (citing 28 C.F.R. § 35.130); 28 C.F.R. § 35.130(b)(7).

278.    The State of Texas is a public entity as defined in Title II of the ADA, and the individual Defendants are the public officials responsible for running these public entities and supervising their operations as to voting within the State of Texas and must comply with Title II of the ADA.  42 U.S.C. § 12131(1).

279.    The members and/or constituents of Plaintiff organizations LUPE, TEXAS IMPACT, and FIEL include individuals with disabilities within the meaning of the ADA and are entitled to the protections of the ADA.  These individuals have a qualifying "disability" because they have "a physical or mental impairment that substantially limits one or more major life activities," including, but not limited to "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. §§ 12102(1)(A), (2)(A).  These individuals are qualified for the programs, services, and activities being challenged herein in that they are registered voters or otherwise eligible to request and cast a ballot, in Texas elections, and are qualified to participate in Defendants' programs and activities related to voting. 42 U.S.C. § 12131(2).

280.    There is no valid justification for the burdens that SB1 imposes on voters with disabilities in making it harder for them to get necessary assistance described herein, as such restrictions will deny voters with disabilities equal access to the franchise and prevent such voters from exercising their fundamental right to vote.

281.    Specifically, Sections 6.01, 6.03, 6.04, 6.05, 6.06, and 7.04 of SB1 individually and collectively discriminate against qualified Texas voters with disabilities exercising their right to vote including on members and/or constituents of Plaintiff organizations as set forth above, in violation of Title II of the Americans with Disabilities Act of 1990.

282.    Through the acts and omissions described above, Defendants have discriminated against Plaintiffs on the basis of disability in violation of Title II of the ADA and its implementing regulations by:

a.    Denying people with disabilities, including the members of Plaintiff organizations LUPE, TEXAS IMPACT, and FIEL with disabilities, the opportunity to participate in and benefit from voting in a way that is equal to that afforded to those without disabilities;

b.    Denying people with disabilities, including the members of Plaintiff organizations LUPE, TEXAS IMPACT, and FIEL with disabilities, services that are as effective in affording equal opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as that provided other voters;

c.    Imposing eligibility criteria that exclude or tend to exclude people with disabilities, including the members of Plaintiff organizations LUPE, TEXAS IMPACT, and FIEL with disabilities, from fully and equally enjoying the state's voting program;

d.    Failing to reasonably modify the state's voting system to provide the services that people with disabilities, including the members of Plaintiff organizations LUPE, TEXAS IMPACT, and FIEL with disabilities, need to avoid discrimination; and

e.    Interfering with the ability of people with disabilities and the Plaintiff organizations LUPE, SVREP, TEXAS IMPACT, JOLT ACTION, and FIEL that assist them to exercise their rights under the ADA.

283.   Unless the requested relief is granted, members of Plaintiff organizations LUPE, TEXAS IMPACT, and FIEL who are qualified individuals with disabilities under the ADA and those similarly situated will be discriminated against and denied adequate access to the franchise.

284.   Unless the requested relief is granted, Plaintiff organizations LUPE, SVREP, TEXAS IMPACT, JOLT ACTION and FIEL will be required to incur substantial costs and divert resources from other activities in order to mitigate the effects of SB1's impermissible burdens on the ability of disabled persons to exercise their full and equal opportunity to vote.

285.   The relief sought by Plaintiffs would not require a fundamental alteration to Defendants' programs, services, or activities.

## COUNT VII
### Against Defendants Scott, Paxton, Scarpello, Wise, Creuzot, Rosales, and Garza

**Section 7.04 of SB1 is unconstitutionally vague and burdens free speech
in violation of the First and Fourteenth Amendments to the U.S. Constitution.**

286.   Plaintiffs re-allege and incorporate by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as though fully set forth herein.

287.   This claim challenges Section 7.04 of SB1.

288.   A criminal law is unconstitutionally vague, and in violation of the Fourteenth Amendment's requirements of due process, if it "(1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *Moore v. Brown*, 868 F.3d 398, 406 (5th Cir. 2017) (citation omitted); *Women's Med. Ctr. v. Bell*, 248 F.3d 411, 422 (5th Cir. 2001). Courts apply a

81

"more stringent" vagueness inquiry when a law "interferes with the right of free speech or association." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010).

289. A speech restriction is also facially unconstitutional and overbroad, in violation of the First Amendment, if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (internal quotation marks omitted) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)). A plaintiff "need only show that a statute or regulation might operate unconstitutionally under some conceivable set of circumstances." *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 662 (5th Cir. 2006) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

290. Section 7.04 is unconstitutionally vague and overbroad in violation of both the First and Fourteenth Amendments because it because it fails to provide adequate notice of what is (or is not) prohibited, invites arbitrary and discriminatory enforcement, and a substantial number of its applications are unconstitutional when judged against its legitimate sweep.

291. First, Section 7.04 fails to provide adequate notice of what is (or is not) prohibited. Section 7.04 of SB1 outlines a number of offenses for persons engaged in "vote harvesting services," which is confusingly defined as "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure."[131] A violation results in a third-degree felony, subject to a minimum of two years (and up to ten years) of jail time and a fine of up to $10,000.[132] Section 7.04

---

[131] S.B. 1 § 7.04, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 276.015(a)(2)).

[132] TEX. PENAL CODE § 12.34(a)–(b).

of SB1 does not define "in-person interaction," potentially reaching a wide and varying range of possibilities. The statute's requirement that an interaction be "in the physical presence of" an official ballot or mail ballot is also unclear and does not adequately define the possible kinds of interactions that could come within the statute's prohibitions.[133] And the intent requirement (that the interaction be "intended to deliver votes") is also cryptic, apparently requiring nothing more than a political motivation (as opposed to an actual intent to defraud or deceive).

292.    Section 7.04's requirement that a person receive "compensation or other benefit" in exchange for the interaction does not ameliorate the vagueness.[134] Section 7.04 defines "benefit" to mean "anything reasonably regarded as a gain or advantage," no matter how minor.[135] The range of possible "benefit[s]" is itself wide and unpredictable to a reasonable person attempting to understand what conduct the law prohibits.

293.    Second, the lack of clarity (coupled with the provision's breadth) invites arbitrary and discriminatory enforcement. It would be largely up to prosecutors to determine whether to bring charges based on any in-person interaction between two people in the presence of a ballot, absentee ballot, or application for an absentee ballot. This possibility would be particularly acute for campaign workers because a benefit can be "inferred." A campaign worker could open herself to the possibility of criminal prosecution virtually any time she speaks about her work to another voter in the presence of a ballot, absentee ballot, or application for an absentee ballot.

---

[133] S.B. 1 § 7.04, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 276.015(a)(2)).

[134] *Id.* (codified at TEX. ELEC. CODE § 276.015(e)(1)).

[135] *Id.* (codified at TEX. ELEC. CODE § 276.015(a)(1)).

294.     Likewise, because Section 7.04 of SB1 does not define "in-person interaction," the phrase impermissibly regulates a broad range of protected, political speech.  Speech is plainly a form of "in-person interaction."  The statute's requirement that an interaction be "in the physical presence of" an official ballot or mail ballot does not cure the overbreadth because pure speech is still covered so long as it is uttered in close proximity to a mail ballot (*e.g.*, in the same room or in the voter's purse).[136]  The range of possible "benefit[s]" is also broad and encompasses any salary paid to a campaign worker and any "benefit" given to a campaign volunteer (*e.g.*, free coffee and breakfast, campaign apparel, or tickets to a rally).  And the statute does not require that any compensation be provided for the specific speech at issue.  The compensation could be for some other "vote harvesting services," yet the uncompensated in-person communication could still be a crime.

295.     Section 7.04 therefore prohibits a wide range of protected speech reaching well beyond the statue's legitimate reach.   Under Section 7.04, a substantial number of daily conversations between a voter and a campaign worker or campaign volunteer are criminalized, so long as the parties are discussing a particular candidate or ballot measure and a mail ballot happens to be close enough to the voter and the campaign worker or volunteer to be considered "in the physical presence" thereof.  Section 7.04's substantial overbreadth thus impermissibly regulates constitutionally protected, political speech.

296.     A law also violates the Fourteenth Amendment if it restricts the freedom of speech protected by the First Amendment.  Under the First Amendment, the "government has no power to restrict expression because of its messages, its ideas, its subject matter, or its content."  *Brown*

---

[136] S.B. 1 § 7.04, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at Tex. Elec. Code § 276.015(a)(2)).

*v. Entm't Merch. Ass'n*, 564 U.S. 786, 790–91 (2011).  When a law regulates speech on the basis of its content, it is presumptively unconstitutional and subject to strict scrutiny.  *See Reagan Nat'l Adver. Of Austin v. City of Austin*, 972 F.3d 696, 702 (5th Cir. 2020).  A law is content based when it "applies to particular speech because of the topic discussed or the idea or messaged expressed." *Id.* (citing *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).

297.    Section 7.04 of SB1 also impermissibly regulates speech in violation of the First Amendment.  Speech is plainly a form of "in-person interaction."  And Section 7.04 regulates speech on the basis of its content: namely, whether the speech is "intended to deliver votes for a specific candidate or measure."  "Laws that burden political speech are 'subject to strict scrutiny,' which requires the Government to prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'"  *Citizens United v. FEC*, 558 U.S. 310, 340 (2010); *Dep't of Tex., Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 438–39 (5th Cir. 2014) (en banc) (quoting *Citizens United*).  Speech that is used to encourage and assist voters both implicates expressive conduct and also constitutes "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'"  *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988); *see also NAACP v. Button*, 371 U.S. 415, 437 (1963) ("Free trade in ideas [sic] means free trade in the opportunity to persuade to action . . . ." (quoting *Thomas v. Collins*, 323 U.S. 516, 537 (1945))).

298.    These new restrictions will have a chilling effect on Plaintiff organizations, who employ paid canvassers and conduct GOTV activities, because the prohibited activities encompass a wide range of interactions and conversations that may occur between Plaintiffs, their employees and organizers, and voters.  The extensive reach of the "vote harvesting" restrictions and the accompanying threat of criminal and civil penalties will deter Plaintiffs' members and volunteers

from participating in Plaintiffs' voter education and GOTV efforts, thereby limiting the means by which Plaintiffs and their constituents communicate with voters and engage in the political process.

299.    Section 7.04 does not promote any legitimate, much less compelling, governmental interest.  Section 7.04 also is not narrowly tailored to advance a compelling governmental interest through the least restrictive means.  In particular, Section 7.04 cannot be justified based on an interest in preventing fraud because it is not limited in any way to conduct or speech that is fraudulent, misleading, or unlawful, and it was already (i.e., before SB1) illegal to "influence the independent exercise of the vote or another in the presences of a ballot during the election process . . . ."  (Tex. Elec. Code § 276.013) or to vote or attempt to vote using someone else's ballot (*id.* § 64.012).

300.    Those prohibitions cannot be constitutionally justified.  Section 7.04 thus unconstitutionally infringes upon Plaintiffs' rights under the First and Fourteenth Amendments, and the Court should declare it unlawful and enjoin its implementation and enforcement.

**COUNT VIII**
**Against Defendants Scott, Paxton, Creuzot, Rosales, and Garza**

**Section 4.09 of SB1 is unconstitutionally vague**
**in violation of the Fourteenth Amendment to the U.S. Constitution**

301.    Plaintiffs re-allege and incorporate by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as though fully set forth herein.

302.    This claim challenges Sections 4.09 and 8.01 of SB1.

303.    Section 4.09 of SB1 subjects persons serving in an official capacity at a polling place to criminal liability as a Class A misdemeanor for taking "any action to obstruct the view of

a watcher or distance the watcher from [the observed activity or procedure] in a manner that would make observation not reasonably effective."[137]

304.    Section 4.09 of SB1 does not impose any limitations on what "any action" may constitute, how small it may be, or what it means to have the intent to obstruct or distance a watcher "in a manner that would make observation not reasonably effective."

305.    Section 4.09 accordingly fails to provide adequate notice to poll workers, election judges, and other officials of what steps, if any, they can take when interacting with a poll watcher while still avoiding a risk of criminal liability.

306.    Section 4.09 similarly invites arbitrary and discriminatory enforcement because prosecutors have essentially free reign to assert, after the fact, that a poll worker took "any action" with the intent to obstruct or distance a watcher "in a manner that would make observation not reasonably effective."

307.    Section 4.09 thus gives poll watchers the ability to observe voting activities without regard for the safety or privacy of voters or poll workers while election officials who attempt to constrain poll watchers in order to maintain peaceful, orderly elections will face the penalty of criminal prosecution.  The threat of prosecution under Section 4.09 will cause individuals like Plaintiff Lewin and members of FRIENDSHIP-WEST and TEXAS IMPACT to self-censor either by refraining from serving as election officials in future elections, allowing poll watchers free reign to potentially harass Texas voters or election workers, or having to significantly alter their approach to engaging with poll watchers.

---

[137] S.B. 1 § 4.09, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 33.051(g)).

308.     Because the poll watcher provision in Section 4.09 is unconstitutional, any civil penalty imposed under Section 8.01 cannot be predicated on a violation of Section 4.09.  Plaintiffs are accordingly entitled under 42 U.S.C. § 1983 to the relief requested below.

309.     For each of the foregoing reasons and as described above, Section 4.09 of SB1 is unconstitutionally vague, and the Court should enjoin its implementation and enforcement.

## COUNT IX
**Against Defendants Scott, Paxton, Scarpello, Wise, Creuzot, Rosales, and Garza**

**SB1 violates the First and Fourteenth Amendments of the U.S. Constitution.**

310.     Plaintiffs re-allege and incorporate by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as though fully set forth herein.

311.     This claim challenges Sections 6.01, 6.03, 6.04, 6.05, and 6.06 of SB1.

312.     SB1's enhanced information requirements, expanded oath, exposure to a potential perjury charge, and accompanying enhanced criminal penalties for persons assisting voters in Sections 6.01, 6.03, 6.04, 6.05, and 6.06 violate the free speech rights of individuals who assist voters at the polling place and with respect to voting by mail.

313.     The voter assistance restrictions violate the First and Fourteenth Amendments, on their face and as applied, by imposing additional burdens on, and preventing through fear of criminal prosecution, the delivery of voter assistance by assistors.

314.     Because the voter assistance restrictions cannot be constitutionally justified, they unconstitutionally infringe upon Plaintiffs' rights under the First and Fourteenth Amendments, and the Court should declare them unlawful and enjoin their implementation and enforcement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

1.     A declaratory judgment that the challenged provisions in SB1 violate:

a. the First and Fourteenth Amendments to the U.S. Constitution as undue burdens on the right to vote;

b. the First and Fourteenth Amendments to the U.S. Constitution as impermissible restrictions on freedom of speech;

c. the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution;

d. Section 208 of the Voting Rights Act;

e. Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the U.S. Constitution for racial discrimination against minority voters; and

f. the Americans with Disabilities Act.

2. An injunction prohibiting Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing any of the challenged provisions of SB1.

3. An injunction prohibiting Defendants Paxton, Creuzot, Rosales, Garza, their agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing Section 8.01 of SB1, as applied to a violation of any of the challenged provisions of SB1.

4. An order requiring Texas to preclear, under section 3(c) of the Voting Rights Act (52 U.S.C. § 10302(c)), all changes in statewide voting practices for a period of ten years;

5. An order awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 52 U.S.C. § 20510(c), 42 U.S.C. § 1988 and other applicable laws; and

6. Granting any such other and further relief as this Court deems just and proper.

Dated: January 22, 2022

Respectfully submitted,

  */s/ Nina Perales*                  
Nina Perales
Julia R. Longoria
MEXICAN AMERICAN LEGAL DEFENSE AND
EDUCATIONAL FUND
110 Broadway, Suite 300
San Antonio, TX 78205
Telephone: (210) 224-5476
Facsimile: (210 224-5382
nperales@maldef.org
jlongoria@maldef.org

Michael C. Keats*
Rebecca L. Martin*
Jason S. Kanterman*
Kevin Zhen*
FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
One New York Plaza
New York, New York 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000
michael.keats@friedfrank.com
rebecca.martin@friedfrank.com
jason.kanterman@friedfrank.com
kevin.zhen@friedfrank.com
* Admitted *pro hac vice*

*Attorneys for Plaintiffs:*
LA UNIÓN DEL PUEBLO ENTERO
 SOUTHWEST VOTER REGISTRATION
  EDUCATION PROJECT
 MEXICAN AMERICAN BAR
  ASSOCIATION OF TEXAS
 TEXAS HISPANICS ORGANIZED FOR
  POLITICAL EDUCATION
 JOLT ACTION
 WILLIAM C. VELASQUEZ INSTITUTE
 FIEL HOUSTON INC.

  */s/ Sean Morales-Doyle*           
Sean Morales-Doyle
Eliza Sweren-Becker*
Patrick A. Berry*
Andrew B. Garber*
Jasleen K. Singh*
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
Telephone: (646) 292-8310
Facsimile: (212) 463-7308
sean.morales-doyle@nyu.edu
eliza.sweren-becker@nyu.edu
patrick.berry@nyu.edu
andrew.garber@nyu.edu

* Admitted *pro hac vice*

Paul R. Genender
Texas State Bar No. 00790758
Elizabeth Y. Ryan
Texas State Bar No. 24067758
Matthew Berde*
Texas State Bar No. 24094379
Megan Cloud
Texas State Bar No. 24116207
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-8158
Facsimile: (214)746-7777
Liz.Ryan@weil.com
Paul.Genender@weil.com
Matt.Berde@weil.com
Megan.Cloud@weil.com

-and-

Alexander P. Cohen*
Texas State Bar No. 24109739
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153

Telephone: (212) 310-8020
Facsimile: (212) 310-8007
Alexander.Cohen@weil.com

\* Admitted *pro hac vice*

*Attorneys for Plaintiffs:*
FRIENDSHIP-WEST BAPTIST
   CHURCH
ANTI-DEFAMATION LEAGUE
   AUSTIN, SOUTHWEST, AND
   TEXOMA REGIONS
TEXAS IMPACT
JAMES LEWIN

APPENDIX C

```
 1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE WESTERN DISTRICT OF TEXAS
 2                        SAN ANTONIO DIVISION

 3
     LA UNION DEL PUEBLO ENTERO,       .
 4   ET AL,                            .
                                       .
 5              PLAINTIFFS,            .
          vs.                          . DOCKET NO. 5:21-CV-844-XR
 6                                     .
     GREGORY W. ABBOTT, ET AL,         .
 7                                     .
                DEFENDANTS.            .
 8

 9

10                   TRANSCRIPT OF BENCH TRIAL
             BEFORE THE HONORABLE XAVIER RODRIGUEZ
11                UNITED STATES DISTRICT JUDGE
                      SEPTEMBER 22, 2023
12

13

14

15

16   APPEARANCES:
     FOR THE PLAINTIFFS:      NINA PERALES, ESQUIRE
17                            FATIMA MENENDEZ, ESQUIRE
                              JULIA LONGORIA, ESQUIRE
18                            MALDEF
                              110 BROADWAY
19                            SUITE 300
                              SAN ANTONIO TX 78205
20

21                            LEAH TULIN, ESQUIRE
                              BRENNAN CENTER FOR JUSTICE AT NY
22                             US SCHOOL OF LAW
                              1140 CONNECTICUT AVENUE NW
23                            SUITE 1150
                              WASHINGTON DC 20036
24

25
```

```
 1
 2                           AMIR BADAT, ESQUIRE
                            NAACP LEGAL DEFENSE & EDUCATIONAL
 3                          FUND INC
                            40 RECTOR STREET, FIFTH FLOOR
 4                          NEW YORK NY 10006
 5
 6
 7
 8                          CHRISTOPHER DOOLEY DODGE, ESQUIRE
                            DANIELA LORENZO, ESQUIRE
 9                          UZOMA N. NKWONTA, ESQUIRE
                            MARCOS MOCINE-MCQUEEN, ESQUIRE
10                          ELIAS LAW GROUP LLP
                            250 MASSACHUSETTS AVENUE NW
11                          SUITE 400
                            WASHINGTON DC 20001
12
13
14
15
16
17   FOR THE DEFENDANTS:   RYAN G. KERCHER, ESQUIRE
                            KATHLEEN HUNKER, ESQUIRE
18                          WILLIAM WASSDORF, ESQUIRE
                            MONROE DAVID BRYANT, JR., ESQUIRE
19                          ETHAN QUINN SZUMANSKI, ESQUIRE
                            ZACHARY BERG, ESQUIRE
20                          TEXAS ATTORNEY GENERAL
                            P.O. BOX 12548
21                          MC 009
                            AUSTIN TX 78711
22
23                          LOUIS J. CAPOZZI, III, ESQUIRE
                            JONES DAY
24                          51 LOUISIANA AVENUE NW
                            WASHINGTON DC 20001
25
```

```
 1
 2
 3                        CORY REN LIU, ESQUIRE
                         BUTLER SNOW LLP
 4                       1400 LAVACA STREET
                         SUITE 1000
 5                       AUSTIN TX 78701
 6
 7
 8
 9
10
11
12
13
14
15   REPORTED BY:        GIGI SIMCOX, RMR, CRR
                         OFFICIAL COURT REPORTER
16                       UNITED STATES DISTRICT COURT
                         SAN ANTONIO, TEXAS
17
18
19
20
21
22
23
24
25
```

1    *(San Antonio, Texas; September 22, 2023, at 9:00 a.m., in*
2    *open court.)*

3            THE COURT:  And your next witness.

4            MR. CAPOZZI:  Your Honor, excuse me.  Would now be a
5    good time to deal with the evidentiary issue we talked about
6    yesterday?

7            THE COURT:  Sure.

8            MR. CAPOZZI:  Good morning.  We met and conferred
9    yesterday with the LULAC plaintiffs.  We weren't able to come
10   to an agreement so I will renew my motion.  We are not moving
11   to introduce the entire deposition, just select page numbers
12   which address SB 1, in particular pages 1 through 9, 17
13   through 18, 28 through 30, 41 through 43, 49 to 50.

14           THE COURT:  I'm sorry.  41 to 43.

15           MR. CAPOZZI:  49 to 50 and 72 to 73.

16           So let me just try to state briefly why these are
17   relevant and to answer your question from yesterday about
18   cumulative evidence.

19           So these are relevant to our organizational standing
20   argument.  The Fifth Circuit in a case called *LULAC v Elfant*,
21   I think this was in November 2022, held that LULAC did not
22   have standing to challenge SB 1111 because Mr. Garcia could
23   not cleanly distinguish between LULAC's response to SB 1 and
24   SB 1111.

25           So we think that this evidence is relevant in this

1 | case for the same reason.  The evidence is admissible as the

2 | statement of a party opponent.  There's also a prior

3 | inconsistent statement.

4 | THE COURT:  And what are these statements?

5 | MR. CAPOZZI:  So, in brief, these are statements that

6 | the Get Out the Vote campaigns, the voter registration

7 | campaigns, and the fund raising that LULAC did in late 2021

8 | and 2022 were in response to both SB 1 and SB 1111.

9 | And the reason the evidence is accumulative and

10 | repetitive is that the emphasis is different between the

11 | testimony that Mr. Garcia gave on the stand and his testimony

12 | in the deposition.

13 | On the stand he de-emphasized SB 1111.  He said the

14 | response was primarily because of SB 1, but in the deposition

15 | he emphasized both equally and he didn't have the greater

16 | emphasis on SB 1 versus SB 1111, so we would like to put that

17 | testimony into the record.

18 | THE COURT:  What's the objection?

19 | MR. NKWONTA:  Your Honor, the objection primarily is

20 | based on relevance, and I'll tell you why it's not relevant,

21 | because opposing counsel has slightly mischaracterized via

22 | Fifth Circuit's ruling.

23 | SB 1111, that case was about voter registration and

24 | all of the activities that are conducted in terms of diversion

25 | of resources are related to voter registration.  Here, what

1 | Mr. Garcia is talking about, voter outreach efforts for GOTV,
2 | helping voters with mail ballots, helping voters get to the
3 | polls, that, by definition, has nothing to do with SB 1111.
4 |        So that brings us back to the relevance issue under
5 | Rule 403 because Rule 403 also excludes evidence that's
6 | cumulative and evidence that confuses the issues.  And even as
7 | we stand here, intervenors are confusing the issues already.
8 |        And the theory that they are trying to advance with
9 | this argument is that because LULAC diverted resources in
10 | response to SB 1111 and in response to SB 1, they are injured
11 | by neither bill, and that is a nonsensical theory which makes
12 | the evidence they are trying to submit irrelevant.
13 |        What's relevant is whether Mr. Garcia and whether he
14 | testified and whether LULAC did, in fact, divert resources in
15 | order to respond to the restrictions on voting procedures in
16 | SB 1.  He has testified that they did.  SB 1111, a statute
17 | about voter registration and testimony about voter
18 | registration cannot have any bearing on that and sufficiently
19 | relevant and avoids confusion of issues.
20 |        Nor has he identified any inconsistency that would
21 | suggest these are admissible under the prior inconsistent
22 | statement theory because Mr. Garcia did not say in the prior
23 | deposition that there was an equal allocation.  He, at the
24 | time, had not separated the two.  That doesn't mean he hasn't
25 | done so now.

1       Finally, to the extent that the Court is inclined to
2  admit this evidence, we would request under Rule 106 an
3  opportunity to admit additional testimony in support of the
4  rule of completeness to ensure —

5       THE COURT:  By witness or by deposition testimony, or
6  what?

7       MR. NKWONTA:  No, additional deposition testimony,
8  from that same deposition, under Rule 106, because they are
9  only seeking to admit — because they are seeking to admit
10  portions, we would request an opportunity to submit our
11  portions as well to ensure that the Court has a complete and
12  accurate record of what Mr. Garcia said.

13       THE COURT:  So in that case, instead of portions,
14  should we just do the whole deposition?  It looks like we've
15  got most of it already.

16       MR. NKWONTA:  Well, we actually have not — I
17  wouldn't say an insignificant amount but there are only a few
18  small excerpts that are being submitted here and what we are
19  counter-designating, for lack of a better word, only amounts
20  to a few additional pages to the extent the Court accepts this
21  excerpt as admissible.

22       THE COURT:  So if this was a jury trial, I would be
23  much more concerned.  It's not a jury trial, it's a trial to
24  the bench.  If the plaintiffs are successful in this case, we
25  all know where this is headed, and so we might as well let the

1  Fifth Circuit clarify for us all this whole issue of standing.

2       I sort of made that gratuitous remark yesterday, but

3  in all sincerity, I really do not understand standing anymore.

4  So the Republican Party of Harris County and Republican

5  National Committee got to come in this case because, as I

6  understood the Fifth Circuit's position, just because they had

7  to offer any additional training to their folks, that gave

8  them standing.

9       So if that's all it took, I really honestly don't

10 understand the organizational standing challenges here, but

11 that's not a ruling, I'm just perplexed.  I don't know how to

12 apply anything anymore here because the standards are so

13 confused and don't seem to be logically applied.

14      With that said, I'm going to begin, withhold ruling

15 on this, you-all meet and confer yet again, find out which

16 additional pages you want to submit, or if you just want to

17 submit the entirety of the deposition and we'll admit it

18 later.

19      MR. NKWONTA:  Thank you, Your Honor.

20      MR. CAPOZZI:  Thank you, Your Honor.

21      THE COURT:  Anything else by way of housekeeping?

22      Next witness.

23      MR. MOCINE-MCQUEEN:  We call Miss Judy Bryant, Your

24 Honor.  My name is Marcos Mocine-McQueen.  I'm with the Elias

25 Law Group and we are representing the LULAC plaintiffs.

1      THE COURT:  Can someone assist moving the podium and

2  it may be locked down below.

3     (JUDY BRYANT, having been duly sworn, testified as

4  follows:)

5      THE COURT:  And this will be on what issues?

6      MR. MOCINE-MCQUEEN:  Your Honor, this will be on

7  5.02, 5.03, 5.08, and 7.04.

8      THE COURT:  Thank you.

9                    DIRECT EXAMINATION

10  BY MR. MOCINE-MCQUEEN:

11  Q.  Good morning.

12  A.  Good morning.

13  Q.  Miss Bryant, can you please state your full name for the

14  record?

15  A.  It is Judy Hawthorne Bryant.

16  Q.  And can you please tell the Court why you are here today?

17  A.  I'm here today to testify for the Texas Alliance for

18  Retired Americans.

19  Q.  And if I refer to the Alliance as TARA, will you

20  understand what I'm referring to?

21  A.  Yes, I will.

22  Q.  And Miss Bryant, where do you live?

23  A.  In Dallas.

24  Q.  And how long have you lived in Texas?

25  A.  Mostly my whole life except for probably about ten or

1 | twelve years living in Louisiana and South Carolina.

2 | Q.  And so roughly how many years have you lived in Texas?

3 | A.  Roughly I guess about 60.

4 | Q.  And before retiring, Miss Bryant, can you tell us a little

5 | bit about what you did professionally?

6 | A.  Yes.  I'm a retired 32-year teacher and I taught home

7 | economics for the first about ten twelve years.  For the last

8 | 20 years I taught prenatal care and infant development to

9 | pregnant and parenting teens in Dallas' school for pregnant

10 | teens.

11 | Q.  And, Miss Bryant, what is your role in the Texas Alliance

12 | for Retired Americans?

13 | A.  I am the field organizer in Texas Alliance for Retired

14 | Americans.

15 | Q.  When did you assume that role?

16 | A.  In May of 2012, so it's been about eleven, going on about

17 | eleven and a half years.

18 | Q.  Are you paid for this role?

19 | A.  Yes, I am.  It's a part-time position, but I'm paid.

20 | Q.  And when did you first become involved with Texas Alliance

21 | for Retired Americans in any capacity?

22 | A.  In about 2008 I became a member in the Dallas area.

23 | Q.  And why did you join TARA?

24 | A.  Because I was working as the political action vice

25 | president and the retiree chair for my union for Alliance AFT,

1  and I became familiar with TARA and the things that they were

2  doing to protect things like social security, Medicare, and so

3  on.

4  Q.  So I'd like to learn a little bit more about TARA then.

5  Can you tell me, what is TARA?

6  A.  TARA is a part of a four and a half million member

7  National Alliance for Retired Americans and we work on –– the

8  Alliance for Retired Americans works on issues, as I

9  mentioned, such as social security, Medicare, Medicaid,

10 pensions, those major issues that affect seniors and retirees.

11 Q.  And –– I'm sorry.

12 A.  And in Texas, in Texas, TARA has chapters all around the

13 state.

14 Q.  Can you name just a few of the areas at least that TARA

15 has chapters?

16 A.  We have chapters in Dallas, Fort Worth, White Settlement,

17 Austin, Houston, San Antonio, Corpus Christi area, and

18 Beaumont, and Port Arthur area.

19 Q.  Does TARA have a partisan affiliation?

20 A.  No, we're officially nonpartisan.

21 Q.  And who are the members of TARA?

22 A.  There are great many members of TARA who are retired union

23 members of all different unions because the National AFL–CIO

24 is our parent organization but we have anybody who wants to

25 further retirement, and so we have a lot of community members

 1  also.

 2  Q.  And what is TARA's mission?

 3  A.  Our mission is to help our members become knowledgeable

 4  about these issues that we talked about, social security,

 5  Medicare, Medicaid, and then take action when those things are

 6  under attack so that they can actually gain the dignified

 7  retirement which they have earned.

 8  Q.  Can you tell me a little bit more about the issues that

 9  you just mentioned, a little more in-depth about the issues

10  that TARA works on?

11  A.  One thing, especially about social security, the — we've

12  been working for 20 years about the windfall on nation

13  provision and the GPO government pension offset because a lot

14  of our members are negatively impacted by that, myself being

15  one of them, and so we work and do things on that.

16      We've been working on Medicaid expansion in Texas since

17  that has never taken place, and currently we're working on

18  cost of living adjustment, COLA, to assist Texas AFT and

19  seeing that Proposition 9 gets passed.

20  Q.  And so what are the actual activities that TARA undertakes

21  to advance these issues?

22  A.  We have monthly chapter meetings in all of our different

23  locations, and, of course, share information about those

24  issues.  We go out and do rallies, street rallies, and things

25  like that.  We have a lot of fun doing those, and getting the

1  word out about things and just calling people's attention to

2  things with signs and so forth.  We use our social media

3  accounts with Facebook and X, formerly Twitter, and also on

4  our website to educate folks.

5  Q.  And do you do anything to advance laws that are related to

6  these issues?

7  A.  Yes, by some of the same things to have our, have members

8  and just the public be aware of things.

9  Q.  And when you make members aware of these things, is there

10  something you hope they do with that information?

11  A.  Yes.  We always ask them to contact whether it's local,

12  state, or federal elected officials to make sure that their

13  voices are heard and our Alliance for Retired Americans gives

14  us tools to help them be aware of what they need to do when

15  making such visits.

16  Q.  And who primarily does the work of organizing these

17  efforts?

18  A.  I do.

19  Q.  And do you get support from anyone else in the

20  organization?

21  A.  Yes.  Especially our state president, and then we have

22  chapter presidents on our executive board and the executive

23  board works to assist in organizing those things.

24  Q.  Miss Bryant, are you familiar with Section 7.04, which is

25  the provision of SB 1 that limits advocacy for or against a

JUDY BRYANT – DIRECT

1 candidate or an issue in the presence of an absentee ballot?

2 A.  Yes, I am.

3 Q.  You stated that TARA does not have a partisan affiliation,

4 but does TARA ever endorse candidates?

5 A.  Yes, we do.  We can endorse local and state candidates and

6 then we work for endorsed national candidates, which our

7 national organization does.

8 Q.  And does TARA ever take positions either for or against

9 issues or questions that are appearing on the ballot?

10 A.  Yes, we do.

11 Q.  And do you ever, when you are advocating for or against

12 these candidates on these issues, do you ever conduct any kind

13 of in-person advocacy?

14 A.  Yes.  In addition to our meetings we are often asked to

15 maybe do a presentation at another meeting of another group or

16 to do what we call tabling at an event, at a convention, or at

17 a meeting where we set up a table and share information that

18 comes from our national organization about various issues.

19 Q.  And why make these in-person presentations instead of just

20 relying on tools like email or phone calls?

21 A.  Because some people don't read their emails, we found out,

22 and also phone calls, a lot of times you have wrong numbers or

23 you have to leave messages, and even if you could have a very

24 short face-to-face interaction with someone we found that's

25 more effective.

JUDY BRYANT - DIRECT

1  Q.  And when you send out emails, what is the audience you

2  reach with your emails?

3  A.  Generally we have about 6,000 folks on an action network

4  email list and that includes the members of each chapter and

5  lots of other people who have identified as being interested

6  in the Alliance for Retired Americans.

7  Q.  And when you are doing these in-person events, who are you

8  reaching?

9  A.  A lot of times it's just the general public because we're

10  asked to do things at events that are non-TARA events.

11  Q.  And who within the organization of TARA does the largest

12  share of this in-person activity?

13  A.  I would generally do that in the Dallas area where I live

14  but some of our chapter presidents, especially one in Austin

15  has done a number of tabling events.

16  Q.  Who would you say does the largest share for the

17  organization?

18  A.  I would be the one who does the largest.

19  Q.  How have SB 1's restrictions on in-person advocacy

20  impacted TARA's approach to advocating for issues such as COLA

21  in person?

22  A.  They have changed and harmed, I think, what we can do and

23  are used to be able to do for various events, various issues.

24  Q.  And how has it changed what you can do?

25  A.  Well, one way in particular is the fact of I haven't been

JUDY BRYANT – DIRECT

1  able to accept or set up any tabling invitations or events
2  just in the few weeks when mail ballots go out and I would not
3  want to take a chance of someone having a mail ballot when we
4  were tabling, talking to them about an issue, so that —
5  because that would be against the provisions in this law.
6  Q.  So when will you stop your in-person advocacy efforts?
7  A.  Probably — well, making sure — probably after the first
8  week in October because mail ballots are generally going out
9  by that time in most counties.
10  Q.  Prior to SB 1, when you engaged in this type of advocacy,
11  how late into the election cycle would you have been
12  conducting these in-person activities?
13  A.  Right up and including Election Day, right up to and
14  including Election Day.
15  Q.  So if you're able to do this work until the ballots come
16  out, why does it matter that you have to stop once the ballots
17  are in the mail?
18  A.  Because we find that especially with this particular law
19  or with anything, the closer you can do some education and
20  information sharing, the closer to the time of someone voting,
21  that's the — going to be the best thing to do because people
22  tend to forget or not be familiar with an issue and then the
23  closer to actually them voting makes a big difference.
24  Q.  So, Miss Bryant, I want to talk about some of the other
25  provisions in SB 1 that affect mail ballots and mail ballot

JUDY BRYANT – DIRECT

1  applications, and specifically I'd like to talk about Sections

2  5.02, 5.03, and 5.08.  Are you familiar with these provisions

3  of SB 1 that require voters to enter ID numbers when they are

4  requesting and when they are returning their absentee ballots?

5  A.  Yes, I am.

6  Q.  What impact did these changes have on TARA members?

7  A.  Well, first of all, we heard from members who were afraid

8  to even apply for a ballot because of it being complicated,

9  new and complicated.  And then, second, we did hear from

10  members who actually made a mistake on their application for a

11  ballot, or even making a mistake on their ballot, the ballot

12  itself when they filed it and so it got rejected.

13  Q.  So what changes did TARA have to make to respond to what

14  it was hearing from its members?

15  A.  We had to do a big education project for advocacy and

16  taking action to inform our members about the provisions of SB

17  1.

18  Q.  So what was involved in this effort to help them navigate

19  the voting process?

20  A.  To help them navigate the new voting system, we have a

21  TARA projects committee which we activated at that time.  We

22  activate for various reasons, and the projects committee is

23  made up of most of our chapter presidents and so we spent a

24  great deal of time planning our advocacy campaign for this new

25  law.

1  Q.  And what was involved, what did you actually create in

2  this effort?

3  A.  We created emails that would go out to all those — that

4  list that I mentioned with the action network.  We also had

5  folks who created or found memes that we could use on social

6  media, which we did a great deal.

7      Obviously, we had information which chapters could share

8  at their chapter meetings or anybody could take out and share,

9  and then we planned and carried out three different webinars

10  about applying for the ballot and voting a ballot.

11  Q.  So if you were to add together the hours that yourself and

12  the volunteers spent creating these presentations, emails,

13  webinars, if you were to estimate how much time was spent on

14  those collectively, what would you estimate that amount of

15  time to be?

16  A.  I would imagine it would be around 125 to 150 hours.

17  Q.  And how does that compare to the amount of time you would

18  have normally expected to get from these volunteers?

19  A.  Well, they are all great volunteers, but it was a great

20  deal more time that they spent doing this particular work, and

21  we really appreciated that because it was necessary.

22  Q.  So before SB 1, was this sort of helping your members

23  navigate voting something that TARA had typically done?

24  A.  No.  We had encouraged everyone, of course, to go to

25  register to vote.  A lot of us are deputy voter registrars in

1  our counties and we do that, but we would just be reminding

2  them to plan to vote by mail and fill out the application and

3  not spend anywhere near this amount of time helping them

4  navigate a new system.

5  Q.  So as you built out this effort to help your members

6  navigate, are there any programs or activities that were

7  negatively impacted?

8  A.  One thing that I can think of, I mentioned the Social

9  Security Fairness Act, we didn't spend as much time getting

10  our members to go and call their Congresspersons and visit

11  them.  Another thing that we have worked on, as I said, is

12  expansion of Medicaid in Texas, and that was something that we

13  definitely had to pull back on a bit.

14  Q.  And who under normal circumstances would have been

15  spearheading these efforts?

16  A.  I would have been.

17  Q.  And would you have relied on anyone else for support in

18  that?

19  A.  Our state president and secretary.

20  Q.  And any other members outside of the executive -- the two

21  executives you just mentioned?

22  A.  Well, chapter presidents to actually carry the message of

23  various things to their members.

24  Q.  Just a couple more questions to wrap this up, ma'am.

25      Are you planning to continue this effort to help your

JUDY BRYANT — CROSS

1  members cast their ballots?

2  A.   Yes.   We will be —— we're planning now the campaign that

3  we'll be doing in January and early February when people can

4  again apply for their mail ballot for 2024.

5  Q.   Now, if I understand correctly, you've already done this

6  once with your members.   They have now cast a ballot under

7  this system.   Why is it that you will continue this

8  educational effort in the future then?

9  A.   Because we still have a great number of people turning 65

10 each year, and so we would have new people who would be

11 eligible to apply for a mail ballot, and also because the

12 process in this situation is still more complicated than

13 people have done in the past, so we want to be able to review

14 it and go over it, and since some people felt frustrated last

15 time and didn't apply for the ballot, and we want to help them

16 perhaps do that by leading them and showing them the way.

17          MR. MOCINE—MCQUEEN:   Thank you, Miss Bryant.

18          I pass the witness.

19          THE COURT:   Anything else on this side?   None.

20          Any cross?

21          MR. BRYANT:   Yes, Your Honor.

22                   CROSS—EXAMINATION

23 BY MR. BRYANT:

24 Q.   Miss Bryant, my name is David Bryant.

25 A.   Oh, okay.   Good morning.

JUDY BRYANT — CROSS

1  Q.  Good morning.  I represent the Secretary of State, the
2  Attorney General of Texas, and as far as I know we're not
3  related, is that your guess as well?
4  A.  Yes, sir.
5  Q.  Although I have lived in Dallas a lot but I don't believe
6  that there's any relationship.
7      Now, you testified first about your organization, TARA,
8  and it was founded in part by the AFL—CIO, is that right?
9  A.  Yes, sir.
10  Q.  And the national organization Alliance for Retired
11  Americans is headquartered in the AFL—CIO building in
12  Washington?
13  A.  Yes, sir.
14  Q.  Who are you actually employed by?
15  A.  The Alliance for Retired Americans.
16  Q.  You are employed by the national organization, not the
17  Texas group?
18  A.  Well, actually my position was a grant that the Texas
19  Alliance on for Retired Americans got and it stipulates, and
20  it's the same grant every year that I sign a contract for,
21  that the Alliance for Retired Americans pays three—fourths of
22  my salary and the Texas Alliance for Retired Americans pays a
23  fourth of my salary every year.  So that was a grant which we
24  received.
25  Q.  And what organization is on your paycheck?

JUDY BRYANT — CROSS

1  A.  The Alliance for Retired Americans.

2  Q.  And TARA, or the Texas Alliance for Retired Americans, has

3  some members who don't pay any dues, is that right?

4  A.  Yes, sir.

5  Q.  Who are those who don't have to pay any dues at all?

6  A.  Well, it's not that they don't have to pay any dues.  Our

7  dues are $10 a year.  It's generally the ones who actually

8  attend or are a part of chapters.  So since we have members

9  that we contact who are all over the state and not

10  necessarily, you know, in a chapter, those would be the people

11  who would not be dues paying members.

12  Q.  And is it fair to say that even the people who do pay dues

13  to TARA, they are just nominal dues?

14  A.  Yes, sir.

15  Q.  Is it correct that there are no paid employees of TARA?

16  A.  Yes, that's correct.  Except myself, but it's not

17  officially of TARA as you just pointed out.

18  Q.  Is it correct that TARA is open to members of all ages,

19  it's not an organization of retirees only?

20  A.  That's correct, sir.  In fact, our motto is "let's not be

21  the last generation to retire," so we have members that are

22  not yet retired because they want to make sure they have a

23  retirement.

24  Q.  Miss Bryant, is it correct that there are no members of

25  TARA that you know of who were unable to vote in 2022 because

1  of anything in SB 1?

2  A.  I don't know of anyone who was unable to vote, but as I

3  said, know of a number of members who had problems and had

4  to — their ballots — their application or ballot was

5  initially rejected and they had to do something about it.

6  Q.  Is it correct that TARA has, for many years, promoted

7  voting by mail?

8  A.  Yes, sir.

9  Q.  That's a — you had campaigns before to encourage your

10  members and your audiences to vote by mail?

11  A.  Yes, that's true.

12  Q.  And I believe in 2020 you had a campaign that was called

13  Step Out of Line for Democracy, is that right?

14  A.  Yes, sir.

15  Q.  And is it true that you've always, as an organization,

16  conducted efforts by social media, direct contact to encourage

17  people to vote by mail in Texas?

18  A.  Yes, we have.

19  Q.  And is it also correct that in 2020 and before you

20  conducted voter education efforts to try to get people to sign

21  their mail ballots the same as they signed everything else so

22  that they would deal with the ID requirements that were in

23  effect at that time?

24  A.  We really didn't do a campaign about that, and most of the

25  time our campaigns have been just simply encouraging people by

JUDY BRYANT — CROSS

1  maybe email or in person at our chapter meetings, not to the

2  extent we did this Step Out of Line for Democracy when that

3  was starting the SB 1.

4  Q.  Okay.  And I understand that it may not have been a

5  campaign, but is it true that TARA always warned people to try

6  to sign the same way and thus comply with the ID requirements

7  for vote by mail that were in effect?

8  A.  Yes.

9  Q.  And you also made efforts in 2022 to encourage people and

10  educate people to comply with the voter ID requirements for

11  vote by mail that were in effect in 2022?

12  A.  We really have not spent that much time about the voter ID

13  requirements.  We were mainly concerned about the numbers that

14  had to be placed on the application and on the ballot flap,

15  so...

16  Q.  Do you understand that those number requirements are part

17  of voter ID requirement in Texas law?

18  A.  Yes.

19  Q.  In other words, it's identifying the voter who is voting

20  by mail?

21  A.  Yes.

22  Q.  So, to that extent, in 2022 you are doing the same kind of

23  thing that you were in 2020, namely educating and encouraging

24  your members and your audiences to comply with the applicable

25  voter ID requirements?

1    A.   Yes.

2    Q.   You testified earlier about Section 7.04 of SB 1 and that

3    TARA has made a decision not to set up tabling events after

4    around the 1st of October to — because of fear of

5    inadvertently violating Section 7.04, is that right?

6    A.   Yes, that's right.

7    Q.   Did TARA consider simply asking people who came up to the

8    table whether they had mail-in ballots present, and if so, to

9    put them away?

10    A.   No, sir.  I wouldn't have considered that.

11    Q.   You testified about efforts that were made in 2022 to

12    educate people on how to comply with the number requirements

13    for voter ID on mail-in ballots.  About how many people did

14    the work on that for TARA, including not only yourself but

15    volunteers?

16    A.   When you said "2022," we actually started this in 2021

17    after SB 1 was passed.

18    Q.   Okay.  And I did not --

19    A.   Summer of 2021, really, so...

20    Q.   I did not mean to limit it.

21    A.   Okay.

22    Q.   You gave us a number of you estimated about 125 hours.

23    Did that include all the work in 2021 and 2022?

24    A.   No.  I was only speaking of the main campaign that we

25    started out so that people when they applied -- in 2021, so

1  that when they applied for a mail ballot in 2022, and then

2  voted, that they would understand and help them navigate the

3  system.  So, once again, I said between 125 and 150 hours.

4  And this was probably spread among about ten people with

5  chapter presidents and our state officers.

6  Q.  Okay.  So that if assuming it were 150 we might be talking

7  about 15 hours a person?

8  A.  Possibly, yes.

9  Q.  And that's over '20, '21, and 2022?

10  A.  No.  This campaign was — this was in about a three-month

11  period where we put this campaign together so that we could

12  carry it out.

13  Q.  What was that three-month period approximately?

14  A.  Probably June, July, August of 2021, after SB 1 was, you

15  know, passed, so that when it became law and we — in 2022

16  when people would have to follow these procedures we wanted to

17  make certain people could navigate that system.

18  Q.  I believe you testified that as a result of the efforts

19  that you made at TARA relating to the voter ID requirements

20  for the mail-in ballots under SB 1, that TARA didn't have as

21  much time to get people to call their representatives or

22  contact their representatives regarding Medicaid issues, is

23  that right?

24  A.  Yes, regarding Medicaid expansion in Texas.

25  Q.  Yes.  And I think you said that because of those

JUDY BRYANT - CROSS

1 provisions of SB 1 TARA had to pull back a bit on its efforts

2 it otherwise would have made, is that right?

3 A.  Yes, that's correct.

4 Q.  But those efforts did continue, just in a diminished

5 manner?

6 A.  Yes, they continued.  That's exactly correct.

7 Q.  Okay.  And you also, I believe, my notes indicate that you

8 said that the efforts to deal with vote-by-mail provisions of

9 SB 1 on the part of TARA also caused TARA to cut back some on

10 their efforts to have people call representatives regarding

11 social security issues, is that right?

12 A.  Yes.

13 Q.  Okay.  Were there any other identifiable effects of TARA's

14 efforts to educate its members regarding the voter ID

15 provisions of SB 1 dealing with vote by mail or any other

16 provisions of SB 1?

17 A.  So would you restate that question, please?

18 Q.  I'll be happy to.  You mentioned that TARA had to cut back

19 on its efforts a little bit on Medicaid expansion and on

20 social security.  Were there any other efforts that TARA had

21 to cut back on or eliminate because of its efforts to educate

22 and deal with the provisions of SB 1?

23 A.  One thing at that time that we did cut back on were

24 efforts about pension and COLAs, cost of living adjustment, we

25 had to cut back on those things at that time because we also

1  work with other groups to get those provisions passed and

2  luckily we did in this last legislature.

3  Q.  Okay.  Can you think of anything else besides those you've

4  already mentioned?

5  A.  Oh, each chapter also has some local issues and local

6  candidates that they can support and recommend for endorsement

7  to the executive board, and I — we didn't have as much action

8  in those areas, so each — because each chapter is free to do

9  certain things that just apply to them locally and they work

10  with me if necessary.

11  Q.  Miss Bryant, is it correct that in 2020 TARA was a

12  plaintiff in a lawsuit to invalidate straight-ticket voting

13  prohibitions in Texas?

14  A.  Yes.

15  Q.  And in that lawsuit, ultimately the Fifth Circuit ruled

16  against TARA and other plaintiffs in that case?

17  A.  Yes, that's true.

18          MR. MOCINE-MCQUEEN:  Objection, Your Honor.

19  Relevance.

20          THE COURT:  What is the relevance?

21          MR. MOCINE-MCQUEEN:  Your Honor, there is a claim,

22  there claims in this case, not by TARA, but by other

23  plaintiffs challenging straight-ticket voting, and I just

24  wanted to make the history of, number one, the fact that that

25  prohibition was in the law prior to SB 1 and the prior

 1  judicial challenge and its results.

 2          THE COURT:  That's overruled.

 3          You can continue.

 4          MR. BRYANT:  Okay.

 5  BY MR. BRYANT:

 6  Q.  Is it correct that in Case Number 20-40643, ultimately

 7  Fifth Circuit reversed a preliminary injunction that TARA and

 8  other plaintiffs had obtained regarding the prohibition of

 9  straight-ticket voting in Texas?

10  A.  Yes.

11  Q.  And is it correct that the Southern District of Texas

12  dismissed the lawsuit by TARA and other plaintiffs challenging

13  the prohibition on straight-ticket voting in Texas in 2022?

14  A.  Yes.

15          MR. BRYANT:  Pass the witness.

16          THE COURT:  Anything further on this side?

17  BY MR. LIU:

18  Q.  Cory Liu with the Harris County District Attorney's

19  Office?

20  A.  I'm sorry.  I didn't hear, what district attorney?

21  Q.  Harris County.

22  A.  Okay.  Thank you.

23  Q.  Could you just state one more time, I want to make sure I

24  heard you correctly, about the in-person, the tabling and why

25  you stopped?

JUDY BRYANT — CROSS

1  A.  You mean why we would stop before?

2  Q.  After the law.

3  A.  After the law?  Because of the provision in the law that

4  if you're actually passing out information when someone has a

5  ballot, then we could have a problem, be in trouble about

6  that.

7  Q.  So is that based on your understanding that even if it was

8  an accident, you didn't know that person had a ballot, that it

9  would still be illegal under the law?

10  A.  Yes.

11        MR. MOCINE-MCQUEEN:  Objection, Your Honor.  This

12  calls for a legal conclusion.

13        THE COURT:  That's overruled.

14        Do you need the question repeated, ma'am?

15        THE WITNESS:  Yes.

16  BY MR. LIU:

17  Q.  So is your stopping the tabling, as you've described, a

18  result of your understanding that even if you were talking to

19  someone, or if you were talking to someone and they had a

20  ballot but you didn't know, that that would still be illegal?

21  A.  Yes.  That's my understanding but I'm not a legal expert.

22  Q.  In coming to that understanding, is that a result of any

23  statement by any law enforcement official that you've heard

24  of?

25  A.  No, but we have some retired attorneys that are members of

JUDY BRYANT - REDIRECT

1 TARA and they just made us aware that that would be a good
2 idea not to do that, so we would not run any risk of talking
3 with someone who might have a ballot in their backpack, or
4 purse, or whatever.  I mean probably their purse or briefcase.
5 Q.  So, to make sure I heard you correctly, that that's not
6 the result of any statement from a law enforcement official,
7 is that right?
8 A.  Correct.
9 Q.  And you're not aware of any investigations into any
10 alleged violations of SB 1's criminal provisions, are you?
11 A.  No.
12 Q.  And you are not aware of any prosecutions that have
13 occurred under SB 1, is that right?
14 A.  That's correct.
15       MR. LIU:  Thank you.  No further questions.
16       THE COURT:  Any redirect?
17       MR. BRYANT:  Yes, Your Honor, just a few quick
18 questions.
19                REDIRECT EXAMINATION
20 BY MR. MOCINE-MCQUEEN:
21 Q.  Miss Bryant, just a few quick questions here.  First of
22 all, I just wanted to confirm, do you receive some of your
23 salary from TARA?
24 A.  Yes, a fourth of my annual salary is paid yearly by TARA.
25 Q.  And do you receive any other sort of reimbursements or any

1  other benefits from TARA itself?

2  A.  My expenses for travel are reimbursed by TARA.

3  Q.  Okay.  And I want to clarify a few questions about the

4  campaign before SB 1 and then following SB 1.  Are there ways

5  in which the campaign you ran after SB 1 was different than

6  your communications with your members before SB 1?

7  A.  Yes.  That campaign was much more extensive than anything

8  we had done before about voting.

9  Q.  When you say "more extensive," can you tell me a little

10  bit more about that?

11  A.  Well, just like the simple things that I mentioned that we

12  did, we had never gone into such detail with having the

13  emails, the social media things like memes, we had not

14  previously done webinars.  Of course, we've just been able to

15  do that during COVID when folks learned about doing that, how

16  to do webinars and things, so, but that did take a lot more

17  time.

18  Q.  And before SB 1 how many communications might you have

19  made with your members about applying for an absentee ballot?

20  A.  Maybe one or two in January when they are eligible to

21  apply.  We would put it on our website, we would have our

22  chapters remind people to do that, and a lot of times have

23  applications for a mail ballot available at meetings for

24  people to take and complete and return.

25  Q.  And how many people would have been involved in preparing

JUDY BRYANT – REDIRECT

1  an email, that email before SB 1?

2  A.  Probably just two, the president and myself.

3  Q.  Okay.  And I want to confirm, you talked about the kind of

4  peak period of work that you put in to creating the Step Out

5  of Line campaign and your efforts to help your members

6  navigate, after that peak period, were there any additional

7  time spent between that peak period and the election?

8  A.  Yes, from reminder emails and again posting things, that

9  was the first time, and then we're planning to do that again

10  in January and early February in 2024.

11  Q.  And do you anticipate you'll have to continue this after

12  2024?

13  A.  Yes, because we had be adding new voters each year.

14  Q.  And with this being a continuing process, do you

15  anticipate that it will continue to have impact on your

16  efforts around things like COLA, Medicaid, Medicare, social

17  security, WEP, and GPO?

18  A.  Yes.

19  Q.  And what kind of impact will that have?

20  A.  Of just taking, especially since I'm the field organizer,

21  taking my time away to do those things with the president, and

22  sometimes with executive board which meets monthly, but I know

23  we'll be spending more time on those things than normal.

24  Q.  And I think I just have one last question, Miss Bryant.

25      In terms of whether you would ask someone if they had a

JUDY BRYANT — REDIRECT

1  ballot, you answered you had not considered that.  Why not?

2  A.  Because I don't think that would be appropriate to ask

3  someone if they have a ballot.  I think it's really none — I

4  would be invading their privacy, none of my business.

5      And when you're tabling you only have, you know, a minute

6  or so to actually talk with someone, and if you asked them

7  that question, that would turn them off, I would think, and

8  also take up time to give them a flyer about whatever issue

9  you are campaigning on, which this time it would be about the

10  COLA.

11     And as I was doing a presentation at a meeting or

12  whatever, same thing.  I think if I said if you have a mail

13  ballot would you please step out, and you know, I can't talk

14  anymore or whatever, I just think that is each person's

15  private business and not for me to ask a question about.

16  Q.  And what do you think would be the result, if you were to

17  ask that question at a meeting?

18          MR. BRYANT:  Objection.  Calls for speculation.

19          THE COURT:  Rephrase your question.

20  BY MR. MOCINE-MCQUEEN:

21  Q.  Why are you concerned about asking that question at a

22  meeting?

23  A.  Because I feel like if I, representing TARA, asked that,

24  that that would probably cause us to never be invited back to

25  that group and would just not be a good thing for TARA, in

1  general, and that's something I'm always concerned about is

2  promoting the integrity of our organization.

3       MR. MOCINE-MCQUEEN:  No further questions, Your

4  Honor.

5       THE COURT:  Anything else?

6       Anything on this side?

7       MR. BRYANT:  No, Your Honor.

8       MR. LIU:  No, Your Honor.

9       THE COURT:  Thank you, ma'am.  You can step down.

10      THE WITNESS:  Thank you, sir.

11      THE COURT:  Your next witness.

12      MR. MOCINE-MCQUEEN:  Your Honor, we next call Miss

13  Elaine Jones.  While she's approaching the stand, Miss Jones

14  will be testifying with regards to Section 5.08.

15   (ELAINE JONES, having been duly sworn, testified as

16  follows:)

17               DIRECT EXAMINATION

18  BY MR. MOCINE-MCQUEEN:

19  Q.  And, once again, I'm Marcos Mocine-McQueen with the Elias

20  Law Group on behalf of LULAC plaintiffs.

21   Good morning.

22  A.  Good morning.

23  Q.  Would you please state your full name for the record?

24  A.  Elaine Irene Jones.

25  Q.  And, Miss Jones, in what county do you live?

ELAINE JONES - DIRECT

1  A.  I live in San Patricio.

2  Q.  And how long have you lived in Texas?

3  A.  All my life.

4  Q.  And, pardon me for asking, Miss Jones, but how old are

5  you?

6  A.  Eighty.

7  Q.  Do you currently belong to any membership organizations?

8  A.  Yes.  I belong to two, Texas State Teachers Association,

9  the Retiree Plus group, and Texas Association for Retired

10  Americans.

11  Q.  And when you say — when you refer to the Texas Teachers

12  Association, are you referring to AFT?

13  A.  Yes.

14  Q.  Is that Texas AFT?

15  A.  Yes.

16  Q.  And how long have you been a member of Texas AFT?

17  A.  I joined Texas AFT, I do not remember the date but it

18  would be some time in the early '90s, and I remained a member

19  the rest of my life.

20  Q.  And why did you choose to join Texas AFT?

21  A.  Well, when I first started teaching at this particular

22  school I changed school districts and I started teaching at

23  this particular school, there was a representative from Texas

24  AFT that everybody went to for advice, for help, and what to

25  do about this, what to do about that, how to vote, and things

1  like that, and I just sat there and watched for about a year

2  or so and I thought, I don't like depending on one person to

3  give me all this information, I want to be on the inside of it

4  finding out about the information, taking votes on decisions

5  and so on.

6      So I wanted to be more active than just somebody that

7  listened to somebody else that did all the work, so I joined

8  so I could become more active.

9  Q.  Can you describe some of the — not in terrific detail,

10  but just at a high level describe some of the issues that drew

11  your attention?

12  A.  Well, things like classroom size.  I can't pretend and

13  avoid mentioning salary, but classroom size, salary, there

14  were so many things that happened in our classroom that wasn't

15  decided and I wanted to start voting for the right people and

16  so the school board made decisions about what happened in our

17  classroom, the State legislature made decisions, and even

18  Congress made some decisions that affected us and I wanted to

19  be able to help vote in the people that were favorable for

20  public education and public teachers and other employees in

21  public schools, so I wanted to help.

22  Q.  And shifting a little bit, how long have you been a member

23  of TARA, and to make sure we're clear, when I say "TARA," I"m

24  referring to the Texas Alliance of Retired Americans?

25  A.  Yes.  I was an original founding member in 2006.

ELAINE JONES – DIRECT

1  Q.  And why did you join TARA?

2  A.  Okay.  I was already a member of one retiree group, but

3  the Texas AFT retiree group covered a number of topics, not

4  just for retired teachers, but there was something we felt

5  needed to be done in the regular classroom, we covered that

6  too.

7      For TARA, we covered just the issues of pensions across

8  the board for everybody, not just for us, but the idea of we

9  want our grandchildren to still have pensions.  We wanted

10  pensions to be around, social security and Medicare.  Those

11  three issues were the main focus of TARA at the time.

12  Q.  And can you tell us a little bit about your professional

13  career before you retired?

14  A.  Yeah.  When I started teaching, I was teaching English for

15  many years.  The –– in 1978 I taught a basic programming class

16  in little Robstown High School.  I don't know how many of you

17  are familiar with Robstown, but it's a very small town in

18  Texas.

19      And that's 1978.  We had our first computer.  It had 4K

20  memory and we had cassette tapes for recording and we were

21  just terribly excited over that.  And I got permission from

22  TEA to teach a basic programming class, so at one time

23  Robstown was the only school district in the state of Texas

24  that had a computer class and so we were a pilot program.

25      And so they later on adopted a similar program, but so

ELAINE JONES — DIRECT

1  I've been working with computers since 1978 and I've stayed

2  up-to-date as much as possible since then.

3  Q.  And outside of teaching at the high school level, have you

4  taught in any other environments?

5  A.  Yeah.  My last 11 years of teaching I taught advanced

6  academic honors computer programming and C++ programming,

7  which you may have never heard of but it was advanced at the

8  time C++ programming.

9      I was also, for the last something like ten or 11 years, I

10  was teaching night school at the local junior college and I

11  was taking computer science classes there as well.

12  Q.  Since retiring from teaching have you done any additional

13  employment work?

14  A.  Yes.  In 2018 I happened to volunteer for a campaign

15  manager.  Usually I volunteered for the Democratic party.

16  This particular time, because of some encouragement, I

17  volunteered for a particular campaign manager and we —

18      (Cell phone interruption)

19      I hope that's not me.

20      — we end up — it is me.

21      I did not set a 10:00 a.m. alarm.  I promise.  This is

22  entirely ghost work.

23      Okay.  So I started working for him full time at the end

24  of 218.  So since 2018, during campaign seasons, I have worked

25  for — I'm doing campaign work of various kinds.

ELAINE JONES – DIRECT

1  Q.  And, Miss Jones, are you registered to vote in Texas?

2  A.  Yes, I am.

3  Q.  And how long have you been registered to vote in Texas?

4  A.  Again, I can't give you the year but I came from a family

5  that believed in voting, so whether it was my

6  eighteenth birthday or my twenty-seventh birthday, I don't

7  remember which, but whenever it was my birthday I was there to

8  register and been voting ever sense.

9  Q.  So would you say that was more than ten years ago?

10 A.  At least.

11 Q.  Roughly how long ago would you say?

12 A.  Sixty years probably.

13 Q.  Would you say you're a regular voter?

14 A.  Yes.

15 Q.  And is it important to you to vote?

16 A.  It is very important to me because, as I alluded to a

17 while ago, as teachers we had an expression that we got to

18 elect our bosses.  Not very many people are in that position

19 but the school board members made so many decisions that

20 affect us and legislature and Congress, and I mean like I

21 believe I mentioned class size, but today we're even being

22 told what books we can teach and what topics we can teach and

23 electing what we consider to be the proper people is a

24 continuing concern of mine.

25 Q.  Okay.  I want to shift and to talk a little bit about your

1  more recent voting experiences and in particular I'd like to

2  talk about the elections immediately leading up to the

3  enactment of SB 1, so we'll talk about the general elections

4  in 2016, 2018, and 2020.  Did you vote in those elections?

5  A.  I did.

6  Q.  And by what method did you cast your ballot?

7  A.  I voted by mail.

8  Q.  And what was that experience like for you?

9  A.  Very plain.  Very ordinary.  No problems.

10  Q.  And why did you choose to cast your ballot by mail?

11  A.  Well, one of the reasons that appealed to me was just

12  simply the weather in Texas.  Sometimes it's unbearably hot to

13  stand in line to — and our voting centers keep getting kicked

14  back so the lines are longer, but my main concern was starting

15  in 2018 I was working full time during the campaign, during

16  the very time that we would be voting.

17      So for several months before I would be working seven days

18  a week, ten hours a day.  So to take off time for voting I

19  would be losing time from work.

20  Q.  And would you be paid for the time that you —

21  A.  No, I would not.

22  Q.  And how far from your workplace is your polling place?

23  A.  Okay.  I mentioned that I live in San Patricio County.  My

24  campaign work is in Nueces County.  Now, from one campaign to

25  another, our office space, of course, will move around a

1 | little bit, but in general my house is 25 to 30 miles away
2 | from where my workplace would be.
3 | Q.  Okay.  I want to shift a little bit now and talk about
4 | your voting experiences after –– or actually, before we do
5 | that, one more question.  You said that you would work the
6 | days leading up to the election.  How about Election Day?
7 | A.  Election Day I was still assigned to work, all day.
8 | Q.  So now I'll shift a little bit to the experience after SB
9 | 1 was enacted.  Are you familiar with the Section a 5.08, and
10 | I'll explain, this is the provision of SB 1 which requires
11 | people voting by mail to include either their driver's license
12 | number ––
13 | A.  I'm familiar with that, yes.
14 | Q.  –– or social security under the flap of their mail ballot
15 | envelope?
16 | A.  Yes.
17 | Q.  And why is it that you are familiar with this provision?
18 | A.  During the legislative session we became aware of the fact
19 | that this number regulation, knowing the number that you are
20 | supposed to vote with, we became aware of that fact while it
21 | was being discussed in the legislature.
22 |     We did a little campaigning, don't vote for this, so on
23 | and so forth, but we were following it before it was ever
24 | adopted.  So when it was finally adopted, when it was passed,
25 | we then started campaigning with our members to educate them

ELAINE JONES - DIRECT

1  about this situation.

2  Q.  And who is the "we" that you are referring to there?

3  A.  TARA.

4  Q.  And did you take any part in this?

5  A.  Yes.  I viewed webinars, but the webinars contained

6  PowerPoints and which we could download.  So we would use the

7  PowerPoints to send out.  So I had groups of people that I

8  sent out the PowerPoints to.  I texted links to the PowerPoint

9  to them and I even presented in person the PowerPoints to two

10  different groups.  So I communicated in every way possible.

11  Q.  And in 2022 did you submit an absentee ballot application?

12  A.  Yes, I did.

13  Q.  And when you submitted that application, did it require

14  you to include an identification number on the application?

15  A.  Yes, it did.

16  Q.  And did you do so?

17  A.  Yes.

18  Q.  After receiving your ballot did you submit your absentee

19  ballot, did you return it in that election?

20  A.  I did return it.

21  Q.  And did you run into any trouble in that process?

22  A.  I did.  Again, I'm sorry that I don't remember dates all

23  the way through, but I do remember that on a Wednesday I

24  received in the mail notification that my ballot had been

25  rejected, and to refresh memories, that means I was working

1  all that day.  So I got home, you know, at 8:00 or so, and so

2  I just got the notification very late Wednesday.

3  Q.  And what did that notification tell you?

4  A.  Told me I had forgotten about the numbers.

5  Q.  And what was your reaction to learning that?

6  A.  Humiliated, angry, embarrassed, because I had —— it had

7  been such a focus of mine for weeks and months to notify and

8  for somehow for me to neglect that, it was humiliating.

9  Q.  And if you did successfully fill out the application, why

10  was it that you had this difficulty when you were completing

11  your actual ballot?

12  A.  I went down the ballot from the top to the bottom and I

13  folded it and mailed it off.  I forgot about the numbers being

14  under the flap.

15  Q.  Okay.  And do you think it's possible that you'll make

16  this mistake again in the future?

17  A.  Well, I would have said it was impossible for me to make

18  the mistake the first time, so I'm very hesitant to say that

19  it's impossible for me to make the mistake again.  I can be

20  distracted or whatever, but it's just another hurdle.

21  Q.  So when you found out your ballot was flagged for possible

22  rejection, what steps did you take?

23  A.  Well, when you receive a notification they have a listing

24  of possible ways of what they call curing or correcting your

25  ballot, and the first one on there was using the State's URL

ELAINE JONES — DIRECT

1 to correct it.  And I thought, I'm not scared of computers,

2 I'm going to use the computer system, why not?

3     Now, remember, I received it Wednesday and got home, you

4 know, 8:00, so I'm, you know, later at night that I'm doing

5 this.  So I did it.  Filled out all the forms, thought this is

6 nice.  And then I get at the end and there's a button and I

7 don't remember if it said submit or continue or what it says,

8 but, in other words, it's the final button and you click the

9 button and it says page not found.

10     So I'm willing to take the burden on myself and say, oh, I

11 did something wrong, so I tried it again.  Same thing.  Tried

12 it a third time.  Same thing.

13     So I decided, okay, they were not prepared for the number

14 of people that were using it so I'll give them a break that

15 they just weren't prepared.  And so the next day, remember I'm

16 working a full day the next day, so I get home, and I once

17 again try three times.  Three seems to be my magic number.  I

18 tried three times and I keep getting page not found.

19     So I'm left with on Friday, I'm worried about getting it

20 there on Monday.  So Friday, I don't go into work.  I stay at

21 home.  I fill out the paper form.  I go to the Post office.

22 Post office says, we can't guarantee we can get it there

23 Monday, you know.

24     Well, the second option was for me to travel personally to

25 the county seat.  That's another 30 miles.  So I'm in my town.

ELAINE JONES – DIRECT

1 The county seat is 30 miles that way.  Where I work is, you

2 know, 25, 30 miles that way, and I keep thinking of there and

3 back and there –– apologize –– going around and I'm going

4 that's a whole lot of time.

5     So I said, okay.  I'm going to go over to FedEx.  FedEx

6 could guarantee they could get it there by Monday and I

7 decided to do that and I spent $12.50 so I had that piece of

8 mind that it was going to get there in time.

9 Q.  And I just want to make sure I understand the timing of

10 this.  When you say you got it on Wednesday, what Wednesday

11 that was in relationship to Election Day?

12 A.  Okay.  It was the week before Election Day.

13 Q.  Okay.

14     MR. MOCINE-MCQUEEN:  I think that's it for me for

15 now, Miss Bryant.

16     I pass the witness.

17     THE COURT:  Anything else?

18     MR. MOCINE-MCQUEEN:  I'm sorry.  Miss Jones; I

19 apologize.

20     THE WITNESS:  Okay.

21     THE COURT:  Anything else on this side?

22     Any cross?

23     MR. BERG:  Yes, Your Honor.

24     Zachary Berg from the Office of the Attorney General

25 on behalf of the Attorney General and the Secretary of State.

1 BY MR. BERG:

2 Q.  Good morning, Miss Jones.  Good to see you.

3 A.  Good morning.

4 Q.  You look well.

5 A.  So do you.

6 Q.  Thank you; that's very kind.

7    You testified that you're a member of AFT, correct?

8 A.  Yes.

9 Q.  And you're a member of TARA, correct?

10 A.  Yes.

11 Q.  And you live in and are registered to vote in Portland,

12 Texas, correct?

13 A.  Yes.

14 Q.  And you mentioned that's in San Patricio County, correct?

15 A.  Yes.

16 Q.  And if I represented to you that in July 2022 the Census

17 Bureau estimated San Patricio's population to be just under

18 70,000, would that sound about right?

19 A.  I'm not going to disagree with you.  You're looking at it;

20 I'm not.

21 Q.  You are eligible to vote by mail on the basis of being 65

22 or older, correct?

23 A.  Yes.

24 Q.  And you're not aware of any other basis on which you would

25 be eligible to vote by mail?

ELAINE JONES – DIRECT

1  A.  No.

2  Q.  And you've been voting by mail since 2016, correct?

3  A.  Yes.  To the best of my recollection, yes.

4  Q.  And we appreciate you coming up to San Antonio to see us.

5  Did you drive up?

6  A.  Yes.

7  Q.  And you have no disability that would prevent you from

8  voting in person, correct?

9  A.  No disability yet.  There's time ahead.

10  Q.  But you prefer mail ballot voting, correct?

11  A.  Yes.

12  Q.  You were involved in AFT's voter education efforts,

13  correct?

14  A.  Yes.

15  Q.  And one of those things you educated voters on was how to

16  fill out an application for ballot by mail, correct?

17  A.  Definitely.

18  Q.  And during those trainings you emphasized the part of the

19  application that people forget to fill out, correct?

20  A.  Yes, I did.

21  Q.  You would agree that you understand mail ballots fairly

22  well?

23  A.  I would agree at this moment, yes.

24  Q.  You also did voter education for TARA, correct?

25  A.  Yes.

1  Q.  And that voter education was similar to the education you

2  did for AFT, correct?

3  A.  Yes.

4  Q.  And that would also include doing voter education for TARA

5  on SB 1, right?

6  A.  Yes.

7  Q.  And that voter education also dealt with mail ballot

8  voting, correct?

9  A.  Yes, sir.

10  Q.  And areas a voter might get confused, right?

11  A.  Yes.

12  Q.  Your chapter of TARA also put on webinars on voting,

13  correct?

14  A.  Yes.

15  Q.  And you weren't the main speaker but you prepared those

16  speaking on SB 1 and voting?

17  A.  Well, there were two instances in which I was the speaker

18  making the presentation, but all the rest of the times the

19  ones online I was just a participant.

20  Q.  And sometimes when you were just a participant you would

21  help prepare those speaking on SB 1 and mail ballot voting?

22  A.  To some extent, yes.

23  Q.  You also met with other women's organizations you were a

24  part of and discussed SB 1, correct?

25  A.  Women's organizations?  Like what?

ELAINE JONES - DIRECT

1  Q.  League of Women Voters.

2  A.  I wasn't a member but I certainly would read their

3  publications.  I joined League of Women Voters just a few

4  weeks ago.

5  Q.  Okay.  But did you meet with them and discuss SB 1?

6  A.  I cannot honestly say that I met with them.  Like I said,

7  I read their publications, but I don't remember meeting with

8  them, no.

9  Q.  Would it be helpful to look over your deposition testimony

10  to refresh your recollection?

11  A.  If you have some sort of written documentation, I'm not

12  going to disagree with you.  But what do you have?  A sign in

13  sheet or something?

14          THE COURT:  Is this important?

15          MR. BERG:  No, I'll move on, Your Honor.

16  BY MR. BERG:

17  Q.  And you also testified that you worked for Campaign

18  Services, LLC, correct?

19  A.  Yes.

20  Q.  And as part of that job you emailed out information on how

21  to vote by mail under SB 1, correct?

22  A.  Yes, sir.

23  Q.  So you would agree with me that at the time you filled out

24  your ballot, mail ballot for the March 2022 Primary, you were

25  aware of the ID requirement?

ELAINE JONES - DIRECT

1  A.  Oh, certainly.

2  Q.  And, in fact, you educated others on the ID requirement,

3  correct?

4  A.  Certainly.

5  Q.  I believe when you were speaking with counsel you

6  testified that when you filled out your application for ballot

7  by mail in 2022, you did put down your ID numbers, correct?

8  A.  Yes.

9  Q.  But your application was initially rejected anyway,

10 correct?

11 A.  Yes, it was.

12 Q.  And when you were filling out the application, you were

13 particularly focused on making sure you didn't forget your

14 signature, right?

15 A.  Yes.

16 Q.  And because you were so focused on that, you forgot to

17 indicate that you were eligible to vote by mail on the basis

18 of being 65 or older?

19 A.  Yes.  I didn't consider that had anything to do with our

20 process here since it's not number oriented, but, yes, you're

21 right.

22 Q.  And after you found out your application had been

23 rejected, you drove a replacement application to the elections

24 office, correct?

25 A.  For that particular one, I honestly don't remember how I

ELAINE JONES – DIRECT

1  corrected.  I think I probably drove it, but that was earlier
2  in the campaign and I didn't feel like I was being neglectful
3  of my job at the time.
4  Q.  If you don't remember driving, would you like me to bring
5  up the deposition to refresh your recollection?
6  A.  I do not remember how I corrected that particular problem,
7  don't remember at all, but —
8  Q.  Brian, would you please bring up Miss Jones' deposition.
9  Thank you.
10  A.  Oh, okay.
11  Q.  Would you just review?
12  A.  Okay.  I see it.  Yeah; I'm refreshed.
13  Q.  Let me ask that question again.  So after you found out
14  your application had been rejected, you drove a replacement
15  application to the elections office, correct?
16  A.  Yes.  Drove it to the window so they would approve.  I do
17  remember that now.
18  Q.  And they accepted your application?
19  A.  Yes.
20  Q.  And I believe you also testified that they were very fine
21  people, right?
22  A.  Yes.  At the time.
23  Q.  Now, the signature requirement was not created by SB 1,
24  correct?
25  A.  Say again.

ELAINE JONES - DIRECT

1  Q.  The signature requirements for the application by ballot
2  by mail that you were focused on wasn't created by SB 1,
3  correct?
4  A.  Right.
5  Q.  And the box on the application to indicate your reason for
6  voting by mail, that you inadvertently forgot --
7  A.  Right.  I was concentrating on the numbers.
8  Q.  So the box to indicate your reason, that wasn't
9  implemented by SB 1, correct?
10  A.  I don't believe it was.  I think it's always been there.
11  Q.  Would you agree that sometimes people just forget to fill
12  out part of the ballot?
13  A.  Obviously.  I'm a case in point.
14  Q.  Let's talk about the March 2022 ballot, primary ballot.
15  You testified that you did not put the ID numbers on your
16  ballot, correct?
17  A.  Yes.
18  Q.  And I believe you also testified that you were aware that
19  the ID numbers had to go under the flap of the carrier
20  envelope, correct?
21  A.  I was aware of it moments before I needed to do it.
22  Q.  And you've already testified today that you were upset
23  when you found out why it had been rejected, correct?
24  A.  Right.
25  Q.  And when we met previously I believe you said you pounded

1 yourself on the head, correct, and you did the motion, right?

2 A.  Quite likely, yes.

3 Q.  And the reason you were upset was because you were aware

4 of the ID requirement?

5 A.  Of course.

6 Q.  And you were aware of the ID requirement because of all

7 the trainings you had done for AFT and TARA, right?

8 A.  Yes.

9 Q.  And the county sent you a replacement ballot that you

10 could have filed and mailed in, correct?

11 A.  Yes, if I felt safe with the amount of time.

12 Q.  But you instead tried to use the Ballot Tracker and were

13 unsuccessful?

14 A.  Yes.  Not the Ballot Tracker, the ballot correction.

15 Q.  Ballot correction.  And when your application for ballot

16 by mail was rejected, you drove the replacement to the

17 elections office, correct?

18 A.  Which one are you talking about now?

19 Q.  The application.

20 A.  Yeah, the application, yes.  Yes, because that was earlier

21 in the campaign.

22 Q.  So, theoretically, you could have gone to either carry

23 your ballot in person or vote in person, correct?

24 A.  Theoretically, yes, but my duties at my job had changed

25 from that moment to, you know, the original time to the time

ELAINE JONES - DIRECT

1 of the actual ballot, the amount of jobs I had to perform and

2 people I was responsible for had changed so I was feeling a

3 little more duty-bound to my office.

4 Q.  So you testified that you received the notice of rejection

5 on the Wednesday and you had to have your replacement ballot

6 in by the next Monday, is that right?

7 A.  Yes, it was my imposed deadline.

8 Q.  And I believe you testified that you were working some of

9 the days in between that Wednesday and that Monday, right?

10 A.  Yeah, I was working seven days a week by that point.

11 Q.  Are you aware that the election code guarantees voters two

12 hours off work, either on Election Day, or while early voting

13 is in progress?

14 A.  I was aware of that, but that was something that we took

15 advantage of in situations like being teachers and so on, and

16 not so much with myself as a contract laborer.  It never

17 crossed my mind at that time.  I felt like I was in a

18 different employment world than as was in at other times.

19 Q.  So would it be fair to say that you were aware of that in

20 the election code but you didn't feel comfortable doing it?

21 A.  It was not in my mind at all during that time.  I knew

22 historically, yes, but it was not in my mind at that time so

23 it's not something I chose to ignore.  Just never thought of

24 it.

25 Q.  Your ballot for the March 2022 Primary arrived on time to

1  be counted, correct?

2  A.  Yes.

3  Q.  And you know that because you tracked it on the Secretary

4  of State's Ballot Tracker, correct?

5  A.  Yes.  And I did have a little trouble with that but it

6  took a little longer and I did found out that, yes, my ballot

7  had been counted.  Wasn't as quick an acknowledgment as I

8  would have wished for.

9  Q.  But you were able to figure out —

10  A.  Yes.

11  Q.  — because of your experience with computers?

12  A.  Yes.  Yes.  I learned to be patient.

13  Q.  So your Primary vote was counted, right, and then you

14  voted by mail in the May 7th, 2022 Constitutional Election,

15  right?

16  A.  Yes.

17  Q.  And that ballot was accepted, correct?

18  A.  Yes.

19  Q.  You also voted by mail ballot for the May 24th, 2022

20  Run-off Election, correct?

21  A.  Yes.

22  Q.  And that ballot was also accepted?

23  A.  Yes.  I only trip up once in a while, but I can trip up

24  again.

25  Q.  You voted by mail ballot in the November 2022 General?

1  A.  I did.

2  Q.  And that ballot was accepted, right?

3  A.  It was.

4  Q.  You also have voted by mail ballot in 2023, right?

5  A.  2023?  What, March, or —

6  Q.  Let me clarify.

7  A.  Yeah; let's clarify.

8  Q.  You voted by mail ballot in the May 6, 2023 city council

9  and school board bond election, correct?

10  A.  Yes.

11  Q.  And that ballot was accepted, right?

12  A.  Yes.

13  Q.  Miss Jones, you have not been criminally charged with

14  violating SB 1, correct?

15  A.  No.

16  Q.  And you have not been assessed a civil penalty for

17  violating SB 1, correct?

18  A.  I have not.

19        MR. BERG:  Thank you for your time.

20        Pass the witness.

21        THE COURT:  Anything else on this side?

22        MR. LIU:  No questions.

23        THE COURT:  Any further redirect?

24        MR. MOCINE-MCQUEEN:  No, Your Honor.  Thank you.

25        THE COURT:  Miss Jones, you may step down.  Thank

1  you, ma'am.

2          Let's take a 10- or 15-minute break.

3     *(Recess)*

4          THE COURT:  Your next witness.

5          MISS LORENZO:  LULAC plaintiffs call Alice Penrod to

6  the stand.  Miss Penrod is here testifying as an injured

7  member and a voter of AFT.  She will provide support for the

8  LULAC plaintiffs challenges to SB 1 Section 5.08.

9     (ALICE PENROD, having been duly sworn, testified as

10  follows:)

11                    DIRECT EXAMINATION

12  BY MISS LORENZO:

13  Q.  Good morning, Miss Penrod.  Could you please state your

14  full name for the record.

15  A.  Alice Lee Penrod.

16  Q.  And where do you live?

17  A.  I live in San Antonio.

18  Q.  San Antonio, in Bexar County?

19  A.  Yes, ma'am.

20  Q.  How long have you lived in San Antonio?

21  A.  Since -- well, over 20 years but recently moved back

22  April 2018.

23  Q.  Have you lived in Texas your whole life?

24  A.  Yes.

25  Q.  And how old are you, Miss Penrod?

ALICE PENROD – DIRECT

1   A.   Sixty-seven.

2   Q.   Who do you live with in San Antonio?

3   A.   I live with my husband and my mother.

4   Q.   How old is your mom?

5   A.   She's 92.

6   Q.   How long has she lived with you?

7   A.   Since July of 2019.

8   Q.   Are you then her primary caretaker?

9   A.   Yes.

10  Q.   What does that look like?

11  A.   Well, she doesn't drive anymore so I take her to all of

12  her appointments, and, you know, do anything she needs me to

13  do for her.

14  Q.   Does she have any issues moving around, or anything like

15  that?

16  A.   Yes.  She is unable to stand for long periods of time so

17  our outings are pretty short but she still likes to go.

18  Q.   And you also said you live with your husband.  How old is

19  he?

20  A.   He's 70.

21  Q.   How long have you two been married?

22  A.   Almost 27 years November.

23  Q.   Congratulations on that.  Are you retired, Miss Penrod?

24  A.   Yes.

25  Q.   When did you retire?

ALICE PENROD — DIRECT

1  A.  Retired in June of 2011.

2  Q.  What did you do before you retired?

3  A.  I was a public school teacher.

4  Q.  What did you teach?

5  A.  I have taught kinder, first, fourth, and sixth grade.

6  Q.  What is the reason that you became a teacher?

7  A.  Well, I've always enjoyed working with children from an

8  early age and in high school I taught Sunday school, I was a

9  camp counselor, those types of things, so it was just a

10  natural desire to be a teacher.

11  Q.  You mentioned that you are retired, but are you a member

12  of any organizations?

13  A.  Yes, I'm a member of AFT.

14  Q.  AFT stands for the Texas chapter of the American

15  Federation for Teachers, correct?

16  A.  Yes.

17  Q.  How long have you been a member of AFT?

18  A.  Since 2005.

19  Q.  What made you get involved with AFT?

20  A.  Well, when I first started teaching I taught here in San

21  Antonio and I was a member of NEA National Education

22  Association.  We moved to the Rio Grande Valley and when I

23  started teaching there they did not have NEA so I joined AFT

24  there.

25  Q.  And NEA and AFT are both — are they unions?

ALICE PENROD - DIRECT

1   A.  Yes.

2   Q.  Why did you feel it was important to join both of those

3   unions?

4   A.  I feel that they are good advocates for teachers.  You

5   know, we, as teachers, are pretty busy teaching and don't have

6   a lot of time to advocate for things like, you know, classroom

7   size, duty-free lunch, things like that, and so it's very

8   helpful to have a union that can advocate for those types was

9   things.

10  Q.  Thank you.  I'd like to talk to you now a bit more about

11  your experiences with voting.  Are you registered to vote in

12  Texas?

13  A.  Yes.

14  Q.  How long have you been voting in Texas?

15  A.  Since 1974.

16  Q.  Is that when you turned 18?

17  A.  Yes.

18  Q.  Do you vote regularly?

19  A.  I do.

20  Q.  Would you say that voting is important to you?

21  A.  Yes.  I think it's my civic duty, so I've always voted as

22  soon as I was able.

23  Q.  Did you vote during the March 2022 Primary?

24  A.  I did.

25  Q.  How did you vote during that Primary?

ALICE PENROD – DIRECT

1  A.  I voted by mail.

2  Q.  Was that your first time voting by mail, or —

3  A.  Yes.  It was my first time because I was finally eligible

4  by age to vote by mail.

5  Q.  So is that the only reason that you decided to vote by

6  mail that election?

7  A.  No.  We were just coming out of the pandemic.  My mother

8  was 90 at the time.  We tried to limit exposure outside the

9  home for her as much as possible so we all discussed it and we

10  were all eligible as a family.  We thought it would just be

11  the better part of valor to easily vote by mail, we thought.

12  Q.  I was going to ask.  As someone who had never voted by

13  mail before, what did you expect that experience to be like?

14  A.  I thought it would be very straightforward and easy.  You

15  know, we applied for the mail-in ballots and we received them,

16  filled them out, I took them to the post office, stamped,

17  mailed, but turned out to not be that straightforward.

18  Q.  And why not?

19  A.  A couple of weeks later I received a letter, form letter,

20  stating that my ballot had not been accepted.  It told me I

21  could go online to a website, state website, and fix the

22  problem on the ballot.  So that's what I did.

23  Q.  Now, do you know why your ballot was rejected?

24  A.  Yes.  I failed to put my driver's license or my social

25  security number on the carrier envelope under the flap.

ALICE PENROD – DIRECT

1  Q.  And you alluded to this, but in order to receive your mail
2  ballot you had to apply to vote by mail, is that correct?
3  A.  Yes.
4  Q.  Do you remember when you applied to vote by mail?
5  A.  I'm sure –– I don't remember exactly, but I think it was
6  probably at least a month before the election.
7  Q.  And did you have any issues with your application?
8  A.  No.
9  Q.  And turning back to your 2022 Primary ballot, when did you
10  learn that your ballot had been rejected?
11  A.  About two weeks after I mailed it.
12  Q.  And you said you were notified with a letter, is that
13  correct?
14  A.  Yes.
15  Q.  How did you feel when you learned that your ballot had
16  been rejected?
17  A.  I was pretty mad.  I was horrified that my vote had not
18  counted, and, you know, this was supposed to be a very secure,
19  easy way to vote.  And it was not.
20  Q.  What did you do once you learned that your ballot had been
21  rejected?
22  A.  I went online to hopefully make the corrections that
23  needed to happen.
24  Q.  Were you ultimately able to cure your ballot?
25  A.  Yes.  I had to keep checking back.  I would say about two

1 weeks before it was finally noted on the screen that it was

2 finally accepted.

3 Q.  How did you feel about the whole process of updating your

4 ballot online?

5 A.  I was a little frustrated.  I wasn't sure -- you know,

6 after I actually went online and made the corrections, it

7 didn't immediately tell me that my ballot was accepted so I

8 had to wait some more and I didn't know if it was ever going

9 to be accepted.  So that was a little frustrating.

10 Q.  Was your ballot the only ballot in your household that was

11 rejected?

12 A.  No.  My husband's was rejected as well.

13 Q.  Was that also your husband's first time voting by mail?

14 A.  Yes.

15 Q.  Did he have any issues with his application to vote by

16 mail?

17 A.  No.

18 Q.  Now, Miss Penrod, did you vote again after your experience

19 in the March 2022 Primary?

20 A.  I did.

21 Q.  In which election?

22 A.  I think there was a Run-off in May.

23 Q.  Did you vote in the November 2022 —

24 A.  I voted in the November General Election as well.

25 Q.  For the November General Election did you vote by mail?

ALICE PENROD - DIRECT

1  A.  No.

2  Q.  Why not?

3  A.  I just didn't trust it.  I made sure that I got to the

4  polling place.

5  Q.  Did your mom go with you to the polling place?

6  A.  Yes.  We had discussed it as a family.  We were all pretty

7  taken aback as to, you know, being — ballot not being

8  automatically accepted and obviously we had made mistakes so

9  we decided as a family to go to the polling place.

10 Q.  And what was that experience like?

11 A.  Well, it was in November.  It was raining.  We decided to

12 go to early voting because our polling place is usually pretty

13 crowded.  It's a very popular polling place.  So we didn't

14 want my mom to have to stand in line very long, if possible.

15     We got up early.  Went as early as we could.  You know,

16 right before it opened.  As I said, it was raining, so we took

17 our umbrellas.  The line wasn't too long.  We took a folding

18 chair in the car just in case my mom needed to sit down, you

19 know, if the line was long.

20     So we were fortunate, while standing in line, that a poll

21 worker did come out, walked the line, and saw my mother with

22 her cane and took her on in so she didn't have to stand in

23 line very long.

24 Q.  Did you and your husband wait in line then?

25 A.  Yes, we waited in line.

ALICE PENROD — CROSS

1  Q.  Did you have any delays in casting your ballot?

2  A.  Yes.  We didn't realize that because we had voted in the

3  Primary by mail they automatically send us a ballot in the

4  mail for the General Election, and we didn't realize we needed

5  to take that with us to the polling place.

6      So we were pulled aside and one of the poll workers called

7  the Clerk's Office to make sure that it was negated or

8  whatever they needed to do to make sure we could go ahead and

9  vote while we were there.

10 Q.  Understood.  Miss Penrod, would it have been overall less

11 burdensome for you and your family if you had voted by mail?

12 A.  Definitely, yes.

13 Q.  But given the current requirements to vote by mail, do you

14 think you'll ever feel comfortable voting by mail again?

15 A.  I don't think so.  As long as I'm able, I think I'm going

16 to go to the polls.

17          MISS LORENZO:  Thank you, Miss Penrod.

18          I pass the witness.

19          THE COURT:  Anything else on this side?

20          Any cross?

21          MR. SZUMANSKI:  Yes, Your Honor.

22                    CROSS-EXAMINATION

23 BY MR. SZUMANSKI:

24 Q.  Good morning, Miss Penrod.

25 A.  Good morning.

ALICE PENROD — CROSS

1  Q.  Good to see you.  My name is Ethan Szumanski and I'm an

2  attorney with the Office of Attorney General in Texas.  I

3  represent the State of Texas, the Secretary of State's Office

4  and the Attorney General's Office.

5      Before I start, I do want to thank you for your service as

6  a teacher.  My brother is an elementary teacher, so I thank

7  you for your service to those kids.

8      Now, I do want to talk about a few topics, okay?

9  A.  Okay.

10 Q.  So as you mentioned on direct, you believe that voting is

11 important, right?

12 A.  Yes.

13 Q.  Now, you don't disagree with all voting requirements,

14 right?

15 A.  No, I don't disagree with all voting requirements.

16 Q.  Right.  And you believe that a voter should be able to

17 show that they are otherwise eligible to vote in order to

18 engage in that voting process, right?

19 A.  Yes.

20 Q.  Such as through presenting some form of identification,

21 right?

22 A.  Yes.

23 Q.  Now, you talked about two different elections, the

24 March 2022 Primary — actually, you talked about several, I

25 believe, some elections in 2022, right?

ALICE PENROD - CROSS

1  A.  Yes.

2  Q.  Well, let's go through some of those.  We'll take them one

3  by one.  So the March 2022 Primary.  You decided to vote by

4  mail for the first time in March 2022?

5  A.  That's correct.

6  Q.  And to do that you went online and you got an application

7  for ballot by mail?

8  A.  Yes.

9  Q.  You printed it out, you filled it out, and you sent it

10 back in?

11 A.  I did.

12 Q.  And after you did that, you got your mail ballot?

13 A.  Yes.

14 Q.  And just like you did with the application, you filled out

15 your mail ballot and sent that back in?

16 A.  Yes.

17 Q.  And then you got a letter notifying you that it was

18 initially rejected?

19 A.  Yes.

20 Q.  Now, you don't actually know why your mail ballot was

21 initially rejected, right?

22 A.  I do.  I do know.

23 Q.  Has that always been your testimony?

24 A.  No.  I didn't know at the time but I have found out since

25 that I failed to put either my driver's license or my social

1  security number on the carrier envelope.

2  Q.  So you just recently found out why your mail ballot was

3  rejected?

4  A.  Yes.

5  Q.  Okay.  Well, you would agree with me that when you found

6  out your mail ballot was initially rejected you got a letter

7  notifying you about how to cure that mail ballot, right?

8  A.  That's correct.

9  Q.  And you are aware that SB 1 created a provision that

10  allowed this texasvote.org or Ballot Tracker, where you could

11  go online and cure your ballot, right?

12  A.  I didn't know that that law created that but I was able to

13  use it.

14  Q.  And so you were able to go to texasvote.org and cure your

15  mail ballot?

16  A.  Yes.

17  Q.  So you would agree with me that you were ultimately able

18  to vote successfully by mail during the March 2022 Primary?

19  A.  Yes, eventually.

20  Q.  Now, you also voted in subsequent elections in 2022, such

21  as the May Primary Run-off?

22  A.  Yes.

23  Q.  Okay.  Let's talk about those.  You voted in person for

24  those elections?

25  A.  Yes.

ALICE PENROD - CROSS

1  Q.  And you didn't have any issues voting in person for those
2  May 2022 elections?
3  A.  No.
4  Q.  Okay.  Then you voted in person for the November 2022
5  General Election?
6  A.  Yes.
7  Q.  And, as you mentioned on direct, you took your mom and
8  your husband with you to the polls for the November 2022
9  Election?
10 A.  Right.
11 Q.  Now, when you got to the polls, you were notified that you
12 did not bring your mail-in ballot to the polls?
13 A.  Yes, that's correct.
14 Q.  So what happened after that was they had to make a few
15 calls and see if you could vote in person at the polling
16 location, right?
17 A.  Yes.
18 Q.  After they made those calls, they handed you a physical
19 ballot, right?
20 A.  That's correct.
21 Q.  And then you voted in person?
22 A.  Yes.
23 Q.  So it's fair to say that you were ultimately able to vote
24 successfully during the November 2022 General Election?
25 A.  Yes.  Eventually, yes.

ALICE PENROD — CROSS

1    MR. SZUMANSKI:  Thank you, Miss Penrod, for your

2  time.  I appreciate it.  And again, thank you for your

3  service.

4    No further questions at this time.

5    THE COURT:  Anything else on this side?

6    MR. LIU:  No questions.

7    THE COURT:  Anything else?

8    MISS LORENZO:  No further questions, Your Honor.

9    THE COURT:  Thank you, ma'am.  You may step down.

10    And your next witness.

11    MISS TULIN:  Your Honor, the plaintiffs call

12  Christina Adkins.

13    THE COURT:  This will be on what issues?

14    MISS TULIN:  Your Honor, the LUPE plaintiffs will

15  be — will elicit testimony from Miss Adkins that will support

16  all of the claims in this case.  I also expect that some of my

17  friends on this side will have additional questions after I

18  pass the witness.

19    THE COURT:  Miss Adkins.

20    MISS TULIN:  Your Honor, I request permission to ask

21  leading questions under Federal Rule of Evidence 611(c)(2)

22  because Miss Adkins is a witness identified with an adverse

23  party.

24    THE COURT:  Any response?

25    MISS HUNKER:  No objection.

1    THE COURT:  You may proceed.

2    (CHRISTINA ADKINS, having been duly sworn, testified as

3 follows:)

4                    DIRECT EXAMINATION

5 BY MISS TULIN:

6 Q.  Good morning, Miss Adkins.

7 A.  Good morning.

8 Q.  Can you please state your full name for the record?

9 A.  Yes.  My name is Christina Worrell Adkins.

10 Q.  Thank you.  Let's start with some background information.

11 You earned an undergraduate degree from the University of

12 Texas at Austin, right?

13 A.  That's correct.

14 Q.  And then you went to SMU, Southern Methodist University,

15 for law school?

16 A.  That's correct.

17 Q.  My grandmother wanted me to go there for law school.

18    After law school, you did some contract work and then you

19 worked at the Texas Workforce Commission?

20 A.  I did.

21 Q.  And then you began working for the Elections Division in

22 the Texas Secretary of State's Office in June of 2012, is that

23 right?

24 A.  That's correct.

25 Q.  At first you ran the certification program for voting

1  systems?

2  A.  When I first started with the Secretary of State's Office,

3  I was an attorney in the Elections Division, a staff attorney,

4  and one of the duties that I did there, or one of my duties at

5  the time was to oversee the certification program for

6  electronic voting system equipment.

7  Q.  Thank you for clarifying that.  And in December of 2017

8  you became the legal director of the Elections Division, is

9  that correct?

10  A.  That's correct.

11  Q.  As the legal director for the Elections Division, you

12  oversaw the division's legal staff?

13  A.  Yes.

14  Q.  And in early March of 2023 you became the Acting Director

15  of Elections?

16  A.  That's correct.

17  Q.  And on April 26, 2023 you were officially named Director

18  of Elections?

19  A.  I was.

20  Q.  Congratulations.  The Director of Elections oversees the

21  entire Elections Division for the Secretary of State's Office,

22  is that right?

23  A.  That's correct.

24  Q.  And in your role of Director of Elections, you report to

25  the Deputy Secretary of State?

CHRISTINA ADKINS — DIRECT

1  A.  That's correct.

2  Q.  And then beyond that you report directly to the Secretary

3  of State, Jane Nelson?

4  A.  Yes.

5  Q.  And during the period of time that you served as the

6  acting Director of Elections, the Legal Director position

7  remained unfilled, is that right?

8  A.  That's correct.

9  Q.  And so during that time you were fulfilling the roles of

10  both the Director of Elections and the Legal Director?

11  A.  Yes, I was.

12  Q.  Before you took over as Acting Director, the Director of

13  Elections was Keith Ingram?

14  A.  That's correct.

15  Q.  And you took over as Acting Director after Mr. Ingram was

16  relieved of his duties?

17  A.  That's correct.

18  Q.  When you were legal director Keith Ingram was your direct

19  supervisor, is that right?

20  A.  That's right.

21  Q.  And Mr. Ingram still works for the Secretary of State's

22  Office doing special projects?

23  A.  He does not.

24  Q.  When did he leave the Secretary of State's Office?

25  A.  His — the end of his employment was, I believe, the end

CHRISTINA ADKINS – DIRECT

1  of August, August 31st I think was his last day officially

2  with the State.

3  Q.  Okay.  For a period of time after he was relieved of his

4  duties and you took over as the Director of Elections, though,

5  he did work for the Secretary of State's Office?

6  A.  That's correct, yes.

7  Q.  And during that time he was doing special projects?

8  A.  That's correct.

9  Q.  Okay.  And for that period of time he reported directly to

10  you?

11  A.  Yes.

12  Q.  Okay.  Thank you.  Let's zoom out for a moment and talk

13  about the Office of the Texas Secretary of State.  The Texas

14  Secretary of State is one of six officials named in the Texas

15  Constitution forming the executive department of the State, is

16  that right?

17  A.  Yes, ma'am.

18  Q.  And the Secretary of State is appointed by the governor of

19  Texas and confirmed by the Texas Senate?

20  A.  Correct.

21  Q.  Among other things, the Secretary of State is the Chief

22  Election Officer for the State of Texas?

23  A.  That's correct.

24  Q.  And the Elections Division is responsible for

25  administering the Texas Election Code, correct?

CHRISTINA ADKINS – DIRECT

1  A.  Among other things, yes.

2  Q.  And the Texas Election Code is the law of the land for

3  Texas voters, elections, voting systems, candidates, and

4  political parties?

5  A.  I would say the election code in conjunction with a number

6  of other laws that also address election-related issues, may

7  not be found in the election code but do speak to elections.

8  Q.  Okay.  And will you believe me if I say that I took that

9  language from the Texas Secretary of State's website?

10  A.  Sure, yes.

11  Q.  The Elections Division maintains more than 16 million

12  voter registration records on behalf of the State?

13  A.  That's correct.

14  Q.  And the division also provides election-related calendars?

15  A.  Yes.

16  Q.  And that entails explaining all the relevant dates and

17  deadlines and requirements leading up to uniform election

18  dates, right?

19  A.  Yes, and the Primary Election.

20  Q.  And the division also handles Primary Election funding?

21  A.  Yes.

22  Q.  You agree that the Elections Division provides general

23  support to the election community in Texas?

24  A.  Absolutely.

25  Q.  And that includes providing assistance and advice to

CHRISTINA ADKINS – DIRECT

1  election officials on the proper conduct of elections?

2  A.  As much as we can, yes.

3  Q.  But elections in Texas are run by the counties, not the

4  State, correct?

5  A.  That's correct.

6  Q.  Okay.  The Elections Division, though, is charged with

7  maintaining and obtaining uniformity in the administration of

8  elections and the laws relating to elections in Texas, right?

9  A.  Correct, and that's straight from the Texas Election Code.

10  Q.  And conducting elections uniformly across the state is

11  meant to protect voters?

12  A.  Yes.

13  Q.  But it's also important for counties to retain local

14  control of elections?

15  A.  Yes, that's the way our system is set up.

16  Q.  Because what works in Harris County may not work in Loving

17  County?

18  A.  Absolutely.

19  Q.  The Elections Division, though, does provide guidance to

20  counties on best practices?

21  A.  Yes.

22  Q.  Okay.  Let's focus a little bit more on the advice and

23  assistance that you provide to election officials.  The

24  division provides legal interpretations of election laws to

25  election officials, right?

CHRISTINA ADKINS – DIRECT

1 A.  Yes, when appropriate.

2 Q.  And sometimes the division issues formal legal opinions?

3 A.  Rarely do we issue legal opinions.  It's been a practice

4 that's done in the past.  Not so much today.

5 Q.  It used to happen more frequently?

6 A.  Correct.

7 Q.  But it's only happened once or twice since you've been at

8 the Secretary of State's Office, right?

9 A.  That's correct.

10 Q.  The Elections Division also sometimes issues election

11 advisories?

12 A.  Yes.  We do that much more frequently.

13 Q.  And your advisories are disseminated in emails to county

14 officials through an email distribution list?

15 A.  Yes, and posted on our website.

16 Q.  You anticipated my next question.

17     For example, your office issued an election advisory about

18 the changes to the poll watcher provisions contained in SB 1,

19 do you recall that?

20 A.  Yes.

21 Q.  Okay.  Let's take a look at what has been admitted as LUPE

22 232.  And this will appear on your screen but I do have a

23 binder, if you would like to have hard copies.  Just let me

24 know.

25 A.  The screen is fine.

1  Q.  Okay.  And so this is an advisory that was issued by your

2  office in February of 2022, correct?

3  A.  It appears to be, yes.

4  Q.  And do you know, is this the version that would be posted

5  on your website?

6  A.  It should be.

7  Q.  And this was also disseminated to county officials via

8  email, correct?

9  A.  That's correct.

10  Q.  And you decided to issue an advisory about this in

11  particular because of the number of questions that your office

12  was receiving about the new poll watcher provisions, do you

13  agree with that?

14  A.  I would agree that that's part of why we decided to issue

15  it.

16  Q.  Okay.  The division also offers more informal advice and

17  assistance to election officials?

18  A.  That's correct.

19  Q.  Sometimes that happens through email?

20  A.  Yes.

21  Q.  And sometimes through phone calls?

22  A.  Correct.

23  Q.  Okay.  Let's now — Derek, you can pull that one down and

24  let's pull up what has been marked as State 143, please.

25      And I'll give you a minute, Miss Adkins, to look at this

1 email.  It's two pages.

2 A.  May I see the second page.  And can we scroll back up to

3 on the top again, please.  Okay.

4 Q.  Thank you, Derek.

5    So this is an email chain between Charles Pinney and

6 Daniel Hayes, correct?

7 A.  That's correct.

8 Q.  And Mr. Pinney was an attorney in the Elections Division,

9 is that correct?

10 A.  Yes.  He's currently an attorney with the Elections

11 Division.

12 Q.  And he was also an attorney at the time of this email in

13 September of 2020?

14 A.  Yes.

15 Q.  And you supervised Mr. Pinney at this time, correct?

16 A.  Yes.

17 Q.  And at the time of this email exchange, Dan Hayes was the

18 Assistant Director of the Travis County Clerk's Office?

19 A.  Assistant Director for Elections, yes.

20 Q.  Thank you.  And at the bottom of the first page, if you

21 can take a look, Mr. Hayes references a phone conversation

22 between himself and Mr. Pinney, do you see that?

23 A.  I do.

24 Q.  And then the top of this email is a response from

25 Mr. Pinney?

CHRISTINA ADKINS - DIRECT

1  A.  I see that.

2  Q.  And so this is an example of the Elections Division

3  providing advice and assistance to a county election official,

4  correct?

5  A.  I would agree with that.

6  Q.  Okay.  Great.  We can take that down.

7     So shifting gears away from your office's work with

8  election officials for a moment, the Elections Division also

9  offers advice and assistance to political candidates?

10 A.  Yes, among others.

11 Q.  You also provide advice and assistance to voters?

12 A.  We do.

13 Q.  Or anyone else who reaches out to the division?

14 A.  That's correct.

15 Q.  The Elections Division has no set policy for determining

16 how to respond to fact-specific questions from voters, is that

17 fair?

18 A.  That's correct.

19 Q.  And the Elections Division has no set policy for

20 determining how to respond to questions regarding how to

21 interpret or apply specific provisions of law?

22 A.  I think it depends on the specific issue.  There may be

23 times where we have particular issues that are arising and we

24 may want to make sure we have a more uniform response, and so

25 depending on the particular issue we may request that certain

CHRISTINA ADKINS – DIRECT

1   inquiries be presented to us in writing, or that they, you

2   know, provide us some additional facts before we can issue a

3   response.

4   Q.  Can we agree that there's not a formal process?

5   A.  I think I can agree with that.

6   Q.  So sometimes an attorney from your division will just

7   answer the question directly?

8   A.  Yes.

9   Q.  And sometimes you convene and discuss as a group?

10  A.  That's correct.

11  Q.  And sometimes administrative staff reviews in response to

12  voter inquiries?

13  A.  Yes, when they are routine inquiries where we typically

14  discussed a response or just are providing information that's

15  available on our website or publicly available information.

16  Q.  And the Elections Division also reviews and responds to

17  election complaints, right?

18  A.  That's correct.

19  Q.  And that means anytime someone doesn't like something with

20  an election they can email or fill out a complaint form?

21  A.  That's correct.

22  Q.  And whenever you get a complaint, you take a look at it

23  and you respond?

24  A.  Yes.  There is a process within the division by which we

25  review complaints and determine how we respond to them.

CHRISTINA ADKINS — DIRECT

1  Q.  And at least when Mr. Ingram was the Director of Elections

2  that process was the complaints would go to him and he would

3  indicate what the disposition should be?

4  A.  That's correct.

5  Q.  And the election code criminalizes certain acts, right?

6  A.  Yes.  There are some criminal — there are provisions that

7  have criminal elements to them, yes.

8  Q.  And the code also addresses what the Elections Division

9  calls irregularities, which are deviations from the law but

10  not criminal?

11  A.  That's correct.

12  Q.  And you would agree that most of the complaints that the

13  office receives are about irregularities, as opposed to

14  criminal conduct?

15  A.  Absolutely, yes.

16  Q.  But your office doesn't track or log complaints, is that

17  right?

18  A.  If it's a formal complaint submitted to us in one of our

19  complaint forms, then we do track and monitor and log our

20  responses to that.  We may get general inquiries, phone calls,

21  where people are making allegations, emails, if it's an email

22  and there is a response, we will retain that response.

23      It depends on how formalized that complaint is.

24  Q.  But if you just get a call, you're not logging calls?

25  A.  That's correct.  Our call volume in general is just too

1  high in order to log calls.

2  Q.  Okay.  Let's talk briefly about forms.

3  A.  Wonderful.

4  Q.  I thought you might be excited about that.

5     Chapter 31 in the election code says that the Secretary of

6  State is responsible for prescribing official forms, correct?

7  A.  It definitely says that.

8  Q.  And SB 1 includes specific requirements about what

9  language must be on some of those forms, would you agree with

10 that?

11 A.  I believe so.  There's other provisions in the election

12 code that speak to that as well.

13 Q.  And you agree that some of those provisions require a lot

14 of information to be included on forms, right?

15 A.  Absolutely.

16 Q.  And sometimes you solicit feedback from county election

17 officials about forms, is that right?

18 A.  Fairly regularly, yes.

19 Q.  Okay.  And one of the ways that historically you have

20 gotten that type of feedback is through the CEO Advisory

21 Group, is that right?

22 A.  That's correct.

23 Q.  And the CEO Advisory Group is a group of election

24 officials that meets on a regular basis to discuss the needs

25 of the election community?

CHRISTINA ADKINS – DIRECT

1  A.  That's correct.  Specifically county election officials.

2  Q.  And the group was formed in response to the COVID-19

3  pandemic?

4  A.  Yes, it was.

5  Q.  And it was your idea to form that group, right?

6  A.  It was.

7  Q.  And you were also the person who initially decided which

8  county should participate in that group, right?

9  A.  Yes, in conjunction with, you know, other folks in my

10 office with, you know, discussions we had with other people.

11 Q.  Okay.  Let's take a look at what has been marked as LUPE

12 292.  And, again, if you would like a hard copy to flip

13 through, this one is a sort of lengthy email.

14 A.  Um-hum.

15 Q.  So actually maybe I will —

16        MISS TULIN:  Your Honor, may I approach the witness?

17        THE COURT:  You may.

18 BY MISS TULIN:

19 Q.  Just for ease of reference I'm going to show you this.

20 A.  I'm familiar with the email.

21 Q.  So I know you said you are familiar with it, but I'll just

22 give you a moment to take a look at it.

23 A.  Okay.

24 Q.  And then if I can focus your attention on the fifth page

25 of the document.  And I apologize, it doesn't have page

CHRISTINA ADKINS – DIRECT

1 | numbers included on it.

2 | A.  I see.

3 | Q.  Okay.  And so this is an email from you to the CEO

4 | Advisory Group summarizing what was discussed on a phone call

5 | on June 23rd, 2021, correct?

6 | A.  That's correct.

7 | Q.  And the second item on that list mentions a draft ABBM

8 | form, right?

9 | A.  That's correct.

10 | Q.  And you and I both understand that ABBM stands for

11 | Application for Ballot By Mail, right?

12 | A.  It does, yes.

13 | Q.  And so this is an example of you soliciting feedback from

14 | county election officials about a form?

15 | A.  That's correct, yes.

16 | Q.  Okay.  And, specifically, you ask the CEO Advisory Group

17 | for questions, concerns, or suggested edits?

18 | A.  That is correct, yes.

19 | Q.  And then if you look back on page 4 at the next email in

20 | the chain, there's a response from Frank Phillips, do you see

21 | that?

22 | A.  I see that.

23 | Q.  Okay.  And Mr. Phillips is the Denton County Elections

24 | Administrator, right?

25 | A.  He is the Denton County Elections Administrator, yes.

CHRISTINA ADKINS - DIRECT

1   Q.  And his office suggested some changes to this form, is

2   that right?

3   A.  They did.

4   Q.  And then the next email in time is from Christopher Davis,

5   is that right —

6   A.  Correct.

7   Q.  — that would be on the first page?

8       And Mr. Davis was of Elections Administrator for

9   Williamson County, is that right?

10  A.  That's correct.

11  Q.  And Mr. Davis said, "Agree with Frank?"

12  A.  Yes.

13  Q.  And you agree that Mr. Davis was expressing agreement with

14  the suggestions that had been made in that previous email by

15  Mr. Phillips?

16  A.  Yeah, suggestions that we actually implemented too.

17  Q.  And turning to the second page, he wrote, "Did y'all

18  misplace your copies of these?"

19  A.  Yes, he did.

20  Q.  And then he pasted below — pasted below that message are

21  photographs or screenshots of a field guide to ensuring voter

22  intent, is that right?

23  A.  Yes.  I think he got those from me.

24  Q.  Okay.  The Elections Division doesn't have a process to

25  validate that every county is using the most updated version

1 of its forms, does it?

2 A.  That's correct.  You know, we post our forms on our

3 website with dates indicating when their last revisions

4 occurred.  We work with vendors to make sure, you know, any

5 new vendors have the most version of the form, but we can't

6 personally validate that all 254 counties are using that,

7 those most recent versions.

8 Q.  And you are aware that at least some counties use outdated

9 forms in the March 2022 Primary, is that right?

10 A.  That's correct, from what I recall.

11 Q.  Okay.  Let's focus a little bit more specifically on the

12 ballot-by-mail process.  You are familiar, I assume, with the

13 changes to the ballot-by-mail requirements included in SB 1?

14 A.  Yes, ma'am, very familiar.

15 Q.  Probably more familiar than me at this point.

16 A.  That's possible.

17 Q.  Neither the ABBM nor the carrier envelope instructs voters

18 to list multiple numbers, is that correct?

19 A.  That's correct.

20 Q.  Okay.  The forms generally instruct the voters to list

21 their driver's license number, and if they do not have one to

22 put down the last four digits of their social security number?

23 A.  That's correct, as consistent with what the law says.

24 Q.  And your office reviewed county inserts recommending that

25 voters put both their driver's license number and social

1  security number on the ABBM, is that right?

2  A.  Yes.

3  Q.  Okay.  And your office approved inserts for application

4  materials recommending that both types of ID numbers be

5  listed?

6  A.  Yes.  And I don't believe that was a form we had to

7  approve, but many of the counties asked us to review them.

8  Q.  And that included Bexar County's insert?

9  A.  That's correct.

10 Q.  And you, your office, communicated with counties to

11 indicate that an insert was an option, correct?

12 A.  Absolutely.

13 Q.  And the Elections Division considered designing a standard

14 insert to recommend providing both numbers, is that right?

15 A.  That's correct.

16 Q.  And if we can take a look at what is in evidence as LUPE

17 170, and that's behind the next tab in your binder, Miss

18 Adkins.  And Miss Adkins, this is an email exchange between

19 you and Miss Callanen from April of 2022, do you agree?

20 A.  I agree.

21 Q.  And Miss Callanen is the Elections Administrator for Bexar

22 County?

23 A.  That's correct.

24 Q.  And so as early as April 2022 you, your office, was

25 working on a separate insert to provide as part of the ABBM,

CHRISTINA ADKINS — DIRECT

1  is that right?

2  A.  Correct.

3  Q.  And that was never finalized, is that right?

4  A.  To my knowledge, no, it was not finalized.

5  Q.  Okay.  And your office doesn't have any plans currently to

6  change any official forms or include any inserts to include

7  advice or suggest that both application — both — excuse

8  me — both identification numbers are included, is that right?

9  A.  At this point we don't have any plans to revise some of

10  the official documentation and some of that is by request of

11  our county election officials that didn't want us changing

12  anything this close to a big election.

13      As far as creating some additional forms, you know, I

14  wouldn't say that that's never — that's completely off the

15  table, we just, we kind of have to see how things play out the

16  next few weeks.

17  Q.  Well, do you remember that you were deposed in April 2023

18  of this year?

19  A.  Yes.

20  Q.  And at that point your office didn't have any plans to

21  change any of the official forms either, is that right?

22  A.  Well, that's because we were in the middle of a

23  legislative session and I wasn't going to commit to making any

24  changes until we had some resolution on potential statutory

25  required changes.

1  Q.  And so you didn't have plans then and now you don't have
2  plans because it's close to the election, is that right?
3  A.  That's correct.
4  Q.  And you have also not spoken to any counties about their
5  future plans with regard to inserts that advise voters to list
6  more than one ID number, do you agree?
7  A.  I would agree with that.
8  Q.  And you don't have any way of knowing how many counties
9  provided inserts regarding the ID requirement for ABBMs, do
10  you agree with that?
11  A.  That's correct.
12  Q.  Okay.  And if the personal identification number is
13  missing or incorrect on the ABBM, then the voter will have the
14  opportunity to cure the defect or correct it, do you agree?
15  A.  Correct the defect, correct, yes.
16  Q.  And one way that a voter can do that is through the Ballot
17  Tracker?
18  A.  Yes.
19  Q.  Your office received a lot of complaints about voters not
20  being able to use the Ballot Tracker, do you agree with that?
21  A.  Yes, regarding the authentication portion of it.
22  Q.  And that was at least in part because of the residence
23  address field in the Ballot Tracker?
24  A.  Yes.
25  Q.  And, in fact, you tried using your own residence address

CHRISTINA ADKINS – DIRECT

1 and the Ballot Tracker wasn't able to validate it, correct?

2 A.  That's correct.

3 Q.  And the residence address field was required by SB 1,

4 would you agree with that?

5 A.  Correct.

6 Q.  Okay.  You also agree that a voter may not remember what

7 information they provided on a defective application form once

8 it's been sent in, do you agree with that?

9 A.  Yes.

10 Q.  And the ABBM rejection form does not provide any

11 information about which number was originally sent in, agreed?

12 A.  Correct.  We discussed that with a number of counties on

13 including that field but generally the consensus was not to

14 include that.

15 Q.  And you agree that some voters whose mail ballots have

16 been rejected because of the ID requirements under SB 1 would

17 not be able to cure in time due to the timing of when they are

18 notified or when they find out about how to cure their ballot?

19 A.  That's correct.  If there's a deadline and they receive

20 notification towards the end of that deadline, it might limit

21 their opportunities.

22          MISS TULIN:  Thank you, Miss Adkins.

23          I pass the witness.

24          THE COURT:  Anything else on this side?

25          MR. DODGE:  Just a few questions, Your Honor.

1  BY MR. DODGE:

2  Q.  Morning, Miss Adkins.

3  A.  Morning.

4  Q.  Miss Tulin was quite thorough so I have just a few

5  questions.  You were discussing a moment ago the application

6  and carrier envelope that your office publishes, correct?

7  A.  That's correct.

8  Q.  And your office cannot amend the application or the

9  carrier envelope to advise voters to include both a driver's

10  license number and a social security number, right?

11  A.  When we put our forms together we try to track the law as

12  much as we can and the law I think limits us in what we can

13  say in that area.

14  Q.  So you can't amend the forms because it would not be

15  consistent with the provisions in SB 1?

16  A.  That's a concern that we've had about changing that

17  language, yes.

18  Q.  You also discussed with Miss Tulin certain inserts that

19  counties put in their materials, do you recall that?

20  A.  I do.

21  Q.  Those counties can't require voters to include both a

22  driver's license and social security number on their

23  applications or carrier envelopes?

24  A.  They cannot require folks to include both numbers, that's

25  correct.

1  Q.  And your office can't require or even encourage counties
2  to recommend providing both numbers?
3  A.  We cannot require them — I'm sorry.  Say that again.
4  Q.  Or encourage.
5  A.  I don't know if I can say that we can't encourage.  I
6  mean, when voters called us asking about what to do with the
7  forms or when they had questions about it we would oftentimes
8  tell voters if you are unsure list both numbers on your
9  documentation.
10 Q.  My question was about whether or not you could encourage
11 counties to ask voters to include both numbers.
12 A.  Oh, I see what you're asking.  We would be very cautious
13 in that area because we don't want them to being making
14 suggestions to a voter that would make them think that they
15 had to include both, that I mean if somebody didn't know both
16 numbers and they were being told that they should put both, it
17 might prevent somebody from completing the process if they
18 don't have both numbers on hand.
19 Q.  Just so it's clear for the record then, your office does
20 not require counties to ask voters to include both numbers?
21 A.  That's correct.
22 Q.  And you would be hesitant to encourage them to do that,
23 correct?
24 A.  Correct, depending on how exactly they are trying to say
25 that or provide that encouragement.

CHRISTINA ADKINS - DIRECT

1  Q.  Your office doesn't keep track of which counties advise

2  voters to include both forms of ID, right?

3  A.  That's correct.

4  Q.  So you don't know which counties intend to advise voters

5  to include both kinds of ID numbers in future elections,

6  correct?

7  A.  Correct.  It gets back to the local control issue.

8  Q.  At the time SB 1 went into effect there were about 700,000

9  registered voters in Texas who had only either a driver's

10  license or social security number but not both associated with

11  their voter registration?

12  A.  That sounds right.

13  Q.  And at that time there were also approximately 100,000

14  registered voters in Texas who had no ID number at all

15  associated with their voter registration?

16  A.  That's correct.

17  Q.  To your knowledge there continue to be voters on TEAM who

18  only have one ID number associated with their registration?

19  A.  To my knowledge -- I'm sorry.  Repeat the question.

20  Q.  To your knowledge there continue to be registered voters

21  on TEAM who only have one ID number associated with their

22  registration?

23  A.  Yes, but much smaller numbers than they were at that time.

24  Q.  And there continue to be voters on TEAM who do not have

25  any ID numbers associated with their registration?

CHRISTINA ADKINS - DIRECT

1    A.    I would agree with that, but, again, in much smaller

2    numbers than previously.

3    Q.    Voters in Texas can have multiple ID numbers issued by the

4    Department of Public Safety, right?

5    A.    Yes, but they are not necessarily all valid.  They may

6    have a driver's license, surrender that driver's license and

7    received a personal identification card, so it may change the

8    validity of those numbers.

9    Q.    But it's possible that they could have multiple valid

10   DPS-issued ID numbers, right?

11   A.    I don't know that.  That's a question for DPS.

12   Q.    The TEAM system only reflects a single DPS-issued ID

13   number for each voter?

14   A.    Correct.  The most current one, the one that I believe

15   would be valid.

16   Q.    Does your office have any plans to update TEAM so that a

17   voter registration record can hold multiple DPS-issued ID

18   numbers?

19   A.    No.

20   Q.    And if a person has a DPS-issued ID number that is valid

21   and not reflected in TEAM, they cannot use that number on a

22   ballot application or carrier envelope, correct?

23   A.    Correct, but, again, I'm not sure how many instances there

24   would be where somebody has a valid number because of the way

25   the DPS process works, where you have to surrender one in

CHRISTINA ADKINS — DIRECT

1 order to obtain a new one.

2 Q.  Shifting gears a little bit, are you familiar with the

3 Election Administration and Voting Survey?

4 A.  The EAV Survey, yes, I am.

5 Q.  Your office is responsible for collecting data for the EAV

6 Survey from county officials, correct?

7 A.  Yes.  I mean, it passes through our office.

8 Q.  And then you report it to the United States Elections

9 Assistance Commission, right?

10 A.  Correct.  We don't go through and validate the data

11 reported because it's meant to be a survey directly from those

12 officials, so it's self-reported data.

13 Q.  Your office has been responsible for collecting that data

14 since at least 2018, right?

15 A.  That sounds right.  Maybe even before then.

16 Q.  And you are aware that the EAV Survey asks the State's

17 Chief Election Officer to certify in writing that the

18 information being presented to the U.S. Election Assistance

19 Commission is true and accurate to the best of their

20 knowledge?

21 A.  Correct, to the best of our knowledge.

22 Q.  Are you aware of any other source of election data like

23 the EAV Survey that you've considered to be superior?

24 A.  I think it depends on the subject or the type of data we

25 are looking at.

CHRISTINA ADKINS – DIRECT

1  Q.  Can you give me an example of what other source of data

2  that might be?

3  A.  I mean, if you're looking for things like rejection rates,

4  you may want to look to what we have in our State system

5  versus what was reported by counties.

6  Q.  And where does the information in the State system come

7  from?

8  A.  It has to do with the information that the counties would

9  put in our system, you know, how they would track and log the

10  individual applications, where they are in the process, all

11  things related to ballot-by-mail tracker, actually.

12  Q.  So the source in the State system is the counties?

13  A.  Correct.

14  Q.  And the counties are also the jurisdictions who report

15  data to the EAV Survey, correct?

16  A.  Correct.

17  Q.  You spoke with Miss Tulin a little bit about the issue of

18  uniformity, do you recall that?

19  A.  Yes.

20  Q.  And she talked about your office's statutory duty to

21  obtain and maintain uniformity in the application of Texas

22  election law, right?

23  A.  Yes.

24  Q.  You would agree also that Texas has a highly decentralized

25  election system?

1  A.  Absolutely.

2  Q.  There's a lot of local control over elections in Texas?

3  A.  Definitely.

4  Q.  And that's a purposeful way that the election process is

5  set up in Texas?

6  A.  I believe so.

7  Q.  So by necessity elections are going to be different on a

8  county-by-county basis in Texas due to different county needs

9  and that element of local control over election

10  administration?

11  A.  Yes.

12         MR. DODGE:  Pass the witness.

13         THE COURT:  Anything else on this side?

14         MR. BADAT:  Few questions, Your Honor.

15  BY MR. BADAT:

16  Q.  Morning, Miss Adkins.  My name is Amir Badat.  I represent

17  the HAUL plaintiffs in this litigation.  Thank you for being

18  here.  A few minutes ago you were talking about the numbers

19  that need to be provided on an ABBM for a person's mail

20  ballot -- or mail ballot application to be accepted, right?

21  A.  Yes.

22  Q.  And you mentioned that there are a number of people still

23  on TEAM that only have either their driver's license number or

24  their social security number, but not both, right?

25  A.  That's correct.

1  Q.  And there are still a number of people in TEAM who have
2  neither a driver's license number or a social security number,
3  right?
4  A.  Yes, but the number is much, much smaller than it was
5  initially.
6  Q.  Now, if a voter's ABBM is rejected for a missing ID or an
7  ID mismatch, SB 1 requires a county to provide notice of the
8  rejection and include information in that notice about the
9  ability to cure the defect through the Secretary of State's
10 online Ballot Tracker, is that right?
11 A.  Yes.  I would say that what you are talking about, that
12 you said the county would provide notice, it could be the
13 county early voting ballot board, signature verification
14 committee, I mean, I think I need to point that out because
15 that's relevant.  It's those individual bodies that are
16 charged with that.  And, yes, they would be providing notice
17 of all of that options for instituting corrective action.
18 Q.  And one of those options is the Secretary of State's
19 online Ballot Tracker, right?
20 A.  That's correct.
21 Q.  Can we pull up Section 86.015(b) of the Texas Election
22 Code.  I'd like to take a look at the provision that covers
23 the Ballot Tracker.  Can we look at 86.015.
24     Okay.  Miss Adkins, are you familiar with this provision?
25 A.  I am, yes.

1  Q.  And Section 86.015(b) says, "The online tool developed or

2  provided under Subsection A must require the voter to provide

3  before permitting the voter to access information described by

4  that subsection, one, the voter's name and date of birth and

5  the last four digits of the voter's social security number;

6  and, two, the voter's — a driver's license number, or, B,

7  personal identification card number issued by the Department

8  of Public Safety."  Did I read that correctly?

9  A.  Yes.

10  Q.  So by statute a voter is only able to access the Secretary

11  of State's online Ballot Tracker if they have in their voter

12  registration file both their social security number and either

13  their driver's license number or personal ID card number, is

14  that right?

15  A.  That's correct.

16  Q.  So someone whose ABBM was rejected because they put down

17  their driver's license number but their voter registration

18  file only has their social security number would not be able

19  to access the online Ballot Tracker, right?

20  A.  Correct.  They couldn't use the tracker but they would

21  still be able to use the other methods that the law

22  prescribes.

23  Q.  And, vice versa, someone whose ABBM was rejected because

24  they put down their social security number but their voter

25  registration file only has their driver's license number, they

CHRISTINA ADKINS – DIRECT

1 would not be able to access the Ballot Tracker either, right?

2 A.  Correct.  Again, they could use the other options that are

3 there.

4 Q.  And someone who only has an election identification

5 certificate is also out of luck, right?

6 A.  Same problem, yes.

7 Q.  Because, by definition, they don't have a driver's license

8 or a personal ID card number so they wouldn't be able to

9 access the Ballot Tracker either, right?

10 A.  Correct, but, again, they have the other options available

11 to them under the law.

12 Q.  And voters who don't have both their social security

13 number and their driver's license or personal ID number in

14 their voter registration file would also be shut out of the

15 Ballot Tracker for purposes of curing their carrier envelopes

16 for an ID defect, right?

17 A.  Correct.  They wouldn't be able to utilize the tracker.

18 They would have to rely on alternative methods.

19 Q.  And because these requirements are set by statute, your

20 office cannot modify authentication requirements for the

21 Ballot Tracker, right?

22 A.  That's correct.

23 Q.  I'd like to stay on the topic of mail ballots.  It's true

24 that mail ballot voters are permitted to drop off their own

25 mail ballots in person at the Early Voting Clerk's Office on

1  Election Day while the polls are open, right?

2  A.  Yes.  You got it all in, yes.

3  Q.  Got it.  And when a voter does that, they must present an

4  acceptable form of photo ID?

5  A.  Correct, yes, sir.

6  Q.  And that's the same photo ID that a voter must present

7  when they are voting in person at a polling location, right?

8  A.  That's correct.

9  Q.  And that photo ID is intended to confirm the identity of

10  the voter, right?

11  A.  Yes.

12  Q.  And when the election worker is looking at the ID to

13  confirm the voter's identity, they are comparing the photo on

14  the ID to the person who is in front of them, right?

15  A.  Correct.

16  Q.  A person is not permitted to drop off someone else's mail

17  ballot, correct?

18  A.  That's what the law says.

19  Q.  And, now, as we discussed, all mail ballots post–SB 1 must

20  include an ID number that matches with an ID number in the

21  voter file in order to be accepted, correct?

22  A.  Correct.

23  Q.  And that requirement also applies to mail ballots that are

24  dropped off in person, correct?

25  A.  The identity requirements are still the same, that's

1   correct.

2   Q.  So even though the voter provides photo ID at drop-off and

3   the election worker confirms the voter's identity, a person's

4   ballot could still be rejected if they don't have a matching

5   ID number on their carrier envelope, correct?

6   A.  That's correct.

7   Q.  Or if they forgot to put their ID on their carrier

8   envelope, correct?

9   A.  That's correct.

10  Q.  I'd like to ask you a couple of questions about voter

11  registrations.  Texas has seen significant growth in the

12  number of people registering to vote over the past several

13  years, correct?

14  A.  Yes, we have.

15  Q.  Hundreds of newly registered voters every day?

16  A.  That sounds right, yes.

17  Q.  Can we take a look at OCA Plaintiffs Exhibit 283, please.

18      This is a Texas voter registration application, right?

19  A.  Yes.

20  Q.  You've seen this before?

21  A.  Many times.

22  Q.  If we could go to the second page of the exhibit, I'd like

23  to turn your attention to the section at the bottom underneath

24  filling out the application, and actually it's on the

25  right-hand side, the seconds bullet.  It states that, "All

CHRISTINA ADKINS – DIRECT

1  voters who register to vote in Texas must provide a Texas

2  driver's license number or personal identification number

3  issued by the Texas Department of Public Safety.  If you don't

4  have such a number, simply provide the last four digits of

5  your social security number, and if you don't have a social

6  security number you need to state that fact."

7      Did I read that correctly?

8  A.  You did.

9  Q.  If we can go back up to the first page and take a look at

10  row nine.  It has a space for the person who is registering to

11  enter their Texas driver's license number or Texas personal ID

12  number, correct?

13  A.  That's correct.

14  Q.  And then next to it, it says, "If no Texas driver's

15  license number or personal identification number, give the

16  last four digits of your social security number," correct?

17  A.  Correct.

18  Q.  So a voter is not –– or a person registering to vote is

19  not required to provide both numbers on this application,

20  correct?

21  A.  Correct.

22  Q.  And a reasonable reading of this is that if I put down my

23  driver's license number I don't have to put down my social

24  security number, correct?

25  A.  Yes.

1  Q.  Or if I put down my social security number I don't have to

2  put down my driver's license number, right?

3  A.  That's correct.

4  Q.  And so for someone who is filling out this application to

5  register in Texas for the first time the ID number they are

6  providing here is the ID number that will populate in TEAM,

7  correct?

8  A.  Initially that will be the one that populates in TEAM, but

9  we do work with DPS to try to obtain missing information.  So

10  we try to get — if you put the last four digits of your

11  social security number, we work to get the full line.  We also

12  work to get driver's license numbers, you know, and vice

13  versa.

14  Q.  And so for people who you can't get that additional

15  information for and they register to vote with just one of

16  these numbers in TEAM, they will only have one of these

17  numbers?

18  A.  That's correct.

19  Q.  Which means that they are at risk of having their ABBMs or

20  carrier envelopes rejected, if they don't use the right ID

21  number, correct?

22  A.  Right.  If they are applying within that time period

23  before we've been able to obtain additional information, if

24  it's available through DPS.

25  Q.  And they will also be shut out of the Secretary of State's

CHRISTINA ADKINS - CROSS

1 online Ballot Tracker because they don't have both numbers in

2 their file, correct?

3 A.  Correct.  If both are not in the file then they would not

4 be able to utilize the tracker.

5 Q.  Generally speaking, Miss Adkins, your office can't waive,

6 modify, or suspend state law, correct?

7 A.  Or alter or create, I think it says after that, yes,

8 that's correct.

9 Q.  You know the election code much better than I do.

10     And last question.  The Secretary of State's Office

11 receives federal funding, is that right?

12 A.  Yes, we do receive some federal funds through HAVA, Help

13 America Vote Act.  There are things that have come through our

14 office.  Most of that is passed on to the counties, but, yes.

15         MR. BADAT:  Thank you, Miss Adkins.

16         I pass the witness.

17         THE COURT:  Anything else on this side?

18         Any cross?

19         MISS HUNKER:  Very short cleanup, Your Honor.

20                     CROSS-EXAMINATION

21 BY MISS HUNKER:

22 Q.  Miss Adkins, what is the Secretary of State's role

23 regarding the EAV Survey?

24 A.  We help collect that data and then pass it on to the

25 Election Assistance Commission.  It's just a point of — we're

1  just a point of collection of the data.

2  Q.  During your examination with counsel you had used the word

3  "pass-through" what did you mean about that?

4  A.  The counties report that data, it says self-reported from

5  the county since they are the practitioners we are gathering

6  this data from.  They submit it through whatever mechanism the

7  EAC is using that year for collection of data.  Once that data

8  has been collected, we submit that data on to the Election

9  Assistance Commission but we don't review it for accuracy.

10  Q.  Were the counties required to collect data related to mail

11  ballot rejection rates prior to 2021?

12  A.  I think there were questions related to that in the EAV

13  Survey, but with respect to the data that our system held

14  there were not as many requirements at the time for them to

15  report, I think all of the things that occur with a

16  ballot-by-mail process directly into the TEAM system.

17  Q.  Were there any state requirements that they collect that

18  data?

19  A.  No.  There were no state requirements that they collect

20  that data.

21  Q.  Were there requirements that the State collect data

22  regarding ABBM rejection rates, specifically State

23  requirements?

24  A.  No, there were no State requirements to collect that

25  information.

CHRISTINA ADKINS — CROSS

1  Q.  Were counties required to follow specific standard when

2  tracking data related to mail ballot rejection rates?

3  A.  No.

4  Q.  Were counties required to follow specific standard when

5  recording EAVS data?

6  A.  No.

7  Q.  When did Texas introduce the Ballot Tracker?

8  A.  It was the result of legislation I believe in 2021.

9  Q.  And in response to the Ballot Tracker have counties

10  started collecting more data related to mail ballots?

11  A.  I would say yes, as a requirement they have to submit

12  information in order to populate that tracker.  In the past

13  counties were not always entering in all the final outcomes

14  related to their ballot-by-mail applications.  They weren't

15  always reporting things that were rejected into the tracker.

16      Because of the tracker, we now have more reporting

17  requirements about where things are along in the process and

18  so now they do have to do that.

19  Q.  And when did Texas introduce a cure process for ballots by

20  mail?

21  A.  That process came about as a result of Senate Bill 1, so

22  as a result of that 2021 legislation.

23  Q.  In response to the cure process are counties collecting

24  more data related to mail ballot rejections?

25  A.  Oh, yes, definitely.

CHRISTINA ADKINS - CROSS

1  Q.  During your conversation with counsel you had mentioned a

2  Ballot Tracker and authentication?

3  A.  Yes.

4  Q.  When SB 1 was enacted, was a voter required to put in

5  their residence address?

6  A.  Yes.  When SB 1 was enacted, residence address was a

7  required field to authenticate.

8  Q.  Has the Texas legislature changed that requirement?

9  A.  They have, yes.

10  Q.  Are Texas voters required to provide their address to

11  enter the Ballot Tracker today?

12  A.  No.  That was a change from the most recent legislative

13  session, in lieu of residence address voters are now using

14  date of birth, which is an easier field for data entry

15  purposes.

16          MISS HUNKER:  Thank you, Miss Adkins.  We'll reserve

17  the rest of the questions for our case in chief.

18          THE COURT:  Any further from this side?

19          MR. LIU:  No questions.

20          THE COURT:  I've got a question.  So these advisories

21  that your office issues and in the past used to issue legal

22  opinions, what's the difference between the two?

23          THE WITNESS:  That's an excellent question, Your

24  Honor.

25          In the past I think our office would wade into the

CHRISTINA ADKINS — CROSS

1  area of issuing opinions similar in a way to the way the

2  Attorney General's Office would issue an opinion.

3         We don't go that route because we really don't have

4  the authority to issue binding opinions like that.  So when we

5  issue an advisory, that's our attempt to provide guidance and

6  instruction, either in areas of law that need clarification,

7  or because there may be something in the law that says SOS may

8  prescribe additional procedures.  And so it's our way of

9  providing those addition procedures and guidance.

10        THE COURT:  So like in a legal precedent statute, the

11 Constitution statutes, and down lower in the list is the

12 federal system regulatory agencies like the wage and hour

13 issue, an opinion letter, the Attorney General for the State

14 of Texas would issue a letter, and so courts are supposed to

15 give some deference.  It's a matter of question about how much

16 deference, but it's got some legal effect.  The advisory

17 opinions have no legal effect, is that correct?

18        THE WITNESS:  Well, I don't know if I would say no

19 legal effect, sir.  I think what I would say is they are very

20 procedure driven.

21        It's more about explaining procedures, kind of in

22 that quest that we have in Chapter 31 of the election code to

23 maintain and obtain uniformity in the way the laws are applied

24 those advisories are the way in which we do that.  We provide

25 detail and procedure to help with the application of the laws,

CHRISTINA ADKINS – CROSS

1  and we do that through the advisory process.

2         You know, it's a little bit different than like an

3  administrative rule because it's more about process and

4  procedure and helping to explain what the law means so that

5  the counties, when they are the ones that are applying the law

6  have a little bit more guidance.

7         It's more to help create some uniformity in our

8  system and to give those additional guidelines when the

9  legislature has indicated there may be a need for additional

10  guidelines.

11         THE COURT:  Are you aware of any Texas state court or

12  any federal court for that matter that has given the advisory

13  opinions the same effect as a letter opinion?

14         THE WITNESS:  No, sir.  I'm not aware.  I'm not

15  aware.

16         THE COURT:  Is it fair to say that — so you talked

17  earlier about getting informal advice on a one-off by email,

18  is this just a better way to give advice on a larger scale, is

19  that a better way of phrasing this?

20         THE WITNESS:  I would say advice and procedures

21  because there are advisories that we have — I'll give you an

22  example, if you don't mind, sir.

23         We have an advisory on our electronic voter systems

24  and procedures.  We have specific statutory authority to

25  prescribe some additional procedures related to the use of

CHRISTINA ADKINS – CROSS

1 electronic voting systems.  We do that in an advisory format

2 that we typically issue every few years because we need to

3 update it with respect to changing technology, and so the

4 guidance in that document is based on statutory authority we

5 have to prescribe procedures, but it's not really an opinion.

6 It's more providing the details on how to do something or to

7 provide some additional standards, you know, in this example

8 security standards and security procedures, but, again,

9 different than the law.  It's filling in the gaps is the way I

10 like to think about it.

11        THE COURT:  And you are not pre–publishing any of

12 this in the Texas Register for comment, or anything like that?

13        THE WITNESS:  That's correct, yes, sir.  It's

14 different than the administrative role–making process.  I

15 agree with you there, Your Honor.

16        THE COURT:  Any questions based on my questions?

17        MR. DODGE:  I have one follow–up question on a topic

18 that counsel touched on.

19        THE COURT:  Do you have an objection to that, or are

20 you going to allow his question out of order or not?

21        MR. KERCHER:  If it's responsive to the questions

22 Your Honor that we raised, we don't have a problem with it.

23        THE COURT:  Go ahead.

24

25

1    REDIRECT EXAMINATION

2    BY MR. DODGE:

3    Q.  You were discussing with counsel a moment ago the new

4    tracking and cure process implemented by SB 1, correct?

5    A.  Yes.

6    Q.  That was in place for the 2022 elections, correct?

7    A.  Yes.

8         MR. DODGE:  Nothing further.

9         THE COURT:  Any other questions based either on the

10   cross or my questions?  None on this side.

11        Anything on this side?  None.

12        You may step down, ma'am.  Thank you.

13        Oh, you are still under the rule, as I think they

14   intend to bring you back.  So you can of course consult with

15   lawyers but no other witnesses.

16        THE WITNESS:  Yes, your Honor.

17        THE COURT:  With that, let's go ahead and take a

18   lunch break.

19        *(Recess)*

20        *(Change in reporter)*

21

22

23

24

25

1        *(12:59 p.m.)*

2        COURT SECURITY OFFICER:  All rise.

3        THE COURT:  Thank you.  Please be seated.

4        MR. KANTERMAN:  Thank you, Your Honor.  Jason

5    Kanterman from Fried, Frank, Harris, Shriver & Jacobson on

6    behalf of the LUPE plaintiffs.  And Your Honor, we're going to

7    call Keith Ingram to the stand.

8        COURTROOM DEPUTY CLERK:  Raise your right hand.

9                        *   *   *

10       *(Oath administered and, KEITH INGRAM, witness, Sworn.)*

11                       *   *   *

12       MR. KANTERMAN:  Your Honor, before we begin the

13   examination, for the record, the LUPE plaintiffs will elicit

14   testimony from Mr. Ingram in support of all of their claims

15   across all of the sections that have been challenged in this

16   case.

17       THE COURT:  Thank you.

18       MR. KANTERMAN:  And Your Honor, as the Court will

19   hear, Mr. Ingram was formerly employed by the Secretary of

20   State's Office, previously served in the Elections Division,

21   and testified on numerous occasions in this case as the

22   30(b)(6) witness; so therefore, pursuant to Federal Rule of

23   Evidence 611(c)(2), I'd request leave to ask leading questions

24   of Mr. Ingram, because he's a witness identified with an

25   adverse party.

1    MR. KERCHER:  No objection.

2    THE COURT:  You may proceed.

3    MR. KANTERMAN:  Thank you, Your Honor.

4                    DIRECT EXAMINATION

5    BY MR. KANTERMAN:

6    Q.  Mr. Ingram, good afternoon.

7    A.  Howdy.

8    Q.  Good to see you again.  Please state your full name for the

9    record.

10    A.  Brian Keith Ingram.

11    Q.  Mr. Ingram, you previously worked for the Secretary of

12    State's Office?

13    A.  I did.

14    Q.  In the Elections Division?

15    A.  I did.

16    Q.  Before going into details about your job with the Secretary

17    of State's role, I'd like to talk a little bit about your

18    personal educational background and employment history.

19        After graduating from college, you went on to law school?

20    A.  I did.

21    Q.  At the University of Texas School of Law?

22    A.  Yes.

23    Q.  You graduated from University of Texas School of Law in

24    1993?

25    A.  1993, yes, sir.

1    Q.  With a Juris Doctorate degree?

2    A.  Yes.

3    Q.  After graduating from law school, you proceeded into

4    private practice?

5    A.  I did.

6    Q.  Worked for a number of firms?

7    A.  Three, I guess.

8    Q.  And after your time in private practice in the late 2000s,

9    you went on to work for Governor Perry's office?

10   A.  That's true.

11   Q.  You worked for the Governor's Office for approximately

12   four years?

13   A.  I did.

14   Q.  And after that, you transitioned over to the Secretary of

15   State's Office?

16   A.  I agree.

17   Q.  And that was generally in January of 2012?

18   A.  Yes, it was January 5, 2012.

19   Q.  Thank you for the clarification.

20       When you first joined the Secretary of State's Office, you

21   were given the title of director of the Elections Division; is

22   that right?

23   A.  I agree.

24   Q.  Director is the most senior title in the Elections

25   Division?

1   A.   It is.

2   Q.   And you held that role for more than ten years?

3   A.   Eleven years, two months, five days.

4   Q.   And that was up until March of 2023?

5   A.   Yes, sir.

6   Q.   At which point you transitioned out of the director role

7   into more of a special projects role?

8   A.   I agree.

9   Q.   And in that new role, you reported to the new director of

10  the Elections Division?

11  A.   I agree.

12  Q.   And that was Ms. Christina Adkins?

13  A.   Yes.

14  Q.   Now that we've had an opportunity to discuss your

15  background, I'd like to talk more about your time at the

16  Secretary of State's Office and your role in the Elections

17  Division.

18      During your time as director, you managed and oversaw the

19  Elections Division?

20  A.   Agree.

21  Q.   And during that time, there were approximately 30 employees

22  in that division?

23  A.   That's right.

24  Q.   All of those individuals ultimately reported to you?

25  A.   They did.

1    Q.  And you ultimately reported to the executive leadership

2    team at the Secretary of State's Office?

3    A.  I agree with that.  Specifically, the deputy secretary.

4    Q.  And the Secretary of State as well; is that right?

5    A.  Of course.

6    Q.  And generally, your job as director was to help the

7    secretary fulfill their responsibility as chief elections

8    officer of the State of Texas?

9    A.  Agreed.

10   Q.  And as part of that role, you helped the secretary prepare

11   for and ultimately implement SB1?

12   A.  That's true.

13   Q.  Let's discuss some of the things that you and your office

14   did prior to SB1's enactment.  Among other things, you and your

15   office met with legislative staff to discuss impending voting

16   legislation, including SB1?

17   A.  Well, in the regular session, it was SB7 and HB6, but, yes,

18   sir.

19   Q.  And you also met with individual legislators before the

20   bill became SB1?

21   A.  Agreed.

22   Q.  And you also met with legislative committees before the

23   bill became SB1?

24   A.  I did.  I testified before several committees.

25   Q.  During some of those meetings, setting aside just for the

1   moment the testimony that you provided, you would -- you and

2   your office would advise legislators, their staff, or

3   legislative committees about the bill language?

4   A.  Our role in the Secretary of State's Office is to be a

5   resource for the legislature, and so if they had a question

6   about how certain language would be implemented or what we

7   thought it meant or if they thought -- if we thought there

8   would be a problem in the implementation, those are the kind of

9   questions we would get.  We didn't usually get asked about

10  language unless the legislature had a question about it.

11  Q.  But, for example, if an individual legislator approached

12  you or your office and asked for your advice about whether some

13  language that they were considering proposing would work in the

14  real world, your office would provide them with that advice?

15  A.  Sort of.  I mean, it's our goal to help the legislature get

16  where it wants to go without doing any damage along the way, so

17  sometimes we might suggest alternative ways to achieve the same

18  goal without some side effects.

19  Q.  And, in fact, it's part of the Secretary of State's role to

20  advise on the technical implementation process of

21  voting-related legislation or future voting-related

22  legislation?

23  A.  When they ask.  It's not our job to volunteer or try to

24  somehow change legislation outside of the resource witness

25  role.

1  Q.  Let's talk a little bit about some of the things you did

2  and your office did to help implement SB1.  We'll start first

3  with discussing drafting of forms.

4      In addition to the legislative interactions we discussed,

5  the Elections Division changed a number of forms that it

6  publishes following the enactment of SB1?

7  A.  I agree.

8  Q.  And, for example, the Secretary of State's Office revised

9  the application for a ballot-by-mail form that it promulgated?

10  A.  We did.

11  Q.  And the Secretary of State's Office also changed the voter

12  assistance oath form?

13  A.  Yes.

14  Q.  And it did so to accommodate new changes in the law brought

15  about by SB1?

16  A.  Agreed.

17  Q.  For example, SB1 changed the language of the assister oath.

18  A.  It did.

19  Q.  And the Secretary of State's Office changed the voter

20  assistance oath form to conform with this new language.

21  A.  Agreed.

22  Q.  As director of the Elections Division, no form or policy

23  could be published without your approval when you were the

24  director?

25  A.  I can't envision a circumstance where it would have.  I

1   don't know if it was possible.  I guess it's possible, but I

2   don't think it ever happened.

3   Q.  You would agree, though, that no form could be published if

4   the deputy Secretary of State disagreed with it?

5   A.  Agreed.

6   Q.  And the same for the Secretary of State.  No form could be

7   published by the Elections Division if the Secretary of State

8   ultimately disagreed with it?

9   A.  Agreed.

10  Q.  You would agree that any form provided to voters should be

11  designed so that a voter who follows the instructions on that

12  form will ultimately have the form accepted?

13  A.  I agree with that.  The most important thing for a form to

14  do is to follow the law.  A good form is a guide to the law

15  and, of course, if it guides through the law successfully, then

16  the voter will be successful.

17  Q.  And so we could agree, then, that any form put out by the

18  Secretary of State's Office, the goal of that form would be

19  that if a voter followed it to the T, it would ultimately get

20  accepted?

21  A.  Agreed.  For whatever purpose the form is supposed to be

22  used for, you bet.

23  Q.  In addition to changing forms and having meetings with the

24  legislature, the Elections Division also issues documents known

25  as "advisories"; is that right?

1   A.  We do.

2   Q.  Advisories are something the division would send out,

3   something more formal than a mass e-mail, but generally a mass

4   communication relating to voted-related topics?

5   A.  Agreed.  We would do advisories on discrete topics of law.

6   Usually the advisory was a combination of legal stuff as well

7   as practical implementation stuff, steps to take.

8   Q.  And so let's talk just a little bit more about that.  These

9   advisories that you would send out may go to county elections

10  officials?

11  A.  That's true.

12  Q.  It might go to cities?

13  A.  Sometimes, yes.

14  Q.  They might go to other political subdivisions throughout

15  the state?

16  A.  Agreed.

17  Q.  These advisories might, as you've already mentioned,

18  provide official instructions to these elections officials from

19  the Secretary of State's Office?

20  A.  Agreed.

21  Q.  Those advisories might, for example, offer interpretation

22  from the Secretary of State's Office of certain provisions of

23  SB1?

24  A.  Yes.  I mean, but usually our role is to follow the law as

25  it's written, so there's not a lot of interpreting to be done.

1    However, sometimes to make a statute work, it has to be

2    interpreted around the edges a little bit, and so that's our

3    job under 31.003 of the Election Code is to obtain and maintain

4    uniformity in the interpretation of the Election Code if the

5    election falls outside of the Code, so sometimes to harmonize

6    existing law with a new statute, some interpretation has to be

7    done, but our goal always was to begin and end with the text.

8    Q.  But it is true that sometimes when you are offering those

9    interpretations in furtherance of your office's goals, those

10   would appear in advisories that your office would send out?

11   A.  I don't know if we put it in the advisory as an

12   interpretation, but that's what ended up in the advisory was

13   our interpretation, if interpretation was needed.

14   Q.  As the director of the Elections Division, you were

15   ultimately the person authorized to make interpretations of law

16   for the division?

17   A.  Well, as I said in my deposition, we've got a whole lot of

18   folks who review our work, and so there's not anything that we

19   do that is not vetted.  So, you know, sure, it's my name that

20   it goes out under, and it's my authority that it goes out

21   under, but it's not only my work.

22   Q.  No advisory would be sent out from the Elections Division

23   under your name if you disagreed with it?

24   A.  I agree with that.

25   Q.  And no advisory would be sent out from the Elections

1  Division if the deputy Secretary of State disagreed with it?

2  A.  Probably not.

3  Q.  And the same is true for the Secretary of State?

4  A.  That's right.

5  Q.  The Division also provided or published trainings relating

6  to SB1's changes to voting laws in Texas; is that right?

7  A.  That's right.

8  Q.  For example, the Division has provided seminars for county

9  election officials to teach them about changes to the election

10  law requirements?

11  A.  Agreed.

12  Q.  And on how to implement those changes in their counties?

13  A.  Yes.  The seminar for county election officials is usually

14  in July of an even-numbered year or an odd-numbered year, and

15  so the SB1 was not completed until September of that year, so

16  we missed our chance with the seminar to teach the counties

17  about it.

18  Q.  Your office has also provided trainings and webinars to

19  ballot boards; is that right?

20  A.  Agreed.  More recently.  That's only a more recent

21  phenomena.

22  Q.  Those webinars or trainings to the ballot boards may have

23  included topics relating to mail ballots following enactment of

24  SB1?

25  A.  Agreed.

1    Q.  You'd also provide trainings on how certain forms

2    promulgated by the Secretary of State's Office could and should

3    be used?

4    A.  I don't know -- I mean, sort of.  The forms that are

5    designed to be used by the voters -- we obviously don't train

6    voters on our forms.  The forms that are supposed to be used by

7    candidates, we do talk to the political parties in every

8    odd-numbered year about the candidate applications.  We also

9    talk to city schools and other political subdivisions and

10   county election officials about the application process in

11   accepting applications, because they do independent

12   applications for office.

13   Q.  And so while you don't necessarily provide training to

14   individual voters about forms, fair to say that you have in the

15   past provided training to entities who receive or accept those

16   ballots on how to use those forms?

17   A.  Right.

18   Q.  The Secretary of State's Office also creates training for

19   poll watchers, right?

20   A.  We do.  It's a part of SB1 for the first time.

21   Q.  And poll watchers may not serve unless they've completed

22   this training?

23   A.  Agreed.

24   Q.  Secretary of State's Office also reports complaints that it

25   receives relating to various election crimes to the Attorney

1    General's Office?

2    A.   One of the functions of our office is to review complaints

3    from the public or from election officials and determine

4    whether or not there's reasonable cause to suspect a crime has

5    occurred.  And if we believe that, you know, on the face of the

6    document that it looks like the elements of a crime have been

7    met, we will refer that to the Attorney General for further

8    action.

9    Q.   And I'm going to unpack that with you in just a moment, so

10   thank you.  But before I get there, as the director of the

11   Elections Division of the Secretary of State's Office, it was

12   ultimately up to you to decide whether to refer a complaint to

13   the Attorney General's Office or not?

14   A.   Yes, most of the complaints.  I'm the one that would review

15   them and decide what the disposition was going to be.  There

16   were a few that were pretty close calls that I would, you know,

17   bring before the rest of the attorneys and have our general

18   counsel to see what they thought, you know, if it was a close

19   call.  Usually, if it's a close call, we'd refer it anyway,

20   because it's better to err on the side of making sure that

21   crimes are prosecuted.

22   Q.   And so you've given me a good amount already about the

23   process that you used in deciding whether to refer something,

24   but let's just run through it a little bit more to make sure I

25   have it.

1    As a general matter, a complaint would come into your

2  office and would ultimately be scanned in and sent to you for

3  review; is that fair?

4  A.   Agreed.

5  Q.   And you personally reviewed every complaint that came in?

6  A.   I did.

7  Q.   And then you personally would decide what to do next?

8  A.   I agree.

9  Q.   You would, for example, as you've mentioned, consider

10 sending a disposition letter?

11 A.   To the person who sent the complaint, sure.

12 Q.   Thank you for clarifying.

13    And if you chose to send a disposition letter to the

14 complainant, you might ask your support staff to draft that

15 letter for you and send it back to the complainant; is that

16 right?

17 A.   Agreed.

18 Q.   Another option that you had at your disposal was to refer

19 internally to Secretary of State's Office the complaint you

20 received to a Secretary of State lawyer for further review?

21 A.   Right.  And usually with instructions to refer or not

22 refer, but to write a specific kind of letter in response to

23 the complaint.

24         THE COURT:  Let me backtrack.  I'm assuming

25 "disposition letter" meant no merit?  Why don't you explain

1    what that means.

2          MR. KANTERMAN:  I think that's a very fair point, Your

3    Honor.

4    BY MR. KANTERMAN:

5    Q.  Mr. Ingram, when you and I refer to the term "disposition

6    letter," is it fair to say that a disposition letter would be

7    sent to a complainant if you determined that there was no merit

8    and the complaint was not worth investigating further?

9    A.  Well, it's kind of both things.  If we write a letter in

10   response to a complaint, sometimes it's a referral to the

11   Attorney General and we do cc the complainant, so they get a

12   response either way.  But if we decide that there's not any

13   merit or if it needs more factual information in order to

14   justify referring it, then we will send that letter to the

15   complainant and ask them for more information or tell them, you

16   know, *We're sorry this happened to you, but it's not a crime*

17   *under any set of circumstances.*  Or we sometimes say, *We're*

18   *sending a copy of this complaint to the local election*

19   *officials so that they can address this in training, so it*

20   *won't happen with their workers again.*  You know, those are

21   kind of the three normal answers to a complainant.

22   Q.  Thank you.

23         MR. KANTERMAN:  Your Honor, I'm happy to explore

24   further unless -- thank you.

25   BY MR. KANTERMAN:

Keith Ingram – Examination                         1880

1  Q.  When making a determination about how to proceed with a
2  particular complaint, there was a standard or a process that
3  you would apply.  I think you've already alluded to that as the
4  reasonable cause to suspect that a crime has occurred, right?
5  A.  Agreed.  That's in 31.006 of the Code.
6  Q.  And in applying that standard, you would review the
7  elements of any particular election crime, compare that with
8  the allegations in the complaint you received, and ultimately
9  see if there was a match?
10 A.  Agreed.
11 Q.  And so long as a complaint alleged facts that your office
12 believed constituted criminal activity, you would send the
13 complaint on to the Attorney General's Office for review?
14 A.  I am a sorry, I lost that question.
15 Q.  I'm happy to repeat it.  As long as a complaint alleges
16 sufficient facts that your office believes constitutes criminal
17 activity, you would send that complaint on to the Attorney
18 General's Office for review?
19 A.  Right.  If it created a reasonable cause to suspect that a
20 crime has occurred.
21 Q.  And I think you mentioned earlier that even if it was a
22 close call in your mind about whether the complaint satisfied
23 that standard, you would err on the side of forwarding those,
24 too, to the Attorney General's Office?
25 A.  Absolutely.

1  Q.  Now, you'd agree that the reasonable cause to suspect
2  standard is subjective?
3  A.  It is.  Well, I mean a reasonable person would they have
4  cause to suspect.  That's always been an objective standard,
5  but I don't know how objectively you can measure it.
6  Q.  In fact, it's probably fair to say it was a judgment call
7  on your part on whether you thought there was enough of an
8  allegation in a complaint to forward along or not?
9  A.  Agreed.
10  Q.  Now, to be clear, while the Secretary of State's Office
11  refers election complaints to the Attorney General's Office, it
12  is not the only referring agency or referring source in the
13  state.
14  A.  Agree with that.
15  Q.  And that means anybody can go to any county attorney or any
16  district attorney and complain about something that they think
17  is criminal activity, including election-related criminal
18  activity and lodge a complaint.
19  A.  Sure.  There's a part of the Election Code that says if two
20  or more voters swear in writing to the facts, then the D.A. has
21  to investigate.  So, I mean, it's both voluntarily as well as
22  mandatory if they do it right.
23  Q.  Mr. Ingram, let's transition now to talk about SB1, and
24  I'll ask Derek, please, to publish the statute, which is
25  already in evidence as Joint Exhibit 1.

1   Mr. Ingram, you've got the statute in front of you on the

2   screen, but if it's helpful, I've got a paper copy.  Happy to

3   provide that to you too.

4   A.  This is fine.

5   Q.  Thank you.  Before we dig into the substance of my

6   questions on SB1, is it fair to say that you're familiar with

7   the statute?

8   A.  Yes.

9   Q.  In fact, you've engaged with this statute regularly since

10  its enactment?

11  A.  Not so much recently, but very much in 2022.

12  Q.  I want to first begin by discussing Section 4.09.

13  Generally, sir, 4.09 makes it a crime to knowingly distance or

14  prevent a poll watcher from observing an activity in a manner

15  that would make observation not reasonably effective.

16  A.  Right.

17  Q.  And Section 4.07(f) -- which I'll give Derek a moment to

18  pull up on the screen for you -- provides that where a poll

19  watcher is entitled to observe an election activity under SB1,

20  they are entitled to sit or stand near enough to see and hear

21  the activity.

22      Is that right?

23  A.  That's what it says.  It's important to note that this law

24  doesn't change anything substantively.  It just set out in

25  words what we already believed the law to be.  So conveniently

1   near or close enough to see and hear the observed activity;

2   that they're entitled to observe any election activity in the

3   polling place, all of these things were already known and put

4   in place by poll workers.  So this didn't change the law

5   substantively.  It did not give more abilities to poll watchers

6   to do whatever they wanted to do.  It was still within the same

7   constraints that you couldn't disrupt the voting process.  You

8   couldn't talk to voters.  I mean, all of those things are still

9   the same.  It just made very clear what an observer was

10  entitled to observe.  You know, it didn't change the

11  relationship between the observer and the poll workers.

12  Q.  And I appreciate that explanation, Mr. Ingram, but just for

13  purposes of the question I asked, you would agree that 4.07(f)

14  provides that where a poll watcher is entitled to observe,

15  they're entitled to sit or stand near enough to see and hear

16  the activity?

17  A.  Right.  You can see up there in (a) that a watcher was

18  entitled to sit or stand conveniently near the observed

19  activity before.  And now it's near enough to see and hear.

20  That's the same thing.

21  Q.  Section 4.07(e), provides that a poll watcher may not be

22  denied free movement where election activity is occurring; is

23  that right?

24  A.  Agreed.  And that was the case before.  If you got in their

25  way and you obstructed them, you were going to be convicted of

1   a crime, Class B misdemeanor, for obstructing a poll watcher.

2   And we had several complaints that were referred to the

3   Attorney General for exactly that crime, and we would still

4   refer them today.

5   Q.  The phrase "reasonably effective" as used in Section 4.09

6   is not defined anywhere in SB1, right?

7   A.  Well, I think everybody knows that the whole point of

8   observing election activity is to be able to effectively

9   observe it so that if something is going on, you can make

10  notes, you can bring it to the attention of your principal, and

11  it might be the basis for an election contest.  That's the

12  whole reason to have observers in the polling places, so that

13  they can effectively observe election activities.

14  Q.  And I appreciate that explanation, but my question was a

15  little bit more narrow.  The phrase "reasonably effective" as

16  used in Section 4.09 is not defined anywhere in SB1, right?

17  A.  I don't believe it is, no.

18  Q.  And the Secretary of State's Office does not have any

19  opinion as to the meaning or definition of the term "reasonably

20  effective" as that phrase is used in this section?

21  A.  If you're asking if we've got anything in our materials, we

22  refer to the statutory language.

23  Q.  The determination of whether some action makes observation

24  not reasonably effective requires a subjective assessment,

25  fair?

1   A.   Yeah.  And the one making that assessment in the first

2   instance is the election judge.

3   Q.   And we'll get to that, and so I appreciate that.

4       Fair to say, though, that differing parties have differing

5   views about what makes observation reasonably effective?

6   A.   I would agree with that.  I think that it's probably on a

7   spectrum from more effective to less effective, and at some

8   point it gets to be so much less effective that it's not

9   effective at all.

10  Q.   You would agree with me that poll watchers, in your

11  experience, tend to be maximalists in their view of how close

12  they're entitled to be to any activity?

13  A.   In my experience, poll watchers are definitely maximalists

14  and so are poll workers, so what we've got is a situation where

15  two people are very much with their feet in concrete, and

16  that's why this language was added to the Code, to make both

17  sides understand, with more words, what the roles are and

18  what's expected of them.

19  Q.   Now, because the Secretary of State's Office does not have

20  an opinion or definition beyond what SB1 says, it would just

21  tell the presiding judge, who you said is responsible for

22  making the determination in the first instance, to use their

23  best judgment when deciding who's right?

24  A.   Agree with that.  And, you know, we encourage them to call

25  back to their election official in the county and make sure

1   that everybody is on the same page with regard to their

2   proposed actions.  Sometimes they call us from the polling

3   place.  Sometimes the election official will call us, and we're

4   happy to give our best guess about what to do, but every time

5   that we talk to somebody about potentially taking action

6   against a poll watcher, we remind them that it's a crime if

7   you're not justified in your action.  So you need to be

8   careful.  But that was our advice before SB1.  That's our

9   advice since SB1.

10  Q.  And so I want to unpack that just a little bit.  The

11  Secretary of State's Office would tell the elections judge to

12  be careful about rejecting a poll watcher's complaint about not

13  having a reasonably effective ability to observe because it's a

14  crime to obstruct a poll watcher?

15  A.  Exactly.

16  Q.  And the Secretary of State's Office would also tell the

17  elections judge to think carefully about what they're doing?

18  A.  Absolutely.  And when we've had conversations with election

19  officials because of poll watchers in Central Count or the

20  ballot board, we've told them the same thing.  And we've had

21  complaints against election officials for obstructing poll

22  watchers in Central Count, and we've referred those over to the

23  Attorney General.

24  Q.  The Secretary of State's Office would also recommend the

25  elections judge consider calling the county attorney before

1   making a final choice on any dispute?

2   A.  If they've got that luxury, yes, sir, that's the best

3   advice, because the county attorney is the one that's going to

4   be representing them.

5   Q.  But in the end, the Secretary of State's Office would tell

6   the elections judge it's ultimately their call?

7   A.  Absolutely.

8   Q.  While the Secretary of State's Office doesn't have an

9   official opinion as to the meaning of the phrase "reasonably

10  effective," it does have a view as to what types of activities

11  might render observation not reasonably effective, right?

12  A.  Right.  Like I said, we've got a spectrum from more

13  effective to less effective, and the further you get toward

14  less effective, that's when you get into not reasonably

15  effective.

16  Q.  So let's try to discuss a little bit about that spectrum.

17  The Secretary of State's Office's view is that even so much as

18  just standing between the watcher and the activity being viewed

19  could violate Section 4.09.

20  A.  Yes.  If you're obstructing their view of the activity,

21  then yes.

22  Q.  And the Secretary of State's Office would also say that

23  making the watcher stay in the designated area could also

24  violate section 4.09.

25  A.  Absolutely.

1   Q.  And the Secretary of State's Office would say watchers

2   can't be put into some sort of a pen.

3   A.  Agree with that.  And that was the law before SB1, and

4   that's the law after SB1.  That hasn't changed at all.

5   Whenever an election official tries to relegate watchers to a

6   particular area of Central Count and doesn't let them have free

7   movement, we would talk to those election officials before SB1

8   and remind them that obstructing a poll watcher is a crime.

9       So, you know, every single Election Day that I've been --

10  that I was in that job, we started the day with poll watchers,

11  usually from Dallas, sometimes from Houston, sometimes from

12  Austin or Bexar County, but every day we would start with poll

13  watchers demanding to be let into Central Count and not kept in

14  a pen.  And every single Election Day we would tell the

15  election officials *You can't keep them in a pen.*

16  Q.  And so similarly, the Secretary of State's Office would

17  say, *"Watchers can't be held behind a wall."*

18  A.  That's right.  Or between a glass partition in the

19  activity.

20  Q.  Now, the Secretary of State's Office has no position about

21  what distance is close enough to see or hear under

22  Section 4.09, right?

23  A.  Well, it's -- yeah, it's just as subjective as conveniently

24  near.  They're both subjective distance requirements, and it's

25  going to depend on how well their eyesight is and how well

1  their hearing works before they're close enough to see and

2  hear.  Or before they're conveniently near, whichever standard

3  you're dealing with.

4  Q.  And in your view, and the view you applied when you were

5  director of the Elections Division, is that asking a poll

6  watcher to stand ten feet back from voting booths could

7  constitute a violation of Section 4.09?

8  A.  Yes, absolutely.  And all of that became much more

9  litigated, more of a real problem in 2020 with COVID.

10  Q.  The Secretary of State's Office can't say whether a poll

11  official violates 4.09 by demanding that a poll watcher stand

12  one foot away from a voter?

13  A.  Yeah, I don't know.  It could be unreasonable.  It could

14  render their service unusable, but in most cases I don't think

15  it would, so that's a very difficult question to answer in the

16  abstract.

17  Q.  As a general matter, the Secretary of State's Office

18  doesn't really get into those details?

19  A.  Well, we get into it when we're called about it, so

20  sometimes, you know, you get a call, and you're on speakerphone

21  and both teams are stressing their position and trying to get a

22  ruling from you on the spot, so we get involved in those

23  situations sometimes.

24  Q.  Mr. Ingram, I want to turn our discussion now to another

25  provision of SB1, and that's going to be Section 4.06(h).  You

1   would agree that 4.06(h), which for the record, I'll note is on

2   the screen in front of you, provides that poll watchers must

3   swear an oath not to disrupt the voting process or harass

4   voters.

5       Right?

6   A.  Agree with that.

7   Q.  The term "disrupt" is not defined in SB1.

8   A.  I agree with that.

9   Q.  And the term "harass" is also not defined in SB1.

10  A.  Yes.

11  Q.  Despite the lack of definition for these terms in the

12  statute, the Secretary of State's Office would agree that there

13  are lots of ways you could harass a voter?

14  A.  I never have stopped to think about the ways that you could

15  harass a voter.  So I don't have an opinion on that at all.

16  You know, obviously, if you're getting in their personal space

17  when they're trying to cast their ballot, that's illegal and

18  should not be done, and that's what I would think would be the

19  harassment.

20      I heard about one situation in Williamson County where a

21  poll watcher wanted to review a voter's ballot before it went

22  into the scanner, and they yanked it out of the voter's hand.

23  That was harassing that voter and should not be done.

24  Q.  And so it sounds like, sir, we agree one way you could

25  harass a voter is trying to see what they're marking on their

1  ballot?

2  A.  Agreed.

3  Q.  And one way you could harass a voter is to get in their

4  personal space?

5  A.  Right.  I mean, sometimes at the check-in table you can't

6  avoid being in their personal space if you're going to

7  adequately observe the check-in process, so I wouldn't say that

8  the personal space invasion is always harassment.  It could be.

9  Q.  And another way you could harass a voter is by standing too

10  close to them?

11  A.  Again, it could be or it could be just doing what you have

12  to do to have a reasonable observation of the check-in process.

13  Q.  And the determination of whether or not there is harassment

14  is going to be left up in the first instance to the presiding

15  elections judge?

16  A.  The presiding judge under 32.075 has the responsibility to

17  maintain order in the polling place, so yes.

18  Q.  And in every election since you've been with the Secretary

19  of State's Office, there has been some tension between poll

20  watchers who want to observe the activity and poll workers who

21  feel like they're being crowded?

22  A.  I agree with that.  And I'd also agree that every election

23  there's tension between poll watchers and election officials in

24  Central Count about the observation process.

25  Q.  Sir, I'll direct the conversation now to Section 8.01 of

1    SB1.  And separate from Section 4.09's creation of a criminal

2    penalty, Section 8.01 creates a civil penalty for anyone

3    convicted of a criminal offense arising under SB1.  Is that

4    right?

5    A.  Yeah, I can't see all of the Section 31.129, so I don't

6    know, is that it?

7    Q.  Sure.  We'll make that available to you.  Please bear with

8    us just one moment.

9    A.  Okay.  That's what I thought.  Yeah, it's not the violation

10   of a provision of SB1 that triggers this.  It's a violation of

11   the Election Code.

12   Q.  So a violation of the Election Code could subject an

13   offender to civil penalty under 8.01?

14   A.  Right.  It could subject an election official as that term

15   is defined up in 31.128 to a civil action.

16   Q.  And that civil action or civil penalty that we're

17   discussing would provide that anyone convicted of a crime may

18   no longer serve as an elections official?

19   A.  I don't agree with that.  Go back up so I can see the rest

20   of 31.129 -- back down, I mean.  Yeah, I don't agree with that.

21   31.128 says if you're convicted of a crime under this code,

22   you're disqualified.  It doesn't say anything about having a

23   civil penalty and that qualifying you or not qualifying you in

24   the future.

25   Q.  So maybe if we change my question just a bit.  If you're

1   convicted of a crime, you'd agree that you'd be disqualified

2   under this section; is that fair?

3   A.   Under 31.128.

4   Q.   Let's turn our attention now if we could to Section 5.13,

5   please.   Section 5.13(b) provides that a mail ballot may be

6   accepted only if certain identifying information is provided on

7   the carrier envelope or signature sheet; is that right?

8   A.   I didn't get to read all of it.

9   Q.   Please take your time.   Just let me know when you're ready.

10      *(Pause.)*

11  A.   Okay.   Yeah, the identifying information has to be on there

12  before it's accepted.

13  Q.   And Section 5.13 also requires an early voting clerk to

14  reject a mail-in ballot if the required identification

15  information on the carrier envelope is either missing or does

16  not match the information that the voter previously provided on

17  their voter registration application.

18  A.   What it says is if a voter provides information required

19  and it identifies the same voter.   Well, "identifies the same

20  voter" is broader than what they submitted on their voter

21  registration application.   That means anything that's in that

22  voter's record that matches what they put on the carrier is

23  sufficient to justify acceptance.   This is not a memory game

24  for voters to have to remember what they put on their

25  application and get it right.   This is for them to use a number

1   that identifies them as the voter.

2   Q.  Mr. Ingram, I'd like to ask you some questions about what

3   is sometimes referred to as the "HB2512 process."  Are you

4   familiar with that?

5   A.  I am.

6   Q.  You'd agree that when I use the term "HB2512 process," this

7   refers to a bill in the 2013 legislative session called HB2512

8   that amended the Transportation Code to provide for the

9   Secretary of State's Office to have access to information in

10  the driver's license file to assist with voter registration?

11  A.  Agreed.

12  Q.  And pursuant to HB2512, Secretary of State's Office created

13  an annual process where it would try to maximize the number of

14  full Social Security numbers that you had in your database?

15  A.  Agreed.

16  Q.  And the HB2512 process, as it's known, allows the Secretary

17  of State to get information from the driver's license record to

18  supplement voter registration records and use it for voter

19  registration purposes?

20  A.  Right.

21  Q.  I'm going to show you what's already in evidence as

22  LUPE 289.

23      Mr. Ingram, you've got that on the screen in front of you?

24  A.  I do.

25  Q.  And you recognize LUPE 289 as an e-mail from Kristi Hart to

1  you and Mr. Adam Bitter dated December 20, 2021?

2  A.  Agreed.

3  Q.  Ms. Hart is the team manager; is that right?

4  A.  She is.

5  Q.  And this communication says, *"As you know, we ran a*

6  *comparative process over the weekend.  We did run queries prior*

7  *to and following the process.  That information is listed*

8  *below."*

9    Do you see that?

10  A.  I do.

11  Q.  And here, the word "query" means a search run across a

12  database; is that right?

13  A.  Right, this query is with regard to the voter registration

14  database.

15  Q.  And "before," as that term is used, means before you did

16  the HB2512 matching process, right?

17  A.  Agreed.

18  Q.  And so before the HB2512 matching process, on December 20,

19  2021, in the team database, the number of active and suspense

20  voting records with no Texas driver's license number was

21  1.3 million plus a little?

22  A.  Agreed.

23  Q.  And then after the process it was 493,823, right?

24  A.  Agreed.

25  Q.  The number went down by approximately 800,000?

1  A.  It did.

2  Q.  And if we go back down to the fourth row of LUPE 289, it

3  says *"Number of active and suspense voting records with neither*

4  *TDL or SSN in the record."*  The after number is 106,911, right?

5  A.  Agreed.

6  Q.  And that box gives us the number of voters with neither

7  Texas driver's license nor Social Security numbers, right?

8  A.  That's right.

9  Q.  And so it's fair to say that on December 20, 2021, there

10  were that many active and suspense voters who did not have

11  either of the numbers required by SB1 in the team database?

12  A.  Agreed.  But they're only required by SB1 if you are voting

13  by mail.

14  Q.  We can take down what's been marked as LUPE 289, and I'd

15  ask, Derek, to please put up what's been marked as LULAC 75.

16      Mr. Ingram, you have LULAC 75 in front of you?

17  A.  I do.

18  Q.  Again, you'll acknowledge this is an e-mail sent from

19  Kristi Hart to you, Ms. Adkins, and Mr. Bitter on December 23,

20  2022, right?

21  A.  Correct.

22  Q.  After the HB2512 process in December 2022, it's fair to say

23  that 463,393 voters had no Texas driver's license number on

24  their record?

25  A.  I agree with that.

1  Q.  And after the HB2512 process in December of 2022, it's fair

2  to say that 392,084 voters had no Social Security number on

3  their voter record?

4  A.  I agree with that.

5  Q.  Together, that's over 850,000 voters who may put an ID

6  number on a mail ballot that does not match their registration

7  record.

8  A.  I wouldn't agree with that, no.  I would look at the bottom

9  two fields, the bottom two where it talks about they have a TDL

10  but a null value for SSN, and where they've got at least a four

11  of SSN but null for TDL, that's the universe of people that

12  we're talking about, or the people in the middle column that

13  have neither one.  Those are the ones, not the top two, the

14  bottom three.

15      And this is precisely why we emphasize in our education

16  materials to put both numbers.  That's why Secretary Scott

17  emphasized it.  I'm sure Secretary Nelson is doing the same,

18  because it increases the voter's chance of success if they put

19  both numbers.  If either one is identifying the same voter,

20  then that carrier envelope or application for ballot-by-mail

21  gets accepted.

22  Q.  So it sounds like you would at least agree with me that

23  there are 93,867 voters have neither Texas driver's license nor

24  Social Security numbers in the team database as of December 22,

25  2022?

1  A.  Right, I agree with that, December 23rd.

2  Q.  The report that we're looking at is only run once a year,

3  right?

4  A.  Yes.

5  Q.  And December 2022 is the last time this report has been

6  run?

7  A.  It's the last time as of the time that I knew anything

8  about it.  Whether they've run it again this summer for some

9  reason, I don't know.  Haven't heard.  I'm not part of that

10  process anymore.

11  Q.  You'd agree that this report was run after voters and

12  counties work to get ID numbers into the voter registration

13  databases in the 2022 primary and general elections, right?

14  A.  I agree with that.  And you can see the result of that work

15  in that middle number here, because in the other dataset from

16  '21, it was 106,000.  Well, 11,000 have already been knocked

17  off before we did the process, and now that it's down 13,000

18  after the process.  So that diminution in that number with zero

19  values for either one is evidence of the work that was done in

20  '21 to get people to supply those numbers.

21      The only way these numbers are ever going to go is down.

22  Q.  Let's turn our attention to Section 6.06 of SB1, and I'll

23  give Derek just a moment to pull it up for you.

24      Mr. Ingram, do you have that on your screen in front of

25  you?

1   A.  I do.

2   Q.  You'd agree that Section 6.06 makes it a state jail felony

3   for a person to compensate or offer to compensate another

4   person or to solicit, receive, or accept compensation for

5   assisting voters?

6   A.  I agree with that.

7   Q.  And relatedly, Section 6.03, which we'll pull up for you,

8   requires an assister to complete an oath form stating, among

9   other things, they have not received or accepted any form of

10  compensation or other benefit from a candidate, campaign, or

11  political committee?

12  A.  I agree with that.  It was a crime before SB1, and it was a

13  more specific crime after SB1.

14  Q.  You'd agree that the oath we're talking about in Section

15  6.03 is sworn to under penalty of perjury, correct?

16  A.  Agree.

17  Q.  Returning to 6.06(e), that section defines "compensation"

18  as an economic benefit as defined by Section 38.01 of the Penal

19  Code?

20  A.  I know it incorporates by reference the Penal Code.  I'm

21  not seeing that on this screen.

22          THE COURT:  Yes, you're in the wrong section.

23          MR. KANTERMAN:  6.06(e).  Do I have the wrong section?

24          THE COURT:  No, he -- displayer has -- you correctly

25  named it.  It's just not what's showing up on the screen.

1      THE WITNESS:  There it is.

2  BY MR. KANTERMAN:

3  Q.  Mr. Ingram, do you now have 6.06(e) in front of you?

4  A.  I do.

5  Q.  And would you agree that it references Section 38.01 of the

6  Penal Code?

7  A.  I agree with that.

8  Q.  Section 38.013 of the Texas Penal Code describes "economic

9  benefit" as *anything reasonably regarded as an economic gain*

10  *or advantage, including money or anything of value.*"

11  A.  Okay.

12  Q.  And so you would agree with that?

13  A.  I'll take your word for it.  I haven't looked at the Penal

14  Code, but I don't have any reason to doubt that you read it

15  correctly.

16  Q.  In your view, there's no difference between the terms

17  "paying" and "compensating," right?

18  A.  Agreed.

19  Q.  And so you understand under Section 6.06, the section

20  creates a felony where a person offers or, in fact, provides

21  money or anything of value in exchange for assisting voters?

22  A.  It didn't create the felony.  The felony already existed

23  since, I believe, 2013.  It was, I believe, House Bill 206 that

24  created the compensation prohibition, so that's not a new

25  creation.

1  Q.  You would agree that it contains reference to the fact that

2  a felony would occur if a person offers or, in fact, provides

3  money or anything of value in exchange for assisting voters?

4  A.  Agree with that, that the difference is it used to be that

5  you had to be paid for piecework, and this made it a little

6  broader to say if you assist voters at all and get paid for it,

7  then you're committing a crime.  This doesn't mean that people

8  who are otherwise paid to assist a voter in their regular life,

9  they also can help them with their ballot.  It's not -- this is

10 not covering that activity.

11 Q.  And so the answer to my question was, yes, you understand

12 Section 6.06 references a felony which occurs if a person

13 offers or, in effect, provides money or anything of value in

14 exchange for assisting voters?

15 A.  In exchange for the assistance.  I agree with that.  And

16 also it creates a crime for -- or changes the crime so that

17 it's clear if you solicit payment for assisting voters.

18 Q.  And you understand also that an assister who, in fact,

19 accepts money or anything of value from a candidate, campaign,

20 or political committee, and swears under oath pursuant to

21 Section 6.03 that they did not accept anything of value,

22 violates that oath and commits perjury?

23 A.  So, obviously, campaigns hire people to canvass for votes

24 in neighborhoods.  I mean, there's -- door-knocking and shoe

25 leather is part of the election experience in America.

1    That's -- nothing in this prohibits that, affects that, changes

2    that in any way.  Campaigns can pay people to canvass

3    door-to-door.  No question about it.  This is not that.

4        What we're talking about is paying somebody specifically to

5    assist a voter with their ballot.  "Assistance" is a term of

6    art.  "Assistance" is not general information.  It's not

7    education.  "Assistance" is a thing that's defined in the

8    Election Code.

9    Q.  Sir, my question, I think, was different, and that was

10   whether you understand that an assister who, in fact, accepts

11   money or anything of value from a candidate, campaign, or

12   political committee and swears under oath that they haven't,

13   violates the oath set forward in Section 6.03?

14   A.  I can't answer the question the way you ask it, because the

15   way you ask it is, if I'm paid by a campaign and then I go

16   assist a voter and swear I didn't get paid, am I lying?  No,

17   maybe not.  I don't know.  It depends on why you got paid.  If

18   you got paid to canvass for votes, and you happen to assist a

19   voter, that's not implicated by this section at all.  So you

20   wouldn't be lying on your oath.  You didn't get paid a $20

21   bonus for assisting that voter.  You didn't get paid extra.

22   You know what I mean?

23       So you're trying to lump in something that's perfectly

24   legal in the First Amendment with something that's not legal,

25   and that's what I'm trying to make sure we've got very

1    distinctly separated.

2    Q.  And so I understand that you cannot answer the question the

3    way I posed it to you.

4    A.  I agree with that, because I don't know the answer.

5    Depends on what's happening.  I need more facts.

6    Q.  Let's discuss a few hypotheticals that may help us supply

7    some of the facts and further understand the Secretary of

8    State's Office's understanding of these provisions and

9    application.

10       Mr. Ingram, assume, please, for the moment, that an elderly

11   voter calls the local senior center and asks for assistance

12   with completing a mail ballot.  Follow me so far?

13   A.  Absolutely.

14   Q.  Assume further that the senior center volunteer agrees to

15   help the voter and, in fact, offers to do so.  Still good?

16   A.  Offers to use them?

17   Q.  Offers to do so.  Offers to assist.

18   A.  Okay, sure.

19   Q.  And assume further that the voter offers to pay the

20   volunteer's bus fare to visit her at her home to get the

21   assistance that's been requested.  Do you have all of that?

22   A.  I do.

23   Q.  Under that hypothetical, the Secretary of State's Office

24   believes the assister can accept the bus fare without violating

25   Section 6.06?

1   A.   Absolutely.  They can get their expenses reimbursed.

2   That's not payment.  That's keeping from going negative.

3   Q.   Another hypothetical -- and you can ignore facts that we

4   just set up.  New facts.

5        Assume for the moment that a community member hires a local

6   teenager and asks them to assist with completing the ballot and

7   offers to pay the teenager $20 to do so.  Understood?

8   A.   Okay.

9   Q.   Under that scenario, the Secretary of State's Office would

10  say Section 6.06 has been violated?

11  A.   We would strongly discourage somebody from taking $20 to

12  assist a voter, yes.

13  Q.   And if they did, it would be the Secretary of State's

14  Office's position that 6.06 has been violated?

15  A.   If I received a complaint with that set of facts in it,

16  yes, I would refer that to the Attorney General.

17  Q.   For example, if a voter says, *Hey, Jimmy, come by.  I'll*

18  *pay you 20 bucks to help me with this ballot,* that violates the

19  statute?

20  A.   I'm sorry.  I missed it.

21  Q.   Sure.  Happy to give it again.

22       If a voter says, *Hey, Jimmy, come by, and I'll pay you 20*

23  *bucks to help me with this ballot,* in the Secretary of State's

24  Office's view, they violated Section 6.06?

25  A.   Agreed.

1    Q.   Another hypothetical.  Assume a blind voter needs

2    assistance with completing a mail ballot.  Good so far?

3    A.   Okay.

4    Q.   Assume that this blind voter calls an old college friend

5    and asks for assistance with the ballot and offers further to

6    meet the friend at a local restaurant at which they will fill

7    out the ballot together.  Still following me?

8    A.   Sure.

9    Q.   Assume that the blind voter offers to and does, in fact,

10   buy lunch for the friend in exchange for his assistance.  Still

11   good?

12   A.   Yeah, I don't know if that's the way that would normally go

13   down.  The way that normally would go down is --

14          THE COURT:  That's not the question, sir.

15          THE WITNESS:  Well, I'm just --

16          THE COURT:  Sir, stop.  You're not going to argue with

17   me.

18          THE WITNESS:  No, sir.

19          THE COURT:  Finish your question.

20          MR. KANTERMAN:  Thank you, Your Honor.

21   BY MR. KANTERMAN:

22   Q.   The most previous hypothetical.  Assume that the blind

23   voter offers to and does, in fact, buy lunch for the friend in

24   exchange for his assistance.

25   A.   If it's definitely for the exchange -- in exchange for the

1  assistance, then, yes, that would be referable, but normally

2  that's going to be something that you do for your friend

3  because he's helping you out.  It's not for the assistance;

4  it's just because you got the opportunity to see your friend

5  and you're happy to see him.

6  Q.  It's your testimony that if a blind voter offers to and

7  does, in fact, buy lunch for the friend in exchange for his

8  assistance, that there has been a violation of SB1?

9  A.  There's definitely a potential violation.  It would depend

10 on the facts of the exchange, but on that hypothetical, with

11 those facts, I would agree that we've got a facial violation.

12     Now, whether or not anybody would ever complain about it

13 and whether it would ever get prosecuted, highly doubt it.

14 Q.  Mr. Ingram, you would agree that there are certain

15 exceptions to 6.06's application, right?

16 A.  I don't know.  I'd have to look at the Code.

17 Q.  Derek, if you wouldn't mind, please, let's pull up

18 Section 6.06(f).

19     Mr. Ingram, on the screen in front of you should be a copy

20 of Joint Exhibit 1, which is already in evidence displaying

21 6.06(f.)  Do you have that?

22 A.  I do.

23 Q.  Section 6.06(f) provides that 6.06's prohibition on

24 compensating assisters does not apply if the person assisting

25 the voter is an attendant or caregiver previously known to the

1   voter.

2   A.   Agree with that.

3   Q.   SB1 does not define the term "attendant."

4   A.   I agree.

5   Q.   And it also doesn't define the term "caregiver."

6   A.   Agree.

7   Q.   The Secretary of State's Office does not have a definition

8   of the term "caregiver" as that's used in this section.

9   A.   Other than Webster's, we don't have any special definition,

10  no, sir.

11  Q.   And same for the term "attendant"?

12  A.   Agreed.

13  Q.   And despite the words "attendant" and "caregiver," each

14  appearing separately in the statute, the Secretary of State's

15  Office understands the terms to mean generally the same thing?

16  A.   I mean, it can have slightly different job functions.

17  "Attendant" might be somebody that, you know, is more like

18  running errands.  "Caregiver" is somebody that has to make sure

19  that somebody is taken care of and able to do their activities

20  of daily life, so they're a little different, but the point is

21  that they're previously being paid for something besides

22  assisting a voter.

23  Q.   So you would generally agree, at least despite minor

24  differences in their functions, the roles and titles, the words

25  mean the same thing?

1  A.  It means somebody that's previously engaged by the voter to

2  take care of them.

3  Q.  Now, the Secretary of State's Office has not published any

4  guidance on how to interpret the term "attendant" as that term

5  is used in this section, right?

6  A.  I agree with that, but we've not had any questions about it

7  either.

8  Q.  But you agree you hadn't published any guidance on it?

9  A.  Usually we publish guidance in order to cut off questions.

10  There haven't been any questions.

11  Q.  And so you would agree that you have not published any

12  guidance on it?

13          MR. KERCHER:  Objection, Your Honor.  Asked and

14  answered.  He responded yes at the very beginning.

15          THE COURT:  That's asked and answered.

16  BY MR. KANTERMAN:

17  Q.  The Secretary of State's Office has not published any

18  trainings on the term "attendant."

19  A.  No.

20  Q.  And the Secretary of State's Office has not published any

21  guidance on how to interpret the term "caregiver"?

22  A.  Agreed.  Again, we haven't had any questions about it, so

23  there hasn't been any perceived need to do any such training or

24  education.

25  Q.  As we discussed, 6.06(f)'s exception requires the caregiver

1    or attendant to have been previously known to the voter, right?

2    A.   Agreed.

3    Q.   SB1 does not define the phrase "previously known to the

4    voter"?

5    A.   It does not.

6    Q.   And the Secretary of State's Office has not published any

7    guidance on how the phrase "previously known to the voter"

8    should be interpreted?

9    A.   Agreed.

10   Q.   And the Secretary of State's Office has not published any

11   trainings on how the phrase "previously known to the voter"

12   should be interpreted?

13   A.   Agree with that.

14   Q.   Setting aside the fact the Secretary of State's Office has

15   not provided guidance on this matter, in your view, it doesn't

16   matter how long the voter has known the attendant or caregiver

17   before voter assistance is provided under this section?

18   A.   Well, I agree with that.

19   Q.   Could be 15 years?

20   A.   Could be 15 years.  Could be 15 minutes, if they're fresh

21   on the job.  But their job is something other than assisting a

22   voter, then it's fine.

23   Q.   But you would agree the explanation you just provided to me

24   cannot be found anywhere in SB1?

25   A.   Sure, it's right here.  I mean, the whole point of

1    attendant or caregiver is that their job is to do more than

2    just assisting the voter with voting.

3    Q.  You can't say with certainty whether prosecutors would

4    agree with your interpretation of the length of relationship

5    that we just discussed, right?

6    A.  I have no ability to control what prosecutors do.  I know

7    that most of them, if they have a question about an election

8    law statute, will call the Secretary of State's Office and ask

9    us what we think.  We get that question a lot.

10   Q.  But ultimately, as you said, you don't have any control

11   over the prosecutorial decision-making in the end?

12   A.  Absolutely not.

13   Q.  Mr. Ingram, let's turn now to Section 7.04.  Confirming,

14   sir, you've got that on the screen in front of you?

15   A.  I do.

16   Q.  You would agree that Section 7.04 codifies several new

17   felony offenses relating to vote harvesting?

18   A.  I mean, I agree it does what it does, yes.  Doesn't

19   specifically define "vote harvesting."

20   Q.  Let's work towards that.  So Section 286.015(b) makes it

21   unlawful to directly or through a third party -- I'll pause for

22   a moment while this populates on your screen.

23       (Pause.)

24       Sir, do you have that in front of you?

25   A.  Okay.

1  Q.  Generally agree that 7.04 makes it unlawful to knowingly

2  provide or offer to provide vote-harvesting services in

3  exchange for compensation or other benefit?

4  A.  Agreed.

5  Q.  And it also makes it unlawful to provide or offer to

6  provide compensation in exchange for those vote-harvesting

7  activities?

8  A.  Agreed.

9  Q.  For purposes of these sections, a "benefit" is *anything*

10 *reasonably regarded as a gain or advantage*"?

11 A.  That's what it says.

12 Q.  And you mentioned a moment ago that this section also

13 defines "vote harvesting," and it defines vote-harvesting

14 services to mean *"any in-person interaction with one or more*

15 *voters in the physical presence of an official ballot or a*

16 *ballot voted by mail intended to deliver votes for a specific*

17 *candidate or measure.*"

18 A.  Uh-huh, I agree with that.

19 Q.  So for an activity to be considered vote harvesting under

20 this provision, the activity must include, one, in-person

21 interaction with one or more voters; and two, be in the

22 physical presence of an official ballot or ballot voted by

23 mail?

24 A.  Agreed.

25 Q.  I want to --

1  A.  And intended to produce a vote for a particular candidate

2  or measure.

3  Q.  I want to begin by discussing the in-person interaction

4  requirement.  In the Secretary of State's Office's view, a

5  telephonic discussion between two individuals would not satisfy

6  the in-person requirement, right?

7  A.  Agree with that.

8  Q.  Sitting across the table from an individual would satisfy

9  the in-person requirement, right?

10 A.  Sure.

11 Q.  And in the Secretary of State's Office's view, in order for

12 the in-person interaction requirement to be met, the

13 interacting individuals must be close enough to see or hear

14 each other; is that right?

15 A.  They have to be in the physical presence of each other,

16 yes.

17 Q.  And so you would agree that they would have to be close

18 enough to see or hear each other?

19 A.  They've got to be with each other, yes.

20 Q.  If I asked you to put a number on how close that would be,

21 you couldn't do that, right?

22 A.  No, no, I couldn't.  The point of vote harvesting is that

23 you are both present, across a table, catty-corner from each

24 other, whatever, in the presence of the ballot.  And

25 politiqueras, when they get hired by a candidate, they don't

1    care who you vote for president, they don't care about U.S.

2    Senate, they don't care about anything except the race that

3    they got hired on.  So when they get down to that school

4    district race, then they want to make sure that the voter

5    checks the box for their preferred candidate.  That's vote

6    harvesting.  That's the whole point of it.

7        So if you've got an interaction with two people that is

8    15 feet apart or close, it doesn't really matter.  The point is

9    that the vote-harvester is trying to do is to make sure that on

10   that particular candidate or measure, the voter goes a

11   particular way.  And that can be done from 15 feet, it can be

12   done from 5 feet.  I'm not going to put a number on it.  If

13   that's what's happening, that's vote harvesting.

14   Q.  Based upon that description you just gave us, I assume it

15   would be the Secretary of State's Office's view it doesn't need

16   to give a precise measurement or distance of closeness, because

17   everybody would know it if they saw it.  Everybody sees it when

18   it happens, everybody would understand what's going on; is that

19   right?

20   A.  Whether everybody would know, I don't know, but if I get a

21   complaint with a set of facts in it that is like what I

22   described -- like what (a)2 here describes, then I would refer

23   that to the Attorney General.  What everybody knows, I don't

24   know what they know.  I have zero insight into what everybody

25   knows.

1    What I do know is if I get a complaint, and it talks about

2   physical presence, intimidation, making sure that a voter

3   marked one box one way, I would consider that vote harvesting,

4   and I would get it over to the Attorney General for

5   investigation.  And I have, in fact, done so, before SB1 and

6   since SB1.

7   Q.  You would agree, though, that the Secretary of State's

8   Office has not published any guidance specifying how close two

9   individuals must be for an interaction to be considered

10   in-person under 7.04?

11   A.  I agree with that.  We have not published any such

12   guidance.

13   Q.  And you have not published any such trainings?

14   A.  I agree with that.

15   Q.  And we alluded to it earlier.  We can squarely address it

16   now.  Let's discuss the requirement that a ballot be physically

17   present under 7.04.

18    You'd agree that SB1 does not define what it means for a

19   ballot to be physically present, right?

20   A.  I agree with that.

21   Q.  For example, SB1 does not designate the proximity within

22   which a ballot must be to a conversation for it to be deemed

23   physically present.

24   A.  I agree that the statute doesn't say anything about that.

25   Q.  The Secretary of State's Office has no official opinion

1    about whether a ballot being within ten feet of a discussion is

2    close enough to constitute physical presence for this section?

3    A.   I don't know how else to say this.  If the ballot is in the

4    kitchen, and we're in the living room, and we're talking about

5    our preferred candidates, that's First Amendment.  That's not

6    implicated by this section at all.  So whether that's ten feet

7    or 8 feet, it doesn't matter.  That's not what's going on.

8    What's going on is a perfectly normal -- I'm trying to persuade

9    you to vote for my candidate.  I can get paid for that.  I can

10   go do it all day long, and it will never, ever, ever implicate

11   this section.

12       The whole point of this section is whenever the voter and

13   the harvester get together and they're reviewing the ballot

14   together, and then they get down to that candidate, and the

15   harvester makes sure they check the right box, that's

16   harvesting.  So anything other than that is First Amendment.

17       I mean, we've got the right to pay canvassers to go solicit

18   votes for our preferred candidate.  That's not implicated by

19   this.  This is whenever you've got a particular mission to

20   deliver a particular number of votes for a particular candidate

21   and you make sure that the voter checks that box.  That means

22   that the ballot has to be in front of both of you and you both

23   have to know it's there and you both have to be looking at it.

24   This is not a situation where you can be caught by accident.

25   Vote-harvesters know exactly what they're doing.

1  Q.  So I think you agreed with me that the Secretary of State's
2  Office has no official opinion about whether a ballot being
3  within ten feet of a discussion is close enough to constitute
4  physical presence for this section.
5  A.  Almost never would that be.  I can imagine, I guess, a
6  very --
7            THE COURT:  Sir, that's not the question.
8            THE WITNESS:  I'm sorry.
9            THE COURT:  It will go a whole lot easier if you just
10 answer the question.  The question is, does the Secretary of
11 State's Office have a position?
12           THE WITNESS:  Not really, no, sir.
13 BY MR. KANTERMAN:
14 Q.  As a general matter, if a discussion is proceeding and a
15 ballot is 5 feet away, generally, the Secretary of State's
16 Office doesn't think that the ballot is sufficiently nearby to
17 constitute physical presence for this section, right?
18 A.  I agree with that.
19 Q.  Yet, in the Secretary of State's Office's view, there are
20 circumstances that might render a ballot which is 5 feet away
21 from a conversation sufficiently nearby to deem it physically
22 present.
23 A.  It's hard to envision.
24 Q.  I'll give you an example.  If a conversation is occurring
25 at a large conference room table and the ballot is 5 feet away

1  from the two speakers but still on the table that, in the

2  Secretary of State's Office's view, might be enough to

3  constitute physical presence under this section.

4  A.  Doubtful, but maybe.  It just depends.

5  Q.  But the Secretary of State's Office can't give a blanket

6  opinion or blanket guidance about how close in proximity a

7  ballot must be to a conversation for it to be deemed physically

8  present for this section.

9  A.  I agree with that.

10  Q.  You'd agree that any decision would have to be made on a

11  case-by-case basis?

12  A.  Well, whether or not voter-harvesting is going on is always

13  going to be decided on a case-by-case basis, yes.  Proximity to

14  the ballot is one of the factors.

15  Q.  And if I pressed for a more specific set of guidance about

16  proximity, you'd tell me it's just you or the director

17  reviewing a complaint and applying their judgment?

18  A.  As far as what we do.  Now, whether or not a prosecutor

19  agrees with us is a different story entirely.

20  Q.  But while you were director, a decision as to whether

21  someone violated this section, for purposes of assessing a

22  complaint, you'd simply just have to know it when you saw it?

23  A.  If the allegation in the complaint is that Ms. Rodriguez or

24  Mr. Smith paid me $50 if I would go vote for commissioner

25  so-and-so for the school board, then that gets it referred to

1  the Attorney General.  That's either 3602 or vote harvesting,

2  but either way, that gets referred.  It's not Keith Ingram

3  deciding, does it fit in the statute or doesn't it?

4           MR. KANTERMAN:  Your Honor, I don't know if now would

5  be a good time for a short break?

6           THE COURT:  Yes.

7           COURT SECURITY OFFICER:  All rise.

8           *(2:22 p.m.)*

9                          *   *   *

10          *(2:39 p.m.)*

11          COURT SECURITY OFFICER:  All rise.

12          THE COURT:  Thank you.  Please be seated.

13          MR. KANTERMAN:  Thank you, Your Honor.

14  BY MR. KANTERMAN:

15  Q.  Mr. Ingram, I've been handed a number of questions from my

16  colleagues, and I'd like to just circle back on some of them to

17  make sure I've closed some gaps, so I appreciate your patience.

18      I don't think I asked you earlier, but when we discussed

19  some of the legislative meetings that your office was having, I

20  wanted to ask two additional questions.  The first is whether

21  on some occasions your office would propose language to achieve

22  what a particular legislator or committee member might want to

23  accomplish?

24  A.  In general or with regard to SB7/SB1?

25  Q.  In general.

1  A.  In general, that is one of the functions of our office,

2  sure.  We will propose language if a legislator tells us what

3  they want to do, and they want us to draft something, it always

4  goes to a "leg." council after we submit it.  That didn't

5  happen on SB1 or SB7.

6  Q.  I'll ask Derek to please pull back up LULAC 75.

7     Mr. Ingram, we looked at this document earlier, right?

8  A.  We did.

9  Q.  And you highlighted row four as being relevant, the row

10 where the post number says 298,217, correct?

11 A.  Yes, and as well as the bottom and the middle.

12 Q.  And I'll stay with row four just for a moment, please.

13 A.  Okay.

14 Q.  These are the voters who, if they put their Social Security

15 number on the mail ballot, will not match to their voter

16 registration record?

17 A.  That's right.

18 Q.  And row five, I believe, is the row that you had just

19 indicated you also identified?

20 A.  That's right.

21 Q.  Row five, which you'll note has been highlighted in green,

22 these are the voters who, if they put their Texas driver's

23 license number on the mail ballot, will not match to their

24 voter registration record?

25 A.  Right.  And I just want to make clear that when we talk

1  about "matching," we mean identify the same voter.  That's what

2  the statutory language is.

3  Q.  And taken together, there are 667,685 voters who could put

4  a valid driver's license or Social Security, the last four, on

5  a mail ballot and not match to their voter registration record?

6  A.  Agree with that.  That's the number that we want to get

7  down, and it's going to continue to decrease.

8  Q.  And so I want to talk a bit about that assertion.  You

9  would also agree, though, that each year a new group of Texas

10  voters turns 65 years old?

11  A.  I agree with that, but these numbers reflect all active and

12  suspense voters.  These are not limited to people over 65.  So

13  out of the almost 18 million voters that we have, this is the

14  total number with one or the other number but not the other

15  one.

16  Q.  But you would agree that there are a new set of voters who

17  would turn 65 every year?

18  A.  I agree with that, yes.

19  Q.  And some Texas voters who turn 65 may choose to vote by

20  mail?

21  A.  Agreed.

22  Q.  We could take LULAC 75 down.  Thank you very much.

23      Mr. Ingram, since implementing SB1, the Secretary of

24  State's Office has not done any analysis of the impact SB1 has

25  had on minority groups?

1   A.  I agree with that.

2   Q.  Secretary of State's Office has not done any analysis, for

3   example, the impact of SB1 on Black voters?

4   A.  I agree with that.

5   Q.  Secretary of State's Office has not done any analysis of

6   the impact of SB1 on Latino voters?

7   A.  Agreed.

8   Q.  Secretary of State's Office has not done an analysis, the

9   impact of SB1 on Asian voters?

10  A.  Agree with that.

11  Q.  Same true for Pacific Islander voters?

12  A.  Agreed.

13  Q.  And the Secretary of State's Office has not done any

14  analysis on the impact of SB1 on voters with disabilities?

15  A.  Agreed.

16  Q.  We spoke earlier about the fact that in March of 2023, your

17  role at the Secretary of State's Office changed.

18  A.  Yes, sir.

19  Q.  And your role changed shortly after an interaction you had

20  with Representative Swanson during testimony that you provided

21  at a March 9, 2023 Texas House Committee Meeting.

22  A.  Agreed.

23  Q.  Generally, that meeting, you were explaining that

24  notwithstanding the challenges that the Harris County election

25  had had in 2022, the November general election was the best one

1  Harris County had had since they implemented an election
2  administrator.
3  A.  I agree with that.
4  Q.  When you provided that testimony at the Texas House
5  Committee, you thought you were making accurate statements
6  regarding that election?
7  A.  I did.  It was accurate.
8  Q.  And Representative Swanson took issue with the views you
9  were expressing.
10  A.  She did.  She misunderstood what I said.  She thought that
11  I was saying they had a good election.  I was not saying that.
12  I was saying they had the best election they had had since they
13  had an EA.  That was a fairly low bar.
14  Q.  And that disagreement was in part because Representative
15  Swanson was expressing there to be, in her view, vast problems
16  in Harris County relating to ballot paper shortages and
17  Republican-heavy areas; isn't that right?
18  A.  I agree with that.  There was a litany of things she listed
19  in that hearing.
20  Q.  And during the exchange that you had with Representative
21  Swanson, you became frustrated with the representative.
22  A.  I did.  I don't like to have my testimony misunderstood or
23  mischaracterized.  I speak plainly, because I want to be
24  understood.
25  Q.  And that frustration that you had with Representative

1  Swanson was because you believed she was, in fact,

2  mischaracterizing your testimony?

3  A.  I agree with that.

4  Q.  After that hearing, the Secretary of State was not pleased

5  with your exchange with the Representative.

6  A.  That's right.

7  Q.  And following that exchange, your role at the Secretary of

8  State's Office changed?

9  A.  It did.

10  Q.  Simply put, as you understand it, the Secretary of State

11  thought that it was best for her and for you to change your

12  role.

13  A.  I agree with that.

14        MR. KANTERMAN:  Just a moment, Your Honor, if I could.

15        Mr. Ingram, thank you for your time.

16        Your Honor, I have no further questions.  I do pass to

17  my colleagues, who I understand have some additional questions.

18        MR. GENECIN:  Good afternoon, Your Honor.  I'm Victor

19  Genecin for the Haul plaintiffs.

20        *(2:47 p.m.)*

21                       EXAMINATION

22  BY MR. GENECIN:

23  Q.  Good afternoon, Mr. Ingram.

24  A.  Howdy.

25  Q.  A little while ago when you were testifying, you described

1    your view of vote harvesting.  Do you recall doing that?

2    A.  I agree we were talking about the new statute in SB1 and

3    its definition.

4    Q.  You explained what you understood the concept of vote

5    harvesting to mean; is that right?

6    A.  That's right.

7    Q.  Now, has the Secretary of State's Office put out any

8    written guidance to set forth the definition of vote harvesting

9    that you provided to the Court this afternoon?

10   A.  No, sir.  We go with the statute.  The criminal enforcement

11   is not something that we generally do, so we don't educate on

12   it.  The only role that the criminal pieces have for us is

13   whether or not something is a crime on the face of a complaint.

14   You know what I mean?  Our office doesn't implement the

15   criminal section, so that -- all those criminal laws and

16   things, you know, we sort of scan them, we know exactly -- we

17   know generally what they say, but it's not our job to educate

18   on those.

19   Q.  So that definition that you provided is not set down in

20   writing anywhere?

21   A.  The definition that I provided came straight out of the

22   statute, so you can look at 27.601, what was it 016(a)(2), and

23   you'll get the definition.

24   Q.  Has your understanding of the vote-harvesting law been

25   adopted by the Attorney General in an opinion of the Attorney

1   General, as far as you know?

2   A.  I don't think they've issued any opinions with regard to

3   vote harvesting.

4   Q.  Now, with regard to your testimony a little bit earlier, do

5   you remember you testified about the concept that the old poll

6   watcher provision that spoke of poll watchers being permitted

7   to be conveniently near meant the same thing as in the new law

8   which says that they have a right to be near enough to see and

9   hear?

10  A.  Agree with that.

11  Q.  You remember that testimony?

12  A.  No substantive difference.

13  Q.  Okay.  And has your view that there's no substantive

14  difference between those two phrases found its way into any

15  written guidance by the Secretary of State's Office?

16  A.  I don't know if we've gotten written guidance on it.  I

17  know that I've presented several legislative updates regarding

18  SB1, and that was my consistent position in front of several

19  different county audiences, including county judges, county

20  commissioners, and county election officials.

21  Q.  I'm asking, though, has there been anything in writing from

22  the Secretary of State's Office to that effect?

23  A.  Well, I don't know what the particular slide said.  You

24  know, I don't know if there's something in writing to accompany

25  what I was saying, but I know that whenever I teach that

1    provision of SB1, that I taught it to be the same as the
2    pre-existing standard.
3    Q.  Do you know if the Attorney General has issued any opinion
4    about the meaning of "near enough to see and hear"?
5    A.  As far as I know, they haven't issued any opinion on that,
6    no, sir.
7    Q.  And you also spoke about the question of what paid
8    canvassers would be allowed to do under SB1, remember that?
9    A.  Okay, uh-huh.
10   Q.  Has the Secretary of State's Office issued any written
11   guidance about what paid canvassers are or are not permitted to
12   do?
13   A.  No, sir.  That's, again, something that's beyond our scope.
14   Q.  Now, during your time as director of elections for the
15   Secretary of State's Office through the month of March of 2023,
16   were you familiar with the Secretary's obligations to voters
17   with disabilities under the Americans With Disabilities Act?
18   A.  Well, the Americans With Disabilities Act is not a voting
19   statute.  It has incidental implications with regard to
20   accessibility of polling locations, but HAVA is the more direct
21   law governing elections with regard to the disabled.
22   Q.  Let's start with Americans With Disabilities Act.  To the
23   extent the Americans With Disabilities Act applied to
24   elections, were you familiar with its requirements?
25   A.  Well, not in detail, no, sir.  There's I don't know how

1    many hundreds of pages in the Code of Federal Regulations about

2    ADA's requirements for accessibility.  We depended upon the

3    Coalition for Texans with Disabilities as well as Texans for

4    Disability Rights.  We depended on them.  They do surveys at

5    polling locations, they do audits in counties, and then they

6    send us those results, and we make sure that the County takes

7    those results seriously and makes changes sometimes to the

8    location, sometimes to a different location, so that they can

9    be accessible to all voters.

10   Q.  Were you familiar with the Secretary's obligations under

11   HAVA?

12   A.  Yes.

13   Q.  Were you familiar with the Secretary's obligations to

14   voters with disabilities under Section 504 of the

15   Rehabilitation Act?

16   A.  I don't know what that is.

17   Q.  Were you familiar with the Secretary's obligations to

18   voters with disabilities under Section 208 of the Voting Rights

19   Act?

20   A.  I do know that, yes, sir.

21   Q.  And during your tenure as director of elections, is it

22   correct that your office did not have written policies

23   regarding the State's obligations under the Americans with

24   Disabilities Act with regard to the administration of

25   elections?

1   A.  As I said before, we depend upon the Coalition for Texans

2   with Disabilities and Texans --

3            THE COURT:  It goes a lot easier if you would just

4   listen to the question and answer the question.

5            THE WITNESS:  The point is that we had them present

6   our seminars with written material --

7            THE COURT:  No, sir, that's not the question.  The

8   question is did you have written policies.

9            THE WITNESS:  Our office did not.  Our office

10  outsourced that to the experts, and we used their materials in

11  our seminars.

12  BY MR. GENECIN:

13  Q.  And to your knowledge, does the Secretary of State's Office

14  now have written policies regarding the State's obligations

15  under the Americans with Disabilities Act?

16  A.  No, sir.

17  Q.  No.  You don't know or the office still does not have such

18  written policies?

19  A.  I haven't looked on the website lately.  I would be

20  surprised if they had policies there.  They did not in March,

21  and there was no plans for such.

22  Q.  Is it correct that no one at the Secretary of State's

23  Office is assigned responsibility of monitoring the Division of

24  Elections compliance with the ADA?

25  A.  That's not true.  We've had a staff attorney assigned to

1  that role throughout my time at the office.  Christine Ramon

2  was the last one who was assigned that role, and she has not

3  been replaced yet, and I don't know if Christine has got

4  somebody else assigned that responsibility now.

5  Q.  Could we, Derek, have Mr. Ingram's deposition of March 29th

6  of 2023, please.  And if you'd go to page eight, please, at the

7  bottom, lines 24 and 25.

8      Yes.  If you would have a look at the testimony there.

9  A.  I think that's exactly what I just said.

10 Q.  Well, I think at that time we asked the question, *Is there*

11 *someone in your office who is assigned the responsibility for*

12 *monitoring compliance with the Americans with Disabilities*

13 *Act?"*  And you answered, *"No, sir."*

14 A.  I agree with that, and that's exactly what I said.  I said

15 Christine Ramon was responsible for it, and she had left a year

16 and a half ago, and we were farming those questions out to all

17 the lawyers.  And then I said that we didn't have anybody

18 assigned.  As far as I know, that remains the case.  Christina

19 could have assigned somebody since March.  This was March of

20 '23.  I don't think I've said anything inconsistent in this

21 room.

22 Q.  Could we take that down.  And thank you, sir.

23     Secretary of State's Office employs trainers who provide

24 peer-to-peer support to county election officials on issues

25 related to elections; is that right?

1    A.   Agreed.

2    Q.   And is it correct that the Secretary of State's Office does

3    not provide internal training about the Americans with

4    Disabilities Act to those peer-to-peer trainers?

5    A.   Agree with that.

6    Q.   Is the correct --

7    A.   I take that back.  We have had presentations in the office

8    to our lawyers and the trainers about ADA and accessibility.

9    That is not something that we do regularly, but it has

10   occurred.  And again, we rely on Coalition for Texans With

11   Disabilities and Texas for Voters with Disability Rights.

12   Q.   You think you didn't remember that when you were deposed on

13   March 29th?

14   A.   Probably not.

15   Q.   I could show you your deposition where you said that

16   Secretary of State's Office did not provide internal training

17   about the ADA to its peer-to-peer trainers.

18   A.   No, I agree with that.  That's what I said.  I think I was

19   mistaken.

20   Q.   So you corrected your deposition testimony here today?

21   A.   I have now.

22   Q.   Okay.  Is it correct that the peer-to-peer trainers

23   employed by the Secretary of State's Office have not conducted

24   any trainings to county officials on their obligations under

25   the ADA outside of consulting with them on the physical

```
 1  accessibility of polling places?
 2  A.  That's probably right.
 3  Q.  And is it correct that the Secretary of State's Office has
 4  not done anything to educate voters with disabilities about
 5  their rights under Section 108 of SB1 to request reasonable
 6  modifications to SB1 under the law?
 7  A.  I don't know.  We have a voter-facing website
 8  votetexas.gov, and I don't know if we updated the disability
 9  page or not.
10  Q.  As of your deposition in 2022, would it be fair to say that
11  you had not yet done anything to educate voters with
12  disabilities about their rights under Section 108?
13  A.  Agree with that.
14  Q.  And you don't know if any such efforts have been made since
15  then?
16  A.  I agree with that.
17  Q.  So I'd like to turn now to recordkeeping required by SB1.
18  Do the counties maintain records of each request for an
19  absentee ballot that they receive?
20  A.  They should.
21  Q.  And the counties are legally mandated, are they not, to
22  enter that information into TEAM?
23  A.  They are.
24  Q.  When I say "TEAM," we mean the -- it's the Texas Election
25  Administration Management system?
```

1  A.  It is.

2  Q.  But even though the counties are required to enter records

3  of each request for an absentee ballot that they receive into

4  TEAM, they don't always do so, do they?

5  A.  It didn't really matter until we had a requirement for a

6  ballot tracker, and so since that's occurred in '21, we have

7  had much higher compliance.

8  Q.  But you still don't have anywhere close to a hundred

9  percent compliance, do you?

10  A.  I don't know.  I would say it's pretty high.  I don't know

11  if it's close to a hundred percent.  I don't know what you

12  consider close to a hundred percent, but it's definitely a good

13  80, 85 percent.

14  Q.  Are you able to tell me which counties do not provide

15  information concerning the requests for absentee ballots that

16  they receive?

17  A.  I can't off the top of my head.  I could get Kristi to

18  print something out of TEAM.  There would be a report.

19  Q.  Okay.  Do the counties maintain records of the date on

20  which they receive each application for a ballot by mail?

21  A.  They're supposed to.

22  Q.  And they're supposed to enter that information into TEAM,

23  aren't they?

24  A.  They are.

25  Q.  And are you able to tell the Court which counties don't

1    provide that information for TEAM?

2    A.  No, sir.  Most do.

3    Q.  Okay.  Do the counties maintain records of whether each

4    application for ballot-by-mail was accepted or rejected?

5    A.  Yes.  I don't know if you mean final acceptance or

6    rejection or interim, but we now have a cure period, so it

7    matters.

8    Q.  Well, we're not talking here -- just to be clear, we're

9    talking ABBM's.  Talking about the applications for

10   ballots-by-mail and not by the ballots-by-mail themselves?

11   A.  I understand that, but still, there's an interim phase

12   where it could be incomplete and need more information that is

13   a status of rejected, but it gets cured, and then it's accepted

14   and the ballot is sent.

15   Q.  Well, do the counties maintain records of those initial

16   rejections?

17   A.  They're supposed to, but what we would have recorded in our

18   TEAM system is the final status, which could be the initial

19   status, and they could have just filled in another application

20   for ballot-by-mail that did get accepted, and so that would be

21   a separate transaction in the database.

22   Q.  Can you tell me which counties are not providing

23   information about their rejections?

24   A.  Not off the top of my head.  We can run a report, but most

25   counties are doing their job with regard to mail ballot

1   recording since SB1.

2   Q.  And it's your testimony they've been doing that since SB1

3   was enacted?

4   A.  No.  We had a rough patch there in the first primary

5   election where we had less than stellar compliance, but since

6   then, it's been getting better and better and better.

7   Q.  And do the counties keep information regarding each ballot

8   that they send to a voter?

9   A.  They should, yes, sir.

10  Q.  And is a record of each ballot that had to be sent to a

11  voter information that the counties are required to enter into

12  TEAM?

13  A.  What they're required to do is put into TEAM the date that

14  a ballot was mailed.

15  Q.  And is it true that there are counties that don't put that

16  information into TEAM?

17  A.  Some don't.

18  Q.  And turning now to the rejection.  Do counties keep records

19  of their final rejections of applications for ballot-by-mail?

20  A.  Yes.

21  Q.  And they're required to enter that information into TEAM?

22  A.  They are.

23  Q.  They don't always do that, do they?

24  A.  Some don't.

25  Q.  Again, do you know which counties don't?

1   A.  We can run a report.

2   Q.  Okay.  Any particular problem children occur to you?

3   A.  No.

4   Q.  And do the counties --

5   A.  That's a hard question to answer because some counties are

6   problematic on some things and not on others.

7   Q.  Do counties maintain records of each ballot-by-mail that is

8   filed with them?

9   A.  Yes.

10  Q.  And is that information required to be enter into TEAM?

11  A.  When they receive back a ballot, yes, sir, that's supposed

12  to be recorded in TEAM.

13  Q.  And do all the counties comply with their obligation to

14  enter that information?

15  A.  Not all of them.

16  Q.  And are they required to enter the date on which they

17  received each ballot-by-mail?

18  A.  Yes, sir.

19  Q.  And do they -- do all the counties enter that information

20  into TEAM?

21  A.  Not all of them.

22  Q.  And are the counties required to maintain information about

23  whether each ballot-by-mail is accepted or rejected?

24  A.  The final disposition will be recorded in TEAM.

25  Q.  And well, they're required to enter the final

1    information -- final disposition into TEAM; is that right?

2    A.  They're also required to enter the interim dispositions.

3    Q.  Do you have a hundred percent compliance with either the

4    interim dispositions or the final dispositions from the

5    counties?

6    A.  More on the final than the interims.

7    Q.  Are the counties required to maintain records of the

8    notification that they send to each voter of the rejection of

9    his or her ballot by mail when a voter's ballot-by-mail is

10   rejected?

11   A.  I can't answer that.  You talking about an interim

12   rejection or the final rejection?  The answer is both, but I

13   want to make sure that we know what we're talking about.

14   Q.  Let's talk about interim first.  Are the counties required

15   to maintain record of their notification to a voter of their

16   interim --

17                    *(Court reporter clarification.)*

18   BY MR. GENECIN:

19   Q.  Are the counties required, under SB1, to maintain records

20   of the interim rejection of a voter's ballot-by-mail?

21   A.  Of their notice to the voter, yes.

22   Q.  And are they required to record that notice to the voter in

23   TEAM?  Or to record information concerning the notice to the

24   voter?

25   A.  I don't think so.  I'd have to go back and look at House

1  Bill 1382 again.  But I don't think that information is

2  required.  You know, maybe some do, some don't, but the

3  important thing is the final acceptance or rejection.

4  Q.  So with regard to the final, are the counties required to

5  maintain records of the final rejection?

6  A.  Yes.

7  Q.  And are they required to enter that information into TEAM?

8  A.  They are.

9  Q.  And do all the counties enter the information concerning

10 their final rejections into TEAM?

11 A.  Not all.

12 Q.  Are you able to tell us which counties don't?

13 A.  It's easier to run a report, but I don't have the

14 information in front of me.

15         MR. GENECIN:  Thank you.  Your Honor, I'll pass the

16 witness.

17         THE COURT:  Anything further on this side?

18         MR. DODGE:  Just a handful more, Your Honor.  If we

19 could pull up Joint Exhibit 1 and go to page 33.

20     (3:07 p.m.)

21                    EXAMINATION

22 BY MR. DODGE:

23 Q.  Good afternoon, Mr. Ingram.  My name is Chris Dodge.  I

24 represent the LULAC plaintiffs in this case.

25     I'd like to return to -- with some questions about the mail

1   ballot provisions in SB1 that you were discussing earlier.  You

2   see Section 5.02 on the screen now right?

3   A.  I see the first part of it, yes.

4   Q.  Section 5.02 states that *"an applicant seeking a mail*

5   *ballot should include the number of the applicant's driver's*

6   *license, election identification certificate or personal*

7   *identification card issued by the Department of Public Safety*

8   *on the application,"* correct?

9   A.  Agreed.

10  Q.  And Section 5.08 contains an identical statement regarding

11  the mail ballot carrier envelope?

12  A.  I believe so, yes.

13  Q.  And you agree that for a voter who has been issued a Texas

14  driver's license, Sections 5.02 and 5.08 require that driver to

15  list their driver's license?

16  A.  I agree that the statute has this hierarchy.  I believe

17  that they copied this from the Help America Vote Act, which has

18  a very similar hierarchy.

19  Q.  And under Section 5.02 and 5.08, Secretary's Office cannot

20  amend the application or carrier envelope to require any

21  additional identification number; is that right?

22  A.  Agreed.

23  Q.  And county officials cannot require mail ballot applicants

24  or voters to include additional ID information on their

25  applications or carrier envelopes?

1  A.  They cannot say that such is required.  They can put a

2  notice in the carrier envelope information, the mail ballot

3  information, that says you increase your odds of success if you

4  put both, but it's not a requirement to put both.  But they

5  definitely can communicate to voters, extraneous from the form,

6  that if you've got two numbers, use two numbers.

7  Q.  But you agree counties aren't required to do that?

8  A.  They are not.

9  Q.  And you agree the Secretary's Office cannot require

10 counties to do that?

11 A.  Agreed.  We can encourage them to.  We can tell them that

12 other counties do it, and we can advise them that it's a great

13 idea.

14 Q.  You agree the application in carrier envelope instructions

15 published by the Secretary's Office after SB1 went into effect

16 track the statutory language of Section 5.02 and Section 5.08,

17 right?

18 A.  I agree.

19 Q.  Switching gears, I have some questions about election

20 security.  At the time of the 2020 general election, it was

21 your view that Texans could have a great deal of confidence in

22 the mail ballot system?

23 A.  Agreed.

24 Q.  As of the 2020 general election, it was your view that

25 Texans could have a great deal of confidence in the electoral

1  process generally?

2  A.  Agreed.

3  Q.  At the time of the 2020 election, Texas mail ballot system

4  and electoral process had robust built-in security checks?

5  A.  Agree with that.

6  Q.  Prior to SB1, election officials in Texas confirmed that

7  each person who applied to vote-by-mail was, in fact,

8  registered to vote before issuing them a ballot?

9  A.  Absolutely.

10  Q.  And also prior to SB1, officials in Texas would make sure

11  that the address listed on the application was the same as the

12  address in the voter's registration file?

13  A.  Agreed.  Or else they would send the statement of residence

14  that had to be returned before the ballot was counted.

15  Q.  Prior to SB1, officials in Texas would verify that the

16  signature on the voter's application to vote by mail matched

17  the signature in the voter's file, on the voter's application?

18  A.  Agreed.  But again, when we talk about "matching," what we

19  really mean is does the signature on the application, signature

20  on the carrier envelope identify the same voter.  "Identify the

21  same voter" is operative language.  That sort of devolves

22  colloquially into "matching," but it's not really matching.

23  It's does it identify the voter?

24  Q.  But you agree that process was in place prior to SB1?

25  A.  Yes.

1   Q.  I appreciate that clarification.

2   A.  SB1 said that if somebody provides a number, it creates a

3   rebuttable presumption that the signatures identify the voter,

4   so it changed the weight of the signature comparison from more

5   to less.  It made the number the more objective standard, the

6   most important, and then shifted the burden of proof to anybody

7   that wants to prove it's not the same voter, that they're going

8   to have to do it.

9   Q.  Prior to SB1, each mail ballot contained a unique serial

10  number so you could identify which ballot went to which voter?

11  A.  Agreed.

12  Q.  Mr. Ingram, do you agree there are people who seek to cast

13  doubt on the--

14          *(Court reporter clarification.)*

15  BY MR. DODGE:

16  Q.  I said, Mr. Ingram, do you agree that there are people who

17  seek to cast doubt on the legitimacy of Texas's electoral

18  system?

19  A.  There are such people, yes.

20          MR. DODGE:  Pass the witness.

21          THE COURT:  Anything else from this side?  Any cross?

22          MR. KERCHER:  Not at this time, Your Honor.  We

23  reserve the right to call this witness during our

24  case-in-chief.

25          THE COURT:  You may step down, sir.

1          THE WITNESS:  Yes, sir.

2          THE COURT:  You're remaining under the rule, so only

3    discussions with the lawyers.  No discussions with any other

4    witnesses.

5          THE WITNESS:  Yes, sir.

6          THE COURT:  Where do we --

7          MS. TULIN:  Leah Tulin with the Brennan Center on

8    behalf the LUPE plaintiffs.  Your Honor, at this time, LUPE

9    plaintiffs would seek to move into evidence LUPE 232, State

10   143, LUPE 292 and LULAC 75.  I believe I misspoke during my

11   examination of Ms. Adkins, and said that LUPE 232 had already

12   been admitted, but I do not believe that is the case.

13         THE COURT:  Any objection from anybody on this side on

14   LUPE 232 or 292?

15         MR. WASSDORF:  No, Your Honor.

16         THE COURT:  No objections over here?

17         MR. LIU:  No objection.

18         THE COURT:  And LUPE 232 and 292 were admitted.  Any

19   objection to State 143?  Hearing none, 143 State is admitted.

20         Any objection to LULAC 75?

21         MR. WASSDORF:  No, Your Honor.

22         THE COURT:  No objection to LULAC 75.  That's

23   admitted.

24         MS. TULIN:  Thank you, Your Honor.  There are two

25   exhibits that were not used today that I would also like to

1    move into evidence at this time.  That would be LUPE 109 and

2    LUPE 194.

3            THE COURT:  Any objections over here to LUPE 109 or

4    194?  Hearing none, any objections here to LUPE 109 or 194?

5            MR. WASSDORF:  No, Your Honor.

6            THE COURT:  None, none.  Those two are admitted.

7            MS. TULIN:  Thank you, Your Honor.

8            THE COURT:  Any other housekeeping?

9            MR. DOLLING:  Thank you, Your Honor.  Zachary Dolling

10   for the OCA plaintiffs.  I would also like to move into

11   evidence a handful of exhibits that were used yesterday during

12   our examinations.  Those would be OCA Plaintiffs 34 and 37,

13   which were the two spreadsheets produced by Travis County, and

14   OCA 427, which was the carrier envelope.

15           THE COURT:  Any objections to OCA 34, 37 or 427?

16           MR. WASSDORF:  No objection, Your Honor.

17           THE COURT:  No objections over here.  Those three are

18   admitted.

19           MR. DOLLING:  Thank you, Your Honor.

20           THE COURT:  Any other housekeeping?

21           MR. BADAT:  Just one more exhibit, Your Honor.  We

22   used with Ms. Adkins today OCA Plaintiff's Exhibit 283, voter

23   registration application.  We'd like to move that into

24   evidence.

25           THE COURT:  Any objection to 283 over here?  Hearing

1   none.  Any objection to OCA 283?

2           MR. WASSDORF:  No objection.

3           THE COURT:  None.  283 is admitted.  Any other

4   housekeeping we need to do?

5           MR. CAPOZZI:  Yes, Your Honor, just to close the book

6   on Intervener Defendant Exhibit Six, I conferred with the LULAC

7   plaintiffs and we have no objection to the additional pages

8   that they want to offer in the SB11 deposition.  Conditional on

9   admitting our exhibit, they would like to also admit pages 31

10  through 33, page 42 lines nine through 21, page 70, line 13

11  through 71, line 18; page 73 line one through page 74 line two.

12          THE COURT:  Are those the additions you want?

13          MS. ARMENTA:  Yes, could you just confirm the last one

14  for me please?

15          MR. CAPOZZI:  Line 73 -- page 73, line one through

16  page 74, line two.

17          MS. ARMENTA:  Yes, thank you.  And again, that is in

18  the event the Court decides to admit the proposed exhibit.

19          THE COURT:  Any objections to the initial introduction

20  of Intervener's Defendant Six is overruled.  The now

21  substituted exhibit is going to be admitted.  I would suggest

22  that you all clean it up and have as Intervener Defendant Six a

23  redacted format with redactions so we know or at least upstairs

24  knows what exactly has been admitted.

25          MS. ARMENTA:  Thank you, Your Honor.

1        THE COURT:  Anything else by housekeeping?

2        MR. KERCHER:  Your Honor, I'd just like to say how

3   much State defendants appreciate the plaintiffs' efficient use

4   of time today.  I never thought we would get through this many

5   witnesses today.  I appreciate their efforts.

6        THE COURT:  I'm surprised we got through all this.

7        MS. PERALES:  Your Honor, we collectively hope that

8   the Court enjoys this afternoon's musical performance.  We were

9   aiming to avoid mariachi music during the examination of

10  Mr. Ingram and I think we may have been successful.  Thank you

11  to the defendants.

12       THE COURT:  We are off next week.  We will resume on

13  Monday, October 2 at 9:00.  In the interim at some point next

14  week, I would suggest to you all that you all coordinate with

15  Ms. Fernandez about what -- at least this point, we probably

16  ought to do interim check-ins, so use this as an interim

17  check-in on what exhibits everybody agrees has been admitted

18  to.  So you might want to check in at some point during this

19  off week and make sure we are all understanding what's been

20  admitted.  That way we can cure any problems as we go along.

21       Anything else we need to take up before we break?

22  Let's make sure that the other side knows which witnesses

23  you'll be calling on the 2nd.  We'll see you back.

24       COURT SECURITY OFFICER:  All rise.

25       (3:18 p.m.)

1                              *   *   *   *   *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5         I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.  I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:  September 22, 2023

12   /s/ Gigi Simcox

13   /s/ Angela M. Hailey
     _____
14   United States District Court
     Official Court Reporters
15   CSRs, CRRs, RPRs, RMRs
     Official Court Reporter
16   262 West Nueva Street
     San Antonio, Texas  78207
17

18

19

20

21

22

23

24

25

APPENDIX D

# United States Court of Appeals
# for the Fifth Circuit

---

No. 23-50885

---

United States of America; OCA-Greater Houston,
League of Women Voters of Texas; REVUP-Texas,

*Plaintiffs—Appellees,*

*versus*

Ken Paxton, *Attorney General, State of Texas*; Jane Nelson, *in her official capacity as Texas Secretary of State*; State of Texas; Harris County Republican Party; Dallas County Republican Party; National Republican Senatorial Committee; National Republican Congressional Committee,

*Defendants—Appellants,*

Republican National Committee,

*Movant—Appellant.*

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:21-CV-844

---

## UNPUBLISHED ORDER

Before Clement, Engelhardt, and Oldham, *Circuit Judges.*

Per Curiam:

No. 23-50885

IT IS ORDERED that Appellants' opposed motion for a temporary administrative stay is GRANTED. Appellees shall file a response to the emergency motion to stay the District Court's order and for a permanent injunction pending appeal **no later than 9:00 a.m. on Monday, December 11, 2023**. Appellants shall file a reply **no later than noon on Tuesday, December 12, 2023**.

# APPENDIX E

# United States Court of Appeals
# for the Fifth Circuit

————————

No. 23-50885

————————

UNITED STATES OF AMERICA; OCA-GREATER HOUSTON,
LEAGUE OF WOMEN VOTERS OF TEXAS; REVUP-TEXAS,

*Plaintiffs—Appellees,*

*versus*

KEN PAXTON, *Attorney General, State of Texas*; JANE NELSON, *in her official capacity as Texas Secretary of State*; STATE OF TEXAS; HARRIS COUNTY REPUBLICAN PARTY; DALLAS COUNTY REPUBLICAN PARTY; NATIONAL REPUBLICAN SENATORIAL COMMITTEE; NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE,

*Defendants—Appellants,*

REPUBLICAN NATIONAL COMMITTEE,

*Movant—Appellant.*

————————————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:21-CV-844

————————————————

## ORDER GRANTING STAY PENDING APPEAL

Before CLEMENT, ENGELHARDT, and OLDHAM, *Circuit Judges*.

Per Curiam:[*]

## I. Relevant Factual and Procedural Background

The Texas Legislature enacted the Election Protection and Integrity Act ("S.B.1") in 2021 in response to the myriad difficulties experienced by election officials concerning mail-in ballots during the 2020 election cycle. *See* An Act Relating to Election Integrity and Security, 2021 Tex. Sess. Law Serv. 2nd Called Sess. Ch. 1 (West). S.B.1 requires voters to, among other things, provide the number from a government-issued ID on any application for a ballot by mail ("ABBM"), as well as on the envelope containing the completed ballot. Tex. Elec. Code §§ 84.002, 86.002. Thus, a qualified voter seeking to vote by mail must submit a signed ABBM to her county's early-voting clerk, and the ABBM must include a number from a government issued ID, a partial social security number, or a statement that the applicant lacks such ID numbers. *Id*. § 84.002. The early-voting clerk then evaluates the ABBM to determine whether it complies with S.B.1's requirements. § 86.001. When the qualified voter sends in her mail-in ballot, the S.B.1-required ID number must also appear on the ballot envelope. *Id.* § 87.041. Early Voting Ballot Boards ("EVBBs") open and evaluate mail-in ballots to determine whether they should be accepted, in part by verifying that the ballot meets the ID number requirement. *Id.* § 87.041(b). Election officials must notify the voter whether her ABBM or mail-in ballot was flagged for rejection and must provide an opportunity for the voter to add or correct the information. *Id.* §§ 86.008, 87.0411.

The case before us involves two consolidated lawsuits. The United States sued the State of Texas and Texas Secretary of State Jane Nelson (in

---

[*] Judge Clement does not join the order. She would have extended the administrative stay and expedited the case to the next available merits panel.

her official capacity). It argues S.B.1 §§ 5.07 and 5.13, which require election officials to reject ABBMs and mail-in ballots if the ID number provided does not match an ID number included with that voter's registration records, violate the Materiality Provision of § 1971 of the Civil Rights Act of 1964, *see* 52 U.S.C. § 10101(a)(2)(B), by requiring election officials to reject ABBMs and mail-in ballots based on immaterial informational errors. Separately, a group of private plaintiffs sued Secretary Nelson (in her official capacity), Texas Attorney General Ken Paxton (in his official capacity), and several county-level election officials (in their official capacities). The private plaintiffs argue the entirety of S.B.1's number matching framework violates the Materiality Provision for reasons similar to those espoused by the United States.

Both the United States and the private plaintiffs moved for summary judgment. The district court granted both motions and entered an order permanently enjoining "the State Defendants, the Harris County Elections Administrator, and the Travis County Clerk, their agents and successors in office, and all persons acting in concert with them" from enforcing "the requirements of Section 5.07 and 5.13 of Senate Bill 1 that violate Section 101 of the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B)." The scope of the injunction is unclear, but it appears the district court's order precludes any Texas official from enforcing the number-matching requirements of S.B.1 §§ 5.07 and 5.13. *See* District Court Order on Motion for Stay Pending Appeal at 4 (explaining "the United States sought and obtained relief against the entire State of Texas.").

Appellants sought a stay pending appeal in the district court. The district court denied their application, so Appellants filed an emergency motion for a stay pending appeal in this court. Because the district court entered its order after EVBBs began processing ballots for local runoff

elections, we administratively stayed the order. We now address Appellants' motion for a full stay pending appeal.

## II. Discussion

Our "power to hold an order in abeyance" while we assess its legality is "inherent." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (citation omitted). *Nken*'s four-factor standard guides our analysis and requires us to consider the following: "(1) whether [Appellants] ha[ve] made a strong showing that [they are] likely to succeed on the merits; (2) whether [they] will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *see also Vote.Org v. Callanen*, 39 F.4th 297, 302 (5th Cir. 2022). "The first two factors . . . are the most critical." *Nken*, 556 U.S. at 434. "The proponent[s] of a stay bear[] the burden of establishing its need." *Clinton v. Jones*, 520 U.S. 681, 708 (1997).

We conclude that the Appellants' motion should be GRANTED, so we exercise our discretion to STAY the district court's order and injunction pending appeal.

### A. Appellants are Likely to Succeed on Appeal.

At the outset, it is not even clear that § 10101 contains a private right of action. *See McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000) ("Section 1971 is enforceable by the Attorney General, not by private citizens."); *see also McKay v. Altobello*, 1996 WL 635987, at *2 (E.D. La. Oct. 31, 1996) ("[42 U.S.C. § 1971] is . . . enforceable only by the Attorney General, not impliedly, by private persons.") (citing *Good v. Roy*, 459 F. Supp. 403 (D. Kan. 1978)); *Gilmore v. Amityville Union Free School Dist.*, 305 F. Supp. 2d 271, 279 (E.D.N.Y. 2004) ("[The] provisions [of § 1971] are only enforceable by the United States of America in an action brought by the

Attorney General and may not be enforced by private citizens.") (citation omitted). *But see Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003) (holding § 1971 can be enforced by private parties through § 1983). If that is true, the private plaintiffs' suit obviously fails. Nevertheless, the Attorney General of the United States unquestionably has authority to enforce § 10101, *see* 52 U.S.C. § 10101(c), so we must proceed to the merits of the parties' arguments.

We conclude Appellants are likely to prevail on appeal for at least three reasons. First, the Materiality Provision precludes state officials only from "deny[ing] the right of any individual to vote…" *See id.* § 10101(b). S.B.1's identification requirements do not deny anyone the right to vote because they only affect the ability of some individuals to vote by mail. We have held voting by mail is a privilege that can be limited without infringing the right to vote. *See, e.g.*, *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 403–05 (5th Cir. 2020) (citing *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807–11 (1969)). So we think it is unlikely S.B.1 implicates the Materiality Provision at all.

Second, even assuming vote-by-mail restrictions implicate the Materiality Provision, we have said only racially motivated deprivations of rights are actionable under § 10101. *See Broyles v. Texas*, 618 F. Supp. 2d 661, 697 (S.D. Tex. 2009) (citing *Kirksey v. City of Jackson*, 663 F.2d 659, 664–65 (5th Cir. 1981)), *aff'd*, 381 F. App'x 370 (5th Cir. 2010) (per curiam)); *see also United States v. Mississippi,* 380 U.S. 128, 138 (1965) ("Section 1971 was passed by Congress under the authority of the Fifteenth Amendment to enforce that Amendment's guarantee…"); *Veasey v. Abbott*, 830 F.3d 216, 315 (5th Cir. 2016) (Jones, J., concurring in part and dissenting in part) ("The Fifteenth Amendment secures the right to vote from denial or abridgment by intentional discrimination on account of race or color.") (citing *City of Mobile v. Bolden*, 446 U.S. 55, 61–66 (1980)); *Ind. Democratic Party v. Rokita*, 458 F.

Supp. 2d 775, 839 (S.D. Ind. 2006) (dismissing § 1971 suit because plaintiffs did "not allege[], much less prove[], any discrimination based on race"), *aff'd sub nom. Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008). Neither the United States nor the private plaintiffs allege Texas enacted S.B.1 with a discriminatory purpose, *see* Appellee United States's Opposition to Appellants' Emergency Motion to Stay at 11–13 (arguing the Materiality Provision is not limited to racially motivated state action but not contending S.B.1 was racially motivated), so we think it unlikely plaintiffs could establish that S.B.1 violates the Materiality Provision.

Lastly (and relatedly), S.B.1's provisions merely require election officials to confirm the identity of persons seeking to vote by mail by matching their identification numbers with identification numbers in Texas's database of registered voters. Texans are required to present identification to vote in person, *see* Appellants' Emergency Motion to Stay at 10**,** and plaintiffs are not arguing those requirements violate the Materiality Provision. There is no reason why identification requirements in the context of vote-by-mail should be subject to any greater scrutiny. In fact, our cases suggest precisely the opposite. *See supra*. Moreover, since 2004, Congress itself has required voters to include identification numbers on voter registration applications. *See* 52 U.S.C. § 20901 *et seq.* So the same legislative body that enacted the Materiality Provision clearly thinks voter identification numbers are "material to determining eligibility to register and to vote." *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1174 (11th Cir. 2008) (citation omitted). We do not think a law requiring voters to include the same information on mail-in voting materials that Congress itself asks voters to include on their voter registration applications violates the Materiality Provision.

At times, Plaintiffs seem to suggest the real problem with S.B.1 is that Texas's voter registration database is riddled with errors that will result in the rejection of ABBMs and mail-in ballots for otherwise qualified Texas voters. *See* Appellee United States's Opposition to Appellants' Emergency Motion to Stay at 21. But that is not what the district court held. The district court held S.B.1's requirements are immaterial as a matter of law because they do not affect a voter's eligibility to vote. *See* District Court Opinion at 27. It may be that the State's execution of S.B.1 is so flawed it unlawfully abridges the voting rights of Texas citizens. But that seems to us a factual question, and the State points to testimonial evidence suggesting ballot rejection rates have not changed much—if at all—since S.B.1 was enacted. *See* Appellants' Reply in Support of Emergency Motion to Stay at 4. Because there appears to be a genuine dispute of material fact about the practical effect of S.B.1, it is not clear the district court have properly held at summary judgment that the State's execution of S.B.1 violates the Materiality Provision.

Thus, even if mail-in voting restrictions implicate the Materiality Provision, and even if election rules untinged by racial motivations can violate the Materiality Provision, we still think Appellants are likely to succeed on the merits. We therefore conclude Appellants have carried their burden on the first *Nken* factor.[†]

## B. The Remaining *Nken* Factors Support the Issuance of a Stay.

The other *Nken* factors also favor granting the application for a stay. First, Appellants carried their burden of demonstrating they will be

---

[†] Of course, our evaluation of Appellants' *likelihood* of success on the merits does not bind a later merits panel's evaluation of the *actual* merits. *See, e.g.*, *Texas Democratic Party v. Abbott*, 978 F.3d 168, 176 (5th Cir. 2020) (so noting).

No. 23-50885

irreparably injured absent a stay. *See Nken*, 556 U.S. at 434. That is because "[w]hen a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (citing *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers)); *see also Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984) (Rehnquist, J., in chambers). Moreover, the district court's order will significantly disrupt the State's administration of current and upcoming elections. Mail-in balloting has already begun ahead of the January 30, 2024 runoff in Texas House District 2. *See* Appellants' Reply in Support of Emergency Motion to Stay at 3. And election officials across the state are undoubtedly preparing for January 1, when voters may submit an ABBM for the March 5, 2024 primaries. *See Important Election Dates 2023–2024*, Texas Secretary of State (last accessed Dec. 12, 2023), https://perma.cc/5A8R-KTRV. Allowing the district court's order would thus render substantial administrative chaos during an election or "in the period close to an election." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 30–31 (2020) (mem.) (Kavanaugh, J., concurring).

Nor will a stay substantially injure the United States or the private plaintiffs. *See Nken*, 556 U.S. at 434. The United States cannot claim to be substantially injured by a stay of an order that likely misapplied federal law. *See supra*. And a stay of the district court's order merely maintains the status quo that prevailed for over two years prior to the district court's summary judgment order. There is no reason to believe "maintenance of the status quo" would substantially injure the private plaintiffs. *E.T. v. Paxton*, 19 F.4th 760, 770 (5th Cir. 2021) (quotation omitted).

Lastly, the public interest weighs in favor of a stay. *See Nken*, 556 U.S. at 434. When "[a] State"—here Texas—"is [an] appealing party, its interest and harm merge with that of the public." *Veasey*, 870 F.3d at 391 (citing *Nken*,

556 U.S. at 435). Since we conclude the state would be irreparably injured absent a stay, *see supra*, we also conclude a stay would serve the public interest.

### III. Conclusion

We GRANT Appellants' motion for the reasons discussed above and exercise our discretion to STAY the district court's order and injunction pending appeal.

# APPENDIX F

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | 5:21-CV-0844-XR |
| | § | [Consolidated Cases] |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

## ORDER DENYING MOTION FOR STAY PENDING APPEAL OF THE COURT'S PERMANENT INJUNCTION AS TO TEX. ELEC. CODE § 276.015

On this date, the Court considered the State Defendants' opposed motion to stay pending appeal (ECF No. 1159) of the Court's order enjoining the enforcement of TEX. ELEC. CODE § 276.015 (the "Canvassing Restriction"). After careful consideration, the motion is **DENIED**.

## BACKGROUND

In September 2021, Texas Governor Greg Abbott signed into law the Election Protection and Integrity Act of 2021, an omnibus election law commonly referred to as S.B. 1. *See* Tex. Leg., An Act Relating to Election Integrity and Security, S.B. 1, 87th Leg., 2d Spec. Sess. (2021). Multiple lawsuits soon followed, which were ultimately consolidated into this action. The cases were tried to the bench in September and October 2023.

On September 28, 2024, this Court issued its Findings of Fact and Conclusions of Law (the "Order") as to Plaintiffs' free speech and due process challenges to TEX. ELEC. CODE ("TEC") § 276.015, concluding that the Canvassing Restriction is unconstitutional under the First and Fourteenth Amendments, both facially and as applied to Plaintiffs' voter outreach activities. *See* ECF No. 1157.

The Canvassing Restriction creates three new, third-degree felonies under the Election Code, each imposing up to ten years in prison and a fine of up to $10,000 on anyone who gives,

offers, or receives some "compensation or other benefit" for an "in-person interaction" with a voter in the "physical presence" of an official ballot or a ballot voted by mail, "intended to deliver votes for a specific candidate or measure." TEC § 276.015(a)(2). [1] The Canvassing Restriction does not define "compensation" or "physical presence" and nothing in its text limits its application to instances of voter fraud, coercion, or harassment, or speech that occurs while a voter is actively completing their ballot.

Plaintiffs are membership-driven, non-partisan civil rights and social advocacy groups in Texas that regularly conduct in-person voter outreach and engagement activities, such as block-walking and candidate forums. Plaintiffs have endorsed ballot measures (and some have supported candidates) aligned with their organizational missions and deployed staff, independent contractors and volunteers to engage with voters in person to increase turnout and electoral support for their causes. Plaintiffs' volunteers often receive refreshments, t-shirts, pens, gas cards, and other tokens of appreciation for their canvassing and assistance efforts. Plaintiffs' voter engagement activities generally occur in the weeks before elections (when they are most effective), when voters are likely to have received their mail ballots. During some outreach events, voters have taken out their mail ballots while speaking with Plaintiffs' organizers to ask questions about their ballots or request voting assistance.

Plaintiffs fear that the Canvassing Restriction will subject their organizations, staff, and volunteers—and even the voters the provision purportedly protects—to criminal liability for engaging in ordinary and routine in-person interactions during elections. To avoid putting staff members and volunteers in legal jeopardy under the Canvassing Restriction, Plaintiffs and their

---

[1] Section 7.04 of S.B. 1 also added TEC provisions addressing the solicitation of applications to vote by mail (TEC § 276.016), the distribution of early voting ballots and balloting materials (TEC § 276.017), and unauthorized alterations to election procedures (TEC § 276.019). For the purposes of this order, however, "Section 7.04" refers only to the Canvassing Restriction, codified at TEC § 276.015.

members have limited their in-person interactions with voters in the weeks before elections, when voters are most likely to have mail ballots in their possession—and when Plaintiffs' speech is most critical. Some organizations have stopped hosting in-person events when mail ballots are sent out and have resorted to alternative means of communication with voters (e.g., text messages) that have turned out to be much less effective. Other organizations have trained their staff to stop speaking in support of a ballot measure if they notice that they are in the presence of a mail ballot.

Trial testimony demonstrated widespread confusion about the meaning of the Canvassing Restriction. Witnesses were particularly uncertain about how to interpret the terms "compensation" and "physical presence"—neither of which is defined in the statute—and how the Canvassing Restriction impacts organizers' ability to provide voting assistance. Despite this confusion, state officials have not offered any definitive answers about the scope of the Canvassing Restriction. The Secretary of State has not provided any guidance. Tr. at 1914:7–14, 1924:7–18. Nor has the OAG. Tr. at 1924:24–1925:3. And the answers provided by the State Defendants' witnesses conflicted with one another and with the State Defendants' positions in their post-trial briefing.[2]

The Court permanently enjoined the Texas Attorney General (the "AG"), the Texas Secretary of State (the "Secretary," and together with, the AG, the "State Defendants") and the

---

[2] For example, former Election Division Director Keith Ingram opined that providing volunteers with bus fare was not "compensation" because "[t]hey can get their expenses reimbursed. That's not payment." Tr. at 1904:1–2. The State's chief voter fraud prosecutor, Jonathan White, on the other hand, testified that he would need to perform *legal research* to determine what kinds of economic benefits would violate the provision. Tr. at 3992:20–3993:21 (conceding that he would need to "review[] the case law" to determine whether a meal, bus fare, or a gift bag containing a t-shirt constitute prohibited compensation).

Similarly, Jonathan White, former Chief of the OAG Election Integrity Division, testified that if his office encountered a GOTV group that paid its organizers to provide mail ballot assistance as a public service while canvassing, he would be concerned that this activity is a subterfuge for voter fraud. Tr. at 3995:11–24. The State Defendants, on the other hand, assert that such assistance falls outside the purview of the Canvassing Restriction because it is not "designed to deliver votes for or against a specific candidate or measure." ECF No. 862 ¶ 479

District Attorneys of Travis County, Dallas County, Hidalgo County, and the 34th Judicial District (the "County DAs") from enforcing the Canvassing Restriction. *See* ECF No. 1157 (the "Order").

The State Defendants filed a Notice of Appeal of the Court's Order, followed by a motion to stay the order pending appeal (ECF No. 1159), which the Court now considers. The State Defendants seek to stay the Court's order pending appeal in light of the upcoming general election in November.

For the reasons stated herein, the State Defendants' motion (ECF No. 1159) is **DENIED**.

## DISCUSSION

In determining whether to grant a motion for stay pending appeal, courts consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009).

## 1.     The State Defendants are unlikely to prevail on the merits.

The State Defendants are unlikely to prevail on the merits of their appeal, for three reasons.

First, their briefing applied an incorrect legal standard, seeking to superimpose the *Anderson-Burdick* balancing test on a content-based regulation of core political speech that is, without question, subject to strict scrutiny. *See* ECF No. 862 at 80–83. The Supreme Court has made clear that while *Anderson-Burdick* applies to laws and regulations that "control the mechanics of the electoral process," it does not apply to "a regulation of pure speech," even in the election context. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995). Burdens on core political speech during elections, like *all* burdens on core political speech, are subject to strict

scrutiny. *Id.* at 347.[3] And with good reason: it would defy logic to subject a content-based restriction of core political speech to *lesser* scrutiny because it happens to regulate speech during elections, when "the importance of First Amendment protections" is at its "zenith." *Meyer*, 486 U.S. at 425.

**Second, the State Defendants' *Purcell* argument is directly at odds with their *Ex parte Young* argument.** They insist that "now is the only time when § 7.04 affords law enforcement the opportunity to prevent ballot harvesting from interrupting the legal conduct of elections, as opposed to conducting a purely retroactive investigation." ECF No. 1159 at 1–2. They fail to define "law enforcement," however, in an apparent attempt to obfuscate which officials are responsible for enforcing the Canvassing Restriction (and when) and leave open the possibility that election administrators will somehow be affected by the injunctive relief. The State Defendants insist that, because mail ballots have been sent out, "impos[ing] a change at this stage not only strains election administrators but also undermines voter confidence in the electoral process." ECF No. 1159 at 1–2. They offer no hint as to how the injunction "strains" election administrators. The injunction facially does not apply to election administrators. Indeed, it is unclear to the Court how it could

---

[3] *See also Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 207 (1999) (Thomas, J., concurring) ("When a State's election law directly regulates core political speech, we have always subjected the challenged restriction to strict scrutiny and required that the legislation be narrowly tailored to serve a compelling government interest."); *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 138, 142 (3d Cir. 2022), *cert. denied sub nom. Mazo v. Way*, 144 S. Ct. 76 (2023) (concluding that *Anderson-Burdick* applies only to laws that "primarily regulate the mechanics of the electoral process, as opposed to core political speech," not to laws "that are primarily directed at regulating 'pure speech'") (quoting *McIntyre*, 514 U.S. at 345); *Lichtenstein v. Hargett*, 83 F.4th 575, 593 (6th Cir. 2023) (explaining the Supreme Court has "applied strict scrutiny—not *Anderson-Burdick* balancing—to many election laws" implicating core political speech) (collecting cases); *Fusaro v. Cogan*, 930 F.3d 241, 258 (4th Cir. 2019) (observing the Supreme Court has "distinguished between laws that . . . regulate 'pure speech,'" and those subject to *Anderson-Burdick*); *Campbell v. Buckley*, 203 F.3d 738, 745 (10th Cir. 2000) (recognizing "strict scrutiny," rather than *Anderson-Burdick*, "is applied where the government restricts the overall quantum of speech available to the election or voting process"); *Cotham v. Garza*, 905 F. Supp. 389, 396 (S.D. Tex. 1995) (holding that provisions governing the mechanics of voting are subject to *Anderson-Burdick* while a "content-based restriction on core political speech" is subject to strict scrutiny).

have crafted injunctive relief against election administrators, who have no enforcement connection with the Canvassing Restriction.

The State Defendants have a sufficient enforcement connection to fall within the *Ex parte Young* exception to sovereign immunity. The OAG continues to operate the Criminal Prosecutions Division unit that prosecutes election-related allegations, known as the Election Integrity Division. Tr. at 3903:23–3905:4, 3905:11–15, 4039:14–19. As of March 17, 2023, the OAG had identified at least one investigation of a possible violation of the Canvassing Restriction. There may very well be additional investigations that the AG failed to produce during discovery because, despite their insistence that he has "no enforcement connection" to election crimes, both of the State Defendants have throughout this litigation, withheld documents discussing "actual or alleged illegal voting, election fraud, or other criminal conduct in connection with" voting and voter assistance, invoking the investigative privilege. *See* ECF No. 992-3; ECF No. 992-16.

Although the AG may no longer unilaterally prosecute allegations of election-related crimes, *State v. Stephens*, 663 S.W.3d 45 (Tex. Crim. App. 2021), the OAG enforces criminal election offenses through other mechanisms. After OAG investigations conclude, the OAG refers cases to local prosecuting attorneys[4] and often seeks opportunities to partner with DAs to prosecute such allegations through deputization by a DA or appointment *pro tem* by a district judge or the DA. Tr. at 3908:21–3909:17, 3909:1–12; 4043:21–4045:21; 4051:2–10. The OAG has specifically identified previous prosecutions in which it participated, including prosecutions for "vote harvesting" and prosecutions conducted by or with the assistance of local DAs in several counties.

---

[4] For example, after the prosecution of Hervis Rogers was dismissed in Montgomery County, the OAG referred the case to the Harris County DA, who brought charges against Mr. Rogers before a grand jury. Tr. at 4058:17–4059:24, 4062:7–12. The same procedure was used in the prosecution of Ignacio González Beltrán, whose case was dismissed in Montgomery County and referred by the OAG to Harris County, where it was presented to a grand jury. Tr. at 4063:3–4064:6.

Even after *Stephens*, Jonathan White, former Chief of the OAG Election Integrity Division, testified that the "vote harvesting" schemes (purportedly targeted by the Canvassing Restriction) remain among the three most common elections-related allegations that the OAG pursues. Tr. at 3915:3–8. For the November 2022 elections, the OAG established a 2022 General Election Integrity Team and publicly stated it was "prepared to take action against unlawful conduct where appropriate," highlighting offenses related to "vote harvesting." OCA-383.

Without citation, the State Defendants accuse the Court of "gloss[ing] over" the Secretary's role by extending *Ex parte Young* based on her "general duty to oversee elections." ECF No. 1159 at 8 (citing *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020)).[5] Not so. The Court specifically based its *Ex parte Young* analysis on the Secretary's specific and mandatory duty under the Election Code to evaluate information she "receiv[es] or discover[s]" about *potential election crimes* (including alleged violations of the Canvassing Restriction). TEC § 31.006 (emphasis added). If she "determines that there is probable cause to suspect that criminal conduct occurred, the [S]ecretary *shall* promptly refer the information to the attorney general" and provide all pertinent documents and information in her possession to the AG. *Id.* (emphasis added).

Indeed, in trying to prove that the Secretary lacks an enforcement connection with respect to the Canvassing Restriction, the State Defendants commit the precise logical error they attribute to the Court, generalizing that "the Secretary's role is *largely* administrative and informational,

---

[5] Further, it is worth noting that the provision at issue in *Texas Democratic Party II*, section 82.003 of the Election Code, did not explicitly refer to the Secretary either. In its entirety, section 82.003 states: "A qualified voter is eligible for early voting by mail if the voter is 65 years of age or older on election day." TEC § 82.003. Despite the absence of a specific reference to the Secretary in section 82.003, the Fifth Circuit located the Secretary's duties to enforce the provision in another section of the Election Code: "[T]he Secretary's specific duties regarding the application form under Section 31.002 are enough for us to conclude that the Secretary has at least a scintilla of enforcement authority for Section 82.003." *Tex. Democratic Party II*, 978 F.3d at 180. In short, the State Defendants' suggestion that the *Ex parte Young* analysis requires the Court to read each provision in a vacuum, without reference to any other Election Code provision—no matter how relevant to the enforcement question at hand—is entirely divorced from Fifth Circuit precedent, and from the fundamental precepts of statutory interpretation

not enforcement focused." ECF No. 1159 at 8 (emphasis added). That is not the question before the Court—the question is whether the State Defendants have a particular duty to enforce the statute in question and demonstrated their willingness to do so.

Here, the State Defendants have shown a desire to enforce the statute. Critically, neither the AG nor the Secretary has disavowed enforcement. Beyond the AG's refusal to disavow, the trial record makes clear that he *does* intend to enforce the Canvassing Restriction. Jonathan White, former Chief of the OAG Election Integrity Division, testified that the "vote harvesting" schemes (purportedly targeted by the Canvassing Restriction) remain among the three most common elections-related allegations that the OAG pursues. Tr. at 3915:3–8; *see also* LULAC-86 at 6 (identifying at least one OAG investigation of a possible violation of the Canvassing Restriction as of March 17, 2023). The OAG has specifically identified previous prosecutions in which it participated, including prosecutions for "vote harvesting" and prosecutions conducted by or with the assistance of local DAs in multiple counties. *See* OCA-377. The Secretary, for her part, has received allegations related to mail ballot "vote harvesting," which she has referred to the OAG both before and after the passage of S.B. 1. Tr. at 1914:1–6.

**Finally, Plaintiffs have standing to challenge the Canvassing Restriction—and succeed on the merits of their challenge because it has chilled their core political speech.** The Canvassing Restriction is "an outright ban" on certain core political speech, "backed by criminal sanctions" of up to ten years in prison. *Citizens United*, 558 U.S. at 337. By Plaintiffs' banning in-person interactions with voters, the Canvassing Restriction 7.04 "restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication. *Meyer*, 486 U.S. at 414.

On these facts, the State Defendants have failed to present a "substantial case on the merits." *United States v. Baylor Univ. Med. Ctr.*, 711 F.2d 38, 39 (5th Cir. 1983) (per curiam).

**2.      The State Defendants will not suffer irreparable harm absent a stay.**

Defendants have not produced "powerful evidence of harm to [their] interests" to tip the equities in their favor. *Opulent Life Church*, 697 F.3d at 297. Again, the injunction does not direct Defendants to change any election procedures before the election. They insist that law enforcement officials must be afforded the opportunity to "prevent ballot harvesting" now that mail ballots have been sent out.

Here again, the State Defendants have a definitional problem. States cannot circumvent strict scrutiny by simply asserting a compelling interest in enforcing the regulation being challenged. Under the State Defendants' theory, the Supreme Court should have upheld the ban on independent corporate expenditures in *Citizens United* based on the government's interest in "preventing independent corporate expenditures." *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 365 (2010) (concluding that the ban on independent corporate expenditures was not narrowly tailored to the government's purported anti-corruption and shareholder-protection interests). That is not how strict scrutiny operates.

Instead, a state must identify an "actual problem" in need of solving, *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000), and demonstrate that restricting free speech is *necessary* to the solution, *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992). The Court concluded that the Canvassing Restriction does not serve Texas' proffered interest in "prevent[ing] paid partisans from haranguing Texas citizens while they fill out their mail ballots." ECF No. 862 ¶ 1023. But nothing in the text of the Canvassing Restriction limits its application to "haranguing"

conduct "while [voters] fill out their mail ballots." Instead, it criminalizes any "interaction" in the "physical presence" of a mail ballot." TEC § 276.015(a)(2).

States, to be sure, have an "important state interest" in "[e]nsuring that every vote is cast freely," *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2341 (2021). But the Election Code already imposes criminal penalties against "effort[s] to influence the independent exercise of the vote of another in the presence of the ballot or during the voting process," TEC § 276.013, or voting (or attempting to vote) a ballot belonging to another person, or attempting to mark another person's ballot without their consent or specific direction, TEC § 64.012. Similarly, it is already a crime for a voting assistor to "suggest[] by word, sign, or gesture how the voter should vote" while providing such assistance or "prepare[] the voter's ballot in a way other than the way the voter directs or without direction from the voter." TEC § 64.036. At trial, the State Defendants failed to offer even *hypothetical* scenarios in which the Canvassing Restriction would serve the government's interest in ways that are not already accomplished by other criminal provisions of the Election Code, let alone identified an "actual problem" in need of solving. *United Playboy Ent. Grp., Inc.*, 529 U.S. at 813.

Because the State Defendants have not shown that the Canvassing Restriction serves a compelling government interest, they cannot establish that being prevented from enforcing the provision will cause any harm to their interests.

**3.      Plaintiffs will suffer irreparable harm in the event of a stay.**

The injury to Plaintiffs in the absence of injunctive relief—the chill on their core political speech in the weeks before an election—would be great. As the Supreme Court has long recognized, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Political

speech, moreover, "occupies the core of the protection afforded by the First Amendment" and that "[n]o form of speech is entitled to greater constitutional protection." *McIntyre*, 514 U.S. at 346–47.

**4.     The public interest lies in enjoining the Canvassing Restriction.**

The Court considered the impact of the injunction on the public interest in its Order. *See* ECF No. 1157 at 74–77 (citing *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 298 (5th Cir. 2012) ("[I]njunctions protecting First Amendment freedoms are always in the public interest.")). Despite the State Defendants' insistence that the injunction will "confuse" voters, it is the overbreadth and vagueness of the Canvassing Restriction itself that confused organizers and voters—and apparently the State Defendants themselves—and has chilled Plaintiffs' speech.

The injunction thus serves the twin public interests of restoring clarity and vindicating the right to free speech. The only prospective interest that the State Defendants can plausibly allege would be impaired by injunctive relief is the deterrent effect of the Canvassing Restriction. Given that its chilling effect on speech is the very feature that renders the Canvassing Restriction constitutionally infirm, however, deterring violations is unlikely to serve the public interest. *See Ingebretsen on behalf of Ingebretsen v. Jackson Public Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996) (where an enactment is unconstitutional, "the public interest [is] not disserved by an injunction preventing its implementation").

**CONCLUSION**

For the forgoing reasons, the State Defendants' motion for a stay (ECF No. 1159) of this Court's order enjoining enforcement of the Canvassing Restriction, codified at Tex. Elec. Code § 276.015, is **DENIED** in all respects.

It is so **ORDERED**.

**SIGNED** this 1st day of October, 2024.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE