No. 24-50783

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

LA UNION DEL PUEBLO ENTERO, *et al.*,

*Plaintiffs-Appellees*,

v.

GREGORY W. ABBOTT, *et al.*,

*Defendants-Appellants.*

**On Appeal from the United States District Court for the
Western District of Texas, San Antonio Division**

## REPUBLICAN PARTY APPELLANTS' BRIEF IN SUPPORT OF
## DEFENDANTS' EMERGENCY MOTION TO STAY

John M. Gore
  *Counsel of Record*
E. Stewart Crosland
Louis J. Capozzi, III
JONES DAY
51 Louisiana Ave. NW
Washington, DC  20001
(202) 879-3939
jmgore@jonesday.com
scrosland@jonesday.com
lcapozzi@jonesday.com

*Counsel for Appellants Harris County Republican Party, Dallas County
Republican Party, Republican National Committee, National
Republican Senatorial Committee, and National Republican
Congressional Committee*

## INTRODUCTION

Appellants Harris County Republican Party, Dallas County Republican Party, Republican National Committee, National Republican Senatorial Committee, and National Republican Congressional Committee ("Republican Party Appellants") support and seek to uphold free and fair elections on behalf of all Texans. They therefore appeal the District Court's erroneous ruling enjoining enforcement of section 7.04 of Senate Bill 1 ("SB 1"), join State Defendants' Emergency Motion To Stay, and seek to reinstate the Texas Legislature's commonsense election laws.

The Court should enter a stay pending appeal for all of the reasons explained in State Defendants' Emergency Motion. *See* Dkt. No. 6. Moreover, Appellants are likely to succeed on appeal for two additional reasons.

*First*, Appellees impermissibly brought pre-enforcement, facial void-for-vagueness claims, which are "difficult, perhaps impossible" to maintain. *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 547 (5th Cir. 2008). No state court has even been given a chance to interpret section 7.04, which reinforces why Appellees must raise these arguments in the context of *actual*—not imagined—enforcement proceedings. *See*

1

*Burson v. Freeman*, 504 U.S. 191, 210 n.13 (1992); *Schirmer v. Edwards*, 2 F.3d 117, 124 (5th Cir. 1993).

*Second*, Appellees' free speech challenges are especially meritless because they are facial challenges that must—but cannot—satisfy the "daunting" standard governing such challenges. *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013). Section 7.04's vote harvesting ban has a "plainly legitimate sweep,'" *id.* at 387 (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)): preventing paid partisans from pressuring voters to vote in a particular way *while they fill out their mail ballots*. That is exactly the protection States are allowed to give *in-person* voters, as the Supreme Court already held. *See Burson*, 504 U.S. at 210. SB 1's extension of that same protection to mail voters therefore likewise comports with the First Amendment.

## ARGUMENT

## I.    Appellees' Pre-Enforcement Facial Void-for-Vagueness Challenges Are Premature.

Appellees' void-for-vagueness claims cannot succeed on the merits because they are pre-enforcement, facial challenges.

"In the context of pre-enforcement review . . . examining facial vagueness is often difficult, perhaps impossible, because facts are

2

generally scarce." *Roark & Hardee*, 522 F.3d at 547. That is why a vagueness challenge must ordinarily be raised as a defense to prosecution. *See Burson*, 504 U.S. at 210 n.13; *Schirmer*, 2 F.3d at 124.

This case is a textbook example of one where that rule must be applied. Appellees failed at the weeks-long trial to adduce *any* examples of prosecutions, threatened prosecutions, or investigations under section 7.04. Instead, they offered only *speculation* about how prosecutors *might* enforce section 7.04. Their primary speculation—repeated throughout trial—was that paid canvassers will be prosecuted for unwittingly advocating around a hidden mail ballot. *See, e.g.*, State Stay Br. 11 (citing record on this point).

As State Appellants explain, section 7.04 *does not* reach such conduct. *Id.* at 10, 12. Section 7.04 has a *knowledge* scienter requirement, *see* Tex. Elec. Code § 276.015(b), and applies only to actions taken "in the physical presence" of a ballot, *id.* § 276.015(a)(2); *accord* State Stay Br. 10-12. Thus, canvassers can be held liable only if they *know* a ballot is immediately, physically present—a point former Election Division Director Keith Ingram (testifying on behalf of the Secretary of State) confirmed at trial. *See* State Appellants' App. A at 53, 56 (District

3

Court acknowledging this testimony); Intervenor-Appellants' Appendix ("App.") 7:11-16, 10:3-16.

The District Court, however, completely embraced Appellees' speculation that section 7.04 will be enforced against unwitting canvassers. *See, e.g.*, State Appellants' App. A. at 23, 57. This was a clear error. Before invalidating state statutes on void-for-vagueness grounds, courts must give state courts a chance to interpret the challenged laws. After all, state courts can adopt a "limiting construction rather than a facial invalidation." *Burson*, 504 U.S. at 210 n.13. Intervenor-Appellants are confident Texas's courts will reasonably interpret section 7.04 according to its plain meaning and limit its application to situations where a canvasser *knows* a ballot is *immediately present. See* Tex. Elec. Code § 276.015(a)-(b). At a minimum, the federal courts must give Texas's courts a chance to adopt that reasonable limiting construction, not prematurely invalidate section 7.04 based on fanciful hypotheticals and speculation that Texas prosecutors and courts will behave unreasonably. *See Burson*, 504 U.S. at 210 n.13.

One more points bears emphasis. The State Appellants are correct that section 7.04 is not vague *at all*. But even if this Court disagrees,

Appellees must—but again cannot—show that the provision is "impermissibly vague in all of its applications." *Vill. of Hoffman Ests v. Flipside.*, 455 U.S. 489, 495 (1982).  The archetypal situation where section 7.04 applies is when a canvasser is paid to secure votes for particular candidates or measures, and then the canvasser presses a voter to accordingly fill out a mail ballot while the canvasser watches. *See* State Stay Br. 10, 12; State Appellants' App. A at 53, 56; App. 7:22-8:13, 10:3-25.  There is nothing unclear about that archetypal application, meaning Plaintiffs' facial void-for-vagueness challenges to section 7.04 fail.

## II.    Appellees' Facial First Amendment Challenges Fail Because Section 7.04 Has a "Plainly Legitimate Sweep."

Appellees' First Amendment challenges are unlikely to succeed on the merits because they cannot satisfy the demanding standard for facial challenges.

Appellees do not (and cannot) claim that *they* have been prosecuted or threatened with prosecution under section 7.04.  In fact, they presented *zero* evidence at trial of *any* investigations or prosecutions under section 7.04.  Instead, Appellees bring pre-enforcement, facial

challenges to section 7.04 under the First Amendment. *See* State Appellants' App. A at 53 (District Court acknowledging this point).

Therefore, Appellees must (but cannot) satisfy the "daunting" standard governing First Amendment facial challenges. *Voting for Am.*, 732 F.3d at 386; *Moody v. Netchoice*, 144 S. Ct. 2383, 2397 (2024) (calling facial-challenge standard for First Amendment challenges "rigorous"). "Courts generally disfavor facial challenges, and for good reasons." *Voting for Am.*, 732 F.3d at 386. "[F]acial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008).

Therefore, to prevail in their First Amendment challenge to section 7.04, Plaintiffs must prove that "'a substantial number of [section 7.04's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Voting for Am.*, 732 F.3d at 387 (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)); *accord Moody*, 144 S. Ct. at 2397 (reaffirming the standard).

In assessing whether Appellees can satisfy the First Amendment facial-challenge standard, the Court cannot consider "fanciful hypotheticals." *United States v. Williams*, 553 U.S. 285, 301 (2008). Rather, when assessing a First Amendment overbreadth argument, courts must consider real-word conduct, not speculation. *Id.* at 300-01. Thus, instead of assuming that Texas prosecutors will act unreasonably, the Court must give Texas a chance to "implement[ section 7.04] in a manner consistent with the Constitution." *Wash. State Grange*, 552 U.S. at 451.

Appellees cannot satisfy their demanding burden. Both in their complaints and at trial, Plaintiffs' attacks on section 7.04 featured farfetched hypotheticals—such as a paid persuader pushing a citizen to vote in a particular way while unaware of a ballot hidden "in the same room or in the voter's purse." State Stay Br. 11 (citing record on this point).

The District Court also impermissibly latched on to such hypotheticals involving unwitting individuals. *See* State Appellants' App. A. at 23, 57. It did so even though Appellees presented *zero* evidence that Texas prosecutors have prosecuted, or would prosecute, such

7

unwitting individuals. In fact, Texas prosecutors cannot prosecute unwitting individuals because section 7.04 has a *knowledge* scienter, meaning canvassers must *know* a ballot is physically present. *See* Tex. Elec. Code § 276.015(a)-(b). Of course, the District Court might have figured that point out if it had followed the Supreme Court's instruction to give Texas a chance to "implement[ section 7.04] in a manner consistent with the Constitution." *Wash. State Grange*, 552 U.S. at 451.

On the other hand, section 7.04 has a "plainly legitimate sweep." *Stevens*, 559 U.S. at 473. As former Election Division Director Keith Ingram explained at trial, section 7.04 permits organizations to "pay canvassers to go solicit votes for [their] preferred candidate." App. 10:17-19. Section 7.04 instead was enacted to prevent paid partisans from haranguing Texas citizens while they fill out their mail ballots. *See, e.g.*, App. 7:22-8:13, 10:3-25. Such protection is precisely what Texas gives in-person voters by requiring campaigners and partisans to remain 100 feet away from in-person polling places. Tex. Elec. Code §§ 61.003, 85.036. The Supreme Court has already made clear that such protection of voters from pressure *while they vote* in-person is legitimate and constitutional. *See Burson*, 504 U.S. at 210. If anything, such protections are *more*

8

*justified* for mail voting because election officials are not present to deter particularly heavy-handed pressure. *See Veasey v. Abbott*, 830 F.3d 216, 239 (5th Cir. 2016) (acknowledging particular risk for elderly voters). Accordingly, Texas's extension of that protection to mail voters *complies with*, rather than *contravenes*, the Constitution.

Section 7.04 therefore has a "plainly legitimate sweep," meaning Appellees must prove the challenged law's "unconstitutional applications *substantially* outweigh its constitutional ones." *Moody*, 144 S. Ct. at 2397 (emphasis added). As discussed above, and for the additional reasons provided by the State Appellants, Appellees cannot make that "rigorous" showing. *Id.*

## CONCLUSION

This Court should stay the District Court's order pending appeal.

Dated:  October 4, 2024

Respectfully submitted,

*/s/* John M. Gore

John M. Gore
  *Counsel of Record*
E. Stewart Crosland
Louis J. Capozzi, III
JONES DAY
51 Louisiana Ave. NW
Washington, DC  20001
(202) 879-3939
jmgore@jonesday.com
scrosland@jonesday.com
lcapozzi@jonesday.com

*Counsel for Appellants Harris County Republican Party, Dallas County Republican Party, Republican National Committee, National Republican Senatorial Committee, and National Republican Congressional Committee*

## CERTIFICATE OF SERVICE

On October 4, 2024, this document was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free from viruses.

Dated: October 4, 2024

/s/ John M. Gore

John M. Gore

*Counsel for Intervenors-Appellants*

## CERTIFICATE OF COMPLIANCE

This motion complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 1583 words, excluding the parts of the motion exempted by rule; and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word (the same program used to calculate the word count).

Dated: October 4, 2024

*/s/* John M. Gore
John M. Gore

*Counsel for Intervenors-Appellants*

**INTERVENOR-APPELLANTS' APPENDIX**

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3
    LA UNION DEL PUEBLO ENTERO,    .
 4  ET AL,                         .
                                   .
 5              PLAINTIFFS,         .
          vs.                      . DOCKET NO. 5:21-CV-844-XR
 6                                 .
    GREGORY W. ABBOTT, ET AL,      .
 7                                 .
                DEFENDANTS.        .
 8

 9

10                 TRANSCRIPT OF BENCH TRIAL
            BEFORE THE HONORABLE XAVIER RODRIGUEZ
11               UNITED STATES DISTRICT JUDGE
                    SEPTEMBER 22, 2023
12

13

14

15

16  APPEARANCES:
    FOR THE PLAINTIFFS:      NINA PERALES, ESQUIRE
17                           FATIMA MENENDEZ, ESQUIRE
                             JULIA LONGORIA, ESQUIRE
18                           MALDEF
                             110 BROADWAY
19                           SUITE 300
                             SAN ANTONIO TX 78205
20
                             LEAH TULIN, ESQUIRE
21                           BRENNAN CENTER FOR JUSTICE AT NY
                              US SCHOOL OF LAW
22                           1140 CONNECTICUT AVENUE NW
                             SUITE 1150
23                           WASHINGTON DC 20036

24

25
```

```
 1
 2                           AMIR BADAT, ESQUIRE
                            NAACP LEGAL DEFENSE & EDUCATIONAL
 3                          FUND INC
                            40 RECTOR STREET, FIFTH FLOOR
 4                          NEW YORK NY 10006
 5
 6
 7
 8                          CHRISTOPHER DOOLEY DODGE, ESQUIRE
                            DANIELA LORENZO, ESQUIRE
 9                          UZOMA N. NKWONTA, ESQUIRE
                            MARCOS MOCINE-MCQUEEN, ESQUIRE
10                          ELIAS LAW GROUP LLP
                            250 MASSACHUSETTS AVENUE NW
11                          SUITE 400
                            WASHINGTON DC 20001
12
13
14
15
16
17  FOR THE DEFENDANTS:     RYAN G. KERCHER, ESQUIRE
                            KATHLEEN HUNKER, ESQUIRE
18                          WILLIAM WASSDORF, ESQUIRE
                            MONROE DAVID BRYANT, JR., ESQUIRE
19                          ETHAN QUINN SZUMANSKI, ESQUIRE
                            ZACHARY BERG, ESQUIRE
20                          TEXAS ATTORNEY GENERAL
                            P.O. BOX 12548
21                          MC 009
                            AUSTIN TX 78711
22
23                          LOUIS J. CAPOZZI, III, ESQUIRE
                            JONES DAY
24                          51 LOUISIANA AVENUE NW
                            WASHINGTON DC 20001
25
```

```
 1

 2

 3                          CORY REN LIU, ESQUIRE
                            BUTLER SNOW LLP
 4                          1400 LAVACA STREET
                            SUITE 1000
 5                          AUSTIN TX 78701

 6

 7

 8

 9

10

11

12

13

14

15   REPORTED BY:           GIGI SIMCOX, RMR, CRR
                            OFFICIAL COURT REPORTER
16                          UNITED STATES DISTRICT COURT
                            SAN ANTONIO, TEXAS
17

18

19

20

21

22

23

24

25
```

 1            *(12:59 p.m.)*

 2            COURT SECURITY OFFICER:  All rise.

 3            THE COURT:  Thank you.  Please be seated.

 4            MR. KANTERMAN:  Thank you, Your Honor.  Jason

 5     Kanterman from Fried, Frank, Harris, Shriver & Jacobson on

 6     behalf of the LUPE plaintiffs.  And Your Honor, we're going to

 7     call Keith Ingram to the stand.

 8            COURTROOM DEPUTY CLERK:  Raise your right hand.

 9                            *   *   *

10            *(Oath administered and, KEITH INGRAM, witness, Sworn.)*

11                            *   *   *

12            MR. KANTERMAN:  Your Honor, before we begin the

13     examination, for the record, the LUPE plaintiffs will elicit

14     testimony from Mr. Ingram in support of all of their claims

15     across all of the sections that have been challenged in this

16     case.

17            THE COURT:  Thank you.

18            MR. KANTERMAN:  And Your Honor, as the Court will

19     hear, Mr. Ingram was formerly employed by the Secretary of

20     State's Office, previously served in the Elections Division,

21     and testified on numerous occasions in this case as the

22     30(b)(6) witness; so therefore, pursuant to Federal Rule of

23     Evidence 611(c)(2), I'd request leave to ask leading questions

24     of Mr. Ingram, because he's a witness identified with an

25     adverse party.

```
 1            MR. KERCHER:  No objection.

 2            THE COURT:  You may proceed.

 3            MR. KANTERMAN:  Thank you, Your Honor.

 4                      DIRECT EXAMINATION

 5   BY MR. KANTERMAN:

 6   Q.  Mr. Ingram, good afternoon.

 7   A.  Howdy.

 8   Q.  Good to see you again.  Please state your full name for the

 9   record.

10   A.  Brian Keith Ingram.

11   Q.  Mr. Ingram, you previously worked for the Secretary of

12   State's Office?

13   A.  I did.

14   Q.   In the Elections Division?

15   A.  I did.

16   Q.  Before going into details about your job with the Secretary

17   of State's role, I'd like to talk a little bit about your

18   personal educational background and employment history.

19        After graduating from college, you went on to law school?

20   A.  I did.

21   Q.  At the University of Texas School of Law?

22   A.  Yes.

23   Q.  You graduated from University of Texas School of Law in

24   1993?

25   A.  1993, yes, sir.
```

1  Q.  Generally agree that 7.04 makes it unlawful to knowingly

2  provide or offer to provide vote-harvesting services in

3  exchange for compensation or other benefit?

4  A.  Agreed.

5  Q.  And it also makes it unlawful to provide or offer to

6  provide compensation in exchange for those vote-harvesting

7  activities?

8  A.  Agreed.

9  Q.  For purposes of these sections, a "benefit" is *anything*

10 *reasonably regarded as a gain or advantage*"?

11 A.  That's what it says.

12 Q.  And you mentioned a moment ago that this section also

13 defines "vote harvesting," and it defines vote-harvesting

14 services to mean *"any in-person interaction with one or more*

15 *voters in the physical presence of an official ballot or a*

16 *ballot voted by mail intended to deliver votes for a specific*

17 *candidate or measure.*"

18 A.  Uh-huh, I agree with that.

19 Q.  So for an activity to be considered vote harvesting under

20 this provision, the activity must include, one, in-person

21 interaction with one or more voters; and two, be in the

22 physical presence of an official ballot or ballot voted by

23 mail?

24 A.  Agreed.

25 Q.  I want to --

1    A.  And intended to produce a vote for a particular candidate

2    or measure.

3    Q.  I want to begin by discussing the in-person interaction

4    requirement.  In the Secretary of State's Office's view, a

5    telephonic discussion between two individuals would not satisfy

6    the in-person requirement, right?

7    A.  Agree with that.

8    Q.  Sitting across the table from an individual would satisfy

9    the in-person requirement, right?

10   A.  Sure.

11   Q.  And in the Secretary of State's Office's view, in order for

12   the in-person interaction requirement to be met, the

13   interacting individuals must be close enough to see or hear

14   each other; is that right?

15   A.  They have to be in the physical presence of each other,

16   yes.

17   Q.  And so you would agree that they would have to be close

18   enough to see or hear each other?

19   A.  They've got to be with each other, yes.

20   Q.  If I asked you to put a number on how close that would be,

21   you couldn't do that, right?

22   A.  No, no, I couldn't.  The point of vote harvesting is that

23   you are both present, across a table, catty-corner from each

24   other, whatever, in the presence of the ballot.  And

25   politiqueras, when they get hired by a candidate, they don't

1    care who you vote for president, they don't care about U.S.

2    Senate, they don't care about anything except the race that

3    they got hired on.  So when they get down to that school

4    district race, then they want to make sure that the voter

5    checks the box for their preferred candidate.  That's vote

6    harvesting.  That's the whole point of it.

7        So if you've got an interaction with two people that is

8    15 feet apart or close, it doesn't really matter.  The point is

9    that the vote-harvester is trying to do is to make sure that on

10   that particular candidate or measure, the voter goes a

11   particular way.  And that can be done from 15 feet, it can be

12   done from 5 feet.  I'm not going to put a number on it.  If

13   that's what's happening, that's vote harvesting.

14   Q.  Based upon that description you just gave us, I assume it

15   would be the Secretary of State's Office's view it doesn't need

16   to give a precise measurement or distance of closeness, because

17   everybody would know it if they saw it.  Everybody sees it when

18   it happens, everybody would understand what's going on; is that

19   right?

20   A.  Whether everybody would know, I don't know, but if I get a

21   complaint with a set of facts in it that is like what I

22   described -- like what (a)2 here describes, then I would refer

23   that to the Attorney General.  What everybody knows, I don't

24   know what they know.  I have zero insight into what everybody

25   knows.

1    What I do know is if I get a complaint, and it talks about

2    physical presence, intimidation, making sure that a voter

3    marked one box one way, I would consider that vote harvesting,

4    and I would get it over to the Attorney General for

5    investigation.  And I have, in fact, done so, before SB1 and

6    since SB1.

7    Q.  You would agree, though, that the Secretary of State's

8    Office has not published any guidance specifying how close two

9    individuals must be for an interaction to be considered

10   in-person under 7.04?

11   A.  I agree with that.  We have not published any such

12   guidance.

13   Q.  And you have not published any such trainings?

14   A.  I agree with that.

15   Q.  And we alluded to it earlier.  We can squarely address it

16   now.  Let's discuss the requirement that a ballot be physically

17   present under 7.04.

18       You'd agree that SB1 does not define what it means for a

19   ballot to be physically present, right?

20   A.  I agree with that.

21   Q.  For example, SB1 does not designate the proximity within

22   which a ballot must be to a conversation for it to be deemed

23   physically present.

24   A.  I agree that the statute doesn't say anything about that.

25   Q.  The Secretary of State's Office has no official opinion

1   about whether a ballot being within ten feet of a discussion is
2   close enough to constitute physical presence for this section?
3   A.  I don't know how else to say this.  If the ballot is in the
4   kitchen, and we're in the living room, and we're talking about
5   our preferred candidates, that's First Amendment.  That's not
6   implicated by this section at all.  So whether that's ten feet
7   or 8 feet, it doesn't matter.  That's not what's going on.
8   What's going on is a perfectly normal -- I'm trying to persuade
9   you to vote for my candidate.  I can get paid for that.  I can
10  go do it all day long, and it will never, ever, ever implicate
11  this section.
12      The whole point of this section is whenever the voter and
13  the harvester get together and they're reviewing the ballot
14  together, and then they get down to that candidate, and the
15  harvester makes sure they check the right box, that's
16  harvesting.  So anything other than that is First Amendment.
17      I mean, we've got the right to pay canvassers to go solicit
18  votes for our preferred candidate.  That's not implicated by
19  this.  This is whenever you've got a particular mission to
20  deliver a particular number of votes for a particular candidate
21  and you make sure that the voter checks that box.  That means
22  that the ballot has to be in front of both of you and you both
23  have to know it's there and you both have to be looking at it.
24  This is not a situation where you can be caught by accident.
25  Vote-harvesters know exactly what they're doing.

1  Q.  So I think you agreed with me that the Secretary of State's

2  Office has no official opinion about whether a ballot being

3  within ten feet of a discussion is close enough to constitute

4  physical presence for this section.

5  A.  Almost never would that be.  I can imagine, I guess, a

6  very --

7           THE COURT:  Sir, that's not the question.

8           THE WITNESS:  I'm sorry.

9           THE COURT:  It will go a whole lot easier if you just

10  answer the question.  The question is, does the Secretary of

11  State's Office have a position?

12           THE WITNESS:  Not really, no, sir.

13  BY MR. KANTERMAN:

14  Q.  As a general matter, if a discussion is proceeding and a

15  ballot is 5 feet away, generally, the Secretary of State's

16  Office doesn't think that the ballot is sufficiently nearby to

17  constitute physical presence for this section, right?

18  A.  I agree with that.

19  Q.  Yet, in the Secretary of State's Office's view, there are

20  circumstances that might render a ballot which is 5 feet away

21  from a conversation sufficiently nearby to deem it physically

22  present.

23  A.  It's hard to envision.

24  Q.  I'll give you an example.  If a conversation is occurring

25  at a large conference room table and the ballot is 5 feet away

1  from the two speakers but still on the table that, in the

2  Secretary of State's Office's view, might be enough to

3  constitute physical presence under this section.

4  A.  Doubtful, but maybe.  It just depends.

5  Q.  But the Secretary of State's Office can't give a blanket

6  opinion or blanket guidance about how close in proximity a

7  ballot must be to a conversation for it to be deemed physically

8  present for this section.

9  A.  I agree with that.

10  Q.  You'd agree that any decision would have to be made on a

11  case-by-case basis?

12  A.  Well, whether or not voter-harvesting is going on is always

13  going to be decided on a case-by-case basis, yes.  Proximity to

14  the ballot is one of the factors.

15  Q.  And if I pressed for a more specific set of guidance about

16  proximity, you'd tell me it's just you or the director

17  reviewing a complaint and applying their judgment?

18  A.  As far as what we do.  Now, whether or not a prosecutor

19  agrees with us is a different story entirely.

20  Q.  But while you were director, a decision as to whether

21  someone violated this section, for purposes of assessing a

22  complaint, you'd simply just have to know it when you saw it?

23  A.  If the allegation in the complaint is that Ms. Rodriguez or

24  Mr. Smith paid me $50 if I would go vote for commissioner

25  so-and-so for the school board, then that gets it referred to

1    the Attorney General.  That's either 3602 or vote harvesting,

2    but either way, that gets referred.  It's not Keith Ingram

3    deciding, does it fit in the statute or doesn't it?

4        MR. KANTERMAN:  Your Honor, I don't know if now would

5    be a good time for a short break?

6        THE COURT:  Yes.

7        COURT SECURITY OFFICER:  All rise.

8        *(2:22 p.m.)*

9                            *   *   *

10       *(2:39 p.m.)*

11       COURT SECURITY OFFICER:  All rise.

12       THE COURT:  Thank you.  Please be seated.

13       MR. KANTERMAN:  Thank you, Your Honor.

14   BY MR. KANTERMAN:

15   Q.  Mr. Ingram, I've been handed a number of questions from my

16   colleagues, and I'd like to just circle back on some of them to

17   make sure I've closed some gaps, so I appreciate your patience.

18       I don't think I asked you earlier, but when we discussed

19   some of the legislative meetings that your office was having, I

20   wanted to ask two additional questions.  The first is whether

21   on some occasions your office would propose language to achieve

22   what a particular legislator or committee member might want to

23   accomplish?

24   A.  In general or with regard to SB7/SB1?

25   Q.  In general.

 1   A.  In general, that is one of the functions of our office,

 2   sure.  We will propose language if a legislator tells us what

 3   they want to do, and they want us to draft something, it always

 4   goes to a "leg." council after we submit it.  That didn't

 5   happen on SB1 or SB7.

 6   Q.  I'll ask Derek to please pull back up LULAC 75.

 7       Mr. Ingram, we looked at this document earlier, right?

 8   A.  We did.

 9   Q.  And you highlighted row four as being relevant, the row

10   where the post number says 298,217, correct?

11   A.  Yes, and as well as the bottom and the middle.

12   Q.  And I'll stay with row four just for a moment, please.

13   A.  Okay.

14   Q.  These are the voters who, if they put their Social Security

15   number on the mail ballot, will not match to their voter

16   registration record?

17   A.  That's right.

18   Q.  And row five, I believe, is the row that you had just

19   indicated you also identified?

20   A.  That's right.

21   Q.  Row five, which you'll note has been highlighted in green,

22   these are the voters who, if they put their Texas driver's

23   license number on the mail ballot, will not match to their

24   voter registration record?

25   A.  Right.  And I just want to make clear that when we talk