# In the United States Court of Appeals for the Fifth Circuit

La Unión del Pueblo Entero, et al., Southwest Voter Registration Education Project; Mexican American Bar Association of Texas; Texas Hispanics Organized for Political Education; Jolt Action; William C. Vasquez Institute; Fiel Houston, Incorporated; Friendship West Baptist Church; Texas Impact; James Lewin,

*Plaintiffs-Appellees,*

*v.*

Gregory W. Abbott, in his official capacity as Governor of Texas; Warren K. Paxton, in his official capacity as Attorney General of Texas; State of Texas; Jane Nelson, in her official capacity as Texas Secretary of State; Harris County Republican Party; Dallas County Republican Party; National Republican Senatorial Committee,

*Defendants-Appellants,*

*v.*

Republican National Committee,

*Movant-Appellant.*

——————

OCA-Greater Houston; League of Women Voters of Texas,

*Plaintiffs-Appellees,*

*v.*

Ken Paxton, Attorney General of Texas,

*Defendants-Appellant.*

*[Caption Continued on Next Page]*

LULAC Texas; Texas Alliance for Retired Americans; Texas AFT; Voto Latino,

*Plaintiffs-Appellees*,

*v.*

Ken Paxton, in his official capacity as the Texas Attorney General,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Texas, San Antonio Division

## BRIEF FOR STATE DEFENDANTS-APPELLANTS

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Aaron L. Nielson
Solicitor General

Lanora C. Pettit
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

Kathleen T. Hunker
Special Counsel

Mark A. Csoros
Assistant Attorney General

Counsel for State Defendants-Appellants

# Certificate of Interested Persons

No. 24-50783

### La Unión del Pueblo Entero, et al.,
*Plaintiffs-Appellees*,

*v.*

### Gregory W. Abbott, et al.,
*Defendants-Appellants.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, State Defendants-Appellants, as governmental parties, need not furnish a certificate of interested persons.

/s/ Lanora C. Pettit

Lanora C. Pettit
*Counsel of Record for*
*State Defendants-Appellants*

## Statement Regarding Oral Argument

In 2021, Section 7.04 of the Texas Election Integrity Protection Act of 2021, 87th Leg., 2d C.S., ch. 1, 2021 Tex. Gen. Laws 3873 (commonly known as "S.B. 1"), banned paid vote harvesting—the vote-by-mail equivalent of electioneering for hire. Three years, multiple elections, and a full trial later, the district court enjoined that common-sense election-integrity provision based on little more than farfetched hypotheticals regarding how the law theoretically *could* be enforced. Based on a record that is simultaneously extensive and devoid of evidence that the law ever *would* be enforced in such a manner, this appeal raises not only significant constitutional issues, but implicates the same legal errors that are subject to interlocutory appeals already pending before this Court. Attorney General Ken Paxton and Secretary of State Jane Nelson (collectively, "State Defendants")[1] respectfully suggest that argument would likely aid this Court in evaluating that record, understanding the case's complicated procedural history, and assessing the intertwining provisions of the Texas Election Code at issue.

---

[1] Although the Governor remains listed in the case caption, the district court dismissed the claims against him for lack of standing. ROA.10762, 10767. As Plaintiffs have not cross appealed this decision, he is no longer a defendant in the district court and has never been an appellant in this appeal.

# Table of Contents

Page

Certificate of Interested Persons ...............................................................i

Statement Regarding Oral Argument ......................................................ii

Table of Authorities ................................................................................ v

Introduction ............................................................................................. 1

Statement of Jurisdiction ........................................................................ 3

Issues Presented ...................................................................................... 3

Statement of the Case ............................................................................. 4

    I.   Factual Background ....................................................................... 4

        A.   The 2020 election ..................................................................... 4

        B.   S.B. 1's Paid-Voter-Harvesting Ban .......................................6

    II.  Procedural History .......................................................................9

Summary of the Argument.....................................................................10

Standard of Review ............................................................................... 14

Argument................................................................................................ 14

    I.   S.B. 1's Paid-Vote-Harvesting Ban Is Not Unconstitutionally
       Vague ........................................................................................... 14

        A.   The Plaintiffs' pre-enforcement facial challenge is premature...........15

        B.   Plaintiffs' vagueness claim fails on the merits................................... 17

            1.   The terms "compensation" and "benefit" are not
               unconstitutionally vague............................................. 18

            2.   The "physical presence" requirement is not
               unconstitutionally vague.............................................25

    II.  S.B. 1's Paid-Vote-Harvesting Ban Complies with the First
       Amendment.................................................................................28

        A.   The district court applied the incorrect standard in subjecting
            Section 7.04 to strict scrutiny...........................................29

        B.   Section 7.04 survives constitutional scrutiny.................................... 31

            1.   States have well-founded reasons for preventing
                electioneering in polling places ...................................32

      2.   Texas's interests in its electioneering laws are no less compelling because Section 7.04 applies in the mail-ballot context .......................................................................... 34

      3.   The paid-vote-harvesting ban is sufficiently tailored .................. 35

      4.   Plaintiffs cannot avoid this conclusion by reciting the word "overbroad" ................................................................. 39

III. The District Court Lacked Jurisdiction to Enjoin the Attorney General and the Secretary ........................................................ 40

   A.  The Attorney General and the Secretary are entitled to sovereign immunity ............................................................. 41

      1.   The Attorney General lacks the independent authority to enforce these criminal-law provisions under state law ............... 42

      2.   The Secretary of State lacks a sufficient enforcement connection to the challenged provision ..................................... 44

   B.  The Plaintiffs lack Article III standing ................................. 46

Conclusion ................................................................................ 48

Certificate of Service ................................................................. 49

Certificate of Compliance .......................................................... 49

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*,
  610 S.W.3d 911 (Tex. 2020) ............................................................... 5

*In re Abbott*,
  954 F.3d 772 (5th Cir. 2020) ............................................................. 2

*In re Abbott*,
  956 F.3d 696 (5th Cir. 2020) ........................................................... 44

*Almendarez-Torres v. United States*,
  523 U.S. 224 (1998) ......................................................................... 10

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983) ........................................................... 12, 30, 31

*Arnold v. Cockrell*,
  306 F.3d 277 (5th Cir. 2002) ........................................................... 42

*Babbitt v. United Farm Workers Nat'l Union*,
  442 U.S. 289 (1979) ................................................................... 46, 47

*Baby Dolls Topless Saloons, Inc. v. City of Dallas*,
  295 F.3d 471 (5th Cir. 2002) ........................................................... 14

*Bd. of Trs. of State Univ. of N.Y. v. Fox*,
  492 U.S. 469 (1989) ......................................................................... 39

*Borgelt v. Austin Firefighters Ass'n, IAFF Local 975*,
  692 S.W.3d 288 (Tex. 2024) ........................................................... 19

*Brnovich v. Democratic Nat'l Comm.*,
  594 U.S. 647 (2021) ................................................................. passim

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973) ......................................................................... 39

*Burdick v. Takushi*,
  504 U.S. 428 (1992) ........................................................... 2, 12, 30, 31

*Burson v. Freeman*,
  504 U.S. 191 (1992) ................................................................. passim

*California v. Texas*,
  593 U.S. 659 (2021) ......................................................................... 47

*City of Austin v. Paxton*,
   943 F.3d 993 (5th Cir. 2019) ...................................................*passim*

*Clapper v. Amnesty Int'l. USA*,
   568 U.S. 398 (2013) ................................................................ 47

*Crawford v. Marion Cnty. Election Bd.*,
   553 U.S. 181 (2008) ................................................................ 37

*Denton Reg'l Med. Ctr. v. LaCroix*,
   947 S.W.2d 941 (Tex. App.—Fort Worth 1997, pet. dism'd by agr.) ...............26

*Dep't of Tex., Veterans of Foreign Wars v. Tex. Lottery Comm'n*,
   760 F.3d 427 (5th Cir. 2014) ................................................. 36

*Eu v. S.F. Cnty. Democratic Cent. Comm.*,
   489 U.S. 214 (1989) ................................................................ 31

*Fischer v. United States*,
   603 U.S. 480 (2024) ......................................................... 18, 20

*Forsyth Cty. v. Nationalist Movement*,
   505 U.S. 123 (1992) ......................................................... 26, 27

*Gonzales v. Carhart*,
   550 U.S. 124 (2007) ................................................................ 23

*Google, Inc. v. Hood*,
   822 F.3d 212 (5th Cir. 2016) ................................................. 43

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) ................................................................ 26

*Haverkamp v. Linthicum*,
   6 F.4th 662 (5th Cir. 2021) .................................................. 44

*In re Hotze*,
   610 S.W.3d 909 (Tex. 2020) ...................................................5

*Iselin v. United States*,
   270 U.S. 245 (1926) ................................................................ 18

*Jennings v. Rodriguez*,
   583 U.S. 281 (2018) ................................................................22

*Johnson v. United States*,
   576 U.S. 591 (2015) ................................................................ 15

*K.P. v. LeBlanc*,
   627 F.3d 115 (5th Cir. 2010) ................................................. 41

*La Union Del Pueblo Entero v. Abbott*,
   119 F.4th 404 (5th Cir. 2024) ...........................................13, 41

*Laird v. Tatum,*
    408 U.S. 1 (1972) ................................................. 47

*Lewis v. Scott,*
    28 F.4th 659 (5th Cir. 2022) ................................... 5

*Lightbourn v. County of El Paso,*
    118 F.3d 421 (5th Cir. 1997) .................................. 45

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ............................................. 46

*Mazo v. N.J. Sec'y of State,*
    54 F.4th 124 (3d Cir. 2022) ................................... 31

*McClelland v. Katy ISD,*
    63 F.4th 996 (5th Cir. 2023) .................................. 16

*McFadden v. United States,*
    576 U.S. 186 (2015) ............................................. 23

*McIntyre v. Ohio Elec. Comm'n,*
    514 U.S. 334 (1995) ............................................. 30

*Meyer v. Grant,*
    486 U.S. 414 (1988) ............................................. 38

*Mi Familia Vota v. Ogg,*
    105 F.4th 313 (5th Cir. 2024) .......................... *passim*

*Minn. Voters Alliance v. Mansky,*
    585 U.S. 1 (2018) ........................................ *passim*

*Moody v. Netchoice,*
    603 U.S. 707 (2024) ............................................. 28

*Morris v. Livingston,*
    739 F.3d 740 (5th Cir. 2014) .................................. 41

*Nash v. United States,*
    229 U.S. 373 (1913) ............................................. 15

*Ostrewich v. Tatum,*
    72 F.4th 94 (5th Cir. 2023) ............................. *passim*

*Planned Parenthood Ctr. for Choice v. Abbott,*
    141 S. Ct. 1261 (2021) ......................................... 44

*Preston Expl. Co., L.P. v. GSF, L.L.C.,*
    669 F.3d 518 (5th Cir. 2012) .................................. 14

*R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water,*
    336 S.W.3d 619 (Tex. 2011) ................................... 27

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ................................................................30

*Reno v. ACLU*,
   521 U.S. 844 (1997) ................................................................ 37

*Reynolds v. Sims*,
   377 U.S. 533 (1964) ................................................................ 31

*Richardson v. Flores*,
   28 F.4th 649 (5th Cir. 2022) .................................................. 3, 5, 45

*Richardson v. Tex. Sec'y of State*,
   978 F.3d 220 (5th Cir. 2020) ................................................1, 35

*Ex parte Rion*,
   662 S.W.3d 890 (Tex. Crim. App. 2022) .................................. 25, 26

*Roark & Hardee LP v. City of Austin*,
   522 F.3d 533 (5th Cir. 2008) ........................................11, 15, 16, 17

*Robinson v. State*,
   466 S.W.3d 166 (Tex. Crim. App. 2015) ..................................24

*Rose v. Locke*,
   423 U.S. 48 (1975) ..................................................................22

*Roth v. United States*,
   354 U.S. 476 (1957) ................................................................ 17

*Russell v. Jones*,
   49 F.4th 507 (5th Cir. 2022) .................................................... 41

*Schirmer v. Edwards*,
   2 F.3d 117 (5th Cir. 1993) ................................................ 15, 31, 33, 35

*Sessions v. Dimaya*,
   584 U.S. 148 (2018) ............................................................14, 15

*Smith v. Goguen*,
   415 U.S. 566 (1974) ............................................................25-26

*Snyder v. United States*,
   603 U.S. 1 (2024) ....................................................................22

*State v. Hollins*,
   620 S.W.3d 400 (Tex. 2020).......................................................5

*State v. Malone*,
   No. 12-17-00074-CR, 2018 WL 2440460 (Tex. App.—Tyler May
   31, 2018, pet. ref'd) ............................................................. 21

*State v. Sandoval,*
    842 S.W.2d 782 (Tex. App.—Corpus Christi-Edinburg 1992, pet. ref'd) ........ 21

*State v. Stephens,*
    663 S.W.3d 45 (Tex. Crim. App. 2021) ....................................................*passim*

*State v. Zurawski,*
    690 S.W.3d 644 (Tex. 2024) ........................................................................... 47

*In re State,*
    602 S.W.3d 549 (Tex. 2020) ............................................................................. 5

*Stokes v. Sw. Airlines,*
    887 F.3d 199 (5th Cir. 2018) ......................................................................... 42

*Storer v. Brown,*
    415 U.S. 724 (1974) ................................................................................. 1, 30

*Tex. All. for Retired Ams. v. Scott,*
    28 F.4th 669 (5th Cir. 2022) .................................................................5, 14, 45

*Tex. Democratic Party v. Abbott,*
    961 F.3d 389 (5th Cir. 2020) ...................................................................31, 41

*Tex. Democratic Party v. Abbott,*
    978 F.3d 168 (5th Cir. 2020) .................................................................. 34, 35

*Tex. League of United Latin Am. Citizens v. Hughs,*
    978 F.3d 136 (5th Cir. 2020) ........................................................................... 5

*Tuilaepa v. California,*
    512 U.S. 967 (1994) ............................................................................... 11, 18

*Tull v. United States,*
    481 U.S. 412 (1987) ....................................................................................... 10

*Turtle Island Foods, S.P.C. v. Strain,*
    65 F.4th 211 (5th Cir. 2023) .................................................................... 22, 27

*Twitter, Inc. v. Paxton,*
    56 F.4th 1170 (9th Cir. 2022) ........................................................................ 43

*United States v. Abbott,*
    85 F.4th 328 (5th Cir. 2023) .......................................................................... 44

*United States v. Anderton,*
    901 F.3d 278 (5th Cir. 2018) ......................................................................... 17

*United States v. Caldwell,*
    655 F. App'x 730 (11th Cir. 2016) ................................................................ 12

*United States v. CITGO Petrol. Corp.,*
    801 F.3d 477 (5th Cir. 2015) ......................................................................... 18

*United States v. Clark,*
    412 F.2d 885 (5th Cir. 1969) ............................................................ 18

*United States v. Davis,*
    36 F.3d 1424 (9th Cir. 1994) ............................................................ 22

*United States v. Hansen,*
    599 U.S. 762 (2023) ..................................................... 10, 29, 31

*United States v. Jackson,*
    968 F.2d 158 (2d Cir. 1992) ............................................................ 22

*United States v. Petrillo,*
    332 U.S. 1 (1947) ................................................................ 15, 23

*United States v. Portanova,*
    961 F.3d 252 (3d Cir. 2020) ........................................................ 11-12

*United States v. Powell,*
    423 U.S. 87 (1975) ........................................................................ 23

*United States v. Robinson,*
    367 F.3d 278 (5th Cir. 2004) ........................................................ 11

*United States v. Stevens,*
    559 U.S. 460 (2010) ...................................................................... 13

*United States v. Williams,*
    553 U.S. 285 (2008) ...............................................................*passim*

*Veasey v. Abbott,*
    830 F.3d 216 (5th Cir. 2016) ............................................. 1, 35, 36

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
    455 U.S. 489 (1982) ...............................................................*passim*

*Vote.Org v. Callanen,*
    89 F.4th 459 (5th Cir. 2023) ............................................. 1, 2, 34

*Voting for Am., Inc. v. Steen,*
    732 F.3d 382 (5th Cir. 2013) ....................................................*passim*

*Wash. State Grange v. Wash. State Republican Party,*
    552 U.S. 442 (2008) ............................................. 16-17, 28, 39

*White v. State,*
    509 S.W.3d 307 (Tex. Crim. App. 2017) ...................................... 24

*Whole Woman's Health v. Jackson,*
    595 U.S. 30 (2021) ................................................................ 15, 47

*Williams v. State,*
    235 S.W.3d 742 (Tex. Crim. App. 2007) ...................................... 24

*Williams-Yulee v. Fla. Bar*,
  575 U.S. 433 (2015) .................................................... 37
*Women's Med. Ctr. of Nw. Hous. v. Bell*,
  248 F.3d 411 (5th Cir. 2001) ..................................25-26
*Yarls v. Bunton*,
  905 F.3d 905 (5th Cir. 2018) ...................................... 36
*Ex parte Young*,
  209 U.S. 123 (1908) ..........................................*passim*

**Constitutional Provisions, Statutes, and Rules:**

U.S. Const.:
  amend. I...................................................*passim*
  amend. XI ................................................. 41
  amend. XIV ............................................. 14, 25

28 U.S.C.:
  § 1292 ......................................................... 3
  § 1331 ......................................................... 3

87th Leg., 2d C.S., ch. 1, 2021 Tex. Gen. Laws 3873 .............ii

Tex. Const. art. II, § 1 ....................................42

Tex. Elec. Code:
  § 1.0015.........................................................6
  § 31.003 .....................................................27
  § 31.004 .....................................................27
  § 31.006 ......................................................8
  § 61.003 ......................................................7
  § 61.008 ......................................................7
  § 64.012 .....................................................38
  § 64.036 .....................................................38
  § 85.036 ......................................................7
  § 86.0105 ...................................................21
  § 86.052 ....................................................21
  § 86.052(e) .................................................21

§ 273.001 ..................................................................... 8

§ 273.021 ..................................................................... 8

§ 273.021(a) ............................................................... 42

§ 276.013(a) ............................................................... 37

§ 276.015 ................................................. 2, 8, 16, 31, 32

§ 276.015(a)-(b) ......................................................... 28

§ 276.015(a)(1) ................................................... 19, 20

§ 276.015(a)(2) ............................................. 8, 23, 25

§ 276.015(b) ............................................................... 23

§ 276.015(b)-(d) ......................................................... 23

§ 276.015(e) ....................................................... 36, 38

§ 276.015(e)(3) ........................................................... 8

Tex. Gov't Code § 402.028(b) ......................................... 44

Tex. Penal Code:

§ 6.02 ...................................................................... 23

§ 6.02(c) ................................................................. 23

§ 6.03(a) ................................................................. 25

§ 6.03(c) ......................................................... 24, 28

§ 6.03(d) ................................................................. 24

§ 38.01 .................................................................... 21

§ 38.01(3) ............................................................... 21

Tex. Elec. Integrity Protection Act of 2021, 87th § 7.04 ................................. *passim*

V.T.E.C. Art. 15.24 [1925 P.C] ......................................... 7

**Other Authorities:**

Amy Coney Barrett, *Substantive Canons and Faithful Agency*,
90 B.U. L. Rev. 109 (2010) ............................................. 22

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ......................................... 20, 32

Appellees Br., *Mi Familia Vota v. Ogg*, 105 F.4th 313 (5th Cir. 2024)
(No. 22-50732) ............................................................ 46

Black's Law Dictionary (11th ed. 2019) ......................... 19, 20, 22, 26

House Comm. on Elections, Bill Analysis at 2, Tex. H.B. 259, 83rd
Leg., R.S. (2013), https://perma.cc/8CVC-8V83 ........................... 34

Joseph Story, *Commentaries on the Constitution of the United States* (1833) ................................................... 17-18

Kurt H. Decker & H. Thomas Felix II, *Drafting and Revising Employment Contracts* (1991) ............................................................. 19

Press Release, Off. of Tex. Gov., *Governor Abbott Delivers 2021 State of the State Address* (Feb. 1, 2021), https://perma.cc/A6HZ-E5NM ..........................5

Press Release, Off. of Tex. Gov., *Governor Abbott Holds Press Conference on Election Integrity Legislation* (Mar. 15, 2021), https://perma.cc/R3NL-X5AW ........................................................................6

Report of the Comm'n on Fed. Election Reform, *Building Confidence in U.S. Elections* (2005) ................................................................ 34-35

*States with Mostly Mail Elections*, National Conference of State Legislatures (Oct. 11, 2024), https://www.ncsl.org/elections-and-campaigns/table-18-states-with-all-mail-elections ..............................................29

Tex. Sec'y of State, Election Advisory No. 2020-14, *COVID-19 (Coronavirus) Voting and Election Procedures* (2020), https://perma.cc/98JX-FSBD ................4

# Introduction

"[A]n examination of the history of election regulation in this country reveals a persistent battle against two evils: voter intimidation and election fraud." *Burson v. Freeman*, 504 U.S. 191, 206 (1992). Until the development of the so-called Australian ballot, "the actual act of voting was usually performed in the open, frequently within the view of interested onlookers." *Minn. Voters Alliance v. Mansky*, 585 U.S. 1, 6 (2018) (quotation marks omitted). This led to chaotic efforts by parties to "heckle and harass voters who appeared to be supporting the other side," *id.* at 7, and elections that "were not a very pleasant spectacle for those who believed in democratic government," *Burson,* 504 U.S. at 202 (quotation marks omitted). There began the battle to insure an "island of calm in which voters can peacefully contemplate their choices," *Mansky*, 585 U.S. at 15, as part of the larger campaign to ensure "fair and honest" elections and bring "order . . . [to] the democratic processes," *Storer v. Brown*, 415 U.S. 724, 730 (1974).

Although this fight began at the physical voting booths, in recent decades mail ballots have been increasingly common. "[C]ompleted far from any government office or employee," courts and legislatures have recognized that such ballots are uniquely vulnerable to many forms of election misconduct. *Vote.Org v. Callanen*, 89 F.4th 459, 489 (5th Cir. 2023). "[T]he potential and reality of fraud is much greater in the mail-in ballot context than with in-person voting." *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 239 (5th Cir. 2020) (quoting *Veasey v. Abbott*, 830 F.3d 216, 239 (5th Cir. 2016)). So too is the potential for voter harassment without election officials present to enforce the "campaign-free zone outside the polls" that all 50 States have

deemed "necessary to secure the advantages of the secret ballot and protect the right to vote." *Mansky*, 585 U.S. at 14.

In 2021, Texas sought to functionally extend its longstanding electioneering laws to mail ballots by banning paid vote harvesting. Part of the larger omnibus election-reform bill known as S.B. 1, this provision bans in-person interactions that (1) are performed for compensation or benefit, (2) knowingly (3) occur in the presence of a ballot or during the voting process, (4) directly involve an official ballot or mail ballot, (5) are conducted in-person with a voter, and (6) are designed to deliver votes for or against a specific candidate or measure. *Id.* § 276.015.

Notwithstanding the long pedigree of similar electioneering laws, the district court declared Section 7.04 to be facially unconstitutional under both the Due Process Clause (as impermissibly vague) and the First Amendment (as a content-based restriction on political speech). The district court further enjoined Texas's Attorney General, its Secretary of State, and the district attorneys in 3 of Texas's 254 counties, "from implementing, enforcing, or giving any effect" to the law. ROA.37580. The Attorney General is also forbidden from even "investigat[ing] potential violations." ROA.37580.

The district court's order is "patently wrong" and should be reversed. *In re Abbott*, 954 F.3d 772, 778 (5th Cir. 2020). Because "[e]lection laws will invariably impose some burden upon individual voters," *Burdick v. Takushi*, 504 U.S. 428, 433 (1992), Texas "has considerable discretion in deciding what is an adequate level of effectiveness to serve its important interests in voter integrity" and "significan[t] . . . authority to set its electoral rules." *Vote.Org*, 89 F.4th at 481, 485. It is

indisputable that Texas has a "compelling interest in protecting voters from confusion and undue influence" that result from exposure to partisan advocacy while filling out their ballots. *See Burson*, 504 U.S. at 199. As that interest does not turn on where voters exercise the franchise, Section 7.04 survives constitutional scrutiny for the same reason electioneering laws have long been deemed constitutional. *Id.* at 211; *Ostrewich v. Tatum*, 72 F.4th 94, 106 (5th Cir. 2023).

The district court's contrary holding was especially problematic because it struck down a presumptively valid state law based not on evidence of unconstitutional enforcement, but on speculative "what-ifs" untethered to the statute's text and real-world application. Such reasoning is flatly impermissible, *United States v. Williams*, 553 U.S. 285, 301 (2008)—as was the district court's decision to enjoin state officials who have no demonstrated enforcement connection to the provision at hand, e.*g., Richardson v. Flores*, 28 F.4th 649, 654 (5th Cir. 2022).

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court pursuant to 28 U.S.C. § 1331. The district court lacked jurisdiction, however, over the Attorney General and Secretary of State. *See* Part III. This Court has appellate jurisdiction under 28 U.S.C. § 1292 because State Defendants timely appealed, ROA.37624, the district court's order granting a permanent injunction, ROA.37504.

## ISSUES PRESENTED

1. Whether S.B. 1's ban on paid vote harvesting provides adequate notice to comply with the Due Process Clause.

2. Whether, properly construed, S.B. 1's ban on paid vote harvesting complies with the First Amendment.

3. Whether the district court erred lacked jurisdiction to enjoin the Attorney General and the Secretary as they do not enforce S.B. 1's ban on paid vote harvesting.

## Statement of the Case

### I. Factual Background

#### A. The 2020 election

The 2020 election was unprecedented because of the COVID-19 pandemic, which precipitated a global health crisis in Texas and throughout the world. *E.g.*, ROA.38845-58. Statewide, Governor Greg Abbott extended the early-voting period ahead of the November 2020 general election and allowed counties to accept hand-delivery of mail ballots before Election Day. *See* ROA.68024-27. And the Secretary provided detailed guidance to local officials regarding the administration of the election during the pandemic. *See* Tex. Sec'y of State, Election Advisory No. 2020-14, *COVID-19 (Coronavirus) Voting and Election Procedures* (2020), https://perma.cc/98JX-FSBD.

In addition, local election officials (particularly in Harris County) experimented with alternative voting rules that had never been authorized by state law, many of which proved to be quite controversial. For example, Harris County proposed a plan to "educate residents about their voting options," ROA.6641, which included an effort to send unsolicited applications to all 4 million registered voters in the county

that was held to be illegal, ROA.68057-88. *See also State v. Hollins*, 620 S.W.3d 400, 409 (Tex. 2020) (per curiam). A separate plan to allow drive-through voting similarly prompted a legal challenge, which was never adjudicated on the merits. ROA.68089-282; *see In re Hotze*, 610 S.W.3d 909 (Tex. 2020) (orig. proceeding) (Devine, J., dissenting from denial of mandamus relief and emergency stay). Governor Abbott responded to a plan to create multiple, unmanned drop boxes by requiring early-voting ballots to be delivered only at one location per county which would be manned by election workers, ROA.68028-32—a decision upheld by both this Court and the Texas Supreme Court, *Tex. League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 146 (5th Cir. 2020); *Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911, 923 (Tex. 2020) (per curiam).

Texas was also hit with numerous lawsuits insisting that its voting laws were suppressing the vote of minorities and/or populations particularly vulnerable to the pandemic. *E.g.*, *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669 (5th Cir. 2022) ("*TARA*"); *Lewis v. Scott*, 28 F.4th 659 (5th Cir. 2022); *Richardson*, 28 F.4th 649; *In re State*, 602 S.W.3d 549, 552 n.13 (Tex. 2020). In the end, however, more than 11 million Texans cast votes in the 2020 general election—the most in Texas history. ROA.68270-92.

In his 2021 State of the State address, Governor Abbott announced that "Election Integrity w[ould] be an emergency item" during that year's legislative session. Press Release, Off. of Tex. Gov., *Governor Abbott Delivers 2021 State of the State Address* (Feb. 1, 2021), https://perma.cc/A6HZ-E5NM. The next month, Governor Abbott "held a press conference in Houston on the importance of election integrity

legislation," during which he noted that "[i]n the 2020 election, we witnessed actions throughout our [S]tate that could risk the integrity of our elections and enable voter fraud." Press Release, Off. of Tex. Gov., *Governor Abbott Holds Press Conference on Election Integrity Legislation* (Mar. 15, 2021), https://perma.cc/R3NL-X5AW.

Although it ultimately took two special sessions to complete, consistent with the Governor's statements, the 87th Legislature passed an omnibus election-integrity bill to address a number of vulnerabilities revealed during the unprecedented stress placed by the 2020 election. Known as S.B. 1, this bill modernized and standardized Texas election procedures—in particular to make "the conduct of elections . . . uniform and consistent throughout this state," to "reduce the likelihood of fraud in the conduct of elections," to "promote voter access," and to "ensure that all legally cast ballots are counted." Tex. Elec. Code § 1.0015.

### B. S.B. 1's Paid-Voter-Harvesting Ban

**1.** One such vulnerability addressed by S.B. 1 was the potential for "vote harvesting," alternately known as "mail ballot fraud." ROA.42425. Mail voters are particularly vulnerable to fraudulent interference because mail voting is uniquely shrouded from the direct oversight of election workers. ROA.42341; ROA.42906. From the moment a blank ballot arrives at a polling station for in-person voting to the moment it is tallied as a cast ballot, it is within the direct supervision and control of local election personnel. But when a ballot passes beyond the control of election workers—as it does during mail voting—it is impossible to determine "whose hands it passes through or who actually . . . voted and returned that ballot." ROA.42341.

Vote harvesting refers to a process by which political operatives, who are typically paid for their services, take advantage of this lack of supervision by first "proliferat[ing] mail ballots," then "collect[ing] those ballots from a voter and ensur[ing] that those [ballots] are voted for [a particular] candidate." ROA.42425. The process begins with "seeding," where operatives "generate applications for mail ballots in . . . targeted precincts," using tactics that range from door-to-door campaigns to convince voters to "sign up for mail ballots if they are eligible" to outright forgery. ROA.42426. The true "harvesting" occurs, however, when operatives "fill[] out and collect[] mail ballots from voters to ensure that those votes are cast for certain candidates." ROA.42430-31. Between 2004 and 2021, seventy-two percent of all election prosecutions resolved by the Texas Attorney General were related to vote harvesting. ROA.65685; *accord* ROA.42425.

Despite this systemic vulnerability, until 2021, prohibitions on pressuring or attempting to influence voters were largely limited to physical polling places. For nearly a century, it has been a Class B misdemeanor to "indicate[] to a voter in a polling place by word, sign, or gesture how the person desires the voter to vote or not vote." Tex. Elec. Code § 61.008; *see* V.T.E.C. Art. 15.24 [1925 P.C]. Electioneering—defined as "the posting, use, or distribution of political signs or literature" either "for or against any candidate, measure, or political party" within 100 feet of an active polling place—is similarly a crime. *Id*. §§ 61.003, 85.036.

Through passage of Section 7.04 of S.B. 1—codified as Section 276.015 of the Texas Election Code—Texas sought to close that gap. In its scope and language, Section 7.04 closely mirrors Texas's long-extant electioneering laws by prohibiting

"in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." Tex. Elec. Code § 276.015(a)(2). To prevent criminalizing innocent conduct, Section 7.04 also includes a scienter requirement, limiting the reach of the paid-vote-harvesting prohibition to "knowing" violations of the statute. *Id.* And it excludes "interactions that do not directly involve" a ballot. *Id.* § 276.015(e)(3).

**2.** Like many aspects of Texas's Election Code, Section 7.04 is enforced wholly by local prosecutors—particularly now. The Secretary of State has preliminary investigative authority over criminal election misconduct and may refer such matters to the Attorney General for further investigation upon "reasonable cause to suspect that criminal conduct occurred." Tex. Elec. Code § 31.006. The Attorney General has discretionary authority to investigate election crimes upon referral from the Secretary of State. Tex. Elec. Code § 273.001.

At the time of S.B. 1's enactment, the Texas Attorney General was authorized to prosecute election law offenses under Section 273.021 of the Texas Election Code. But later that year, Texas's highest criminal court held that Section 273.021 unconstitutionally "delegate[d] to the Attorney General a power more properly assigned to the judicial department." *State v. Stephens*, 663 S.W.3d 45, 47 (Tex. Crim. App. 2021). So long as *Stephens* remains good law, the Attorney General may now prosecute election crime only with the invitation, consent, or request of a county or district attorney. *Stephens*, 663 S.W.3d 45 at 56. The record on appeal does not reflect any instance in which the Attorney General received such an invitation by a local prosecutor to participate in a prosecution under S.B. 1's paid-vote-harvesting ban.

## II.  Procedural History

This lack of evidence is perhaps unsurprising: Before any provision of S.B. 1 came into effect, several groups of plaintiffs brought facial challenges against more than three dozen of its common-sense voter-integrity provisions. *See* ROA.218-306, 399-608. These provisions included Section 7.04, which appellees challenged as both unconstitutionally vague and an infringement of free speech. ROA.218-306.

State Defendants moved to dismiss Plaintiffs' operative second amended complaints. ROA.7301; ROA.7334; ROA.7443. Those motions for dismissal were granted in part and denied in part. ROA.10695; ROA.10769; ROA.10830. Although State Defendants' appeals raising similar questions remain pending, the Court has ordered plaintiffs' claims against the Harris County District Attorney, Kim Ogg, to be dismissed on sovereign-immunity grounds because Ogg's mere theoretical ability to prosecute or investigate violations of the Election Code did not demonstrate any willingness to enforce the statute or any compulsion or constraint against these plaintiffs. *Mi Familia Vota v. Ogg*, 105 F.4th 313, 330-33 (5th Cir. 2024).

While the appeals of the motion-to-dismiss orders were litigated in this Court, discovery in the larger consolidated action in the district court proceeded apace. Plaintiffs, however, never sought discovery from any of the local prosecutors regarding their intention (if any) to enforce Section 7.04's prohibition on paid vote harvesting. As a result, the record—developed over three years of litigation since the enactment of S.B. 1—reflects not a single prosecution attempted, threatened, or considered under Section 7.04, let alone by State Defendants.

On September 11, 2023, the district court commenced its bench trial on Plaintiffs' claims against State Defendants. ROA.38511-49523. Parties submitted hundreds of pages of findings of facts and conclusions of law on January 19, 2024. ROA.33361-835, 34098-297, 34656-5535, 35791-6052. On February 13, 2024, the court heard closing arguments. ROA.43462-718. And on September 28, 2024—seven months later and only 23 days before the start of early voting in the 2024 election—the district court enjoined Defendants from enforcing the paid-vote-harvesting ban. ROA.37504. State Defendants immediately filed a notice of appeal, ROA.37624; ROA.37584, and ultimately obtained a stay from this Court on October 15, 2024. Although the district court has enjoined other parts of S.B. 1 in separate orders and retains jurisdiction over yet further provisions claimed to be unconstitutional, at issue in this appeal is only the district court's order enjoining enforcement of the Section 7.04 prohibition on paid vote harvesting.

## Summary of the Argument

**I.** "To judge whether a statute is overbroad," improperly vague, or otherwise unconstitutional, a court "must first determine what it covers," *United States v. Hansen*, 599 U.S. 762, 770 (2023); including by examining its regulatory context, *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). In doing so, the Court construes the statute, if fairly possible, not just to preserve the statute's constitutionality but also to determine "whether a construction of the statute is fairly possible by which the constitutional question may be avoided." *Tull v. United States*, 481 U.S. 412, 417 n.3 (1987) (cleaned up); *see also, e.g.*, *Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998). Had the district court engaged in

such analysis, Plaintiffs' facial void-for-vagueness challenge—which this Court has described as among "the most difficult . . . to mount successfully"—would have been easily and quickly dispatched. *United States v. Robinson*, 367 F.3d 278, 290 (5th Cir. 2004); *see also Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 547 (5th Cir. 2008) (noting that the onus in a pre-enforcement posture is "perhaps impossible, because facts are generally scarce").

**A.**   To start, Plaintiffs' pre-enforcement facial claims, are based entirely upon speculation about how Texas courts and prosecutors might interpret and enforce these provisions and are thus premature. Under such a theory, the legality of a statute hinges on whether "it has some common-sense core of meaning . . . that criminal juries should be capable of understanding," *Tuilaepa v. California*, 512 U.S. 967, 973-74 (1994)—not whether its application in a hypothetical edge case is in some sense unclear. Here, Plaintiffs have offered no evidence that Section 7.04 lacks such a core meaning. If Plaintiffs identify a specific problematic application, then the courts can (and should) address it in an as-applied challenge where courts can examine Section 7.04 in a concrete setting and give it a limiting construction rather than invalidate it altogether.

**B.**   Plaintiffs' void-for-vagueness claim also fails on the merits. The district court erroneously found vagueness based on the theory that if Section 7.04's use of the term "compensation" were construed as broadly as the term is defined in *other* parts of the Election Code, that section could extend not only to monetary compensation but also to meals, bus fare, t-shirts, and water. ROA. 37571-72. But "mere breadth" is insufficient to establish unconstitutional vagueness. *United States v.*

*Portanova*, 961 F.3d 252, 263 n.76 (3d Cir. 2020) (citing *inter alia, United States v. Caldwell*, 655 F. App'x 730, 732-33 (11th Cir. 2016) (per curiam)). More fundamentally, when interpreting an undefined term, courts are to give the words in the paid-vote-harvesting ban their ordinary meaning, which do not extend to the gratuitous gift of items of minimal value without regard to whether they were consideration for service rendered. To the extent there is ambiguity, the scienter requirement should mitigate concerns.

**II.A** Properly construed, Section 7.04 also passes First Amendment scrutiny. The district court started by applying the wrong standard when considering this claim. This Court has held that election rules with incidental speech effects are evaluated under the *Anderson-Burdick* framework. *See, e.g.*, *Voting for Am.*, 732 F.3d at 387-88. Under that test, the paid-vote-harvesting ban represents (at most) a modest and incidental burden because it applies in highly specific and narrow circumstances. Accordingly, Section 7.04 need only be reasonable. Texas's "compelling interest in protecting voters from confusion and undue influence" more than justifies the targeted restriction. *Burson*, 504 U.S. at 210.

**B.** Even if heightened scrutiny applied, the challenged provision still passes constitutional muster for the same reasons Texas's electioneering laws survive review. The district court acknowledged—as it must—that States "have an 'important state interest' in '[e]nsuring that every vote is cast freely.'" ROA.37562 (quoting *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021)). In limiting partisan attempts to influence a voter while that voter is casting his mail-in ballot, Section 7.04 is targeted to serve that interest in a way that is functionally no different

from bans on electioneering in polling places that have long been upheld as constitutional. *E.g.*, *Ostrewich*, 72 F.4th at 107. And, far from showing "a substantial number of [Section 7.04's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep," Plaintiffs failed offer evidence of *any* instance of Section 7.04 being applied to curtail protected activity in the three years since S.B. 1 took effect. *Voting for Am.*, 732 F.3d at 387 (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)). Instead, both Plaintiffs and the district court relied entirely on the very type of "implausible" scenarios, *Williams*, 553 U.S. at 301, which are insufficient to invalidate a statute as a matter of law, *id.* at 303.

**III.A**    At minimum, the district court erred by enjoining the Secretary of State and the Attorney General who do not enforce Section 7.04, and whose sovereign immunity is already subject to an appeal pending before this Court. *See La Union del Pueblo Entero v. Nelson*, Nos. 22-50775, 22-50777, 22-50778 (5th Cir.). In the two years following the district court's denial of State Defendants' motion to dismiss, this Court published multiple decisions clarifying that those officials are not proper defendants under *Ex parte Young* simply because they can investigate potential violations of the Election Code—including in a case involving this very law. *Ogg*, 105 F.4th at 333; *La Union Del Pueblo Entero v. Abbott*, 119 F.4th 404, 409 (5th Cir. 2024); *see also Stephens*, 663 S.W.3d at 51-54. Instead, the proper defendant is typically the local election official charged with implementing the Election Code provision at issue or punishing individuals for its violation. *E.g.*, *Ostrewich*, 72 F.4th at 100-01. By doubling down on its prior analysis and enjoining State Defendants, the district court exceeded the scope of its jurisdiction.

**B.**   For much the same reasons, the district court erred in finding that Plaintiffs had standing. "This [C]ourt has acknowledged that [its] Article III standing analysis"—and particularly its analysis of traceability and redressability—"and *Ex parte Young* analysis 'significantly overlap.'" *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019). Because "the Attorney General and Secretary of State" have no authority "to exercise undue influence over [a district court's exclusive] prosecutorial discretion," Plaintiffs cannot show *either* a route around sovereign immunity or standing. *Ogg*, 105 F.4th at 331.

## Standard of Review

Following a bench trial, findings of fact are reviewed for clear error, and legal conclusions *de novo. Preston Expl. Co., L.P. v. GSF, L.L.C.*, 669 F.3d 518, 522 (5th Cir. 2012). The determination of whether a challenged statute violates First Amendment free speech rights is a mixed question of law and fact that is reviewed *de novo. Baby Dolls Topless Saloons, Inc. v. City of Dallas*, 295 F.3d 471, 479 (5th Cir. 2002), as are the district court's determinations related to sovereign immunity and standing, *TARA*, 28 F.4th at 671.

## Argument

## I.   S.B. 1's Paid-Vote-Harvesting Ban Is Not Unconstitutionally Vague.

The district court erred in finding Section 7.04 unconstitutionally vague on its face. Under the Fourteenth Amendment, statutes must give "'fair notice' of the conduct [the] statute proscribes." *Sessions v. Dimaya*, 584 U.S. 148, 155-56 (2018) (citation omitted). Due process "does not require impossible standards" of clarity.

*United States v. Petrillo*, 332 U.S. 1, 7 (1947). "Many perfectly constitutional statutes use imprecise terms." *Dimaya*, 584 U.S. at 159, and "[t]he law is full of instances where a man's fate depends on his estimating rightly," *Johnson v. United States*, 576 U.S. 591, 603-04 (2015) (quoting *Nash v. United States*, 229 U.S. 373, 377 (1913)).

The district court gave these principles short shrift when it held Section 7.04 unconstitutionally vague based on speculative hypotheticals about how state officials (who have never had the opportunity to interpret its scope) might apply it in fringe cases. It is blackletter law that "the mere fact that close cases can be envisioned" does not "render[] a statute vague," since "[c]lose cases can be imagined under virtually any statute." *Williams*, 553 U.S. at 305-06. "The problem that poses is addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt." *Id.* at 306.

### A. The Plaintiffs' pre-enforcement facial challenge is premature.

As a threshold matter, Plaintiffs' facial vagueness challenge fails "[i]n the context of pre-enforcement review." *Roark*, 522 F.3d at 547. Like "many federal constitutional rights," *Ogg*, 105 F.4th at 333 (quoting *Whole Woman's Health v. Jackson*, 595 U.S. 30, 538 (2021)), a vagueness challenge is ordinarily raised as a defense to prosecution, *see Burson*, 504 U.S. at 210 n.13; *Schirmer v. Edwards*, 2 F.3d 117, 124 (5th Cir. 1993). A defendant "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Hoffman Ests.*, 455 U.S. at 495. As a result, pre-enforcement vagueness challenges are disfavored (if not prudentially unripe) because "examining facial vagueness is often difficult, perhaps impossible" as there is no "adequate record of the

ordinance's operation and particularized harmful effect" to allow the Court to assess whether the "provision is impermissibly vague in all its applications"—including in the plaintiff's case. *Roark*, 522 F.3d at 547; *e.g.*, *McClelland v. Katy ISD*, 63 F.4th 996, 1013 (5th Cir. 2023).

Here, the core prohibition of Section 7.04 is clear: A person violates Section 7.04 if (1) she is a party to an "in-person interaction" (2) with "one or more voters" (3) knowingly, (4) "in the physical presence of" and "directly involv[ing]" an official ballot or a ballot voted by mail," in which she (5) intends "to deliver votes for a specific candidate or measure," and (6) receives "compensation," defined as "anything reasonably regarded as a gain or advantage, including a promise or offer of employment, a political favor, or an official act of discretion." Tex. Elec. Code § 276.015. That is, paid activists violate the law if they try to influence a voter to vote for a candidate or cause *while* that voter is holding or filling out a mail ballot.

Indeed, neither the district court nor the Plaintiffs seem to challenge this core prohibition—only whether it could apply to certain fringe hypotheticals such as "if the ballot is on the kitchen table in the next room" or "if the voter brings the ballot to a community meeting at which Plaintiffs' employees speak." ROA.37573. The Supreme Court has, however, unambiguously stated that a vagueness analysis *must* "examine the complainant's conduct before analyzing other hypothetical applications of the law," *Hoffman Ests.*, 455 U.S. at 495, which are more properly considered as-applied challenges, *see Burson*, 504 U.S. at 210 n.13. If such a challenge were brought, the Court could then give the statute a limiting construction rather than to wholly invalidate it, *id.*—or allow Texas courts to do so, *see Wash. State Grange v. Wash.*

*State Republican Party*, 552 U.S. 442, 451 (2008). Because Plaintiffs have identified no conduct in which they wish to engage as to which the application of Section 7.04 is putatively vague, their vagueness challenges are premature.

### B. Plaintiffs' vagueness claim fails on the merits.

Even if this case could proceed based entirely on speculative hypotheticals, Plaintiffs claims would fail on the merits. "Courts must indulge a presumption of constitutionality." *United States v. Anderton*, 901 F.3d 278, 283 (5th Cir. 2018). That presumption applies even when criminal statutes are "extremely broad" or their consequences "harsh." *Id*. In applying that presumption, a court will not find a statutory term vague because it "do[es] not mean the same thing to all people, all the time, everywhere." *Roth v. United States*, 354 U.S. 476, 491 (1957). Rather, a law will be declared void for vagueness only if its meaning specifies "no standard of conduct . . . at all," *Roark*, 522 F.3d at 554-55, or depends upon "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Williams*, 553 U.S. at 306. Thus, "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Id.*

Here, the district court failed to abide by these principles when it took the statutory terms "compensation," "benefit" and "physical presence" out of context and assigned them meanings other than the "plain, obvious and common sense" meanings of the word even though nothing in that "context furnishes some ground to control, qualify, or enlarge" their meaning. 2 Joseph Story*, Commentaries on the*

*Constitution of the United States* 157 (1833). The district court's interpretation was not so much "a construction of a statute, but, in effect, an enlargement of it by the court," which "transcend[ed] the judicial function." *Iselin v. United States*, 270 U.S. 245, 251 (1926); *see also United States v. CITGO Petrol. Corp.*, 801 F.3d 477, 482 (5th Cir. 2015) (quoting *United States v. Clark*, 412 F.2d 885, 890 (5th Cir. 1969) (regulation that carries criminal penalties "must be strictly construed and cannot be enlarged by analogy or expanded beyond the plain meaning of the words used")).

### 1. The terms "compensation" and "benefit" are not unconstitutionally vague.

In interpreting statutes, courts must "determine how" a word or "clause is linked to its surrounding words" in order to "give effect, if possible, to every clause and word of [the] statute." *Fischer v. United States*, 603 U.S. 480, 486 (2024) (citations omitted). "To that end," the Court should "consider both the specific context in which [the word or clause] appears and the broader context of the statute as a whole." *Id.* (citations omitted). Although "compensation" and "benefit"—upon which the district court's vagueness analysis heavily focuses—could theoretically have multiple meanings, read in their statutory context, they clearly have "common-sense core of meaning . . . that criminal juries should be capable of understanding." *Tuilaepa*, 512 U.S. at 973. That meaning does not typically extend to like-minded individuals giving ballot harvesters "food, water, swag, letters of recommendation, academic credit, gas cards, bus fare, free parking, or even the use of ifs offices for their advocacy work." ROA.37571.

**a.** To start, "benefit" is defined in the statute itself as "anything reasonably regarded as a gain or advantage, including a promise or offer of employment, a political favor, or an official act of discretion, whether to a person, or another party whose welfare is of interest to the person." Tex. Elec. Code § 276.015(a)(1). This is consistent with the ordinary dictionary definition of "benefit," namely "[p]rofit or gain; esp., the consideration that moves to the promise," or "[f]inancial assistance that is received from an employer, insurance, or a public program." *Benefit*, *Black's Law Dictionary* 193-94 (11th ed. 2019). Neither extends so far, however, as providing someone water on a hot day.

Similarly, in ordinary usage, "[c]ompensation" means "[r]emuneration and other benefits received in return for services rendered; esp., salary or wage." *Compensation*, *id.* at 354. An ordinary individual thus would understand that "compensation" "consists of wages and benefits in return for services" and "is payment for work." *Id.* (quoting Kurt H. Decker & H. Thomas Felix II, *Drafting and Revising Employment Contracts* § 3.17, at 68 (1991)).

Taken together or separately, both "compensation" and "benefit" are best understood to refer to some form of consideration offered in return for work. The form of perk or assistance contemplated by the district court would seem to fall more clearly within the definition of "gift"—that is, the "voluntary transfer of property to another without compensation." *Gift*, *id.* at 831; *cf. Borgelt v. Austin Firefighters Ass'n, IAFF Local 975*, 692 S.W.3d 288, 301-02 (Tex. 2024) (discussing the distinction between consideration and gratuity for the purposes of the Gift Clause in the

Texas Constitution). But the Texas Legislature chose to use the terms "benefit" and "compensation," not "gift."

Ordinary canons of statutory interpretation confirm this common understanding. In particular, the "canon of *noscitur a sociis* teaches that a word is given more precise content by the neighboring words with which it is associated," thereby preventing "ascribing to one word a meaning so broad that is inconsistent with the company it keeps." *Fischer*, 603 U.S. at 487 (citations omitted). Here, the phrase "anything reasonably regarded as a gain or advantage," Tex. Elec. Code § 276.015(a)(1), must mean something like the accompanying examples of "employment," "political favors," and "official acts." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 69, 195 (2012). Items like food, water, and letters of recommendation do not fit the bill.

**b.** The district court nonetheless found vagueness based largely on the fact that other provisions of the Election Code use different, broader definitions of "compensation." ROA.37571-72. This was error. When interpreting an undefined term, like "compensation," the district court should have given the words in the paid-vote-harvesting ban their ordinary meaning, Scalia & Garner, *supra* at 69—particularly when doing so would have allowed the district court to *avoid* constitutional infirmity. *See Ostrewich*, 72 F. 4th at 107. The district court did the opposite when it read "compensation" broadly to include not only monetary compensation but also the provision of incidental items of modest value without regard to whether they represented consideration for a vote harvester's efforts. ROA.37572.

The district court's reasoning is particularly troubling because even the provisions it cites, *see* ROA. 37571-72, still use "compensation" to refer to fees and payments in exchange for a service. For example, the district court cites the related ban on compensated assistance, codified at Texas Election Code § 86.0105, which incorporates by reference the definition of "economic benefit" set forth in the Texas Penal Code, namely:

> Anything reasonably regarded as an economic gain or advantage, including accepting or offering to accept employment for a *fee*, accepting or offering to accept a *fee*, entering into a fee contract, or accepting or agreeing to accept money or anything of value.

Tex. Penal Code § 38.01(3) (emphasis added). Consistent with the ordinary meaning of its terms, Texas courts have generally interpreted this provision narrowly to apply only to a form of transaction for consideration—not a mere gratuity. *See State v. Malone*, No. 12-17-00074-CR, 2018 WL 2440460, at *5 (Tex. App.—Tyler May 31, 2018, pet. ref'd); *State v. Sandoval*, 842 S.W.2d 782, 788 (Tex. App.—Corpus Christi-Edinburg 1992, pet. ref'd).

The district court fares no better by citing Texas Election Code § 86.052, which defines "compensation" as "any form of monetary payment, goods, services, benefits, or promises or offers of employment, or any other form of consideration offered to another person in exchange for depositing ballots." ROA.37572 (quoting Tex. Elec. Code § 86.052(e)). Although Section 86.052 may, in some sense, be broader than Section 38.01 because it contemplates some forms of non-economic compensation, it still speaks in terms of "consideration"—that is, "something … bargained

for and received by a promisor," which "motivates a person to do something." *Consideration*, Black's, *supra* at 382.

Particularly when it comes to criminal law, there is a material difference between bargained-for consideration conveyed for a service and a perk conveyed in gratitude *without* a preexisting bargain. *See generally Snyder v. United States*, 603 U.S. 1 (2024). Nothing in the additional statutes cited by the district court implies that "compensation" as used in 7.04 extends beyond the former to include the latter. As a result, it was improper for the district court to adopt this broader definition when the result was to invalidate a state statute. *E.g.*, *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 219 (5th Cir. 2023) (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018)); Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L. Rev. 109, 117 (2010).

This outcome does not change because former Division Chief of the Election Integrity Division Jonathan White testified that he would recommend reviewing the case law on whether a meal, bus fare, or gift bag would constitute compensation. ROA.37572. Even a circuit split "does not mean that the term is void for vagueness." *United States v. Davis*, 36 F.3d 1424, 1434 (9th Cir. 1994) (quoting *United States v. Jackson*, 968 F.2d 158, 163 (2d Cir. 1992)). That a "trained lawyer[] may find it necessary to consult legal dictionaries, treatises, and judicial opinions before [he] may say with any certainty what some statutes may compel or forbid" certainly does not do so. *Rose v. Locke*, 423 U.S. 48, 50 (1975) (per curiam).

**c.** Assuming the Texas Legislature "might, without difficulty, have chosen '[c]learer and more precisely language' equally capable of achieving the end"—

which is debatable—that "does not mean that the statute which it in fact drafted is unconstitutionally vague," *United States v. Powell*, 423 U.S. 87, 94 (1975) (quoting *Petrillo*, 332 U.S. at 7), particularly given the Legislature's express inclusion of a scienter requirement. The Supreme Court has repeatedly recognized that such a "scienter requirement" will "alleviate vagueness concerns," *McFadden v. United States*, 576 U.S. 186, 197 (2015) (alteration in original) (quoting *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007)), by improving "the adequacy of notice to the complainant that his conduct is proscribed," *Vill. of Hoffman Ests.*, 455 U.S. at 499. This rule applies even when the challenged law "reaches a substantial amount of constitutionally protected conduct," *id.* at 494, which section 7.04 does not, *infra* Part II.B.4.

In the case of Section 7.04, three potential scienter requirements apply, which separately or together alleviate any questions of vagueness that may linger after giving its operative language its ordinary meaning. *First*, Section 276.015(a)(2) defines prohibited "vote harvesting services" as "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, *intended* to deliver votes for a specific candidate or measure." Tex. Elec. Code § 276.015(a)(2) (emphasis added). *Second*, Sections 276.015(b)-(d) creates three separate offenses, each of which requires "knowing conduct"—for example "*knowingly* provid[ing]s or offer[ing] to provide vote harvesting services in exchange for compensation or other benefit." *Id.* § 276.015(b) (emphasis added). *Third*, Texas Penal Code section 6.02 provides that "[i]f the definition of an offense does not prescribe a culpable mental state, . . . intent, knowledge, or recklessness suffices to establish criminal responsibility." Tex. Penal Code § 6.02(c).

Because Plaintiffs sued before S.B. 1 went into effect, no state court has had the opportunity to construe how these mens rea elements fit together, which is a somewhat complicated issue under state law. *White v. State*, 509 S.W.3d 307, 313 n.8 (Tex. Crim. App. 2017) (noting that Texas did not adopt the Model Penal default rule). The best view is that the Legislature required intent as to the purpose of the conduct—namely, to influence voters—and the lower standard of knowledge as to the remaining elements of the crime. *Cf.* Tex. Penal Code § 6.03(d). But at minimum, a prosecutor must prove criminal recklessness—that is, that the defendant was "aware of but consciously disregards a substantial and unjustifiable risk that the circumstances [of the paid-vote-harvesting ban] exist or the result[of his conduct] will occur." *Id.* § 6.03(c); *see also Robinson v. State*, 466 S.W.3d 166, 172 (Tex. Crim. App. 2015). It is not enough that the person *should* have foreseen the risk; he must "actually foresee the risk involved and . . . consciously decide to ignore it." *Williams v. State*, 235 S.W.3d 742, 751 (Tex. Crim. App. 2007).

Here, the district court gave no weight to this requirement before finding that that the terms "compensation," "benefit," and "physical presence" rendered the statute unconstitutionally vague. For example, the district court hypothesized that a vote harvester could violate Section 7.04 inadvertently if he were to accept a bottle of water after talking to a voter who had a concealed ballot in her purse. ROA.37525, 37568. But under state law, it is insufficient that the defendant is "reckless as to the conduct itself"—that is, that the "nature" of his conduct is advocating to a voter. *Ex parte Rion*, 662 S.W.3d 890, 900 (Tex. Crim. App. 2022). Instead, he must be aware of and consciously disregard a substantial risk "with respect to the

circumstances exist or the result of his conduct." *Id.* The district court nowhere explains how our hypothetical vote harvester would consciously disregard the risk that a bottle of water would be considered compensation for talking to someone who may or may not be a voter, who may or may not be carrying a ballot of which he was unaware—let alone that he do so with the "conscious objective or desire," Tex. Penal Code § 6.03(a) (defining intent), "to deliver votes for a specific candidate or measure." Tex. Elec. Code § 276.015(a)(2). This was reversible error.

### 2. The "physical presence" requirement is not unconstitutionally vague.

For many of the same reasons, the district court erred in holding the term "physical presence" in 276.015(a)(2) rendered Section 7.04 unconstitutionally vague. ROA.37573-75. Although the district court correctly recognized that unknowingly canvassing in the presence of a ballot would not be a criminal act, ROA.37573, the court faulted State Defendants for their witness's "refus[al] to offer a specific distance or any concrete guidance about how canvassers should determine whether they are in the 'physical presence' of a mail ballot, which can only be determine [*sic*] on a case-by-case basis." ROA.37573

But as the Supreme Court has repeatedly emphasized, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Mansky*, 585 U.S. at 21 (cleaned up). Instead, "[t]he Fourteenth Amendment's guarantee of Due Process proscribes laws so vague that persons 'of common intelligence must necessarily guess at [their] meaning and differ as to [their] application.'" *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 421 & n.29 (5th Cir. 2001) (alterations in original) (quoting *Smith v. Goguen*, 415 U.S. 566, 572 n.8

(1974)). That is, "[a] law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *Id.* at 421 & n.30 (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)).

For example, in *Goguen*, the Supreme Court held that a statute banning "contemptuous" treatment of the flag was unconstitutionally vague not just because it allowed "selective law enforcement," 415 U.S. at 574-76, but because the word "contemptuous" is inherently subjective, providing no "ascertainable standard for inclusion and exclusion," *id.* at 578. It is not enough to render a statute unconstitutional, the Court made clear, that a ban's "application to . . . behavior is uncertain." *Id.*

Measured against this standard, "physical presence" is not a vague term. "Presence" is generally understood to connote "[c]lose physical proximity coupled with awareness." *Presence*, Black's, *supra* at 1432; *id.* (defining "present as "in attendance; not elsewhere"). "Physical," in this context is generally understood to mean "of, relating to, or involving someone's body." *Id.* at 1386. Taken together, the phrase "physical presence" is phrase commonly used across a variety of contexts to describe in-person interactions. *See, e.g.*, *Denton Reg'l Med. Ctr. v. LaCroix*, 947 S.W.2d 941, 952 (Tex. App.—Fort Worth 1997, pet. dism'd by agr.).

Due to the premature nature of Plaintiffs' lawsuit, there is "authoritative construction" by a state court for the Courts to "consider . . . in interpreting a state law." *Mansky*, 585 U.S. at 17-18 (quoting *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992)). When asked about "physical presence" of a ballot, Former

Director of Election Keith Ingram explained on behalf of the Secretary that "[t]he whole point of this section" is to address instances "when[] the voter and the harvester get together and they're reviewing the ballot together, and then they get down to that candidate, and the harvester makes sure they check the right box." ROA.40425. By contrast, "[i]f the ballot is in the kitchen, and [they]'re in the living room, and [they]'re talking about our preferred candidates, that's First Amendment. That's not implicated by this section at all." ROA.40425.

Texas courts would give the Secretary's view considerable weight as she is the one charged with interpreting and advising election officials on the meaning of the Election Code. Tex. Elec. Code §§ 31.003, 31.004; *e.g.*, *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 n.6 (Tex. 2011) (collecting cases for the proposition that Texas courts "give 'serious consideration' to an agency's construction of its statute and should uphold the agency's interpertation, so long as it is reasonable and does not contradict the statute's plain language"). Tellingly, Plaintiffs have never sought—let alone presented—evidence that any prosecutor in the State holds a contrary view of the statute.

Perhaps most importantly, because this narrow interpretation is consistent with the statutory language, "the court was thus required to accept it" and leave the hypotheticals to the realm of as-applied challenges. *Voting for Am.*, 732 F.3d at 398; *see also Turtle Island Foods*, 65 F.4th at 221.

To the extent that there were any lingering doubts, the two-fold scienter requirement embodied in both the language of the challenged statute itself as well as in Texas Penal Code should have resolved them. *See Vill. of Hoffman Ests.*, 455 U.S. at

499 & n.14 (collecting cases). As just discussed, to be convicted under the statute, a canvasser would have to at least "consciously disregard[] a substantial and unjustifiable risk" that a ballot was present. Tex. Penal Code § 6.03(c); *see* ROA.42944-45. As Ingram also explained, to meet this test "the ballot has to be in front of both of you[,] you both have to know it's there[,] and you both have to be looking at it." ROA.40425. Merely being unsure whether a ballot was nearby would fall well short of that exacting standard. *See* Tex. Elec. Code § 276.015(a)-(b); *see also* ROA.40425 ("This is not a situation where you can be caught by accident."). The district court misinterpreted the statute when it held to the contrary. And it misapplied the Constitution when it facially invalidated a presumptively valid state law as a result.

## II. S.B. 1's Paid-Vote-Harvesting Ban Complies with the First Amendment.

Similar errors pervade the district court's analysis of Plaintiffs' First Amendment claims as well. Even in the context of free speech, "[c]ourts generally disfavor facial challenges, and for good reason." *Voting for Am.*, 732 F.3d at 386. "[F]acial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange*, 552 U.S. at 451. Accordingly, courts only hold statutes "facially unconstitutional even though [they have] lawful applications" if they "'prohibit[] a substantial amount of protected speech' relative to [their] 'plainly legitimate sweep.'" *Hansen*, 599 U.S. at 769-70 (quoting *Williams*, 533 U.S. at 292); *accord Moody v. Netchoice*, 603 U.S. 707 (2024). "In the absence of [such] a

lopsided ratio, courts must handle unconstitutional applications as they usually do—case-by-case." *Hansen*, 599 U.S. at 770.

Close adherence to these rules is particularly significant in instances like this one where the constitutional rights of more than individual are at stake. Specifically, although political speech is at the core of the First Amendment, voters also have a "fundamental right . . . to cast a ballot in an election free from the taint of intimidation and fraud." *Burson*, 504 U.S. at 211. To balance those rights and interests, States are constitutionally permitted to create "an island of calm in which voters can peacefully contemplate their choices." *Mansky*, 585 U.S. at 15; *see also Ostrewich*, 72 F.4th at 104-05. The principles behind that rule are no less applicable because mail ballots have become increasingly prevalent.[2] And they demonstrate the facial constitutionality of S.B. 7.04, which is nothing more than a "reasonable" extension of longstanding electioneering rules from the in-person context to the mail-ballot context, which "further[s] Texas's interest in ensuring a campaign-free polling place." *Ostrewich*, 72 F.4th at 104-05.

## A. The district court applied the incorrect standard in subjecting Section 7.04 to strict scrutiny.

The district court's First Amendment analysis stumbled at the outset when it subjected Section 7.04 to strict scrutiny. ROA.37553-55. Although strict scrutiny

---

[2] Indeed, were it otherwise, entire States would be unable to regulate electioneering. *States with Mostly Mail Elections*, National Conference of State Legislatures (Oct. 11, 2024), https://www.ncsl.org/elections-and-campaigns/table-18-states-with-all-mail-elections (reflecting that eight States and the District of Columbia have moved to all mail ballots).

typically applies to content-based restrictions on speech, *cf. Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), different rules apply in the election context, *McIntyre v. Ohio Elec. Comm'n*, 514 U.S. 334, 336 (1995) (collecting cases outlining this distinction). Elections are themselves a form of political expression, and all "[e]lection laws will invariably impose some burden upon individual voters." *Burdick*, 504 U.S. at 433. Yet "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer*, 415 U.S. at 730.

Because "subject[ing] every voting regulation to strict scrutiny . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently," courts apply a "more flexible standard" to election laws. *Burdick*, 504 U.S. at 433-34 (applying *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)). Under this so-called *Anderson-Burdick* test, the level of scrutiny applied depends on the severity of the restriction. 504 U.S. at 433-34. Strict scrutiny applies to "severe" burdens on protected speech, and the rule must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* But "the State's important regulatory interests are generally sufficient to justify" other "reasonable, nondiscriminatory restrictions." *Id.*

Here, as a regulation of the privilege of voting by mail, it is questionable if anything more than a rational basis is required for Section 7.04. *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 406 (5th Cir. 2020) (*TDP I*). But at most, it would be subject to the same *Anderson-Burdick* balancing test as other canvassing restrictions. *See*

*Voting for Am.*, 732 F.3d at 385; *see also Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 138, 144 (3d Cir. 2022).

## B. Section 7.04 survives constitutional scrutiny.

Section 7.04 meets any applicable constitutional test, all of which must consider the state interests at issue and evaluate them in light of the alleged restrictions on expressive conduct. *See Mansky*, 585 U.S. at 13. That a "campaign-free zone" serves "compelling interests" is "obvious[]" because they "protect[] the right[s] of [a State's] citizens to vote freely for the candidates of their choice" and "to vote in an election conducted with integrity and reliability." *Burson*, 504 U.S. at 198-99. This "'right to vote freely for the candidate of one's choice is of the essence of a democratic society.'" *Id.* at 199 (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)). As a result, to protect its republican form of government, a State "has a compelling interest in protecting voters from confusion and undue influence." *Id.* (citing *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 228-29 (1989)); *Schirmer*, 2 F.3d at 121.

As the Supreme Court has reiterated recently that "[t]o justify facial invalidation," given such a compelling interest, "a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep." *Hansen*, 599 U.S. at 770; *see also Voting for Am.*, 732 F.3d at 387. But as discussed above, properly construed, it is a narrow provision that places at most a modest burden on speech by precluding paid partisans from interacting with voters for the purpose of delivering votes for or against a specific candidate or measure *while the ballot is physically present*. Tex. Elec. Code § 276.015.

Because neither Plaintiffs nor the district court offer anything *but* fanciful hypotheticals, State Defendants were entitled to judgment in their favor.

1. **States have well-founded reasons for preventing electioneering in polling places.**

a.    The Supreme Court has issued two cases, which together stand for the proposition that States have important—indeed, compelling—interests in protecting the integrity of the actual voting process through electioneering laws. *First*, even applying strict scrutiny, *Burson* upheld a Tennessee law that prohibited "the display of campaign posters, signs or other campaign materials, distribution of campaign materials, and solicitation of votes for or against any person or political party or position on a question" within a 100-foot radius of a polling place. 504 U.S. at 193-94. The Court reasoned that the law "protect[s] the right[s] of [the State's] citizens to vote freely for the candidates of their choice" and "in an election conducted with integrity and reliability." *Id.* at 198-99. The Court concluded "that requiring solicitors to stand 100 feet from the entrances to polling places does not constitute an unconstitutional compromise." *Id.* at 211. Justice Scalia, who concurred in the judgment, arguing that mere reasonableness review should apply, but agreeing the law was "at least reasonable" given the plurality's analysis. *Id.* at 216 (Scalia, J., concurring in the judgment).

*Second*, *Mansky* considered a Minnesota law that provided that "a 'political badge, political button, or other political insignia may not be worn at or about the polling place.'" *Mansky*, 585 U.S. at 8. Mindful of the history of intimidation at polling places, the Supreme Court rejected the plaintiffs' proposed distinction between

*Burson*'s primary focus on active campaigning outside a polling place and the Minnesota law's asserted focus on "passive, silent self-expression by voters themselves when voting." *Mansky*, 585 U.S. at 15 (citation omitted); *Schirmer*, 2 F.3d at 122-24. Seeing "no basis for rejecting Minnesota's determination that some forms of advocacy should be excluded from the polling place," the Court emphasized the "unique context" and the need for States to create "an island of calm in which voters can peacefully contemplate their choices." *Mansky*, 585 U.S. at 15. And the Court unambiguously held that "in light of the special purpose of the polling place itself," States could prohibit expressive conduct that might otherwise be constitutionally protected "so that voters may focus on the important decisions immediately at hand." *Id.* at 161.

True, there are limits to what types of expressive activity can be barred from the presence of the ballot. But *Mansky* clarifies that States can regulate speech in a polling place during voting periods as long as the regulation on speech is "'reasonable in light of the purpose served by the forum': voting." 585 U.S. at 13. A polling place "qualifies as a nonpublic forum," *id.*, and in a nonpublic forum, "the government has much more flexibility to craft rules limiting speech," *id.* at 12.[3] Thus, a State need only "articulate some sensible basis for distinguishing what may come in from what must stay out." *Id.* As a result, "the unmoored use of the term 'political'" could be too expansive if interpreted to go beyond campaign material to preclude

---

[3] For this reason (among others), the district court erred in attempting to limit *Burson* to analyzing voting in a *public* forum in a physical location. ROA.37565.

"words and symbols that an objectively reasonable observer would perceive as conveying a message about the electoral choices at issue in [the] polling place." *Id.* at 16.

### 2. Texas's interests in its electioneering laws are no less compelling because Section 7.04 applies in the mail-ballot context.

That interest exists regardless of *where* the voter exercises the franchise. If anything, these same concerns that justify protecting in-person voters apply even more forcefully to mail voters, whose ballots are, by definition, "completed far from any government office or employee." *Vote.Org*, 89 F.4th at 489; *see also Brnovich*, 594 U.S. at 685-86.

True, there is not the same historical record of chaos and voter intimidation with mail ballots as with in-person voting before the development of the Australian ballot. *See Mansky*, 585 U.S. at 6; *Burson*, 504 U.S. at 202; *see also* House Comm. on Elections, Bill Analysis at 2, Tex. H.B. 259, 83rd Leg., R.S. (2013), https://perma.cc/8CVC-8V83 (discussing one such incident the prior year). One wouldn't expect it. As this Court extensively explored in a different context, mail ballots are a far more recent phenomenon that largely post-date the Australian ballot. *See Tex. Democratic Party v. Abbott*, 978 F.3d 168, 186-88 (5th Cir. 2020) (*TDP II*).

Nevertheless, even without that record, it is clear that the same interests in preserving election integrity apply. As *Burson* itself recognized, "[v]oter intimidation and election fraud are successful precisely [when] they are difficult to detect." *Burson*, 504 U.S. at 208. And it is now generally accepted that various forms of fraud, including "[v]ote buying schemes are far more difficult to detect when citizens vote by mail." *Brnovich*, 594 U.S. at 685 (quoting Report of the Comm'n on Fed. Election

Reform, *Building Confidence in U.S. Elections* 46 (2005)); *see also, e.g.*, *Richardson*, 978 F.3d at 239 (quoting *Veasey*, 830 F.3d at 239 (plurality op.)).

Thus, the State has the same compelling interest in protecting voters from confusion and undue influence" whether voting is conducted in person, *Burson*, 504 U.S. at 199; or by mail, *Brnovich*, 594 U.S. at 685. And *Burson*'s holding—which *Mansky* does not disturb—allows States to prohibit both "non-ballot political activity" and "passive political speech" like "buttons and T-shirts" where doing so protects the State's interests in allowing voters to cast their ballots without interference. *Schirmer*, 2 F.3d at 122. It certainly allows States to prohibit paid partisans from knowingly advocating a specific to voter cast his ballot in a particular way *in the physical presence* of a ballot itself.

### 3. The paid-vote-harvesting ban is sufficiently tailored.

**a.** Because strict scrutiny does not apply, to be adequately tailored to the State's compelling government interest, Section 7.04 need only provide "objective, workable standards" to what types of electioneering conduct are and are not allowed in the presence of a mail ballot. *Mansky*, 585 U.S. at 21. Section 7.04 does so. As Ingram testified, the statute allows organizations to pay canvassers for legitimate voter outreach while ensuring that voters are not harassed or pressured while completing their mail ballots. ROA.40425.

This is no more restrictive than *Burson*, where the Supreme Court held that a 100-foot limit on electioneering around a polling location was not a "significant impingement." 504 U.S. at 210. If anything, the "physical presence" of a ballot imposes less of a burden on free speech than the law at issue in *Burson*, which extended

100-feet regardless of the presence of the ballot. *Compare* Tex. Elec. Code § 276.015(e), *with Burson*. 504 U.S. at 193-94. The State's interests are also greater because the paid-vote-harvesting ban applies only when voters have the ballot in-hand outside of the presence of election officials. *See Brnovich*, 594 U.S. at 685-86; *Veasey*, 830 F.3d at 239.

**b.** Even under the district court's view that Section 7.04 is subject to strict scrutiny, the statute is "narrowly tailored" because "it (1) actually advances the state's interest, (2) does not sweep too broadly, (3) does not leave significant influences bearing on the interest unregulated (i.e., is not underinclusive), and (4) could be replaced by no other regulation that could advance the interest as well as with less infringement of speech (is the least-restrictive alternative)." *Dep't of Tex., Veterans of Foreign Wars v. Tex. Lottery Comm'n*, 760 F.3d 427, 440 (5th Cir. 2014).

*First*, the statute advances the state's compelling interest by restricting paid persuaders from advocating for a particular electoral option while physically in the presence of a ballot—a moment when the risk of election misconduct is highest. ROA.48984; *Veasey*, 830 F.3d at 239 (plurality op.); *accord Mansky*, 585 U.S. at 15. And "[l]imiting the classes of persons who may handle early ballots to those less likely to have ulterior motives" furthers the State's compelling interests. *Brnovich*, 594 U.S. at 685.

*Second*, it does not sweep too broadly. When examining this element, the Court will not assume that election judges will exercise their discretion abusively or unreasonably in violation of their statutory directive. *Cf. Yarls v. Bunton*, 905 F.3d 905, 910 (5th Cir. 2018) (absent contrary evidence, courts "presume public-spiritedness"

36

in government officials).[4] Moreover, the Court will consider will only those alternatives that are at least as effective in accomplishing the State's goal. *See Reno v. ACLU*, 521 U.S. 844, 874 (1997).

*Third*, the statute is not significantly underinclusive even though it restricts paid, but not unpaid vote harvesting. "[T]he First Amendment imposes no freestanding underinclusiveness limitation." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015) (quotation marks omitted). Instead, that the State may have limited too *little* speech is relevant only to the extent that it undermines the State's asserted interest. *Id.* Here, it does no such thing as the significance and sincerity of the State's interest in preserving the integrity of, and confidence in, its elections is "perfectly clear." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008). Furthermore, the record shows that paid canvassers represent a more acute threat than volunteer activity. ROA.48588-89; *cf.* ROA.39615-16

*Fourth*, the district court was wrong to hold that the paid-vote-harvesting ban was duplicative, ROA.37562-63, or that there were hypothetically narrower options, ROA.37563-64. For example, the district court noted that Texas has another statute prohibiting people from intentionally or knowingly "influenc[ing] the independent exercise of the vote of another in the presence of the ballot" or during the voting

---

[4] For this reason (among others), it was entirely improper for the district court to facially invalidate Section 7.04 because "it is anyone's guess how far the Canvassing Restriction reaches beyond ballots that are being actively voted." ROA.37560. The law is presumed valid and can only be invalidated based on real-world unconstitutional conduct. *Williams*, 553 U.S. at 301; *Ostrewich*, 72 F.4th at 106.

process. Tex. Elec. Code § 276.013(a). But this statute criminalizes different conduct than the paid-vote-harvesting ban, which covers certain efforts to influence a voting decision rather than the exercise of the vote itself. *See id.* Similarly, the Election Code's penalties for "suggest[ing] by word, sign, or gesture how the voter should vote" while providing assistance or "prepar[ing] the voter's ballot in a way other than the way the voter directs or without direction from the voter" are focusing on ensuring that assistants are not voting for the voter. *Id.* §§ 64.012, 64.036. The paid-vote-harvesting ban instead prohibits the specific act of paid canvassing in the physical presence of a ballot. And it is necessary to the State's interest to distinguish between vote harvesting and canvassing so as not to prohibit perfectly legal and constitutional activity, such as legitimate, unreimbursed, and noncoercive get-out-the-vote efforts.

*Meyer v. Grant*, 486 U.S. 414 (1988), is not to the contrary. There, the Supreme Court struck down a Colorado law prohibiting paid persuaders from approaching voters under any circumstances. *Id.* at 424. Section 7.04, by contrast, allows paid canvassers to approach voters in any location and at any time save one: when a ballot is physically present. Tex. Elec. Code. § 276.015(e). That is, the statute does not "restrict[] access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication." *Meyer*, 486 U.S. at 424. It merely requires such communications *outside* the presence of the ballot—a modest restriction whose burden on free speech is far outweighed by the State's compelling interest in preventing voter confusion and harassment.

### 4. Plaintiffs cannot avoid this conclusion by reciting the word "overbroad."

This analysis does not change because Plaintiffs have brought an overbreadth challenge. A statute will not survive a constitutional overbreadth challenge if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Wash. State Grange*, 552 U.S. at 449 n.6 (quotation marks omitted). Although this theory does not require Plaintiffs to show that *all* applications of the statute are unconstitutional as would an ordinary facial challenge, the "mere fact" that a plaintiff "can conceive of some impermissible applications of [the] statute is not sufficient to render it" unconstitutional. *Williams*, 553 U.S. at 303. Instead, the Supreme Court has "vigorously enforced the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Id.* at 292 (citing *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 485 (1989); *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)).

The record does not establish that a substantial number of Section 7.04's applications are unconstitutional, judged in relation to the state's "important" and compelling interest in "[e]nsuring that every vote is cast freely." *Brnovich*, 594 U.S. at 672. Instead, as noted above, Plaintiffs have offered nothing more than farfetched hypothetical examples of potentially chilled speech such as a paid canvasser unknowingly advocating for a particular vote while a ballot is in another room or even hidden in a voter's purse. *E.g.*, ROA.46368-69. Leaving aside that such a circumstance would not satisfy the scienter requirement, Plaintiffs presented no actual evidence

that (1) such a scenario has ever occurred or realistically would occur, (2) prosecutors are likely to learn it happened, or (3) having learned of such an event, a prosecutor would charge individuals under such outlandish facts. Such a fanciful application of a statute "is not sufficient to render it susceptible to an overbreadth challenge." *Williams*, 553 U.S. at 303 (cleaned up).

The district court fares no better by speculating that "a voter discussing his mail ballot with a like-minded [get out the vote] volunteer would arguably violate Section 7.04 by offering a glass of water as a pick-me-up during a hot afternoon of door knocking." ROA.37559. As discussed above, water is not "compensation" or a "benefit" within the meaning of Section 7.04. *Supra* part I.B.1. And given that Plaintiffs presented no evidence prosecutors would pursue harvesters for accepting a bottle of water in the Texas heat, the district court has improperly overridden a democratically enacted law for a mere possibility.

## III. The District Court Lacked Jurisdiction to Enjoin the Attorney General and the Secretary.

At minimum, the injunction cannot be affirmed as written because Plaintiffs have offered no evidence that State Defendants have ever sought to enforce section 7.04 against them in the last three years—or even could do so in the future absent a change to state law. Without such evidence, the district court lacked jurisdiction to enter judgment against those defendants for two reasons. *First*, plaintiffs' only route around the defendants' sovereign immunity was the doctrine established in *Ex parte Young*, 209 U.S. 123 (1908). Plaintiffs, however, failed to show that State Defendants had an adequate connection to the enforcement of the allegedly unconstitutional law

by means of a "particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (quotation marks omitted); *see also Ogg*, 105 F.4th at 326. *Second*, for similar reasons, plaintiffs have failed to demonstrate standing to sue these defendants.

## A. The Attorney General and the Secretary are entitled to sovereign immunity.

"The doctrine of state sovereign immunity recognizes the residual and inviolable sovereignty retained by the states in the Constitution's wake." *Russell v. Jones*, 49 F.4th 507, 512 (5th Cir. 2022) (cleaned up). "This principle, partially embodied in the Eleventh Amendment, is commonly distilled to the proposition that individuals may not sue a state—either in its own courts, courts of other states, or federal courts—without the state's consent." *Id*. The *Ex parte Young* doctrine provides a limited exception to this rule "where a state actor enforces an unconstitutional law." *Id.* (citing *Ex parte Young*, 209 U.S. at 160). But for the doctrine to apply, "state officials must have some connection to the state law's enforcement" and "have taken some step to enforce" it. *TDP I*, 961 F.3d at 400-01 (cleaned up). In this context, courts have defined "enforcement" to mean some form of "compulsion or constraint." *City of Austin*, 943 F.3d at 1000 (quoting *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010)). Plaintiffs lack a route around sovereign immunity because "[n]either the Secretary of State nor the Attorney General enforces S.B. 1" by compelling Plaintiffs to do, or constraining them from doing, anything. *La Union Del Pueblo Entero*, 119 F.4th at 409; *accord Ogg*, 105 F.4th at 332.

### 1. The Attorney General lacks the independent authority to enforce these criminal-law provisions under state law.

"A recent opinion from the Texas Court of Criminal Appeals is dispositive of this question" with respect to the Attorney General. *Ostrewich*, 72 F.4th at 101. Specifically, in *Stephens*, the Court of Criminal Appeals held that Section 273.021(a), Texas Election Code, which authorized the Attorney General to prosecute election-related criminal statutes, violated the separation of powers clause of the Texas Constitution. 663 S.W.3d at 51-54 (discussing Tex. Const. art. II, § 1). Although the Attorney General maintains that *Stephens* was wrongly decided, it nonetheless binds this Court as to the meaning of Texas criminal law. *See Arnold v. Cockrell*, 306 F.3d 277, 279 (5th Cir. 2002) (per curiam). And, even if it did not, *Ostrewich* is now binding on this panel under this Court's rule of orderliness. *Cf. Stokes v. Sw. Airlines*, 887 F.3d 199, 205 (5th Cir. 2018) (noting that a "determination whether a given precedent has been abrogated is itself a determination subject to the rule of orderliness"). As a result, because the Attorney General "cannot initiate the prosecution" of an election law "unilaterally," *Stephens*, 663 S.W.3d at 55, he lacks the necessary enforcement connection to invoke *Ex parte Young*. *Ostrewich*, 72 F.4th at 101.

In holding to the contrary, the district court pointed to two potential enforcement connections. *First*, it asserted that the Attorney General *must* investigate election crimes covering more than one county, *may* investigate other election crimes (including at the instigation of the Secretary), and is "*likely*" to investigate vote-harvesting crimes specifically. ROA.37534. But this Court has already stated—with respect to this very statute—that "investigations" are not "enforcement" and will not

bring a state official within the scope of *Ex parte Young. See Ogg*, 105 F.4th at 331. Instead, an investigation is, at most, a precursor to potential enforcement, *see Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1176 (9th Cir. 2022), which this Court has held does not yet give rise to a justiciable controversy—let alone a route around sovereign immunity, *Google, Inc. v. Hood*, 822 F.3d 212, 225 (5th Cir. 2016).

*Second*, the district court pointed out that the Attorney General has previously participated in prosecutions "conducted by or with the assistance of local DAs in multiple counties." ROA.37619. Each of the prosecutions identified in the record, however, predated *Stephens* and concerned different election statutes. ROA. 65685.

Even without *Stephens*, Plaintiffs theory would run afoul of this Court's case law, which expressly holds that the mere fact that the Attorney General has assisted with prosecutions of "*different* statutes under *different* circumstances" is insufficient to "show that he is likely to do the same here." *City of Austin*, 943 F.3d at 1002. And notwithstanding extensive discovery, Plaintiffs have been unable to identify a single example of the Attorney General—or any other state and county officials for that matter—targeting Plaintiffs' canvassing efforts for prosecution or even an investigation. Nor have they identified any occasion when they were threatened with prosecution. Their entire case hinges on far-fetched hypotheticals that bear little relation to the statue's text and, in some instances, contradict it. *E.g.* ROA.37526; ROA.40291. That is insufficient even if the Attorney General still *could* prosecute Plaintiffs on his own initiative.

Following *Stephens*, "all prosecutions under the Election Code require the consent or authorization of the applicable DA."[5] ROA.37546. Plaintiffs have acknowledged as much, amending their complaints to add district and county attorneys as defendants following the *Stephens* decision, *e.g.*, ROA.6231; ROA.6365; ROA.6639 ROA.6704. Plaintiffs are thus left with nothing but "[s]peculation" that the Attorney General might be asked by a local prosecutor to 'assist' in enforcing" criminal laws, which is insufficient "to support an *Ex parte Young* action against the Attorney General." *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020) (citation omitted), *vacated on other grounds sub. nom. Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 1261 (2021); *accord United States v. Abbott*, 85 F.4th 328 (5th Cir. 2023) (reaffirming that *In re Abbott*'s view of *Ex parte Young* remains law of the circuit).

### 2. The Secretary of State lacks a sufficient enforcement connection to the challenged provision.

Although the precise issue of whether the Secretary of State can enforce S.B. 1 remains pending before this Court in other cases, *e.g.*, *La Union del Pueblo Entero v. Nelson*, No. 22-50775, 22-50777, 22-50778 (5th Cir.), this Court's prior precedent clearly demonstrates that she lacks such authority. "To be amenable to suit under [*Ex parte Young*], the state actor must both possess the authority to enforce the challenged law and have a sufficient connection to the enforcement of the challenged act." *Haverkamp v. Linthicum*, 6 F.4th 662, 670 (5th Cir. 2021) (per curiam) (cleaned

---

[5] Even where a prosecutor asks the Attorney General for assistance, the Attorney General is exercising the district attorney's prosecutorial authority, not his own. He is being "deputize[d] . . . . as assistant prosecutor." Tex. Gov't Code § 402.028(b).

up). As this Court has long recognized, Texas administers its elections through a decentralized system. *E.g.*, *Lightbourn v. County of El Paso*, 118 F.3d 421, 428 n.7 (5th Cir. 1997). And notwithstanding her title as Texas's Chief Election Officer, the Secretary's role is largely administrative and informational. *E.g.*, *Flores*, 28 F.4th at 654. As a result, whether she has an adequate enforcement to a challenged law requires a "provision-by-provision analysis," *TDP II*, 978 F.3d at 179; *e.g.*, *TARA*, 28 F.4th at 672.

The district court acknowledged that local district attorneys are primarily responsible for investigating and prosecuting the paid-vote-harvesting ban. ROA.37546. (The District Attorneys admitted as much. ROA.37530 n.18.) The court nonetheless found the Secretary has sufficient enforcement connection because she (1) has referred violations of election laws for investigation and potential prosecution in the past and (2) has not disavowed an intent to do so in the future. ROA.37534-35. These observations run into at least two of the same problem highlighted above. *First*, the fact that the Secretary has asked the Attorney General to investigate whether *different* behavior violates *different* provisions of the Election Code does nothing to "show that [s]he is likely to do the same here." *City of Austin*, 943 F.3d at 1001. *Second*, even if it did, referring a question to another government official does not constitute an enforcement action because it does nothing to compel or constrain the Plaintiffs' conduct—even if that investigation ripens into a subsequent enforcement action. *E.g.*, *Ostrewich*, 72 F.4th at 101.

It would be particularly odd for the Court to find the Secretary to have a sufficient enforcement connection here given prior litigation regarding the *same law.*

Specifically, Plaintiffs have expressly argued to this Court that "no state officials have a greater connection to the Criminal Provisions [of S.B. 1] than district attorneys." Appellees Br. at 32, *Mi Familia Vota v. Ogg*, No. 22-50732 (5th Cir. Dec. 16, 2022). This Court nonetheless found District Attorney Ogg retained sovereign immunity because "Ogg has not done or threatened to do anything," and "the mere fact that the [state official] *has* the authority to enforce [the challenged statute] cannot be said to 'constrain' the party challenging the statute." *Ogg*, 105 F.4th at 332 (quoting *City of Austin*, 943 F.3d at 1001). That same reasoning applies *a fortiori* to claims against the Secretary as her "role in enforcing [the] statute [is] merely to train and advise other officials." *Id.* (citing *Ostrewich*, 72 F.4th at 100-01).

## B. The Plaintiffs lack Article III standing.

Even if the Plaintiffs could get around sovereign immunity, they lack Article III standing to bring their constitutional claims under section 1983 against the Secretary and Attorney General for many of the same reasons. Because this case has proceeded to trial, to establish standing, Plaintiffs must have proven by a preponderance of the evidence that (1) they have suffered an "injury in fact," which is (2) fairly traceable to the enforcement of the specific challenged provision, and (3) likely to be redressed by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

Because Plaintiffs have brought a pre-enforcement First Amendment challenge, they must show not just that they self-censored but they did so based on a fear of prosecution that is not "imaginary or wholly speculative." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979). A fear of prosecution is deemed impermissibly "imaginary or speculative" where plaintiffs "do not claim that they have

ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible." *Id.* at 298-99 (citation omitted). That is, even in the First Amendment context, "[a]llegations of a subjective 'chill'" do not demonstrate standing because they are no "substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972). Because Plaintiffs have not alleged that State Defendants *could* enforce Section 7.04 against them—let alone that they would—Plaintiffs' theory of injury is wholly speculative and deemed legally self-inflicted. *E.g.*, *Clapper v. Amnesty Int'l. USA*, 568 U.S. 398, 416-18 (2013).

Finally, even if Plaintiffs' putative chill were sufficient to establish an injury at trial, they have still failed to show that the Attorney General's and Secretary's "actual or threatened *enforcement*" of S.B. 1's paid-vote-harvesting ban caused Plaintiffs' alleged injury—here, chilling of their paid vote harvesting. *California v. Texas*, 593 U.S. 659, 669-70 (2021). As this Court has noted, this inquiry "significantly overlap[s]" with that under *Ex parte Young*. *City of Austin*, 943 F.3d at 1002. That is because a federal court may only "enjoin named defendants from taking specified unlawful actions"; it cannot "enjoin challenged laws themselves." *Whole Women's Health*, 595 U.S. at 44. Since, here, "the enjoined official[s] never had the power to enforce the law in the first place," the district court's order is an "empty vessel." *State v. Zurawski*, 690 S.W.3d 644, 659 (Tex. 2024). Federal courts lack jurisdiction to issue such advisory opinions.

## Conclusion

The Court should reverse the district court's order and vacate the injunction.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General

/s/ LANORA C. PETTIT
LANORA C. PETTIT
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

KATHLEEN T. HUNKER
Special Counsel

MARK A. CSOROS
Assistant Attorney General

Counsel for State Defendants-
Appellants

## Certificate of Service

On December 23, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Lanora C. Pettit
LANORA C. PETTIT

## Certificate of Compliance

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,865 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Lanora C. Pettit
LANORA C. PETTIT