No. 24-50783

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

LA UNION DEL PUEBLO ENTERO; SOUTHWEST VOTER REGISTRATION EDUCATION
PROJECT; MEXICAN AMERICAN BAR ASSOCIATION OF TEXAS; TEXAS HISPANICS
ORGANIZED FOR POLITICAL EDUCATION; JOLT ACTION; WILLIAM C. VELASQUEZ
INSTITUTE; FIEL HOUSTON, INCORPORATED; FRIENDSHIP-WEST BAPTIST CHURCH;
TEXAS IMPACT; JAMES LEWIN,
*Plaintiffs-Appellees*,
*v.*
GREGORY W. ABBOTT, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS;
WARREN K. PAXTON, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF TEXAS;
STATE OF TEXAS; JANE NELSON, IN HER OFFICIAL CAPACITY AS TEXAS SECRETARY
OF STATE; HARRIS COUNTY REPUBLICAN PARTY; DALLAS COUNTY REPUBLICAN
PARTY; NATIONAL REPUBLICAN SENATORIAL COMMITTEE,
*Defendants-Appellants*,
*v.*
REPUBLICAN NATIONAL COMMITTEE
*Movant-Appellant*

———

OCA-GREATER HOUSTON; LEAGUE OF WOMEN VOTERS OF TEXAS,
*Plaintiffs-Appellees*
v.
KEN PAXTON, TEXAS ATTORNEY GENERAL,
*Defendant-Appellant*

———

LULAC TEXAS; TEXAS ALLIANCE FOR RETIRED AMERICANS;
TEXAS AFT; VOTO LATINO,
*Plaintiffs-Appellees*
*v.*
KEN PAXTON, IN HIS OFFICIAL CAPACITY AS THE TEXAS ATTORNEY GENERAL,
*Defendant-Appellant*

On Appeal from the United States District Court
for the Western District of Texas
San Antonio Division - No. 5:21-cv-00844

# BRIEF OF PLAINTIFFS-APPELLEES OCA-GREATER HOUSTON AND LEAGUE OF WOMEN VOTERS OF TEXAS

Zachary Dolling
Sarah Chen
TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, TX 78741
(512) 474-5073
zachary@texascivilrightsproject.org
schen@texascivilrightsproject.org

Ashley Harris
Adriana Pinon
Thomas Buser-Clancy
Edgar Saldivar
Savannah Kumar
ACLU FOUNDATION
OF TEXAS, INC.
5225 Katy Freeway, Suite 350
Houston, TX 77007
(713) 942-8146
aharris@aclutx.org
apinon@aclutx.org
tbuser-clancy@aclutx.org
esaldivar@aclutx.org
skumar@aclutx.org

Christopher McGreal
DISABILITY RIGHTS TEXAS
2222 West Braker Lane
Austin, TX 78758-1024
(512) 454-4816
cmcgreal@drtx.org

Sophia Lin Lakin
Ari J. Savitzky
Dayton Campbell-Harris
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
(212) 284-7334
slakin@aclu.org
asavitzky@aclu.org
dcampbell-harris@aclu.org

Adriel I. Cepeda Derieux
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street NW
Washington, DC 20005
(202) 457-0800 acepedaderieux@aclu.org

Patrick Stegemoeller
ASIAN AMERICAN LEGAL DEFENSE
AND EDUCATION FUND
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 966-5932 (phone)
pstegemoeller@aaldef.org

Jessica Ring Amunson
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
(202) 639-6000
jamunson@jenner.com

*Counsel for OCA-Greater Houston and
League of Women Voters of Texas*

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

LA UNION DEL PUEBLO ENTERO ET AL.,
*Plaintiffs-Appellees,*
*v.*
GREGORY W. ABBOTT ET AL.,
*Defendants-Appellants.*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellees**

- OCA-Greater Houston
- League of Women Voters of Texas
- La Union del Pueblo Entero
- Southwest Voter Registration Education Project
- Mexican American Bar Association of Texas
- Texas Hispanics Organized for Political Education
- JOLT Action
- William C. Velasquez Institute
- Fiel Houston, Incorporated
- Friendship-West Baptist Church

**Counsel**

- Zachary Dolling
- Sarah Xiyi Chen
- Veronikah Warms
- Adriel I. Cepeda Derieux
- Ari Savitzky
- Sophia Lin Lakin
- Dayton Campbell-Harris
- Adriana Pinon
- Thomas Buser-Clancy
- Edgar Saldivar
- Savannah Kumar
- Ashley Harris
- Bryan Lawrence Dimmick

- Texas Impact
- James Lewin
- LULAC Texas
- Texas Alliance for Retired Americans
- Texas AFT
- Voto Latino

- Lucia Romano
- Christopher McGreal
- Peter Hofer
- Patrick Stegemoeller
- Nina Perales
- Fátima L. Menéndez
- Julia Renee Longoria
- Leah J. Tulin
- Jessica Ring Amunson
- Michael C. Keats
- Rebecca L. Martin
- Sean Morales-Doyle
- Andrew B. Garber
- Eliza Sweren-Becker
- Jason S. Kanterman
- Jasleen K. Singh
- Parick A. Berry
- Madeleine Hall Carpenter
- Zachary D. Tripp
- Aaron J. Curtis
- Megan Cloud
- Charles Gehnrich
- Natalie Howard
- Augustus Ipsen
- Uzoma N. Nkwonta
- Christopher D. Dodge
- Marcos Mocine-McQueen
- Julie Zuckerbrod
- Elena Alejandra Rodriguez Armenta

**Defendants-Appellants**

- Gregory W. Abbott
- Warren K. Paxton
- Jane Nelson
- Ken Paxton

**Counsel**

- Brent Webster
- Meagan Corser
- Mark A. Csoros
- Kathleen Theresa Hunker
- Kateland R. Jackson

- Ryan Glen Kercher
- Aaron Lloyd Nielson
- William D. Wassdorf
- John M. Gore
- Louis Joseph Capozzi, III
- Zachary Austin
- John M. Gore
- E. Stewart Crosland
- Louis J. Capozzi, III

**Other Interested Persons or Groups Not Party to this Appeal**

- REVUP-Texas
- Houston Area Urban League
- Mi Familia Vota
- Marla Lopez
- Marlon Lopez
- Paul Rutledge
- REVUP-Texas
- Delta Sigma Theta Sorority Inc.
- Houston Area Urban League
- Houston Justice
- The Arc of Texas
- Jeffrey Lamar Clemmons

- Lisa Wise
- Michele Carew
- Teneshia Hudspeth
- Michael Scarpello
- Dyana Limon-Mercado
- Hilda Salina
- Joe Gonzales
- John Creuzot
- Jose Garza
- Seane Teare
- James Montoya
- Toribio Palacios

Dated: February 21, 2025

*/s/ Zachary Dolling*
Counsel of Record for Plaintiffs-Appellees OCA-Greater Houston and League of Women Voters of Texas

# STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellees OCA-Greater Houston and League of Women Voters of Texas respectfully request oral argument. *See* Fed. R. App. P. 34; 5th Cir. R. 28.2.3. This appeal raises legally and practically significant questions regarding the proper construction and constitutionality of the Texas Election Code. Oral argument will assist this Court in answering those questions.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ......................................................... i

STATEMENT REGARDING ORAL ARGUMENT ........................................... iv

TABLE OF CONTENTS ...................................................................................... v

TABLE OF AUTHORITIES ............................................................................. vii

INTRODUCTION ............................................................................................... 1

STATEMENT OF JURISDICTION .................................................................... 3

STATEMENT OF THE CASE ............................................................................ 3

    A.   Section 7.04's Text .................................................................................. 3

    B.   Section 7.04's Chilling Effect on Plaintiffs-Appellees' and Others' Core Political Speech. ............................................................................ 4

    C.   Local and State Officials' Inability to Clarify Section 7.04's Reach. ......... 8

    D.   The AG's Willingness to Enforce Section 7.04. ..................................... 10

    E.   Plaintiffs-Appellees' Lawsuit and the Trial. ......................................... 10

SUMMARY OF THE ARGUMENT ................................................................. 11

ARGUMENT ................................................................................................... 13

    I.   SECTION 7.04 IS FACIALLY OVERBROAD ...................................... 13

    A.   Section 7.04 Sweeps In All Manner of Core Political Speech. ............... 14

    B.   Section 7.04's Unconstitutional Applications Substantially Outweigh Its Constitutional Ones. ........................................................ 20

        1.   Section 7.04 has minimal constitutional applications. ..................... 21

        2.   Section 7.04 has substantial unconstitutional applications ............. 22

            a.   Section 7.04's regulation of core political speech is subject to strict scrutiny ......................................................................... 22

            b.   Section 7.04 fails strict scrutiny. ............................................. 25

                i.   Section 7.04 does not advance the state's interests. ................ 25

                ii.   Section 7.04 is fatally underinclusive. ................................... 28

                iii.   Section 7.04 sweeps too broadly and is not the least-restrictive alternative. ............................................... 31

                iv.   This outcome would not differ under *Anderson-Burdick*. ........... 33

c. Appellants' attempts to analogize Section 7.04 to
electioneering regulations are unconvincing. ......................................33

II. SECTION 7.04 IS UNCONSTITUTIONALLY VAGUE ........................38

A. "Compensation or Other Benefit" is Vague..............................................39

B. "Physical Presence" is Vague. ..................................................................42

C. Vague Terms Are Not Made Less Vague by a Scienter Requirement. ......45

III. PLAINTIFFS-APPELLEES' CLAIMS ARE NOT PREMATURE .........46

IV. THE AG IS NOT ENTITLED TO SOVEREIGN IMMUNITY ...............48

A. There Is No Sovereign Immunity Under the Governing Test. .................48

B. The AG Is Precluded from Asserting Sovereign Immunity.....................54

V. PLAINTIFFS-APPELLEES HAVE STANDING....................................55

CONCLUSION ........................................................................................................55

CERTIFICATE OF SERVICE ..............................................................................58

CERTIFICATE OF COMPLIANCE.....................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*281 Care Comm. v. Arneson*, 638 F.3d 621 (8th Cir. 2011)....................................54

*Ali v. Fed. Bureau of Prisons*, 552 U.S. 214 (2008)................................................40

*Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987) ............. 41, 48

*Buckley v. Valeo*, 424 U.S. 1 (1976) ........................................................................1

*Burson v. Freeman*, 504 U.S. 191 (1992)................................................................34

*Carcieri v. Salazar*, 555 U.S. 379 (2009) ...............................................................30

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010)............................22

*City of Austin v. Paxton*, 943 F.3d 993 (5th Cir. 2019)…....……………………53

*City of El Cenizo v. Texas*, 890 F.3d 164 (5th Cir. 2018).......................................20

*City of Houston v. Hill*, 482 U.S. 451 (1987) .........................................................47

*City of Rockwall v. Hughes*, 246 S.W.3d 621 (Tex. 2008)......................................39

*Coal. for Good Governance v. Kemp*, 558 F. Supp. 3d 1370 (N.D. Ga. 2021).......37

*Dep't of Tex., Veterans of Foreign Wars of U.S. v. Tex.*
    *Lottery Comm'n*, 760 F.3d 427 (5th Cir. 2014)......................... 25, 27, 28, 31

*Ex parte Young*, 209 U.S. 123 (1908)......................................................................48

*Fish v. Schwab*, 957 F.3d 1105 (10th Cir. 2020)....................................................33

*Flint v. Dennison*, 488 F.3d 816 (9th Cir. 2007) ............................................. 37, 38

*Google, Inc. v. Hood*, 822 F.3d 212 (5th Cir. 2016)...............................................53

*Government of the Canal Zone v. Burjan*, 596 F.2d 690 (5th Cir. 1979)...............52

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ......................................38

*Huskey v. Jones*, 45 F.4th 827 (5th Cir. 2022)..........................................52

*In re Abbott*, 956 F.3d 696 (5th Cir. 2020) ...............................................53

*Johnson v. United States*, 576 U.S. 591 (2015) .......................................47

*Kolender v. Lawson*, 461 U.S. 352 (1983)................................................47

*La Union Del Pueblo Entero v. Abbott*, 119 F.4th 404 (5th Cir. 2024) .................11

*Lichtenstein v. Hargett*, 83 F.4th 575 (6th Cir. 2023) .............................23

*Matsumoto v. Labrador*, 122 F.4th 787 (9th Cir. 2024).........................544

*Mazo v. New Jersey Sec'y of State*, 54 F.4th 124 (3d Cir. 2022) ............................23

*McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996 (5th Cir. 2023) .......................38

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) ...................................23

*Meyer v. Grant*, 486 U.S. 414, 422 (1988) ........................................ 1, 14

*Mi Familia Vota v. Ogg*, 105 F.4th 313 (5th Cir. 2024)............................ 48, 50, 53

*Miller v. Nelson*, 116 F.4th 373 (5th Cir. 2024) .........................................33

*Minnesota Voters Alliance v. Mansky*, 585 U.S. 1 (2018)......................... 34, 35, 37

*Mobility Workx, LLC v. Unified Pats., LLC*, 15 F.4th 1146 (Fed. Cir. 2021).........52

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024).............................................. 13, 19

*Morris v. Livingston*, 739 F.3d 740 (5th Cir. 2014) .................................54

*Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770 (5th Cir. 2024) ... 48, 55

*NetChoice, L.L.C. v. Paxton*, 121 F.4th 494 (5th Cir. 2024)...................................19

*N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1 (1988).......................22

*Northshore Dev., Inc. v. Lee*, 835 F.2d 580 (5th Cir. 1988)....................................11

*Nova Records, Inc. v. Sendak*, 706 F.2d 782 (7th Cir. 1983) ...............................45

*Oettle v. Guthrie*, 189 N.E.3d 22 (Ill. App. Ct. 2020) ............................................37

*Ostrewich v. Hudspeth*, 2021 WL 4170135 (S.D. Tex. Sept. 14, 2021),
    *report and recommendation adopted*,
    2021 WL 4480750 (S.D. Tex. Sept. 30, 2021)............................................50

*Ostrewich v. Tatum*, 72 F.4th 94 (5th Cir. 2023)....................................... 39, 49, 50

*Ostrewich v. Tatum*, No. 21-20577 (5th Cir.).........................................................50

*Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818 (10th Cir. 2007)........54

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ......................................... 22, 25, 29

*Reno v. ACLU*, 521 U.S. 844 (1997)....................................................................14

*Rideout v. Gardner*, 123 F. Supp. 3d 218 (D.N.H. 2015),
    *aff'd*, 838 F.3d 65 (1st Cir. 2016).................................................................37

*Rideout v. Gardner*, 838 F.3d 65 (1st Cir. 2016)...................................................26

*Rose v. Locke*, 423 U.S. 48 (1975).......................................................................41

*Seals v. McBee*, 898 F.3d 587 (5th Cir. 2018) .....................................................20

*Serafine v. Branaman*, 810 F.3d 354 (5th Cir. 2016) ..................................... 20, 41

*Sessions v. Dimaya*, 584 U.S. 148 (2018)............................................................38

*Smith v. Daily Mail Pub. Co.*, 443 U.S. 97 (1979) ...............................................29

*Smith v. Goguen*, 415 U.S. 566 (1974) .................................................................45

*Snyder v. United States,* 603 U.S. 1 (2024) ..........................................................28

*State v. Stephens*, 663 S.W.3d 45 (Tex. Crim. App. 2021) ............................. 10, 49

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)......................................46

*Tex. Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020) ............................49

*TIC Energy & Chem., Inc. v. Martin*, 498 S.W.3d 68 (Tex. 2016) ........................39

*Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622 (1994) ......................................26

*Twitter, Inc. v. Paxton*, 56 F.4th 1170 (9th Cir. 2022) ..........................................53

*United States v. Grace*, 461 U.S. 171 (1983) ..........................................29

*United States v. Kidd*, 23 F.4th 781 (8th Cir. 2022) ...............................41

*United States v. Loy*, 237 F.3d 251 (3d Cir. 2001) ......................... 45, 46

*United States v. Petrillo*, 332 U.S. 1 (1947) .................................. 44, 45

*United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803 (2000)......................32

*United States v. Stevens*, 559 U.S. 460 (2010) ......................... 19, 20, 21

*United States v. Williams*, 553 U.S. 285 (2008) .....................................39

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982).............................................. 14, 47

*Vote.Org v. Callanen*, 89 F.4th 459 (5th Cir. 2023) ........................ 24, 25

*VoteAmerica v. Schwab*, 121 F.4th 822 (10th Cir. 2024) ................ 23, 25

*Voting for America Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013)............................24

*Willey v. Harris Cty. Dist. Attorney*, 27 F.4th 1125 (5th Cir. 2022) ......................28

*Williams-Yulee v. Fla. Bar*, 575 U.S. 433 (2015)....................................29

*Willy v. Admin. Rev. Bd.*, 423 F.3d 483 (5th Cir. 2005) ...........................54

*Witherspoon v. United States*, 838 F.2d 803 (5th Cir. 1988) ......................52

*Yowell v. Granite Operating Co.*, 620 S.W.3d 335 (Tex. 2020) ...........................40

**Statutes**

28 U.S.C. § 1292(a)(1)..........................................................3

28 U.S.C. § 1331 ................................................................3

Tex. Code Crim. Pro. art. 2A.104 ...........................................49

Tex. Gov't Code § 311.005(13)...............................................40

Tex. Gov't Code § 402.028......................................................49

x

Tex. Penal Code § 12.34 ........................................................................4

**Tex. Elec. Code ("TEC")**

§ 1.003(a) ......................................................................................40

§ 64.012(a)(3)-(4) ...................................................................... 26, 27

§ 64.036(a)(2)-(3) ...................................................................... 26, 27

§ 276.013(a) ............................................................................... 26, 27

§ 276.015 ........................................................................... 1, 3, 40, 52

§ 276.015(a)(1) .................................................................... 4, 39, 46

§ 276.015(a)(2) .............................................................. 4, 29, 42, 43

§ 276.015(b)-(c) .................................................................... 15, 17

§ 276.015(b)-(c), (f) ...........................................................................3

§ 276.015(e)(2) ...............................................................................18

§ 276.015(e)(3) ...............................................................................18

§ 276.015(e)(5) ...............................................................................29

**Other Authorities**

@bradj_TX, X (Sept. 4, 2024, 10:39AM),
   https://x.com/bradj_TX/status/1831356448724455604 ...............................52

ACLUTX Records Request (Feb. 10, 2025) and Frio County Response
   (Feb. 12, 2025),
   https://www.aclutx.org/sites/default/files/21025_pia_request.pdf ...............52

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation
   of Legal Texts* 204 (2012) ...............................................................41

*Benefit*, BLACK'S LAW DICTIONARY (12th ed. 2024) ............................................40

*Directly*, BLACK'S LAW DICTIONARY (12th ed. 2024) ...........................................18

*Directly*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/directly ..................................................................18

*Involve*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/involve ..................................................................18

*OAG SW-Voter Fraud Investigation*, contributed by Brad Johnson, THE TEXAN (created on Sept. 4, 2024), https://www.documentcloud.org/documents/25090410-oag-sw-voter-fraud-investigation/................................................................................52

*Physical*, BLACK'S LAW DICTIONARY (12th ed. 2024) ...........................................42

*Physical*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/physical .................................................43

*Presence*, BLACK'S LAW DICTIONARY (12th ed. 2024) ...........................................43

*Presence*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/presence.................................................43

*Press Release, Attorney General Ken Paxton's Criminal Investigation Division Executes Search Warrants in Frio, Atascosa, and Bexar Counties in Ongoing Election Integrity Investigation*, TEXAS ATTORNEY GENERAL (Aug. 21, 2024), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxtons-criminal-investigation-division-executes-search-warrants-frio-atascosa..................................................................................52

*Texas Attorney General Records Regarding the Election Integrity Division*, AMERICAN OVERSIGHT (Feb. 4, 2025), https://americanoversight.org/featureddocument/texas-attorney-general-records-regarding-the-election-integrity-division/ ........................................52

# INTRODUCTION

"The First Amendment affords the broadest protection" to "[d]iscussion of public issues and debate on the qualifications of candidates." *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (cleaned up). Such "interactive communication concerning political change … is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 422 (1988).

This appeal involves Section 7.04 of Texas's sweeping election law known as "S.B.1." Section 7.04 imposes criminal penalties on core political speech by making it a felony to give, offer, or receive "compensation or other benefit" for any "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." Tex. Elec. Code ("TEC") § 276.015.

After a six-week trial involving almost 80 witnesses and 1000 exhibits, the District Court determined that Section 7.04 violated the First and Fourteenth Amendments. That decision rests soundly on the trial evidence and black-letter legal principles and contains no reversible error. Indeed, the facts established at trial illustrate how Section 7.04's expansive-but-vague reach has silenced the core political speech of voter-outreach and assistance organizations while doing virtually nothing to advance the state's purported interest in combatting voter fraud.

The trial evidence showed, and the District Court found, that before S.B.1, organizations like OCA-Greater Houston ("OCA-GH") and League of Women Voters of Texas ("LWVTX") (collectively, "Plaintiffs-Appellees") conducted a wide array of in-person voter outreach activities—including door-to-door canvassing, hosting candidate forums, and tabling at community events. These activities were carried out both by paid staff, and by other members and volunteers, some of whom were paid, and some of whom received modest benefits like food or T-shirts for their time. They often took place 'in the physical presence' of a mail-ballot because Plaintiffs-Appellees' voter outreach efforts naturally intensified in the weeks ahead of elections, when voters were most likely to have mail-ballots and when political advocacy and engagement was most likely to be effective. For example, voters often brought their mail-ballots to the door during canvassing, or to community events, to ask questions about the candidates and measures on the ballot, or to seek assistance with mail-voting. There is no evidence to suggest that any of Plaintiffs-Appellees' political advocacy in the physical presence of a mail-ballot was ever coercive.

The trial evidence also showed, and the District Court found, that Plaintiffs-Appellees and other plaintiff-organizations have been forced to cease advocating for candidates and/or measures during many routine voter outreach activities, or to cease those activities entirely, for fear of criminal prosecution under Section 7.04. Indeed,

the Texas Attorney General ("AG") has made his willingness to enforce Section 7.04 clear, including by participating in the prosecution of alleged violations of the statute.

Defendants-Appellants have failed to offer meaningful evidence that justifies this severe chilling of Plaintiffs-Appellees' First Amendment rights. Instead, as the District Court correctly concluded, Section 7.04 is both overbroad in violation of the First Amendment and vague in violation of the Fourteenth Amendment. This Court should affirm.

## STATEMENT OF JURISDICTION

The District Court had jurisdiction under 28 U.S.C. § 1331 because Plaintiffs-Appellees' claims arise under federal law. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) because the District Court entered a permanent injunction.

## STATEMENT OF THE CASE

### A.     Section 7.04's Text.

Section 7.04 became effective on December 2, 2021. TEC § 276.015. It creates two third-degree felonies: to (1) "knowingly provide[] … vote harvesting services in exchange for compensation or other benefit"; or (2) "knowingly provide[] … compensation or other benefit to another person in exchange for vote harvesting services." TEC § 276.015(b)-(c), (f). "'Vote harvesting services' means in-person interaction with one or more voters, in the physical presence of an official ballot or

a ballot voted by mail, intended to deliver votes for a specific candidate or measure." TEC § 276.015(a)(2).

The only mental states assigned in the statute are that (1) 'vote harvesting services' requires intent to deliver votes; (2) under the first offense, a person knowingly provide 'vote harvesting services'; and (3) under the second offense, a person knowingly provide 'compensation or other benefit.' The remaining elements are unassigned.

The statute does not define "compensation" or "physical presence," but broadly defines "benefit" as "anything reasonably regarded as a gain or advantage, including a promise or offer of employment, a political favor, or an official act of discretion, whether to a person or another party whose welfare is of interest to the person." *Id.* § 276.015(a)(1).

Violations are punishable by up to ten years imprisonment and a fine of up to $10,000. Tex. Penal Code § 12.34.

### B. Section 7.04's Chilling Effect on Plaintiffs-Appellees' and Others' Core Political Speech.

Section 7.04's sweeping but vague reach "has chilled Plaintiffs[-Appellees' and others'] willingness to conduct in-person community events and political outreach to voters where a mail-in-ballot might be present, including events where [their] members have historically provided (and received) voting or language assistance." ROA.37527. This is both because of the statute's breadth and because

Plaintiffs-Appellees and others are "uncertain about how to interpret the terms 'compensation' and 'physical presence,'" including whether benefits as small as "a bottle of water could be considered 'compensation.'" ROA.37524-37525, 40108-40109, 40224, 40227-40228, 41054.

Prior to S.B.1, OCA-GH—which seeks to advance the well-being of Asian American and Pacific Islanders ("AAPIs") in the Greater Houston area—regularly hosted in-person voting-related events like AAPI candidate meet-and-greets, candidate forums, and voting machine demonstrations. ROA.37512-37513, 40195-40196, 40199-41200, 40204-40212, 40216-40217. Hundreds of people attended these events, some of whom were limited English proficient seniors bringing their mail-ballots to seek (and receive) language assistance. ROA.37513, 40197, 40204-40212, 40216-40217. OCA-GH particularly focused on serving limited English proficient and senior voters, and drove hundreds of seniors to the polls each year, many of whom would bring mail-ballots to surrender and vote in person. ROA.37528, 40197, 40199-41200, 40203, 40217, 40232-40233, 40242. It also engaged in door-to-door canvassing, tabling at polling places, and exit-polling, during which it provided language assistance to seniors who had their mail-ballots. ROA.37513, 40212-40216, 40242. OCA-GH sometimes advocated for ballot measures during these activities and has historically been the largest provider of

Chinese language assistance in the Greater Houston area. ROA.37513, 40217-40218, 40221-40223.

OCA-GH accomplished these activities through paid staff, paid members, or paid volunteers, as well as by giving members or volunteers bottles of water, Gatorade, or T-shirts in exchange for their services. ROA.37513-37514, 40197-40198, 40203-40204, 40224, 40227-40228, 40240.

LWVTX, like OCA-GH, works to register new voters, ensure that voters' ballots count, help voters vote by mail, and provide voter assistance when requested. ROA.37514, 40090-40091, 40095-40097, 40099-40100, 40103-40104. Before S.B.1, it hosted in-person election events across Texas, including candidate forums and discussions of ballot measures and constitutional amendments. ROA.37514, 40109. It and its local affiliates sometimes endorsed ballot measures and held in-person events in support of those measures. ROA.37514, ROA.40110-40111. These events almost always occurred after mail-ballots had been distributed, meaning that voters were likely to bring their mail-ballots. ROA.40137, 40109-40110, 37514, 37527-35728. LWVTV's work is of particular importance to the older voters and voters with disabilities in the communities that it serves. ROA.40098, 40102.

LWVTX staffed these in-person events with volunteers who received small benefits for their efforts, including pens, stickers, refreshments, free parking,

certificates of participation for academic credit, or letters of recommendation. ROA.37514, 40108, 40111-40112.

Due to Section 7.04, Plaintiffs-Appellees now fear carrying out their previously-routine in-person voter outreach and advocacy. OCA-GH did not host a candidate forum for the March 2022 election, and while it co-sponsored one in November 2022, did not interact with community members. ROA.37528, 40228-40229. And it resorted to virtually hosting its AAPI candidate meet-and-greet in the spring of 2022, resulting in "fairly abysmal" attendance compared to prior years. ROA.40230, 37529.

Section 7.04 has also "completely changed" OCA-GH's canvassing; it now trains canvassers to do nothing but send voters to the county's website. ROA.40232-40234, 37528. It similarly trains those conducting exit-polling to do nothing but direct voters to go inside the polling place, and it no longer drives seniors to the polls for fear that they will have mail-ballots with them. ROA.40232-40233, 37528. It has also ceased providing voting assistance. ROA.37528, 40236-40237. And while OCA-GH wants to engage in future advocacy for ballot measures, it is not sure how to do so without violating Section 7.04. ROA.40236. S.B.1 has "made it nearly impossible" for OCA-GH to accomplish its mission. ROA.40236, 40226-40227. If not for S.B.1, OCA-GH would "absolutely" return to its prior activities. ROA.40237.

LWVTX, which continues to host in-person election-related events, is concerned that it can no longer host in-person events supporting ballot measures because attendees are likely to bring mail-ballots. ROA.40111. It also fears that if it hosts a candidate forum to which only one candidate shows up, it may be perceived to be advocating for that candidate, as has happened in the past. ROA.40106-40107. LWVTX's only option now is to "turn away members with their mail-in ballots from" in-person events. ROA.37528, 40130-40131, 40137.

The same is true for the other plaintiff-organizations in this lawsuit: each has "endorsed ballot measures (and some have supported candidates) aligned with their organizational missions in the past and deployed staff, independent contractors[,] and volunteers to engage with voters in person to increase turnout and electoral support for their preferred measure or candidate." ROA.37511. But Section 7.04 has "chilled [their] in-person interactions with voters," forcing them and their members to limit such interactions "in the weeks before elections, when voters are most likely to have mail-ballots in their possession—and when [their] speech is most likely to be effective." ROA.37527-37530. Together, the plaintiff-organizations in this lawsuit have more than 100,000 members statewide. ROA.37512-37519.

### C. Local and State Officials' Inability to Clarify Section 7.04's Reach.

Since Section 7.04's enactment, government officials have been unable to clarify the reach of the statute or assure Plaintiffs-Appellees that they will not be

prosecuted for their political advocacy. "Even local election administrators ('EAs') are unsure about how to interpret" Section 7.04's expansive-but-vague reach. ROA.37524. For example, the Dallas County EA testified that "I don't know what ballot harvesting means and … it could be interpreted a lot of different ways based on the definition … put into the law," ROA.37524, 39006, while the former Travis County Clerk of 36 years observed that the statute criminalizes advocacy *for*, but not *against*, a measure, ROA.37524, 39354. County elections officials agree, however, that "Section 7.04 could interfere with community organizers' ability to assist voters with their mail-ballots because its prohibition … does not include an exception for mail-ballot assistance." ROA.37526-37527, 39268-39269; ROA.39351-39352, 39354.

At the state level, neither the Secretary nor the AG have provided any guidance as to Section 7.04's reach. ROA.37524, 40424, 40434-40435. The Secretary's former Director of Elections and the former Chief of the AG's Election Integrity Division also testified to divergent understandings of what "compensation" means. ROA.37525-37526, 40413-40414 (stating that bus fare does not qualify), 42502-42503 (stating he would need to consult caselaw to know if bus fare or similar qualified).

**D. The AG's Willingness to Enforce Section 7.04.**

Although the AG cannot *unilaterally* prosecute election-related offenses following *State v. Stephens*, 663 S.W.3d 45 (Tex. Crim. App. 2021), he continues to use his remaining authority under Texas law to participate in such prosecutions, including by enforcing Section 7.04. Thus, even post-*Stephens*, he has publicly stated his intent to combat "vote harvesting," maintained an Election Integrity Division focused solely on election-related prosecutions, and worked with local prosecutors to ensure that such offenses are prosecuted, either by referring cases or by having his attorneys deputized or appointed to prosecute those cases—including alleged Section 7.04 offenses. ROA.37520-37522; *infra* IV.A.

**E. Plaintiffs-Appellees' Lawsuit and the Trial.**

Plaintiffs-Appellees filed their operative complaint on January 18, 2022. ROA.6365-6442. In it they brought pre-enforcement challenges against Defendant-Appellant Ken Paxton, in his official capacity as the Texas AG, along with the district attorneys ("DAs") of Travis and Harris Counties, alleging that Section 7.04 violates both the First and Fourteenth Amendments. ROA.6434-6439. Plaintiffs-Appellees' suit was consolidated with those brought by several other plaintiff-organizations, who in their Section 7.04 challenges additionally sued the Texas Secretary of State ("the Secretary") and numerous DAs. Shortly thereafter, several Republican parties and committees ("Intervenor-Appellants") intervened to defend

Section 7.04 alongside the AG and Secretary ("State-Appellants"). ROA.10401-10429.

The District Court held a six-week bench trial beginning September 11, 2023. On September 28, 2024, the Court issued an order concluding that Section 7.04 is facially overbroad and facially vague in violation of the First and Fourteenth Amendments, and permanently enjoined State-Appellants and the DA defendants[1] from enforcing it. ROA.37504-37581. Appellants appealed and sought a stay in this Court, which was granted on October 15, 2024. *La Union Del Pueblo Entero v. Abbott*, 119 F.4th 404 (5th Cir. 2024).[2]

## SUMMARY OF THE ARGUMENT

The District Court correctly concluded that Section 7.04 violates the First Amendment because its unconstitutional applications (regulating core political speech) substantially outweigh its constitutional applications (regulating unprotected voter fraud or coercion). Appellants attempt to evade that conclusion by offering an atextual re-imagining of Section 7.04's scope, but the District Court correctly concluded that it could not rewrite a statute enacted by the Texas Legislature. The District Court also correctly applied strict scrutiny to Section 7.04,

---

[1] Plaintiffs-Appellees' claims against the Harris County DA were dismissed, but it is undisputed that jurisdiction is proper over the Travis County DA, who is not part of this appeal. ROA.37530 n.18.

[2] "[A] motions panel decision is not binding precedent." *Northshore Dev., Inc. v. Lee*, 835 F.2d 580, 583 (5th Cir. 1988).

rather than *Anderson-Burdick* balancing, and correctly found that it fails strict scrutiny because it is not narrowly tailored to furthering the State's purported interests in combatting voter fraud. This is because it adds nothing to the coverage of preexisting law; fails to regulate speech that clearly implicates the State's purported interests; and could have been, but was not, drawn narrowly to address those interests. The District Court reached this decision based on extensive trial evidence, not 'farfetched' hypotheticals, as Appellants claim. It further properly rejected Appellants' attempts to analogize Section 7.04 to prohibitions on electioneering around or in polling places, because Section 7.04 implicates different First Amendment concerns than regulations that govern clearly-delineated, government-controlled physical spaces.

The District Court also correctly concluded that Section 7.04 is void for vagueness. Terms like "compensation or other benefit" and "physical presence" fail to provide people of ordinary intelligence a reasonable opportunity to know what conduct the statute prohibits, and are so indefinite that they allow for arbitrary and discriminatory enforcement. Appellants' arguments otherwise are textually untenable, violate the rule against surplusage, and underscore the indeterminacy of these key terms. Meanwhile, Section 7.04's scienter requirements do nothing to cure this vagueness; not only is it unclear what mental states apply to which elements,

but annexing a mental state onto a vague term does not, by itself, make it any less vague.

Appellants' arguments that this suit is premature are similarly unconvincing. Pre-enforcement challenges are allowed to laws, like Section 7.04, that restrict a substantial amount of protected speech. Plaintiffs-Appellees have also shown that Section 7.04 is vague as applied to their activities, so as to permit their facial vagueness challenge, and that abstaining from adjudicating their claims would unjustifiably prolong the chilling of their constitutional rights.

Lastly, the District Court correctly concluded that the AG is not entitled to sovereign immunity. Extensive trial evidence reflects his statewide prosecutorial enforcement of election-related criminal laws, and he is currently involved in the prosecution of alleged Section 7.04 offenses. Appellants' standing arguments, which only rehash their sovereign immunity arguments, fail for the same reasons.

## ARGUMENT

### I.    SECTION 7.04 IS FACIALLY OVERBROAD

Section 7.04 is facially overbroad and violates the First Amendment because its "unconstitutional applications substantially outweigh its constitutional ones." *Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024). This follows from a "proper facial analysis," where "[t]he first step … is to assess the state laws' scope," and the second "is to decide which of the laws' applications violate the First Amendment,

and to measure them against the rest." *Id.* at 724-725. During this analysis, "a court should evaluate the ambiguous as well as the unambiguous scope of the enactment," because "ambiguous meanings cause citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.6 (1982) (cleaned up). "Regardless of whether [a law] is so vague that it violates the Fifth Amendment … ambiguities concerning the scope of its coverage [can] render it problematic for purposes of the First Amendment." *Reno v. ACLU*, 521 U.S. 844, 870 (1997).

Applying these rules, the District Court correctly concluded that Section 7.04 (1) regulates an expansive swath of core political speech; (2) has minimal constitutional applications to voter fraud or coercion; (3) fails to pass constitutional muster in its regulation of core political speech; and (4) is therefore facially overbroad because its unconstitutional applications substantially outweigh its constitutional ones. ROA.37548-37569.

## A.    Section 7.04 Sweeps In All Manner of Core Political Speech.

Section 7.04's scope is expansive, sweeping in all manner of "interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer*, 486 U.S. at 422. It imposes criminal liability on anyone who gives, offers, or receives "compensation or other benefit" in exchange for "in-person interaction" with a voter "in the physical presence of" a mail-ballot,

14

"intended to deliver votes for a specific candidate or measure." TEC § 276.015(b)-(c). This capacious reach is magnified by the ambiguous scope of terms like "compensation or other benefit", "in the physical presence of," and "intended to deliver votes for a specific candidate or measure."

Thus, as the District Court concluded, Section 7.04 is not "limited to instances of voter fraud or coercion" because it extends to "*interactions* rather than actual *delivery* of votes and imposes liability based on the *intent* of the voter outreach activity … rather than its actual effect on a voter." ROA.37557. And "'interaction' … very clearly encompasses *both* core political speech *and* voting assistance." ROA.37558. Additionally, as State-Appellants admit, Section 7.04 is ambiguous as to what mental state applies to Plaintiffs-Appellees' awareness that a ballot is present; it could even be recklessness. State Br. 23-24.

The trial record provides support for the following scenarios within Section 7.04's reach:

- OCA-GH hosts an AAPI candidate meet-and-greet, knowing that elderly limited English proficient community members frequently bring their mail-ballots to such events seeking language assistance. During the event a paid OCA-GH staffer urges the attendees to support AAPI candidates, or vote for a specific measure on the ballot.

  o Same facts, but the staffer sees community members carrying their mail-ballots before engaging in such advocacy.

  o Same facts, and the staffer provides mail-voting assistance to an attendee; the attendee chooses to vote for an AAPI candidate at the event, or the ballot measure OCA-GH endorsed.

15

- o Same scenarios, but instead of a paid staffer, a volunteer who is provided with a T-shirt in exchange for their work.

ROA.40197-40198, 40203-40204, 40209-40212, 40221-40222, 40224.

- LWVTX hosts a candidate forum staffed by volunteers in exchange for pens, stickers, or academic credit. Some attendees bring mail-ballots to fill out while listening to the candidates, or to ask for assistance. Only one invited candidate shows up, and/or volunteers hand out information about a LWVTX-endorsed ballot measure.

ROA.40106-40112, 40137.

- LUPE's paid staffers are canvassing door-to-door to advocate for a ballot measure. An elderly voter answers the door, holding their mail-ballot in anticipation of asking questions during the interaction.

    - o After hearing from the canvasser, the voter asks for and receives voting assistance, and fills out the ballot in favor of the measure.

- LUPE hosts a house meeting, or a union hall meeting, or one of its biannual colonias events, at which a paid staffer advocates for a ballot measure. It knows elderly community members have brought their mail-ballots, seeking assistance, to the event.

- All the same scenarios, but rather than a paid staffer, a volunteer whom LUPE provides with a T-shirt or a gas card in exchange for their efforts.

ROA.38573-38574, 38581, 38584-38587, 38599-38600, 38629-38630, 38632, 38655.

- Texas AFT's paid staffers are knocking on their members' doors to discuss AFT's candidate endorsements and to advocate in support of a ballot measure. An elderly voter has their mail-ballot with them during the interaction.

    - o Same facts, but a volunteer who AFT has provided with a gas or meal card in exchange for their efforts.

- Texas AFT retiree chapters, consisting of voters over 65, gather at an AFT location to mark their ballots together and turn them in as a group.

> A paid AFT staffer passing by reminds the group of the candidates and measures AFT has endorsed.

ROA.39434-39440.

None of these, or other scenarios supported by the record, ROA.37511-37519, 37524-37530, 37556-37560, involve the voter fraud or coercion Appellants claim the statute targets. GOP Br. 9; State Br. 27. Section 7.04 thus sweeps in vast amounts of core political speech.

Appellants insist that Section 7.04 reaches only "paid partisans … haranguing Texas citizens while they fill out their mail-ballots" or while "the ballot is immediately at hand," GOP Br. 9, 15, or "when the voter and the harvester get together" to review the ballot "and the harvester makes sure they check the right box," State Br. 27 (cleaned up). But the Legislature did not write a statute limited to those scenarios; instead, it encompasses all manner of "in-person interaction[s]" involving core political speech "in the physical presence" of a mail-ballot, whenever and wherever they occur. TEC § 276.015(b)-(c).

For example, Intervenor-Appellants suggest that Section 7.04 cannot apply to voting assistance because assistance "help[s] a voter effectuate *her own choice*." GOP Br. 34-35. As the District Court concluded, however, "[n]othing in the text of Section 7.04[] suggests that a voter who asks a canvasser for voting assistance while discussing a ballot measure begins a new, distinct 'interaction' that is no longer imbued with the canvasser's original intent." ROA.37558-37559.

Intervenor-Appellants also contend that Section 7.04 applies only "during the voting process" because it excludes interactions that do not "occur in the presence of the ballot or during the voting process." GOP Br. 18. That is self-evidently wrong. The exception's plain terms apply only to interactions that do not occur *either* "during the voting process" *or* "in the presence" of a ballot. TEC § 276.015(e)(2); *see* ROA.37560. An interaction that occurs 'in the physical presence' of a ballot (a constitutionally vague term, *infra* II.B), but not 'during the voting process,' is not excluded from Section 7.04's reach.

Similarly, Intervenor-Appellants propose that the statute's exclusion of interactions that do not "directly involve" a mail-ballot limits its reach to interactions where "a canvasser is *interacting with the mail-ballot—e.g.*, walking the voter through the ballot and urging them" to vote a certain way. GOP Br. 35 (citing TEC § 276.015(e)(3)). This reads an unwarranted limitation into the ordinary meaning of "directly involves." "Directly" means "[i]n a straightforward manner" or "[i]mmediately," *Directly*, BLACK'S LAW DICTIONARY (12th ed. 2024), or "in a direct manner," "in immediate physical contact," or "without delay : IMMEDIATELY," *Directly*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/directly (last visited Feb. 21, 2025). "Involve" means "to engage as a participant," "to have within or as part of itself : INCLUDE", or "to relate closely : CONNECT." *Involve*, MERRIAM-WEBSTER.COM,

https://www.merriam-webster.com/dictionary/involve (last visited Feb. 21, 2025).[3]

Thus, as a matter of ordinary language, an in-person interaction "directly involves" a mail-ballot whenever it straightforwardly or immediately includes, or is connected or related to, a mail-ballot. This comfortably encompasses in-person advocacy for a candidate or measure on the ballot, directed to a mail-voter, while in the physical presence of their mail-ballot.

Appellants finally argue that Plaintiffs-Appellees and the District Court offered only "farfetched hypothetical[s]" of chilled speech that are unlikely to be prosecuted. State Br. 39-40; GOP Br. 33-36. But the District Court's conclusions were predicated on extensive findings, ROA.37511-37519, 37524-37530, which it used to generate hypotheticals to aid it in "evaluat[ing] the full scope of the law's coverage," as required by the governing legal standard. *Moody*, 603 U.S. at 744; *NetChoice, L.L.C. v. Paxton*, 121 F.4th 494, 498-499 (5th Cir. 2024). Moreover, whether the government acts on any particular hypothetical application of Section 7.04's text is irrelevant. "[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*." *United States v. Stevens*, 559 U.S. 460, 480 (2010). Plaintiffs-Appellees cannot be forced to suffer the continued chilling of their protected speech by "an unconstitutional statute merely because the Government promise[s] to use it responsibly." *Id.*

---

[3] *Black's Law Dictionary* does not have a definition for "involve."

With no support for their interpretation in the actual *text* of Section 7.04, Appellants alternatively argue that the District Court was required to accept it as a limiting construction. State Br. 27; GOP Br. 35. But as the District Court concluded, Appellants' "proposed limiting constructions are unsupported" by Section 7.04's text. ROA.37562. Instead, reading it "as [Appellants] desire[] requires rewriting, not just reinterpretation." *Stevens*, 559 U.S. at 481; *see also* ROA.37563-37564; *City of El Cenizo v. Texas*, 890 F.3d 164, 182-183 (5th Cir. 2018). This Court should "decline to give it an additional extra-textual limiting construction in a frantic attempt to rescue it." *Serafine v. Branaman*, 810 F.3d 354, 369 (5th Cir. 2016).

### B. Section 7.04's Unconstitutional Applications Substantially Outweigh Its Constitutional Ones.

Turning to the next step in the overbreadth analysis, the District Court properly concluded that Section 7.04's constitutional applications to unprotected voter fraud or coercion are substantially outweighed by its unconstitutional applications to core political speech, where it is subject to and fails strict scrutiny. ROA.37548-37569. Texas may not "proscribe unprotected content through a regulation that simultaneously encompasses a substantial amount of protected content, judged in relation to the unprotected content." *Seals v. McBee*, 898 F.3d 587, 596 (5th Cir. 2018) (cleaned up).

### 1. Section 7.04 has minimal constitutional applications.

The District Court correctly concluded that Section 7.04 has minimal "legitimate applications to voter fraud or coercion," ROA.37569, which may be constitutionally regulated because they are unprotected by the First Amendment, ROA.37562; *see Stevens*, 559 U.S. at 468. Indeed, Appellants have failed to identify more than a "few alleged instances of misconduct in Texas" to which Section 7.04 might apply. ROA.37563. The Secretary's former Director of Elections agreed that Texas has "never had any evidence of a systemic statewide fraud" with mail-voting. ROA.42964-42966. The former Chief of the AG's Election Integrity Division agreed that the number of individuals prosecuted by his office represented a "very, very, very small fraction of a percent" of the voters in Texas. ROA.42540-42541. Local elections officials had next to no knowledge of any voter fraud occurring in Texas. ROA.38770, 39866-39867, 39806, 39366-39367, 39516-39517, 40057, 42390-42391, 42402-43403. And from 2002 to 2021, while nearly 87 million people voted in Texas, there were only 108 convictions or settlements of voter fraud, constituting "several 10 thousandths of one percent." ROA.41327-41329.

Appellants do not contest this scant evidence of Section 7.04's legitimate applications to voter fraud. Instead, they argue that Section 7.04 has additional lawful applications either because it satisfies strict scrutiny or because a more lenient

scrutiny applies and is met. State Br. 28-39; GOP Br. 16-40. As explained below, *infra* I.B.2, they are incorrect.

### 2. Section 7.04 has substantial unconstitutional applications.

By contrast, and as discussed already, Section 7.04 sweeps in a vast amount of core political speech. *Supra* I.A. Its regulation of such speech is unconstitutional because it is subject to and fails strict scrutiny. Thus, as the District Court concluded, both "from the text of" the statute "and from actual fact" adduced at trial, "a substantial number of instances exist in which [Section 7.04] cannot be applied constitutionally." *See N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 14 (1988); ROA.37569.

### a. Section 7.04's regulation of core political speech is subject to strict scrutiny.

Section 7.04's regulation of core political speech is subject to strict scrutiny both because it "singles out specific subject matter"— speech 'intended to deliver votes for a specific candidate or measure'—"for differential treatment," *Reed v. Town of Gilbert*, 576 U.S. 155, 169-171 (2015), and because it directly targets, and thus burdens, that core political speech, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). Strict scrutiny "requires the Government to prove that [Section 7.04] furthers a compelling interest and is narrowly tailored to achieve that interest." *See Reed*, 576 U.S. at 171 (cleaned up); *Citizen's United*, 558 U.S. at 340.

Appellants' differing position—that election-related rules burdening First Amendment rights are *always* subject to *Anderson-Burdick* balancing—is wrong. GOP Br. 21, State Br. 30-31.

The Supreme Court has instructed that while laws that "control the mechanics of the electoral process" (such as when and where to vote, or the format of the ballot) are subject to *Anderson-Burdick* review, "[w]hen a law burdens core political speech, [courts] apply 'exacting scrutiny,' and [should] uphold the restriction only if it is narrowly tailored to serve an overriding state interest." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345-347 (1995); *see id.* at 346 & n.10 (equating "exacting scrutiny" with "strict scrutiny").

Applying this precedent, the Third, Sixth, and Tenth Circuits recently rejected Appellants' exact argument. Instead, "[i]f the government is preventing a speaker from *saying* something (other than through the medium of casting a ballot for the party or candidate of their choice or by registering for a political party), even in the context of an election-related law, *Anderson-Burdick* balancing is inappropriate, and ordinary First Amendment standards apply." *See VoteAmerica v. Schwab*, 121 F.4th 822, 839-843 (10th Cir. 2024); *accord Lichtenstein v. Hargett*, 83 F.4th 575, 589-594 (6th Cir. 2023); *Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 136-143 (3d Cir. 2022).

Appellants misplace reliance to the contrary on *Voting for America Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013) and *Vote.Org v. Callanen*, 89 F.4th 459 (5th Cir. 2023). State Br. 30-31, GOP Br. 17-21.

In *Steen*, this Court held that Texas's regulations on voter deputy registrars ("VDRs") did not burden First Amendment rights because they "merely regulate[d] [who could engage in] the receipt and delivery of completed voter-registration applications, two non-expressive activities." 732 F.3d at 391. It nevertheless determined that even if these regulations *did* "implicate First Amendment interests, they pass[ed] the *Anderson/Burdick* balancing test" because VDRs are "carefully regulated ... agents of the state," who "serve the citizens who register to vote as well as the public interest in the integrity of the electoral body." *Id.* at 393. Because the challenged law regulated state actors in performing their duties, any burdened VDR speech was "qualitatively different" from "core political speech" aimed at "trying to persuade the voting public." *Id.* Instead, such speech was premised on the "mere mechanics of registration performed by VDRs." *Id.* at 395.

*Steen* is therefore consistent with the framework set out in *McIntyre*. Regulation of a VDR's official activities, as an agent of the State tasked with registering voters, is in essence a regulation on the mechanics of the electoral process, *not* a regulation of core political speech.

*Vote.Org* is no different. There the plaintiffs claimed that Texas's requirement of an original signature to register to vote by fax burdened the right to vote—a regulation readily categorized as governing the mechanical rules of the electoral process rather than a regulation of core political speech. *See* 89 F.4th at 468-469.

Unlike the challenged laws in *Steen* and *Vote.org*, Section 7.04 is a content-based restriction on core political speech that "prevent[s] a speaker from *saying* something." *See VoteAmerica*, 121 F.4th at 840 (cleaned up). It is therefore subject to "ordinary First Amendment standards"—here, strict scrutiny. *Id.*

### b. Section 7.04 fails strict scrutiny.

Section 7.04 fails strict scrutiny because it is not "narrowly tailored" to "further[ing] a compelling governmental interest." *See Reed*, 576 U.S. at 171; ROA.37561-37569. A law is narrowly tailored if it "actually advances the state's interest," "does not sweep too broadly," "is not underinclusive," and "is the least-restrictive alternative." *Dep't of Tex., Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*, ("*VFW*") 760 F.3d 427, 440 (5th Cir. 2014) (en banc) (citation omitted). Appellants carry the burden to prove that Section 7.04 satisfies strict scrutiny. *Id.* at 438.

### i. Section 7.04 does not advance the state's interests.

Appellants assert that Section 7.04 is narrowly tailored to advance compelling interests in the context of mail-voting: election integrity, free and secret voting, and

protecting from intimidation, confusion, or undue influence. State Br. 31-39; GOP Br. 14-15.

As the District Court correctly concluded, however, Appellants have failed to identify evidence demonstrating that these interests implicate "actual problem[s] in need of solving." ROA.37563 (citation omitted); *supra* I.B.1. But even if this Court accepts Appellants' proffered interests, and even if they are compelling "in the abstract," that does not mean that Section 7.04 "in fact advance[s]" them. *See Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994). "Broad prophylactic prohibitions that fail to respond precisely to the substantive problem which legitimately concerns the State" do not pass muster even under intermediate, let alone strict, scrutiny. *Rideout v. Gardner*, 838 F.3d 65, 72 (1st Cir. 2016) (cleaned up).

This is because Texas law already makes it an offense when a person:

- "[M]akes any effort to … influence the independent exercise of the vote of another in the presence of the ballot or during the voting process," TEC § 276.013(a);

- "Votes or attempts to vote a ballot belonging to another person," or "marks or attempts to mark ... another person's ballot" without their consent or specific direction, TEC § 64.012(a)(3)-(4); or

- While providing voting assistance, "prepares the voter's ballot in a way other than the way the voter directs or without direction from the voter," or "suggests by word, sign, or gesture how the voter should vote," TEC § 64.036(a)(2)-(3).

As the District Court concluded, "[t]he fact that these preexisting provisions target the very conduct purportedly regulated by [Section 7.04] indicate that" it is neither necessary to nor advances the government's interests. *See* ROA.37563; *VFW*, 760 F.3d at 441.

Appellants try to wedge daylight between these provisions and Section 7.04, but fail because the former cover all legitimately coercive scenarios. For instance, Appellants argue that 7.04 uniquely reaches "efforts to influence a voting decision," State Br. 38, or inducing (or attempting to induce) a voter to fill out their own ballot, or paid canvassers who do not provide voting assistance, GOP Br. 31-32. But these arguments ignore that Section 276.013 already prohibits 'any effort' to influence the exercise of the vote, not only "the exercise of the vote itself." State Br. 37-38. Further, Intervenor-Appellants' argument that Section 64.012 "does not require a paid canvasser" shows only that when both apply, Section 64.012 is *more* expansive than Section 7.04, GOP Br. 32, while State-Appellants' argument that Sections 64.012 and 64.036 are focused on voting assistance ignores that Section 7.04 also reaches voting assistance, State Br. 38. To the extent the State has an interest in harsher penalties for conduct already prohibited by these preexisting statutes, GOP

Br. 32, that interest would be narrowly served by increasing the existing penalties rather than creating an overbroad, unnecessary new speech restriction.[4]

Moreover, as the District Court noted, Appellants utterly fail to explain how Section 7.04 furthers their purported interests by preventing voters from choosing to "vote their ballot in the presence of canvassers for trusted community groups and advocacy organizations." ROA.37567.

### ii.    Section 7.04 is fatally underinclusive.

Section 7.04 is also "obvious[ly] underinclusive[]," an independent signifier that it is not narrowly tailored and fails strict scrutiny. *See VFW*, 760 F.3d at 441. The "sincerity of the State's interest," State Br. 37, cannot save a "woefully underinclusive" speech restriction. *Willey v. Harris Cty. Dist. Attorney*, 27 F.4th 1125, 1134 (5th Cir. 2022) (citation omitted).

Here, Section 7.04 prohibits speech intended to deliver votes for, but not against, a specific candidate or measure; says nothing about delivering votes for or against a political party; and applies only to paid, but not unpaid, advocacy. ROA.37567-37569. As the District Court concluded, "[i]t is unclear" why the speech Appellants say the statute targets "would be more tolerable" if intended to deliver

---

[4] *Snyder v. United States* does not say that "duplicative drafting" of statutory coverage is mundane in the context of strict scrutiny, GOP Br. 31; rather, it held that a statute's use of "rewarded" in addition to "influenced" addressed "gaps" in its coverage. 603 U.S. 1, 19 (2024). But preexisting Texas law does not leave any gaps, and *Snyder* did not involve strict scrutiny.

votes "*against* a particular candidate or measure," "*for or against a political party*," or when unpaid. ROA.37568. Thus, even if Section 7.04 advances the State's anti-fraud or anti-coercion interests to *some* extent, its underinclusiveness "reveal[s] that [it] does not actually advance" them to the degree needed to satisfy strict scrutiny. *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015); *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 105 (1979); *United States v. Grace*, 461 U.S. 171, 182-183 (1983). "[A] law cannot be regarded as protecting an interest of the highest order … when it leaves appreciable damage to that supposedly vital interest unprohibited." *Reed*, 576 U.S. at 172 (cleaned up).

Intervenor-Appellants respond that despite its plain language, Section 7.04 *does* extend to interactions intended to deliver votes *against* a specific candidate or measure because one of its exceptions says it "does not apply" to "activity that is not designed to deliver votes for or against a specific candidate or measure." GOP Br. 38-39 (citing TEC § 276.015(e)(5)). But an exception to a criminal offense cannot somehow expand the scope of the offense itself. And Section 7.04, on its face, applies only to interactions "intended to deliver votes *for* a specific candidate or measure." TEC § 276.015(a)(2) (emphasis added). It therefore does not apply to *any other interaction*—including those designed to deliver votes *against* a specific candidate or measure. The redundant and confusing nature of the exception may be

the result of imprecise drafting, but the statutory text must be applied "according to its terms." *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009) (citation omitted).

Intervenor-Appellants also contend that "advocating *against* a candidate or measure amounts to advocating *for* the candidate's opponent or the status quo," and that advocacy "for a political party's candidates … is advocacy for a candidate." GOP Br. 38-39. But a person who advocates against a candidate could encourage voters to sit out the election, or write-in a protest vote. Likewise, an anti-measure advocate may advocate against the status quo, or against voting at all. And not every election is a binary choice between two candidates; there are often third-party candidates and, in primary elections, frequently many different candidates. In these common scenarios, advocacy against one candidate does not always equate to advocacy for another specific candidate. One can also generally favor a political party without having a stance on a specific candidate and—in the context of a primary election in Texas, where candidates vie for party nominations—can also advocate for a party without advocating for a specific candidate (and vice versa).

Finally, Appellants claim that Section 7.04's failure to include unpaid attempts to deliver votes is justified because the Legislature "recognized that people *paid* to deliver votes … are more likely to apply pressure than those who are not." GOP Br. 39-40; State Br. 37. Nothing supports this claim; while State-Appellants provide two record cites, neither is relevant. State Br. 37. The first is testimony from

a legislative hearing regarding the importance of elections and does not discuss paid activities at all. ROA.48588-89. The second is an EA's testimony that hourly VDRs have "an incentive to bring more registration forms to impress the organization they [are] working for." ROA.39615-16. But that is irrelevant as to Section 7.04, which nowhere address VDRs.

On the contrary, the record shows that there is no "reason to think" that a person who is paid by a nonprofit organization to help voters "is more likely to engage in misbehavior than one that is not paid." *See* ROA.39357 (testimony from former Travis County clerk of 36 years); ROA.37575 ("Nothing in the trial record suggests that Plaintiffs[] or their members seek to defraud or intimidate voters.").

### iii. Section 7.04 sweeps too broadly and is not the least-restrictive alternative.

Even if Section 7.04 meaningfully advanced the State's proffered interests, it would still fail strict scrutiny because it "sweep[s] too broadly," and "could be replaced" by another regulation "that could advance the [State's proffered] interest[s] … with less infringement of speech." *VFW*, 760 F.3d at 440.

As the District Court concluded, "the legislature could have crafted language specifically targeting speech that is 'intended to defraud, confuse, unduly influence or deceive,'" and "rather than restricting speech whenever a ballot is merely 'present,' [Section 7.04] easily could have been limited to instances when a voter is actively completing their ballot." ROA.37564. It could also have targeted the "actual

31

*delivery* of votes" (a non-speech-based restriction) rather than "*interactions* with voters." ROA.37564.

Intervenor-Appellants claim "it is not even clear what would qualify" as "unduly influenc[ing]" or "confus[ing]" a voter, GOP Br. 37, but *those are the very terms they use* to define the interests that Section 7.04 purportedly serves, *id.* at 29 (preventing "confusion and undue influence"), as well as to make their own arguments, *see id.* at 40 (positing that a spousal discussion about voting their mail-ballots would not "be characterized by undue or unwelcome pressure" and thus "properly excluded" from Section 7.04). They also complain that the District Court's "actively completing" alternative would reduce Section 7.04's scope. *Id.* at 37-38. But these arguments merely confirm that Section 7.04, which contains no such limiting language, sweeps too broadly.

It is also irrelevant whether Plaintiffs-Appellees' speech has been chilled "*at all times or places*," GOP Br. 23-24, or whether alternative avenues for such speech exist, State Br. 38. Even if Plaintiffs-Appellees' speech had been "merely" burdened, *see id.*, "[t]he distinction between laws burdening and laws banning speech is but a matter of degree. The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 812 (2000). Appellants fail to carry their burden to satisfy that rigorous scrutiny.

#### iv. This outcome would not differ under *Anderson-Burdick*.

Although not applicable, Section 7.04 would also be unconstitutional under *Anderson-Burdick*. Under that test "laws that impose 'severe' burdens" on First Amendment rights "are subject to strict scrutiny." *Miller v. Nelson*, 116 F.4th 373, 379 (5th Cir. 2024) (citation omitted). Here, Section 7.04 imposes *criminal liability* for political speech. A more severe penalty is difficult to imagine. Accordingly, Section 7.04 would flunk *Anderson-Burdick* balancing for the same reasons it fails First Amendment strict scrutiny. *See, e.g.*, *Fish v. Schwab*, 957 F.3d 1105, 1132-1133 (10th Cir. 2020) (law that significantly burdened the right to vote was unconstitutional because there was no evidence that it was "necessary to burden voters' rights" to further state's "legitimate in the abstract" interest in preventing voter fraud).

### c. Appellants' attempts to analogize Section 7.04 to electioneering regulations are unconvincing.

Appellants argue that Section 7.04 can constitutionally regulate core political speech either because it is analogous to prohibitions on electioneering around polling places that sometimes survive strict scrutiny, or to prohibitions on electioneering in polling places that sometimes survive reasonableness review. GOP Br. 24-29; State Br. 32-35. These arguments fail.

As for the analogy to restrictions on electioneering around polling places, Appellants misplace reliance on *Burson v. Freeman*, 504 U.S. 191 (1992). State Br. 32; GOP Br. 29. In *Burson*, a plurality of the Court applied strict scrutiny to uphold a 100-foot prohibition on electioneering "around the voting area," on Election Day, to advance "the right to cast a ballot … free from … intimidation and fraud." 504 U.S. at 208-210. While Section 7.04 *could* have been narrowly drawn that way—linked directly to the act of voting—it was not. *Supra* I.B.2.b.iii. Moreover, the buffer zone in *Burson* imposed a clearly defined, "minor geographic limitation" on speech in traditional public forums —public parks, streets, and sidewalks. *Id.* at 196-197, 210. Appellants' theory here, in contrast, would let the State regulate core political speech in a vaguely-defined area surrounding a mail-ballot *anywhere* it goes, at any time—an outcome *Burson* explicitly rejected, explaining that beyond "some measurable distance from the polls ... governmental regulation of vote solicitation could effectively become an impermissible burden." *Id.* at 210. *Burson* was a "rare" case where a law satisfied strict scrutiny and where, unlike here, the limitation was well-defined, narrow, and grounded in a "long history, a substantial consensus, and simple common sense." *Id.* at 211. Section 7.04 is precisely the overreach that *Burson* warned against.

Appellants next analogize Section 7.04 to the restrictions on electioneering inside the polling place assessed in *Minnesota Voters Alliance v. Mansky*, 585 U.S.

1 (2018), but that argument fares no better. GOP Br. 24-28; State Br. 32-34. *Mansky* held that a polling place on Election Day "qualifies as a nonpublic forum"—a "government-controlled space[]" in which content-based restrictions on speech will be upheld if "reasonable in light of the purpose served by the forum." 585 U.S. at 11-13 (citation omitted). It applied this "distinct standard of review" to strike down Minnesota's ban on "political" apparel inside polling places, because the broadness of the term "political," combined with "haphazard interpretations the State ha[d] provided in official guidance and representations to the Court," made it impossible to "articulate some sensible basis" for what was prohibited. *Id.* at 12-17.

Appellants seize upon this reasoning to argue that the mail-ballot is a nonpublic forum around which the State may reasonably restrict political speech while the voter is completing the mail-ballot. GOP Br. 24-28; State Br. 32-34. This novel argument fails for at least four reasons.

*First*, as discussed, Section 7.04's applications extend far beyond the narrow circumstances when "ballots are being completed and cast." GOP Br. 25; *supra* I.A.

*Second*, although the *act* of voting was relevant to defining the governmental interests at stake in *Mansky* (and *Burson*), it was not what dictated the constitutional framework applicable to the restriction of speech in the area *around* that act. Rather, in both cases the Supreme Court determined what constitutional rule to apply by reference to the forum in which the voting occurred. Instead of applying this

principled analysis, Appellants assume that the mail-ballot transmogrifies settings within its "physical presence" into government-controlled nonpublic forums that are governed by the reasonableness test. But as the District Court concluded, this theory of an overriding and free-roaming zone of lesser First Amendment protection, where

> public parks and streets will vacillate from moment to moment between being traditional public forums and non-public forums designated for voting depending on whether a voter happens to be carrying or … casting a mail-ballot on the premises … fails as a matter of law and common sense.

ROA.37565-37566.

Intervenor-Appellants counter that this is "hardly unusual," given that buildings can shift into nonpublic forums when used as a polling place, GOP Br. 27, but this merely highlights the fundamental disconnect between the forums in *Burson* and *Mansky*—clearly-delineated, government-controlled physical spaces—and Appellants' theory of a moving bubble emanating from every mail-ballot, inside which the government may criminalize political speech between advocates and voters whenever and wherever it happens, irrespective of the participants' consent.

*Third*, even if mail-ballots constitute nonpublic forums, that means only that Texas may reasonably regulate speech *on* the mail-ballot, not *around* it. For example, even if "the ballot itself is a nonpublic forum," a law restricting voters from sharing images of their completed regular or mail-ballot—rather than "what a voter may write on [the] ballot"—is subject to strict scrutiny in its regulation of speech

that "occurs in forums that the government does not own or control." *Rideout v. Gardner*, 123 F. Supp. 3d 218, 220-221, 231 (D.N.H. 2015), *aff'd*, 838 F.3d 65 (1st Cir. 2016); *see also Coal. for Good Governance v. Kemp*, 558 F. Supp. 3d 1370, 1386 (N.D. Ga. 2021) (similar).[5]

*Fourth*, even if the nonpublic forum test applied, Section 7.04 would fail it due to the statute's breadth and vagueness, just as in *Mansky*. These deficiencies are compounded by the "haphazard interpretations the State has provided" in representations to the District Court. *See Mansky*, 585 U.S. at 16-17; ROA.37572. And because "even the State's top lawyers struggle" to articulate its sweep, Section 7.04 does not provide "some sensible basis for distinguishing" what is prohibited. *Mansky*, 585 U.S. at 16, 21; ROA.37572.

Finally, Intervenor-Appellants rely on *Flint v. Dennison*, 488 F.3d 816 (9th Cir. 2007) to suggest that elections *themselves* are nonpublic forums. GOP Br. 28.[6] Nothing supports this untethered assertion, and *Flint* is patently inapposite—it held that a university's campaign-spending limits for student office were reasonable

---

[5] *Oettle v. Guthrie* (GOP Br. 25-26), which upheld a ban on photographing completed ballots after determining it was a "content-based restriction of a nonpublic forum" (the ballot), is unpersuasive. *See* 189 N.E.3d 22, 25-28 (Ill. App. Ct. 2020). *Oettle* conflated expression *involving* the ballot with expression *on* it, *id.*, and that a ballot "is not a means through which a citizen traditionally expresses their political opinions," *id.* at 27, is irrelevant here because Section 7.04 does not regulate ballot-speech.

[6] *Oettle*, 189 N.E.3d at 27, says nothing about "recognizing elections are nonpublic fora." GOP Br. 28.

because that election was *unlike* governmental elections, which involve "the exercise of … political self-determination." 488 F.3d at 820.

***

In sum, Section 7.04's regulation of core political speech—the vast majority of its applications—is subject to and fails strict scrutiny, while it has minimal constitutional applications to unprotected voter fraud. Section 7.04 is facially overbroad in violation of the First Amendment.

## II.    SECTION 7.04 IS UNCONSTITUTIONALLY VAGUE

The District Court also correctly concluded that the terms "compensation or other benefit" and "physical presence" render Section 7.04 unconstitutionally vague because each "fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited" and "is so indefinite that it allows arbitrary and discriminatory enforcement." *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023) (citation omitted); ROA.37570-37575. This is doubly true for Section 7.04, to which a "more stringent vagueness test" applies, both because it "interferes with the right of free speech or of association," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010) (citation omitted), and because it imposes criminal penalties, *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018) (citation omitted).

## A.      "Compensation or Other Benefit" is Vague.

First, the District Court correctly concluded that "compensation or other benefit" is vague, such that Plaintiffs-Appellees cannot tell whether providing volunteers with "food, water, swag," or comparable items, in exchange for their advocacy work, is unlawful. ROA.37571.

State-Appellants respond that the ordinary meaning of *both* "compensation" and "benefit" is "some form of consideration offered in return for work," thereby excluding items not bargained for in a contract-like manner. State Br. 18-20. This argument is meritless.

To start, State-Appellants' duplicative interpretation violates the rule that courts must give "effect to each provision so that none is rendered … mere surplusage." *TIC Energy & Chem., Inc. v. Martin*, 498 S.W.3d 68, 74 (Tex. 2016).[7] More importantly, courts must "use definitions prescribed by the Legislature." *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008). Section 7.04 defines "benefit" as "*anything* reasonably regarded as a gain or advantage, including a promise or offer of employment, a political favor, or an official act of discretion." TEC § 276.015(a)(1) (emphasis added). This open-ended definition does little to lessen the "indeterminacy of precisely what" 'benefit' means. *See United States v.*

---

[7] "When interpreting Texas statutes, this court employs the same methods of statutory interpretation used by the Texas Supreme Court." *Ostrewich v. Tatum*, 72 F.4th 94, 99 (5th Cir. 2023) (cleaned up).

*Williams*, 553 U.S. 285, 306 (2008). And because the statute refers to "compensation *or* other benefit," it is "benefit" that circumscribes its reach, not "compensation." TEC § 276.015 (emphasis added).

Appellants attempt to skirt this expansive definition by invoking the *noscitur a sociis* canon to argue that "benefit" must be limited to things "like the accompanying examples" of employment, political favors, and official acts. State Br. 20, GOP Br. 41-42.

This argument fails because Texas's Code Construction Act, which applies to the TEC, dictates that "'[i]ncludes' and '[i]ncluding' are terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded." Tex. Gov't Code § 311.005(13); TEC § 1.003(a); *see, e.g.*, *Yowell v. Granite Operating Co.*, 620 S.W.3d 335, 350 (Tex. 2020) (applying rule to conclude that "applies to legal and equitable interests, including noncharitable gifts and trusts" did "not preclude … other types of legal and equitable interests").

Additionally, the Supreme Court has held that the term "any"—like 'anything' in the definition of 'benefit'—"suggests a broad meaning" that supersedes the *noscitur a sociis* canon. *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218-227 (2008). And, where "the general words precede the specifics … [a]nd where the specifics are preceded by the word 'including,'" it "'can serve the function of making doubly

sure that the broad (and intended-to-be-broad) general term is taken to include the specifics,'" meaning that it is not limited "*only* to" the types of examples listed. *United States v. Kidd*, 23 F.4th 781, 786 (8th Cir. 2022) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 204 (2012)).

The examples set out in its statutory definition thus set a floor for what *must* be considered a 'benefit,' not a ceiling for what *can* be considered a 'benefit.'

The vagueness of 'compensation or other benefit' is not merely a matter of interpretation; it was proven up at trial, including through the "divergent interpretations" given the term by the Secretary's former Director of Elections and the former Chief of the AG's Election Integrity Division, with the former stating that bus fare does not qualify, and the latter saying he would he would need to consult caselaw to know if bus fare or similar qualified. ROA.37572, 40413-40414, 42502-42503. The latter is particularly indicative of "[t]he 'opportunity for abuse, especially where a statute has … a virtually open-ended interpretation.'" *Serafine*, 810 F.3d at 368 (crediting similar testimony from chairman of state board) (quoting *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 576 (1987)).[8]

---

[8] State-Appellants cite *Rose v. Locke*, 423 U.S. 48, 50 (1975), to suggest that just because a lawyer needs to research a law to understand it does not render it vague. State Br. 22. But *Rose* limited that observation to statutes that do not "threaten[] a fundamental right such as freedom of speech." 423 U.S. at 50 n.3.

The District Court therefore correctly concluded that "compensation or other benefit" fails to give a reasonable person sufficient notice of "what is or is not permitted under the statute," and "impermissibly delegates basic policy matters to policemen, judges and juries for resolution on an ad hoc and subjective basis." ROA.37571-37573 (citation omitted).

**B.    "Physical Presence" is Vague.**

The District Court also correctly concluded that the undefined term "physical presence" is vague because "Plaintiffs[-Appellees] cannot tell … how physically proximate a ballot must be to a volunteer or employee" before Section 7.04 applies. ROA.37573.

In response, State-Appellants cherry-pick dictionary definitions to argue that "physical presence" is a "phrase commonly used across a variety of contexts to describe in-person interactions." State Br. 26.

This interpretation is most clearly wrong because it duplicates Section 7.04's already existing "in-person interaction" requirement. TEC § 276.015(a)(2). On top of that, State-Appellants elide unfavorable definitions of "physical" and "presence" from *Black's Law Dictionary*, which defines "physical" not only as "of, relating to, or involving someone's body," State Br. 26, but also as "[o]f, relating to, or involving material things; pertaining to real, tangible objects," *Physical*, BLACK'S LAW DICTIONARY (12th ed. 2024). *Merriam-Webster* supplies similar definitions;

"physical" means "of or relating to material things" or "of or relating to the body." *Physical*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/physical (last visited Feb. 21, 2025). The 'material things' meaning applies here given that Section 7.04 prohibits interactions in the physical presence *of a ballot*, not a person. TEC § 276.015(a)(2).

State-Appellants similarly omit that *Black's* defines "presence" not only as "[c]lose physical proximity coupled with awareness," State Br. 26, but also as "[t]he quality, state, or condition of being in a particular time and place." *Presence*, BLACK'S LAW DICTIONARY (12th ed. 2024). *Merriam-Webster* again supplies similar definitions: "the fact or condition of being present"; "the part of space within one's immediate vicinity"; or "one that is present: such as … the actual person or thing that is present" or "something present of a visible or concrete nature." *Presence*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/presence (last visited Feb. 21, 2025).

The actual ordinary meaning of 'in the physical presence of' a mail-ballot is therefore hopelessly indeterminate. It could mean that a ballot is materially present somewhere—*anywhere*—around the voter or canvasser, within their immediate vicinity, or visible or concretely present. Indeed, the Secretary's former Director of Elections testified that the Secretary had no position on how close a ballot must be before Section 7.04 applies; that five feet would "maybe" qualify, "[i]t just

depends"; and that a "ballot being within ten feet of a discussion" would "[a]lmost never" qualify, except he could "imagine" a scenario where it might. ROA.40426-40427. Either way, he conceded that "whether or not a prosecutor agrees … is a different story entirely." ROA.40427, 37574.

This vagueness is not ameliorated, as Intervenor-Appellants claim, by the fact that Section 7.04 only applies to interactions that "directly involve" a mail-ballot. GOP Br. 43.

*First*, as discussed, an in-person interaction "directly involves" a mail-ballot whenever it straightforwardly or immediately includes, or is connected or related to, a mail-ballot. *Supra* at 18-19. This does not narrow the reach of "physical presence."

*Second*, Intervenor-Appellants' hypotheticals do not illustrate "borderline applications" of the statute, but instead its indeterminacy. GOP Br. 43 (citing *United States v. Petrillo*, 332 U.S. 1, 7 (1947)). They assert that "urging a [voter] to support particular candidates or measures while the ballot is in another room" does not "'directly involve' the ballot," while the same interaction "when the ballot lies nearby on the entryway table is closer to the line," but "still unlikely" to qualify. GOP Br. 43 (cleaned up). But there is no intelligible reason that the former categorically does not 'directly involve' the ballot while the latter *might*. Nor would there be any need for equivocation if Appellants' interpretation of Section 7.04 were accurate—that it applies only to paid partisan pressure "while a voter is filling out

her mail-ballot or the ballot is immediately at hand." GOP Br. 15. Why would a difference of a few feet between the ballot in another room, versus on the entryway table, pose any difference under that interpretation? Similarly, why would it be the case that "[i]f a canvasser sees that the voter has a mail-ballot at hand, he can avoid liability by simply asking the voter to put her mail-ballot away?" GOP Br. 33. And how far 'away' would be sufficient? Section 7.04's indeterminate reach does not create "marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls," *Petrillo*, 332 U.S. at 7, but rather cases where it is not *possible* to make that determination without guesswork.

"[P]hysical presence" thus renders Section 7.04 vague because it fails to provide ordinary people with fair notice of the conduct it punishes and because it is "easy to see how" it would allow state officials to "arbitrarily discriminate in their enforcement of [Section 7.04]." ROA.37573-37575.

### C. Vague Terms Are Not Made Less Vague by a Scienter Requirement.

Appellants' final attempt to save "compensation or other benefit" and "physical presence" is to point to Section 7.04's scienter requirements. State Br. 23; GOP Br. 42. What mental state even applies to each term is unclear, *supra* at 4, but either way, annexing a mental state to otherwise vague terms "does not clarify what conduct" is prohibited. *Smith v. Goguen*, 415 U.S. 566, 580 (1974); *accord Nova Records, Inc. v. Sendak*, 706 F.2d 782, 789 (7th Cir. 1983); *United States v. Loy*, 237

F.3d 251, 265 (3d Cir. 2001) (collecting cases). As the District Court aptly put it, "a person's knowledge that there is a ballot in the vicinity still does not tell them whether they are violating the statute." ROA.37573.[9]

## III.  PLAINTIFFS-APPELLEES' CLAIMS ARE NOT PREMATURE

The District Court correctly rejected Appellants' arguments that Plaintiffs-Appellees' claims are premature. ROA.37509. Appellants re-raise those unconvincing arguments here, but all of them fail.

To start, Appellants suggest that Plaintiffs-Appellees cannot bring a pre-enforcement facial vagueness challenge in the absence of some unspecified greater quantum of evidence of Section 7.04's enforcement. State Br. 15-16; GOP Br. 48. But it is well-established that a plaintiff need not wait for an actual arrest or prosecution to challenge a law that chills their First Amendment rights. *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-161 (2014) (collecting cases).

Appellants' argument appears to be based on a misreading of *Hoffman Estates* for the idea that Plaintiffs-Appellees must establish that Section 7.04 is vague in *all* its applications. State Br. 16; GOP Br. 48-49. But *Hoffman Estates* said that where the law "involve[s] First Amendment freedoms," a plaintiff challenging it as facially vague need only establish that it "reaches a substantial amount of constitutionally

---

[9] This logic disposes of Intervenor-Appellants' argument that Section 7.04's requirement that a "benefit" be "reasonably regarded as a gain" somehow mitigates the vagueness of the term "benefit." GOP Br. 41 (citing TEC § 276.015(a)(1)).

protected conduct," not that it is vague "in all of its applications." *Hoffman Estates*, 455 U.S. at 494-495 & n.7. Moreover, the Supreme Court has found criminal statutes to be facially vague "even when [they] could conceivably have … some valid application" because "where a statue imposes criminal penalties, the standard of certainty is higher." *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983) (collecting cases). It has also clarified that vague provisions are not rendered constitutional "merely because there is some conduct that clearly falls within the provision's grasp." *Johnson v. United States*, 576 U.S. 591, 602-603 (2015). The vague-in-all-its-applications standard has no relevance here.

Next, contrary to State-Appellants' arguments (State Br. 17), Plaintiffs-Appellees have established that Section 7.04 is vague as applied by identifying desired conduct that, to determine if prohibited by the statute, would require applying the vague terms "compensation or other benefit" and "physical presence." *Supra* at 7-8; ROA.37542-37544.

Finally, this Court should reject Appellants' invitation to abstain from adjudicating Plaintiffs-Appellees' claims. GOP Br. 44; State Br. 26. Abstention is "the exception and not the rule," and the Supreme Court has "been particularly reluctant to abstain in cases" where, as here, "statutes are justifiably attacked on their face as abridging free expression." *City of Houston v. Hill*, 482 U.S. 451, 467 (1987) (cleaned up). Moreover, "it is difficult to imagine that the resolution" of Section

7.04's numerous constitutional infirmities "could be limited by anything less than a series of [state court] adjudications, and [its] chilling effect … on protected speech in the meantime would make such a case-by-case adjudication intolerable." *Jews for Jesus, Inc.*, 482 U.S. at 575-576.

## IV.   THE AG IS NOT ENTITLED TO SOVEREIGN IMMUNITY

The District Court correctly concluded, pursuant to *Ex parte Young*, that the AG is not entitled to sovereign immunity. ROA.37531-37537. Appellants' contrary arguments fail.

### A.      There Is No Sovereign Immunity Under the Governing Test.

"To be a proper defendant under *Ex parte Young*, a state official 'must have some connection with the enforcement of' the law being challenged." *Mi Familia Vota v. Ogg*, 105 F.4th 313, 325 (5th Cir. 2024) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)). This Court has enumerated three "guideposts to aid the decision" as to "what constitutes a sufficient connection to enforcement": whether the state official has (1) a "particular duty to enforce the statute in question"; (2) "a demonstrated willingness to exercise that duty"; and (3) through his conduct "compel[led] or constrain[ed persons] to obey the challenged law." *Id.* (cleaned up). The "particular duty to enforce the statute in question" may be satisfied by discretionary authority, such as that exercised by law enforcement. *See Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 786 (5th Cir. 2024). Ultimately, all

that is required is "some scintilla of affirmative action by the state official." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 401 (5th Cir. 2020) (cleaned up).

The District Court correctly applied these principles in concluding that the AG is not entitled to sovereign immunity. This is true even though the AG cannot *unilaterally* prosecute elections offenses following *State v. Stephens*, 663 S.W.3d 45 (Tex. Crim. App. 2021), because he affirmatively utilizes his remaining authority to participate in the prosecutorial enforcement of election-related offenses, including alleged violations of Section 7.04. This includes having his attorneys deputized, or appointed to act, as assistant county prosecutors. Tex. Gov't Code § 402.028; Tex. Code Crim. Pro. art. 2A.104. *See infra* at 51-52.

In response, State-Appellants stitch language from *Stephens* together with a citation to *Ostrewich v. Tatum* to argue that "because the [AG] 'cannot initiate the prosecution' of an election law 'unilaterally,'" State Br. 42 (quoting *Stephens*, 663 S.W.3d at 55), "he lacks the necessary enforcement connection to invoke *Ex parte Young*," *id.* (citing *Ostrewich v. Tatum*, 72 F.4th 94, 101 (5th Cir. 2023)). Neither *Stephens* nor *Ostrewich* stand for that proposition.

*Stephens* explained that the TEC's grant of unilateral prosecutorial authority to the AG violated the Texas Constitution in part *because* it was discretionary—had such prosecutions been "required by law," the grant might have been constitutional. 663 S.W.3d at 54-55. This meant the AG "can prosecute with the permission of the

local prosecutor but cannot initiate prosecution unilaterally." *Id.* at 55. *Ostrewich* recounted *Stephens'* reasoning to explain that the AG's "power related to election laws" is "limited" before proceeding to its actual holding: that his authority to investigate alleged election-related offenses, standing alone, does not overcome his sovereign immunity. 72 F.4th at 101-102. That is uncontroversial, since the authority to investigate (relating to the first guidepost) does not alone demonstrate a willingness to enforce (the second guidepost). But neither *Stephens* nor *Ostrewich* held that because the AG cannot unilaterally bring prosecutions, he can *never* have some connection to the enforcement of election-related offenses.

Moreover, in *Ostrewich* this Court did not have the benefit of a factual record or briefing regarding the AG's authority to *prosecute* election-related offenses post-*Stephens*, *see generally Ostrewich v. Tatum*, No. 21-20577 (5th Cir.), nor had the AG enforced the provisions at issue in that case within the previous decade, *see Ostrewich v. Hudspeth*, 2021 WL 4170135, at *3 (S.D. Tex. Sept. 14, 2021), *report and recommendation adopted*, 2021 WL 4480750 (S.D. Tex. Sept. 30, 2021).

*Ogg* adds little to this analysis. State Br. 42-43. *Ogg* held—consistent with *Ostrewich*—that a DA's authority to investigate did not indicate a willingness to enforce where she "attested that she [would] not attempt to enforce the challenged provisions" and had "taken no action" to do so. *See* 105 F.4th at 330-331.

The evidence in this case paints a far different picture than that seen in *Ostrewich* and *Ogg*. Specifically, the record shows that:

- The AG publicly maintains that one of his key priorities is to investigate and prosecute allegations of voter fraud. ROA.37520.

- Before and after *Stephens*, the AG has maintained an Election Integrity Unit (investigators) and an Election Integrity Division (prosecutors) who work together to investigate and prosecute election-related crimes, including allegations of "vote harvesting." ROA.42413-42416, 42551, 42549-42550, 42602, 65669-85; *see* State Br. 7 (prosecutions of vote harvesting are a central focus of the AG's). After *Stephens*, "vote harvesting," purportedly targeted by Section 7.04, remains "among the three most common elections-related allegations" that the AG pursues for prosecution. ROA.37536, 42425.

- The AG established a General Election Integrity Team for the November 2022 election and publicly stated he was "'prepared to take action against unlawful conduct where appropriate,' highlighting offenses related to 'vote harvesting.'" ROA.37521.

- The AG has opened at least one investigation, in Starr County, of alleged violations of Section 7.04. ROA.60376; ROA.37521

- Pre-*Stephens*, the AG had a "working relationship" with "the majority of counties where [he had] prosecuted cases," and "generally had some form of cooperation from" local prosecutors in the election-related prosecutions in which he was involved. ROA.42557-42560. Post-*Stephens*, he has continued these relationships, referring investigations to local prosecutors and successfully encouraging them to appoint his attorneys to prosecute alleged offenses. ROA.42552-42555, 42560-42561, 42565. In 2023 and 2024, this included having AG attorneys appointed or deputized to prosecute election-related offenses in Collin, Johnson, Crane, Randall, and Webb counties. ROA.42565-42569, 32187-32191,[10] *infra* n.11. Local prosecutors frequently seek these

---

[10] The District Court granted this request for judicial notice via text order on October 19, 2023.

collaborations because election-related cases are "political hot potato[es]." ROA.42557-42558.

Additionally, in 2022 the Frio County DA referred a Section 7.04 "vote harvesting" investigation to the AG's Election Integrity Unit, and in October 2024, deputized Geoff Barr, the current Director of the Election Integrity Division, ROA.42567-42568, as an assistant DA in that case.[11] As discussed, the Election Integrity Unit *investigates*, while the Election Integrity Division *prosecutes*, alleged election-related offenses. ROA.42413-42416, 42551, 42602.

---

[11] *Press Release, Attorney General Ken Paxton's Criminal Investigation Division Executes Search Warrants in Frio, Atascosa, and Bexar Counties in Ongoing Election Integrity Investigation*, TEXAS ATTORNEY GENERAL (Aug. 21, 2024), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxtons-criminal-investigation-division-executes-search-warrants-frio-atascosa (describing referral); @bradj_TX, X (Sept. 4, 2024, 10:39AM), https://x.com/bradj_TX/status/1831356448724455604 (reporting on search warrants); *OAG SW-Voter Fraud Investigation*, contributed by Brad Johnson, THE TEXAN (created on Sept. 4, 2024), https://www.documentcloud.org/documents/25090410-oag-sw-voter-fraud-investigation/ (search warrants showing investigation into alleged violations of TEC § 276.015); ACLUTX Records Request (Feb. 10, 2025) and Frio County Response (Feb. 12, 2025), https://www.aclutx.org/sites/default/files/21025_pia_request.pdf (producing same search warrants); *Texas Attorney General Records Regarding the Election Integrity Division*, AMERICAN OVERSIGHT (Feb. 4, 2025), https://americanoversight.org/featureddocument/texas-attorney-general-records-regarding-the-election-integrity-division/ (Frio County deputization of Geoff Barr and appointments in Crane, Randall, and Webb counties). This Court may judicially notice these facts. Fed. R. Evid. 201(d); *see Government of the Canal Zone v. Burjan*, 596 F.2d 690, 693-694 (5th Cir. 1979); *Huskey v. Jones*, 45 F.4th 827, 831 n.3 (5th Cir. 2022); *Witherspoon v. United States*, 838 F.2d 803, 805 (5th Cir. 1988); *Mobility Workx, LLC v. Unified Pats., LLC*, 15 F.4th 1146, 1151 (Fed. Cir. 2021).

These facts satisfy all three *Young* guideposts. The AG has (1) the duty to enforce Section 7.04, as shown by his authority to bring prosecutions in cooperation with local prosecutors; (2) a demonstrated willingness to exercise that duty, as shown by his statements, actions in pursuit of prosecution, and appointment of one of his attorneys to prosecute alleged Section 7.04 offenses; and (3) constrained Plaintiffs, through that enforcement, to obey Section 7.04. *See Ogg*, 105 F.4th at 325.

This case is not about whether the AG's investigatory authority, without more, constitutes some connection to the enforcement of Section 7.04, and this evidence goes well beyond enforcement of "*different* statutes under *different* circumstances," *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019), or "[s]peculation that [the AG] might be asked by a local prosecutor to 'assist'" with a prosecution, *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020). State Br. 43.[12] Moreover, the AG's long history of cooperation with local prosecutors refutes any suggestion that he can enforce Section 7.04 only by "exercis[ing] undue influence" over local prosecutors. State Br. 14 (citing *Ogg*, 105 F.4th at 331).

---

[12] State-Appellants misrely on *Twitter, Inc. v. Paxton*, 56 F.4th 1170 (9th Cir. 2022) and *Google, Inc. v. Hood*, 822 F.3d 212 (5th Cir. 2016), for their argument that "an investigation is, at most, a precursor to potential enforcement." State Br. 42-43. Here, the AG has demonstrated a willingness to enforce Section 7.04 beyond the investigatory stage.

Finally, it is no defense that the AG does not enforce Section 7.04 alone. That he "play[s] any role at all" is enough, *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014), and he "does not need to be [the] primary authority to enforce the challenged law," *281 Care Comm. v. Arneson*, 638 F.3d 621, 633 (8th Cir. 2011); *accord Matsumoto v. Labrador*, 122 F.4th 787, 803 (9th Cir. 2024); *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007). The Eighth Circuit has thus found *Young* satisfied where, as here, "the attorney general could only participate in a criminal proceeding if his assistance was requested by the assigned county attorney or the trial court asked him to sign indictments." *281 Care Comm.*, 638 F.3d at 633 (citation omitted).

## B.     The AG Is Precluded from Asserting Sovereign Immunity.

Even if the above were insufficient to overcome sovereign immunity, the District Court correctly concluded it "would be manifestly unfair," under the sword-and-shield doctrine, to credit the AG's immunity claim after he invoked the investigative privilege to withhold discovery that Plaintiffs-Appellees could have used to overcome that claim. ROA.37536 n.20 (citing *Willy v. Admin. Rev. Bd.*, 423 F.3d 483, 497 (5th Cir. 2005)). Appellants make no effort to rebut this conclusion. That Plaintiffs-Appellees must ask this Court to judicially notice the Section 7.04 Frio County case, which the AG started investigating in 2022, is consistent with the District Court's observation that he may have failed to produce such evidence based

on that privilege. ROA.37521 n.15. Thus, even if this Court finds that the AG would otherwise be entitled to immunity, it should not allow him to assert it here based on his unfair use of the investigative privilege as both sword and shield.

## V. PLAINTIFFS-APPELLEES HAVE STANDING

State-Appellants challenge Plaintiffs-Appellees' standing by reiterating their position that the AG does not enforce Section 7.04. State Br. 46-47. As discussed, however, that is wrong. And State-Appellants do not challenge that for standing in the First Amendment context, this Court "may *assume* a substantial threat of future enforcement absent compelling contrary evidence." *McCraw*, 90 F.4th at 782-783 (citation omitted). The District Court therefore correctly concluded that Plaintiffs-Appellees have standing. ROA.37537-37548.

## CONCLUSION

The District Court's judgment should be affirmed.

Dated: February 21, 2025.                    Respectfully submitted,

*/s/ Zachary Dolling*
Zachary Dolling
Sarah Chen
TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, TX 78741
(512) 474-5073
zachary@texascivilrightsproject.org
schen@texascivilrightsproject.org

Ashley Harris
Adriana Pinon

Thomas Buser-Clancy
Edgar Saldivar
Savannah Kumar
ACLU FOUNDATION
OF TEXAS, INC.
5225 Katy Freeway, Suite 350
Houston, TX 77007
(713) 942-8146
aharris@aclutx.org
apinon@aclutx.org
tbuser-clancy@aclutx.org
esaldivar@aclutx.org
skumar@aclutx.org

Christopher McGreal
DISABILITY RIGHTS TEXAS
2222 West Braker Lane
Austin, TX 78758-1024
(512) 454-4816
cmcgreal@drtx.org

Sophia Lin Lakin
Ari J. Savitzky
Dayton Campbell-Harris
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
(212) 284-7334
slakin@aclu.org
asavitzky@aclu.org
dcampbell-harris@aclu.org

Adriel I. Cepeda Derieux
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th Street NW
Washington, DC 20005
(202) 457-0800
acepedaderieux@aclu.org

Patrick Stegemoeller
ASIAN AMERICAN LEGAL
DEFENSE AND EDUCATION FUND
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 966-5932 (phone)
pstegemoeller@aaldef.org

Jessica Ring Amunson
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
(202) 639-6000
jamunson@jenner.com

*Counsel for OCA-Greater Houston
and League of Women Voters of
Texas*

# CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2025, a true and correct copy of the foregoing document was served on all counsel of record by filing with the Court's CM/ECF system.

*/s/ Zachary Dolling*
Zachary Dolling

# CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,000 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman) using Microsoft Word (the same program used to calculate the word count).

*/s/ Zachary Dolling*
Zachary Dolling