No. 24-50783

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

LA UNION DEL PUEBLO ENTERO, *et al.*,
*Plaintiffs-Appellees,*

v.

GREGORY W. ABBOTT, *et al.*,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Texas
(Case No. 5:21-CV-00844-XR)

## LULAC PLAINTIFFS-APPELLEES' RESPONSE BRIEF

Uzoma N. Nkwonta
Christopher D. Dodge
Julie Zuckerbrod
Marcos Mocine-McQueen
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
unkwonta@elias.law
cdodge@elias.law
jzuckerbrod@elias.law
mmcqueen@elias.law

*Counsel for Plaintiffs-Appellees LULAC Texas, Texas Alliance for
Retired Americans, Texas AFT, and Voto Latino*

# CERTIFICATE OF INTERESTED PERSONS

No. 24-50783

LA UNION DEL PUEBLO ENTERO, *et al.*,
*Plaintiffs-Appellees*,

v.

GREGORY W. ABBOTT, *et al.*,
*Defendants-Appellants*.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| **Plaintiffs-Appellees** | **Counsel** |
|---|---|
| <ul><li>LULAC Texas</li><li>Voto Latino</li><li>Texas Alliance for Retired Americans</li><li>Texas AFT</li></ul> | <ul><li>Uzoma N. Nkwonta</li><li>Christopher D. Dodge</li><li>Julie Zuckerbrod</li><li>Marcos Mocine-McQueen</li><li>Elena Rodriguez Armenta</li><li>Marisa O'Gara</li><li>Elias Law Group LLP</li></ul> |

| **Plaintiffs-Appellees** | **Counsel** |
|---|---|
| <ul><li>Friendship-West Baptist Church</li><li>Texas Impact</li><li>James Lewin</li></ul> | <ul><li>Zachary Tripp</li><li>Patrick A. Berry</li><li>Aaron J. Curtis</li><li>Charles Kyle Gehnrich</li><li>Jasleen K. Singh</li></ul> |

- Leah Tulin
- Brennan Center for Justice at NYU School of Law
- Paul Hastings LLP
- Weil, Gotshal, & Manges LLP

**Plaintiffs-Appellees**

- La Union Del Pueblo Entero
- Southwest Voter Registration Education Project
- Mexican American Bar Association of Texas
- Texas Hispanics Organized for Political Action
- JOLT Action
- William C. Velasquez Institute
- Fiel Houston, Inc.

**Counsel**

- Nina Perales
- Jason S. Kanterman
- Michael C. Keats
- Rebecca L. Martin
- Leah Tulin
- Elizabeth Ryan
- Brennan Center for Justice at NYU School of Law
- Mexican American Legal Defense and Educational Fund
- Fried, Frank, Harris, Shriver & Jacobson LLP
- Weil, Gotshal & Manges LLP

**Plaintiffs-Appellees**

- OCA-Greater Houston
- League of Women Voters of Texas

**Counsel**

- Zachary Dolling
- Jessica Ring Amunson
- Thomas Buser-Clancy
- Dayton Campbell-Harris
- Adriel I. Cepeda Derieux
- Sarah Xiyi Chen
- Ashley Harris
- Savannah Kumar
- Sophia Lin Lakin
- Christopher McGreal
- Adriana Cecilia Pinon
- Edgar Saldivar
- Ari Savitzky

- Patrick Stegemoeller
- Texas Civil Rights Project
- Jenner & Block LLP
- American Civil Liberties Union of Texas
- American Civil Liberties Union Foundation
- Disability Rights Texas
- Asian American Legal Defense & Education Fund

**Defendants-Appellants**

- Gregory W. Abbott
- Warren K. Paxton
- State of Texas
- Jane Nelson

**Counsel**

- Meagan Corser
- Mark A. Csoros
- Kathleen Theresa Hunker
- Kateland R. Jackson
- Ryan G. Kercher
- Aaron Lloyd Nielson
- William D. Wassdorf
- Office of the Texas Attorney General
- Office of the Texas Solicitor General

**Defendants-Appellants**

- Harris County Republican Party
- Dallas County Republican Party
- Republican National Committee
- National Republican Senatorial Committee
- National Republican Congressional Committee

**Counsel**

- John M. Gore
- Louis J. Capozzi , III
- Jones Day

| **Amici Curiae** | **Counsel** |
|---|---|
| ▪ Brian M. Middleton, District Attorney of Fort Bend County<br>▪ Joe D. Gonzales, Criminal District Attorney of Bexar County | ▪ Justin Carl Pfeiffer<br>▪ Law Office of Justin Pfeiffer, P.L.L.C. |

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta

*Counsel for Plaintiffs-Appellees LULAC Texas, Texas Alliance for Retired Americans, Texas AFT, and Voto Latino*

## STATEMENT REGARDING ORAL ARGUMENT

The LULAC Plaintiffs-Appellees do not object to oral argument if the Court believes it would be helpful to resolve this appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................i

STATEMENT REGARDING ORAL ARGUMENT ..................................v

TABLE OF AUTHORITIES...................................................................viii

INTRODUCTION....................................................................................1

JURISDICTIONAL STATEMENT .........................................................5

STATEMENT OF ISSUES ......................................................................5

STATEMENT OF THE CASE ..................................................................6

I. Texas enacted the canvassing ban after historic turnout by voters in the 2020 election. ...........................................................................6

II. The LULAC Plaintiffs scaled back their voter engagement efforts out of fear of prosecution under the canvassing ban.......................8

III. The district court held that the canvassing ban violates the First Amendment. ................................................................................11

SUMMARY OF ARGUMENT ................................................................12

STANDARD OF REVIEW ....................................................................18

ARGUMENT ........................................................................................18

I. The canvassing ban is an unconstitutional content-based restriction on core political speech.................................................18

A. The Court should apply strict scrutiny to the canvassing

ban. ................................................................................ 19

     1.   The *Anderson-Burdick* test does not apply to restrictions
        on core political speech. ......................................................21

     2.   The canvassing ban is not a proper time, place, and
        manner restriction. ............................................................29

  B.   The district court correctly concluded that the canvassing ban
     fails strict scrutiny. .................................................................36

  C.   Defendants' efforts to rewrite the canvassing ban to satisfy
     strict scrutiny fail. ...................................................................44

  D.   The canvassing ban is not a polling place restriction.............48

II.  Defendants' remaining timing and jurisdictional arguments lack
  merit or do not apply to LULAC Plaintiffs. ....................................51

  A.   LULAC Plaintiffs' challenge is not premature. .......................51

  B.   LULAC Plaintiffs did not sue State Defendants and thus face
     no sovereign immunity or standing bar.................................54

CONCLUSION ........................................................................56

CERTIFICATE OF ELECTRONIC SUBMISSION ...............................58

CERTIFICATE OF SERVICE ...............................................59

CERTIFICATE OF COMPLIANCE.......................................60

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Appliance Liquidation Outlet, L.L.C. v. Axis Supply Corp.*,
  105 F.4th 362 (5th Cir. 2024) ........................................... 18

*Ark. Educ. Television Comm'n v. Forbes*,
  523 U.S. 666 (1998) ........................................................ 30

*Babbitt v. United Farm Workers Nat'l Union*,
  442 U.S. 289 (1979) ........................................................ 53

*Boos v. Barry*,
  485 U.S. 312 (1988) ........................................................ 34

*Buckley v. Am. Const. L. Found., Inc.*,
  525 U.S. 182 (1999) .................................................... 22, 28

*Buckley v. Valeo*,
  424 U.S. 1 (1976) ........................................................... 21

*Burson v. Freeman*,
  504 U.S. 191 (1992) ...................................... 2, 3, 24, 32, 48, 49, 50

*Campbell v. Buckley*,
  203 F.3d 738 (10th Cir. 2000) ..................................... 13, 27

*Citizens United v. Fed. Election Comm'n*,
  558 U.S. 310 (2010) ...................... 13, 14, 20, 21, 36, 38, 52

*Flint v. Dennison*,
  488 F.3d 816 (9th Cir. 2007) ............................................ 33

*Fusaro v. Cogan*,
  930 F.3d 241 (4th Cir. 2019) ....................................... 13, 27

*Gahagan v. USCIS,*
 911 F.3d 298 (5th Cir. 2018)...........................................................28

*Int'l Soc. for Krishna Consciousness, Inc. v. Eaves,*
 601 F.2d 809 (5th Cir. 1979).....................................................53, 54

*Int'l Soc. for Krishna Consciousness, Inc. v. Lee,*
 505 U.S. 672 (1992) ........................................................................31

*Justice v. Hosemann,*
 771 F.3d 285 (5th Cir. 2014).....................................................16, 52

*Lewis v. Ascension Par. Sch. Bd.,*
 806 F.3d 344 (5th Cir. 2015)...........................................................18

*Lichtenstein v. Hargett,*
 83 F.4th 575 (6th Cir. 2023) .....................................................13, 27

*Mazo v. N.J. Sec'y of State,*
 54 F.4th 124 (3d Cir. 2022) ......................................................13, 27

*Mazo v. Way,*
 144 S. Ct. 76 (2023) .......................................................................13

*McCullen v. Coakley,*
 573 U.S. 464 (2014) .......................................................................30

*McIntyre v. Ohio Election Comm'n,*
 514 U.S. 334 (1995) ..................................................3, 13, 21, 22, 38

*Meyer v. Grant,*
 486 U.S. 414 (1988) ..........................................4, 18, 20, 22, 23, 24

*Meyers ex rel. Benzing v. Texas,*
 410 F.3d 236 (5th Cir. 2005)...........................................................55

*Mi Familia Vota v. Ogg,*
   105 F.4th 313 (5th Cir. 2024) ........................................ 17

*Minn. Voters Alliance v. Mansky,*
   585 U.S. 1 (2018) ..................... 2, 3, 14, 24, 29, 31, 32, 34, 35, 50, 54

*NAACP v. Button,*
   371 U.S. 415 (1963) ..................................................... 38

*Nat'l Press Photographers Ass'n v. McCraw,*
   90 F.4th 780 (5th Cir. 2024) ........................................... 53

*Oettle v. Guthrie,*
   189 N.E.3d 22 (Ill. App. Ct. 2020) .................................... 34

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n,*
   460 U.S. 37 (1983) ................................................. 29, 30

*R.A.V. v. City of St. Paul,*
   505 U.S. 377 (1992) ............................................ 36, 39, 41

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015) ........................................... 13, 20, 36

*Republican Party of Minn. v. White,*
   416 F.3d 738 (8th Cir. 2005) ........................................... 23

*Rollins v. Home Depot USA,*
   8 F.4th 393 (5th Cir. 2021) ............................................ 29

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
   515 U.S. 819 ( 1995) ................................................... 32

*Serafine v. Branaman,*
   810 F.3d 354 (5th Cir. 2016) ........................................ 5, 44

*Snyder v. United States,*
   603 U.S. 1 (2024) ...................................................... 39

*Speech First, Inc. v. Fenves,*
    979 F.3d 319 (5th Cir. 2020)........................................................52, 55

*Timmons v. Twin Cities Area New Party,*
    520 U.S. 351 (1997) ..........................................................................34

*United States v. Stevens,*
    559 U.S. 460 (2010) ...............................................................17, 44, 54

*Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n,*
    760 F.3d 427 (5th Cir. 2014)....................................21, 36, 41, 42, 43

*Vote.org v. Callanen,*
    89 F.4th 459 (5th Cir. 2023) ................................................26, 27, 28

*Voting for America, Inc. v. Steen,*
    732 F.3d 382 (5th Cir. 2013)......................................................25, 26

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) ..........................................................................30

## STATUTES

28 U.S.C. § 1292 ...........................................................................................5

28 U.S.C. § 1331 ...........................................................................................5

42 U.S.C. § 1983 ...........................................................................................5

Tex. Elec. Code § 276.013.................................7, 11, 12, 15, 37, 38, 40, 45

Tex. Elec. Code § 276.015.............1, 4, 7, 15, 16, 20, 30, 35, 40, 42, 45, 46

Tex. Elec. Code § 64.012....................................................8, 12, 15, 37, 39

Tex. Elec. Code § 64.036....................................................8, 12, 15, 37

Tex. Penal Code § 12.34 ...............................................................7

**OTHER AUTHORITIES**

FORUM, Black's Law Dictionary (12th ed. 2024) ...................................30

## INTRODUCTION

Shortly after the 2020 elections, Texas enacted a law that made it a felony to engage in speech "intended to deliver votes for a specific candidate or measure" while in the "physical presence" of a ballot, *if* the speaker received "compensation" or any "other benefit" in exchange. Tex. Elec. Code § 276.015 ("canvassing ban").[1] On its face, the canvassing ban is an unprecedented attack on the most sacred forms of expression protected by the First Amendment: it targets speech aimed at generating support for "a specific candidate or measure," *id.*, and it regulates discussions between voters and advocates in all corners of the state—from public parks, streets, and sidewalks to private living rooms and kitchen tables—as long a ballot is in the vicinity.

The Supreme Court has carved out several categories of speech restrictions that implicate core First Amendment protections and warrant the highest levels of scrutiny—and Texas's canvassing ban qualifies twice over: it restricts speech designed to secure political

_____

[1] In the interest of brevity, this brief refers to Tex. Elec. Code § 276.015 as the "canvassing ban." This is not intended to exclude any of the required elements including that the speech be for "compensation" or "other benefit" and involve the "physical presence" of a ballot.

change, and it is undeniably content-based. To survive a First Amendment challenge, then, Defendants were required to demonstrate that Texas's sweeping restriction is narrowly tailored to advance a compelling state interest. But after a six-week trial featuring extensive testimony about the canvassing ban's chilling effect on Plaintiffs and their members—and virtually no countervailing evidence demonstrating the necessity of sweeping restrictions on compensated canvassers—the district court correctly enjoined this unlawful prohibition on political speech.

Defendants—the Texas Attorney General, Secretary of State, and various Republican Party intervenors—fail to identify any error in the district court's factual findings or legal conclusions. They sidestep the dearth of evidence offered to justify the boundless restriction imposed by the canvassing ban and rely instead on inapt analogies to the Supreme Court's review of polling place regulations in *Burson v. Freeman*, 504 U.S. 191 (1992), and *Minnesota Voters Alliance v. Mansky*, 585 U.S. 1 (2018). But those cases merely highlight what was missing from Defendants' response below. While the Supreme Court surveyed the lengthy, well-documented history of intimidation and coercion as voters approached

the polling place, *Burson*, 504 U.S. at 201–06, *Mansky*, 585 U.S. at 6–8, Defendants offer little more than speculation and innuendo to justify a speech restriction that applies *anywhere* a mail ballot is present. And they ignore the Supreme Court's admonition that "[a]t some measurable distance from the polls, of course, governmental regulation of vote solicitation could effectively become an impermissible burden*." Burson*, 504 U.S. at 210.

These cases also undermine Defendants' attempt to lower their burden by insisting the *Anderson-Burdick* balancing test—reserved for challenges to laws that "control the mechanics of the electoral process," *McIntyre v. Ohio Election Comm'n*, 514 U.S. 334, 345 (1995)—applies to the canvassing ban. *Burson* and *Mansky* confronted restrictions on speech directed toward voters in the moments before they cast their ballots, yet in neither case did the Supreme Court apply the *Anderson-Burdick* test. And Defendants fail to distinguish this case from the Supreme Court's explicit rejection of similar attempts to conflate restrictions on core political speech with voting regulations. *See id.* (finding that *Anderson-Burdick* does not apply to "a regulation of pure speech" even in the election context).

Because the canvassing ban is a content-based restriction on core political speech—a point Defendants do not dispute on appeal—it is subject to strict scrutiny, and it collapses immediately under the weight of this standard. Most problematically, the canvassing restriction is not narrow in any sense. Although Defendants insist the canvassing ban was enacted to reduce instances of voter coercion, its broad terms make no mention of coercion and instead prohibit persuasion by disfavored speakers (those who receive compensation or other benefits) whenever a ballot is "presen[t]." Tex. Elec. Code § 276.015(a)(2). At the same time, it allows all others to engage in the exact same conduct without consequence. *Id.* If two canvassers, one paid and one unpaid, have identical conversations with the same voter on the same day sitting next to the same unopened mail ballot, the unpaid canvasser's conversation will be untouched by the ban while the paid canvasser will risk imprisonment for a felony. The law, in essence, restricts speech from disfavored speakers, while permitting all others to deliver the same message. *Meyer v. Grant*, 486 U.S. 414, 416 (1988) (finding that restrictions that applied only to paid petition circulators burdened their speech in violation of the First Amendment).

The district court properly enjoined the canvassing ban, and this Court should affirm. Defendants have failed to provide any reason why this Court should restore such sweeping prohibitions on political speech in the moments when the First Amendment "has its fullest and most urgent application." *Serafine v. Branaman*, 810 F.3d 354, 361 (5th Cir. 2016).

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over LULAC Plaintiffs' First Amendment claim under 42 U.S.C. § 1983 and 28 U.S.C. § 1331. This Court has jurisdiction over this appeal under 28 U.S.C. § 1292 to review the district court's permanent injunction. No party on appeal disputes that this Court—or the district court—had jurisdiction over the county district attorneys ("County DAs") sued by LULAC Plaintiffs.

## STATEMENT OF ISSUES

Whether S.B. 1's canvassing ban—which makes it a felony for some individuals to engage in speech "intended to deliver votes for a specific candidate or measure" if a ballot is physically "presen[t]"—violates the First Amendment to the United States Constitution.

## STATEMENT OF THE CASE

### I. Texas enacted the canvassing ban after historic turnout by voters in the 2020 election.

In 2020, Texans encountered unprecedented challenges while attempting to vote in the midst of a global health crisis. But due to the innovation of local election officials, many of whom worked diligently to ensure that Texans had meaningful opportunities to participate in the state's elections, a historic number of Texas voters made their voices heard in that year's general election, with the state's highest voter turnout in nearly 30 years. ROA.39661–68; ROA.41697.

The following year, the Texas Legislature rushed to adopt Senate Bill 1 ("S.B. 1"), an omnibus set of election rules and restrictions that prohibited many of the same voting procedures that Texas voters relied on when the state achieved record turnout in 2020. Among other restrictions, S.B. 1 eliminated drive-thru voting and 24-hour polling places, added additional requirements for applying to vote absentee, and criminalized efforts by public officials to encourage voters to submit absentee ballot applications. Election Integrity Protection Act of 2021, S.B. 1, 87th Leg., 2d Spec. Sess. (2021). The Legislature enacted these measures despite assurances from Keith Ingram, the state's then-

director of elections, that the state's elections were "in good shape" and the 2020 presidential election had been "smooth and secure." ROA.42965–66.

At issue in this appeal is S.B. 1's canvassing ban, which prohibits individuals from engaging in speech "with one or more voters, in the physical presence of" a mail ballot "in exchange for compensation or other benefit," if the communication was "intended to deliver votes for a specific candidate or measure." Tex. Elec. Code § 276.015. The term "benefit" is defined to include "anything reasonably regarded as a gain or advantage." *Id.* § 276.015(a)(1). The term "presence" is not defined at all. A violation of the canvassing ban is a felony punishable with imprisonment for up to 10 years, and a fine of up to $10,000. *See id.* § 276.015(f); Tex. Penal Code § 12.34.

The canvassing ban was not passed on a blank slate, as Texas already had a broad array of laws that prevent improper interference with the absentee voting process. For example, Texas already outlaws "any effort to influence the independent exercise of the vote of another in the presence of the ballot or during the voting process" regardless of whether the effort succeeds. Tex. Elec. Code § 276.013(a)(1). Similarly, it

is a crime to "vot[e] (or attempt[] to vote) a ballot belonging to another person" or to "attempt[] to mark any portion of another person's ballot without the consent of that person, or without specific direction from that person how to mark the ballot." *Id.* § 64.012. Texas law also prohibits those who may lawfully assist voters from "suggest[ing] by word, sign, or gesture how the voter should vote" or "prepar[ing] the voter's ballot in a way other than the way the voter directs or without direction from the voter." *Id.* § 64.036(a)(1), (3). At trial below, Defendants failed to identify even "*hypothetical* scenarios in which the Canvassing Restriction" could proscribe unlawful conduct in a way "not already accomplished by [these] other criminal provisions of the Election Code." ROA.37563.

## II.    The LULAC Plaintiffs scaled back their voter engagement efforts out of fear of prosecution under the canvassing ban.

Plaintiffs LULAC Texas, Texas Alliance for Retired Americans ("TARA"), and Texas AFT each operate in-person canvassing operations in pursuit of their respective missions. ROA.37515–17, 37528. Though the organizations are nonpartisan, they endorse individual candidates and take positions on ballot questions that relate to the issues they prioritize and causes they support. *Id.*; *see also* ROA.40155.

As part of their core activities, Plaintiffs engage with voters by setting up informational tables at public gatherings and by visiting members and constituents at their homes to encourage them to cast votes for candidates endorsed by the organizations and to support or oppose various ballot questions.[2] ROA.39434–36; ROA.40274. In doing so, the organizations often either rely on paid staff or provide volunteers with tokens of appreciation such as gift cards. ROA.39439–40; ROA.40270; ROA.40275; ROA.37515–17.

Recognizing that their voter outreach efforts were likely proscribed by the canvassing ban, the organizations sued the district attorneys of Travis, Dallas, Hidalgo, Harris, El Paso, and Bexar Counties to enjoin the ban's enforcement. ROA.6639–40.[3] They alleged the canvassing ban violates the First Amendment because it is a content-based restriction and a direct regulation of their core political speech. ROA.6695–98.

---

[2] All of these activities involve in-person interactions intended to persuade a voter to cast a ballot for an endorsed candidate or for or against a ballot measure. This brief refers to these types of interactions as "canvassing."

[3] LULAC Plaintiffs also named various county election administrators in their Complaint, but the district court dismissed their free speech claim as it pertained to those individuals. *See* ROA.37520 n.14.

Over a six-week trial, the district court heard unrefuted testimony that the canvassing ban chills LULAC Plaintiffs' canvassing efforts. ROA.37527–30 ¶¶ 80–86. For example, TARA's paid field organizer and long-time member ceased much of her in-person advocacy work because of the ban. ROA.37528 ¶ 82. She further explained that prior to the canvassing ban, she would attend community meetings "right up to and including election day," but now halts those activities in early October— just before absentee ballots are typically delivered—for fear of violating the new law, *id.*, thereby forgoing persuasion efforts near election day, during the period that TARA has found to be the most effective time to persuade voters, ROA.40276. Texas AFT's President described how his organization had to significantly scale back its paid block-walker program because of the canvassing ban. ROA.37529 ¶ 84. The organization has almost completely abandoned face-to-face canvassing— its primary mode of communicating with members before the ban. ROA.37529 ¶ 85; ROA.39434; ROA.39438. It has attempted to fill this void with communications via phone and text messaging, but these arms-length interactions have proven significantly less effective than the in-person canvassing AFT has largely abandoned. ROA.39440–41.

**III. The district court held that the canvassing ban violates the First Amendment.**

In a thorough decision backed by substantial and undisputed trial evidence, the district court held that the canvassing ban violates the First Amendment and permanently enjoined the County DAs, among others, from enforcing the law. ROA.37580–81. The district court first found that the canvassing ban's broad and ambiguous text "chilled Plaintiffs' willingness to conduct" routine voter engagement activities. ROA.37527–29. It next concluded that, because the canvassing ban is both content-based and restricts "core political speech," it is subject to strict scrutiny. ROA.37550–52. The court rejected Defendants' plea to apply the *Anderson-Burdick* balancing test because the canvassing ban did not "control the mechanics of the electoral process," and was instead a "regulation of pure speech." ROA.37552–55 (citation omitted).

Applying strict scrutiny, the court concluded that the canvassing ban did not advance the state's asserted interest in preventing "citizens from being 'harangued' while they fill out their mail ballots," because the restriction is entirely redundant with existing statutes that target the same conduct, including criminal prohibitions on (1) efforts to influence another person's vote in the presence of a ballot, Tex. Elec. Code §

276.013; (2) voting or marking another person's ballot without their consent, *id.* § 64.012; and (3) suggesting how a voter should vote while providing them assistance, *id.* § 64.036; *see also* ROA.37562–63. The court also determined that the canvassing ban "sweeps too broadly," extending its reach beyond simply "haranguing voters" to prohibit "vast swaths of protected First Amendment activity" ROA.37564 (cleaned up).

The district court enjoined the County DAs, the Attorney General, and the Secretary from "implementing, enforcing, or giving any effect to" the canvassing ban. ROA.37580. None of the County DAs appealed or sought to stay the injunction. Only the Texas Secretary of State and Attorney General ("State Defendants")—joined by various Republican Party intervenors ("the RNC")—have appealed. And while this Court granted those parties' request for a stay pending appeal on October 10, 2024, the motions panel's decision was based entirely on concerns about altering the law when the November election was imminent. Stay Order at 3–4, Doc. 112.

## SUMMARY OF ARGUMENT

The canvassing ban is an unconstitutional infringement on Plaintiffs' free speech rights. The ban is subject to strict scrutiny both

because it is a content-based speech restriction, *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015), and because it burdens core political speech, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010).

The district court correctly declined Defendants' invitation to apply the *Anderson-Burdick* test to the canvassing ban's "regulation of pure speech." ROA.37552–55. The Supreme Court has made clear that *Anderson-Burdick* governs regulations that "control the mechanics of the electoral process," *McIntyre*, 514 U.S. at 345, and does not apply to "a regulation of pure speech" even in the election context. *Id.* Several circuits have applied that precedent to reject similar arguments that *Anderson-Burdick* should be applied to restrictions on core political speech in the elections process. *See, e.g.*, *Lichtenstein v. Hargett*, 83 F.4th 575, 593 (6th Cir. 2023); *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 138, 142 (3d Cir. 2022), *cert. denied sub nom. Mazo v. Way*, 144 S. Ct. 76 (2023); *Fusaro v. Cogan*, 930 F.3d 241, 258 (4th Cir. 2019); *Campbell v. Buckley*, 203 F.3d 738, 745 (10th Cir. 2000).

The RNC's argument—raised for the first time in this appeal—that the canvassing ban can be upheld as a reasonable time, place, and manner restriction in a nonpublic forum distorts the Supreme Court's

forum analysis beyond recognition. A restriction on speech implicates the Supreme Court's forum-based approach when it "applies . . . in a specific location." *Mansky*, 585 U.S. at 11. The canvassing ban, however, applies in an unlimited number of public and private spaces—from streets and sidewalks to dinner tables and living rooms. The RNC's observation that forum analysis can apply to "metaphysical" spaces does not change the fact that there is no discernible forum here. In any event, a forum analysis would not save the canvassing ban because content-based restrictions in a public forum are subject to strict scrutiny. And the RNC's attempt to treat all undefined areas surrounding a mail ballot as government-controlled spaces traditionally closed to the public ignores the characteristics the Supreme Court has found to be indicative of a nonpublic forum. *See id.* at 12.

Because strict scrutiny applies, the canvassing ban must be narrowly tailored to advance a compelling government interest. *See Citizens United*, 558 U.S. at 340. The district court correctly concluded that it is not. ROA.37563–69. Although Defendants point to an array of interests, they nowhere explain how the canvassing ban *advances* those interests, especially considering Texas's preexisting criminal provisions

that prohibit the very conduct the ban purportedly guards against. *See* Tex. Elec. Code § 276.013(a)(1) (unduly influencing a person's vote); *id.* § 64.012(a)(3) (voting or attempting to vote another person's ballot); *id.* § 64.036 (suggesting how the voter should vote while providing ballot assistance). Defendants fail to identify even a *theoretical* scenario where the canvassing ban could reach improper conduct not already proscribed by current Texas law.

The canvassing ban is also not narrow in any sense. Its broad terms prohibit voter persuasion by certain disfavored speakers whenever a ballot is "presen[t]," *id.* § 276.015(a)(2), effectively treating the *entirety of Texas* as a polling place where conversations about candidates and issues risk criminal liability. Defendants have no answer to the district court's conclusion that "rather than restricting speech whenever a ballot is merely 'present,' the restriction at issue easily could have been limited to instances when a voter is actively completing their ballot." ROA.37564. Instead, they rely on their own post-hoc redrafting of the canvassing ban to pass it off as narrow.

In any event, each of their efforts to rewrite the canvassing ban to satisfy strict scrutiny fails. Defendants assert that the canvassing ban

applies only while a voter is filling out their ballot, but the ban's plain text prohibits speech intended to persuade a voter if they are simply "in the physical presence of an official ballot or a ballot voted by mail," Tex. Elec. Code § 276.015(a)(2). Even where Defendants acknowledge that a ballot's mere physical "presence" is sufficient to trigger the canvassing ban's speech restrictions, they cannot agree on precisely how "present" a ballot must be. That is because the term "physical presence" is left undefined, leaving speakers to guess whether they are close enough to a ballot to be at risk of up to a decade in prison. And while Defendants rely heavily on the testimony of a single witness—former Director of Elections Keith Ingram—to give the canvassing ban more defined contours, Ingram himself repeatedly disclaimed any precise definition of "physical presence," admitting it would require a case-by-case determination. *See* ROA.40427; *see also* ROA.40426.

Defendants' remaining timing and jurisdictional arguments are mere distractions. LULAC Plaintiffs' free speech claim is not premature; as the district court found, their speech has *already* been chilled—and continues to be chilled—by the canvassing ban. ROA.37527–30; *see also Justice v. Hosemann*, 771 F.3d 285, 294 (5th Cir. 2014). The RNC is also

wrong to suggest that the Court must construe the canvassing ban in a manner that preserves its constitutionality. Because Defendants have failed to identify any limiting construction that would be consistent with the canvassing ban's text, imposing a limiting construction would require the Court to impermissibly rewrite the law entirely. *See United States v. Stevens*, 559 U.S. 460, 481 (2010) (courts may not "rewrite a . . . law to conform it to constitutional requirements").

Finally, State Defendants' argument that the district court lacked jurisdiction to enjoin them as state officials has no force against LULAC Plaintiffs, who bring their claim against individual County DAs. The County DAs did not assert sovereign immunity.[4] And LULAC Plaintiffs plainly have standing to sue the County DAs who stipulated that they will enforce the canvassing ban absent an injunction in this case. ROA.37523 ¶ 64. This substantial threat of prosecution has chilled LULAC Plaintiffs' speech, ROA.37542–44, which Defendants do not dispute.

---

[4] The Harris County District Attorney alone asserted sovereign immunity. The district court dismissed all constitutional claims against her following this Court's ruling in *Mi Familia Vota v. Ogg*, 105 F.4th 313 (5th Cir. 2024). The remaining district attorneys have not asserted sovereign immunity.

At bottom, the canvassing ban is an impermissibly broad restriction on core political speech, and Defendants have failed at every turn to explain how it is narrowly tailored to advance any compelling state interest. This Court should thus affirm the district court's conclusion that the ban violates Plaintiffs' First Amendment rights.

## STANDARD OF REVIEW

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed de novo." *Lewis v. Ascension Par. Sch. Bd.*, 806 F.3d 344, 353 (5th Cir. 2015) (quotation omitted). Clear error review means the Court "may not set those findings aside unless [it is] left with the definite and firm conviction that a mistake has been committed." *Appliance Liquidation Outlet, L.L.C. v. Axis Supply Corp.*, 105 F.4th 362, 374 (5th Cir. 2024) (quotation omitted).

## ARGUMENT

### I. The canvassing ban is an unconstitutional content-based restriction on core political speech.

The canvassing ban prohibits speech designed to persuade voters— precisely the sort of communication "for which First Amendment protection is at its zenith." *Meyer*, 486 U.S. at 414. Recognizing that the

canvassing ban was both a content-based restriction and also a restriction on "core political speech," the district court could only apply strict scrutiny. And the district court correctly declined to supplant the governing standard with the *Anderson-Burdick* test—which governs only regulations that control the mechanics of voting, ROA.37552–55—or the time, place, and manner test, which cannot reach a broad restriction that is not confined to any government-controlled forum but instead vacillates from one location to the next depending on whether a mail ballot is "present."

Applying the appropriate standard, the canvassing ban quickly unravels because its broad restriction on political speech does not advance any compelling interest, is both over- and under-inclusive, and merely duplicates existing laws that prevent the purported harm the ban purportedly seeks to address. The district court's ruling should be affirmed.

A. **The Court should apply strict scrutiny to the canvassing ban.**

Under the Supreme Court's well settled precedents, the canvassing ban is subject to strict scrutiny for two independent reasons: it is a

content-based speech restriction, *Reed*, 576 U.S. at 163–64, and it burdens core political speech, *Citizens United*, 558 U.S. at 340.

As the district court recognized, the canvassing ban "is content based because it 'single[s] out specific subject matter'—speech intended to deliver votes for a specific candidate or measure—'for differential treatment.'" ROA.37551 (quoting *City of Austin v. Reagan Nat'l Advert. of Austin*, 596 U.S. 61, 69 (2022)); *see also Reed*, 576 U.S. at 169. No other category of speech is targeted for similar disfavored treatment. *SEIU v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010) (holding that content-based regulations are those that distinguish between "favored" and "disfavored speech" (quotation omitted)). Such content-based regulations are presumptively invalid unless they satisfy strict scrutiny. *See Reed*, 576 U.S. at 163.

The canvassing ban is also a *paradigmatic* restriction on core political speech. It targets speech "intended to deliver votes for a specific candidate or measure," Tex. Elec. Code § 276.015(a)(2), which is precisely the sort of "interactive communication concerning political change" that sits at the heart of the First Amendment's protections. *Meyer*, 486 U.S. at 421–22. Because "[d]iscussion of public issues and debate on the

qualifications of candidates are integral to the operation of the system of government established by our Constitution," *Buckley v. Valeo,* 424 U.S. 1, 14 (1976), laws that restrict such political speech receive the strictest scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United*, 558 U.S. at 340 (cleaned up); *Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 438 (5th Cir. 2014) (same).

## 1. The *Anderson-Burdick* test does not apply to restrictions on core political speech.

The district court correctly rejected Defendants' attempt to ratchet down the degree of scrutiny applied to the canvassing ban. Br. for State Defendants-Appellants at 29–31, Doc. 148 ("State Br."); Br. of Intervenor-Appellants at 17–24, Doc. 150 ("RNC Br."). While Defendants seek to rebrand the canvassing ban as a mere "election rule" subject to *Anderson-Burdick*'s balancing framework, State Br. at 29–31; RNC Br. at 17, the Supreme Court has rejected similar attempts to conflate restrictions on core political speech with regulations that "control the mechanics of the electoral process," *McIntyre*, 514 U.S. at 345, and held that *Anderson-Burdick* simply does not apply to "a regulation of pure speech" even in

the election context, *id.* at 344–45 (rejecting the *Anderson-Burdick* standard in challenge to state law restriction on distributing pamphlets). As Justice Thomas once explained:

> When a State's election law directly regulates core political speech, we have always subjected the challenged restriction to strict scrutiny and required that the legislation be narrowly tailored to serve a compelling governmental interest.

*Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 207 (1999) (Thomas, J., concurring). To hold otherwise would perversely result in *less* protection for political speech in the election context—where "the importance of First Amendment protections" is at its "zenith," *Meyer*, 486 U.S. at 425, and where the "First Amendment affords the broadest protection," *McIntyre*, 514 U.S. at 346.

Defendants' argument would shrink the First Amendment to such a degree that it would virtually disappear within sight of an election, but the Supreme Court has made clear that it does not. In *McIntyre*, for instance, the challenged restriction applied exclusively to "campaign literature" that, like the canvassing targeted here, "was designed to influence voters in an election," but the Supreme Court did not hesitate to apply strict scrutiny. *Id.* at 345. It did not matter that the restriction involved electoral literature; the Court held that *Anderson-Burdick*

simply "does not apply" when, as here, the restriction is a "regulation of pure speech." *Id.* And in *Meyer*, the Supreme Court applied strict scrutiny to a law prohibiting paid canvassers from circulating initiative petitions to registered voters. 486 U.S. at 416–17, 424. The challenged law "involve[d] both the expression of a desire for political change and a discussion of the merits of the proposed change," and thus, the Supreme Court applied rigorous scrutiny. *Id.* at 421.

The RNC attempts to distinguish *Meyer* and *McIntyre* based on the alleged *breadth* of the law in question, and the fact that the canvassing ban does not prohibit speech "at all times and places," RNC Br. at 23, but it never explains why such a distinction would alter the level of scrutiny applied to a content-based restriction on political speech. *Cf. Republican Party of Minn. v. White*, 416 F.3d 738, 749 (8th Cir. 2005) (because "[p]olitical speech" is "at the core of the First Amendment," "strict scrutiny is applied to *any* regulation that would curtail it") (emphasis added). Considerations about the scope of a law speak, at most, to whether it is properly tailored, not whether the speech it impacts is entitled to *less* First Amendment protection. And like the prohibition in *Meyer*, the canvassing ban results in less protected speech overall, not

least of all because in restricting advocacy by anyone who receives any form of compensation, it "limits the number of voices who will convey [the organizations'] message . . . and, therefore, limits the size of the audience they can reach." *Meyer*, 486 U.S. at 422–23.

Even the cases on which Defendants rely to defend the constitutionality of the canvassing ban do not endorse Defendants' proposed standard. *See Burson*, 504 U.S. at 198; *see also Mansky*, 585 U.S. at 11, 13. *Burson* and *Mansky* both involved speech restrictions at polling places while voters were *lining up to cast their ballots*— quintessential parts of the "election context." Yet neither applied the *Anderson-Burdick* framework. *See Burson*, 504 U.S. at 198 (subjecting restriction on speech within 100 feet of polling places to strict scrutiny); *Mansky*, 585 U.S. at 11, 13 (evaluating speech restriction within a polling place under the nonpublic forum standard, but noting that in public forums, restrictions "based on content must satisfy strict scrutiny"). That is especially significant considering *Mansky* was decided in 2018—when the *Anderson-Burdick* standard had been firmly established in the Court's jurisprudence for decades. Defendants' argument thus assumes

that the Supreme Court simply overlooked the standard it created for evaluating election rules—this Court should not accept that premise.

Unable to locate their theory in any Supreme Court precedent, Defendants are left to twist this Court's caselaw. RNC Br. at 21; State Br. at 30–31. They rely most heavily on *Voting for America, Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013), which they misread. *Steen* concerned provisions that "regulate[d] the appointment and activities of volunteer deputy registrars ('VDRs')," who are "individuals trained and empowered" by Texas to collect "and deliver completed voter registration applications." *Id.* at 385. VDRs play a "carefully regulated" role in the administration of elections in Texas and act *on behalf of the state* "to serve the citizens who register to vote as well as the public interest in the integrity of the electoral body." *Id.* at 393.

The Court in *Steen* carefully distinguished regulations governing state-regulated actors—who were required to perform the ministerial task of returning completed applications to registrars—from laws governing speech meant to "further[] [the speakers'] own or th[eir] sponsors' advocacy." *Id.* at 393. Unlike the VDRs at issue, the Court explained, "[p]etition circulators, in contrast, are not agents of the state."

*Id.* (citing *Buckley*, 525 U.S. at 192 n.11). *Steen* thus expressly did not concern restrictions on "core political speech" where "advocates are trying to persuade the voting public to consider supporting an initiative or . . . a candidate." *Id.* In contrast, the rule challenged here *does* burden the canvasser's "own or the[ir] sponsor's advocacy." *Id.* at 393. And *Steen* itself recognized that "the character of any speech" limitations on VDRs is "qualitatively different from the political speech restricted by" laws like the canvassing ban, which impedes LULAC Plaintiffs' advocacy. *Id.*; *see also* ROA.37527–30.

Defendants also lean heavily on *Vote.org v. Callanen*, 89 F.4th 459 (5th Cir. 2023), but that was not a political speech case at all. No party in *Callanen* alleged that the election rule at issue—a requirement to sign certain voter registration papers with a wet ink, rather than a digital or electronic signature—burdened core political speech by advocates. The plaintiff in *Callanen* instead alleged this election rule violated "the Civil Rights Act of 1964 and the First and Fourteenth Amendments' ban on imposing undue burdens on *the right to vote.*" *Id.* at 467 (emphasis added). In other words, that case concerned precisely the sort of mechanical election rule where the *Anderson-Burdick* balancing

framework applies. This Court dutifully applied that standard to plaintiff's "undue burden[] on the right to vote" claim. *Id.* at 467. That decision offers no precedent or analysis on the sort of standalone First Amendment claim at issue here.

Defendants' strained reading of these cases also risks bringing this Circuit into conflict with its sister circuits that have rejected similar efforts to mask speech restrictions as mere election regulation. Among them, the Sixth Circuit found that the Supreme Court has "applied strict scrutiny—not *Anderson-Burdick* balancing—to many election laws" that "target expression." *Lichtenstein*, 83 F.4th at 593 (collecting cases). And the Third Circuit held that *Anderson-Burdick* applies only to laws that "primarily regulate the mechanics of the electoral process, as opposed to core political speech," and not to laws "that are primarily directed at regulating 'pure speech'" like the one here. *Mazo*, 54 F.4th at 138, 142 (quoting *McIntyre*, 514 U.S. at 345). Other circuits have reached similar conclusions. *See, e.g.*, *Fusaro*, 930 F.3d at 258 (Fourth Circuit observing the Supreme Court has "distinguished between laws that . . . regulate 'pure speech,'" and those subject to *Anderson-Burdick*); *Campbell*, 203 F.3d at 745 (Tenth Circuit recognizing "strict scrutiny," rather than

*Anderson-Burdick*, "is applied where the government restricts the overall quantum of speech available to the election or voting process"). As have district courts in this Circuit. *See, e.g.*, *Cotham v. Garza*, 905 F. Supp. 389, 396 (S.D. Tex. 1995) (holding that provisions governing the mechanics of voting are subject to *Anderson-Burdick* while a "content-based restriction on core political speech" is subject to strict scrutiny). Defendants' contorted readings of *Steen* and *Callanen* offer no good basis to cause such rupture. *See Gahagan v. USCIS*, 911 F.3d 298, 304 (5th Cir. 2018) (observing this Court is "always chary to create a circuit split," particularly where it has no reason "to do so").

All of that said, Defendants' preferred test would lead to the same result. Under the *Anderson-Burdick* framework, laws that impose a "severe burden on First Amendment rights" are also subject to strict scrutiny, *Callanen*, 89 F.4th at 490 (quoting *Steen,* 732 F.3d at 387), and the canvassing ban's felony prohibition on speech designed to persuade voters is a severe burden on political speech. *See, e.g., Buckley,* 525 U.S. at 208 (noting that "restrictions on core political speech so plainly impose a 'severe burden'"). Thus, applying the *Anderson-Burdick* framework

would not change the outcome of this case or provide any reason to disturb the district court's order.

### 2. The canvassing ban is not a proper time, place, and manner restriction.

In a final attempt to stave off strict scrutiny and to rationalize the canvassing ban, the RNC wrongly suggests that the law can be upheld as a reasonable time, place, and manner restriction—a theory it advances for the first time on appeal. Not only is this argument forfeited, *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021), it distorts the Supreme Court's forum-based analysis by converting every corner of the state into a nonpublic forum whenever a mail ballot is anywhere in the vicinity.

**1.** A restriction on speech implicates the Supreme Court's forum-based analysis when it "applies . . . in a specific location." *Mansky*, 585 U.S. at 11. In a traditional public forum—*i.e.*, areas that are historically available for public use—the government may not prohibit speech based on its content unless the restriction satisfies strict scrutiny. *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983). But in a nonpublic forum—a space that has not been traditionally open for "public communication"—a content-based restriction on speech is permissible if

the regulation is reasonable and does not discriminate based on the speaker's viewpoint. *Id*. at 46.

The RNC's argument fails because the forum analysis they ask this court to employ is incompatible with a restriction, like the canvassing ban, that applies in an unlimited number of public and private spaces—from streets and sidewalks to dinner tables and living rooms. Indeed, the forum-based framework presupposes that the restriction at issue regulates a *forum—i.e.*, a government-controlled setting to which the public has access. *See* FORUM, Black's Law Dictionary (12th ed. 2024) ("A public place, esp. one devoted to assembly or debate"); *see also, e.g.*, *Perry Educ. Ass'n*, 460 U.S. at 46 (mail system in public schools); *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (public sidewalk access); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (city-owned performance venue); *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 676 (1998) (candidate debate broadcast by state-owned public television station).

The canvassing ban does not regulate speech in any government-controlled forum; it is a felony prohibition on *private speech* that applies *anytime* and *anywhere* a ballot is "presen[t]." Tex. Elec. Code § 276.015.

As the district court correctly concluded, applying forum analysis to the canvassing ban "is impossible here, because there are no restrictions on where in the state a mail-ballot may be present or voted—including in traditional public forums, where content-based restrictions remain subject to strict scrutiny" and on private properties which are not government fora at all. ROA.37565. To adopt such a framework here would "effectively convert[] the entirety of Texas into a polling place where conversations about candidates can create criminal liability." *Id.*

The cases the RNC relies on to cram a roving speech restriction into a forum analysis illustrate the ill fit of that framework here. *Mansky*, for example, implicated the Court's "forum based approach" because the political apparel ban at issue "applie[d] only in a specific location: the interior of a polling place," which is a "government-controlled property set aside for the sole purpose of voting." 585 U.S. at 11, 12. In that scenario, a state may enact certain content-based restrictions on speech "in light of the special purpose of the polling place itself," and the state's consequent interest in preserving the space for that purpose. *Id.* at 16; *see also Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 680 (1992) (noting that public forums are "special enclave[s], subject to

greater restriction").[5] Similarly, the challenged restriction in *Burson* barred speech in "quintessential public forums," including parks, streets, and sidewalks near polling places, "which by long tradition or by government fiat have been devoted to assembly and debate." 504 U.S. at 196 (quotation omitted). And because the challenged law was a "facially content-based restriction on political speech in a public forum," the Court applied strict scrutiny. *Id.* at 198.

The RNC's argument that a forum can be "metaphysical" does not change the fact that there is no discernable forum here. The Supreme Court's decision in *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819 (1995), illustrates the point. That case involved a restriction on access to a public university fund, the purpose of which was "to open a forum for speech and to support various student enterprises." *Id.* at 840. The restriction thus applied to an identifiable—albeit "metaphysical"—setting, which was reserved for a specific purpose. And

---

[5] *Manksy* ultimately held that Minnesota's political apparel ban violated the First Amendment because the state failed to "articulate some sensible basis for distinguishing what [political apparel could] come in from what must stay out." 585 U.S. at 16. Similar line-drawing problems abound here if the canvassing ban could be subject to forum analysis.

the Court employed the forum analysis to determine whether the state "act[ed] to preserve the limits of the forum it ha[d] created." *Id.* at 829.

Similarly, the Ninth Circuit's ruling in *Flint v. Dennison* stressed that forum analysis was applicable to evaluate a spending restriction that applied to a student government election only because "[t]he speech at issue occurred in [a public university] student election system," which was "a forum opened by the University to serve . . . educational interests." 488 F.3d 816, 820 (9th Cir. 2007). Much like the physical polling place in *Manksy*, the student election to which the funding restriction applied had clear boundaries and a specific purpose: it was limited to "the confines of the [university] election," and "the specific educational purpose" of student government. *Id.* at 827, 831. The state thus had an interest in "control[ling] speech in its school election system to preserve the character of that system." *Id.* at 826.

But here, the canvassing ban restricts speech in limitless settings with immeasurable purposes: it is equally applicable in a public park during a community event, on a public sidewalk during a protest, and during a conversation at a family's kitchen table or living room. The ban

simply does not regulate any kind of bounded forum resembling those courts have used to analyze time, place, and manner restrictions.

**2.**     In any event, a forum analysis would not save the canvassing ban because content-based restrictions in a public forum are subject to strict scrutiny—a standard that the ban cannot meet. *See Boos v. Barry*, 485 U.S. 312, 321 (1988) (subjecting content-based speech restriction in public forum to strict scrutiny); *see also infra* Argument § I.B. The RNC attempts to avoid this fate by characterizing all locations within the vicinity of a mail ballot as nonpublic forums. The thrust of their argument is that because physical polling places—and ballots themselves—are government controlled, restrictions on mail voting are necessarily restrictions on nonpublic forums. *See* RNC Br. at 24–26. This argument fails in multiple ways.

*First*, the RNC's observation that the ballot itself is a nonpublic forum is irrelevant. The cases the RNC cites in support of this proposition simply confirm that a ballot cannot be used for other forms of political expression beyond its designated purpose—voting. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 363 (1997); *Mansky*, 585 U.S. at 15; *Oettle v. Guthrie*, 189 N.E.3d 22, 27 (Ill. App. Ct. 2020). But the

canvassing ban does not regulate what appears on the ballot. It criminalizes certain forms of core political speech while merely in the vicinity of a ballot. *See* Tex. Elec. Code § 276.015.

*Second*, the RNC attempts to equate the undefined physical area surrounding a mail ballot (where the canvassing ban applies) with the confined area *inside* a polling, which the Supreme Court treated as a nonpublic forum in *Mansky*, 585 U.S. at 12. In doing so, the RNC all but ignores the Court's reasoning—particularly where the Court explained that the interior of a polling place is a nonpublic forum because it is "government-controlled property set aside for the sole purpose of voting," with rules that "strictly govern who may be present, for what purpose, and for how long." *Id.* The area surrounding a mail ballot, on the other hand, shares none of these characteristics: the mail ballot can appear *in any corner of the state* where a voter decides to carry it, and cannot be considered a forum, much less a nonpublic one. Besides their strained comparison to physical polling locations, the RNC offers no other reason why this Court should accept their logical leap that there is some movable environment around mail ballots that turns that area into a nonpublic forum, wherever it may be.

In sum, the RNC's forum-based arguments are mere distractions from the fact that the canvassing ban is, at bottom, a content-based restriction on political speech and is subject to strict scrutiny. *Reed*, 576 U.S. at 163.

**B.     The district court correctly concluded that the canvassing ban fails strict scrutiny.**

Because strict scrutiny applies, the canvassing ban must be narrowly tailored to achieve a compelling government interest to pass constitutional muster. *See Citizens United*, 558 U.S. at 340; *Veterans of Foreign Wars*, 760 F.3d at 438. "A law is narrowly tailored if it "[1] actually advances the state's interest . . . , [2] does not sweep too broadly . . . , [3] does not leave significant influences bearing on the interest unregulated (is not underinclusive), and [4] could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative)." *Id.* at 440 (quotation omitted). It is not enough that the canvassing ban generally "promotes" some compelling interest—it must be "necessary to serve the asserted [compelling] interest." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992) (quoting *Burson*, 504 U.S. at 199).

**1.** Defendants offer up a grab bag of purported interests, including "preserv[ing] secret voting" and "protecting against vote buying schemes," RNC. Br. at 29, as well as permitting voters to cast a ballot "without interference," State Br. at 35. But they nowhere explain how the canvassing ban *advances* these interests, particularly given preexisting criminal provisions that already prohibit (1) unduly influencing a person's vote in the presence of a ballot or during the voting process, Tex. Elec. Code § 276.013(a)(1); (2) voting or attempting to vote a ballot belonging to another person without their consent or specific direction, *id.* § 64.012(a)(3); and (3) suggesting how the voter should vote while providing assistance or preparing a voter's ballot in a way other than what the voter directs, *id.* § 64.036. As the district court concluded, "these preexisting provisions target the very conduct purportedly regulated by the [canvassing ban]," rendering the law unnecessary to serve the government's alleged interest in preventing voter coercion. ROA.37562–63. Defendants failed below to identify "even *hypothetical* scenarios in which the [canvassing ban] would serve the government's interest in ways that are not already accomplished" by these existing laws. ROA.37563.

Defendants' arguments on appeal fare no better. State Defendants suggest the canvassing ban is non-duplicative because—unlike Tex. Elec. Code § 276.013(a)(1)—it "covers certain efforts to influence a voting decision rather than the exercise of the vote itself." State Br. at 38.[6] But the state has no valid interest in preventing Plaintiffs—or any other advocates—from influencing a voter's decision when a fellow citizen is *not* in the act of voting. In fact, such civic discourse between citizens *is the epitome of core political speech*. And "the First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." *Citizens United*, 558 U.S. at 339 (quotation omitted); *see also NAACP v. Button*, 371 U.S. 415, 437 (1963) (explaining that "'[f]ree trade in ideas' means free trade in the opportunity to persuade to action, not merely to describe facts." (quoting *Thomas v. Collins*, 323 U.S. 516, 537 (1945)); *McIntyre*, 514 U.S. at 346. State Defendants fail to explain—or provide a *single* example—of what unlawful or illegitimate "effort to influence a voting decision" the canvassing ban could reach that existing law does not. Instead, they simply *admit* the canvassing ban

---

[6] This argument runs headlong into the RNC's (textually baseless) efforts to rationalize the canvassing ban by suggesting it applies chiefly when a person is marking their ballot. *See* State Br. at 35; *infra* Argument § I.C.

targets obviously protected activities: using speech to persuade. *See* State Br. at 38.

The RNC takes a different tack, candidly acknowledging that the canvassing ban is "overlapping" with these existing laws, which they suggest is a valid legislative choice. *See* RNC Br. at 31 (citing *Snyder v. United States*, 603 U.S. 1, 19 (2024)). But the RNC's purported authority for that claim addresses methods of statutory construction, *see Snyder*, 603 U.S. at 19, *not* whether a law restricting core political speech satisfies strict scrutiny under the First Amendment. To satisfy strict scrutiny, any burden on political speech must be "*necessary*," *City of St. Paul*, 505 U.S. at 395, not merely convenient to legislative draftsmen.

The RNC's subsequent effort to distinguish the canvassing ban from existing laws is also infirm. It suggests that Tex. Elec. Code § 64.012—which, among other things, prohibits attempting to vote another person's ballot or marking another person's ballot—is not "coterminous" with the canvassing ban because the latter prohibits "induc[ing]" a voter to fill out their ballot a certain way. RNC Br. at 31–32. But § 276.013(a)(1) already targets efforts to deceive a person into voting a certain way and prohibits nefarious efforts to commandeer a ballot such as "by altering

the ballot of another or by otherwise *causing a ballot to not reflect the intent* of the voter." *Id.* (emphasis added). Section 276.013(a)(1) also prohibits interactions that deny a voter the ability to act independently. The canvassing ban, by contrast, broadly restricts efforts to persuade voters as a means to prevent the very actions that the Election Code already prohibits. Tex. Elec. Code § 276.015(a)(2). And while § 276.013(a)(1) successfully limits its scope to the act of voting ("causing a ballot to not reflect the intent of the voter"), the canvassing ban applies any time a ballot is present, even when the ballot is not being marked. Tex. Elec. Code § 276.015(a)(2).

At bottom, both sets of Defendants once again fail to identify even a *theoretical* scenario where the canvassing ban could reach improper conduct not already proscribed by current Texas law so as to actually advance the state's interests. And in their unsuccessful attempt to do so, State Defendants simply concede the canvassing ban outlaws speech meant to influence voters—conduct at the heart of the First Amendment. *See* State Br. at 38. The RNC, too, ultimately can only justify the canvassing ban as a prophylactic prohibition on "activities that *risk* coercion," *i.e.*, speaking to voters. RNC Br. at 33. But strict scrutiny does

not permit such imprecision, and the "existence of [longstanding] alternatives" for prohibiting improper conduct "undercut[s] significantly" any suggestion the canvassing ban serves a compelling purpose. *City of St. Paul*, 505 U.S. at 395 (quoting *Boos*, 485 U.S. at 329).

**2.** For similar reasons, the canvassing ban is also not "narrow[]" in any sense. *Veterans of Foreign Wars*, 760 F.3d at 440. Defendants rely overwhelming on their post-hoc redrafting of the canvassing ban to pass it off as narrow, but notwithstanding their efforts to rewrite the statutory text, the canvassing ban fails to clearly explain when core political speech—urging others to support a cause or candidate—is permitted, and when the same speech constitutes a felony.

For example, the district court found that, because the term "physical presence" is not defined, LULAC Plaintiffs "are unsure how physically proximate a ballot must be to a volunteer or employee to violate the Canvassing Restriction and risk exposure to a decade in prison." ROA.37526 ¶ 75. Similarly, it is unclear whether providing modest gifts or other benefits to volunteers and short-term employees is unlawful because "compensation" is not defined anywhere. ROA.37525 ¶ 71. The district court also found that these vague and undefined terms

have chilled Plaintiffs' interactions with voters because "they are afraid to advocate for ballot measures or candidates in circumstances where voters have historically brought their mail ballots and/or requested assistance." ROA.37576; *see also* ROA.37527–30. Defendants do not dispute these factual findings, much less identify any clear error.

As such, there is no doubt the law "sweep[s] too broadly." *Veterans of Foreign Wars*, 760 F.3d at 440 (quotation omitted). Defendants have no answer to the district court's conclusion that "the legislature could have crafted language specifically targeting speech that is 'intended to defraud, confuse, unduly influence or deceive,'" and "rather than restricting speech whenever a ballot is merely 'present,' the restriction at issue easily could have been limited to instances when a voter is actively completing their ballot." ROA.37564. Instead, the canvassing ban's broad terms prohibit voter persuasion whenever a ballot is "presen[t]," Tex. Elec. Code § 276.015(a)(2), effectively treating the *entirety of Texas* as a polling place where conversations about candidates and causes risk criminal liability.

**3.** By restricting only paid persuasion the ban also leaves a great number of "influences bearing on the interest unregulated" and so is

underinclusive. *Veterans of Foreign Wars*, 760 F.3d at 440 (quotation omitted). Advocating in the presence of a mail ballot remains entirely legal so long as the advocate isn't getting paid or receiving some other benefit. In function, the ban allows canvassing in the presence of a ballot but prohibits certain categories of speakers from engaging in that persuasion. State Defendants offer no credible explanation for this mismatch. They incorrectly claim that Jacquelyn Callanen, the Bexar County Election Administrator, testified that paid canvassers represent "a more acute threat" than volunteers, but Ms. Callanen offered no such testimony. ROA.39615–16. In fact, Ms. Callanen did not discuss canvassing at all in the cited testimony and instead was answering questions about voter registration processes. *Id.* State Defendants' other offering is a state legislator's unrelated soliloquy about the importance of local elections such as those in "municipal utility districts" and "hospital districts" that does not contain even the vaguest reference to persuasion, much less paid canvassing. ROA.48588–89. State Defendants' aspersions about paid canvassers are, at best, their own speculative extrapolation not supported by the testimony they cite.

**4.** Because any valid reach of the canvassing ban hides entirely within the shadow of existing laws, it is clearly not "necessary," *see supra*, to advance the state's interests. The fact that the law fails to even mention the threat against which it supposedly protects—efforts to overcome a voter's free exercise of their vote—affirms that the law is at best an ill-executed miss, and not necessary.

### C. Defendants' efforts to rewrite the canvassing ban to satisfy strict scrutiny fail.

Unable to explain how the canvassing ban is narrowly tailored *as drafted*, Defendants go to great lengths to rewrite it to suit their arguments. But each of these efforts runs headlong into the plain text of the statute, and courts may not "rewrite a . . . law to conform it to constitutional requirements." *Stevens,* 559 U.S. at 481 (quotation omitted) (explaining that courts may "impose a limiting construction on a statute only if it is readily susceptible to such a construction"). This Court should thus "decline to give [the canvassing ban] an additional extra-textual limiting construction in a frantic attempt to rescue it." *Serafine*, 810 F.3d at 369.

Defendants' chief tactic is to imagine that the canvassing ban is focused solely on interactions between voters and canvassers that occur

while a voter is filling out their ballot, larding their briefs with words to that effect.[7] The Legislature could have easily drafted such a law and well knows how. *E.g.*, Tex. Elec. Code § 276.013(a)(1) (prohibiting efforts to "influence the independent exercise of the vote" such as by "altering the ballot of another" or "otherwise causing a ballot to not reflect the intent of the voter"). But it did not. Under the canvassing ban, a speaker commits a *felony* for engaging in plainly constitutional speech—intended to persuade a voter regarding a cause or candidate—if they are simply "in the physical presence of an official ballot or a ballot voted by mail," Tex. Elec. Code § 276.015(a)(2), regardless of whether the voter is completing the ballot or even reviewing it.

The RNC goes so far as to claim that the canvassing ban applies only "during the voting process," RNC Br. at 34, but that argument completely misreads the conjunctive use of "or" in § 276.015(e)(2)

---

[7] *See, e.g.,* RNC Br. at 1 ("casting a vote"), 2 ("while voters are engaged in (or could immediately engage in) the act of voting"), 7 ("fill the ballot out on the spot"), 9 ("while they fill out their mail ballots"), 15 ("filling out her mail ballot"), 17 ("fill out their ballot[s]"),19 ("during voting"), 20 ("the moment at which the voter casts her ballot," "completing a ballot"), 27 ("complete her ballot"), 33 ("walking the voter through the mail ballot and pushing him to fill it out in a particular way"), 38 ("filling out their ballot"); State Br. at 27 ("the harvester makes sure they check the right box"), 35 ("completing their mail ballots").

(excluding "interactions that do not occur in the presence of the ballot *or* during the voting process" (emphasis added)). *Either* condition is sufficient to make such ordinary voter interactions a felony because the statute, plainly read, criminalizes certain voter interactions outside of the voting process so long as a ballot is simply "presen[t]." Tex. Elec. Code § 276.015(a)(2). The RNC's formulation altogether fails to offer a limiting construction that "aligns with the provision's plain text." RNC Br. at 47.

Both sets of Defendants later acknowledge that a ballot's mere physical "presence" is sufficient to trigger the canvassing ban's speech restrictions, but even then they cannot agree on precisely how "present" a ballot must be. *See* RNC Br. at 33; State Br. at 36. The RNC offers that a ballot must be "immediately *at* hand," a gauzy description that apparently does not require physical possession and would extend to a ballot merely sitting on "a table next to the voter." RNC Br. at 33. State Defendants take the more categorical view that the law applies "only when voters have the ballot in hand." State Br. at 36. While the lack of harmony between Defendants on this point is itself troubling given the felony penalties at stake, both of these proposed limiting constructions on the term "presen[t]" appear nowhere in the statute. Again, the

Legislature could have drafted the law to require that a voter physically possess a ballot to trigger the canvassing ban, but it did not. Instead, it drafted a law that leaves speakers to guess whether they are in the "presence" of a ballot if it "lies nearby on the entryway table" or when a "voter brings [her] ballot to a community meeting" where someone intends to speak. ROA.37573.

Unable to mold the statutory text itself, Defendants rely heavily on the testimony of a single witness—former Director of Elections Keith Ingram—to do so instead. *See* State Br. at 27, 28, 35; RNC Br. at 9, 18–19, 26. But Ingram himself repeatedly disclaimed any precise definition of "physical presence," admitting it would require a case-by-case determination where different prosecutors could have different views. *See* ROA.40427; *see also* ROA.40426. He further admitted that the Secretary's office took no official position on the meaning of the term. *See* ROA.40426. And he provided testimony that contradicts the plain text of the statute, including by claiming (in the RNC's paraphrasing) that the restrictions apply only "where a canvasser is interacting with the mail ballot." RNC Br. at 35; *but see id.* at 33 (admitting this is not the case).

Indeed, as the district court found, Ingram *repeatedly* offered testimony that gainsaid "the text of the statute." ROA.37557 (collecting examples).

Most notably, Ingram conceded that "[w]hether or not a prosecutor agrees with" the Secretary's view "is a different story entirely." ROA.40427. That point is critical given State Defendants' laborious effort to disclaim any enforcement role for the Secretary of State and their insistence that the canvassing ban is "enforced wholly by local prosecutors." State Br. at 8. For all these reasons, Defendants' extratextual interpretations of the canvassing ban cannot be reconciled with the First Amendment.

### D. The canvassing ban is not a polling place restriction.

Defendants cannot rely on decisions like *Burson* and *Mansky*, both of which involve polling place restrictions, as those cases simply highlight the canvassing ban's failings. *Burson* concerned a Tennessee law that prohibited certain forms of political speech within 100 feet of a polling place. 504 U.S. at 193–94. That limitation survived strict scrutiny— which Defendants pretend does not even apply here—because it narrowly focused on a clearly defined space where for centuries there had been well-documented "bribery," "intimidation," and "coercion." *Id.* at 200–

206. The Court quoted one commentator's description of the chaotic polling places as "scenes of battle, murder, and sudden death." *Id.* at 204. There is no such record to support the canvassing ban for mail ballots. Defendants have offered no evidence that the living rooms, kitchen tables, and senior centers where the canvassing ban applies are the scene of even mild discomfort, much less "battle." Defendants' speculation and averments cannot make up for what the record so plainly lacks in this case.

And while *Burson*'s restriction applied in a specific space long subject to government control, under the canvassing ban, "public parks and streets will vacillate from moment to moment" as places for speech based on whether a ballot is present. ROA.37565. *Burson* rejected just such geographically amorphous restrictions, explaining that beyond "some measurable distance from the polls . . . governmental regulation of vote solicitation could effectively become an impermissible burden." 504 U.S. at 210. Further, the restriction in *Burson* was linked directly to the act of voting—it restricted speech "around the voting area" on "election-day." *Id.* at 193, 207–08. Only in view of the centuries of polling-place

chaos did Tennessee's law present the "rare case in which . . . a law survives strict scrutiny." *Id.* at 211. There is no record akin to that here.

Similarly, *Mansky* held that a Minnesota law prohibiting the wearing of political apparel within a polling place violated the First Amendment. 585 U.S. at 16–17. Defendants stress the Supreme Court's observation that Minnesota could lawfully exclude "some forms of advocacy . . . from the polling place." *Id.* at 15; *see also* State Br. at 33; RNC Br. at 25. But that observation turned on the need to protect voters specifically "when voting," *Mansky*, 585 U.S. at 15, a limitation that is lacking from the canvassing ban. The Supreme Court emphasized the "unique context" and need to protect voters as they "contemplate their choices" in the "interior of a polling place," *id.* at 12, 15, not to protect them from speech *whenever* a mail ballot is proximate. Unlike an apparel ban in a polling place, the canvassing ban does *not* prohibit speech "only in a specific location," nor does it narrowly regulate "government-controlled property set aside for the sole purpose of voting" on "Election Day." *Id.* at 12.

At bottom, both *Burson* and *Mansky* concern state efforts to restrict speech at *specific* locations at *specific* times when a voter is actually

engaged in the voting process. The canvassing ban, in contrast, applies at some indeterminate distance from a mail ballot, regardless of whether it is being completed. In *Burson* and *Mansky*, the Court weighed the restrictions against a centuries-long, non-speculative history of widespread coercion, intimidation, and violence. As no evidence was presented about such problems in the virtually limitless venues in which the canvassing ban would have force, the district court simply would have had no basis to endorse state control of otherwise lawful speech taking place in living rooms and at kitchen tables across the state of Texas.

## II. Defendants' remaining timing and jurisdictional arguments lack merit or do not apply to LULAC Plaintiffs.

### A. LULAC Plaintiffs' challenge is not premature.

The RNC—but not the State Defendants—contend that LULAC Plaintiffs' First Amendment claim is premature.[8] RNC Br. at 45–48. That suggestion altogether ignores the district court's finding—uncontested by any Appellant—that LULAC Plaintiffs' speech has *already* been chilled (and continues to be chilled) by the canvassing ban. ROA.37527–30.

---

[8] State Defendants argue only that several Plaintiffs' *void for vagueness* claim is premature. State Br. at 15–17. LULAC Plaintiffs did not bring such a challenge. ROA.6695–98; *see also* ROA.37507 n.5.

Facial challenges are not only common and appropriate in such contexts, they are necessary to ensure that "citizens whose speech might otherwise be chilled by fear of sanction can prospectively seek relief." *Justice*, 771 F.3d at 294; *cf. Speech First, Inc. v. Fenves*, 979 F.3d 319, 331 (5th Cir. 2020) ("It is not hard to sustain standing for a pre-enforcement challenge in the highly sensitive area of public regulations governing bedrock political speech." (collecting cases)).[9]

The RNC's repeated emphasis that no Plaintiff has yet been prosecuted under the canvassing ban thus misses the point in several respects. Most obviously, LULAC Plaintiffs have *ceased* engaging in activity that could put them at risk of prosecution. "To insist that a person must break the law in order to test its constitutionality is to risk punishing him for conduct which he may have honestly thought was constitutionally protected. Not only is this prima facie unfair, but it discourages people from engaging in protected activity and enforcing

---

[9] Defendants overread the relevance of the distinction between facial and as-applied challenges. The distinction "goes to the breadth of the remedy employed by the court, not what must be pleaded in a complaint." *Citizens United*, 558 U.S. at 331; *Justice*, 771 F.3d at 292 (same). Furthermore, the district court found the canvassing ban violated the First Amendment "both on its face and as applied to Plaintiffs' speech." ROA.37580.

constitutional rights." *Int'l Soc. for Krishna Consciousness, Inc. v. Eaves*, 601 F.2d 809, 821 (5th Cir. 1979).

In *National Press Photographers Association v. McCraw*, for example, this Court explicitly contrasted pre-enforcement Due Process claims with First Amendment claims, holding that "[i]n pre-enforcement cases alleging a violation of the First Amendment's Free Speech Clause, the Supreme Court has recognized that chilled speech" is a sufficient basis to mount a challenge. 90 F.4th 770, 728 (5th Cir. 2024) (quotation omitted). And this Court found a pre-enforcement First Amendment challenge justiciable because the plaintiffs "ha[d] evidence" that the challenged law chilled their speech and interfered with their ability to engage in similar speech going forward. *Id.* at 783; s*ee also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 301 (1979) (similar). That is precisely the case here. The record conclusively establishes that LULAC Plaintiffs have halted core political activities because of the canvassing ban, and Defendants do not dispute these findings. ROA.37527–30. Because the canvassing ban has already curtailed LULAC Plaintiffs' speech, they cannot be forced to wait until they are

prosecuted to assert their First Amendment rights. *See Int'l Soc. for Krishna Consciousness*, 601 F.2d at 821.

The RNC attempts to torque up Plaintiffs' burden by suggesting that facial First Amendment challenges require courts to construe the statute in a manner that preserves its constitutionality. *See* RNC Br. at 47. But as discussed, *supra* Argument § I.C., Defendants have failed to identify any limiting construction that would be consistent with the plain text of the canvassing ban and render it constitutional. *Cf. Mansky*, 585 U.S. at 22, n.7 (declining to certify First Amendment issue to Minnesota Supreme Court for its interpretation of the statute). Imposing a limiting construction would thus require the Court to impermissibly rewrite the law entirely. *See supra* Argument § I.C; *Stevens*, 559 U.S. at 481 (courts may not "rewrite a . . . law to conform it to constitutional requirements" (quotation omitted)).

## B. LULAC Plaintiffs did not sue State Defendants and thus face no sovereign immunity or standing bar.

State Defendants argue the district court lacked jurisdiction to enjoin *them* as state officials, both under principles of sovereign immunity and Article III standing. State Br. 40–46.

That argument has no force against LULAC Plaintiffs, who did not assert their First Amendment claim against the Attorney General, Secretary of State, or any other state official. ROA.6695; ROA.37523. Instead, LULAC Plaintiffs bring their claim against individual county district attorneys, who did not assert sovereign immunity here. *See* ROA.37530–31 n.18; *Meyers ex rel. Benzing v. Texas*, 410 F.3d 236, 245 (5th Cir. 2005).

LULAC Plaintiffs also have standing to sue the County DAs. Each district attorney sued by LULAC Plaintiffs stipulated that they *will enforce* the canvassing ban absent an injunction in this case. *See* ROA.37523 ¶ 64.[10] The district court thus correctly found that LULAC Plaintiffs face a substantial threat of prosecution that has chilled their speech, ROA.37542–44—an injury directly traceable to the County DAs' duty to enforce the canvassing ban, ROA.37544–46; *see also Speech First, Inc.*, 979 F.3d at 335 ("courts will assume a credible threat of prosecution in the absence of compelling contrary evidence" (quotation omitted)).

---

[10] Several of the County DAs emphasized recent state legislation that threatened district attorneys with removal if they refused to prosecute certain criminal offenses. ROA.28312–13 ¶ 4; ROA.28428 ¶ 8; ROA.37523–24 ¶ 65.

State Defendants do not dispute these findings, let alone claim they are clear error.

## CONCLUSION

This Court should affirm the district court's order.

Dated: February 21, 2025

Respectfully submitted,

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta
Christopher D. Dodge
Marcos Mocine-McQueen
Julie Zuckerbrod
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW,
Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
unkwonta@elias.law
cdodge@elias.law
mmcqueen@elias.law
jzuckerbrod@elias.law

*Counsel for Plaintiffs-Appellees
LULAC, Texas Alliance for
Retired Americans, Texas AFT,
and Voto Latino*

# CERTIFICATE OF ELECTRONIC SUBMISSION

I hereby certify that: (1) all required privacy redactions have been made in compliance with 5th Cir. Rule 25.2.13; (2) the electronic submission of this document is an exact copy of any corresponding paper document, in compliance with 5th Cir. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free from viruses.

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that counsel for Appellees are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta

# CERTIFICATE OF COMPLIANCE

This document contains 11,217 words, excluding parts exempted by Federal Rule of Appellate Procedure 32(f). This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 27(d)(1) because it has been prepared in a proportionally spaced, serifed typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta