# United States Court of Appeals for the Fifth Circuit

---

No. 24-50783

---

United States Court of Appeals
Fifth Circuit

**FILED**

February 12, 2026

Lyle W. Cayce
Clerk

LA UNION DEL PUEBLO ENTERO; SOUTHWEST VOTER REGISTRATION EDUCATION PROJECT; MEXICAN AMERICAN BAR ASSOCIATION OF TEXAS; TEXAS HISPANICS ORGANIZED FOR POLITICAL EDUCATION; JOLT ACTION; WILLIAM C. VELASQUEZ INSTITUTE; FIEL HOUSTON, INCORPORATED; FRIENDSHIP-WEST BAPTIST CHURCH; TEXAS IMPACT; JAMES LEWIN,

*Plaintiffs—Appellees*,

*versus*

GREGORY W. ABBOTT, *in his official capacity as Governor of Texas*; WARREN K. PAXTON, *in his official capacity as Attorney General of Texas*; STATE OF TEXAS; JANE NELSON, *in her official capacity as Texas Secretary of State*; HARRIS COUNTY REPUBLICAN PARTY; DALLAS COUNTY REPUBLICAN PARTY; NATIONAL REPUBLICAN SENATORIAL COMMITTEE,

*Defendants—Appellants*,

REPUBLICAN NATIONAL COMMITTEE

*Movant—Appellant*,

---

OCA-GREATER HOUSTON; LEAGUE OF WOMEN VOTERS OF TEXAS,

*Plaintiffs- Appellees*,

*versus*

KEN PAXTON, *Texas Attorney General*,

*Defendant—Appellant*,

———————————————————

LULAC TEXAS; TEXAS ALLIANCE FOR RETIRED AMERICANS; TEXAS AFT; VOTO LATINO,

*Plaintiffs—Appellees*,

*versus*

KEN PAXTON, *in his official capacity as the Texas Attorney General*,

*Defendant—Appellant*.

———————————————————

Appeal from the United States District Court
for the Western District of Texas
USDC Nos. 1:21-CV-780, 1:21-CV-786,
5:21-CV-844, 5:21-CV-848, 5:21-CV-920

———————————————————

Before JONES and ENGELHARDT, *Circuit Judges*, and SUMMERHAYS, *District Judge*.[*]

EDITH H. JONES, *Circuit Judge*:

Deeply concerned about "the vicious arts by which elections are too often carried," *The Federalist No. 10* (James Madison), the Framers of the Constitution supported election provisions, such as the Electoral College, that aimed to erect "every practicable obstacle . . . to cabal, intrigue, and

———————————————————

[*] District Judge for the Western District of Louisiana, sitting by designation.

No. 24-50783

corruption," *The Federalist No. 68* (Alexander Hamilton).  In accordance with a constitutional design that aspires to maintain free and secure elections, Texas enacted S.B. 1 in 2021.  The statute curtails various activities that incentivize vote fraud and intimidation.  Its provisions are being serially litigated before the district court for reasons that are not obvious considering the similarity of parties, issues, and witnesses.  Before this panel is a provision to prevent professionally conducted ballot harvesting.  Tex. Elec. Code § 276.015.  The district court erred in facially striking down this provision and entering an injunction against state officials in violation of their sovereign immunity.  Accordingly, the district court's judgment is REVERSED.

## I. Background

Following the electoral chaos caused by the COVID pandemic, Texas modernized its election security laws.  S.B. 1 aimed to make "the conduct of elections . . . uniform and consistent throughout [the] state[,] . . . reduce the likelihood of fraud in the conduct of elections, protect the secrecy of the ballot, promote voter access, and ensure that all legally cast ballots are counted."  Tex. Elec. Code § 1.0015.  Because "the potential and reality of fraud is much greater in the mail-in ballot context than with in-person voting," S.B. 1 added additional election integrity provisions to prevent mail ballot fraud.  *Veasey v. Abbott*, 830 F.3d 216, 239 (5th Cir. 2016) (en banc).  Mail ballots are more susceptible to fraud because they render election workers incapable of knowing what happens to the ballot once it is mailed out.  Due to the inherent vulnerability of mail ballots, "[f]raud is a real risk that accompanies mail-in voting."  *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 686, 141 S. Ct. 2321, 2348 (2021).  In particular, "[v]ote buying schemes are far more difficult to detect when citizens vote by mail."  *Id.* at 685, 141 S. Ct. at 2347 (quoting Report of the Comm'n on Fed. Election Reform, Building Confidence in U.S. Elections 46 (Sept. 2005)).

No. 24-50783

One particularly common form of "mail ballot fraud" is known as "vote harvesting." Vote harvesting describes a process whereby paid election operatives "generate applications for mail ballots in . . . targeted precincts." Operatives often go door-to-door, talk to voters, and get them to sign up to vote by mail. More nefariously, vote harvesting can also be accomplished by paid operatives forging applications for voters without the voters' knowledge or consent. Later, once the voters receive the mail ballots that were requested by canvassing or by forgery, the same partisan operatives return to collect the voters' completed mail ballots. As part of the ballot collection process, the partisan operatives ensure that the ballots were cast for a particular candidate.

Unsurprisingly, mail-in voting is a rich field for fraud. Between 2004 and 2021, 72% of all election prosecutions undertaken by the Texas Attorney General involved mail ballot fraud. "[I]t should go without saying that a State may take action to prevent election fraud." *Id.* at 686, 141 S. Ct. at 2348. Faced with evidence of mail ballot fraud, Texas enacted S.B. 1, which contained multiple provisions to address mail ballot fraud.

Section 276.015 of the Texas Election Code defines "vote harvesting services" as "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." Tex. Elec. Code § 276.015(a)(2). A person is guilty of vote harvesting if he "knowingly provides or offers to provide vote harvesting services in exchange for compensation or other benefit." *Id.* § 276.015(b). The illegal vote harvesting interaction must also "occur in the presence of the ballot or during the voting process," "directly involve an official ballot or ballot by mail," be "conducted in-person with a voter," and be "designed to deliver votes for or against a specific candidate or measure." *Id.* § 276.015(e).

The plaintiffs, a group of organizations engaged in get-out-the-vote efforts that could be construed as illegal vote harvesting, have attacked many aspects of S.B. 1. Previously, this court found that at least two of the plaintiff organizations have standing to challenge the vote harvesting statute and held that it was not preempted by the Voting Rights Act. *La Union Del Pueblo Entero v. Abbott*, 151 F.4th 273, 283, 290–93 (5th Cir. 2025).

In this case, plaintiffs sought to enjoin section 276.015 of the Texas Election Code as impermissibly vague under the Due Process Clause of the Fourteenth Amendment and an impermissible content-based restriction on political speech under the First Amendment. The district court ruled for the plaintiffs and enjoined the Texas Attorney General, the Texas Secretary of State, and the district attorneys of Travis County, Dallas County, Hidalgo County, and the 34th Judicial District from enforcing it. Additionally, the Attorney General was enjoined from even "investigat[ing] potential violations of [Texas Election Code] § 276.015," and the DAs were enjoined from deputizing the Attorney General to prosecute violations of the vote harvesting statute. However, this court stayed the district court's injunction pending appeal. *La Union Del Pueblo Entero v. Abbott*, 119 F.4th 404, 407 (5th Cir. 2024).

The state defendants timely appealed.

## II. Standard of Review

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed *de novo*." *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 601 (5th Cir. 2000). Whether a statute violates the First Amendment's protection of free speech "is a mixed question of law and fact" and is reviewed *de novo*. *Baby Dolls Topless Saloons, Inc. v. City of Dall.*, 295 F.3d 471, 479 (5th Cir. 2002) (quoting *Int'l Soc'y for Krishna Consciousness of New Orleans, Inc. v. City of Baton*

No. 24-50783

*Rouge*, 876 F.2d 494, 496 (5th Cir. 1989)).  The district court's decisions on sovereign immunity and standing are reviewed *de novo*.  *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 671 (5th Cir. 2022).

## III. Discussion

### A. Facial Challenge

As an initial matter, the district court erred in granting plaintiffs' facial, pre-enforcement challenge and enjoining this provision before it ever went into effect.  This case illustrates the precise reasons why facial challenges are "generally disfavor[ed]."  *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013).  Facial challenges too often degenerate into conjecture rather than rulings on concrete controversies.  Devoid of any record evidence about how Texas will enforce the vote harvesting prohibition or how Texas courts may interpret the statute, the "factually barebones record[]" consists of nothing more than vague hypotheticals conjured up by the district court.  *Sabri v. United States*, 541 U.S. 600, 609, 124 S. Ct. 1941, 1948 (2004).

Shoddy hypothetical analysis is not what our federalist system requires.[1]  "Under the federalist structure of the United States, the states are responsible for regulating the conduct of their elections."  *Voting for Am.*, 732 F.3d at 387.  A federal district court's intrusion on a state's constitutional

---

[1] The district court gave an interview to the *Wall Street Journal* explaining how he had used artificial intelligence as an adjunct to his work on some aspects of a case "involving Texas[] election law."  Erin Mulvaney, *How Judges Are Using AI to Help Decide Your Legal Dispute*, Wall Street Journal, Jan. 6, 2026, https://www.wsj.com/tech/ ai/how-ai-could-help-decide-your-next-legal-dispute-9cb12517?st=vNF5JG.  Whether it was this case is uncertain.  However, as one distinguished U.S. Senator has commented, AI "must not be a substitute for legal judgment," 171 Cong. Rec. S7751 (daily ed. Oct. 27, 2025) (statement of Sen. Grassley), nor must the public perceive that federal judges outsource our judgment to AI tools.

prerogative cannot be supported by mere speculation. A facial challenge must not "go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450, 128 S. Ct. 1184, 1190 (2008).

As is often the temptation with facial challenges, the district court transgressed "the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id.* at 450, 128 S. Ct. at 1191 (internal quotation marks omitted) (quoting *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 346–47, 56 S. Ct. 466, 483 (1936) (Brandeis, J., concurring)). Proper judicial restraint requires a federal court to "construe the provisions to avoid a constitutional conflict." *Voting for Am.*, 732 F.3d at 387 (quoting *Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 895 (5th Cir. 2012) (per curiam)). "[A] democratically enacted statute" is entitled to "'every reasonable construction . . . in order to save [it] from'" being held facially unconstitutional. *Id.* (quoting *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 563, 132 S. Ct. 2566, 2594 (2012)). In a facial challenge to a state election statute, a federal court must grant "deference to the executive and judicial officials who are charged with implementing it" and determine whether it can be implemented "in such a way as to eliminate . . . the perceived threat to the First Amendment." *Wash. State Grange*, 552 U.S. at 456, 128 S. Ct. at 1194. This deferential analysis requires a court to grant great weight to "any limiting construction that a state court or enforcement agency has proffered." *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 795–96, 109 S. Ct. 2746, 2756 (1989)). Anything less than this deferential analysis "short circuit[s] the democratic process by preventing laws embodying the will of the people from being implemented in

No. 24-50783

a manner consistent with the Constitution." *Voting for Am.*, 732 F.3d at 387 (quoting *Wash. State Grange*, 552 U.S. at 451, 128 S. Ct. at 1191).

It is hard to sustain a facial challenge against a democratically enacted state law. "With the exception of First Amendment cases, a facial challenge will succeed only if the plaintiff establishes that the act is invalid under all of its applications." *Id.* Even in the First Amendment context, the burden to sustain a facial challenge is "daunting." *Id.* In a facial challenge under the First Amendment, a state law is unconstitutional only if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (quoting *United States v. Stevens*, 559 U.S. 460, 473, 130 S. Ct. 1577, 1587 (2010)).

The district court's vagueness and First Amendment analyses equally suffered from the infirmities attendant to largely hypothetical facial challenges to the instant statutory provision.

## B. Void-for-Vagueness

The district court here concluded, on a barren record, that § 276.015 is unconstitutionally vague.[2] The Due Process Clause of the Fourteenth

---

[2] Because there are no concrete examples of enforcement in the record, the only evidence available is testimony from two state officials with differing interpretations of the statute. Former Election Division Director Keith Ingram opined that bus fares paid for volunteer workers would not be illegal compensation or benefit. In contrast, Texas's chief voter fraud prosecutor Jonathan White testified that he would need to conduct legal research to answer that question. The district court held that the existence of divergent views of what counts as compensation "effectively concedes" that the statute is vague and unconstitutional. That is not so. A criminal statute is not necessarily impermissibly vague even when "trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid." *Rose v. Locke*, 423 U.S. 48, 50, 96 S. Ct. 243, 244 (1975) (per curiam). In any event, divergent views at the margins of statutory applicability do not demonstrate that a provision is unconstitutionally vague "in all of its applications." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495, 102 S. Ct. 1186, 1191 (1982).

No. 24-50783

Amendment requires a statute to give "ordinary people . . . fair notice of the conduct a statute proscribes." *Sessions v. Dimaya*, 584 U.S. 148, 155–56, 138 S. Ct. 1204, 1212 (2018) (internal quotation marks omitted). But a statute can be "perfectly constitutional" even if it "use[s] imprecise terms." *Id.* at 159, 138 S. Ct. at 1214; *see also Johnson v. United States*, 576 U.S. 591, 604, 135 S. Ct. 2551, 2561 (2015) ("[T]he law is full of instances where a man's fate depends on his estimating rightly" what the statute requires of him. (quoting *Nash v. United States*, 229 U.S. 373, 377, 33 S. Ct. 780, 781 (1913))). A statutory term "is not unconstitutional if it has some 'common-sense core of meaning . . . that criminal juries should be capable of understanding.'" *Tuilaepa v. California*, 512 U.S. 967, 973, 114 S. Ct. 2630, 2635–36 (1994) (quoting *Jurek v. Texas*, 428 U.S. 262, 279, 96 S. Ct. 2950, 2959 (1976) (White, J., concurring in judgment)). Indeed, "[c]ourts must indulge a presumption of constitutionality and carefully examine a statute before finding it unconstitutional," even when considering "extremely broad" criminal statutes that carry "harsh" penalties. *United States v. Anderton,* 901 F.3d 278, 283 (5th Cir. 2018).

Prevailing in a void-for-vagueness challenge requires a plaintiff to establish that the law is vague, "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Coates v. City of Cincinnati*, 402 U.S. 611, 614, 91 S. Ct. 1686, 1688 (1971). Therefore, a challenger bears the weighty burden of demonstrating that the law is "impermissibly vague in all of its applications." *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023) (quoting *Home Depot, Inc. v. Guste*, 773 F.2d 616, 627 (5th Cir. 1985)). The plaintiffs' vagueness challenge fails this threshold test. As the district court conceded, applying the statute to "prevent paid partisans from haranguing Texas citizens while they fill out their mail ballots" is not vague or unconstitutional.

No. 24-50783

Finally, a void-for-vagueness analysis usually "examine[s] the complainant's conduct before analyzing other hypothetical applications of the law." *Vill. of Hoffman Ests.*, 455 U.S. at 495, 102 S. Ct. at 1191. If a challenger engages in "conduct that is clearly proscribed," he is barred from pursuing a void-for-vagueness challenge based on hypothetical applications of the law. *Id.* The district court inverted this process with its facial, hypothetical approach.

In light of these principles, we examine the district court's conclusions that the terms "compensation or other benefit" and "physical presence" in Section 276.015 are unconstitutionally vague. They are not.

### 1. "Compensation or Other Benefit"

The statute prohibits "knowingly provid[ing] or offer[ing] to provide vote harvesting services in exchange for compensation or other benefit" and "knowingly provid[ing] or offer[ing] to provide compensation or other benefit to another person in exchange for vote harvesting services." Tex. Elec. Code § 276.015(b)–(c). In contrast, the statute does not apply to "an activity not performed in exchange for compensation or a benefit." *Id.* § 276.015(e)(1). The statute defines "benefit" as "anything reasonably regarded as a gain or advantage, including a promise or offer of employment, a political favor, or an official act of discretion, whether to a person or another party whose welfare is of interest to the person." *Id.* § 276.015(a)(1).

These provisions are not recondite: a paid professional may not use illegal means to conduct ballot harvesting nor may a person subsidize such conduct. Had the legislature criminalized both paid and volunteer ballot harvesting, it would not have limited the provision to those who receive a "compensation or other benefit."

Nonetheless, the district court hypothesized that it is unclear whether the statute would prohibit providing volunteers with "a glass of water as a

pick-me-up during a hot afternoon of door-knocking" or "providing volunteers food, water, swag, letters of recommendation, academic credit, gas cards, bus fare, free parking, or even the use of its offices for their advocacy work." The district court opined that neither the plain meanings of the words "compensation" and "benefit" nor the statutory definition of "benefit" could aid in discerning whether something trivial like a glass of water is a form of "compensation or other benefit."

In contrast to this judicial myopia, ordinary citizens serving on a jury "should be capable of understanding" this statute's "common-sense core of meaning." *Tuilaepa*, 512 U.S. at 973, 114 S. Ct. at 2635–36 (quoting *Jurek*, 428 U.S. at 279, 96 S. Ct. at 2959 (WHITE, J., concurring in judgment)). Limiting the statute's scope to "compensation or other benefit" protects campaign volunteers who are presumably less trained than seasoned, salaried political operatives and who have no incentive to harangue voters for pay.

According to ordinary English, the statutory text, and the statutory definition, this statute facially passes constitutional muster. "Benefit" means "[p]rofit or gain; esp., the consideration that moves to the promise . . . [or] [f]inancial assistance that is received from an employer." *Benefit, Black's Law Dictionary* (12th ed. 2024). It can also mean "a service (such as health insurance) or right (as to take vacation time) provided by an employer in addition to wages or salary." *Benefit, Merriam-Webster*, https://www.merriam-webster.com/dictionary/benefit (last visited Nov. 18, 2025). The statutory definition builds on this ordinary English meaning. It defines "benefit" as "anything reasonably regarded as a gain or advantage, including a promise or offer of employment, a political favor, or an official act of discretion, whether to a person or another party whose welfare is of

interest to the person."[3] Tex. Elec. Code § 276.015(a)(1).   In the political context, job offers, political favors, and official acts of discretion are often part of the employment benefits that campaign operatives expect to receive because "the hope of some [patronage] reward generates a major portion of the local political activity." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 104, 110 S. Ct. 2729, 2753 (1990) (Scalia, J., dissenting) (quoting *Elrod v. Burns*, 427 U.S. 347, 385, 96 S. Ct. 2673, 2695 (1976) (Powell, J., dissenting)).

Building on the theme of employment-related gains, "compensation" means "[r]emuneration and other benefits received in return for services rendered; esp., salary or wages." *Compensation*, *Black's Law Dictionary* (12th ed. 2024).   It can also mean "[s]alary or wages, esp. of a public servant; payment for services rendered." *Compensation, Oxford English Dictionary*, https://www.oed.com/dictionary/compensation_n?tab=meaning_and_use #8816104 (last visited Nov. 18, 2025).   Taken together, the ordinary definitions, statutory definitions, and structure of the statute show that the phrase "compensation or other benefit" is not vague.

In addition to the statutory definition and the ordinary meaning of both words, the canon of *noscitur a sociis* strongly implies that the provision is not unconstitutionally vague.[4]   "[T]he canon of *noscitur a sociis* teaches that

---

[3] The plaintiffs concede that the statutory definition provides the "floor for what *must* be considered a 'benefit.'" (emphasis in original).   This concession is fatal, because it undermines their burden to prove that the law is "impermissibly vague in all of its applications." *McClelland*, 63 F.4th at 1013 (quoting *Home Depot*, 773 F.2d at 627).

[4] The plaintiffs argue that the *noscitur a sociis* canon is inapplicable because of Texas's Code Construction Act, which states, "'[i]ncludes' and 'including' are terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded." Tex. Gov't Code § 311.005(13).   But Texas courts "do not consider statutory words and phrases in isolation." *GEO Grp., Inc. v. Hegar*, 709 S.W.3d 585, 594 (Tex. 2025).   Instead, they apply

No. 24-50783

a word is 'given more precise content by the neighboring words with which it is associated.'" *Fischer v. United States*, 603 U.S. 480, 487, 144 S. Ct. 2176, 2183 (2024) (quoting *United States v. Williams*, 553 U.S. 285, 294, 128 S. Ct. 1830, 1839 (2008)). The canon cabins the meaning of statutory terms so that a court does not "ascrib[e] to one word a meaning so broad that it is inconsistent with the company it keeps." *Id.* at 487, 144 S. Ct. at 2183–84 (internal quotation marks omitted) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575, 115 S. Ct. 1061, 1069 (1995)). In the context of the statutory phrase "compensation or other benefit," *noscitur a sociis* supports that the statute is targeting weighty benefits commonly received by professional political operatives in exchange for their work on a campaign, such as a salary, patronage, and official action.

## 2. "Physical Presence"

The district court also erred in holding that the statute's term "physical presence" is vague because it does not indicate how much physical proximity between a canvasser and a ballot is required to establish criminal liability. The district court makes much of hypothetical interactions, such as a ballot harvester's talking with a voter while a ballot is in another room or a campaign worker's speaking to an assembly of voters while some of them have ballots hidden in their bags. These speculative scenarios are inconsistent with a reasonable interpretation of the statute. If criminal juries can understand the "common-sense core of meaning" of the statute, it is not impermissibly vague. *Tuilaepa*, 512 U.S. at 973, 114 S. Ct. at 2635–36

---

the *noscitur a sociis* canon to ensure that words "associated in a context suggesting that the words have something in common . . . be assigned a permissible meaning that makes them similar." *Id.* (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012)).

No. 24-50783

(quoting *Jurek*, 428 U.S. at 279, 96 S. Ct. at 2959 (WHITE, J., concurring in judgment)).

Here, the phrase "physical presence" has a discernible, normative meaning. "Presence" means "[c]lose physical proximity coupled with awareness." *Presence*, *Black's Law Dictionary* (12th ed. 2024); *see also Presence, Merriam-Webster*, http://merriam-webster.com/dictionary/presence (last accessed Nov. 20, 2025) ("the part of space within one's immediate vicinity"); *Presence, Oxford English Dictionary*, https://www.oed.com/dictionary/presence_n?tab=meaning_and_use#285 96772 (last accessed Nov. 20, 2025) ("the immediate vicinity of a person"). "Physical" means "[o]f, relating to, or involving someone's body as opposed to mind." *Physical*, *Black's Law Dictionary* (12th ed. 2024); *see also Physical, OxfordEnglishDictionary*,https://www.oed.com/dictionary/physical_adj?ta b=meaning_and_use#30455352 (last accessed Nov. 20, 2025) ("Of an action, event, etc.: undertaken or attended in person"). With the common meaning of both words in mind, there is little doubt that the phrase "physical presence" covers an in-person interaction where a ballot harvester is knowingly in close physical proximity with a ballot.

To the extent that any doubt remains, the statute clarifies that it only applies to interactions that "directly involve an official ballot." TEX. ELEC. CODE § 276.015(e)(3). "Directly" means "in immediate physical contact." *Directly, Merriam-Webster*, https://www.merriam-webster.com/dictionary/directly (last accessed Nov. 18, 2025). In sum, the statutory text provides a standard sufficient to pass constitutional muster.

Further, in his trial testimony, former Election Division Director Keith Ingram interpreted the statute to prohibit "the voter and the harvester get[ting] together and . . . reviewing the ballot together . . . and the harvester mak[ing] sure they check the right box." Texas courts would give

No. 24-50783

considerable weight to this interpretation of the Secretary of State's Office because the Secretary is charged with interpreting and advising other election officials on the meaning of the Election Code. Tex. Elec. Code §§ 31.003, 31.004; *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 n.6 (Tex. 2011) (holding that Texas courts give "'serious consideration' to an agency's construction of its statute and should uphold the agency's interpretation, so long as it is reasonable and does not contradict the statute's plain language" (quoting *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008))). Because such a narrow interpretation offered by the Secretary of State's office "is not contradictory to the statute, . . . the court was . . . required to accept it." *Voting for Am.*, 732 F.3d at 398. "[B]y failing to accept the State's narrower construction of the Act's text, the district court erred." *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 221 (5th Cir. 2023).

### 3. Mens Rea

Also overlooked by the district court was the important principle that "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Vill. of Hoffman Ests.*, 455 U.S. at 499, 102 S. Ct. at 1193. A "scienter requirement in a statute 'alleviate[s] vagueness concerns,' 'narrow[s] the scope of [its] prohibition[,] and limit[s] prosecutorial discretion.'" *McFadden v. United States*, 576 U.S. 186, 197, 135 S. Ct. 2298, 2307 (2015) (quoting *Gonzales v. Carhart*, 550 U.S. 124, 149–50, 127 S. Ct. 1610, 1828–29 (2007)). This principle applies to election integrity statutes. *See League of Women Voters of Fla. v. Fla. Sec'y of State*, 66 F.4th 905, 947 (11th Cir. 2023) ("The *mens rea* element also undermines any assertion that this phrase is unconstitutionally vague.").

No. 24-50783

Section 276.015 contains four scienter terms. A person violates the statute if the person "*knowingly* provides or offers to provide vote harvesting services in exchange for compensation or other benefit[,] . . . *knowingly* provides or offers to provide compensation or other benefit to another person in exchange for vote harvesting services[,] . . . [or] *knowingly* collects or possesses a mail ballot or official carrier envelope in connection with vote harvesting services." Tex. Elec. Code § 276.015(b)–(d) (emphasis added). The statute additionally defines illegal "vote harvesting services" as "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, *intended* to deliver votes for a specific candidate or measure." *Id.* § 276.015(a)(2) (emphasis added). And in general, Texas law provides that "[i]f the definition of an offense does not prescribe a culpable mental state, . . . intent, knowledge, or recklessness suffices to establish criminal responsibility." Tex. Penal Code § 6.02(c). Therefore, at minimum, a prosecutor must prove criminal recklessness.[5] Criminal recklessness requires a person to be "aware of but consciously disregard[] a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 6.03(c). These numerous *mens rea* requirements "mitigate [the] law's vagueness." *Vill. of Hoffman Ests.*, 455 U.S. at 499, 102 S. Ct. at 1193.

Considering all the foregoing reasons why the statute is not unconstitutionally vague, we need hardly note that, even if ambiguous, the statute would be "construed with lenity," which "reinforces the state's . . . narrowing interpretation." *Voting for Am.*, 732 F.3d at 398.

---

[5] Due to the pre-enforcement nature of this challenge, Texas courts have not yet been able to determine how these statutory *mens rea* requirements interact, demonstrating yet again why pre-enforcement facial challenges are disfavored.

No. 24-50783

## C. First Amendment

### 1. *Anderson/Burdick* Analysis

"Where a state election rule directly restricts or otherwise burdens an individual's First Amendment rights, courts apply a balancing test derived from two Supreme Court decisions" amalgamated as the "*Anderson/Burdick* balancing test." *Voting for Am.*, 732 F.3d at 387; *Anderson v. Celebrezze*, 460 U.S. 780, 103 S. Ct. 1564 (1983); *Burdick v. Takushi*, 504 U.S. 428, 112 S. Ct. 2059 (1992). Under the test, "the court 'must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate.'" *Voting for Am.*, 732 F.3d at 387 (quoting *Anderson*, 460 U.S. at 789, 103 S. Ct. at 1570). Then, "the court 'must identify and evaluate the precise interest put forward by the State as justifications for the burden imposed by its rule.'" *Id.* (quoting *Anderson*, 460 U.S. at 789, 103 S. Ct. at 1570). The court must then weigh these factors. *Id.*

If a statute imposes "a severe burden on First Amendment rights" it "must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* at 388 (quoting *Burdick*, 504 U.S. at 434, 112 S. Ct. at 2063). In contrast, "when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S. at 434, 112 S. Ct. at 2063 (quoting *Anderson*, 460 U.S. at 788, 103 S. Ct. at 1570).

*Anderson/Burdick* review applies to "all First and Fourteenth Amendment challenges to state election regulations." *Acevedo v. Cook Cnty. Officers Electoral Bd.*, 925 F.3d 944, 949 (7th Cir. 2019) (Barrett, J.). While *Anderson/Burdick* does not apply to "pure speech," it applies whenever the regulation in question "control[s] the mechanics of the

electoral process." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345, 115 S. Ct. 1511, 1518 (1995). Laws relating to the "protection of voters" and "prevention of fraud and corrupt practices" are governed by the *Anderson/Burdick* test. *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 140 (3d Cir. 2022) (quoting *Smiley v. Holm*, 285 U.S. 355, 366, 52 S. Ct. 397, 399 (1932)). The Texas vote harvesting statute is designed "to reduce the likelihood of fraud in the conduct of elections," Tex. Elec. Code § 1.0015, by protecting voters from coercion, fraud, and corrupt practices that "directly involve" an official ballot. *Id.* § 276.015(e)(3). Therefore, *Anderson/Burdick* review applies. *Mazo*, 54 F.4th at 140.

The fact that the statute applies only in direct physical proximity to a voter as he or she fills out an official ballot necessitates *Anderson/Burdick* review. While speech that "occurs nowhere near the ballot" receives normal First Amendment review, speech that occurs "within the voting process will typically trigger application of the *Anderson-Burdick* balancing test." *Id.* at 142.

### 2. Strict Scrutiny

But even if strict scrutiny applies, this statute would still pass constitutional muster. Strict scrutiny requires the state "to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 171, 135 S. Ct. 2218, 2231 (2015) (quoting *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734, 131 S. Ct. 2806, 2817 (2011)). While strict scrutiny is an exacting standard, a statute protecting a voter's "right to cast a ballot in an election free from the taint of intimidation and fraud" represent one of the "rare case[s]" where "a law survives strict scrutiny." *Burson v. Freeman*, 504 U.S. 191, 211, 112 S. Ct. 1846, 1857–58 (1992). Because this statute

survives strict scrutiny review, it necessarily satisfies the *Anderson/Burdick* balancing test.

The vote harvesting statute serves multiple compelling state interests. The Supreme Court has long recognized that "a State has a compelling interest in protecting voters from confusion and undue influence" and in "ensuring that an individual's right to vote is not undermined by fraud in the election process." *Id.* at 199, 112 S. Ct. at 1851–52. A state also "indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231, 109 S. Ct. 1013, 1024 (1989).

These compelling interests in election security are heightened for mail-in voting because "[v]ote buying schemes are far more difficult to detect when citizens vote by mail" and "[f]raud is a real risk that accompanies mail-in voting." *Brnovich*, 594 U.S. at 685–86, 141 S. Ct. at 2347–48 (quoting Report of the Comm'n on Fed. Election Reform, Building Confidence in U.S. Elections 46 (Sept. 2005)); *see also Veasey*, 830 F.3d at 239 ("the potential and reality of fraud is much greater in the mail-in ballot context than with in-person voting."). Texas has a compelling interest in preventing the "pressure and intimidation" common in "third-party ballot collection." *Id.* at 686, 141 S. Ct. at 2348. In *Brnovich*, the Supreme Court upheld a vote harvesting law and noted that similar "[r]estrictions on ballot collection are also common in other States." *Id.* at 685, 141 S. Ct. at 2348. In 2020, Arizona, Indiana, Connecticut, New Mexico, Georgia, Missouri, Nevada, North Carolina, Oklahoma, Ohio, Colorado, North Dakota, New Jersey, Minnesota, Arkansas, Nebraska, West Virginia, South Dakota, California, Maine, and Florida all had various forms of vote harvesting restrictions. *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1068–69 (9th Cir. 2020) (Bybee, J., dissenting). Evidence of "widespread . . . consensus" in vote harvesting laws demonstrates that they are "necessary in order to serve the

States' compelling interests in preventing voter intimidation and election fraud." *Burson*, 504 U.S. at 206, 112 S. Ct. at 1855. Texas, like many other states, has a compelling interest in preventing fraud by enacting vote harvesting restrictions.

This statute is narrowly tailored to advance Texas's compelling interests in election integrity. To be narrowly tailored, a law must "actually advance[] the state's interest[,] . . . not sweep too broadly[,] . . . not leave significant influences bearing on the interest unregulated (is not underinclusive), and" be incapable of being "replaced by [any] other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative)." *Dep't of Tex., Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 440 (5th Cir. 2014) (en banc) (quoting *Republican Party of Minn. v. White*, 416 F.3d 738, 751 (8th Cir. 2005) (en banc)).

First, the statute actually advances a number of the Texas's interests. It "protect[s] voters from confusion and undue influence," "ensur[es] that an individual's right to vote is not undermined by fraud," *Burson*, 504 U.S. at 199, 112 S. Ct. at 1851–52, "preserv[es] the integrity of its election process," *Eu*, 489 U.S. at 231, 109 S. Ct. at 1024, and prevents "pressure and intimidation" common in "third-party ballot collection," *Brnovich*, 594 U.S. at 686, 141 S. Ct. at 2348.

Second, the statute is not overbroad. A statute is overbroad only if a "'substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.'" *Wash. State Grange*, 552 U.S. at 449 n.6, 128 S. Ct. at 1190 (quoting *New York v. Ferber*, 458 U.S. 747, 769–771, 102 S. Ct. 3348, 3361–62 (1982)). An overbreadth challenge requires far more than a court's "conceiv[ing] of some impermissible applications of a statute." *Williams*, 553 U.S. at 303, 128 S. Ct. at 1844

No. 24-50783

(quoting *Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800, 104 S. Ct. 2118, 2126 (1984)).

In *Burson*, the Supreme Court rejected an overbreadth challenge to a Tennessee statute that prohibited campaign activity within 100 feet of a polling place. 504 U.S. at 210 n.13, 112 S. Ct. at 1857. The challengers argued overbreadth because a polling place could be located within 100 feet of a road and drivers could be prosecuted for driving by in a car with a political bumper sticker. *Id.* The Court rejected this hypothetical, and it reminded district courts that borderline hypotheticals are best addressed by "as applied" rather than facial challenges. *Id.* In the absence of any factual record suggesting that the statute would operate in such a manner, the Court refused to "entertain the challenge[]." *Id.* Likewise, this case contains no evidence whatsoever that Texas would enforce this vote harvesting statute in an impermissibly broad manner. "Absent evidence to the contrary, [the court is] to presume public-spiritedness" in how election officials will implement the law. *Yarls v. Bunton*, 905 F.3d 905, 910 (5th Cir. 2018). This includes the presumption that officials will not execute the law in a way that it is impermissibly broad and standardless.

Third, the statute is not impermissibly underinclusive. Plaintiffs argue that by applying only to paid vote harvesting, it is underinclusive. This is not a fatal blow, however, because "the First Amendment imposes no freestanding 'underinclusiveness limitation.'" *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449, 135 S. Ct. 1656, 1668 (2015) (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 387, 112 S. Ct. 2538, 2545 (1992)). "A State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns." *Id.* Even under strict scrutiny, the Supreme Court has upheld laws that were underinclusive and "could have restricted even greater amounts of speech in service of their stated interests." *Id.* The Court cited *Burson* as one such case. *Id.*; 504 U.S. at 207, 112 S. Ct.

at 1855–56. In *Burson*, the statute restricted campaign speech within 100 feet of a polling location, but it allowed charitable solicitation, commercial solicitation, and exit polling. 504 U.S. at 207, 112 S. Ct. at 1855–56. The Court rejected the challenger's underinclusiveness argument. Because there was "ample evidence that political candidates have used campaign workers to commit voter intimidation or electoral fraud," the statute justifiably prohibited campaign workers from entering the buffer zone while permitting others to do so. *Id.* at 507, 112 S. Ct. at 1856. States are permitted to enact election laws that "address the problems that confront them" while declining "to regulate . . . problems that do not exist." *Id.* As in *Burson*, Texas has evidence that voter fraud primarily involves paid campaign operatives. Therefore, Texas is permitted to regulate the conduct of paid political operatives while leaving still nascent concerns about campaign volunteers unaddressed.

Fourth, the statute satisfies the least restrictive means test. Texas has other election integrity statutes on the books, but no other law addresses Texas's legitimate interest in preventing the "pressure and intimidation" common with paid "third-party ballot collection." *Brnovich*, 594 U.S. at 686, 141 S. Ct. at 2348. Texas is permitted to "take steps to ensure that partisan discord not follow the voter up to the voting booth, and distract from a sense of shared civic obligation at the moment it counts the most." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 15–16, 138 S. Ct. 1876, 1888 (2018). In the context of mail-in voting, limiting campaign speech in the presence of a voter who is filling out a ballot is the only way to create this desired "island of calm in which voters can peacefully contemplate their choices." *Id.* at 15, 138 S. Ct. at 1887 (internal quotation marks omitted).

Further, the statute is the least restrictive means to "protect the secrecy of the ballot." Tex. Elec. Code § 1.0015. "Limit[ing] access to the area around the voter" while the voter is filling out a ballot is "the only

No. 24-50783

way to preserve the secrecy of the ballot." *Burson*, 504 U.S. at 207–08, 112 S. Ct. at 1856. To protect ballot secrecy, the Supreme Court has upheld regulations creating a "restricted zone" around the "secret ballot." *Id.* at 206, 112 S. Ct. 1855. Permissible restrictions often ban campaign operatives from entering a buffer zone around the entrance and inside a polling place. *Id.* at 211, 112 S. Ct. at 1857–58. "[T]he same concerns about privacy and security at the voting booth readily apply to privacy and security when it comes to mail-in ballots." *La Union Del Pueblo Entero*, 119 F.4th at 409. Texas permissibly addressed these concerns with the vote harvesting prohibition. For mail-in balloting, Texas's vote harvesting statute is the least restrictive means to accomplish the same objectives permitted in the in-person voting context. Therefore, the Texas vote harvesting statute withstands strict scrutiny review and is permissible under the First Amendment.

### D. Sovereign Immunity

The Attorney General and Secretary of State are entitled to sovereign immunity. "Generally, state sovereign immunity precludes suits against state officials in their official capacities." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 400 (5th Cir. 2020). *Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441 (1908), represents "an exception to that baseline rule," and it allows for "relief against state officials acting in violation of *federal* law." *Tex. Democratic Party*, 961 F.3d at 400 (emphasis in original) (quoting *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437, 124 S. Ct. 899, 903 (2004)). For the *Ex parte Young* exception to apply, a "state official[] must have some connection to the state law's enforcement." *Id.* (internal quotation marks omitted) (quoting *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 517 (5th Cir. 2017)). Furthermore, "a mere connection to a law's enforcement is not sufficient—the state official[] must have taken some step to enforce." *Id.* at 401.

No. 24-50783

The Attorney General and the Secretary asserted sovereign immunity here, but the district court denied their motion. The district court not only denied their motion but entered judgment against them in this case while the identical issue was being appealed from that same court in another S.B. 1 case. The district court doubly erred by requiring them to remain as defendants and continuing the litigation against them. First, "it is the general rule that a district court is divested of jurisdiction upon the filing of the notice of appeal with respect to any matters involved in the appeal." *United States v. Paxton,* 148 F.4th 335, 340 (5th Cir. 2025) (quoting *Alice L. v. Dusek,* 492 F.3d 563, 564 (5th Cir. 2007) (per curiam)). Second, this court ruled on the State defendants' appeal and found that neither the Secretary nor the Attorney General is a proper party defendant for challenging the specific portions of S.B. 1 at issue in this appeal. *La Union del Pueblo Entero v. Nelson*, 163 F.4th 239, 263–67, 270–75 (5th Cir. 2025).

Although the State defendants are not proper parties, the injunction still fairly bound the named defendant district attorneys. For sovereign immunity purposes, county DAs may be the best available defendants. *See Mi Familia Vota v. Ogg*, 105 F.4th 313, 328 (5th Cir. 2024). Evaluating how *Ex parte Young* applies requires a "case-by-case approach." *Id.* at 333 (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 280, 117 S. Ct. 2028, 2039 (1997)). Whether or not a party is a proper defendant under *Ex parte Young* is a fact-intensive question based on whether "(1) the state official has 'more than the general duty to see that the laws of the state are implemented,' *i.e.*, a 'particular duty to enforce the statute in question'; (2) the state official has 'a demonstrated willingness to exercise that duty'; and (3) the state official, through her conduct, 'compel[s] or constrain[s persons] to obey the challenged law.'" *Id.* at 325 (quoting *Tex. All.*, 28 F.4th at 672). The second factor was dispositive in *Mi Familia Vota*. *Id.* at 331. District Attorney Ogg "stipulate[d] that she will not enforce the challenged criminal provisions

No. 24-50783

until a final, non-appealable decision has been issued," and this court determined that she did not "demonstrate[] a willingness to enforce the challenged election code provisions." *Id.* at 330–31. This court held she was not a proper party, with the caveat that if she "reneges on her promise, the Plaintiffs may be able to . . . overcome sovereign immunity." *Id.* at 331 n.13. In contrast to District Attorney Ogg, the DAs in this case have stipulated that they will enforce the statute absent an injunction. Under the *Mi Familia Vota* framework, that is enough to overcome sovereign immunity and make them proper parties.

As in *Paxton*, the district court's messy handling of the sovereign immunity issue poses "no jurisdictional bar to our court reaching the merits of this suit and determining the validity of the [statute]." 148 F.4th at 340. Moreover, the injunction against the DAs demonstrably harms the Republican intervenors' interests. This court previously found that the Republican intervenors had a right to intervene to defend S.B. 1, and nothing has changed to disturb that holding. *La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 304 (5th Cir. 2022). For an intervenor to have standing to appeal, it must have suffered an "injury from the judgment of the lower court." *DeOtte v. Nevada*, 20 F.4th 1055, 1070 (5th Cir. 2021). "Standing includes injury in fact, a causal connection, and redressability." *Id.* A threat to a political party's "election prospects" is "a concrete and particularized injury sufficient for standing purposes." *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586–87 (5th Cir. 2006). The Republican intervenors asserted that "Republican voters are more likely to participate in elections and turn out to vote if they have confidence in the integrity of elections, and S.B. 1 increases voter confidence." Therefore, enjoining S.B. 1 harms "the electoral prospects of Republican candidates." "Having found injury in fact in [the Republican intervenors'] threatened loss of political power, we also find causation and redressability." *Benkiser*, 459 F.3d at 587. Republican

No. 24-50783

intervenors' "injury would be redressed by a favorable court ruling that vacated the injunction[]." *DeOtte*, 20 F.4th at 1071.

\* \* \*

For these reasons, the judgment of the district court is REVERSED.